# EXHIBIT 46

Report to Michael Williams, Esq, Re Shoulder Chondrolysis Causation

August 24, 2009

Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.

Professor of Epidemiology, UCLA School of Public Health

Professor of Statistics, UCLA College of Letters and Science

## 1. Introduction

I have been asked by Michael Williams, Esq, to provide my opinions regarding the epidemiologic observations on arthroscopic shoulder surgery that connect postsurgical use of intra-articular pain-pump catheters to subsequent glenohumeral chondrolysis. Section 2 of the present report provides my qualifications to render these opinions, while subsequent sections provide the facts as I know them and the reasoning I used to form my opinions. All of these opinions are held to a reasonable degree of scientific certainty. They are subject to change upon receipt of further evidence or information regarding this topic. I also reserve the right to respond to criticisms offered by defense experts or other parties.

## 2. Qualifications

My qualifications for this evaluation are extensive, as follows:

a) I am an author of over 300 peer-reviewed articles, over 60 published letters, over 130 published abstracts, and over 30 other publications including book chapters and scientific encyclopedia entries for major publishers. Of particular relevance is that I have written and published over 100 peer-reviewed articles on the summarization, analysis, interpretation, and limitations of scientific literature, including determination of causation (see my curriculum vitae).

b) The textbook I have co-authored with Kenneth J. Rothman, *Modern Epidemiology* (2nd ed. 1998; Lippincott, Philadelphia; 3rd ed. 2008), has been selected as the advanced epidemiologic reference text in numerous schools of public health and medicine. *Modern Epidemiology* has also been authoritatively cited in innumerable peer-reviewed journal articles and reviews including the Federal Judiciary Center's *Reference Manual on Scientific Evidence*, in large measure because of its extensive coverage of issues in determining causes of effects and effects of causes.

c) I have received honors and professional certifications including Fellow of the American Statistical Association and as a Fellow and a Chartered Statistician of the Royal Statistical Society. I am a member of the Biometric Society and the Society for Epidemiologic Research. I have served on the Executive Committee for the latter society, which is the largest society of epidemiologists in the world today, and as Chair of the Epidemiology Section of the American Statistical Association, which is the largest statistical society in the world today.

d) I have served as a consultant in epidemiology and statistics for numerous government agencies and private corporations, including the National Academy of Sciences (NAS), the National Institute of Environmental Health Sciences (NIEHS), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the Centers for Disease Control (CDC), the California State Attorney General's Office (regarding risk assessment), the California State Department of Health, the World Health Organization (WHO), The March of Dimes, General Electric, Southern California Edison, Dow Corning, Boehringer-Ingelheim, and Amgen. I currently serve as a member of the FDA Drug Safety and Risk Management Advisory Committee (DSaRM).

e) I have been invited to give and have given over 200 presentations and workshops at such institutions as Oxford University, Cambridge University, Stanford University, Harvard University, Yale University, Johns Hopkins University, Columbia University, Case Western School of Medicine, Albert Einstein College of Medicine, McGill University, Emory University, Tulane University, the National Cancer Institute, the Food and Drug Administration, the Centers for Disease Control, the International Agency for Research on Cancer, the Royal Statistical Society, the American Statistical Association, the Society for Epidemiologic Research, the Society for Perinatal and Pediatric Epidemiology, the International Epidemiological Association, the International Society for Pharmacoepidemiology, the Australasian Epidemiological Association, the Universities of Washington, Texas, Quebec, Pennsylvania, North Carolina, Montreal, Minnesota, Michigan, California, British Columbia, and Alberta, as well as universities, research institutes, and conferences in England, Scotland, Germany, Denmark, Sweden, Finland, Norway, The Netherlands, France, Switzerland, Spain, Italy, Japan, Australia, and New Zealand.

f) I received a Doctorate in Public Health (Dr.P.H. 1978) from the University of California, Los Angeles, where I majored in Epidemiology, minored in Mathematics, and received a Regents Fellowship in Epidemiology. I also received a Master's degree in Mathematics from the University of California, Berkeley (1973), where I received highest honors and a Regents Fellowship in Mathematics.

