# EXHIBIT 49

**Pain Pump**

# Burkhead, Jr., M.D., Wayne Z.

**8/31/2009 - 11:11:00 AM**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

DONNELL COX; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST, §

Plaintiffs, §

VS. § CASE NO. CV 07-1310 AA

DJO, LLC, a Delaware Corporation; DJO, INC., f/k/a DJ ORTHOPEDICS, INC., a Delaware Corporation; I-FLOW INC., a Delaware Corporation; McKINLEY MEDICAL, L.L.C., a Colorado Corporation; MOOG, INC., a New York Corporation; CURLIN MEDICAL, INC., a Delaware corporation; and PACIFIC MEDICAL, INC., a Pennsylvania corporation, §

Defendants. §

---

— — —

VIDEOTAPED TELEPHONIC DEPOSITION OF
WAYNE Z. BURKHEAD, JR., M.D.
AUGUST 31, 2009

— — —

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION CINCINNATI

DIANNA SCHOTT and §
RAYMOND E. SCHOTT §
§
Plaintiffs, §
§
VS. § CASE NO. 1:08CV323
§
I-FLOW, INC., §
§
Defendant. §
______________________________§

MICHELLE KASSELMAN- §
SCHOETTMER and MARK §
SCHOETTMER §
§
Plaintiffs, § CASE NO. 1:08-cv-00700-MRB
§
VS. §
§
§
I-FLOW CORPORATION, §
§
Defendant. §
______________________________§

RIAN MUZIK, §
§
Plaintiffs, §
§ CASE NO. 1:08-cv-00818-MRB
VS. §
§
I-FLOW CORPORATION, §
et al., §
§
Defendants. §
______________________________§

MARTIN MITCHENER, §
§
Plaintiff, §
§ CASE NO. 1:09-cv-00155-MRB
VS. §
§
I-FLOW CORPORATION, et al,§
§
Defendants. §
______________________________§

AMY WEST and VINCE WEST, §
§
Plaintiffs, §
§ CASE NO. 1:09-cv-98
VS. §
§
I-FLOW CORPORATION, §
§
Defendant. §
______________________________§
KENEITHA CORDLE and §
JENNINGS CORDLE, §
§
Plaintiffs, §
§
VS. § CASE NO. 1:09-cv-403
§
I-FLOW CORPORATION; §
HOSPIRA, INC.; ABBOTT §
LABORATORIES, INC., §
§
Defendants. §
______________________________________________________________

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

TIMOTHY D. VARNEY, §
§
Plaintiff, §
§ CASE NO. 2:08-CV-00101-WOB
VS. §
§
I-FLOW CORPORATION, §
§
Defendant. §

---

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

CHRISTINA McCLELLAN, §
§
Plaintiff, §
§
VS. § CASE NO. 07-CV-1309-AA
§
I-FLOW CORPORATION, et al. §
§
Defendants. §

---

VIDEOTAPED TELEPHONIC DEPOSITION OF WAYNE Z. BURKHEAD, JR., M.D., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on August 31, 2009, from 11:11 a.m. to 4:28 p.m., before Janice K. McMoran, RMR, CRR, and Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand at the offices of Wilson Elser Moskowitz Edelman & Dicker LLP, 901 Main Street, Suite 4800, Dallas, Texas, pursuant to notice and the Federal Rules of Civil Procedure.

# A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS:

VIA TELEPHONE:
MICHAEL L. WILLIAMS, ESQUIRE
Williams Love O'Leary & Powers, P.C.
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225-6681
Telephone: (503) 295-2924
Facsimile: (503) 295-2924
email: mwilliams@wdolaw.com

a n d

VIA TELEPHONE:
LAURA B. KALUR, ESQUIRE
Kalur Law Office
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225-4145
Telephone: (503) 595-4145
Facsimile: (503) 295-3720
email: lbkalur@kalurlaw.com

APPEARING FOR THE PLAINTIFFS MARTIN MITCHENER, DIANNA SCHOTT AND RAYMOND SCHOTT, MICHELLE KASSELMAN-SCHOETTMER AND MARK SCHOETTMER, RIAN MUZIK, AND TIMOTHY D. VARNEY:

VIA TELEPHONE:
PAUL J. SCHACHTER, ESQUIRE
RONALD E. JOHNSON, JR., ESQUIRE
Schachter & Hendy, PSC
909 Wrights Summit Parkway, Suite 210
Fort Wright, Kentucky 41011
Telephone: (859) 578-4444
Facsimile: (859) 578-4440
email: pschachter@pschachter.com
rjohnson@pschachter.com

