# EXHIBIT 50

# REPORT OF FREDERICK MATSEN, M.D.
## Intra-Articular Use of Pain Pumps As A Scientifically Plausible Cause of Glenohumeral Chondrolysis

## I. Introduction And Credentials.

I have been a board-certified orthopedic surgeon since 1975. I am certified by the board of the State of Washington and also by the American Board of Orthopedic Surgery. I am currently a professor and Chairman of the Department of Orthopedic Surgery and Sports Medicine at the University of Washington School of Medicine in Seattle.

I attended college at the University of Texas. I graduated in chemistry, and from there I went to Baylor University College of Medicine, graduating in 1968. That is when I got my M.D. degree. I then did a surgical internship at Johns Hopkins University. Then I spent two years at the National Institutes of Health doing medical research. I began my orthopedic residency at the University of Washington in 1971, and completed that in 1975. I have been on the faculty at the University ever since, progressing up the ranks to full professorship and Chair of the Department.

At the National Institutes of Health I was in the National Institute of Neurological Disease and Blindness. We did research into neurologic problems. I was particularly interested in the neurologic system at that time and was studying brain injury at that time.

I have held several faculty positions at the University of Washington. I started out as an assistant professor, and then after a while became associate professor, and then finally full a professor. In 1986, I became the Chairman of the Department, and have served in that capacity ever since then, over 23 years.

A professor at a major medical school has responsibilities for patient care and for teaching and for doing research. I have my own practice of orthopedics, and I see patients and do surgery. Then part of my week is spent running the department. The University of Washington has five teaching hospitals and we have a total of 40 residents that I am responsible for. I also have my own research program that I carry out.

I hold hospital privileges at The University of Washington Medical Center, Harborview Medical Center, the Seattle VA Hospital and Seattle Children's Hospital. I do all of my surgeries at the University of Washington Medical Center. About 95% percent of my surgeries are on shoulders.

I have received multiple honors, including graduating Phi Beta Kappa from the University of Texas. I received the Nicholas Andre Award from the Association of Bone and Joint Surgeons, which is a research award that this organization gives for a paper that they feel is meritorious. The award was for outstanding achievement in the field of orthopedic surgery

research. The Charles S. Neer Award we received was for a study entitled Laxity of the Glenohumeral Joint, Quantitative Assessment.

I am a member of numerous professional associations, including the American Academy of Orthopedic Surgeons, the American Orthopedic Association, the Washington State Orthopedic Association, the Western Orthopedic Association, the American Shoulder and Elbow Surgeons, the King County Medical Association, the Association of Bone and Joint Surgeons, and the Orthopedic Research Society.

I have served on numerous committees and held responsibilities in many national organizations. I have been on the Board of Directors of the American Academy of Orthopedic Surgeons. I was a founding member of the American Shoulder and Elbow Surgeons and had the opportunity of serving as their President. I have been Program Committee Director and served in various other posts.

I review articles actively for the Journal of Bone and Joint Surgery, for the Journal of Shoulder and Elbow Surgery, for the Journal of Orthopedic Research, for the American Journal of Sports Medicine, and for various other journals as well. These are all peer-reviewed medical journals.

As a reviewer, I receive manuscripts from various authors. These manuscripts are usually blinded so reviewers do not know who wrote the article. Then it is my task to review the article and find if it was done in a way that was scientifically sound and also whether or not the results would be important to those practicing in orthopedics.

I am familiar with the rules and accepted methods that apply to scientific research, and have done scientific research throughout my career in orthopedics. My research has resulted in many papers that have been published in peer-reviewed medical journals.

I have had many research grants. A research grant is a way of supporting research, and it is a little bit like writing an article for a journal. I write a proposal saying I would like to study something, describe the methods to be used, the conclusions I hope to find, and the facilities that I have for doing that research. Then the granting institution decides if the subject is meritorious and if I am capable of pulling off the proposed research as proposed. If so, they then award the research grant to me.

