IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Kreiger

Civil Action No. 1:08-cv-00365-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

v.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.;
REABLE THERAPEUTICS, LLC; and
I-FLOW CORPORATION;

Defendants.

---

**PLAINTIFF'S RESPONSE TO**
**DJO, INCORPORATED'S MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT .................................. 1

A. DJO is not entitled to Summary Judgment on Claim 1: Negligence ...................... 1

1. Burden of proof and elements ................................................................. 1

2. Elements Challenged by the Defendant ................................................. 1

A.) Plaintiff can Establish "General Causation" ............................................ 1

B.) Plaintiff's Evidence Presents Triable Issues of Fact for the Jury .......................... 2

C.) Overview of Shoulder and Cartilage Anatomy ................................................ 3

D.) Brief Synopsis of Plaintiff's General Causation Experts ................................ 4

i. Charles Beck, M.D. ........................................................................ 4

ii. Charles Matsen, M.D. ..................................................................... 5

iii. Stephen Badylak, M.D., Ph.D., DVM ................................................ 5

iv. Carl Basamania, M.D. ..................................................................... 5

v. Jason Dragoo, M.D. ......................................................................... 6

vi. Stephen Trippel, M.D. ..................................................................... 6

vii. Sander Greenland, Dr.P.H. ............................................................... 6

viii. Martin Wells, Ph.D. ........................................................................ 7

E.) Plaintiff's Evidence of Case Reports, *In Vitro* Studies, and Animal Tissue Studies Linking Pain Pumps to Chondrolysis is Sufficient to Present Triable Issues of Causation for the Jury to Resolve. ........................................................... 7

F.) Plaintiff's Evidence of Epidemiology Linking Pain Pumps to Chondrolysis is Sufficient to Present Triable Issues of Causation for the Jury to Resolve. ........... 18

B. Claims 3, 5, 6, 8: DJO is entitled to Summary Judgment on Claims, 3, 5, 6, 8: Product Liability ................................................................................................ 24

1. Burden of proof and elements ................................................................. 24

2. Elements challenged by the Defendant .................................................. 25

A.) Plaintiff can Establish "General Causation" ............................................ 25

B.) Plaintiff's evidence in support of the causation element in her product liability claims is identical to the evidence offered in support of her negligence claim. ............... 26



116748v1

C.) Claim 6: DJO is entitled to Summary Judgment on Claim 6: Product Liability – Breach of Implied Warranty of Merchantability ........ 26

1. Burden of proof and elements ........ 26

2. Elements challenged by the Defendant ........ 26

D.) Claim 6: DJO is also entitled to Summary Judgment on Its Affirmative Defense of Statute of Limitations Regarding Claim 6, Product Liability/Breach of Warranty ........ 26

1. Burden of proof and elements ........ 26

CONCLUSION ........ 27

# TABLE OF AUTHORITIES

## Cases

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 289 F. Supp. 2d 1230 (W.D. Wash. 2003)* ............ 18

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 882 C.A. 10 (Colo.), 2005 ............ 18

## Other Authorities

A. Wei and L. Galatz, *Ch. 19, Complications of Shoulder Arthroscopy*, p.918, in THE SHOULDER, FOURTH ED., Vol. 2, Rockwood, Matsen, Wirth and Lippitt, eds. (Saunders Elsevier 2009) .. 17

B. Hill, *The Environment and Disease: Association or Causation?* 58 PROCEEDINGS OF THE ROYAL SOCIETY OF MEDICINE 295-300 (1965) ............ 22

MODERN EPIDEMIOLOGY (3rd Ed 2008) ............ 6, 21

Oxford Center for Evidence-based Medicine Levels of Evidence (Mar. 2009) ............ 18

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, SECOND (Federal Judicial Center 2005) ...... 6, 20

S. Greenland and K. Rothman, *Ch. 7, Cohort Studies*, 100 in MODERN EPIDEMIOLOGY 3D ED., K. Rothman, S. Greenland & T. Lash, eds. (Lippincott Williams & Wilkins 2008) ............ 18, 19

## Medical Articles

A. McNickle et al., *Postsurgical glenohumeral arthritis in young adults*, Am J Sports Med (Jun. 9, 2009) ............ 14

A. Miniaci and M. Codsi, *Thermal capsulorrhaphy for the treatment of shoulder instability*, 34(8) AM J SPORTS MED 1356-63, 1362 (Aug. 2006) ............ 10

A. Reading et al., *Quantitative assessment of the effect of 0.05% chlorhexidine in rat articular cartilage metabolism in vitro and in vivo,* 18 J ORTHOPAEDIC RES 762-67 (2000) ............ 9

A. Reading, *Chlorhexidine and chondrolysis in the knee(Letter),* 82 JBJS(B) 620 (2000) ............ 9

*A. van Huyssteen and D. Bracey*, Chlorhexidine and chondrolysis in the knee. 81 JBJS(B) 995-96 (1999) ............ 9

B. Busfield and D. Romero, *Current Concepts: Pain pump use after shoulder arthroscopy as a cause of glenohumeral chondrolysis,* 25(6) J ARTHROSCOPIC AND RELATED SURG 647-652 (Jun. 2009) ............ 16

Baillieul, R. J., *The peri-operative use of intra-articular local anesthetics: A review*, 60 ACTA ANAESTH BELG 101-08 (2009) ............ 16, 17

C. Chu et al., *In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articular Chondrocytes*, 22 ARTHROSCOPY 693-99 (Jul. 2006) ............ 13

C. Chu et al., *The in vitro effects of bupivacaine on articular chondrocytes*, 90-B:6 J BONE & JOINT SURG (BR) 814-20 (2008) ........................................................................ 14

C. Douw et al., *Clinical and pathological changes in the knee after accidental chlorhexidine irrigation during arthroscopy*, 80 JBJS(B) 437-40 (1998)........................................................ 9

C. Hogan and D. Diduch, *Progressive articular cartilage loss following radiofrequency treatment of a partial-thickness lesion*, 17(6) ARTHROSCOPY E24 (2001) ................................ 9

D. Jackson, *Intra-articular injections of local anesthetics: How much is too much?* 28:5 ORTHOPEDICS TODAY (2008) ........................................................................................ 17

D. Petty et al., *Glenohumeral chondrolysis after shoulder arthroscopy: case reports and review of the literature.* 32 AM J SPORTS MED. 509-515 (2004).................................................... 9, 10

E. Fester and F. Noyes, *Postoperative chondrolysis of the knee: 3 case reports and a review of the literature*, AM J SPORTS MED (Jun 17, 2009) (Epub ahead of print) ................................ 15

G. Athwal et al., *Osteolysis and arthropathy of the shoulder after use of bioabsorbable knotless suture anchors*, 88-A(8) J. Bone & Joint Surg. 1840-45 (Aug. 2006) .................................... 10

J. Dragoo et al., *The effect of local anesthetics administered via pain pump on chondrocyte viability*, 36:8 Am J Sports Med 1484-88 (Jun. 1, 2008)......................................................... 13

J. Levy et al., *Young patients with shoulder chondrolysis following arthroscopic shoulder surgery treated with total shoulder arthroplasty*, J SHOULDER ELBOW SURG (2008) ................ 8

J. Rapley et al., *Glenohumeral chondrolysis after shoulder arthroscopy associated with continuous bupivacaine infusion*, 25:12 ARTHROSCOPY: J ARTHROSCOPIC AND RELATED SURG. 1367-73 (Dec. 2009) ................................................................................................ 23, 24

K. Tamai et al., *Chondrolysis of the shoulder following a "color test" – assisted rotator cuff repair – a report of 2 cases*, 68(4) ACTA ORTHOP SCAND 401-02 (1997) ............................... 8

K. Wong and G. Williams, *Complications of thermal capsulorrhaphy of the shoulder*, 83-A Supp. 2 Part 2 J BONE & JOINT SURG. 151-155 (2001) .......................................................... 10

M. Saltzman et al., *Postsurgical chondrolysis of the shoulder*, 32 ORTHOPEDICS 215 (2009)..... 14

M. Slabaugh, N. Friel and B. Cole, *Rapid chondrolysis of the knee after anterior cruciate ligament reconstruction: A case report*, 92 J BONE & JOINT SURG 186-89 (Jan. 2010).......... 16

