IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Case No. 1:08-cv-003650-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

v.

DJO, INCORPORATED, f/k/a DJ ORTHOPEDICS, INC.; I-FLOW CORPORATION

Defendants.

---

**DEFENDANT I-FLOW'S MEMORANDUM IN SUPPORT OF ITS RULE 702 MOTION TO EXCLUDE EXPERT OPINION ON GENERAL CAUSATION**

---

Jeffrey R. Pilkington
Jordan Lipp
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
E-Mail: jeff.pilkington@dgslaw.com
jordan.lipp@dgslaw.com

Chad J. Layton
Erin N. Graham
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, IL 60606-6306
Telephone: (312) 645-7800
Facsimile: (312) 645-7711
E-Mail: clayton@smsm.com
egraham@smsm.com

**Attorneys for Defendant I-Flow Corporation**

Dated: July 7, 2010

# Table of Contents

Page

Table of Authorities ..... iii

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 6

A. Dr. Charles Beck ..... 6

B. Dr. Frederick Matsen ..... 7

C. Dr. Jason Dragoo ..... 7

D. Dr. Stephen F. Badylak ..... 8

E. Dr. Armando Vidal ..... 8

F. Dr. Sander Greenland and Dr. Martin T. Wells ..... 8

III. LEGAL STANDARD

A. Rule 702 ..... 9

B. Prior Rule 702 Decisions ..... 10

C. Applicability of Prior Decisions ..... 12

IV. ARGUMENT ..... 14

A. Plaintiff's Experts Are Not Qualified Because Their Opinions Were Developed For The Express Purpose Of Testifying. ..... 14

B. Plaintiff's Expert Opinions Rely on Unreliable Methodologies. ..... 16

1. *Plaintiff's expert opinions have not been subjected to peer review.* ..... 16

2. *Plaintiff's experts improperly synthesize available science through their own* ipse dixit. ..... 17

3. *Plaintiff's expert opinions are unsupported by epidemiology.* ..... 20

4. *Plaintiff's experts improperly rely on differential diagnosis.* ..... 22

C. Plaintiff's Expert Opinions Are Not Based On Sufficient Facts And Data. .......... 24

1. *Background rates and relative risk.* .......... 24

2. *The mechanism for the development of chondrolysis.* .......... 25

D. Plaintiff's Experts Apply Their Methodologies Improperly .......... 26

1. *Plaintiff's experts improperly extrapolate from* in vitro *studies.* .......... 26

2. *Plaintiff's experts improperly rely on* in vivo *animal studies.* .......... 28

3. *The case series relied upon by Plaintiff's experts are insufficient to establish general causation.* .......... 31

E. The Expert Opinions are Individually Defective. .......... 34

1. *Dr. Charles Beck* .......... 34

2. *Dr. Frederick Matsen* .......... 34

3. *Dr. Jason Dragoo* .......... 37

4. *Dr. Stephen F. Badylak* .......... 38

5. *Dr. Armando Vidal* .......... 39

6. *Dr. Sander Greenland and Dr. Martin T. Wells* .......... 39

V. CONCLUSION .......... 43

## Table of Authorities

Page

**Cases**

*Allison v. McGhan Medical Corp.*,
184 F.3d 1300 (11th Cir. 1999) ....................................................................................40

*Brumbaugh v. Sandoz Pharm. Corp.*,
77 F. Supp. 2d 1153 (D. Mont. 1999)..........................................................................33

*Casey v. Ohio Med. Prods.*,
877 F. Supp. 1380 (N.D. Cal. 1998) ............................................................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...................................................14, 15, 17, 19, 24, 25, 30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..................................................................................................5, 10

*Dodge v. Cotter Corp.*,
328 F. 3d 1212 (10th Cir. 2003) ..................................................................................19

*Domingo v. TK*,
289 F. 3d 600 (9th Cir. 2002) ...............................................................................19, 26

*General Electric Co.* v. *Joiner*,
522 U.S. 136 (1997)................................................................................................18, 19

*Hall v. Baxter Healthcare Corp.*,
947 F. Supp. 1387 (D. Or. 1996) ......................................................20, 22, 23, 26, 33

*Hollander v. Sandoz Pharm. Corp.*,
289 F.3d 1193 (10th Cir. 2002) ...........................................................................22, 28

*Hollander v. Sandoz Pharmaceuticals Corp.*,
95 F. Supp. 2d 1230 (W.D. Okla. 2000)....................................................5, 28, 31, 33

*In re Bausch & Lomb, Inc. Contact Lens Solution Prods. Liability Litig.*,
MN-77777-DCN, 2009 WL 2750462 (D.S.C. Aug. 26, 2009) ..................................28

*In re Breast Implant Litigation*,
11 F. Supp. 2d 1217 (D. Colo. 1998)................................................ 20, 22-25, 33, 39

*In re Rezulin Products Liability Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)..........................................................................30

*In Re Silicone Gel Breast Implant Prods Liab. Litig.*,
318 F. Supp. 2d 879 (C.D. Cal. 2004) ....22

*James River Ins. Co. v. Rapid Funding, LLC*,
No. 07-cv-01146-CMA-BNB, 2009 WL 481688
(D. Colo. Feb. 24, 2009) ....13, 24

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) ....14

*Kilpatrick* v. *Breg, Inc.*,
No. 08-10052-CV, 2009 WL 2058384,
(S.D. Fla. June 25, 2009) .... 5, 10, 11, 15, 24, 25, 29-33, 40

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....15

*Lusch* v. *Matrixx Initiatives, Inc.*,
No. 05-292-HA, 2007 WL 2816203 (D. Or. Sept. 25, 2007) ....30

*Lust v. Merrell Dow Pharmaceuticals, Inc.*,
89 F.3d 594 (9th Cir. 1996) ....30

*Marsee v. U.S. Tobacco Co.*,
866 F.2d 319 (10th Cir. 1989) ....40

*McClain* v. *Metabolife Int'l, Inc.*,
401 F.3d 1233 (5th Cir. 2005) ....30, 31

*McClellan v. I-Flow Corp.*,
Nos. 07-1309-AA, 07-1310-AA, 07-1318-AA, 07-1671-AA, 08-0478-AA,
08-0588-AA, 08-1419-AA, 09-0146-AA, 09-0342-AA, 09-0378-AA,
2010 WL 1753261 (D. Or. Apr. 29, 2010) ....7, 11, 12, 36, 37, 40

*Miller v. Pfizer, Inc.*,
196 F. Supp. 2d 1095 (D. Kan. 2002)....6, 16

*Miller v. Pfizer, Inc.*,
356 F.3d 1326 (10th Cir. 2004) ....6, 30

*Miller v. Pfizer, Inc.*,
196 F. Supp. 2d 1062 (D. Kan. 2002)....30

*Mitchell v. Gencorp Inc.*,
165 F.3d 778 (10th Cir. 1999) ....13, 19

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ....1, 14, 16, 20, 21, 22, 23, 30, 31

*Perry v. United States*,
755 F.2d 888 (11th Cir. 1985) .......................................................................................17

*Primiano v. Cook*,
No. 06-15563, 2010 WL 1660303 (9th Cir. Apr. 27, 2010) .......................................................12

*Renaud v. Martin Marietta Corp.*,
749 F. Supp. 1545 (D. Colo. 1990)...........................................................................20, 21

*Renaud v. Martin Marietta Corp.*,
972 F.2d 304 (10th Cir. 1992) .......................................................................................21

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) .........................................................................................5

*Schott v. I-Flow Corp.*,
Nos. 1:8-CV-00323, 1:08-CV-00700, 1:08-CV-00818;
1:09-CV-00098; 1:09-CV-00155; 1:09-CV-00403,
2010 WL 1008478 (S.D. Ohio Mar. 16, 2010).................................................................12, 13

*Sil-Flo, Inc. v. SFHC, Inc.*,
917 F.2d 1507 (10th Cir. 1990) .....................................................................................40

*United States v. Crabbe*,
556 F. Supp. 2d 1217 (D. Colo. 2008)..........................................................9, 10, 13, 14, 24

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
173 F.R.D. 675 (D. Kan. 1997)......................................................................................14

*Wilson v. Merrell Dow Pharmaceuticals, Inc.*,
893 F.2d 1149 (10th Cir. 1990) .....................................................................................20

*Zenith Electronics Corp.* v. *WH-TV Broadcasting Corp.*,
395 F.3d 416 (7th Cir. 2005) ...................................................................................19, 20

**Rules**

Fed. R. Evid. 702 .............................................................................................................9

**Other Authorities**

David S. Bailie et al.,
*Severe Chondrolysis After Shoulder Arthroscopy: A Case Series*,
18 J. SHOULDER ELBOW SURG. 742 (Sept. 2009)..................................................................2

Benjamin Coobs & Robert F. LaPrade,
*Severe Chondrolysis of the Glenohumeral Joint After Shoulder Thermal Capsulorrhaphy*, 38 AM. J. ORTHOP. E34 (2009) ..........2

Brent D. Hansen et al.,
*Postarthroscopic Glenohumoral Chondrolysis*, 35 AM. J. SPORTS MED. 1628 (July 2007) ..........3

Richard W. Kang et al.,
*Complications Associated with Anterior Shoulder Instability Repair*, 25 ARTHROSCOPY 909 (August 2009) ..........2

James J. Lubowitz & Gary G. Poehling,
*Glenohumeral Thermal Capsulorrhaphy Is Not Recommended—Shoulder Chondrolysis Requires Additional Research*, 23 ARTHROSCOPY 687 (July 2007) ..........3

Allison G. McNickle et al.,
*Postsurgical Glenohumeral Arthritis in Young Adults*, 37 AM. J. SPORTS MED. 1784 (Sept. 2009)..........2

Damon H. Petty et al.,
*Glenohumoral Chondrolysis After Shoulder Arthroscopy: Case Reports and Review of Literature*, 32 AM. J. SPORTS MED. 509, 514 (2004) ..........3

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Center 2d ed. 2000)..........28, 41

Matthew Saltzman et al.,
*Postsurgical Chondrolysis of the Shoulder*, 32 ORTHOPEDICS 215 (2009) ..........2

Wright, J.G., et al.,
*Introducing Levels of Evidence to The Journal*, 85-A J. BONE JOINT SURG. AM. 1 (2003)..........21

Defendant I-Flow Corporation submits this memorandum in support of the Parties' Joint Motion under Fed. R. Evid. 702 (Dkt. No. 153) (the "Motion"):

## I. INTRODUCTION

This is a product liability and personal injury suit. Plaintiff claims that in 2003, following arthroscopic shoulder surgery, she was injured by a "pain pump" manufactured and distributed by the defendants. The pain pump administered a continuous infusion of the anesthetic Marcaine into the intra-articular space of her shoulder. Plaintiff alleges that this process ("continuous infusion") caused a condition called chondrolysis (the loss or death of cartilage) in her glenohumeral joint.