g) I have been teaching epidemiology and statistics at the UCLA School of Public Health since 1979. I currently am Professor of Epidemiology, UCLA School of Public Health, and Professor of Statistics, UCLA College of Letters and Science.

h) I have served as an investigator on over 30 grants and contracts from numerous research agencies, including the National Cancer Institute, National Institute of Child Health and Human Development, National Institute of Mental Health, National Institute of Environmental Health Science, National Institute of Allergy and Infectious Diseases, National Institute on Drug Abuse, National Center for Health Services Research, National Highway and Traffic Safety Administration, Rockefeller Foundation, Public Health Institute, Electric Power Research Institute, and the State of California. I have also carried out research for private industry including the Battelle Corporation, Southern California Edison, the Dow-Corning Corporation, Boehringer-Ingelheim Pharmaceuticals, and the General Electric Corporation.

i) I have served three terms as an Associate Editor of the *American Journal of Epidemiology* (1984-98) and the journal *Epidemiology* (1989-2006), and now serve as an Associate Editor of *Statistics in Medicine* (1985-present) and the *European Journal of Epidemiology* (2003-present). I also serve as a regular referee for American Journal of Epidemiology, Epidemiology, International Journal of Epidemiology, and Statistics in Medicine, have served as a referee for the American Journal of Public Health, the American Statistician, Annals of Epidemiology, Biometrics, Biometrika, Communications in Statistics, Computational Statistics and Data Analysis, Controlled Clinical Trials, International Statistical Review, Journal of the American Medical Association, Journal of the American Statistical Association, Journal of Clinical Epidemiology, The New England Journal of Medicine, and the Scandinavian Journal of Work, Environment, and Health, and have served as a textbook reviewer for Oxford University Press, John Wiley & Sons, and other academic publishing houses.

## 3. The Hansen et al. study

For brevity, in what follows I will refer to "postsurgical use of intra-articular pain pump catheters" as intra-articular pump use, and I will refer to "postarthroscopic glenohumeral chondrolysis" as chondrolysis. I am aware of one published comparative clinical epidemiologic investigation of the association between intra-articular pump use and chondrolysis, the study by Hansen et al. (which examined pumps eluting bupivacaine with epinephrine) appearing in the Journal of Sports Medicine in 2007.

Hansen et al. characterize their study as a case series, as does the defense expert Judith Jones in her report of July 24, 2009. However in the classification schemes found in standard epidemiologic texts such as *Modern Epidemiology* (2nd ed. 1998, 3rd ed. 2008), this study would correspond to a historical (retrospective) cohort study. This is because the "case series" referred to by the authors is composed of two cohorts of surgeries: A cohort of surgeries in which the shoulder was exposed to the intra-articular pump, the other in which the shoulder was not exposed. In standard epidemiologic terms, the term "case" refers not to all the subjects in a study, but instead refers only to those who go on to experience the adverse event under study. Thus, in epidemiologic terms, the "cases" in the Hansen et al. study are not the surgeries, but rather only those shoulders that go on to experience chondrolysis after their surgery.

The structure of the Hansen et al. study is also the same as the second part of a classic epidemiologic outbreak investigation, in which a group experiences an unusually high frequency of some adverse event. The common example is an outbreak of food poisoning among those attending a social event or restaurant. Typically, the group is first divided into those with and without the event, and their exposure histories compared. Then when an exposure is identified as

being more common in the cases (those experiencing the adverse event, which here is chondrolysis), the group is divided into those with and without the exposure (here, the intra-articular pump) to compare the incidence of adverse events among those exposed to those unexposed.

A comparison of the post-surgical outcomes reported in Hansen et al. is given in the following table comprising two cohorts, those with the intra-articular pump and those without:

| | Intra-articular pump | Other treatment | Total |
|---|---|---|---|
| Chondrolysis | 12 | 0 | 12 |
| No chondrolysis | 7 | 158 | 165 |
| Total | 19 | 158 | 177 |
| Percent with chondrolysis | 63% | 0% | |

The standard statistical estimates and tests from this table (see Rothman and Greenland, 1998, Chapters 13 and 14) are as follows:

1. The proportion getting chondrolysis in the intra-articular pump group is 63%, compared to 0% (no one) in the group without the pump, a dramatic difference in absolute and relative terms.
2. The two-sided P value from Fisher's exact test for association of the intra-articular pump with chondrolysis is less than 0.0001. This means that the association is orders of magnitude beyond anything chance alone could produce.
3. The odds ratio is the odds of chondrolysis in the intra-articular pump group divided by odds of chondrolysis in the other group. The actual odds ratio from the table is 12(158)/0(9) = 1896/0, which is infinity. The median unbiased estimate for odds ratio is 321. This is a larger

association than that seen between some of the deadliest exposures and death. For comparison, the association seen between a lifetime smoking a pack of cigarettes a day and lung cancer is on the order of 10.

4. For the above table, the Fisher's exact lower 95% confidence limit for odds ratio is 47. This means, that if we conduct a statistical test of any hypothesized value for the odds ratio that is less than 47, we will find that the P-value for that value is less than 0.05. For example, if we test the hypothesis that the odds ratio is 10 (roughly the association seen between a lifetime smoking a pack of cigarettes a day and lung cancer), we obtain an exact P-value less than 0.001.

To assess the sensitivity of these results to alternative ways of constructing the cohorts from the data published by Hansen et al., I repeated the above analysis restricting the second ("other treatment") cohort to

1) compare outcomes of surgeries using intra-articular pumps (19 surgeries, 12 with chondrolysis) to surgeries using extra-articular pumps (104 surgeries, none with chondrolysis);

2) compare outcomes of arthroscopic-stabilization surgeries using intra-articular pumps (19 surgeries, 12 with chondrolysis) to arthroscopic-stabilization surgeries using no pump (11 surgeries, none with chondrolysis);

Both of these analyses were then repeated to compare outcomes of patients rather than surgeries using intra-articular pumps (17 patients, 10 with chondrolysis). In none of these comparisons was there a change in the statistical conclusions: The association of the intra-articular pump with chondrolysis remained far beyond chance expectation (Fisher exact P-value always less than 0.005, which is 10 times smaller than the usual .05 level for "statistical significance"); the percent experiencing chondrolysis with the intra-articular pump remained around 60%, versus

0% without the pump; the mid-P odds ratio was always greater than 10; and the lower Fisher-exact 95% confidence limit for the odds ratio was always greater than 2.

The bottom line is that the association seen in the study by Hansen et al. is far beyond anything normally seen, even with exposures as deadly as heavy lifetime cigarette smoking. It cannot be ascribed to chance alone. That leaves only explanations in which some nonrandom mechanism is operating to produce the association.

Having eliminated chance or coincidence as a plausible explanation, the only question is then whether one can invoke a plausible mechanism with scientific support in the literature that can explain away the association of intra-articular pumps with chondrolysis seen in Hansen et al. without need to invoke a causal effect of intra-articular pumps themselves. As I will explain next, this has not been done and there are good reasons to think it cannot be done.

**4. Other factors in the association of intra-articular pumps with chondrolysis**

The Hansen et al. study was conducted in a single practice, concerns only surgeries done at that practice, and uses records entirely and exclusively from that practice. Thus one cannot explain away the association as being due to differences in practice or reporting of outcome events. Especially in light of the seriousness of the outcome, it is simply not credible to claim that anything approaching the 63% chondrolysis rate actually occurred in those without intra-articular pumps and simply went unreported. Thus we must turn to other explanations for the association observed in Hansen et al.

The report of the defense expert, Judith Jones, raises the possibility that the association might be ascribed to factors associated with use of pumps are also causing chondrolysis. This is known as a confounding hypothesis (e.g., see Chapter 4 of Rothman and Greenland, 1998; Greenland et al., 1999; Greenland and Morgenstern, 2001; or Greenland, 2007).

Note first that if other factors merely acted in concert with the intra-articular pump to produce chondrolysis, this concerted action alone would not absolve intra-articular pumps as responsible for chondrolysis (any more than the existence of co-conspirators in a murder absolves any of the murderers of guilt). In that case the other factors would merely be causal cofactors or co-causes of chondrolysis in what is known as a multifactorial etiology, and intra-articular pumps would remain as primary contributory causes of chondrolysis.