A P P E A R A N C E S (continued)

APPEARING FOR THE DEFENDANT I-FLOW INC.:

MAYNARD M. KIRPALANI, ESQUIRE
HEIDI WOLMUTH, ESQUIRE
Wilson Elser Moskowitz Edelman & Dicker, LLP
260 Franklin Street, 14th Floor
Boston, Massachusetts 02110
Telephone: (617) 422-5300
Facsimile: (617) 423-6917
e-mail: maynard.kirpalani@wilsonelser.com
heidi.wolmuth@wilsonelser.com

APPEARING FOR THE DEFENDANT STRYKER CORPORATION:

WAYNE A. WOLFF, ESQUIRE
Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105-1101
Telephone: (415) 781-7900
Facsimile: (415) 781-2634
e-mail: wayne.wolff@sdma.com

APPEARING FOR THE DEFENDANT McKINLEY MEDICAL, L.L.C., MOOG, INC., and CURLIN MEDICAL, INC.:

VIA TELEPHONE:

KONRAD F. PAYNE, ESQUIRE
Harris Beach, PLLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone: (212) 687-0100
Facsimile: (212) 687-0659
e-mail: kpayne@harrisbeach.com

A P P E A R A N C E S (continued)

APPEARING FOR THE DEFENDANT PACIFIC MEDICAL, INC.:
VIA TELEPHONE:
ROBERT SOKOL, ESQUIRE
Mitchell Lang & Smith
2000 One Main Place
101 S.W. Main Street
Portland, Oregon 97204-3230
Telephone: (503) 221-1011
Facsimile: (503) 248-0732
e-mail: rsokol@mls-law.com

APPEARING FOR THE DEFENDANTS BRUCE R. HOLLADAY, M.D. and COMMONWEALTH ORTHOPAEDIC CENTERS:

VIA TELEPHONE:
MARY K. MOLLOY, ESQUIRE
Arnzen, Molloy & Storm, P.S.C.
600 Greenup Street
Covington, Kentucky 41011
Telephone: (859) 431-6100
Facsimile: (859) 431-3778
e-mail: mmolloy@arnzenlaw.com

APPEARING FOR THE DEFENDANTS DJO, INC. And DJO, LLC:
VIA TELEPHONE:
TAMMARA TUKLOFF, ESQUIRE
Morris Polich & Purdy, LLP
501 West Broadway, Suite 500
San Diego, California 92101
Telephone: (619) 557-0404
Facsimile: (619) 557-0460
e-mail: ttukloff@mpplaw.com

VIDEOGRAPHER:
John Hines, Golkow Technologies, Inc.

know, you're asking me to look back on it now. I don't think the opinion that I reached was that, because this was just an emerging issue at that time. I think after --

Q. You now hold -- you do now hold the opinion that thermal energy used in the shoulder joint can cause chondrolysis, don't you?

MR. KIRPALANI: Objection.

A. I think it's a factor that's been associated as an isolated feature with the development of chondrolysis.

Q. (By Mr. Williams) Well, in your report you call it a causative factor, don't you?

A. I think you can --

MR. KIRPALANI: Objection.

A. It is a -- in some cases that are isolated, I think it is a causative factor.

Q. (By Mr. Williams) Okay. In the sense that the chondrolysis would not have happened unless the surgeon had used the thermal energy in that particular fashion?

A. That's correct.

Q. Okay. I want to ask you about your theory that younger patients are more susceptible to developing this condition than older patients. Could

areas to be able to see exactly where the pins were, rather than just relying on a static x-ray.

Q. Okay. Well, let me try to ask this question in a more focused way. What scientific evidence do you have to support your opinion that such a procedure in a young patient could cause chondrolysis in the hip?

A. It would be the fact that they -- it has been reported and it's been reported as an isolated factor.

Q. No controlled studies, though, right?

A. No controlled studies.

Q. Nothing but case reports, really.

A. That's correct.

Q. Are there any animal models of chondrolysis to the hip in young people?

A. There are of chondrolysis -- of chondrolysis in general. I don't know that it's -- it's the hip joint. It's not in people. There is a -- there is a model for a chondrolysis, and they create it using this molecule called fibronectin.