I have had a number of research grants from the National Institutes of Health, and thirteen from the Orthopedic Research Education Foundation. I have also had research grants from the Veterans Administration. All of these research grants were for research in my field of specialty, orthopedics.

I have lectured to the Orthopedic Research Society, which tries to be the most scientific of all of the orthopedic groups and the most robust in their methodologies and their criteria for acceptance. It is an honor to get a chance to present to them because when abstracts are

submitted, those abstracts are scrutinized again to try to find out if the topic is of interest and if the study was well done.

I have published over 100 peer-reviewed articles in medical journals. Among the things that I have published on are articles about the glenohumeral joint. In 1984, I published an article called Complications About the Glenohumeral Joint Related to the Use of Screws and Staples. In 1989, I published an article in the Journal of Bone and Joint Surgery titled An Approach to the Repair of Glenohumeral Ligament Avulsion and the Management of Traumatic Interior Glenohumeral Instability. This article was about the problem of shoulder dislocations and described a method for fixing it.

Among others, I have published on the following topics relating to the glenohumeral joint: complications about the glenohumeral joint related to the use of screws and staples, an approach to the repair of glenohumeral ligament avulsion in the management of traumatic anterior glenohumeral instability, translation of the humeral head on the glenoid with passive glenohumeral motion, the technique of glenohumeral arthroplasty, laxity of the normal glenohumeral joint, mechanisms of glenohumeral joint stability: the relationship of the glenohumeral joint capsule to the rotator cuff, mechanics of glenohumeral instability, and many others.

I have authored three medical textbooks, one of which is called Practical Evaluation and Management of the Shoulder, published in 1994. Another is called Shoulder Surgery Principles and Procedures, published in 2003. I have authored many chapters in various orthopedic textbooks. I have been an editor with Dr. Charles Rockwood of a text entitled The Shoulder, which is in its fourth edition and is a text widely used by orthopedic surgeons throughout the country on the subject of the shoulder.

I have lectured internationally in Venezuela, Belgium, France, Japan, Canada, Mexico, Puerto Rico, Sweden and Denmark, Argentina, Australia, Austria, and England, among others.

I have done many national lectureships for audiences of orthopedists in my national organizations over the years, and many lectureships to local and regional associations of orthopedic surgeons.

I have been asked to testify and give opinions regarding:

(1) My education, training, experience, and qualifications, some of which is set forth in this Report and is also summarized in my curriculum vitae, a copy of which is submitted with this Report;
(2) A study of 67 cases of glenohumeral chondrolysis from various orthopedic surgeons;
(3) My personal experience treating a chondrolysis patient;
(4) A study of 396 consecutive arthroscopic surgeries in the glenohumeral joint by a single orthopedic surgeon over 12 years;

(5) Whether intra-articular use of pain pumps is a scientifically plausible cause of glenohumeral chondrolysis.

My opinions set forth in this Report are based on my education, and my professional training and experience as an orthopedic surgeon. The opinions set forth in this report are based upon a reasonable degree of medical and scientific probability.

My rate is $500 per hour for medical-legal preparation and testimony, including the time for travel. During the previous four years, I have testified as an expert at trial or by deposition in the following cases: Grossnickle, et al v. Stryker Corporation, et al., Multnomah County Circuit Court Case No. 0703-02834.

**II. The Study of 67 Cases of Glenohumeral Chondrolysis from Various Surgeons.**

The history behind this study, which is the first one I did specifically involving glenohumeral chondrolysis, is an interesting one. A year or two ago, I met with Ms. McClellan's attorney, Mr. Wihtol, to discuss my consultation and examination of her in May of 2006. After my meeting with Mr. Wihtol, he indicated that he had access to the records of a group of other patients that had sustained a similar problem. Mr. Wihtol asked if I was interested in looking at the records on those cases from a scientific standpoint. I am not an arthroscopic surgeon. Arthroscopic surgery is not something I do. I do open surgeries on the shoulder. But I am always interested in studying adverse outcomes of any kind of treatment, believing that the study of adverse outcomes is the best way to acquire knowledge about avoiding them. So I expressed interest in reviewing the records of those patients.