P. Clavert and J. Warner, *Panacryl synovitis: Fact or fiction?* 21 Arthroscopy 200-03 (2005) . 10

P. Greis et al., *Bilateral shoulder chondrolysis following arthroscopy. A report of two cases*, 90 J BONE JOINT SURG AM 1338-1344 (2008)................................................................... 14

R. B. Edwards et al., *Thermal chondroplasty of chondromalacic human cartilage: an ex vivo comparison of bipolar and monopolar radiofrequency devices*, 30(1) Am J Sports Med 90-97 (2002)........................................................................................................................ 9

S. Anderson et al., *Chondrolysis of the Glenohumeral Joint*, J ARTHROSCOPY SUPP e13 (2008) 14

S. Webb and S. Ghosh, *Further opinion: The in vitro effects of bupivacaine on articular chondrocytes,* J BONE & JOINT SURG BR. (2008) .................................................................... 15

W. Levine et al., *Chondrolysis following arthroscopic thermal capsulorrhaphy to treat shoulder instability: a report of two cases.* 87 J BONE JOINT SURG AM. 616-621 (2005)....................... 9

Y. Lu et al., *Thermal chondroplasty with radiofrequency energy: an in vitro comparison of bipolar and monopolar radiofrequency devices*, Am J 29(1) SPORTS MED 42-49 (2001) ......... 9

Y. Nakagawa et al., *Glenohumeral osteoarthritis following a "color test" during rotator cuff repair,* 57 BULLETIN HOSPITAL FOR JOINT DISEASES 216-18 (1998)......................................... 8

Y. Shibata et al., *Chondrolysis of the glenohumeral joint following a color test using gentian violet*, 25 INTERNATIONAL ORTHOPEDICS 401-03 (2001) .......................................................... 8

COMES NOW Plaintiff Stacey Ann Hansen, in opposition to Defendant DJO, Incorporated's Motion for Summary Judgment (DJO), pursuant to Fed. R. Civ. P. 56. Triable issues of fact exist with regard to all claims upon which the Defendant seeks summary judgment, except Claim 6, which plaintiff concedes as described herein.

Plaintiff notes that the instant motion by DJO is virtually identical to a motion for summary judgment filed simultaneously by co-defendant I-Flow, Docket No. 155; DJO's motion, in fact, incorporates by reference and joins the points made in I-Flow's motion. For that reason, plaintiff files this brief in opposition, which is identical to her response opposing the I-Flow motion, Docket Nos. 196-202, *Declaration of Thomas B. Powers in Support of Plaintiffs' Response to I-Flow's Motion for Summary Judgmen*t (with Exhibits 1-53). Rather than burden the Court with a duplicative set of the extensive exhibits accompanying the response to I-Flow's motion, however, plaintiff refers to those exhibits as if incorporated herein.

**<u>CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT</u>**

**A. DJO is not entitled to Summary Judgment on Claim 1: Negligence**

1. <u>Burden of proof and elements</u>

Plaintiff agrees that she has the burden of proving 1) the existence of a duty owed by defendant DJO, 2) a breach of that duty, 3) causation, and 4) damages, in order to prevail on her negligence claim. DJO's motion incorrectly contends that plaintiff fails in her proof of causation. DJO does not move against any other elements of plaintiff's negligence claim. The only element of the negligence claim at issue in defendant's motion is scientific causation.

2. <u>Elements Challenged by the Defendant</u>

Element 3—Causation. Plaintiff can demonstrate triable issues of fact that DJO's product <u>caused</u> her injury and therefore, her claim survives summary judgment and is to be decided by a jury.

**A.) PLAINTIFF CAN ESTABLISH "GENERAL CAUSATION"**

Plaintiff will offer substantial medical and scientific evidence in support of general causation; that is, that the continuous infusion of local anesthetics via a pain pump directly into

the should joint for 48-72 hours is capable of causing chondrolysis, the injury suffered by Ms. Hansen. Contrary to defendant's motion, the medical and scientific evidence is overwhelming in support of the contention that pain pump use is capable of causing chondrolysis, and plaintiff's claim is supported by qualified medical experts who have offered opinions—based on reliable scientific evidence—that the continuous infusion of local anesthetics via a pain pump directly into the should joint for 48-72 hours is capable of causing chondrolysis.

Although this Court has yet to hear and decide the Rule 702 Motions raised by the parties in this matter, the sufficiency of plaintiff's evidence (assuming it is admissible) is put at issue by DJO's motion, so plaintiff's evidence of causation is discussed and summarized below.

**B.) PLAINTIFF'S EVIDENCE PRESENTS TRIABLE ISSUES OF FACT FOR THE JURY**

The evidence of general causation in this case could not be more basic. Plaintiff expects to call as expert witnesses prominent surgeons, researchers and epidemiologists. Many of them have published on subjects relevant to the etiology of chondrolysis and have clinical experience diagnosing chondrolysis and caring for patients with chondrolysis. In support of their opinions, all of plaintiffs' experts rely on a combination of published case reports, case series, animal studies, and *in vitro* studies on both animal and human cartilage, as well as two sets of retrospective cohort epidemiological data. The causal relationship has even been described in a leading medical textbook. The evidence associating the continuous intra-articular infusion of local anesthetics and chondrolysis is so strong that the community of orthopedic surgeons has stopped using pain pumps in the shoulder joint space. There are no published studies finding that continuous intra-articular infusion of local anesthetics from high-volume pain pumps do <u>not</u> cause chondrolysis.

Courts in the Tenth Circuit have repeatedly held that the totality of such sources of evidence is sufficient foundation for expert testimony under *Daubert* and Rule 702. Assuming that the Court decides plaintiff's expert opinions are admissible, plaintiff will satisfy her burden

of presenting genuine issues of material facts for resolution by the jury, and defendant's motion should be denied.

### C.) OVERVIEW OF SHOULDER AND CARTILAGE ANATOMY

Understanding the evidence relevant to causation in this case begins with the basic anatomy of the shoulder. The shoulder has two joints: the acromial clavicular ("A-C") joint and the glenohumeral joint. As the illustration below shows, the A-C joint is at the roof of the shoulder. The subacromial bursa is situated below the deltoid and above the rotator cuff. The glenohumeral joint is a ball-and-socket joint. The subacromial space has no articular cartilage. The glenohumeral joint does. The glenohumeral joint is an intra-articular space. The terms "joint space," "intra-articular space," "synovial cavity" and "synovial space" all mean the same thing: a joint containing synovial tissue and articular cartilage. Below the rotator cuff is the capsule. It is made of fibers and encases the glenohumeral joint. Inside the capsule of the glenohumeral joint is the synovial space.




As shown above, the articular cartilage in the glenohumeral joint is a thin layer of tissue that covers the ends of bone. It provides a smooth, gliding surface to enable the bones to move. Unlike other cartilage in our bodies, articular cartilage is enclosed. It has no blood supply, lymph supply or nerves. Articular cartilage gets its nutrients from the joint. The synovial tissue (inside the joint) produces synovial fluid, which carries and diffuses the necessary nutrients into the articular cartilage matrix and the cartilage cells ("chondrocytes") that live within and

continually renew the matrix of cartilage. Synovial fluid is the "lifeblood" for articular cartilage. Ex. 01, Trippel Report at 4.

Plaintiff Stacey Hansens's articular cartilage in this case was destroyed by the continuous infusion of local anesthetics into her joint space following routine arthroscopic surgery on June 9, 2003. Dr. Houseworth performed the surgery, and placed the pain pump catheter into Ms. Hansen's shoulder joint, infusing her shoulder with approximately 300cc of anesthetic for two days following her surgery. Ms. Hansen has since been diagnosed with chondrolysis, a permanent and disabling injury that leaves her with lifelong pain, loss of the use of her arm, and a series of major surgeries to preserve what use she still has left of her arm.

Ms. Hansen's evidence of causation is summarized below.

**D.) BRIEF SYNOPSIS OF PLAINTIFF'S GENERAL CAUSATION EXPERTS**

Plaintiffs present several highly qualified experts who will testify in support of the general causation element of plainitff's negligence claim—that intra-articular placement of pain pumps can cause glenohumeral chondrolysis. A brief synopsis of these experts' qualifications and opinions is listed below.