Under *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005), a plaintiff in medical-device litigation is required to demonstrate both general causation and specific causation. "General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury. Plaintiff must first demonstrate general causation because without general causation, there can be no specific causation." *Id*. at 881. The purpose of this motion is to exclude Plaintiff's designated expert opinions on general causation.[1]

Despite the Court's admonition to put forth non-cumulative expert opinions (Dec. 1, 2009 Tr. (Dkt. No. 237) at 22:19-22:3), Plaintiff has offered several duplicative opinions through a group of similarly credentialed experts. They all say, in one fashion or another, that continuous infusion is generally capable of causing chondrolysis.

These opinions cannot withstand the scrutiny of Rule 702 and should be excluded. No one—including either Plaintiff's treating physicians or her cadre of experts—knows, on the basis

---

[1] The parties have agreed to brief only general causation for now and to defer briefing on specific causation. Defendants intend to challenge Plaintiff's designated opinions on specific causation as well.

of reliable scientific evidence, whether continuous infusion causes chondrolysis. Indeed, one leading medical researcher (ignored by Plaintiff and her experts) recently concluded that "the exact cause of chondrolysis after labral repair has not been determined" and that "to date, no single etiology has been identified as the cause of chondrolysis associated with anterior shoulder instability repair[.]" Richard W. Kang et al., *Complications Associated with Anterior Shoulder Instability Repair*, 25 ARTHROSCOPY 909, 914 (August 2009).[2] This echoes the conclusion reached over and over in the scientific and medical community:

> "Although intra-articular pain pumps, radiofrequency devices, and hardware problems such as prominent anchors have been described, the causes of PAGCL are still not completely understood. . . . The role of intra-articular catheters and pumps in pain management after shoulder surgery has not been substantiated. . . ." Allison G. McNickle et al., *Postsurgical Glenohumeral Arthritis in Young Adults*, 37 AM. J. SPORTS MED. 1784, 1789 (Sept. 2009). (Appx. I, Tab 2.)
>
> "[T]he etiology of chondrolysis remains unclear." Benjamin Coobs & Robert F. LaPrade, *Severe Chondrolysis of the Glenohumeral Joint After Shoulder Thermal Capsulorrhaphy*, 38 AM. J. ORTHOP. E34, E36 (2009). (Appx. I, Tab 3.)
>
> "Although the etiology of these cases is not known for certain, there has been speculation that radiofrequency devices, young patient age, instability surgery, intra-articular pain pumps, and the type of anesthetic may be precipitating factors." Matthew Saltzman et al., *Postsurgical Chondrolysis of the Shoulder*, 32 ORTHOPEDICS 215, 215 (2009). (Appx. I, Tab 4.)
>
> "[T]he actual cause of even the reported cases has not been confirmed, and the associations are speculative at this juncture." David S. Bailie et al., *Severe Chondrolysis After Shoulder Arthroscopy: A Case Series*, 18 J. SHOULDER ELBOW SURG. 742, 743 (Sept. 2009). (Appx. I, Tab 5.)
>
> "The etiology of glenohumeral chondrolysis may be multifactorial. Future research is required to determine the cause, and proper

[2] This article can be found in Appendix I at Tab 1. Appendix I contains reference materials, Appendix II contains the reports of Plaintiff's proffered experts, and Appendix III contains deposition and trial transcripts. Documents in the appendices are cited "Appx. __, Tab __."

> prevention, of shoulder chondrolysis." James J. Lubowitz & Gary G. Poehling, *Glenohumeral, Thermal Capsulorrhaphy Is Not Recommended—Shoulder Chondrolysis Requires Additional Research*, 23 ARTHROSCOPY 687 (July 2007). (Appx. I, Tab 6.)
>
> "We believe that further investigation of the possible association of pain pump use with chondrolysis is warranted." Brent D. Hansen et al., *Postarthroscopic Glenohumoral Chondrolysis*, 35 AM. J. SPORTS MED. 1628, 1633 (July 2007). (Appx. I, Tab 7.)
>
> "The disease pathophysiology is currently not understood. . . . We do not know the natural history of this process." Damon H. Petty et al., *Glenohumoral Chondrolysis After Shoulder Arthroscopy: Case Reports and Review of Literature*, 32 AM. J. SPORTS MED. 509, 514 (2004). (Appx. I, Tab 8.)

The consensus in peer-reviewed journals is that a causal link between continuous infusion and chondrolysis has not been reliably established. *This is a fact admitted by all of the proffered experts in this case*:

- **Beck**: "[T]he cause of this process [i.e., chondrolysis] is unknown" and "further investigation of the possible association of pain pump use with chondrolysis is warranted." (Appx. I, Tab 7, at 1, 6.)
- **Matsen**: Acknowledging that no one has "published something that [he] would consider as scientifically demonstrating" the mechanism by which postoperative infusion of local anesthetics contributes to the development of chondrolysis in human beings and that "[t]he etiology of the [chondrolysis] cases reported in the literature was not known for sure." (Appx. III, Tab 7, at 124:10-125:8; Appx. III, Tab 8, at 46:25-47:2.)
- **Dragoo**: "[A] direct link of anesthetic-induced chondrolysis has not been established." (Appx. I, Tab 9, at 1484.)
- **Badylak**: Acknowledging "other causes of chondrolysis" (Appx. II, Tab 1, at 3), and testifying that he is not aware of a single article finding that continuous infusion is "the primary cause" of chondrolysis. (Appx. III, Tab 1, at 163:11-163:23.)
- **Vidal**: Acknowledging that chondrolysis is "multifactoral" and agreeing that "further study is necessary." (Appx. III, Tab 11, at 50:21-51:3; 49:6-49:8, 49:24-50:1, 52:18-52:19.)
- **Greenland**: Acknowledging that chondrolysis has "multiple causes"

because "you don't have every single patient [receiving continuous infusion] getting chondrolysis," and that he does not know of "any other scientists, whether it be epidemiologist or other scientist, or physicians that accepted or endorsed [the] opinion that intra-articular use of pain pumps causes chondrolysis." (Appx. III, Tab 10, at 29:5-29:13; 143:2-143:7.)

- **Wells**: Acknowledging that he is not "aware of any peer-reviewed publication where it is concluded that a cause-and-effect relationship between the use of pain pumps delivering local anesthetics continuously and the development of chondrolysis has been established." (Appx. III, Tab 12, at 71:14-71:21.)

In other words, each of Plaintiff's proffered experts admits that the cause of chondrolysis is scientifically unknown.

Accordingly, the experts' general causation opinions fail both the qualification and reliability prongs of Rule 702's two-step test. Qualification cannot be shown because the opinions generally do not arise out of the experts' ordinary work, but were instead prepared specifically for this litigation. (*See* Part IV.A.) Reliability cannot be shown for three reasons.

*First*, the opinions are based on unreliable methodology. When reliable methods are tried, such as those described in the peer-reviewed literature, researchers have been unable to identify the cause of chondrolysis—including, in particular, the use of continuous infusion. Consequently, the experts in this case rely either on substandard methodologies or the non-methodology of *ipse dixit* predicated on "experience." (*See* Part IV.B.)

*Second*, the opinions are based on insufficient facts and data because they fail to account for background rates and relative risk, or the mechanism by which chondrolysis develops. The opinions also rely on studies corrupted by litigation bias, patient samples that are too small or too limited in scope to apply generally, and research (such as *in vitro* studies and *in vivo* animal studies) that cannot, standing alone, support an opinion about causation in a living human population. (*See* Part IV.C.)

*Third*, the experts improperly apply both valid and invalid methodologies. They distort the consensus of the medical literature by cherry-picking research and extrapolating from defective samples or inadequate research. (*See* Part IV.D.)

Any one of these defects would permit exclusion, but collectively they require it. When the methodological defects are accounted for, nothing is left but a chorus of conclusory opinions that general causation is "plausible" or "likely." But the cause, development, and prevention of chondrolysis cannot be established without research, studies, and data collected and analyzed objectively by methodical scientists working in a non-litigation setting. Notwithstanding the conclusory pronouncements of Plaintiff's experts, that research does not exist. This precludes admission because "[l]aw lags science; it does not lead it." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1217 (10th Cir. 2002) (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). A scientist in the witness box cannot voice opinions that fail scrutiny in the laboratory, even if they contain plausible insights. That "is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596-97 (1993).

Science lags behind the unscientific, unfounded, and speculative opinion of Plaintiff's experts that continuous infusion likely causes chondrolysis. *See Kilpatrick* v. *Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, *9 (S.D. Fla. June 25, 2009) (excluding expert's opinion based on his concession that "the current state of the medical literature is still unsettled about the cause of chondrolysis") (emphasis removed). Rule 702 requires their exclusion.

## II. BACKGROUND

On October 15, 2010, the parties submitted the Motion, which identified Plaintiff's expert opinions and Defendants' objections. (Dkt. No. 153.) Plaintiff designated ten experts with twenty-five mostly redundant opinions stating, in one qualified way or another, that continuous infusion is generally capable of causing chondrolysis.[3]

At a hearing on December 1, 2009, the Court instructed the parties to avoid "redundant and cumulative evidence," or, using the Court's analogy to a prize steer at the stock show, "[i]t is the best of the witnesses' opinions, evidence, and arguments that we need to consider, not the whole herd." (Dec. 1, 2009 Tr. (Dkt. No. 237) at 23:1-23:3.) The Court further advised that "to the extent that there are redundant and cumulative opinions all based on a similar methodology, it doesn't make a whole lot of sense to have a 702 hearing with regard to every single opinion based on identical methodology." (*Id.* at 23:14-23:17.)

In response, Plaintiff withdrew only four opinions of two experts, Dr. Carl J. Basamania and Dr. Stephen Trippel. Plaintiff served the withdrawal (attached here as Exhibit A), but did not file it. Plaintiff currently offers eight experts with twenty-one opinions, of which fourteen opinions relate to general causation.[4]

### A. Dr. Charles Beck

Dr. Charles Beck, an orthopedic surgeon, and his colleague, Dr. Brent Hansen, performed a case survey relating to patients in Beck's practice. In their published, peer-reviewed paper

---

[3] On June 29, 2010—just days before this brief was due—Plaintiff served her *First Amended Notice of Plaintiff's Experts' Supplemental Reliance Materials*. Defendants object to this late filing and reserve the right to respond should the need arise.

[4] Seven opinions (Opinions 1-5 from Dr. Parisian and Opinions 2-3 from Dr. Beck) concern common-law and regulatory standards. Because those opinions do not relate to general causation, Defendants have addressed them in a separate, simultaneously filed supplemental brief. Of course, if Plaintiff is unable to establish general causation, then those seven opinions of Parisian and Beck are moot. *See, e.g.*, *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1095, 1124 (D. Kan. 2002) (noting that if the plaintiff failed to prove general or specific causation, then the question of the manufacturer's duty to warn was irrelevant), *aff'd*, 356 F.3d 1326 (10th Cir. 2004).