As explained in Chapter 2 of Rothman and Greenland (1998), causal cofactors exist for every adverse event (e.g., cigarettes must be inhaled rather than just puffed to seriously elevate lung-cancer risk). It is therefore neither surprising nor relevant that cofactors would exist if pumps cause chondrolysis. In fact, we can see from the table that such factors *must* exist, since 37% of the surgeries receiving the pump did not get chondrolysis (and so must not have had the necessary cofactors present). For comparison, it is worth noting that most heavy smokers do *not* get lung cancer; smoking only tremendously elevates their risk of lung cancer, which is rare but does occur in the absence of smoking. In contrast, most patients in the Hansen et al. study who received the intra-articular pump suffered chondrolysis, indicating that either the effect of the pump is less dependent on cofactors, or its cofactors are quite common.

The only way other factors could explain away the observed association would be if the intra-articular pumps were associated with chondrolysis only by virtue of an innocent association with these other causal factors, rather than through any effect of their own. Such an alternative explanation is highly speculative. Furthermore, for reasons I will now explain, I regard it as an incredible hypothesis, due to the enormity of the observed association.

As was shown by leading epidemiologists a half century ago when they fought cigarette companies on the effects of tobacco (Cornfield et al., 1959; Bross et al., 1967), for these other factors to produce an association as large as that seen, they would have to have net associations with the exposure and the adverse event larger than the observed association of the exposure (here, intra-articular pump) with the adverse event (here, chondrolysis); see also Greenland (2003). Because the association of the intra-articular pump with chondrolysis is itself enormous (infinite on the ratio scale), these factors would have to occur almost exclusively among those selected to receive the pumps, and also would have to elevate the risk of chondrolysis from 0% to well over 60%.

In other words, these factors would have to almost never occur except when the intra-articular pump is given, and they would have to have an even stronger effect on chondrolysis than the pump appears to have. To the best of my knowledge, no assemblage of other factors with these amazing characteristics has ever been proposed in the peer-reviewed medical literature, let alone verified to congregate exclusively in arthroscopic shoulder-surgery patients who receive intra-

articular pumps. Furthermore, the statistics given above demonstrate that a chance clustering of such factors among those with pumps is far beyond unlikely (of less than ½% probability) .

While Dr. Jones lists a number of other factors that have been associated with chondrolysis, she provides no data on how strongly they are associated with chondrolysis, either individually or in aggregate, or that they have the properties needed to explain away the observed association of the intra-articular pump with chondrolysis. In particular, Dr. Jones provides no data to show that the factors are strongly associated with intra-articular pumps, or that they can elevate risk of chondrolysis beyond 60%. Both these conditions would need to be satisfied for these other factors to fully explain away the association of intra-articular pumps with chondrolyis as seen in Hansen et al. Yet Hansen et al. reported no other associations of factors with chondrolysis; this fact suggests that there were no such enormously strong other factors, for if those did exist they would have been as obviously associated with chondrolysis as was the intra-articular pump.

I therefore regard as profoundly if not fancifully speculative the idea that “other factors” could explain the observed association of intra-articular pumps with chondrolysis. It is based on no scientific evidence for the enormous associations that would be needed for other factors to explain away the observed association. It thus appears to be no more than a contrivance that diverts attention away from the actual scientific evidence. By comparison, the hypothesis that some aspect of intra-articular pump use (e.g., the composition of the injected fluid) caused the chondrolysis seen among the patients in the Hansen et al. study is straightforward and requires no contrived, improbable, or speculative auxiliary hypothesis to operate.

**5. Other data**

The results reported above and by Hansen et al. are supported by case series published in the peer-reviewed literature, such as that by McNickle et al. (2009) reporting 16 intra-articular pain pumps among 20 cases of glenhumoral (shoulder) chondrolysis, that by Fester and Noyes (2009) reporting 3 intra-articular pain pumps among 3 cases of knee chondrolysis, and other case reports of chondrolysis following use of intra-articular pumps reviewed by Fester and Noyes (2009). Causation by the intra-articular pump is also supported by laboratory studies finding that the analgesics eluted by such pumps appear toxic to both human and animal chondrocytes (Chu et al., 2006; Gomoll et al., 2006; Karpie and Chu, 2007; Piper and Kim, 2008).