Q. Well, now, you've now seen chondrolysis in a lot of -- or well beyond the growth plate closure stage, haven't you?

A. In the shoulder, I assume you're asking me about?

Q. In the shoulder, yes.

A. I have seen cases of chondrolysis beyond that, yes.

Q. I mean of the -- and by "chondrolysis," let's make sure we're talking about the same thing. In your report, you call it, the kind of chondrolysis we're talking about here, a rapid dissolution of cartilage in the glenohumeral joint?

A. Yes.

Q. And by "rapid," what do you mean?

A. Over a period of several months.

Q. Which -- and that is -- that's a condition that, except for a couple of gentian violet cases, is it true that that condition has never been reported in the medical literature until 2004?

A. That's correct.

Q. And, by the way, do you agree that gentian violet dye did, in fact, cause chondrolysis in those patients reported in the literature?

A. I think it occurred as an isolated factor. The -- it occurred in 2 of the 12 patients in one of the series. X-ray changes occurred at two years after the event, so if you go back and read the article itself and look at it, I'm not sure I could say that it caused it,

but it's certainly a factor that has been mentioned in isolation as a cause of it.

You can also look to the Japanese literature. Unfortunately, it's in Japanese. It's an article by Dr. Fakuda and Dr. Hamada, who looked at patients who develop arthritis. So there's a certain incidence of developing arthritis after a rotator cuff repair anyway. So with that knowledge, I'm not sure that those two articles -- I guess there are two now -- about gentian violet really prove that gentian violet causes chondrolysis.

Q. Okay. How do you think thermal devices cause chondrolysis? And let's start by defining what we mean by thermal devices. Would you tell me first, what are the thermal devices that have been implicated in the chondrolysis cases?

A. Well, there are basically two types of thermal devices. There are monopolar devices, and then there are bipolar devices. And in the series that I reported a number of years ago, all the patients had bipolar devices used in their surgeries. But it has been reported with monopolar devices as well.

Q. Are bipolar devices, do they have more energy?

Q. What tissue does create synovial fluid?
A. The synovium.
Q. Do you know how rapidly it could replace synovial fluid if you -- suppose you aspirated all the fluid out of a shoulder joint, for whatever reason. How long would it take for the shoulder joint to replace that fluid?
A. You know, I don't know. I saw in one of your experts -- I think it was Dr. Badylak or Trippel gave a figure, but I didn't see a reference for that figure, and I've actually looked for that, and I haven't been able to find it. So my answer to your question is I honestly don't know.
Q. While we're on the subject, do you have an opinion or do you know what the average volume of synovial fluid is in the glenohumeral joint?
A. Yes. It's probably only 2 or 3 cc's.
Q. And that's based on MRI measurements?
A. I think it's -- it's been done several different ways. Prior to MRI scans, they used aspiration and injection techniques to try to determine that.
Q. Okay. Now, back to the young children being susceptible or younger people being susceptible, I

talked to you about the knee, but I didn't talk to you about the shoulder. Is it your opinion that people who have not had their shoulder growth plate close yet are significantly more susceptible to chondrolysis than older people; is that right?
A. Yes.
Q. Okay. Now, what scientific evidence do you have to support that opinion?
A. I think it's just based on my looking at these patients and -- certainly, it's my opinion. It's not a proven theory, but it's my -- actually, it is a theory. I have a hypothesis. I haven't been able to test the hypothesis.
Q. Well, you wrote it in your report as if you believe it to be true, right?
A. I wrote it in my report of those -- my reports are my opinions.
Q. Yeah.
A. And that's true that that's my opinion.
Q. But there's no controlled studies to support your opinion; is that right?
A. That's correct.
Q. And there's not really even any cases here to support your opinion, is there?

A. Well, only in the fact that, you know, it's very unusual for kids to get arthritis, and then all of a sudden you see all these cases of horrible chondrolysis, and it's -- a similar condition occurs in a joint that's extremely similar, so I think it hasn't been proven, no, and I can't prove that -- prove that. But I can still hold the opinion that that's my theory of why this happened.

Q. Do you believe you could design a study to test the hypothesis that placing the pain pump catheter in the joint space for -- and infusing with anesthetics for two days or more could cause chondrolysis?

THE COURT REPORTER: Sir, could you repeat that? I'm sorry, I kind of lost you there. "Do you believe you could design a study to test the hypothesis that" --

Q. (By Mr. Williams) Yeah, the question is, Dr. Burkhead, do you believe you could design a study to address the question of whether pain pump catheters in the joint space, infusing local anesthetics for two days or more, cause chondrolysis?