I reviewed those medical records and it eventually led to a study we did at the University of Washington that was presented in February, 2009 at the American Academy of Orthopedic Surgeons meeting in Las Vegas. I am the senior author on this paper. Dr. Scheffel was the speaker at the February 2009 AAOS Convention. This paper is currently undergoing peer review by the American Journal of Sports Medicine. The paper is embargoed because it is being peer reviewed and therefore is not currently available for public consumption, and only appears in an abstract form. This is our first study and was the father, if you will, of my second study of 396 consecutive arthroscopic surgeries by a single orthopedic surgeon over 12 years.

In 2004, there were still only two reported cases of glenohumeral chondrolysis in the world literature. By the time we wrote the paper, the total number of glenohumeral chondrolysis cases published in peer-reviewed literature was 55, and our paper added 67 to that. There has been a very recent report of another batch of cases in the Journal of Shoulder and Elbow Surgery. Clearly the incidence of glenohumeral chondrolysis has mushroomed in the past five years. We found the 55 cases in the English language literature because that's what we reviewed. We did what's called a systematic review, looking at lots of different sources, Index Medicus and PubMed and all these sorts of things to try to identify other reported cases. So those were all the cases we could identify in a systematic look at the English language literature. And we went back as far as we could to identify cases.

The abstract does not mention a review of the literature because of limited space. So what happened is we had to truncate our abstract and, in fact, truncate a lot of the presentation. But the presentation did include a discussion of the 55 cases that we culled from the literature, as well as the 67 new cases that we had added. But I regret that that is not in the abstract. The reason it's not in the abstract is because they said we could only have 300 words, or whatever it was, in the abstract. The abstract is therefore an incomplete presentation of our work. In the live presentation, we got a chance to compare those 67 cases with the 55 that were in the literature. And we were happy that we had been able to at least double the number of cases that had been reported.

In this AAOS podium presentation paper, we tried to review everything that had been written about chondrolysis. The presentation was a case report of 67 cases, and a review of the literature, which at that time contained 55 other cases of chondrolysis of the glenohumeral joint.

Prior to the conclusions of my AAOS podium presentation paper, people had been thinking that a local anesthetic known as Bupivacaine was responsible for causing glenohumeral chondrolysis when post-arthroscopic infusion of local anesthetic was used. There were discussions about the concentration of Bupivacaine necessary to produce this complication. There were three new findings in the full paper. One was it was not only Bupivacaine because there were cases of Lidocaine too. The second was, it was not only instability surgery, which had been previously stated in the literature. And the third was, it wasn't only young patients. So those were the three increments that we added to the literature on glenohumeral chondrolysis.

## III. <u>Personal Experience Treating A Chondrolysis Patient</u>.

In my own personal experience, I have not long ago treated a patient who suffered from glenohumeral chondrolysis. It is an interesting case that came to me of a patient who had been treated elsewhere previously. She had identical surgeries performed on both shoulders, by the same surgeon, not Dr. DiPaola, but a different surgeon, and in both shoulder joints a pain pump catheter was used. On one side, the catheter malfunctioned and all of the anesthetic squirted out all over the skin and never got into the joint. And on the other side, the anesthetic went into the joint as planned. What was interesting was on the side where it squirted all over the skin, she got a great functional result from her shoulder surgery. On the side where the pain pump had worked just as it was designed and intended to work, she developed chondrolysis on that side.

## IV. <u>Study Of 396 Consecutive Arthroscopic Surgeries In The Glenohumeral Joint By A Single Orthopedic Surgeon Over 12 Years</u>.