**i. Charles Beck, M.D.**

Dr. Beck is a board certified orthopedic surgeon with over twenty years experience in Salt Lake City. He is also a research scientist. Dr. Beck conducts clinical trials and serves as a consultant to medical device companies working on improvements in orthopedic surgery technology. Dr. Beck was the first orthopedic surgeon to investigate systematically the sudden appearance in 2003-2004 of shoulder chondrolysis in many of his patients. He began alerting the orthopedic surgery community about the hazards intra-articular placement of pain pumps catheters in 2005. Dr. Beck presented his scientific findings to his colleagues at the March 2006 annual meeting of orthopedic surgeons, and finally published the full study in the American Journal of Sports Medicine, a peer reviewed journal, in 2007. He will testify that the use of high-volume pain pumps to infuse local anesthetics into the intra-articular space is a likely cause of chondrolysis following shoulder surgery.

**ii. Charles Matsen, M.D.**

Dr Matsen is the Chair of Orthopedic Surgery at the University of Washington. He has been a board certified orthopedic surgeon for 34 years. Dr. Matsen has conducted extensive research on the shoulder and has served as scientific consultant to several device companies. He is one of the four editors of the leading textbook on the shoulder, entitled *The Shoulder*. The fourth edition of this two-volume treatise was published this year. Dr. Matsen has submitted for peer review and publication an epidemiological study of 375 consecutive shoulder surgeries from the practice of Portland surgeon Dr. Benz, examining the relationship between intra-articular pain pump use and chondrolysis. Dr. Matsen will testify that the infusion of 250ml or more of local anesthetics via pain pumps into the intra-articular space for 2-3 days is a scientifically plausible cause of glenohumeral chondrolysis.

**iii. Stephen Badylak, M.D., Ph.D., DVM**

Dr. Stephen Badylak is an MD, PhD (Anatomic Pathology), and Doctor of Veterinary Medicine who performs research on tissue regeneration at the University of Pittsburgh, where he is a full professor in both the departments of Surgery and of Bioengineering. He is the Director of the Center for Preclinical Studies and Deputy Director of the McGowan Institute for Regenerative Medicine. Before moving to Pittsburgh in 2003, Dr. Badylak was head team physician for Purdue University for 15 years. He spends much of his time conducting research on various aspects of injuries to joints and limbs. He will testify that the use of pain pumps to deliver intra-articular medications such as marcaine and other local anesthetics known to be cytotoxic is a primary cause of chondrolysis in the shoulder.

**iv. Carl Basamania, M.D.**

Dr. Carl Basamania is a board-certified orthopedic surgeon specializing in shoulder surgeries, and has performed over 50,000 shoulder surgeries in his career, including shoulder replacements and other surgical procedures on patients suffering from chondrolysis. He holds patents on orthopedic medical devices, and consults with several pharmaceutical companies and medical device manufacturers. He conducts clinical research, and has published on orthopedic

topics in the peer-reviewed literature. He will testify that the intra-articular use of pain pumps is a scientifically valid and plausible cause of chondrolysis, and that pain pumps are probably the leading cause of chondrolysis following shoulder surgery.

**v. Jason Dragoo, M.D.**

Dr. Jason Dragoo is an Associate Professor of Orthopedic Surgery at Stanford University. His research focuses on the mechanisms of cartilage degeneration, including the use of local anesthetics, and on the functional restoration of cartilage. He runs a research lab at Stanford, and has published extensively on cartilage damage and restoration. He has specifically published on the effects of local anesthetics on cartilage. He will testify that the use of intra-articular pain pumps with local anesthetics can cause cartilage degeneration in a dose-dependent manner.

**vi. Stephen Trippel, M.D.**

Dr. Stephen Trippel is a board-certified orthopedic surgeon whose clinical practice specializes in total joint replacement surgeries. He also has a research specialty in articular cartilage, running a cartilage research lab at Indiana University. Dr. Trippel has published over 50 peer-reviewed articles relating to cartilage, has authored chapters in medical textbooks, and consults and conducts sponsored research for pharmaceutical companies, medical device manufacturers, and biotechnology firms. Dr. Tripple will testify that local anesthetics continuously injected via pain pumps into the glenohumeral joint are toxic to cartilage, and that the intra-articular use of pain pumps in the shoulder is a scientifically plausible cause of chondrolysis.

**vii. Sander Greenland, Dr.P.H.**

Dr. Greenland is one of the world's most renowned epidemiologists. He is both author and editor of the leading textbook for courses in advanced epidemiology around the world, MODERN EPIDEMIOLOGY (3rd Ed 2008). Dr. Greenland's textbook has also been authoritatively cited in innumerable peer-reviewed journal articles and treatises, including the Federal Judiciary Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, in large measure because of the text's coverage of issues in determining causes of effects and effects of causes.

Dr. Greenland holds a Doctorate of Public Health and is a full professor of both Epidemiology and Statistics at UCLA. He is consulted on epidemiological questions by numerous business and government organizations, and he has published more than 300 papers in the peer-reviewed literature. He will testify that, with a high degree of certainty, the use of intra-articular pain pumps was a primary and essential contributing factor in the development of chondrolysis for any patient with chondrolysis in the Beck, Matsen and Rapley studies.

**viii. Martin Wells, Ph.D.**

Dr. Martin Wells is the Chair of the department of Statistical Sciences at Cornell University. He is professor of Clinical Epidemiology and Health Services Research at Cornell's Weill Medical School. Dr. Wells also serves on the editorial board of several statistical science journals and has published extensively in the scientific literature. He will testify that the epidemiological studies examining the association between pain pump use and chondrolysis provide strong evidence supporting causation.

**E.) PLAINTIFF'S EVIDENCE OF CASE REPORTS, *IN VITRO* STUDIES, AND ANIMAL TISSUE STUDIES LINKING PAIN PUMPS TO CHONDROLYSIS IS SUFFICIENT TO PRESENT TRIABLE ISSUES OF CAUSATION FOR THE JURY TO RESOLVE.**

Chondrolysis is the end result of the death of the cartilage. The cartilage matrix is no longer replaced as it wears into the normal use of the joint. [1]. Because the cartilage matrix is no longer replaced as it wears in the normal use of the joint, there is no protective padding between the ball and socket once it wears away completely. This is a permanent loss of cartilage, which does not regenerate. The bones then rub against one another, causing a great deal of pain and stiffness. The images below illustrate the disappearance of cartilage in the in the shoulder of a chondrolytic joint:[2]

[1] On-Line Medical Dictionary: http://medical-dictionary.thefreedictionary.com/chondrolysis

[2] Image provided courtesy of Dr. Frederick Matsen.



116748v1




Because the destroyed cartilage does not grow back, chondrolysis is a permanent and devastating condition. It is much worse than ordinary arthritis in that all or almost all of the cartilage is lost, and the tissues of the joint are inflamed and contracted. There are few treatment options for chondrolysis other than pain management. Total shoulder joint replacement has had only limited success in patients with chondrolysis.[3]

Chondrolysis is an extremely rare disease. This is especially true where it occurs with rapid onset in younger people whose joints are typically healthy. Chondrolysis of the shoulder was unknown and unreported in the medical literature until the late 1990s. At that time, three case reports by Japanese researchers unearthed a cluster of chondrolysis cases in the shoulders of seven patients after they received an injection of gentian violet, a color contrast dye, during open surgery.[4] At around the same time, three case reports and a handful of animal studies also

[3] Ex. 02, J. Levy et al., *Young patients with shoulder chondrolysis following arthroscopic shoulder surgery treated with total shoulder arthroplasty*, J SHOULDER ELBOW SURG (2008).

[4] Ex. 03, K. Tamai et al., *Chondrolysis of the shoulder following a "color test" – assisted rotator cuff repair – a report of 2 cases*, 68(4) ACTA ORTHOP SCAND 401-02 (1997); Ex. 04, Y. Nakagawa et al., *Glenohumeral osteoarthritis following a "color test" during rotator cuff repair*, 57 BULLETIN HOSPITAL FOR JOINT DISEASES 216-18 (1998); Ex. 05, Y. Shibata et al., *Chondrolysis of the glenohumeral joint following a color test using gentian violet*, 25 INTERNATIONAL ORTHOPEDICS 401-03 (2001).

identified chlorohexadine (irrigation solution) as chondrotoxic to the knee joint.[5] A single case report found that use of methylmethacrylate (acrylic bone cement) in the hip joint caused a similar destruction of cartilage. Surgeons quit using these substances in joint spaces. As a result, no further cases were reported in the published literature.