("Hansen-Beck"), the doctors acknowledge that "the cause of this process [chondrolysis] is unknown" and that "[p]ostarthroscopic glenohumeral chondrolysis is a devastating complication that has yet to be etiologically defined." (Appx. I, Tab 7, at 1, 5.) The article finds an "association" between continuous infusion and chondrolysis in these particular patients, but concludes that "further investigation of the possible association of pain pump use with chondrolysis is warranted." (*Id.* at 6.) The Hansen-Beck study has become the centerpiece of several opinions by Plaintiff's experts, notwithstanding its explicit admission of ignorance and doubt about causation. In contrast to this published conclusion, Beck's litigation opinion (Opinion 1) asserts that continuous infusion is a "scientifically valid and plausible" cause of chondrolysis. (Appx. II, Tab 2, at 10). Yet his litigation opinion is not based on any research beyond that which he relied upon in his published work.

**B. Dr. Frederick Matsen**

Dr. Frederick Matsen, who is also an orthopedic surgeon, prepared three case series on small samples of patients for the purpose of litigation. Matsen presents exactly the same opinion (Opinion 1) on causation as Beck, namely that continuous infusion is "a scientifically plausible" cause of chondrolysis. (Appx. II, Tab 6, at 13.) In part because Matsen's opinion was based on records collected and prepared by lawyers, Matsen's opinion was stricken in another chondrolysis case for gross litigation bias. *See McCellan v. I-Flow Corp.*, Nos. 07-1309-AA *et al.*, 2010 WL 1753261, *24-31 (D. Or. Apr. 29, 2010) ("Dr. Matsen's opinion [is] irreparably tainted by litigation bias and unreliable.")

**C. Dr. Jason Dragoo**

Dr. Jason Dragoo, like Beck and Matsen, is an orthopedic surgeon. Like Beck, he published a non-litigation study admitting that "a direct link of anesthetic-induced chondrolysis

has not been established." (Appx. I, Tab 9, at1484.) Also like Beck, he asserts the much more robust opinion in this litigation (Opinion 1) that continuous infusion "can cause chondrolysis cartilage degeneration in a dose-duration dependant manner." (Appx. II, Tab 3, at 7.)

**D. Dr. Stephen F. Badylak**

Dr. Stephen Badylak is a doctor and pathologist by training, and now works in bioengineering and tissue regeneration. He too performed a literature review after being retained for this litigation. He concludes that continuous infusion is "the primary cause of chondrolysis" in the surveyed patients (Opinion 1), and that there is "no reason to suspect other causes" when continuous infusion has been used (Opinion 2). (Appx. II, Tab 1, at ¶¶ 1, 6.) Badylak performed no independent research or analysis; rather, he based his opinion only on a review of the medical literature (none of which concludes that continuous infusion causes chondrolysis).

**E. Dr. Armando Vidal**

Dr. Armando Vidal is Plaintiff's fourth designated orthopedic surgeon. He reviewed Plaintiff's surgical records. In addition, and like Badylak, he reviewed the medical literature after being retained for this litigation, but conducted no independent research. Vidal offers the thoroughly hedged opinion (Opinion 1) that it is "possible" for continuous infusion to be a "likely" causative "factor" in the development of chondrolysis.

**F. Dr. Sander Greenland and Dr. Martin T. Wells**

Plaintiffs designated Dr. Sander Greenland, an epidemiologist, and Dr. Martin Wells, a biostatistician, as rebuttal experts. They offer four identically worded opinions (Greenland Opinions 1-4, Wells Opinions 1-4) that assert general causation based on an asserted statistically significant association in the Hansen-Beck case series. Because the association applies only to the Hansen-Beck patients and not to the general population, however (Appx. II, Tab 4, at 14;

Appx. III, Tab 12, at 133:21-134:13), the same opinions were deemed irrelevant and excluded in another chondrolysis case. *See* Part III.B.3 (discussing the *McClellan* case, which held that the Greenland and Wells opinions are not "particularly relevant or helpful, given their inability to generalize the stated association beyond the patients involved in the Hansen-Beck Study.")

## III. LEGAL STANDARD

### A. Rule 702

The admissibility of expert opinions is governed by Rule 702, as amended following *Daubert*. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

"The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). Under the current version of Rule 702, "a witness' qualifications are no longer sufficient foundation, in and of themselves, to admit expert testimony." *Id.* Rather, "the proponent of the witness' opinions must demonstrate that the process by which the witness derived his or her opinions is reliable." *Id.* While the opinion need not be proven "objectively correct," the proponent must establish that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Id.* at 1221.

The Rule 702 analysis has two steps. The proponent must first demonstrate that the expert is qualified to render the proffered opinion. *Id.* It is not enough for the expert to have "knowledge, skill, experience, training, or education" in the relevant field; the expert must have them "*relative to the particular opinion or testimony proffered*." *Id.* at 1220 (emphasis added) (citation omitted).

Next, the Court must assess "the process or means by which the witness derived the opinion." *Id*. This requires: "(i) a showing that the *method or principle* used by the witness is reliable; (ii) a showing that the witness used *sufficient facts and data* as required by the method or principle; and (iii) a showing that the witness properly *applied* the method or principle to the collected facts and data." *Id.* (emphasis added). Importantly, "[t]he burden on the proponent of the witness is an exacting one, as *any inadequacy* in the proof on any of Rule 702's elements *renders the entire opinion inadmissible*." *Id.* (emphasis added). The "focus, of course, must be solely on the principles and methodology, not on the conclusion that they generate." *Daubert*, 509 U.S. at 595.

**B. Prior Rule 702 Decisions.**

As the Court knows, there are chondrolysis cases pending in other courts. General causation has been addressed by federal courts in at least three of them.

**1. *Kilpatrick v. Breg, Inc.***

In *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009), Dr. Gary Poehling opined on behalf of the Plaintiff that continuous infusion causes chondrolysis. Like most of Plaintiff's experts in this case, "Poehling did not personally conduct any independent research; rather, he relied upon several medical journal articles." *Id.* at *4. He relied mainly on the Hansen-Beck study and two separate articles by Gomoll and Greis, all of which are relied upon by Plaintiff's experts here as well. Though none of the articles conclude

that continuous infusion causes chondrolysis, Poehling claimed that his experience overcame this deficiency. *Id.* at *9. The court found that though Poehling was qualified, *id*. at *3, his opinions were unreliable under Rule 702 because (i) the studies upon which Poehling relied did not establish causation; (ii) Poehling did not explain the background risk of chondrolysis; and (iii) scientific literature has not yet reached a conclusion as to the cause of chondrolysis. *Id.* at *4-9. The court concluded that Poehling's general causation opinion was supported only by his "ipse dixit" and "extrapolations [that] are not warranted." *Id.* at *9.

**2. *Schott v. I-Flow Corp.***

In *Schott v. I-Flow Corp.*, Nos. 1:8-CV-00323, 1:08-CV-00700, 1:08-CV-00818; 1:09-CV-00098; 1:09-CV-00155; 1:09-CV-00403, 2010 WL 1008478 (S.D. Ohio Mar. 16, 2010), the defendant moved to exclude the opinions of Dragoo, Greenland, and Wells. The defendant objected that they took a "leap of faith" from the existing literature to their opinions and did not comply with the scientific rigor typical of the laboratory. *Id.* at *3. The defendant contended that the experts' opinion must "be based on more than their credentials," specifically proper data and methodology. *Id*. In a two-paragraph analysis, the court rejected the defendant's argument and admitted the opinions. The court relied largely on the experts' credentials, explaining that "[t]he Court finds the Plaintiffs' experts are clearly highly skilled in their respective fields and does not believe they would risk their professional reputations by offering bogus causation opinions before the Court." *Id.* at *6.

**3. *McClellan v. I-Flow Corp.***

In *McClellan v. I-Flow Corp.*, Nos. 07-1309-AA, 07-1310-AA, 07-1318-AA, 07-1671-AA, 08-0478-AA, 08-0588-AA, 08-1419-AA, 09-0146-AA, 09-0342-AA, 09-0378-AA, 2010 WL 1753261 (D. Or. Apr. 29, 2010), the defendant moved to exclude the opinions of Matsen, Beck, Badylak, Dragoo, Greenland, and Wells. As noted above, the court excluded Matsen

because of litigation bias:

> [T]he circumstances of the 396-study and its unfinished status render Dr. Matsen's opinion irreparably tainted by litigation bias and unreliable. At best, Dr. Matsen sought "clarification" from [the plaintiff's attorney] concerning his analysis of the patient data. At worst, [the plaintiff's attorney] utilized Dr. Matsen in an orchestrated attempt to design, conduct, and complete a research study for the purpose of supporting litigation in which he has a vested economic interest. Either way, the resulting litigation bias, combined with the ever-changing and still unfinished report that is the crux of Dr. Matsen's opinion, render his testimony unreliable and inadmissible.

*Id.* at *31. The court also excluded the opinions of Greenland and Wells, explaining that they were not helpful "given their inability to generalize the stated association beyond the patients involved in the Hansen/Beck Study." *Id.* at * 42.

The court did, however, decline to exclude the opinions of Beck, Badylak and Dragoo. The court relied extensively upon the then-recent opinion in *Primiano v. Cook*, No. 06-15563, 2010 WL 1660303 (9th Cir. Apr. 27, 2010), which did not involve chondrolysis but rather an artificial elbow joint. In *Primiano*, the district court rejected a certain expert's opinions as based on insufficient facts and data, and unsupported by existing scientific literature. *Id.* at *3. The district court stated: "there's got to be an objective source that [the expert] relies on." *Id.* Reversing, the Ninth Circuit observed that the standard under Rule 702 "is a flexible one" and that its analysis under Rule 702 (as in the Sixth Circuit, where *Schott* was decided) focuses "especially on experience." *Id.* at *4, 5. The Ninth Circuit concluded that, based on the expert's "background and experience . . . [his opinion] had to be admitted." *Id.* at *6. Faced with this mandate, the *McClellan* court focused on the experience of Beck, Badylak, and Dragoo, and found that their opinions passed muster under the "flexible" standard of Rule 702.

**C. Applicability of Prior Decisions**

Plaintiff may contend that under *Schott* and *McClellan*, the designated opinions should be

admitted because the experts are experienced physicians who relied on their background and training to extrapolate their conclusions from existing literature. But the "flexible," "experience-based" approach of the Ninth and Sixth Circuits is inconsistent with the law in this circuit. As the Court has made clear, the burden of proof under Rule 702 "is an exacting one," requiring the examination of not only "a witness' qualifications," but also "the *process* by which the witness derived his or her opinions." *Crabbe*, 556 F. Supp. 2d at 1220-21 (emphasis added). As the Tenth Circuit has explained, the focus on the inquiry under Rule 702 is less on the witness' credentials and more on whether the opinions are "ground[ed] in the methods and procedures of science." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999); *see also James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA-BNB, 2009 WL 481688, *7 (D. Colo. Feb. 24, 2009) (excluding opinion and explaining that even a qualified expert's testimony may be excluded for lack of "the necessary foundation of facts or data").