In addition to currently published data, there is an as-yet unpublished study by Dr. Frederick Matsen, M.D., of 396 arthroscopic shoulder surgeries performed in the practice of Dr. Brooke Benz, M.D., from 1996 to 2008, described by Dr. Matsen in the transcript of his testimony of 5 March 2009 in re Grossnickle et al. vs. Stryker Corp. et al. The results reported by Dr. Matsen in his testimony closely resemble those reported by Hansen et al.: Based on the numbers Dr. Matsen describes on pages 1664-1666 of the transcript, there was not a single case of chondrolysis reported among the 281 (71% of 396) surgeries that did not receive the intra-articular pain pump. In stark contrast, among the 115 (29% of 396) of surgeries that received the intra-articular pump, about 48 (12% of 396) developed chondrolysis, which 48/115 = 42% of those receiving the intra-articular pump. As in the Hansen et al. study, this represents an enormous association, with a Fisher exact P-value less than 0.001, ruling out chance clustering of other factors among those with the pump as a sole explanation. The odds ratio is again infinite,

with a median-unbiased estimate for the odds ratio of 282 and a lower exact confidence limit of 50.

In statistical terms, the results from the data reported by Dr. Matsen are strikingly close to the results from the Hansen et al. study. As with the latter study, the association observed by Dr. Matsen is far too large to be credibly explained by any other factor that has been shown linked to chondrolysis. Furthermore, chondrolyis ceased occurring in this practice after use of intra-articular pumps was discontinued in 2006. As has long been recognized (e.g., see Hill, 1965), it is a hallmark of causation that the adverse event (here, chondrolysis) disappears after the exposure in question (here, the intra-articular pump) is removed. Thus, the study by Dr. Matsen strongly confirms the findings of Hansen et al.

**6. Conclusion**

In standard epidemiologic terms, the data from Hansen et al. can be legitimately analyzed as a comparative retrospective cohort study comparing surgeries (or patients) with and without the intra-articular pump. When analyzed in this fashion, the association exhibited is far larger than anything commonly seen in epidemiology, and thus difficult to explain away except in a most contrived fashion lacking in evidential support. The simplest explanation, and the one most consistent with other literature, is that the use of the intra-articular pump is indeed the cause of the chondrolysis observed in the study (apparently due to the toxicity of the analgesics eluted by the pump).

Based on the considerations detailed above, I regard the evidence provided by the Hansen et al. study as providing strong positive support for the hypothesis that postarthroscopic glenohumeral

chondrolysis was and can be caused by use intra-articular pain pumps eluting bupivacaine with epinephrine. The nature of this evidence is strong enough that I would regard it as an unethical to conduct a prospective study or randomized trial of intra-articular pain pumps, and I believe no institutional review board would approve such a study. Thus retrospective cohorts such as those by Hansen et al. and Matsen are the best evidence we can expect to obtain bearing on the effect of intra-articular pain pumps.

In summary, causation of chondrolysis by some aspect of intra-articular use of pain pumps is far more credible and consistent with other findings than alternative explanations that have been offered for the dramatic association observed in these studies. Thus, with high scientific certainty, I would infer that the intra-articular placement of the pain-pump catheters was a primary and essential contributing factor to the development of chondrolysis in the cases reported by Hansen et al. and by Dr. Matsen.

August 24, 2009

Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.

**6. References**

Bross, I.D.J. Pertinency of an extraneous variable. *Journal of Chronic Diseases* 1967; 20:487-495.

Chu, C.R., Izzo, N.J., Papas, N.E., Fu, F.H. In vitro exposure to 0.5% bupivacaine is cytotoxic to bovine articular chondrocytes. *Arthroscopy* 2006; 22:693-699.

Cornfield, J., Haenszel, W.H., Hammond, E.C., Lilienfeld, A.M., Shimkin, M.B.,Wynder, E.L. Smoking and lung cancer: recent evidence and a discussion of some questions. *Journal of the National Cancer Institute* 1959; 22:173-203.