MR. KIRPALANI: Objection.

A. Not for two days or more, but I think I

could -- could design one that you did it for 48 hours. Two days or more is way too vague, plus you run the risk of infection after having a foreign body or a drain in after 24 or 48 hours. So I would say I could design a study that could be performed with a two-day window.

Q. And just what would the structure of the study be?

A. Well, you'd have to have paid volunteers or several different ways you could do it. You could do it through a national IRB, like the breast implant cases that eventually invalidated all the allegations about breast implants, so you could go to a national IRB. You don't have to use a hospital IRB. And then you show them data that says that, you know, in less than 48 hours, there's not much damage or any damage with Bupivacaine in a fashion, and you show them Gamal's article that says at three months, whatever damage was there is not there anymore, and, in fact, the cartilage may even appear healthier. And then you pay the subjects, and I think, you know, quite rightly, you have to inform them of the risks and guarantee that should they get chondrolysis, that they can fly to Dallas and the company will pay Dr. Buz Burkhead to do their shoulder replacement.

Q. And page 8?

A. I have it.

Q. If you look down to about the bottom third of that first full paragraph, you're talking about absorbable suture anchors.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And you state, quote, "Another causative factor of chondrolysis reaction to the breakdown particles of absorbable suture anchors used during labral repair and instability surgery." Did I read that right?

A. Yes.

Q. How do you think -- or what is -- excuse me. Let me start over. What is the basis of your opinion that the breakdown particles of absorbable suture anchors can cause chondrolysis?

A. Well, they -- and reported in several areas, the one that I cite in this particular paragraph is the article by Athwal, who the senior author is Dr. Shawn O'Driscoll. And these are patients who -- they had 25 patients, and I think five -- four or five of those patients that had the same types of anchors developed

chondrolysis, and there weren't any other risk factors with the exception of the ones that I mentioned about the patient's age, except one of these patients, I think, was 33 years of age. So, again, when I look at -- use the term causative, if it's something that's isolated usage where you can't see anything else that might have caused it, then I think it's reasonable to use that terminology.

Q. Okay. Well, aside from patient's age and thermal devices and absorbable suture anchors, what other factors do you believe can be causative in causing -- you know, bringing about chondrolysis?

MR. KIRPALANI: Objection.

A. My opinion?

Q. (By Mr. Williams) Yeah.

A. Well, I'm concerned about the use of a bolus with Marcaine and epinephrine possibly being causative. Clearly, you know, the best choice of terms is isolated factor, but it's -- it's certainly a worry when you look at these articles.

Q. And is it true that in all cases of chondrolysis, you believe that the dissolution of the cartilage results from the death of the chondrocytes that are in the cartilage matrix?

Q. (By Mr. Williams) Had you never asked anybody at Stryker whether the pain pumps had been approved, let's say -- well, first, for orthopedic surgery?
A. No.
Q. And specifically for use in the synovial space?
A. No.
Q. And what was your assumption about the FDA involvement there? Did you think the FDA must have approved it?
MR. KIRPALANI: Objection to the form.
A. I didn't have an opinion one way or the other.
Q. (By Mr. Williams) Let's go back to your experience for a minute now. In how many of the arthroscopic surgery cases that you did of these 8,000 did you put the pain pump catheter in the joint space, in the shoulder?
A. Yeah, I used it both in arthroscopic and open surgery. Now, you're talking about all arthroscopic cases or things where I used arthroscopy and combined it with, say, a mini open rotator cuff repair? You said --
Q. Well, right now I want to know the total number of shoulder surgeries in which you placed a pain pump catheter in the synovial space of the glenohumeral

joint.
A. The total number?
Q. Yes.
A. I'd say it's over a thousand.
Q. And what -- how many of those thousand patients are still your patients?
A. Well, to a certain extent, there -- a lot of them still come back for their other shoulder to be done, so I can't tell you exactly how many of them are actually -- actively have appointments to see me, but I think once they're my patients, they kind of stay my patients. Once you're a patient at the Carrell --
Q. Well, how many of them --
A. Once you -- once you're a patient at the Carrell Clinic, you remain a Carrell Clinic patient, and once you're a patient of Dr. Burkhead, you're Dr. Burkhead's patient.
Q. Do you know, out of the 1,000 cases in which you've put a pain pump catheter in the shoulder joint, how many of those people do you still have coming to your clinic today?
MR. KIRPALANI: Objection to the form.
A. I don't know.
Q. (By Mr. Williams) Have you ever gone back and

done any kind of systematic survey of those 1,000 patients to see if there is any chondrolysis?