### 1. <u>Reason for the Study</u>.

This is my second study specifically designed to evaluate the cause or causes of glenohumeral chondrolysis. I conducted a study of a series of cases of arthroscopic intra-articular glenohumeral surgery by a single physician. I got interested in the subject of such

surgeries and use of an intra-articular pain pump because a lot of my research has been in the causes of failure of shoulder surgery. The reports of chondrolysis of the glenohumeral joint have increased markedly beginning in about 2004-2006. Rather than studying all the things that go right in about 85 percent of the cases, I am really interested in what goes wrong in the five or 10 or however many percent of cases that do not go right. "Case" refers to a surgical case, not a legal case.

I was presented with the unique opportunity to study 396-some odd consecutive cases by a single surgeon, some of which developed a problem known as chondrolysis. My goal was to review this consecutive case series to see if common factors could be identified to the development of the condition known as glenohumeral chondrolysis.

As a clinical scientist, this was a unique opportunity because it is very rare that we get a chance to study the beginning to the end of an entire surgeon's practice. By virtue of having it be a single surgeon, then that important variable is held constant. So if some of the people get the complication and some of the people do not get the complication, then you don't have to worry about was it a surgeon-determined variable.

So this was a special opportunity. As a matter of fact, I have never had such an excellent research opportunity, except with my own patients, to study a consecutive series like this.

2. Purpose of the Study.

The purpose of the study was to try to identify features that were common among this patient population to the development of glenohumeral chondrolysis.

I am considered the senior author of this study. I intend to submit this study for peer review in a medical journal to make sure that physicians have all the information that they can possibly get so they can avoid problems. We try to be very careful and present the data in a way that enables the reader to draw their own conclusions, but I think it is our responsibility to get the information out where physicians can see it, so hopefully they can avoid problems like this in the future.

3. Type of Study.

This study was conducted to comport with the principals of sound scientific research as I know them. "Retrospective" means we looked backward across this case experience. A retrospective study is an understood and accepted way to gather information to draw conclusions scientifically. It is the kind of information and study methodology that are routinely published in peer-reviewed journals.

4. Study Methodology.

a. Independent Team:

Because this was such a special opportunity, and the data was being produced in a legal case, I wanted to really conduct the study in a manner so that we would not be open to criticism for bias. So even though I had some inkling about what the study might show, I got an independent team to look at the data, and all I provided them with were the primary source documents (from which the patient and surgeon names had been removed) so that they could look at those. The research team was comprised of an orthopedic surgery resident, a statistician, and a research nurse.

We made sure there was a lot of distance between me and any legal proceedings. I had never met the surgeon whose series I studied, nor am I personally acquainted with him. Nor are any of my team members.

The entire study was done under my direction. I designed the study and told my team what to do. I am familiar with the skills and talents of the people reviewing the raw data and they were competent to do it. This is a standard way for this kind of study to be done and is the way many of our studies are done.

b. <u>Funding</u>:

I am fortunate in holding an endowed chair at the University of Washington that was donated by a company, as well as by a number of individuals, to fund orthopedic research related to the shoulder. So I funded this study out of that endowment. The donors have had no say whatsoever, and no role in or knowledge of, this study.

c. <u>Documents</u>:

In any kind of study like this, it is important that it be free from bias. We wanted to review the primary documents. In other words, the surgeon's operative notes, clinic records, x-rays, and any other primary documents, so we were not making conclusions based on somebody else's look at the data, but we were looking at the primary data ourselves.

We were provided with an assurance, under oath, that this was, in fact, all the patients who had arthroscopic surgery in the glenohumeral joint in this time period, which ran, I think, from 1996 to 2008. This was to be sure that we had, in fact, all the data that were available on these particular patients so we could try to get the whole picture. We were provided copies of the primary source documents for all those patients. As I understand it, the records were produced pursuant to a court order in another legal case, and then I was provided exactly what was produced. This level of assurance, which included a statement under oath and a formal court order compelling completeness of the records being reviewed, exceeded the verification of the inclusiveness of the database commonly available and accepted for scientifically valid research.