A second small wave of shoulder chondrolysis appeared in 2000-2001, when radiofrequency devices (sometimes called "thermal wands") became popular.[6] Surgeons used these devices to burn away excess tissue, cauterize wounds and shrink the lining of joints that had become too unstable. However, if they were used at high settings or for too long, thermal wands were hypothesized to cause the synovial fluid in the joint to overheat, kill the chondrocytes and destroy the cartilage. Once alerted by the medical literature, surgeons quickly changed the way they used thermal wands, employing them sparingly and at low energy settings. The reported incidence of shoulder chondrolysis cases diminished. The correlation between thermal wands and chondrolysis is established, albeit slightly. Only five cases of acute chondrolysis of the glenohumeral joint after the use of thermal wands in arthroscopic procedures have been reported in the published literature.[7]

Thermal capsulorrhaphy was once a popular technique to treat shoulder instability. However, due to risk of damage to the capsular tissue and clinical experience that showed it was

---

[5] Ex. 06, C. Douw et al., *Clinical and pathological changes in the knee after accidental chlorhexidine irrigation during arthroscopy*, 80 JBJS(B) 437-40 (1998); Ex. 07, *A. van Huyssteen and D. Bracey*, Chlorhexidine and chondrolysis in the knee. 81 JBJS(B) 995-96 (1999); Ex. 08, A. Reading, *Chlorhexidine and chondrolysis in the knee(Letter)*, 82 JBJS(B) 620 (2000). *See also, e.g.*, Ex. 09, A. Reading et al., *Quantitative assessment of the effect of 0.05% chlorhexidine in rat articular cartilage metabolism in vitro and in vivo*, 18 J ORTHOPAEDIC RES 762-67 (2000).

[6] Ex. 10, R. B. Edwards et al., *Thermal chondroplasty of chondromalacic human cartilage: an ex vivo comparison of bipolar and monopolar radiofrequency devices*, 30(1) Am J Sports Med 90-97 (2002); Ex. 11, C. Hogan and D. Diduch, *Progressive articular cartilage loss following radiofrequency treatment of a partial-thickness lesion*, 17(6) ARTHROSCOPY E24 (2001); Ex. 12, Y. Lu et al., *Thermal chondroplasty with radiofrequency energy: an in vitro comparison of bipolar and monopolar radiofrequency devices*, Am J 29(1) SPORTS MED 42-49 (2001).

[7] Ex. 13, W. Levine et al., *Chondrolysis following arthroscopic thermal capsulorrhaphy to treat shoulder instability: a report of two cases.* 87 J BONE JOINT SURG AM. 616-621 (2005); Ex. 14, D. Petty et al., *Glenohumeral chondrolysis after shoulder arthroscopy: case reports and review of the literature.* 32 AM J SPORTS MED. 509-515 (2004).

not effective, the use of thermal capsulorrhaphy to treat instability has largely been abandoned. A survey conducted by Drs. Wong and Williams in 2001 reported 14,277 thermal capsulorrhaphy procedures from roughly 1996 to 2001, with a staggered follow-up of over 5 years of thermal capsulorrhaphy patients. In this study, the authors did not find a single case of chondrolysis.[8] Similarly, Dr. Anthony Miniaci published a paper, which summarized ten other studies that had reported on an additional 259 patients who underwent thermal capsulorrhaphy. Those patients had a follow-up of between one and three years without a single reported case of chondrolysis. Dr. Miniaci expressed doubt that there is a strong correlation between radiofrequency devices and chondrolysis.[9]

Beginning in the early 2000s, surgeons also reported isolated cases of cartilage damage hypothesized to be due to the use of suture anchors.[10] The literature has suggested that it is the depth (or height) of placement of the anchors themselves, rather than the bioabsorbable panacryl sutures, which are associated with chondrolysis.[11] In any event, the damage to the cartilage is limited to the area near the anchors – typically described as "focal injury" – rather than the widespread destruction of cartilage of the entire joint.[12]

The most pronounced wave of chondrolysis began surfacing in the published literature 2004, when Petty and colleagues reported three cases of glenohumeral chondrolysis in young athletes following arthroscopic shoulder surgery.[13] Thermal devices were used in two of the three patients. The third patient, however, received a pain pump infused with a solution of .5% bupivacaine ("Marcaine") and epinephrine. Dr. Petty and his colleagues failed to mention

---

[8] Ex. 15, K. Wong and G. Williams, *Complications of thermal capsulorrhaphy of the shoulder*, 83-A Supp. 2 Part 2 J BONE & JOINT SURG. 151-155 (2001).

[9] Ex. 16, A. Miniaci and M. Codsi, *Thermal capsulorrhaphy for the treatment of shoulder instability*, 34(8) AM J SPORTS MED 1356-63, 1362 (Aug. 2006).

[10] *See* Ex. 17, G. Athwal et al., *Osteolysis and arthropathy of the shoulder after use of bioabsorbable knotless suture anchors*, 88-A(8) J. Bone & Joint Surg. 1840-45 (Aug. 2006).

[11] *Id. See also* Ex. 18, P. Clavert and J. Warner, *Panacryl synovitis: Fact or fiction?* 21 Arthroscopy 200-03 (2005).

[12] Ex. 17, G. Athwal, *supra*, at 1845.

[13] Ex. 14, D. Petty et al., *supra*, (2004).

whether pain pumps were used in the other two cases. Although the authors determined that thermal devices played a role in two of the three cases of chondrolysis, they did not make the connection between the pain pump used in any of the patients. The authors' oversight is not surprising, since no one had yet reported a link between pain pumps and chondrolysis. But as intra-articular use of pain pumps became more and more popular in arthroscopic shoulder procedures, surgeons began seeing a surge in the number of their patients who developed chondrolysis. One of these surgeons was Dr. Charles Beck.

Dr. Beck had performed hundreds of arthroscopic shoulder surgeries at his clinic in Salt Lake City without encountering a single case of glenohumeral chondrolysis. But beginning in 2003, several of his patients developed rapid-onset chondrolysis. Ex. 19, Beck Report at 6-7. Dr. Beck scrutinized his patients' records, trying to find out what could be causing them to develop this rare disease. He considered all of the potential etiologies: anchors, sutures, radiofrequency probes, irrigation fluid, pre-existing cartilage injury, surgical technique. None of these other factors could explain the injury. The only consistent common factor was use of a high volume pain pump with bupivacaine and epinephrine in the glenohumeral joint. *Id.* at 7. Dr. Beck reviewed the medical records for <u>all</u> 152 of his arthroscopic shoulder surgery patients over the same time frame. He discovered that most of his patients who had received a pain pump catheter in their joint space (63%) developed glenohumeral chondrolysis. In contrast, there were <u>no</u> cases of chondrolysis in any of his patients who did not receive a pain pump catheter in the joint space, *nor in any patient who received a pain pump where the catheter was placed near, but outside, the joint space*. *Id.* at 7-8. The only patients who developed chondrolysis were those in whom he had inserted a pain pump catheter in the joint space.

Alarmed, Dr. Beck consulted with his colleagues to find out if they were having the same experience. Dr. Paulos, a fellow surgeon in Salt Lake City, confirmed that the only patient of his who ever received a pain pump – an NCAA football player – developed chondrolysis. *Id.* at 8. Dr. Paulos was a highly paid consultant for Stryker Corp. (Stryker is another pain pump

manufacturer, not a party to this lawsuit). In early 2005, Dr. Paulos faxed a letter to Stryker alerting the manufacturer about this new complication:

> I want to let you know what I am hearing about complications with drip pain pumps. Over the past 2 years there have been a number of incidences of chondrolysis in younger patients. We have been perplexed and thought it could be the heat wand used.
>
> It now appears that the only common thread through all cases is the Marcain [sic] and/or Lidocain [sic] with the Epinephrine solution which tends to be very acidic and is probably the cause.
>
> You might want to look into this development and advise Stryker to change labeling.

Ex. 20, Letter from L. Paulos to B. Shirley (Feb. 11, 2005). Dr. Paulos followed up with an email to Stryker "to reinforce the importance of the issue":

> Guaranteed! This summer when Charlie Beck presents his paper at the Herodicus Society there will be a huge out pouring of other cases that have been smoldering for several years. Buddie Savoie has at least a dozen, Jim Andrews has an equal number and Charlie and I have about 6-8 cases. These are cases that I know of personally, the only common link is the pain dripping devices with Marcain or Lidocain [sic] and Epinephrine.