In other words, the Tenth Circuit emphasizes the recipe rather than the cook. The focus in this circuit on scientific process and methodology ensures that opinions are *scientific*. In contrast, under the "experience-based" standard employed in cases such as *McClellan* and *Schott*, any highly qualified expert could render an opinion on any subject arguably within the expert's field. If Rule 702 could be satisfied by a court's subjective belief that a witness "would [not] risk their professional reputations by offering bogus causation opinions before the Court," *Schott*, 2010 WL 1008478 at *6, then the analysis would stop once a witness' credentials had been established. This is inconsistent with the language and purpose of Rule 702, as well as binding precedent in this Circuit. Accordingly, the Court should disregard the findings in *Schott* and *McClellan* that the opinions of Beck, Badylak, and Dragoo are admissible.

## IV. ARGUMENT

### A. Plaintiff's Experts Are Not Qualified Because Their Opinions Were Developed For The Express Purpose Of Testifying.

Because "a scientist's normal workplace is the lab or the field, not the courtroom or lawyer's office," *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 682 (D. Kan. 1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*")), "one very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d at 1317; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (affirming exclusion of experts' opinions on general causation in part because "Plaintiff's and her experts' efforts to discredit the epidemiology . . . are not peer-reviewed [or] developed independent of litigation"); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) ("[E]xpert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution.") (citation omitted); *Crabbe*, 556 F. Supp. 2d at 1221 (explaining that "the Court should consider whether the witness proposes to testify about matters growing naturally and directly out of research he or she conducted independent of the litigation [or] whether the witness developed opinions expressly for the purposes of testifying").

Here, Plaintiff's experts formed their causation opinions in the "lawyer's office" and did so expressly for purposes of testifying because no scientific study, paper, or article concludes that continuous infusion causes chondrolysis. In fact, several of Plaintiff's experts—specifically Matsen, Badylak, Greenland, Wells and Vidal—admit that they had had no prior relevant

experience with chondrolysis, either clinically or in research, and first addressed the question of causation because they were retained as litigation experts. (Appx. III, Tab 7, at 99:8-99:11; Tab 1, at 124:1-124:6; Tab 10, at 11:2-11:6; Tab 12, at 50:22-51:20.) These admissions highlight the absence of "important, objective proof that [their] research comports with the dictates of good science." *Daubert II*, 43 F.3d at 1317.

Though a few of Plaintiff's experts have analyzed chondrolysis outside of litigation, their results have proven far less conclusive than their litigation opinions. The Hansen-Beck study, for example, candidly states that "[t]he cause of this process is unknown" and that "further investigation of the possible association of pain pump use with chondrolysis is warranted." (Appx. I, Tab 7, at 1, 6.) This did not escape the court's attention in *Kilpatrick*:

> The study purported to identify a "strong association" between chondrolysis and intra-articular pain pumps, but also acknowledged that "[t]hermal and/or radiofrequency, suture material, and reabsorbable suture anchors may have played a role not yet completely understood at this time." Unlike [the plaintiff's litigation expert], the Hansen study declined to reach a conclusion as to the general causation of chondrolysis.

*Kilpatrick*, 2009 WL 2058384 at *5.

The published uncertainty of Beck and others in the etiology of chondrolysis stands in stark contrast to the litigation-driven causation conclusions offered by Plaintiff's experts, including Beck himself, in this suit. Where, as here, an opinion is developed solely for the purpose of litigation, or where the litigation opinion goes far beyond the expert's non-litigation research and scholarship, it must be viewed with deep caution and skepticism. An expert may not offer an opinion in court that he cannot or will not present to the scientific and medical community. *See generally Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (the court's duty is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

**B. Plaintiff's Expert Opinions Rely on Unreliable Methodologies.**

**1. Plaintiff's expert opinions have not been subjected to peer review.**

"In determining whether a particular scientific theory or technique is reliable, the district court may consider . . . whether the technique or theory has been subject to peer review. . . ." *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1071 (D. Kan. 2002) (citations omitted). Indeed, "the lack of peer review means that the Court simply does not have the assurance of reliability that this *Daubert* factor would normally provide." *Id.* at 1073, n.32 (excluding opinion); *see also Norris*, 397 F.3d at 886 (affirming exclusion of plaintiff's expert opinions as to general causation in part because they were not peer reviewed).

Here, not one of the proffered litigation opinions of Plaintiff's experts has been subjected to peer review. Many of the opinions stand in stark contrast to peer-reviewed literature on the same topic—including those by Plaintiff's experts, such as Beck and Dragoo—whose published work states only that the cause of chondrolysis remains unknown and that additional research is needed. The lack of peer review for these litigation opinions, which are much bolder in their conclusions than the non-litigation research, casts serious doubt upon their scientific reliability.

In fact, several of Plaintiff's experts openly acknowledge that their litigation reports—the only writings that they have ever authored on the subject of pain-pump use and chondrolysis—would not pass peer review and could not be published in current form. (*See, e.g.*, Appx. III, Tab 7, at 109:6-109:11, 238:17- 238:18) (Matsen acknowledging that his study was universally rejected by peer-reviewed journals); Appx. III, Tab 1, at 135:10-135:22 (Badylak admitting that he did not provide any backup data to support his opinions, which would preclude publication); Appx. III, Tab 10, at 297:2-297:17 (Greenland admitting that for purposes of peer-review his report would require "more work" and "a lot more caution"); Appx. III, Tab 12, at 69:3-69:22 (Wells admitting that "more analysis of various issues would have to be put in").

The pain-pump controversy has brewed for some time. Scores of pain-pump cases have been filed across the country, and they frequently involve the same cast of experts. Yet none of these experts has deemed his litigation opinion "worthy of verification, refutation or even comment" outside of the courtroom. *Daubert II*, 43 F.3d at 1318. "[T]he only review the plaintiff's experts' work has received has been by judges . . . and the only place their theories and studies have been published is in the pages of federal . . . reporters." *Id.* This is insufficient under Rule 702. "[T]he examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) (excluding expert opinions for lack of peer review).

Plaintiff's experts have not been shy about submitting their opinions on *other* subjects to the scrutiny of their peers. They have collectively published scores of papers, books, and articles in the literature of their respective scientific and medical fields. But not one of these espouses the theories of general causation asserted here. The experts' unwillingness to submit their opinions to the scrutiny of peer review and publication betrays "a tacit understanding . . . that what's going on here is not science at all, but litigation." *Daubert II*, 43 F.3d at 1318.

**2. Plaintiff's experts improperly synthesize available science through their own *ipse dixit*.**

Experts are permitted to rely on objective sources, such as a learned treatise, the policy statement of a professional organization, or a published article in a reputable scientific journal. *Daubert II*, 43 F.3d at 1319. But as Plaintiff's experts uniformly concede, there has never been a finding in such literature that continuous infusion causes chondrolysis. To compensate for this deficiency, they cobble together independently inconclusive bits and pieces from various papers and claim that, based on their "expertise," the whole is greater than the sum of its parts.

Badylak, for example, states in his report that he "used the same methodology with the

same degree of rigor . . . use[d] in [his] research" (Appx. II, Tab 1, at 1), but his expert report in this case does not say what he did other than review the relevant literature. All he says is that he drew his conclusion "based on the available medical and scientific data," *id*. at 4, and that "*[i]n addition* [he] used [his] education, training, clinical and research experience and general references within [his] field of research to reach [his] opinions." *Id*. at 2 (emphasis added). His methodology, in other words, is to read some articles and then ask you to trust him because he has a lot of experience. Vidal does the same in his "brief literature review," stating that his opinions "are based on [his] education as an Orthopedic Surgeon, clinical experience and understanding of the current literature." (Appx. II, Tab 7, at 2.) Perhaps the most representative testimony comes from Wells:

> Q. I'm trying to understand whether you bring anything to the analysis that goes beyond what, say, an undergraduate can do. What you did is you didn't design the study. Right?
>
> A. Correct.
>
> Q. You didn't look at the underlying data after the study was done?
>
> A. Correct.
>
> Q: You didn't bring any expertise to bear on that except to say that in your expertise, you realized that there were things that would be much more -- that would be helpful to know as a scientist. Right?
>
> A. Correct.

(Appx. III, Tab 12, at 334:13-335:4.)

This will not do. In *General Electric Co.* v. *Joiner*, 522 U.S. 136 (1997), the Supreme Court held that if the expert's opinion is all that connects the data to the ultimate conclusion, then the opinion should be excluded: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Id.* at 146 (citation omitted). "It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Dodge v. Cotter Corp.*, 328 F. 3d 1212, 1222 (10th Cir. 2003) (internal quotations omitted). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist." *Daubert II, 43* F.3d at 1315-16; *see also id.* at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")

The logic of *Joiner* controls here. The experts here go well beyond the limitations of the underlying literature to reach their causation conclusions—despite acknowledging that the literature does not support such an opinion—and attempt to spackle the gaps in the analysis and conclusions through the unifying whole of their own individual viewpoints. The untestable methodology of the experts is: take my word for it. The opinions may come from experienced professionals, but they are still personal viewpoints without objective, authoritative weight. This is unacceptable under Rule 702. *See generally Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (affirming the district court's finding that "the analytical gap in the experts' testimony is simply too wide for the opinions to establish causation" where the literature did not "support the notion that chemicals similar to benzene will affect the body in a manner similar enough to cause the same response as benzene"); *Domingo v. TK*, 289 F.3d 600, 606 (9th Cir. 2002) (affirming exclusion of causation testimony where the expert failed to offer "any objective source, peer review, clinical tests, establishment of an error rate or other evidence to show that [the expert] followed a valid, scientific method in developing his theory"); *Zenith Elect. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("[The expert's] method, 'expert intuition,' is neither normal among social scientists nor testable—and conclusions that are not

falsifiable aren't worth much to either science or the judiciary.").

### 3. Plaintiff's expert opinions are unsupported by epidemiology.

"Epidemiology is the medical science devoted to determining the causes of disease in human beings. Epidemiologists compare control groups of exposed individuals to groups of individuals exposed to a hypothetical cause of the disease being studied to determine whether exposed individuals have a greater risk of manifesting that disease. In epidemiological terms, any difference in risk of getting the disease between the two groups is the exposed individuals' relative risk. The existence or nonexistence of relevant epidemiology can be a significant factor in proving general causation. . . ." *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996).