Fester, E.W., Noyes, F.R. Postoperative chondrolysis of the knee: 3 case reports and a review of the literature**.** *The American Journal of Sports Medicine* 2009; 37: in press.

Gomoll, A.H., Kang, R.W., Williams, J.M., Bach, B.R., Cole, B.J. Chondrolysis after continuous intra-articular bupivacaine infusion: an experimental model investigating chondrotoxicity in the rabbit shoulder. *Arthroscopy* 2006; 22:813-819.

Greenland, S. Quantifying biases in causal models: classical confounding versus collider-stratification bias. *Epidemiology* 2003; 14:300-306.

Greenland, S., Robins, J. M. and Pearl, J. Confounding and collapsibility in causal inference. *Statistical Science*, 1999; 14:29-46.

Greenland, S. and Morgenstern, H. (2001). Confounding in health research. *Annual Reviews of Public Health*, 2001; 22:189-212.

Greenland, S. (2007). Confounding. In: Boslaugh, S. (ed.). *Encyclopedia of Epidemiology*. Thousand Oaks, CA: Sage Publications, 2007.

Hansen, B.P., Beck, C.L., Beck, E.P. and Townsley, R.W. Postarthroscopic glenohumeral chondrolysis. *The American Journal of Sports Medicine* 2007; 35:1628-1635.

Hill, A.B. The environment and disease: association or causation? Proceedings of the Royal Society of Medicine 1965; 58:295-300.

Jones, J. Report of Opinions, Huerta v. I-Flow Corporation, July 24, 2009.

Karpie, J.C., Chu, C.R. Lidocaine exhibits dose- and time-dependent cytotoxic effects on bovine articular chondrocytes in vitro. *The American Journal of Sports Medicine* 2007;35:1621-1627.

Matsen, Frederick. Testimony in transcript of proceedings, vol. 7-A, 5 March 2009, in the circuit court of the State of Oregon for the County of Multnomah, in re Grossnickle et al. vs. Stryker Corp. et al., case no. 0703-02834.

McNickle, A.G., L'Heureux, D.R., Provencher, M.T., Romeo,A.A., Cole, B.J. Postsurgical glenohumeral arthritis in young adults. *The American Journal of Sports Medicine* 2009; 37: in press.

Piper S.L., Kim, H.T. Comparison of ropivacaine and bupivacaine toxicity in human articular chondrocytes. *Journal of Bone and Joint Surgery*, American Volume, 2008; 90:986-991.

Rothman, K. J. and Greenland, S. (1998). *Modern Epidemiology*, 2nd ed. Philadelphia: Lippincott-Williams-Wilkins. (3rd ed. 2008).

Expert Testimony by Sander Greenland 1997-2009,
including reports, declarations, affidavits, depositions, and court appearances

1. Testimony regarding epidemiologic evidence on health effects of silicone implants before Rule 706 National Science Panel hearings, Birmingham, Alabama, July 1997.
2. Hall vs. Babcock and Wilcox (Pennsylvania), telephone deposition as plaintiff expert, and declaration regarding probability of causation, March 1998.
3. Halton vs. Bristol-Myers (Missouri), deposition regarding epidemiologic evidence on silicone implant rupture rates, Jan. 2000.
4. Aguayo et al. vs. PG&E, Betz Laboratories, et al. (California), declaration at request of plaintiffs regarding 1999 article by Boice et al., Feb. 2000; deposition, Feb. 2001.
5. Judicial Council Coordination Proceeding 2967. Lockheed litigation (California), deposition as plaintiff expert regarding 1999 article by Boice et al., Nov. 2000.
6. Magistrini vs. 1-Hour Martinizing et al., United States District Court, New Jersey, no. 96-4991, declaration and deposition as plaintiff expert regarding qualifications of David Ozonoff, Dec. 2000; testimony at Daubert hearing regarding declaration, June 2001.
7. Burbank Environmental Litigation, United States District Court Central District of California Master File No. 96-5584 MPR (ANx), declaration for plaintiffs regarding 1999 article by Boice et al., Feb. 2001; declaration regarding whether a relative risk below 2 or lack of statistical significance constitute evidence against causation, June 2001.