A. No.

Q. And you don't know how many of them you've lost contact with altogether, do you?

A. No.

Q. What kind of -- what records would your clinic have to determine that? If we wanted to try to get the thousand set of patient records and find out what the most recent record your clinic had of those patients was, are those records all available on all thousand of them?

MR. KIRPALANI: Objection to the form.

A. They're archived. I mean, if you said how would we go about doing it, I guess, you know, we would have to go to the hospitals and get -- find out however many people got pain pumps and then pull all the charts. I mean, it's -- it could be done. It would be, you know, a huge -- a huge project.

Q. (By Mr. Williams) Wouldn't you have copies of the operative reports in your files?

A. Yeah, but I can't -- I can't see through the file to see who had a -- who had a pain pump or not. And I don't have a -- if I had a list of everybody I had

a -- put a pain pump in in my office, I'd be able to tell you a much more accurate number than somewhere around a thousand. I don't know.

Q. Okay.

A. You would have -- if you wanted to figure out how you could do it, you could subpoena the records from Baylor University Medical Center and Presbyterian Hospital and get a lot number for every patient I put a pain pump in and then -- and follow them that way.

Q. Did you ever advise your -- did you ever advise your patients to leave the pain pump catheter in their shoulder joint more than 48 hours?

A. Never.

Q. Did you always tell them to take it out at least at the end of 48 hours?

A. Yes. I had home -- I had home care do most of my pain pump removals.

Q. Okay. Did you have a subset of the thousand cases where you did put a catheter in the shoulder joint where the length of time was less than 48 hours?

A. Well, I guess the issue would be did some of those patients' pain pumps clot off and the medication was delivered for less than 48 hours? I think -- I'm sure that happened. Pain pumps come out. But my

from, I couldn't find it. So I honestly think that it probably reconstitutes over a several day period of time.

That would be my -- that's really an opinion. I guess the best answer to it is I don't know how long it takes.

Q. Did you ever use the chlorhexidine in your arthroscopic shoulder surgery?

A. No.

Q. Do you think chlorhexidine causes chondrolysis in some shoulders?

MR. KIRPALANI: Objection.

A. I'm not sure that it was in shoulders. I think there's a report where chlorhexidine was used as an irrigant for a knee, and there weren't any other known risk factors for chondrolysis when that occurred. I'm not sure which one it was. I don't think it was the shoulder, though.

Q. (By Mr. Williams) So you think the most likely cause in that particular case was the chlorhexidine?

A. It's been a while since I have reviewed that particular case, but I think that was the author's suggestion.

Q. And you didn't disagree with the author?

A. No.

Q. Okay. Now, in your arthroscopic shoulder surgeries, did you ever use bolus injections of any local anesthetics at any time during the surgery?

A. No.

Q. Why not?

A. Again, at the end of a surgery, especially an instability surgery, the last thing you want to do is put 20 or 30 cc's of more fluid back into a joint that you're trying to decrease -- you know, you've spent an hour and a half trying to decrease the volume of the joint, you don't want to go back in and redistend the joint and risk, you know, rupturing your suture line or creating so much pressure in the joint that you could cause cartilage necrosis or some other issues, bone necrosis.

So I never felt that it was necessary. I've always injected just the portals, and then I've always used just some of the irrigant of the saline.

Once I'm sure that I'm in the joint, I'll inject right down to the joint. And once you feel this kind of loss of resistance, then I switch from .25 percent Marcaine with epinephrine to the actual irrigant that I'm going to use and put saline into the

And Panacryl suture has been shown to cause foreign body reactions in skin. It's been recalled. Those anchors, however, were never recalled, and it was never taken off the shelf. This was all -- the actual recall on Panalok -- or Panacryl occurred in, I think, in 2006 or 2007.

Q. All right. Are there any -- is there any data about the patients in either Table 1 or Table 2 of this paper that you believe should have been presented but wasn't?

A. Well, the ones that I mentioned are that -- you know, I think in terms of the discussion section or the results or the conclusions? I'm not quite -- can you repeat your question for me?