I reviewed some of the documents because it was important to me that the study be based on primary source documents, not on somebody else's interpretation of the of the data. So I

made sure that we were being given copies of the raw records, not somebody's interpretation of them.

d. Criteria for Diagnosing Chondrolysis:

i. Definition of Condition:

So when you're looking for something, you have to define what that something is, and it has to be defined in a way that everybody can understand. So we said we're looking for a condition that we'll call chondrolysis and we're going to call that a condition in which the articular cartilage in the joint -- that is, the smooth covering that normally covers joints -- is completely destroyed. And we would accept two types of evidence if that was the case.

ii. X-ray Evidence:

One was an x-ray showing substantial narrowing of the gap between the two bones, between the ball and the socket of the shoulder. A second was direct surgical visualization of a joint that showed that that was the case. And those were the two criteria. Once again, we weren't going to accept anything else as evidence -- in other words, we didn't accept pain, we didn't accept stiffness, we didn't accept instability or anything else. Those were our two necessary criteria for making this diagnosis in this study.

In an x-ray of a normal joint space, there is that gap between the bones filled by normal cartilage, which just does not show well on an x-ray. With chondrolysis, there is joint space narrowing. There may also be cysts, little holes in the bone, making it look like Swiss cheese, and that seems to be also another characteristic of chondrolysis.

So the primary findings are joint space narrowing; secondarily, we often see those kinds of cysts.

I showed my team examples of such x-rays and I said, this is the kind of thing we're looking for.

iii. Surgical Findings Evidence:

I mentioned that we had two criteria, one was the x-ray and the other was the surgical findings. An example of the surgical findings that we felt were characteristic of chondrolysis would be visualization at surgery of the surface of the ball or the socket, and there has been pretty much total destruction of the joint surface. There may also be some craters in the bone that may correspond with cysts seen on the x-rays.

iv. Data Collected:

There was no case in which we only looked at the pain pump as a possible factor in the

production of chondrolysis. The type of data we looked for included the type of surgery, what the preoperative diagnosis was, age, gender, normal articular cartilage before surgery, whether radio frequency was used or not, and what anesthetic was used. We tried to consider every factor that had ever been proposed in the literature, as well as other factors that we thought might have been relevant to chondrolysis.

We used the same evidence to get assurance that the joint was normal before the arthroscopic surgery as we did to diagnose chondrolysis. Arthroscopic findings of normal-looking articular cartilage and normal x-rays beforehand.

5. Study Analysis and Conclusions.

We found that this surgeon had, as I mentioned, done, as I recall the numbers, something like 396 arthroscopic shoulder arthroscopies in the glenohumeral joint during the period, and that a percentage of these cases had developed chondrolysis. What we found was that each of the cases of chondrolysis were associated with one factor, which was the continuous post-surgical infusion of local anesthetics with a pain pump in the joint. Of the proposed or possible pathogenic causes, such as radio frequency or the use of one local anesthetic or another, there was no other one factor that was consistent.

The primary conclusion of the study is that there was no case of chondrolysis in this case series where a pain pump was not used in the glenohumeral joint. There were no cases of chondrolysis that did not have post-arthroscopic continuous infusion of local anesthetic by a pain pump in the glenohumeral joint.

There were no cases in which a pain pump was used intra-articularly by this physician after mid 2006. Most of these cases had no pain pump and no chondrolysis was noted. Thirteen of the cases had a pain pump used in the joint but no chondrolysis was noted. Forty-nine of the cases had both the intra-articular pain pump and chondrolysis.

Based on the fact that chondrolysis only occurred when a pain pump was used, my opinion to a reasonable medical probability as to this series of cases is that the continuous post-operative infusion of local anesthetics by a pain pump into the glenohumeral joint was the single factor that was present in each of the cases of chondrolysis. We had no cases of chondrolysis in this series that did not have the infusion of local anesthetics after surgery by a pain pump into the glenohumeral joint.

The significance of having a single consistent element in a big study like this is that it suggests that that factor is causative. In other words, that the intraarticular use of pain pumps causes chondrolysis in some percentage of patients.