Ex. 21, Email from L. Paulos to B. Shirley and D. Kelley (Feb. 15, 2005). Dr. Paulos also proposed doing a cartilage study on animals, which he could complete within 30 days. Until then, Dr. Paulos urged Stryker to "cover its butt" and change the pain pump label right away. *Id.* at 5. Stryker never responded to Dr. Paulos' repeated requests.

Like Stryker, defendant DJO never conducted safety studies examining the possible relationship between pain pumps and chondrolysis.

In July 2005, Dr. Beck presented his findings to orthopedic surgeons at a Herodicus Society meeting in Colorado. Ex. 19, Beck Report at 8. As Dr. Paulos predicted, Dr. Beck's presentation prompted other scientists to begin studying the toxicity of bupivacaine in animal cartilage. *Id.* Anxious to alert surgeons to this devastating complication, Dr. Beck and his colleague Dr. Hansen wrote a paper for a podium presentation at the annual meeting of the American Academy of Orthopedic Surgeons (AAOS) in March, 2006. Ex. 22 Podium Presentation (Mar. 23, 2006). Drs. Beck and Hansen then submitted their research for peer

review and publication. Their paper was published on July 3, 2007 in the AMERICAN JOURNAL OF SPORTS MEDICINE. EX. 23.

At about the same time, Dr. Constance Chu and her colleagues at the University of Pittsburgh published an *in vitro* study showing that a solution of 0.5% bupivacaine (the local anesthetic most commonly used in pain pumps) is cytotoxic to bovine joint cartilage after just 15 to 30 minutes of exposure. Ex. 24, C. Chu et al., *In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articular Chondrocytes*, 22 ARTHROSCOPY 693-99 (Jul. 2006). A series of animal and *in vitro* studies built upon Dr. Beck's findings and Dr. Chu's research. They confirmed that local anesthetics in general were toxic to cartilage, and that this effect was both dose and duration dependent. These studies are too numerous to describe in detail here.[14] But it is notable that Dr. Jason Dragoo and colleagues repeated these experiments in human joint cartilage tissue and reached similar conclusions. *See* Ex. 30, J. Dragoo et al., *The effect of local anesthetics administered via pain pump on chondrocyte viability*, 36:8 Am J Sports Med 1484-88 (Jun. 1, 2008).

Soon after, other surgeons came forward, publishing reports of their patients who developed chondrolysis after receiving pain pumps. Unlike Dr. Beck's investigation, these studies did not include control groups. Nevertheless, they reported the identical experience in numerous patients. After ruling out other potential factors, these surgeons concluded that the intra-articular infusion of local anesthetics through a pain pump was the probable cause of their patients' chondrolysis and cautioned against using pain pumps in the joint space. *See, e.g.*, Ex. 31, P. Greis et al., *Bilateral shoulder chondrolysis following arthroscopy. A report of two cases*,

---

[14] Ex. 25, A. Gomoll et al., *Chondrolysis after continuous intra-articular bupivacaine infusion: An experiemental model investigating chondrotoxicity in the rabbit shoulder,* 22:8 Arthroscopy 813-19 (Aug. 2006); Ex. 26, J. Karpie and C. Chu, *Lidocaine exhibits dose-and time-dependent cytotoxic effects on bovine articular chondrocytes in vitro,* 10 Am J Sports Med 1-6 (Jul. 2007); Ex. 27, I. Lo et al., *Local anaesthetics induce chondrocyte death in bovine articular cartilage,* 7th Annual Meeting Podium Presentations AAOS (Mar. 5, 2008); Ex. 28, M. Yeger-McKeever et al., *Low doses of bupivacaine are cytotoxic to articular cartilage in vivo,* 7th Annual Meeting AAOS (Mar. 5, 2008); Ex. 29, S. Piper and H. Kim, *Comparison of ropivacaine and bupivacaine toxicity in human articular chondrocytes,* 90:5 J BONE JOINT SURG Am 986-91 (May 2008);



116748v1

90 J BONE JOINT SURG AM 1338-1344 (2008); Ex. 32, S. Anderson et al., *Chondrolysis of the Glenohumeral Joint,* J ARTHROSCOPY SUPP e13 (2008) (18 patients with pain pumps developed chondrolysis); Ex. 33, A. McNickle et al., *Postsurgical glenohumeral arthritis in young adults,* Am J Sports Med (Jun. 9, 2009) (16 of 20 chondrolysis patients received pain pumps).

One report in particular was compelling. Ex. 34, M. Saltzman et al., *Postsurgical chondrolysis of the shoulder*, 32 ORTHOPEDICS 215 (2009). It involved a patient who injured both shoulders. After bilateral arthroscopic surgeries, she received pain pumps in her left and right shoulders, but the pain pump in her right shoulder malfunctioned and did not deliver any anesthetic medication into her right shoulder joint. The patient developed chondrolysis in her left shoulder but not in her right shoulder. As the authors noted, it is unusual to have a patient, who serves as both a case and control. After eliminating other potential factors, the authors cautioned that pain pumps should not be used to deliver local anesthetics in the shoulder joint space. *Id.*

The most recent study by Dr. Chu and colleagues confirmed that the prolonged exposure of human and bovine joint cartilage to bupivacaine at doses ranging from 0.25 to 0.5% is chondrotoxic. Moreover, bupivacaine chondrotoxicity is both dose- and time-dependent. Ex. 35, C. Chu et al., *The in vitro effects of bupivacaine on articular chondrocytes,* 90-B:6 J BONE & JOINT SURG (BR) 814-20 (2008). The researchers also found a significant distinction between single injections and continuous infusion of anesthetics: although single injections of bupivacaine did not destroy joint cartilage, continuous infusion over longer periods did. The authors explained:

> These findings provide critical new information relating to current concerns on the clinical use of bupivacaine. Our results may provide an explanation for the absence of clinical reports on the association between chondrolysis and the use of intra-articular bupivacaine before the introduction of continuous-infusion pumps. In addition to systemic absorption and to the potential counteraction of the expected dilutional effects of joint fluid, continuous intra-articular infusion protocols may prolong the exposure of chondrocytes to bupivacaine. Eventually, the threshold for chondrolysis may be reached, as has been suggested clinically.



116748v1

*Id.* at 818.

This mounting evidence of clinical and laboratory studies has prompted the editors of leading orthopedic journals and textbooks to conclude that the infusion of anesthetics via pain pumps into the joint space causes chondrolysis and that surgeons should avoid using pain pumps in this manner. After reviewing Dr. Chu's most recent study, journal editors Webb and Ghosh stated:

> For the first time, a rational explanation for a variable effect of intra-articular bupivacaine can be provided based on demonstration of the dose- and time-dependent chondrotoxicity of drug. It can be concluded that the continuous intra-articular administration of high-concentration bupivacaine for a prolonged duration may result in adverse clinical effects, whereas the single injection of low-concentration bupivacaine is less likely to cause harm.
>
> * * *
>
> [W]e must be prepared to modify our approach to drug usage in light of new knowledge of adverse effects, even turning away from previously well-recognised practices. We commend our surgical colleagues on bringing the subject of bupivacaine-associated chondrotoxicity and its potentially devastating clinical consequences to the attention of the broader medical community.

Ex. 36, S. Webb and S. Ghosh, *Further opinion: The in vitro effects of bupivacaine on articular chondrocytes,* J BONE & JOINT SURG BR. (2008). The editors also called for a moratorium on the use of continuous intra-articular bupivacaine to avoid exposing patients to further unnecessary harm. *Id.*

A recent case report by Fester and Noyes also agreed with Dr. Chu's findings, concluding, "In summary, there is currently a significant amount of in vitro and in vivo evidence that the use of pain pumps with bupivacaine and epinephrine may lead to significant chondrolysis when placed into a joint." Ex. 37, E. Fester and F. Noyes, *Postoperative chondrolysis of the knee: 3 case reports and a review of the literature,* AM J SPORTS MED (Jun 17, 2009) (Epub ahead of print).

In January of 2010, Slabaugh, Friel and Cole published a second case report documenting chondrolysis in the knee following use of a pain pump. Ex. 38, M. Slabaugh, N. Friel and B.

Cole, *Rapid chondrolysis of the knee after anterior cruciate ligament reconstruction: A case report*, 92 J BONE & JOINT SURG 186-89 (Jan. 2010). The authors cautiously noted that the *definitive* cause of chondrolysis is uncertain. *Id.* at 186. However, they ascribed the use of a pain pump in the intra-articular space as the *likely* cause:

> It has been shown that rapid chondrolysis can occur when cartilage is exposed to toxic substances, such as methylmethacrylate and chlorhexadine. Although the exact cause of the severe acute chondrolysis in this patient remains unknown, the postoperative intra-articular infusion of bupivacaine is a likely cause.