The existence of well-controlled, reliable epidemiology studies, demonstrating the background rate and relative risk of disease, is a well-accepted method of demonstrating causation. *See In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1224-25 (D. Colo. 1998) ("Epidemiology is the best evidence of causation in the mass torts context."); *see also Norris*, 397 F.3d at 882 ("We agree with the district court that epidemiology is the best evidence of general causation in a toxic tort case. . . . While the presence of epidemiology does not necessarily end the inquiry, where epidemiology is available, it cannot be ignored. As the best evidence of general causation, it must be addressed.") (internal citations omitted); *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1154 (10th Cir. 1990) ("This lack of epidemiological proof for the Wilsons' claims is particularly significant in light of recent decisions of federal courts of appeals granting judgment n.o.v. for Merrell Dow based upon the absence of epidemiological evidence showing a causal relationship between Bendectin use and birth defects") (citations omitted); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1554 (D. Colo. 1990) (excluding expert opinions and explaining that "even if plaintiffs had been able

to prove exposure by their direct evidence, they would have been required to submit epidemiological evidence in support of their causation contentions"), *aff'd*, 972 F.2d 304, 307 (10th Cir. 1992) (noting that plaintiffs' causation evidence "was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data") (citations omitted).

Here, Plaintiff's experts neither relied upon nor conducted an epidemiological study. Some of them characterize the Hansen-Beck paper as epidemiology, but the study's own authors admit that it is not. The paper identifies itself as a case series (Appx. I, Tab 7, at 1), which merely reports clinical cases without attempting to control for variables. It is considered, at best, "Level 4" evidence.[5] *See Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1998). Beck explained the import of the study designation—something absent from his case series—in prior trial testimony: "[I]t's a case series, which means we looked at these patients who had this happen to them, and just presented them for the review of those who are reading the paper. *It wasn't meant or it wasn't designed to be this highly rigid, highly scientific study of A versus B.*" (Appx. III, Tab 4, at 1225:11-1225:17 (emphasis added).) Nor was it "any type of prospective matched series or any kind of attempt to make a statement under certain criteria." (Appx. III, Tab 3, at 445:10-12.) In his own words, Beck did nothing more scientific than observe and report.[6]

As a result, the "association" described in the Hansen-Beck paper is merely a hypothesis, with no scientific import as to causation. *Norris*, 397 F.3d at 885 ("Case reports that state that some women with breast implants developed disease do not provide an adequate scientific basis

---

[5] This refers to efforts by the scientific community to categorize various levels of evidence according to scientific reliability. The categories range from a low of Level 5 (which includes expert testimony) to Level 1 (which refers to the "gold standard" of a randomized, prospective, controlled study). *See* James G. Wright, et al., *Introducing Levels of Evidence to The Journal*, 85-A J. BONE & JOINT SURGERY 1-3 (2003).

[6] Plaintiff also attempts to transform the Hansen-Beck and Matsen papers into an epidemiological study through the expert reports of Greenland and Wells. As explained in Part IV.E.6, this effort fails as well.

from which to conclude that breast implants in fact cause disease. A correlation does not equal causation."); *Hollander v. Sandoz Pharmaceuticals Corp.*, 95 F. Supp. 2d 1230, 1237 (W.D. Okla. 2000) ("[b]ecause of their limitations, case reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation"), *aff'd in part and remanded for other reasons*, 289 F.3d 1193, 1211 (10th Cir. 2002) (holding that "it was not unreasonable for the district court to characterize the [case] reports as unreliable evidence of causation" because of the "limited information regarding the medical histories of the patients and the nature of the injuries they suffered" as well as "the large number of women who took [the drug at issue] and the variety of possible causes for many of these injuries").

The lack of randomized, prospective, controlled studies, or any epidemiology study whatsoever, renders the causation opinion of plaintiff's experts excludable as "a potential, untested hypothesis" that "cannot be a scientifically reliable basis for an opinion on causation." *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1228.

**4. Plaintiff's experts improperly rely on differential diagnosis.**

"Differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1229 (citation omitted). Though differential diagnosis "is an acceptable source of data on *specific* causation," *In Re Silicone Gel Breast Implant Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 892 (C.D. Cal. 2004) (emphasis added) (citation omitted), it cannot, as a matter of law, "speak to the issue of *general* causation [because] differential diagnosis *assumes that general causation has been proven* for the list of possible causes it eliminates." *Hall*, 947 F. Supp. at 1413 (emphasis added). In *Norris*, for example, the court affirmed the exclusion of expert testimony based on differential diagnosis:

> Their reliance on differential diagnosis without supporting epidemiological evidence is misplaced and demonstrates the unreliable nature of the testimony. Observations cannot define a disease. The foundational evidence that the doctors rely upon do not reach conclusions based on accepted scientific methodology. "[D]ifferential diagnosis *assumes* that general causation has been proven… ."

*Norris*, 397 F.3d at 885 (quoting *Hall*, 947 F. Supp. at 1413) (emphasis in original); *see also In re Breast Implant Litig.*, 11 F. Supp. 2d at 1229.

Beck's opinions are particularly plagued by such an approach. He first identifies the various factors that he thinks *might* be involved in chondrolysis, including surgical procedures, suture anchors, suture materials, and surgical instruments. (Appx. II, Tab 2, at 7.) He includes continuous infusion on that list without any inquiry or evidence that continuous infusion *could* cause chondrolysis. Then, after observing that continuous infusion was a common factor amongst his chondrolysis patients, he concludes *ipso facto* that continuous infusion was responsible. (*Id.* at 8.)

Beck's previous trial testimony confirms his faulty method. He testified that continuous infusion was behind chondrolysis because he "[could not] find any other reason for it." (Appx. III, Tab 4, at 1107:7-1108:1.) This conclusion was driven by the bare assumption that continuous infusion *could* cause chondrolysis. He may have stricken other causes off his list, but he failed to explain what objective, verifiable evidence allowed him to put continuous infusion on the list in the first place.

The other causation experts follow the same improper approach and their opinions should likewise be excluded. *See, e.g.*, Appx. II, Tab 6, at 9-13 (Matsen ruling out other potential factors and attributing chondrolysis to continuous infusion, without first establishing a causal relationship between continuous infusion and chondrolysis); Appx. II, Tab 1, at ¶ 6 (Badylak, doing the same); Appx. II, Tab 4, at 1-14 (Greenland); Appx. II, Tab 8, at 5, 7-8 (Wells); Appx.

II, Tab 7, at 2-3 (Vidal).

**C. Plaintiff's Expert Opinions Are Not Based On Sufficient Facts And Data.**

The proponent of an expert opinion must establish "that the witness gathered 'sufficient facts and data' to formulate the opinion." *Crabbe*, 556 F. Supp. 2d at 1223. This is a "quantitative" analysis, meaning that the issue is "whether the witness obtained the amount of data that the methodology itself demands." *Id.* "A party's failure to support expert opinion with sufficient facts and data requires exclusion of the unsupported evidence." *James River Ins. Co.*, 2009 WL 481688, at *7 (citation omitted). The litigation opinions of Plaintiff's experts are lacking sufficient facts and data in at least two material respects.

**1. Background rates and relative risk.**

In *Kilpatrick*, the court observed that the medical literature referenced "'idiopathic' chondrolysis" — that is, chondrolysis caused by unknown factors. 2009 WL 2058384 at *7. Chondrolysis occurs in patients who have never been treated with continuous infusion, and many patients treated with continuous infusion never develop chondrolysis. *Kilpatrick*, 2009 WL 2058384 at *8 (finding "demonstrably incorrect" the plaintiff's contention that the background rate of chondrolysis is "for all intent[s] and purposes zero") (citation omitted).

This is a critical fact that Plaintiff and her experts improperly downplay. Where, as here, chondrolysis occurs naturally in the general population even without exposure to continuous infusion, Plaintiffs "must prove that [her] injuries were the result of the accused cause and not some independent factor." *Daubert II*, 43 F.3d at 1320.

Indeed, "Plaintiffs must present expert testimony demonstrating that exposure . . . more than doubled the risk of their alleged injuries." *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1226. "If exposure . . . does not at least double the risk of injury, then more than half of the population suffering from the injuries allegedly caused by [the device] would be injured anyway

(the background rate of injury), thereby disproving legal causation." *Id.*; *see also Daubert II*, 1143 F.3d at 1321 ("For an epidemiological study to show causation under a preponderance standard, the relative risk of limb reduction defects arising from the epidemiological data will, at a minimum, have to exceed 2.") (internal quotations omitted).

Plaintiff's experts do not—and under the state of current knowledge cannot—make this showing. Nor do they make any independent findings about background rates, or even attempt to gather the relevant data. Without such evidence, their conclusions are unreliable. *See Kilpatrick*, 2009 WL 2058384 at *8 ("Whatever the true background risk, Poehling has not endeavored to explain it, and this casts further doubt on the reliability of his methodology.").

**2. The mechanism for the development of chondrolysis.**

Plaintiff's experts can only hypothesize about how and why chondrolysis develops; according to the current scientific literature, the actual mechanism is unknown. For example, Dr. McNickle writes that the "role of intra-articular catheters and pumps in pain management after shoulder surgery [in causing chondrolysis] has not been substantiated." (Appx. I, Tab 2, at 6.) Dr. Bailie writes that "the actual cause of even the reported cases has not been confirmed, and the associates are speculative at this juncture." (Appx. I, Tab 5, at 2.) Less than a year ago, Dr. Kang, a leading medical researcher, wrote that "to date, no single etiology has been identified as the cause of chondrolysis associated with anterior shoulder instability repair." (Appx. I, Tab 1, at 914). And, as recently as December 2009, Dr. Rapley noted that "[chondrolysis] develops only in a minority of patients, and this fact has contributed to the difficulty in recognizing exactly what is occurring." (Appx. I, Tab 10, at 1372.) Notably, Dr. Rapley concluded that "[t]he pain pump and its catheter do not mechanically cause this problem" and that the cause is likely "[a] constellation of contributing factors." (*Id.*) As noted above, Plaintiff's own expert Beck—in his non-litigation study with Hansen—writes that the "cause of this process [of

chondrolysis] is unknown." (Appx. I, Tab 7, at 1.)

The medical literature speaks only in terms of possibility, not probability, and therefore does not meaningfully advance Plaintiff's case. *See Hall*, 947 F. Supp. at 1412 (holding that causation testimony does not fit because there was no "epidemiological, rheumatological, or immunological/toxicological evidence linking those breast implants to disease"). Without sufficient facts and data about this mechanism, the causation opinion here is merely a hypothesis, and therefore inadequate under Rule 702. *Id*. at 1402 ("Because ACTD is at best an untested hypothesis, there is no scientific basis for any expert testimony as to its causes and presence in plaintiffs."); *Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (causation testimony properly excluded because expert could not explain how duration of medical procedure increased risk of alleged injury).

**D. Plaintiff's Experts Apply Their Methodologies Improperly.**

**1. Plaintiff's experts improperly extrapolate from *in vitro* studies.**

Plaintiff's experts rely upon several *in vitro* studies (*i.e.*, conducted in a test tube or outside of a living organism), including studies published by Karpie et al., Chu et al., and Dragoo et al. Those studies can only support causation, however, if the experts can properly extrapolate from them to reach their opinion. In the present case, any such extrapolation is inherently unjustified and improper.