8. Rider vs. Sandoz Pharmaceuticals Corp. et al., United States Court of Appeals 11th Circuit 01-11965BB, amici brief (with Michael Green) in support of plaintiffs regarding whether epidemiologic evidence is necessary in determining causation, July 2001.
9. Kennedy v. Southern California Edison, no. 98-56157, DC no. CV-95-03769-NAJ/RBB. Declaration re the calculation of the Probability of Causation ("PC") estimate presented on p. 13897 of the Opinion of the United States Court of Appeals, 9th Circuit, 2001.
10. The People vs. Alva-Amco (California), deposition as state expert regarding risk assessment of coal-tar containing shampoos, Nov. 2001; deposition Dec. 2001.
11. Baxter Healthcare Corporation vs. Joan Denton et al. (California), written direct testimony as state expert regarding written direct testimony of Patricia A. Buffler, Ph. D., Jan. 2002.
12. Rita Smith vs. Wyeth-Ayerst et al., United States District Court (Western District North Carolina) 3:01 CV 355V, affidavit for plaintiffs regarding whether a P-value above 0.05 (lack of "statistical significance") implies the result is "scientifically unreliable", Aug. 2002.
13. Redlands Tort Litigation, Superior Court of the State of California for the County of San Bernardino, West District, no. RCV 31496, deposition as plaintiff expert regarding epidemiologic and statistical methods, Feb.-Oct. 2003; declaration regarding "Rebuttal Report" and "TCE and Cancer in Humans" by Dr. Jack Mandel, Sept. 2004.

14. Sharon Thompson vs. American Home Products et al., United States District Court (Idaho), no. CV-01-287-E-BLW, affidavit for plaintiffs regarding whether a P-value above 0.05 (lack of "statistical significance") implies the result is "scientifically unreliable", and regarding attempts by Wyeth-Ayerst to discredit alternatives to significance testing, Mar. 2003.
15. Hanford Nuclear Reservation Litigation, United States District Court of Appeals, 9th Circuit, CV-91-03015-AAM, deposition as plaintiff expert regarding the Hanford Thyroid Disease Study (HTDS), Aug. 2004; declaration regarding defendants' brief in support of motion to exclude expert testimony, Nov. 2004; declaration regarding defendants' memorandum in support of motion for summary judgment, Mar. 2005; court testimony May and November, 2005.
16. The People vs. Tri-Union Seafood et al. (California), deposition as state expert regarding surveys of tuna consumption and mercury levels in tuna, July, 2005; court testimony December, 2005.
17. Irrer et al. v. Milacron, Inc., declaration as plaintiff expert regarding the series of articles published by Eisen and colleagues on metalworking fluids and cancer, March, 2006; deposition July 2006.
18. Scottsdale vs. Castellini (arbitration). Declaration as plaintiff expert regarding CDC report on outbreak of hepatitis A linked to green onions, February 2007; deposition April 2007; testimony June 2007.

19. Omnibus Autism Proceedings. Declaration and Reports as plaintiff expert regarding the need for examination of further evidence, January 2006 and August 2007, and testimony before Special Masters, U.S. Court of Appeals, May 2008.
20. Multidistrict Litigation vs. Ortho-McNeil. Expert for plaintiffs regarding epidemiologic and statistical evidence relating the Ortho-Evra contraceptive patch to thromboembolic and cardiovascular events, reports July 2007 and January 2008, deposition March 2008.
21. In re: Neurontin Marketing and Sales Practices Multi-District Litigation. Expert reports for plaintiffs regarding the epidemiology of Neurontin® (gabapentin) and suicidal behavior, October 2007; March, May, July 2008; May 2009. Testimony July 2009.
22. In re: Tesauro and Elizabeth Eley vs. The Quigley Corporation. Expert report for plaintiffs regarding the effectiveness of zinc lozenges for treatment of common colds, September 2008; testimony, January 2009.
23. In re: Zhao vs. Walt Disney World. Expert report for plaintiffs regarding the relevance of statistical testimony for a witnessed accident, April 2009.
24. In re: Various plaintiffs vs. GlaxoSmithKline. Expert report for plaintiffs on the relation of first-trimester exposure to paroxetine to cardiac defects, June, July 2009.