Q. My question is: Are there -- are there aspects to the surgical procedures or devices used or anything used, drugs, anything, that is not presented here that you thought should have been presented to you?

A. Well, if it's not presented here, I wouldn't have any idea how I would know what -- what existed and what wasn't presented. I take Dr. Hansen at his -- at face value that when he wrote this up, he presented all the data that he had. I just think it's the interpretation of that data is where I would disagree

with this article.

Q. Okay. There's no missing category of data here, right?

A. I don't -- I don't think that they have omitted anything. The question is, you know, they call propiona bacterium, they call it a contaminant in a shoulder aspiration. You know, that -- that's what a lot of people thought propiona bacterium was before they realized that it could be a pathogen. But they did mention that one of the patients did grow out propiona bacterium. So it's not something that's missing. It's just perhaps misinterpreted, perhaps not.

Q. You don't hold yourself out as having qualifications to talk about epidemiology, do you?

A. No, sir.

Q. Or biostatistics?

A. No, sir.

Q. Did you ever look at any of the patient records from Dr. Matsen's study of Dr. Benz's case series?

A. Well, inadvertently, I looked at some of the records as part of the Grossnickle trial preparation for that trial. There were patients that I was -- that I've opined on, I guess, that were part of that patient

straight up, so we'll unmute at ten after and wait for you if you're not there.

MR. WILLIAMS: Thanks a lot.

THE VIDEOGRAPHER: We're off record at 1:00 p.m. End of Tape 1.

(Recess taken 1:00 p.m. - 1:13 p.m.)

THE VIDEOGRAPHER: We're back on the record at 1:13 p.m., beginning of Tape 2.

Q. (By Mr. Williams) Okay. I want to go back to what you said about Dr. Beck's paper having bad data and see if we've now reached an agreement that it's not the data that he's presented you're questioning, it's the way in which either he or others have analyzed it. Is that a fair way to describe your opinion here?

A. That's correct.

Q. You haven't attempted to perform any biostatistical analysis of this yourself?

A. No.

Q. And did you ask any of the lawyers whether they have had an epidemiologist look at this to see?

A. I did.

Q. I'm sorry, I couldn't hear your answer because my cell phone started ringing and I threw it out of the room.

A. Yes, I thought that they should have an epidemiologist to counter your epidemiologist. I'm not an expert in epidemiology. I can't testify about biostatistics or epidemiologic methods.

Q. But you told them they ought to get one?

A. Well, I assume that they have one, but that's just an assumption. I mean, if I were them, I would.

Q. You haven't -- you haven't seen any epidemiological report from an expert for the pain pump makers?

A. I have not.

Q. Have you talked to any other retained expert on either side of these cases about the issues we've been talking about?

A. No.

Q. Do you have occasion still to run into Dr. Matsen and Dr. Basamania at professional functions?

A. I do, but I have specifically not asked them about any of this because that would be, I think, a violation of probably a court order.

Q. And --

A. And I'll see them in October. If you say it's -- I mean, we've got a big meeting that we all

more likely it is that they will develop this condition."

Now, when you say "this condition," you're talking about chondrolysis, correct?

A. Yes.

Q. Okay. What -- have there been any controlled studies or published literature that talk about the likelihood of chondrolysis increasing in the shoulder when the patient is younger or closer to having an open growth plate?

A. Ask me the question again, I'm sorry.

Q. Are there any controlled studies or published medical literature that talk about this likelihood or increase in the likelihood of a young patient developing chondrolysis in the shoulder the closer they are to the age of having an open growth plate?

A. Well, all of the initial review articles, as I -- I've already answered this question once, but all the original review articles had patients that were no older than about 23 years of age. And even in 2009, in the article titled McNickle that Brian Cole is the senior author, the average age of those patients undergoing their definitive surgical procedure, which is his case -- in many cases is an osteochondral allograph,

was 19.

So I think there is case report series showing a high incidence of this complication.

Q. Okay. So --

A. Because at the same time that Dr. Andrews or Petty, he would have done surgery on probably as many as I have or even more, and Dr. Savoie, I'm sure, does more cases than I do every year. They weren't seeing this complication in older patients. Their report only talked about patients that were between -- I think in their initial report, they were about 16 to 22. Which I was amazed that Brian Cole actually had one patient that was 13 in his articles. It's a frightening condition because we don't know exactly what causes it, and it seems to be that it occurs much more commonly in these younger patients.