One of the things that you look for when considering causation is to see if the factor that is suspicious is present in a lot of the cases or all of the cases that developed the complication, and also look for the fact that if that factor is removed or not present, that the complication does

not occur. Here, when the utilization of the post-operative infusion of local anesthetic stopped in 2006, the occurrence of the chondrolysis diminished as well. So in medicine, that is pretty good scientific evidence that you have identified at least one of the likely causes of chondrolysis in this particular case series.

Whether this relates to other practices in other parts of the world at other times is a different topic. But at least in these 396 cases, that was a consistent association. Furthermore, when that factor (pain pump use) was removed, the incidence of chondrolysis disappeared.

To my knowledge, other surgeons have also had this experience of patients developing chondrolysis after intra-articular use of the pain pump. There have been other reports in the literature of similar findings. To my knowledge, there has not been a study as scientifically robust as this one. In other words, capturing a whole patient population of an individual surgeon. But there certainly have been other case reports. The problem of chondrolysis following pain pump use in the joint is not surgeon-specific. The problem has been reported in recent years in the patients of many orthopedic surgeons, across the United States.

More patients in this study had arthroscopic surgery done without pain pump use than those who did.

(a) We looked at cases where radio frequency, or RF, or a heat wand or a RF hook or any kind of thermal device was used and there was no pain pump. None of those patients developed chondrolysis that we could see.

(b) We looked at cases where bioabsorbable anchors were used and there was no pain pump. We could find no patients that developed chondrolysis. We looked at cases where patients had loose anchors and no pain pump, and none of them developed chondrolysis.

(c) We looked at SLAP procedures where no pain pump was used, and none of them developed chondrolysis.

(d) We also looked at plications, or tightening procedures, with no pain pump, and none of them developed chondrolysis.

(e) We also looked for any combination of causal factors that was significant, and we have not been able to identify any combinations of factors present for those patients who developed chondrolysis. If there were a combination of causal factors that was significant, it would definitely include intra-articular use of pain pumps in the glenohumeral joint as one of the significant contributing factors.

We considered all other known scientifically plausible causes for glenohumeral chondrolysis, and even some that are not yet scientifically plausible:

1. <u>Instrument/Mechanical Damage</u>.

When I did my summary, I looked at whether or not instrumentation damage to the cartilage by the surgeon might have been the cause of chondrolysis. We tried to consider every cause. With specific reference to instrument damage, we all know that that can occur in

arthroscopy because the surgeon is working in a closed space, and it is possible to damage the cartilage. But that damage is usually local and identifiable, just like running across a floor with baseball cleats on. It will make scratches in a certain part, but it will not destroy the whole finish of the entire floor. I am unaware of any studies establishing that localized injury from instruments or other localized mechanical damage results in chondrolysis of the joint.

What happens in a case of chondrolysis is the entire finish is destroyed and this is not consistent with mechanical scraping.

2. Anchors/Sutures.

One of the things that surgeons do is they use anchors, which are a little piece of metal, or plastic, or alcohol solutions made into a solid. They are used for binding suture to various parts of the shoulder for doing these kinds of repairs. There is no question that those can damage cartilage. But it is like the baseball cleats on the floor. I have recently had quite a few of these cases where you can just see the scrape from that particular mechanical thing, but it's not this global loss of cartilage that I'm trying to describe for you.

There's no question that suture anchors and instruments can injure cartilage locally. But in the 396 surgeries study, there was no evidence that they caused complete destruction of all the cartilage on both sides of the joint.

3. Radio Frequency/Thermal Energy.

Radio frequency and thermal devices are used in the joint for various kinds of things. One is to destroy tissue. For example, if there is a flap from the lining of the joint that is in the way, a surgeon may want to burn that out of there. Another application of radio frequency is to shrink the lining of the joints and shoulders that seem to be too unstable. There is some indication that radio frequency can be associated with chondrolysis.

In my study of this particular series of patients, radio frequency was not a consistent feature of the cases that went on to develop chondrolysis. In other words, there were cases that had chondrolysis that did not involve thermal or radio frequency use in the joint.