*Id.* at 188. The paper goes on to consider the possible *mechanisms* to explain how pain pumps can cause chondrysis. *Id.*

Likewise, Drs. Busfield and Romero published a paper unambiguously identifying intra-articular use of pain pumps as a cause of chondrolysis, as is evident from the title itself. Ex. 39, B. Busfield and D. Romero, *Current Concepts: Pain pump use after shoulder arthroscopy as a cause of glenohumeral chondrolysis*, 25(6) J ARTHROSCOPIC AND RELATED SURG 647-652 (Jun. 2009).

A more recent review article, published by Baillieul and colleagues, is a useful example of how real world scientists have concluded that pain pumps cause chondrolysis, based on a comprehensive assessment of the available literature. Ex. 40, R.J. Baillieul, *The peri-operative use of intra-articular local anesthetics: A review*, 60 ACTA ANAESTH BELG 101-08 (2009). As the authors stated, the purpose of their paper was "to summarize the available literature on intra-articular local anesthetics in terms of efficacy, clinical use, relative effectiveness compared to other analgesic procedures, side effects and possible toxicity." *Id.* at 101. After reviewing many of the same studies plaintiffs' experts did, the authors found little evidence supporting the efficacy of intra-articular infusion of local anesthetics for pain management compared to placebo. *Id.* at 106. Based on their review of the published literature, the authors concluded:

> Continuous intra-articular infusion of local anesthetic has not been demonstrated to be an effective analgesic strategy after arthroscopy. **Furthermore, there is a strong correlation with post-operative chondrolysis after shoulder surgery. We hence**

> **advise against the use of continuous intra-articular local anesthetics**.

*Id.* (emphasis added)

A leading medical textbook on the shoulder acknowledges bupivacaine in pain pumps as a cause of chondrolysis. Ex. 41, A. Wei and L. Galatz, *Ch. 19*, *Complications of Shoulder Arthroscopy*, p.918, in THE SHOULDER, FOURTH ED., Vol. 2, Rockwood, Matsen, Wirth and Lippitt, eds. (Saunders Elsevier 2009). The title of the section is "Bupivacaine Induced Chondrolysis." Plaintiffs' expert Dr. Charles Matsen is one of the four editors of this widely used textbook, now in its fourth edition. Plaintiffs' expert Dr. Stephen Badylak is the author of one of the chapters.

It is no surprise that surgeons have recently abandoned the use of pain pumps in the glenohumeral joint space. Nearly every relevant medical article now discourages this practice. Medical school students and surgical residents are now taught to avoid placing the catheters in the joint space because it ruins the cartilage. In an interview with the chief medical editor of the journal ORTHOPEDICS TODAY, Dr. Chu noted, "The most important recommendation I have made to [medical residents and fellows] is to avoid continuous intra-articular infusion of local anesthetics. The in vitro data consistently show a dose and time dependent chondrotoxicity of both bupivacaine and lidocaine suggesting this is a class effect of local anesthetics." Ex. 42, D. Jackson, *Intra-articular injections of local anesthetics: How much is too much?* 28:5 ORTHOPEDICS TODAY (2008).

It has become generally accepted in the orthopedic surgery community that continuous infusion of local anesthetics through a pain pump into the joint space causes chondrolysis. This knowledge derives from a confluence of human case reports, case series, animal and in vitro studies (of both human and animal tissue), textbook references and retrospective cohort epidemiological data. Combined, these sources are compelling and consistent evidence of causation. This evidence certainly is sufficient to present triable issues of fact for the jury, and the motion for summary judgment should be denied.

**F.) PLAINTIFF'S EVIDENCE OF EPIDEMIOLOGY LINKING PAIN PUMPS TO CHONDROLYSIS IS SUFFICIENT TO PRESENT TRIABLE ISSUES OF CAUSATION FOR THE JURY TO RESOLVE.**

Where epidemiology studies exist, they are well received by courts in mass-tort litigation. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 882 C.A. 10 (Colo.), 2005 ("where epidemiology is available, it cannot be ignored"); *In re Phenylpropanolamine (PPA) Litig.*, 289 F. Supp 2d at 1239. Well-conducted studies are uniformly admitted. *Id.* Plaintiff in this case relies on three epidemiological studies to prove general causation.

Dr. Charles Beck is one of plaintiffs' experts. Before this litigation began, Dr. Beck and his colleagues published a study that found a startlingly high percentage (63%) of chondrolysis among his patients who had been treated with continuous intra-articular infusions of bupivacaine and epinephrine through a pain pump following shoulder surgery. In contrast, none of his patients who were not treated with pain pumps in the joint developed chondrolysis. Ex. 23, Hansen, Beck et al. at 5 (2007). Although Dr. Beck referred to his study as a Level IV case series, by design and definition, it is a Level II retrospective cohort epidemiological study. Ex. 43, Oxford Center for Evidence-based Medicine Levels of Evidence (Mar. 2009). Dr. Beck explained that he did not submit his paper as an epidemiological study because he felt it was more important to alert orthopedic surgeons of this condition right away than to wait and hire a biostatistician to compute the odds ratios. Ex. 44, Beck dep. at 449-450 (Aug. 31, 2009).

Cohort studies are a common tool used by epidemiologists and other scientists to compare and measure and compare adverse health outcomes in one or more study cohorts. Ex. 45, S. Greenland and K. Rothman, *Ch. 7, Cohort Studies*, 100 in MODERN EPIDEMIOLOGY 3D ED., K. Rothman, S. Greenland & T. Lash, eds. (Lippincott Williams & Wilkins 2008). A "cohort" is defined as a group of people who share a common experience or condition. *Id.* Often, if there are two cohorts in a study, one of them is called the "exposed cohort," i.e., those individuals who have experienced a putative causal event or condition. The other is referred to as the "unexposed," or reference cohort. *Id.* Cohort studies may be prospective (i.e, they follow

cohorts going forward in time) or retrospective (studying a group of subjects historically where an adverse outcome already occurred). *Id.* at 109.

The Hansen/Beck study consists of two "cohorts" of arthroscopic shoulder surgeries. The first cohort is the surgeries in which the shoulder joint space was exposed to a pain pump. The second cohort is the surgeries in which the shoulder joint space was not exposed to a pain pump. Ex 46, Greenland Report at 5. As Dr. Wells point s out, it is equally valid to define the "control cohort" as the shoulders of those patients who had a pain pump but whose catheter was placed outside the joint space. *See* Ex. 47, Wells Report at 4. The "exposed" cohort is the same in both analyses: it consists of the shoulders of those patients who received a pain pump catheter in the joint space.

The total population in the Hansen/Beck study consisted of 152 patients of Dr. Beck who had 177 shoulder surgeries over a 19-month period between August 2003 and March 2005. Ex. 23, Hansen, Beck et al. at 2. This was the time period in which Dr. Beck used high volume pain pumps in his patients' shoulder joints. The "exposed" cohort included 19 shoulders. Twelve of the 19 shoulders, or 63%, developed chondrolysis. *Id.* at 5-6. The unexposed cohort, where no pain pumps were used in the joint space, included 158 arthroscopic shoulder surgeries. *Id.* Dr. Beck further analyzed his patients to see if the arthroscopic procedure itself – particularly shoulder stabilization – could have been the culprit. Of the 30 stabilization procedures, 19 shoulders were exposed to intra-articular pain pump infusions. Twelve of the 19 shoulders developed chondrolysis. None of the 13 shoulders treated for arthroscopic stabilization without pain pumps developed chondrolysis. Again, the hazard rate for chondrolysis in the exposed cohort was 63%. *Id.* at 5.

Dr. Beck also reanalyzed the data to find out whether subacromial (outside the glenohumeral joint) placement of pain pump catheters caused chondrolysis. Of the 104 patients with subacromial placement, none developed chondrolysis. *Id.* Dr. Beck also considered other suspected etiologic factors, such as thermal wands, type or irrigation fluid, the use of loose metallic hardware and various suture and anchor types. *Id.* Because a few, but not all, patients

were exposed to one or another, or a combination, of these factors, none of them could be rationally implicated as an alternative explanation. As the authors noted, "the 1 consistent factor in every patient with chondrolysis is that all of the patients received intra-articular pain pump catheters that eluted 0.25% bupivacaine and epinephrine, and all were arthroscopic capsular procedures." *Id.*

Dr. Beck's study also had two other cohorts: those patients using small volume/flow rate pumps prior to August 2003, and those using high volume/flow rate pumps after August 2003. None of the low volume pain pumps developed chondrolysis. This demonstrates a dose-response relationship. Ex. 19, page 8 (Beck Report).