For instance, the Karpie article discusses an *in vitro* study of the cytotoxic effects of lidocaine on bovine articular chondrocytes (i.e., cartilage cells from cows).[7] (Appx. I, Tab 11.) The article expressly cautions against extrapolating its conclusions to humans in the way that the

---

[7] The article is inapplicable for the further reason that Plaintiff in this case was given Marcaine, not lidocaine. (Dkt. No. 1 (Complaint) at ¶ 16.) The article recognizes the differences in toxicity between lidocaine and other medications, recognizing that lidocaine's small molecular size may "have greater potential to penetrate the intact articular surface." (Appx. I, Tab 11, at 1625.)

Plaintiff's experts do here: "As this study was performed using chondrocytes obtained from healthy bovine cartilage, the results may be different with human cartilage after joint injury or in the presence of degenerative changes." (*Id.* at 1626.) Not surprisingly, as good science would require, the study advocates additional "*in vivo* studies [*i.e.*, done on a living organism] designed to model each potential clinical scenario. . . ." (*Id.*)

The Chu articles (Appx. I, Tabs 12 and 13) studied the effects of bupivacaine on cartilage harvested from cow knees after slaughter, and human knee cartilage harvested following joint replacement or donor death. The articles recognize similar limitations that warrant the exclusion of Plaintiff's litigation opinions here:

- "[L]imitations were that this was an in vitro study that used bovine cartilage, and there was no dose-response curve" (Appx. I, Tab 12, at 698);
- The data supports the "need for comprehensive additional studies" (*id.*);
- "[O]ne of the limitations of our study was that human cells could not be considered to be as healthy as bovine cells" (Appx. I, Tab 13, at 819);
- "Diseased chondrocytes could be more susceptible to the effects of cytotoxic agents" (*id.* at 819-20); and
- "It is important to note that in vitro assessments do not account for dilutional effects or in vivo reparative processes" (*id.* at 820).

The Dragoo article does not support causation, either. (Appx. I, Tab 9.) The article acknowledges that "a direct link of anesthetic-induced chondrolysis has not been established. . . ." (Appx. I, Tab 9, at 1484.) Dragoo himself does not believe that his study establishes or supports causation, because it was not "constructed to show . . . chondrolysis" and did not involve the evaluation of chondrolysis itself. (Appx. III, Tab 6, at 47:4-47:13.) Dragoo concedes, as he must, that neither he nor anyone else knows the causal mechanism and progression of chondrolysis. (*Id.* at 202.) By concluding otherwise in this litigation, Dragoo (and the experts here who rely on his research) exhibits none of the intellectual rigor that marked his non-litigation research.

Courts routinely find that *in vitro* studies, standing alone, are insufficient to establish causation. *See In re Bausch & Lomb, Inc. Contact Lens Solution Prods. Liab. Litig.*, 2:06-MN-77777-DCN, 2009 WL 2750462, at *12 (D.S.C. Aug. 26, 2009) (recognizing that "in-vitro tests are only the first step, and that animal studies followed by human trials are necessary to determine applicability of an hypothesis to humans" because "[i]n vitro tests generate hypotheses but lack sufficient reliability, standing alone, to demonstrate causation in humans") (citation omitted); *see also Hollander*, 95 F. Supp. 2d at 1238 ("Although animal studies can contribute to an expert's scientific conclusions as to causation, the court finds that the animal studies on which the plaintiffs' experts rely are too dissimilar to the facts presented in this litigation to be reliable."), *aff'd in part and remanded on other* grounds, 289 F.3d 1193, 1209 (10th Cir. 2002) (upholding district court's specific finding as to the unreliability of animal studies); *see generally* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 442 (Federal Judicial Center, 2d ed. 2000) ("REFERENCE MANUAL") ("The major barrier to use of in vitro results is the frequent inability to relate doses that cause cellular toxicity to doses that cause whole-animal toxicity."). Accordingly, the Karpie, Chu, and Dragoo articles—the three *in vitro* articles upon which the litigation opinions are primarily based—do not reliably support conclusions regarding general causation.

**2. Plaintiff's experts improperly rely on *in vivo* animal studies.**

Plaintiff's experts also rely upon two *in vivo* animal studies conducted by Gomoll, et al. (Appx. I, Tabs 14 and 15.) Those studies can only provide support for causation through unjustifiable extrapolation. The first Gomoll study (Appx. I, Tab 14) investigated the chondrotoxicity of bupivacaine in rabbit shoulders. The article cautions against extrapolation to humans: "One limitation of our study, which it shares with most animal models, should be considered; although we were able to show the detrimental effects of bupivacaine on the cellular

and tissue level in a rabbit model, it remains to be determined whether human cartilage is equally susceptible and whether these histopathologic and functional changes result in the subsequent development of rapidly progressive osteoarthritis." (Appx. I, Tab 14, at 817.) Indeed, Gomoll advocates that additional human studies be undertaken before any conclusions regarding a causal relationship between continuous infusion and chondrolysis can be drawn. *See generally Kilpatrick*, 2009 WL 2058384 at *6 (holding that the Gomoll article does not support chondrolysis causation in humans).

The second Gomoll article ("Gomoll II") (Appx. I, Tab 15) actually tends to *disprove* causation. The study underlying this article continued the work reported in Gomoll's first article. (Appx. I, Tab 15, at 1-2.) It reported *no* lasting impairment of cartilage following infusion of local anesthetic:

> Our current study did not demonstrate any permanent impairment of cartilage function at 3 months in a rabbit model. Conversely, we found an increase in chondrocyte anabolic activity, as evidenced by an elevated sulfate uptake and higher PG content in cartilage exposed to bupivacaine when compared with contralateral controls, or with shoulders treated with saline infusion. These apparently conflicting results suggest that for the experimental model used, *cartilage function was only transiently impaired by exposure to bupivacaine*.

(*Id.* at 4-5 (emphasis added).) As with other rigorous scientific articles on this subject—unlike the litigation opinions of Plaintiff's experts—the Gomoll II article recognizes that "[a]dditional experiments will be necessary before the phenomenon of bupivacaine toxicity is fully understood." (*Id.* at 6.)

None of Plaintiff's experts addressed the contrary results of Gomoll II.[8] An expert

---

[8] Badylak and Vidal indicate they reviewed Gomoll II but neither makes any mention of it in his analysis or conclusions. When confronted with Gomoll II in his deposition, Dragoo testified that the second study did not undermine the first because rabbits, unlike humans, can regenerate cartilage. (Appx. III, Tab 6, at 207.) But Dragoo cannot rely on studies of rabbit cartilage only when they support his litigation opinion; if human and

betrays advocacy by failing to report the full scope of the relevant scientific literature, or reporting contrary literature without explaining why it does not refute his conclusions. "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *In re Rezulin Prods. Liab. Litig.,* 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005); *see also Norris,* 397 F.3d at 882 ("where there is a large body of contrary epidemiological evidence, it is necessary to at least address it with evidence that is based on medically reliable and scientifically valid methodology"); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d. 1062, 1087 (D. Kan. 2002) ("obtaining information from sources that support, refute or are neutral regarding the hypothesis is appropriate to minimize the likelihood of a false conclusion"), *aff'd* 356 F.3d 1326, 1331 (10th Cir. 2004) (noting the district court's concern about the excluded expert's "pre-selected evidence"); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 596 (9th Cir. 1996) (affirming district court's exclusion of an expert where the expert "'pick[ed] and chose' from the scientific landscape").

As with the *in vitro* studies, the Gomoll articles do not reliably support the causation opinions of Plaintiff's experts. *See Daubert II,* 43 F.3d at 1319 ("While these materials indicate that plaintiffs' experts have relied upon animal studies, chemical structure analyses and epidemiological data, they neither explain the methodology the experts followed to reach their conclusions nor point to any external source to validate that methodology."); *Lusch* v. *Matrixx Initiatives, Inc.,* No. 05-292-HA, 2007 WL 2816203, at *5 (D. Or. Sept. 25, 2007) (excluding causation testimony in part because the expert "fails to explain and demonstrate why extrapolation [from mice studies] in this instance is scientifically proper") (citing *McClain* v.

rabbit cartilage are incomparable, then they must be so regardless of whether the result hurts or helps Plaintiff's case.

*Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241-42 (11th Cir. 2005).

### 3. The case series relied upon by Plaintiff's experts are insufficient to establish general causation.

Plaintiff's experts rely heavily upon case reports and case series, including not just the Hansen-Beck paper, but also papers by Petty, et al. (Appx. I, Tab 8), Greis, *et* al. (Appx. I, Tab 16), and Saltzman et al. (Appx. I, Tab 4). But case reports are generally insufficient to establish causation. *See, e.g.*, *Norris*, 397 F.3d at 885 ("Case reports that state that some women with breast implants developed disease do not provide an adequate scientific basis from which to conclude that breast implants in fact cause disease. *A correlation does not equal causation*.") (emphasis added); *Hollander*, 289 F. 3d at 1211 (affirming exclusion of case reports because they "contain only limited information regarding the medical histories of the patients and the nature of the injuries they suffered," which had a "variety of possible causes").

As noted above, the Hansen-Beck paper fails to support causation; it expressly acknowledges that "[t]he cause of this process [chondrolysis] is unknown" and that "further investigation of the possible association of pain pump use with chondrolysis is warranted." (Appx. I, Tab 7, at 1, 6.) The court in *Kilpatrick* agreed:

> Kilpatrick, and [Plaintiffs' expert] Poehling, claim that this 63% injury rate (i.e. twelve chondrolytic shoulders out of nineteen treated with pain pumps) is powerful evidence of general causation. However, the Hansen study includes no statistical analysis, and therefore no means of determining whether the findings are statistically significant, or whether it is statistically meaningful to extrapolate from the relatively small sample size. Further, the study noted that thermal energy, another suspected cause of chondrolysis, was used in four cases, but did not explain whether thermal energy contributed to or wholly accounted for the chondrolysis in those cases, beyond a vague statement that "[thermal energy] does not appear to be clearly proven to be the only factor in these cases." *See* Hansen study (dkt # 72-3, at 14). The study purported to identify a "strong association" between chondrolysis and intra-articular pain pumps, but also acknowledged that "[t]hermal and/or radiofrequency, suture

> material, and reabsorbable suture anchors may have played a role not yet completely understood at this time." *Id.* at 15. . . . [T]he Hansen study declined to reach a conclusion as to the general causation of chondrolysis . . . Extrapolating from the Hansen study that intra-articular pain pumps cause chondrolysis, then, effectively leaves an unexplained 40% error rate in Poehling's hypothesis. This is not the "good science" that *Daubert* and Rule 702 demand.