Q. Okay. So you are extrapolating from those case reports here the fact that the patients in the series are young must mean that the closer the patient is to having an open growth plate in the humerus, the more likely it is that they will develop this condition. That's your extrapolation, correct?

A. That's my extrapolation also based on all the patients that I had in my series. They were all -- I

think the oldest was 22 or 23 years old when I saw them.
Q. Is that the conclusion, though, of any of the authors of those papers?
A. They all describe that this is so unusual because these patients are all so young, and they all list that as a factor in their papers.
Q. They list what as a factor? The age of the patient --
A. Absolutely.
Q. -- or the fact that they are closer to having an open growth plate in the humerus?
A. Well, those two things go together like love and marriage. I mean --
Q. Okay. That leads to my next question. What age is that?
A. It varies from individual to individual, but it could be as early as -- well, your growth plate is open, you know, all the way up until you probably could be -- in a male, it would probably be 18, 19, 20 years old. Females' growth plates close sooner, probably two years after the age of their first menstrual period. So from individual to individual is going to vary, but male patients, especially immature male patients, their growth plates may stay open until 19 to 20.

on the Dallas Cowboys without a trial to prove its safety first.

MR. KIRPALANI: Objection.

A. Well, right now I couldn't do it because there's a new label on at least the two pain pumps that I did that says it's not indicated to put it in -- or not recommended to put in a joint.

Q. (By Mr. Williams) But I take it you think that label is unnecessary.

MR. KIRPALANI: Objection.

A. I'm not sure that it's unnecessary. I just think that it's -- it is what it is. And I think that it perhaps came about because the other -- some other users of pain pumps, in conjunction with some of the other things they were doing to people's joints at the time, created this environment, and that latching onto Level 4, poorly designed studies is exactly analogous to what happened to breast implants.

Q. (By Mr. Williams) What makes you think that a -- well, let me ask you this: What level of evidence do you think a retrospective cohort study is?

A. A Level 4 -- it's a Level 4 retrospective study. It's a Level 4.

Q. And you're citing what chart of level? Where

are you getting your level?
A. It's the American Academy of Orthopedic Surgeons.
Q. That uses the Oxford chart of evidence-based medicine, doesn't it, from Oxford University?
A. There's no -- there's nothing other than Level 4 evidence out there on pain pumps. They're all retrospective reviews.
Q. I'm not asking about what's out there now. I'm just trying to figure out what your understanding is of the legals of evidence. Don't you agree that the AAOS uses the Oxford evidence-based medicine levels of evidence?
A. I believe it does, yes.
Q. And you don't know that a retrospective cohort study is considered Level 2 in that -- in that hierarchy?
A. Anything that's retrospective is below -- you said retrospective study?
Q. I did.
A. That's not Level -- that's not Level 2.
Q. I'm talking about a retrospective cohort study like Dr. Beck's and Dr. Hansen's published work.
MR. KIRPALANI: Objection.

A. That's not. That's a case report study. That's not a retrospective cohort study.
Q. (By Mr. Williams) What makes you think it's just a case report?
A. It's a case series. It's a series of retrospectively reviewed cases. There's no cohort.
Q. You don't see that there's a cohort of people that were exposed to the pump in the shoulder and a cohort of people that were exposed to the pump outside the shoulder?
MR. KIRPALANI: Objection.
Q. (By Mr. Williams) Aren't those two cohorts?
A. They're not -- it's not controlled at all. There's no -- absolutely no control, and it's completely biased in that regard, and so we don't know which one -- why he decided to do pain pumps on one group and why he decided to do subacromial on the other group. So I think in anybody reading this, I think even in the JVJS or wherever it was presented, I think where it's been presented before it's even labeled as a Level -- maybe even labeled as a Level 4 study.
MR. KIRPALANI: It's Exhibit 12 if you're looking for it.
A. I don't know where it is, but --

C E R T I F I C A T E

I, Janice K. McMoran, RMR, CRR, and Certified Shorthand Reporter in and for the State of Texas, certify that the foregoing deposition of WAYNE Z. BURKHEAD, JR., M.D. was reported stenographically by me at the time and place indicated, said witness having been placed under oath by me, and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for nor related to any party in the case and am not financially interested in its outcome.

Given under my hand on this the 10th day of September, 2009.

_________________________

JANICE K. McMORAN, RMR, CRR
Texas CSR #1959
Expiration Date: 12/31/10