4. Epinephrine.

In arthroscopic surgery epinephrine has been used in two different ways. One is, in some cases it being used in the irrigant; and, two, in some cases it being used with the anesthetic that is injected, such as Marcaine with epinephrine. Some observers have suspected that Epinephrine can be a factor in chondrolysis.

In this series, epinephrine was not a consistent feature of the cases that went on to develop chondrolysis.

5. Infection.

We considered the role of infection as possibly being the cause of the chondrolysis cases we saw. We tried to consider every possible cause. In other words, the way we did this study is we did not start with an idea about what the specific cause was. So I instructed our team to be looking out for any possible other factors. And in this series of 396 cases, we could find no evidence of an infection.

If there was a subclinical infection, that means the clinicians are not going to see it so there was no way we have of knowing if it was there or not. In a clinical infection, the patient has signs of infection, like fevers, chills, elevated redness around the joint, swelling, lab studies that may indicate that there is an infection present like elevated C-reactive protein or white cell count or sedimentation rate. And in this series, there was no evidence that was a factor.

6. <u>Gentian Violet, Chlorhexidine, and Methylmethacrylate</u>.

There are certain substances, such as Gentian Violet, chlorhexidine, and methylmethacrylate, which have been established to be toxic to cartilage. When a joint is exposed to these chemicals, the cartilage may die.

In this particular series of patients, none of these substances were used in the joints of these patients, and each of these possible causes can be ruled out as a cause of chondrolysis.

<u>Conclusions</u>.

The data we had available and which we studied was scientifically sufficient to support the conclusions I have reached. I think that right now, as of our analysis of this paper and of the most recent series studied, there are now three identified scientifically valid causes of chondrolysis of the glenohumeral joint.

One is historical, largely because it is not done anymore. It involves chemical toxicities to cartilage. There were three cases in the literature of the use of a dye that was injected into the joint. I think it was Gentian Violet. This was found to be toxic to cartilage. And there are also reports of the use of chlorhexidine in the joint. This was also found to be toxic to cartilage. These are not used in the joint anymore.

The second cause that has been documented to my satisfaction is the use of radio frequency, or thermal devices or treatments in the joint. This can be harmful and fatal to cartilage.

And the third is the continuous intra-articular infusion of local anesthetic by means of a pain pump.

## V. Intra-Articular Use of Pain Pumps as a Scientifically Plausible Cause of Glenohumeral Chondrolysis.

Chondrolysis of the glenohumeral joint was basically unheard of until the middle part of this decade.. There were lots of arthroscopic surgeries in glenohumeral joints occurring prior to that, but chondrolysis was not being seen or reported. I see lots and lots of serious shoulder conditions in my Shoulder and Elbow Clinic at the University of Washington. Patients with the most serious injuries tend to be referred to our Clinic. And over the two decades or more prior to about 2005, we just weren't seeing any cases of glenohumeral chondrolysis. We know that there is substantial under-reporting of all types of medical complications. This would also be true for glenohumeral chondrolysis. But even if the incidence of glenohumeral chondrolysis was under-reported in prior years, the occurrence of glenohumeral chondrolysis has significantly increased, manyfold, since the middle of this decade. The question being addressed is why. That is the reason for my studies.

Based upon the studies we have done, which are described in this Report, and my education, training, and experience, and the basic science research and case reports published in the medical literature on this subject, I have concluded, based upon a reasonable medical probability, that intra-articular use of pain pumps to continuously inject commonly used anesthetic medications such as Marcaine or lidocaine, with or without epinephrine, in volumes of 250 ml. more or less over a period of 2-3 days or more, is a scientifically plausible cause of glenohumeral chondrolysis.

I reserve the right to amend or supplement this Report in the event that additional pertinent information becomes available or additional issues that are not adequately addressed in this Report are raised in reports of other experts.

Dated: May 25, 2009

Frederick Matsen, III, M.D.