Of significance, the authors reported they had no other patients with chondrolysis either before or after the dates of the study. *Id.* at 6. This "dechallenge" finding is important, because the disappearance of a disease after withdrawal of the suspected toxic agent adds further support for a causal relationship. THE REFERENCE MANUAL ON SCIENTIFIC EVIDENCE SECOND, p. 534 (2005-2006) states that when "eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship." Ex. 48.

Dr. Frederick Matsen is also a plaintiffs' expert. He is Chair of the Department of Orthopedic Surgery and Sports Medicine at the University of Washington in Seattle. Ex. 50, Matsen Report at 1. Dr. Matsen conducted a retrospective cohort analysis similar in design to Dr. Beck's study. Although Dr. Matsen undertook his investigation in the course of litigation and his analysis has not yet been published, the results are strikingly consistent with Dr. Beck's findings. Dr. Matsen's work is also valuable because it validates Dr. Beck's methodology and conclusions.

Dr. Matsen investigated 396 arthroscopic glenohumeral shoulder procedures by a single surgeon, Dr. Brook Benz, for the period from 1996 to 2008. The purpose of his study was to try to identify common etiologic features of Dr. Benz's patients who developed chondrolysis and to compare those patients to those who did not. *Id.* at 5-6. To avoid criticism of bias, Dr. Matsen used a research team to independently review the patient records and data. The team included an

orthopedic surgery resident, a statistician and a research nurse. The investigation was funded by an endowment that had no involvement in, or knowledge of, the study. *Id.* at 7.

Like Dr. Beck's study, Dr. Matsen's study contains two cohorts. The first cohort consisted of 115 shoulder surgeries using a pain pump in the intra-articular space ("exposed"). The second, or "unexposed" cohort included 281 shoulder surgeries in which pain pumps were not used in the glenohumeral joint. Of the 115 shoulder surgeries in the exposed cohort, 48 shoulders (42%) developed chondrolysis. In the unexposed cohort, there were no cases of chondrolysis. Ex. 51, *Grossnickle* Tr. at 1664-66. Like Dr. Beck, Dr. Matsen considered and ruled out other plausible causes, including the use of thermal wands, bioabsorbable anchors, surgical procedures, infection, and substances such as gentian violet. Ex. 52, Matsen Report at 10-12. After Dr. Benz discontinued pain pumps in the intra-articular space, there were no further cases of chondrolysis. Ex. 51, *Grossnickle* Tr. at 1636.

Plaintiffs have retained two experts to assess the validity and statistical power of Dr. Beck's and Dr. Matsen's studies. Dr. Sander Greenland is a renowned epidemiologist who is a professor of epidemiology and statistics at UCLA. He has authored over 300 peer-reviewed studies and is co-author with Kenneth Rothman of the leading textbook on epidemiology and statistics, MODERN EPIDEMIOLOGY, now in its third edition. Ex. 46, Greenland Report at 1-2. Dr. Martin Wells is a professor of statistical sciences and Chair of the Department of Statistical Science at Cornell University. He serves as an editor of several prestigious journals on statistics. Ex. 47, Wells Report at ¶ 2.

Dr. Greenland and Dr. Wells independently conducted statistical analyses of the two studies and reached the same conclusions. They both found that the magnitude of risk for the pain pump (exposed) cohort compared to the no-pain pump (unexposed) cohort was enormous. In the Beck study, the median unbiased estimated odds ratio is 321. Ex. 46, Greenland Report at 6; Ex. 47, Wells Report at ¶ 8. As Dr. Greenland observed, "This is a larger association than that seen between some of the deadliest exposures and death. For comparison, the association between a lifetime of smoking a pack of cigarettes a day and lung cancer is on the order of 10."

Ex. 46, Greenland Report at 7. Drs. Greenland and Wells also found an extraordinary magnitude of risk in the Matsen study. They calculated a median unbiased estimated odds ratio of 282 for the exposed versus unexposed group. Ex. 46, Greenland Report at 13; Ex. 47, Wells Report at ¶ 13. Both experts remarked that the results reported by Dr. Matsen were strikingly consistent with the results from Dr. Beck's study. *Id.* The experts also conducted sensitivity analyses to assure that the data was sufficiently robust. They found that the "p-values" for statistical significance were so small that the results could not possibly be attributed to chance. Ex. 46, Greenland Report at 7-8; Ex. 47, Wells Report at ¶¶ 8-9. Drs. Greenland and Wells determined that both studies sufficiently ruled out confounding factors. Ex. 46 Greenland Report at 8-11; Ex. 41 at ¶¶ 18-19.

Drs. Wells and Greenland also applied the Bradford Hill criteria to evaluate causality. These criteria are a tool used by epidemiologists as a cross-check to ensure that causal associations are valid. [15] Drs. Wells and Greenland found: 1) the strength of the association was "startlingly high" and "stronger than anything commonly seen in epidemiology." Ex. 47, Wells Report at ¶16; Ex. 46, Greenland Report at 13. 2) The evidence of temporal relationship was similarly compelling, not only because pain pump use preceded the onset of chondrolysis, but also because Drs. Beck and Benz encountered no additional cases of chondrolysis after they stopped using pain pumps in the joint space. Ex. 47, Wells Report at ¶ 15; Ex. 46, Greenland Report at 13. 3) The findings of the Beck and Matsen studies were not only consistent with one another, but with the clinical reports published by other physicians. Ex. 47, Wells Report at ¶ 7; Ex. 46, Greenland Report at 12. 4) Animal and laboratory findings provide a biologically plausible explanation for the association. Ex. 46, Greenland Report at 12.

Finally, both experts effectively discredited the possibility that the association reported by Dr. Beck must be due to other factors. They observed that the magnitude of the odds ratio for the exposed versus unexposed cohorts is far too large to be explained away by the existence of

---

[15] Ex. 52. B. Hill, *The Environment and Disease: Association or Causation?* 58 PROCEEDINGS OF THE ROYAL SOCIETY OF MEDICINE 295-300 (1965).

other factors. Drs. Greenland and Wells explain that in order for such confounders to be the primary causes of chondrolysis, these factors would have to be present only when the pain pump was used in the intra-articular space, and only if there were data showing that these alternative factors pose a higher risk of chondrolysis than pain pumps. Ex. 46, Greenland Report at 8-11; Ex. 47, Wells Report at ¶¶ 18-19. Drs. Beck and Matsen did, in fact, consider these other factors and concluded that they were unlikely because they were not always present in all the exposed groups and *were also* present in the unexposed groups. Moreover, there are no statistical studies that suggest these alternative factors carry a risk anywhere approaching the astronomical odds ratio associated with pain pumps. Even if there were sufficient data available to show these other factors were concurrent causes, intra-articular pain pump use would still be a substantial contributing cause of chondrolysis. *Id.*

A new epidemiological retrospective comparison study, published in December 2009 by J. Rapley and colleagues, validated the clinical findings of Drs. Beck and Hansen. Ex. 53, J. Rapley et al., *Glenohumeral chondrolysis after shoulder arthroscopy associated with continuous bupivacaine infusion*, 25:12 ARTHROSCOPY: J ARTHROSCOPIC AND RELATED SURG. 1367-73 (Dec. 2009). In this study, the authors investigated all arthroscopic shoulder surgery patients of a single surgeon between 2000 and 2007. The purpose of the study was to measure the incidence rate of chondrolysis when a pain pump is used in the joint space versus in the subacromial space. The study consisted of two qualifying groups of patients with no pre-existing shoulder conditions: 29 patients who had pain pumps inserted in the glenohumeral joint, and 36 patients who had pain pumps inserted in the subacromial space. Of the 29 patients with intra-articular placement of the pump catheter, 13 used a low volume/low flow pain pump, and 16 patients received a high volume/high flow pain pump. A solution of .5% bupivacaine without epinephrine was used in all of the surgeries. At the beginning of the study, the authors hypothesized that chondrolysis is not caused by subacromial use of pain pumps and that chondrolysis was an uncommon complication of intra-articular use of pain pumps.