2009 WL 2058384 at *5-6 (emphasis added).

The Greis, Saltzman, and Petty articles are similarly unsupportive of the expert opinions on causation. *See, e.g.*, Greis (Appx. I, Tab 16, at 1338) ("the cause of chondrolysis following these procedures remains unclear"); *id.* at 1343 ("How these bupivacaine solutions affect chondrocyte viability is not fully understood."); Saltzman (Appx. I, Tab 4, at 1) ("Although the etiology of these cases is not known for certain, there has been speculation that radiofrequency devices, young patient age, instability surgery, intra-articular pain pumps, and type of anesthetic may be precipitating factors."); Petty (Appx. I, Tab 8, at 514 ("The disease pathophysiology is currently not understood. . . . We do not know the natural history of this process."); *see generally Kilpatrick*, 2009 WL 2058384 at *7 (discussing impropriety of extrapolating causation from Greis article and similar case reports). The Petty report does not even mention continuous infusion as a potential contributing factor, but rather only discusses radiofrequency devices. (Appx. I, Tab 8.)

In addition, several of Plaintiff's experts failed to consider case reports demonstrating other potential causes, and cases of chondrolysis where no potential cause was ascertained. Instead, they relied upon a few cherry-picked reports to support their conclusions. For instance, all of the expert opinions fail to address the case series of Bailie (2009).[9] (Appx. I, Tab 5.) In that case series, Bailie concluded that no single mechanism could be implicated in the

[9] Vidal and Badylak indicate they reviewed the study but neither mentions it in his analysis or conclusions.

development of chondrolysis after shoulder arthroscopy. (*Id.*) Although the article contradicts the opinion that continuous infusion causes chondrolysis, Plaintiff's experts do nothing to address it. Similarly, the findings of Dr. Ruben Gobezie are all but ignored by Plaintiff's proferred experts, and for good reason. (Appx. I, Tab 17.) Dr. Gobezie performed "a retrospective review of a consecutive series of 687 patients undergoing arthroscopic shoulder procedures between December 2000 and January 2005." (*Id.*) Yet, contrary to the opinions of Plaintiff's experts, none of the patients who received continuous infusion developed a case of chondrolysis. (*Id.*) As discussed above, the selective reliance and failure to consider contrary evidence makes the experts' opinions unreliable.

The law is clear that absent some compelling circumstance—and there is none here—case reports do not support causation opinions. *Hollander*, 95 F. Supp. 2d at 1237 (excluding expert opinion and explaining that "[b]ecause of their limitations, case reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation"); *Hall,* 947 F. Supp. at 1411 ("[C]ase reports and case studies are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls. Therefore, they cannot be the basis of an opinion based on scientific knowledge under *Daubert*.") (internal citations omitted); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) ("Case reports and [adverse drug event reports] are compilations of occurrences, and have been rejected as reliable scientific evidence") (citation omitted); *Kilpatrick*, 2009 WL 2058384 at *7 ("[C]ase reports are way down at the very bottom as far as medical strength of an article and cannot establish medical causation.") (internal quotations omitted). As one court explained, "[c]ase reports can give rise to a question about causation; epidemiology answers the question." *In re Breast Implant Litig.,* 11 F. Supp. 2d at 1230 (citation

omitted). Here, the opinions of Plaintiff's experts go no further than giving "rise to a question." Accordingly, they are not reliable to establish general causation.

**E. The Expert Opinions are Individually Defective.**

In addition to their common flaws, the opinions of the proffered experts contain additional, individual defects.

**1. Dr. Charles Beck**

Given the central role that the Hansen-Beck case series plays in the opinions of the majority of Plaintiff's proffered experts, the foundational problems with the Hansen-Beck paper have been discussed in some detail above. They are incorporated here but will not be reiterated, except to say that the main problem with the litigation opinion of Beck is that it is inconsistent with the findings contained in his own non-litigation paper, which he presented to his peers in the medical community.

**2. Dr. Frederick Matsen**

Dr. Matsen had no experience in chondrolysis before becoming involved in the litigation. Arthroscopy is not one of Matsen's areas of interest (Appx. III, Tab 7, at 83:15-83:18), and he has never conducted research on glenohumeral chondrolysis independent of litigation. (*Id. at* 99:16-99:22.) In his own words, he was a "late arrival on the scene of chondrolysis." (*Id. at* 82:23-82:24.)

Matsen drew his conclusions from three legally insufficient data sets, all of which required the application of flawed and unreliable methodologies. First, Matsen describes a single patient he treated who developed chondrolysis. (Appx. II, Tab 6, at 5.) A sample of one cannot, as a matter of law, establish causation. Matsen candidly concedes this: "I don't think I have enough experience treating chondrolysis patients to make conclusions." (Appx. III, Tab 7, at 239:18-20.)

Next, Matsen prepared a case series of a sample of 67 chondrolysis patients. (Appx. II, Tab 6, at 4-5.) Both this study and its successor were performed for the purpose of litigation; Matsen admitted that both the idea for the study and its data were generated solely by lawyers representing a plaintiff in chondrolysis litigation. (Appx. III, Tab 7, at 99:8-99:11; Appx. II, Tab 6, at 4-5.) The study was submitted for publication and universally rejected. (Appx. III, Tab 7, at 109:6-109:11; 238:17-238:18.) Matsen now concedes the unreliability of this study, acknowledging that "[b]ecause the cases in the case series were referred by [a] legal office, there was selection bias in the inclusion of cases in which local anesthetics were infused after arthroscopy." (*Id.* at 238:25-239:3.) In fact, he admits that he has now decided—contrary to the assertions in his litigation opinion—that he no longer thinks this study supports his opinion. (*Id.* at 18:20-18:22 ("[S]o I would like to state today that the opinion[s] that I have today are not based on those 67 cases.").)

Realizing the fundamental unreliability of his opinion, Matsen returned to the attorney who provided him with the original data set of 67 cases. (Appx. III, Tab 9, at 1637:6-1637:8.) The attorney provided Matsen with another data set, this time of 396 patient records, and all from arthroscopic surgeries performed by a single doctor, Dr. Benz, over a twelve-year period. (Appx. II, Tab 6, at 5-6.) The data from Benz is itself suspect. In surgeries that Benz performed, 49 cases of chondrolysis presented themselves (believed to be more than any other orthopedic surgeon in the United States). (*Id.* at 9.) Matsen was never able to personally review the patient records, because Benz destroyed certain records owing to his fear of liability. (Appx. III, Tab 5, at 137:2-139:5; 141:14-141:25) (explaining that Benz drove sixty miles in order to throw some of his medical records into a dumpster.) The lawyer in the case provided what data remained to a nurse selected and hired by the lawyer. Appx. III, Tab 7, at 37:2-37:4). The nurse then

extracted data from the records and compiled them into a data sheet. (*Id.* at 38:2-38:7.) Matsen did not participate in this process at all. (*Id.* at 41:9-41:12.) To form his opinion, he simply reviewed two columns in this summary data sheet, namely whether a pain pump was used and whether the patient was diagnosed with chondrolysis:

> Q. So you basically looked at two columns, was there a pain pump used and has there been a diagnosis of chondrolysis, basically, and counted those up?
>
> A. That's right.
>
> Q. Okay. And you really, for the purposes of your testimony [ ], didn't look at any other data in these data sheets?
>
> A. That's right.

(*Id.* at 165:7-165:14.) He then arrived at his opinion by first "ruling in" chondrolysis as a cause—which is not appropriate for general as opposed to specific causation—and then "ruling out" the other possible causes. (Appx. II, Tab 6, at 9.) Matsen admits that his study has no application beyond the group of 396 patients. (*Id.* at 6.) This is just as well, since the study is incomplete and no manuscript exists. (Appx. III, Tab 7, at 12:15-13:17; 225:25-226:10.)

In other words, Matsen relied on secondhand data compiled by a lawyer's agent, and then reached a conclusion without performing any real additional analysis, or even finishing the analysis. The litigation influence was so extensive that Matsen thanked the attorney by email for his "partnership," *McClellan*, 2010 WL 1753261 at *28, and was willing to give the attorney credit as a co-author. *Id.* at *30. Such gross litigation bias requires that his opinions be disregarded, and indeed the court in *McClellan* rejected them for this very reason. *See McClellan*, 2010 WL 1753261 at *31 ("Dr. Matsen's opinion [is] irreparably tainted by litigation bias and unreliable."). The *McClellan* opinion recounts a thorough (and now public-record) history of the facts showing that Matsen's opinion has been infected with litigation bias. *Id.* at

*24-31. Because the opinion he offers here is based on the same methodology, his opinion should be excluded.

### 3. Dr. Jason Dragoo

Dr. Dragoo is one of Plaintiff's few experts who, before being retained in litigation, researched the potential effect of local anesthetic on cartilage. Dragoo conducted a study that subjected human cartilage, harvested during total knee replacements, to local anesthetics in a chamber intended to mimic conditions in the human body. In his published study, Dragoo admits that "a direct link of anesthetic-induced chondrolysis has not been established." (Appx. I, Tab 9, at 1484.) He also expresses concern that the study chondrocytes came "from older patients with arthritis," which "may be more susceptible to damage." (*Id.* at 1488-89). During his deposition, Dragoo admitted that his study was not even designed to ascertain the cause of chondrolysis. (Appx. III, Tab 6, at 281:19 – 282:6.) He also admitted that "all of the pathways and changes within the joint from initial trauma to the cartilage or injury to the cartilage to the development of chondrolysis has not been . . . established . . . [and thus] what makes people susceptible is unknown at this time." (*Id.* at 135:24- 136:4, 201:22-201:23.) In other words, he doesn't know what causes chondrolysis.

In his litigation opinion, however, Dragoo goes well beyond the inconclusiveness of his own study to assert "that the use of intra-articular pain pumps with a local anesthetic, with or without epinephrine, can cause cartilage degeneration in a dose-duration dependant manner." (Appx. II, Tab 3, at 7.) He reaches this opinion despite further admitting that it cannot be supported either by the Hansen-Beck paper (*id.* at 6-7), or by the Chu and Gomoll animal studies upon which virtually all of Plaintiff's experts rely. Dragoo notes that using animals "prevent[s] the direct correlation to human disease." (Appx. I, Tab 9, at 1484.) Dragoo concludes that "additional testing" and "additional investigation" are necessary. (*Id.* at 1487.)

There is nothing that connects Dragoo's own inconclusive study outside of litigation to a conclusive opinion for the lawsuit, other than his own *ipse dixit*.

**4. Dr. Stephen F. Badylak**

Dr. Badylak's opinion was prepared expressly for litigation. He had no prior clinical, medical, or research background relating to chondrolysis. (Appx. III, Tab 1, at 124:1-124:6.) He is not an orthopedic surgeon. (*Id.* at 11:15-11:17.) He has never performed a shoulder surgery (*id.* at 11:20-11:23), administered continuous infusion (*id. at* 15:9-15), diagnosed or treated a patient with chondrolysis (*id.* at 114:5-116:2), investigated or analyzed the effect of continuous infusion on human or animal cartilage (*id.* at 38:16-39:4), or investigated the possible causes of chondrolysis. (*Id.* at 103:16-103:20.) He further admits that he has no prior experience extrapolating clinical data on the causes of shoulder chondrolysis. (*Id.* at 104:4-104:10.)