The study found that 19% (3 of 16) of the patients with intra-articular placement of the high volume pain pump developed chondrolysis. *Id.* at 1372. In contrast, none of the patients with the low volume/low flow pain pumps and none of the patients with subacromial placement developed chondrolysis. This finding surprised the authors. It refuted their hypothesis that chondrolysis was an uncommon complication. As the authors noted, "a 20% incidence of glenohumeral chondrolysis cannot be considered 'uncommon.'" *Id.* The researchers further observed that the clinical response was related to concentration of the drug and pump volume, and that epinephrine (not used in this study) may worsen the effect. *Id.* Notably, these results are similar to the Beck/Hansen study, which found no incidence of chondrolysis in patients who used a low volume pain pump or had the pump catheter placed outside of the joint space. Ex. 23, Hansen and Beck, et al. *POSTARTHROSCOPIC GLENOHUMERAL CHONDROLYSIS*, J. AM. SPORTS MED. (2007) at 2, 5; Ex. 19, Beck Report at 5. The higher incidence rate of chondrolysis observed in the Beck/Hansen study is likely due in part to the use of bupivacaine with epinephrine.

The retrospective epidemiological studies of Drs. Beck, Matsen and Rapley are extraordinarily compelling evidence of causation. In light of their findings, it would be unethical to conduct a prospective human study today. As Dr. Greenland notes, these studies are the best evidence the scientific community can expect to obtain on the cause-and-effect relationship between intra-articular use of pain pumps and glenohumeral chondrolysis. Ex. 46, Greenland Report at 14.

Combined with plaintiff's other scientific evidence and testimony, this powerful epidemiological evidence in support of the general causation element of plaintiff's negligence claim presents triable issues of fact for the jury, and defendant's motion should be denied.

**B. Claims 3, 5, 6, 8: DJO is entitled to Summary Judgment on Claims, 3, 5, 6, 8: Product Liability**

1. Burden of proof and elements

The Plaintiff disputes the Defendant's statement of the burden of proof and elements on this claim. Plaintiff agrees that her claims 3, 5, 6, and 8 are all product liability

claims. She further agrees that she must establish that 1) the product is in a defective condition unreasonably dangerous to the user or consumer, 2) the product reached the user or consumer without substantial change in the condition in which it was sold, 3) the defect must be the cause of plaintiff's injuries, 4) defendant sold the product, and is engaged in the business of selling such products, and 5) plaintiff sustained damages as a result.

DJO's motion incorrectly contends that plaintiff fails in her proof of causation. DJO does not move against any other elements of plaintiff's product liability claims. The only element of the product liability claims at issue in defendant's motion is the third element; that is, scientific causation.

2. Elements challenged by the Defendant

Element 3—Causation. Plaintiff can demonstrate a triable issue of fact that DJO's product caused her injury and therefore, her claim survives summary judgment and is to be decided by a jury.

**A.) Plaintiff can Establish "General Causation"**

Plaintiff will offer substantial medical and scientific evidence in support of general causation; that is, that the continuous infusion of local anesthetics via a pain pump directly into the should joint for 48-72 hours is capable of causing chondrolysis, the injury suffered by Ms. Hansen. Contrary to defendant's motion, the medical and scientific evidence is overwhelming in support of the contention that pain pump use is capable of causing chondrolysis, and plaintiff's claim is supported by qualified medical experts who have offered opinions—based on reliable scientific evidence—that the continuous infusion of local anesthetics via a pain pump directly into the should joint for 48-72 hours is capable of causing chondrolysis. Although this Court has yet to hear and decide the Rule 702 Motions raised by the parties in this matter, the sufficiency of plaintiff's evidence (assuming it is admissible) are put at issue by DJO's motion, so plaintiff's evidence of causation is discussed and summarized below.



116748v1

**B.) Plaintiff's evidence in support of the causation element in her product liability claims is identical to the evidence offered in support of her negligence claim.**

As described above in Section A(2)(A-F), the evidence is overwhelming, and it presents triable issues for the jury on all of the product liability claims, just as it does on the negligence claim. DJO's erroneous mischaracterization of the evidence as speculative is without merit, and the motion should be denied.

**C.) Claim 6: DJO is entitled to Summary Judgment on Claim 6: Product Liability – Breach of Implied Warranty of Merchantability**

1. Burden of proof and elements

Plaintiff disputes the Defendant's statement of the burden of proof and elements on this claim. Specifically, Plaintiff agrees with defendant's description of her burden of proof and the elements of the claim, but disagrees with defendant's argument that she cannot present a triable issue of fact regarding causation.

2. Elements challenged by the Defendant

Defendant challenges element 5 of the warranty claim, incorrectly claiming that plaintiff cannot present a triable issue as to causation. Plaintiff does not concede causation, for all of the reasons described in Section A(2)(A-F) above, but this motion is moot because plaintiff concedes that her breach of warranty claim is untimely.

**D.) Claim 6: DJO is also entitled to Summary Judgment on Its Affirmative Defense of Statute of Limitations Regarding Claim 6, Product Liability/Breach of Warranty**

1. Burden of proof and elements

Plaintiff agrees that her breach of warranty claim is untimely, as it was filed after the limitations period provided by C.R.S. §4-2-725 and C.R.S. §13-80-101(a) had expired. Plaintiff concedes that she has no evidence presenting a triable issue of fact as to Claim 6 of her complaint, and she concedes that DJO's motion for summary judgment as to Claim 6 should be granted.

## CONCLUSION

For all of the reasons above, plaintiff presents overwhelming evidence in support of causation, an essential element of her negligence and strict products liability claims. If the Court rules that the testimony of plaintiff's experts as described above is admissible, then the evidence is more than sufficient to present triable issues of fact for the jury to resolve, and DJO's motions challenging plaintiff's negligence and product liability claims should be denied.

Plaintiff concedes her breach of warranty claim is untimely, and that DJO's motion against Claim 6 should be allowed.

Dated: March 4, 2010.

Respectfully submitted,

By:/s/ Thomas B. Powers

Thomas B. Powers, OSB # 98393
tpowers@wdolaw.com
Michael L. Williams, OSB No. 78426
mwilliams@wdolaw.com
Leslie W. O'Leary, OSB No. 99090
loleary@wdolaw.com
WILLIAMS LOVE O'LEARY & POWERS, P.C.
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 295-2924
Facsimile: (503) 295-3720

Laura B. Kalur, OSB No. 023424
lbkalur@kalurlaw.com
Kalur Law Office
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 595-4145
Facsimile: (503) 295-3720

D. Robert Jones, CSB No. 25393
Jones@drjpc.com
D. Robert Jones, PC
219 West Colorado Ave Suite 210
Colorado Springs, CO 80903
Telephone: (719) 630-1556
Facsimile: (719) 630-7004

Ernest Franklin Woodson, ASB No. 0479-W66E
frank.woodson@beasleyallen.com
Beasley Allen Crow Methvin Portis & Miles, P.C.

234 Commerce St.
Montgomery, AL 36104-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was served electronically via the Court's electronic filing system on the 4th day of March, 2010, according to this Court's provision for service on the following:

Jeffrey R. Pilkington, Esq.
jeff.Pilkington@dgslaw.com
Jordan Lipp, Esq.
Jordan.lipp@dgslaw.com
Davis Graham & Stubbs LLP
1550 – 17th Street, Suite 500
Denver, CO 80202
Telephone: 303-892-9400
Facsimile: 303-893-1379

Maynard Kirpalani, Esq.
maynard.kirpalani@wilsonelser.com
Geoffrey M. Coan, Esq.
geoffrey.coan@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
260 Franklin Street, 14th Floor
Boston, MA 02110-3112

*Attorneys for I-Flow Corporation*

Brett Marshall Godfrey, Esq.
godfrey@godlap.com
Rachel L. Carnaggio, Esq.
carnaggio@godlap.com
James A. Johnson
johnson@godlap.com
Godfrey & Lapuyade, PC
9557 S. Kingston Court
Englewood, CO 80112
Telephone: 303-228-0700
Facsimile: 303-228-0701

*Attorneys for DJO, Incorporated f/k/a DJ Orthopedics, Inc.*

WILLIAMS LOVE O'LEARY & POWERS, P.C.

/s/ Thomas B. Powers
Thomas B. Powers, OSB # 98393
tpowers@wdolaw.com

cc: Co-counsel