Badylak performed no independent research for the purpose of his litigation opinion. He reviewed a handful of studies and articles after being retained as an expert, but concedes that there is no medical or scientific literature concluding that continuous infusion is the primary cause of chondrolysis. (*Id.* at 157:7-157:10.) He concedes that the current state of medical science is such that the dose-response relationship of the local anesthetics at issue cannot be quantified, and that the levels being tested cannot be directly translated into clinical studies because of several alternative variables. (Appx. III, Tab 2, at 329:9-329:18; 465:19-466:7.) Finally, Badylak admits that there are studies concluding that other causes of shoulder chondrolysis may exist, including some potential unknown causes. (Appx. III, Tab 1, at 108:7-112:5.)

At its core, Badylak's opinion is based on little more than his perception of an increase in the number of cases of chondrolysis at the same time as an increase in the use of pain pumps. (Appx. III, Tab 1, at 159:3-162:12.) Such a temporal relationship—even if it existed—would be

insufficient to establish causation: "The fact of a temporal relationship establishes nothing except a relationship in time. Proof of a temporal relationship merely suggests the possibility of a causal connection and does not assist Plaintiffs in providing medical causation." *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1238-39 (citations omitted). Not surprisingly, Badylak concedes that his study is "Level Five" (*id.* at 135:9), i.e., the lowest level of scientific evidence.

**5. Dr. Armando F. Vidal**

Dr. Vidal evaluated the surgical records of the Plaintiff and performed a literature review, again only after being retained for this litigation. He conducted no review of independent records. After eliminating other possible causes of *Plaintiff's* chondrolysis, Vidal concluded that "in all reasonable probability," prolonged exposure to Marcaine was the "most likely" cause. (Appx. II, Tab 7, at ¶ 14.) This opinion about specific causation, which assumes the existence of general causation, is now being offered to prove general causation.

Vidal's highly qualified conclusion is further weakened by his admission that the cause of chondrolysis is "multifactoral" and "further study is necessary." (Appx. III, Tab 11, at 50:21-51:3; 49:6-49:8, 49:24-50:1, 52:18-52:19.) Like some of his fellow experts, Vidal admits that no published article has concluded that continuous infusion causes chondrolysis. (*Id.* at 80:11-80:15, 85:5-85:19; 100:5-101:16, 106:7-107:4, 112:10-112:20, 153:6-153:20, 156:14-156:20, 159:3-159:14, 287:19-288:1, 325:20-326:2.) As with the other experts, he connects the relevant literature to his opinion of causation only through his own *ipse dixit*.

**6. Dr. Sander Greenland and Dr. Martin T. Wells**

In an attempt to bolster the epidemiological deficiencies of the Hansen-Beck and Matsen papers, Plaintiff retained Dr. Greenland, an epidemiologist, and Dr. Wells, a biostatistician.[10]

---

[10] The Court need not address the Greenland and Wells opinions. Though Plaintiff offers their opinions in support of her case-in-chief, she only disclosed them as rebuttal expert witnesses. Evidence offered as rebuttal will be

Greenland and Wells purport to demonstrate a statistically significant "association" between continuous infusion and chondrolysis in the Hansen-Beck case series. (Appx.II, Tab 4, at 13-14; Appx. II, Tab 8, at 2 ¶ 3.) Association is not causation, however, and does not satisfy Rule 702. *Kilpatrick*, 2009 WL 2058384, at *5 (excluding chrondrolyis-causation expert and holding that Hansen-Beck and other studies show at best "an association between chondrolysis and intra-articular pain pump use, but . . . 'showing *association* is far removed from proving *causation*'") (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n. 16 (11th Cir. 1999) (emphasis in original).

The opinions of Greenland and Wells should be excluded for the further reason that, as both experts admit, their conclusions are limited to the patients in those particular studies and cannot be generalized to a larger population. (Appx. II, Tab 4, at 14 (Greenland opinion that he "would infer that the intra-articular placement of the pain-pump catheters was a primary and essential contributing factor to the development of chondryolysis *in the cases reported by Hansen et al. and by Dr. Matsen*") (emphasis added); Appx. III, Tab 12, at 139:18-139:23 (Wells admitting that his "analysis of the Hansen Beck articles is a single piece of data that cannot be used by itself to establish a cause-and-effect relationship"). The court in *McClellan* excluded the identical opinions by Greenland and Wells for this very reason. *McClellan*, 2010 WL 1753261 at *42 ("I do not find the testimony of Drs. Greenland or Wells to be particularly relevant or helpful, given their inability to generalize the stated association beyond the patients involved in the Hansen/Beck Study.")

---

excluded if it should have been presented in the party's case-in-chief, *see Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 324 (10th Cir. 1989), since such evidence is repetitive, serves only to bolster other evidence previously presented in the party's case-in-chief, or is a belated attempt to fix a perceived defect in the case-in-chief. *See Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1515 (10th Cir. 1990) (affirming exclusion of rebuttal expert testimony that "was really an attempt [] to introduce or interpret exhibits more properly part of [the plaintiff's] case-in-chief").

The Greenland and Wells opinions also fail to control for systematic errors in the underlying studies. An epidemiological study accounts for the possibility of an erroneous association due to chance, or random error, through a statistical analysis to ensure that the association is statistically significant. REFERENCE MANUAL at 354. But even statistically significant associations may be erroneous because of "bias" or "confounding." *Id*. Bias may result in the description of an association that does not actually exist, generally through systematic errors in the research process such as subject selection, data collection, or data analysis. REFERENCE MANUAL at 363.[11] Confounding may describe the existence of an actual association, but in the misleading circumstance where some other factor or factors has in fact caused the association. Reference Manual at 369.[12]

Greenland and Wells acknowledge that the Hansen-Beck paper and Matsen analysis were not designed to establish causation, but were merely retrospective case studies. (Appx. III, Tab 10, at 170:4-9; Tab 12, at 184:12-185:21.) They concede that the studies did not control for errors of bias or confounding. (Appx. III, Tab 10, at 48:5-48:15; Tab 14, at 155:8-155:18.) They further admit that they lack sufficient data to perform any independent analysis of the potential sources of bias and confounding. (Appx. III, Tab 10, at 129:4-129:6; Tab 14, at 48:4-48:10.)[13]

Like the other experts, neither Greenland nor Wells can opine that pain pumps are even *a* cause of chondrolysis. For example, referring to different instruments, anesthetics, flow rates, surgical procedures, and other specifics of pain-pump use, Greenland admitted that the

---

11 An example of bias is where women with a removed cervix are included in a study of causes of cervical cancer. REFERENCE MANUAL at 364.

12 An example of confounding is an association between death and gray hair, where the results might in fact be explained by the confounding factor of age. REFERENCE MANUAL at 369.

13 In their supplemental reports, Greenland and Wells state that they reviewed a new study by Wiater, et al. analyzing the data of the Hansen-Beck study. (Appx. II, Tab 5, at 2; Tab 9 at 2.) Though the experts here state that Wiater provides further evidence "linking" intra-articular pain pumps and chondrolysis, this additional opinion is irrelevant, in that neither Greenland nor Wells opines about the Wiater methodology or data, or adds anything other than to report its conclusion.

"association . . . could be because it's one of the factors in there or some interaction of two of the factors in there, and I could not make a separate statement about any of them based on the data that I have seen." (Appx. III, Tab 10, at 303:12-303:16.) By the end of his deposition, Greenland admitted that "without that further data [relating to other factors], there is no way to be sure that it isn't some aspect of something surrounding . . . when they used the pain pumps." (*Id.* at 322:23-323:1.) Thus, "[i]f I was to write this today . . . I would word that, my conclusion, I think more cautiously." (*Id.* at 321:18-321:21.) *See also* Appx. III, Tab 14, at 242:2 (Wells acknowledging that to write a paper he would need "a better set of data to analyze").

There is no reliable epidemiology in this case, or at least nothing that Greenland and Wells would consider reliable epidemiology in the ordinary course of their work. (*See* Appx. III, Tab 10, at 133:8-134:1 (Greenland admitting that his analysis was a situation where the normal rules of epidemiology "might start to break down"); Appx. III, Tab 14, at 334:13-335:4 (Wells admitting that he didn't perform any analysis beyond what an undergraduate might do). They ran insufficient data through a substandard methodology, and then stamped it with the imprimatur of their own expertise. Like applying a fresh coat of paint to a pair of cars with faulty engines, Greenland and Wells make the Hansen-Beck and Matsen studies look more respectable without actually improving their reliability.

## V. CONCLUSION

The litigation opinions of Plaintiff's proffered experts do not remotely approach the standards required by Rule 702. They are based on *ipse dixit* and simply parrot a lawyer's views of the case. This is advocacy, not science, and the law requires far more. Accordingly, Defendants respectfully request that the general causation expert opinions of Stephen F. Badylak, Charles Beck, Jason Dragoo, Frederick Matsen, Armando F. Vidal, Sander Greenland, and Martin Wells be excluded pursuant to Rule 702. As addressed in the accompanying supplemental memorandum, Defendants also request that the Court exclude the remaining opinions of Charles Beck, as well as the opinions of Suzanne Parisian.

Dated: July 7, 2010

**Attorneys for Defendant I-Flow Corporation**

*s/ Jordan Lipp*
Jeffrey R. Pilkington
Jordan Lipp
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
E-Mail: jeff.pilkington@dgslaw.com
jordan.lipp@dgslaw.com

Chad J. Layton
Erin N. Graham
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.
233 South Wacker Drive, Suite 5500
Chicago, IL 60606-6306
Telephone: (312) 645-7800
Facsimile: (312) 645-7711
E-Mail: clayton@smsm.com
egraham@smsm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2010, I electronically filed the foregoing **DEFENDANT I-FLOW'S MEMORANDUM IN SUPPORT OF ITS RULE 702 MOTION TO EXCLUDE EXPERT OPINION ON GENERAL CAUSATION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Attorneys for Plaintiff**

D. Robert Jones, Esq.
jones@drjpc.com

Laura B. Kalur, Esq.
lbkalur@kalurlaw.com

Ted Gordon Meadows, Esq.
Frank Woodson, Esq.
ted.meadows@beasleyallen.com
frank.woodson@beasleyallen.com

Leslie W. O'Leary, Esq.
Thomas B. Powers, Esq.
Michael L. Williams, Esq.
loleary@wdolaw.com
tpowers@wdolaw.com
mwilliams@wdolaw.com

and I hereby certify that I mailed or served the document or paper to the following non-CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non participant's name:

NONE

*s/ Paige Finnell*