# Appendix II, Tab 10

**Expert Report of Suzanne Parisian, M.D., May 27, 2009**

# EXPERT REPORT

## SUZANNE PARISIAN, M.D.

## I. QUALIFICATIONS

1. Since August 1995, I have been President and founder of MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the United States Food and Drug Administration's regulation of products. I received my Medical Degree (M.D.) from the University of South Florida in 1978 and have been Board Certified in Anatomic and Clinical Pathology since 1989. I have been a general practitioner and President of Mountain Emergency Physicians. I received a Masters in Biology from the University of Central Florida. I am the author of FDA Inside and Out, a text about the FDA.

2. From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander. During that time period, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the Food and Drug Administration ("FDA"). Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology ("AFIP"), Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3. From 1991 to 1993, I was a FDA Medical Officer in the Office of Health Affairs (OHA), a staff office within the Center for Devices and Radiological Health (CDRH), FDA. In OHA, I provided regulatory support to both the FDA's Office of Compliance and Office of Device Evaluation. My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports and medical literature and review of product labeling, promotions, advertising, and

corporate records as to compliance with the Food, Drug and Cosmetic Act. I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of voluntary reports submitted by health care providers, patients and others. I presided over 162 health risk assessments convened to advise the FDA on overall health risk issues for the public and made recommendations to the FDA regarding the subsequent regulatory actions which should be undertaken by the FDA, health care providers, users groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and participated in an administrative hearing as the FDA's expert witness. While in OHA, I was assigned primary responsibility for both anesthesia and orthopedic product issues.

4. There are two examples of drug safety issue that I helped identify and manage for the FDA as its medical officer. The first was an anesthetic drug and device combination that resulted in FDA's issuance of a May 29, 1992 Safety Alert titled: *Cauda Equina Syndrome Associated with Use of Small-Bore Catheters in Continuous Spinal Anesthesia*. The Safety Alert was sent from FDA directly to Anesthesia Care Providers, Hospital Administrators, Hospital Pharmacists and Risk Managers:

> This is to alert you to serious hazard associated with continuous spinal anesthesia, Since December 1989, following initial marketing of small-bore catheter (27 gauge or smaller), FDA has received 11 reports of cauda equina syndrome in which small-bore catheters were used to deliver 5% lidocaine with 7.5% glucose to the intrathecal space. Recent cases have also been reported in the medical literature. This compares with one reported case of cauda equina syndrome associated with the use of larger-bore catheters since 1984...
>
> We are concerned that the use of small-bore catheters in continuous spinal anesthesia is increasing, and thus that the potential for new cases of cauda equine syndrome associated with technique may be increasing. **Because of these safety concerns, we are advising against the use of <u>any</u> small-bore catheter for**

> **continuous spinal administration of any local anesthetic agents.** Please note that this Safety Alert is not directed towards catheters used for other types of drug delivery such as epidural anesthesia, of the use of 5% lidocaine with 7.5% glucose as a single-dose spinal anesthetic injection.
>
> **We are also taking action to remove from the market all small –bore catheters distributed for continuous spinal anesthesia…**
>
> If drug or device manufacturers, medical facilities, or physician groups wish to conduct controlled clinical studies demonstrating the safety and efficacy of a specific local anesthetic for continuous spinal anesthesia using small-bore catheters, FDA will consider Investigational New Drug (IND) and Investigational Device Exemption (IDE) applications.
>
> **Please share this Safety Alert with colleagues who are involved in anesthesia delivery or follow-up care.** If you have medical questions pertaining to this subject please contact: Suzanne Parisian, M.D….

5. The second drug safety issues involved reports in FDA's databases and the medical literature of serious adverse events and deaths occurring in patients taking daily ACE Inhibitor (ACEI) drugs for control of hypertension who had their blood exposed to certain types of device membrane surfaces. From reviewing the Adverse Event Reports ("AERs"), both CDER's and CDRH's, the patients shared common events: 1) extracorporeal circulation of blood; 2) ingestion of an ACEI drug; 3) followed by a life-threatening anaphylactoid reaction. ACEI had been a class of popular antihypertensive drugs first approved by the FDA in the 1980s. They were approved with relatively limited safety information.

6. When patients had taken an ACEI near the period of blood exposure to specific types of device membrane surfaces, for example hemodialysis or LDL apheresis, a sudden life-threatening anaphylactoid reaction could be triggered. The event was unique in that it was not a typical allergic reaction, it did not respond to antihistamines but required epinephrine. As the FDA's medical officer, I reviewed both drug and device adverse event reports, the medical literature and performed a health risk assessment (21 C.F.R. Part 7.4), and then made a clinical

recommendation to FDA as a reasonable degree of medical certainty. As a clinician I felt that health care providers needed to be quickly informed by FDA of the potential interaction between membranes and timing of ACE I ingestion as well as the way to treat a patient and prevent death. I also felt as a FDA medical officer that both the drug and medical device industry needed help to identify the etiology of the reaction and improve label warnings for health care providers. No other FDA medical officer was assigned or involved in the work-up or handling of this drug/device safety issue. Working with an FDA epidemiologist, I helped design and issue the Agency's epidemiologic study to quickly obtain additional safety data for FDA. The epidemiology study was obtained as a questionnaire contained in FDA's Safety Alert. It was designed to capture essential risk information and to inform health care providers, raise awareness and protect patients. As a result of the project in 1992, both the involved devices labels and the current ACEI class drug labels warn physicians about the combined risk of membrane surface exposure, timing of ACE I dosing and potential for anaphylactoid reaction.

7. From March 1993 to December 1993, I was a Medical Officer in the Office of Device Evaluation (ODE), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology (DRAERD), FDA; from January 1994 through June 1995, I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for pre-marketing evaluation of new product applications and clinical trials to support safety and effectiveness to begin legal marketing within the United States. In ODE, I participated in the review of proposed clinical trials, pre-marketing applications, including review of animal toxicology and biocompatibility data, in addition to the assigned responsibility of training new medical officers and scientific reviewers in application, clinical trial and labeling evaluation. I was the primary reviewing medical officer in charge of pre-marketing approval applications required for

adherence to CDER's Drug Guidances, and for presentation at the FDA Advisory Panel with members from CDRH and Center for Drug Evaluation and Research (CDER). I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling. I consulted as a medical officer on Investigational New Drug Applications ("INDs") for combination products including drugs and biologics. While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for heath risk assessments, health hazard evaluations, annual report, adverse event and labeling review.

8. I was an initial instructor in the FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and pre-marketing applications. I had primary responsibility for review of marketing applications, labeling and was required to teach medical officers the process for evaluation and review required by the Food, Drug and Cosmetic Act for support of product marketing. I was charged with training medical officers on the process for health risk assessment and health evaluation per 21 C.F.R. Part 7.

9. Regarding post-market surveillance of marketed products, I participated with the FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, labeling, product complaints and adverse event reports obtained by the FDA. I was the primary clinician involved in several of the FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services to the FDA. My awards have included Department of Health and Human Services and the Food and Drug Administration Employee of the Month.

10. I was sent by the FDA to serve as an official Agency representative to medical meetings and seminars to help identify and monitor conduct of manufacturers for potential

deviations from regulations governing promotional activities. At those interactions, I was required to provide official guidance as to the FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

11. While at the FDA, I helped draft agency documents, guidance documents regarding requirements for obtaining FDA's marketing approval, FDA Safety Alerts, provided the FDA comments for voluntary warnings and physician and user notifications, and agency comments on voluntary industry standards. I was a FDA liaison with the National Institutes of Health (NIH) for issues involving ENT, Renal, Respiratory, Women's Health, and Alternative Medicine. I was required to provide support to Health Care Financing Agency (HCFA now CMS) regarding the FDA's approval of product and issues involving hemodialysis. I was assigned responsibility for product adverse event reporting to the Department of Defense (DOD) and Veterans Administration.

12. One of my assigned responsibilities at the FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post-marketing experience, and available manufacturing documents gathered by the FDA or provided to the FDA by the manufacturer or other regulatory agencies, and then to use those facts to 1) make a clinical determination to a reasonable degree of medical certainty for FDA per the FDCA and; 2) recommend the next courses of action available to FDA to protect the public health. I was also required by the FDA to advise and train other FDA employees regarding the review of facts of a case or issue, the requirements of the Food, Drug and Cosmetic Act, and making a determination to a reasonable degree of medical certainty regarding the clinical impact of the agency's actions to the public. This was a process I was

trained in and required to perform for the FDA. The health risk assessment process is further described in 21 C.F.R. Part 7. During my tenure at the FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for evaluation, marketing and labeling review of new products. I organized national conferences with industry and physicians to discuss and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

13. At the Armed Forces Institute of Pathology (AFIP), Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and make a final determination: 1) to a reasonable degree of medical certainty, as to the cause of death, and 2) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as the FBI and CIA. While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths, occurring in military hospitals, to a reasonable degree of medical certainty, appeared to have been associated with unanticipated drug/device effects. I then reported my findings as a MedWatch report to the FDA. As an AFIP Medical Examiner, I was able to trigger the FDA to investigate a major drug regulatory safety action which resulted in the protection of public health.

14. After leaving the FDA, and founding MD Assist, Inc., I have continued to provide information to individuals, manufacturers, and organizations of the FDA's requirements, Adverse Event Reporting, and labeling of FDA-regulated products. Those products have

included INDs, NDAs, IDEs, PMAs, and 510(k) s for devices, biologics and drugs. I was requested by the FDA to participate in a 1997 panel of experts convened by the FDA to comment on changes proposed in the requirements for medical device labeling. I continue to consult for manufacturers, lecture at conferences and seminars regarding FDA, pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action (CAPA) and Quality Systems. I have been an online instructor for the Regulatory Affairs Professional Society (RAPS) course regarding FDA and Medical Devices.

15. Attached is a list of my last 5 years of deposition and court testimony APPENDIX 2 A copy of my most recent *Curriculum Vitae* is attached as APPENDIX 1. I receive $400/hr for study and $600/hr for deposition and trial testimony.

Attached are the following:

- APPENDIX 1: is a copy of my most recent *Curriculum Vitae;*
- APPENDIX 2: S. Parisian, M.D. Legal Court and Deposition Testimony Through 5 Years
- APPENDIX 3: Summary of Failure to Warn

## II. PURPOSE OF EXPERT REPORT

16. I hold the following opinions, based on my training, experience and education, to a reasonable degree of medical and professional certainty. I have used the same methodology I was first trained to use while as an FDA medical officer in terms of analysis of the pre-and postmarket documentation regarding intra-articular promotion of external infusion pain pump manufacturers and distributors: McKinley Inc ("McKinley"); 2) I-Flow Corporation ("I-Flow");

3) Stryker Instruments, Inc ("Stryker"); DJO, LLC ("DJO") and Pacific Medical ("Pac Med"). I have been asked to first provide a background about the role, procedures and function of the Food and Drug Administration ("FDA") and the role and obligations of manufacturers, relabelers and distributors for selling safe and effective products to healthcare providers for patients. The report has been divided into the following sections:

1. The role, procedures and function of the Food and Drug Administration (FDA) and medical device manufactures, relabelers and distributors.

2. The duties and responsibilities of external infusion manufacturers McKinley, I-Flow, Stryker, to obtain FDA clearance to infusion pumps in the United States for elective post operative pain management and to market safe and effective devices in the United States. (

3. The duties and responsibilities of companies selling pumps in the United States to protect the public by monitoring device performance and communication of risks.

## EXECUTIVE SUMMARY

17. My opinions are made to a reasonable degree of medical, scientific, and professional certainty. McKinley, I-Flow, Stryker, DJO and Pacific Medical each had an independent obligation and duty under the Federal Food Drug and Cosmetic Act("Act") and implementing regulations to ensure the safety of the public and compliance with the Act in promotion, sales and distribution of infusion pain pumps. Each of these firms has failed in differing ways to protect the public, to fulfill standards of conduct for the medical device industry and to comply with the Act (See APPENDIX 3). As a direct result of their combined actions, they have directly contributed to needless pain and suffering and permanent injuries to consumers exposed to their pain pumps.

18. The lack of appropriate research and development, testing and knowledge about the risks of intra-articular infusion resulted in the marketing of dangerous products to health care providers when provided for a new intended use and without adequate testing, warnings or instructions for use. McKinley, I-Flow, DJO and Stryker, all knew by 1999 that FDA had repeatedly denied clearance of a 510(k) to begin to market infusion pumps for intra-articular use. FDA's denial was based on a lack of support for safety and efficacy of a new intended use. This same lack of FDA clearance would have triggered a responsible manufacturer to attempt to acquire the skill and knowledge to perform testing necessary to obtain FDA's clearance before beginning promoting products in violation of the Act for a new and unapproved indication. The manufacturers, besides promoting a violative product, failed to warn physicians and their own sales forces about the lack of adequate and appropriate testing and failed to provide adequate safety information.

19. Health care providers and sales representatives were not advised there was no FDA approved local anesthetic safe for intra-articular infusion. Besides promoting their own pumps in violation of FDA regulations, they engaged in conduct intended to misbrand other manufacturers' products. Stryker and later I-Flow were both told by drug manufacturers that their local anesthetics were not approved for intra-articular use and to make such recommendations was a violation of the Act. Long before 1988, the scientific literature discussed the long-term risks of a local anesthetic instilled in a joint and suggested the potential for damage to cartilage.

20. Despite all these safety signals, these three external infusion pump manufacturers, and both distributors, persisted in promoting pumps for intra-articular use without adequate

testing, without an approved safe drug, and without adequate warnings or labeling. These firms each independently disregarded the law, and disregarded patient safety to profit from promoting general pain pumps for a new, untested and unapproved orthopedic use despite:

- lack of FDA premarket clearance for a new use;
- FDA's communications against intra-articular use based on a lack of supporting data on safety and efficacy;
- lack of an FDA approved local anesthetic for intra-articular infusion;
- the Food Drug & Cosmetic Act's prohibition against misbranding and providing misleading information;
- scientific literature, which described risks to articular cartilage from local anesthetics;
- a failure to adequately design, develop, and test its products for intra-articular placement;
- a failure to investigate adverse events;
- a failure to warn physicians, sales representatives, distributors;
- a failure to monitor the medical literature to identify long-term risks.

21. By 2002, each of these pump manufacturers and distributors had notice from signals in the medical literature about the risks of unapproved use described in the medical literature[1], yet failed to warn. By May 2004, each manufacturer again received a safety signal

[1] Liguori GA, et al. Possible Bupivacaine Toxicity After intraarticular Injection for Postarthroscopic Analgesia of the Knee: Implications of the Surgical Procedure. Anesthesia Analgesia 2002;94:1010-3.

about risks of indwelling pumps when Dr. Brown, FDA published findings about adverse events associated with pain pumps in *Anesthesia*[2]. In November 2005, FDA required a contraindication for intra-articular use in I-Flow's Silver Soaker Catheter, another signal. In February 2006, in another signal, FDA told I-Flow the only method to remove the intra-articular contraindication was by testing, clinical studies, and obtaining FDA's clearance of a new indication.

22. All of the three pump manufacturers, and both distributors, sold pumps for unapproved use, and each had an independent duty to protect the public by monitoring the medical literature, performing failure investigations, trending complaints, and warning about the risks. By December 2008, all pain pump manufacturers and distributors were given repeated and direct notice of a safety signal identified by FDA when both CDER plus CDRH described a combined FDA signal in "*Potential Signals of Serious Risks/New Safety Information Identified from the Adverse Event Reporting (AERS) between July-September 2008*". The FDA indicated from its own review of filed combination drug and device adverse events that *"Bupivacaine intra-articular injection given by infusion- Chondrolysis; FDA (CDER and CDRH) is evaluating this issue involving local infusion for post-operative pain, which is an unapproved use*."[3]

## III. OPINIONS:

### ISSUE #1

### ROLE OF THE FDA

[2] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

[3] (http://www.fda.gov/cder/aers/potential_signals/potential_signals2008Q3.htm).

**OPINION #1:** McKinley, I-Flow, DJO, and Stryker each disregarded their duties and obligations to protect public safety and ensure compliance with regulatory safeguards of the Food Drug and Cosmetic Act ("the Act"). Each failed to adequately design, test and obtain appropriate premarketing clearance from FDA to begin marketing its infusion pain pump legally for a new and unapproved indication. Such negligent actions directly contributed to the pain, suffering and permanent injuries of patients.

**OPINION #2:** Each of the actions of McKinley, I-Flow, DJO, and Stryker rendered other drug manufactures' FDA-approved products misbranded pursuant to 21 C.F.R. 801.6 (21 C.F.R. 201.6). Such conduct is prohibited by the Food, Drug and Cosmetic Act pursuant to 21 USC 331(a) & (b) and directly contributed to the pain, suffering, and permanent injuries of patients.

**ISSUE #2**

**FDA AND PREMARKET CLEARANCE**

**OPINION #4:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker promoted orthopedic surgical pumps to physicians for investigational use in patients without first obtaining an approved IDE (21 C.F.R. 812) or IND (21 C.F.R. 312). Such negligent action after notification that 510(k) clearance was necessary for intra-articular use ignored the safeguards developed by Congress. Each manufacturer's and distributor's actions directly contributed to needless pain, suffering, and serious injuries of orthopedic patients.

**OPINION #5:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker disregarded information in medical and scientific literature regarding negative effects of anesthetics on cartilage, and the negative effects of prolonged exposure of cartilage to foreign substances, when they promoted post operative continuous infusion of anesthetic into joints. Each firm also disregarded the medical and scientific literature for NDA approved local anesthetic drug products when they failed to warn physicians of the risks.

**OPINION #6:** McKinley, I-Flow, DJO, Pacific Medical,. and Stryker all engaged in practices designed to mislead the FDA, physicians, sales representatives in order to continue selling adulterated and misbranded pain pump sets when used for continuous infusion of local anesthetics into joints.

## ISSUE #3

## COMMUNICATION OF RISK

**OPINION #7:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker failed to voluntarily and adequately warn health care providers, sales representatives, distributors and patients of the risks of continuous infusion of local anesthetics into joints for elective post operative pain management.

**OPINION #8:** McKinley, I-Flow, DJO, and Stryker failed as manufacturers and distributors to adequately monitor complaints, device performance and the medical literature to identify safety signals from intra-articular infusion of local anesthetic into joints, and thus failed to warn health care providers and sales representatives of these potential risks.

**OPINION #9:** McKinley, I-Flow, DJO, and Stryker all continue to minimize and downplay the risks of chondrolysis associated with continuous intra-articular infusion to health care providers, employees, distributors and sales representatives.

**OPINION #10:** Neither McKinley, I-Flow, DJO nor Stryker have performed epidemiological studies necessary to determine the incidence of chondrolysis associated with the unapproved use of their own pain pumps.

**OPINION #11:** Pacific Medical, relying on DJO, failed to monitor the medical literature and labeling of products it sells. As a result, it failed to communicate the risk of chondrolysis to health care providers and changes in the DonJoy PainPump labeling before April 2008.

## IV. BASES FOR OPINIONS #1 -#3

### A. FOOD & DRUG ADMINISTRATION (FDA) & OVERSIGHT OF MEDICAL DEVICES

23. After a public health outcry from women injured by the Dalkon Shield as a result of insufficient product development and testing, Congress took steps to ensure that FDA became involved with premarketing review and oversight of medical devices. The passage of the Medical Device Amendments (MDA) of 1976 to the Federal Food Drug and Cosmetic Act of 1938 ("Act"), gave FDA authority to institute regulations for premarket review similar to

regulations created for drugs. FDA was to perform a premarket review to ensure that all medical devices sold in the United States met a minimum standard of safety and effectiveness. FDA also would monitor medical device reports (MDRs), inspect manufacturing facilities, and continue to monitor device labeling, marketing and promotions.

24. Prior to MDA, manufacturers of medical devices were regulated only by postmarket oversight of commercial products by FDA much as cosmetics and foods. FDA would look for evidence of adulteration and misbranding. Certain medical devices, for example, suture and contact lenses, later called "transitional devices," based on potential risk to public health, were regulated by FDA before MDA with premarket review under authority of FDA's drug regulations.

25. Prior to MDA, manufacturers of medical devices were regulated by labeling misbranding. Certain medical device, for example, suture, later called transitional device, based on risk to the public, were regulated with premarket review under drug regulations.

26. It was initially assumed by Congress that FDA would issue performance standards for categories of devices to expedite support of safety and effectiveness by industry. However, FDA's issuance of performance standards did not occur. Instead, FDA elected to rely on a simple 510(k) notification process (21 C.F.R. part 807). The MDA had required FDA to issue Good Manufacturing Practices (21 C.F.R. part 820) for the medical device industry that would describe minimum GMP requirements, as well as later factory inspection to ensure adherence to GMP.

27. After MDA, FDA began premarket oversight of medical devices by establishing a risk-based classification scheme. FDA used public advisory panels of outside experts to

recommend types of manufacturing controls needed for categories of devices on the market prior to 1976 (pre-Amendments). Classification was based on potential known and unknown risks at the time of a classification panel to ensure that manufactured devices remained safe and effective. FDA classified devices into one of three classes.

- Class I- the lowest risk, were devices for which general manufacturing controls and device reporting alone appeared to be sufficient to help ensure performance of a device and safety of the public.

- Class II- devices of moderate risk, were devices for which general controls, reporting and special controls of GMP appeared sufficient. Finally,

- Class III- highest risk, included devices that were life-sustaining or failure could result in permanent injury or death, or there was insufficient information for classification of risk and manufacturing controls.

28. Class III devices include devices with insufficient scientific information available at time of FDA's initial classification to allow recommendations to be made by the Panel or FDA as to the manufacturing controls necessary to ensure safety and effectiveness for the public. Faced with the large task of all medical device classification, FDA was able to defer until a later date its request that a sponsor provide additional data as premarket approval applications (PMA) for these types of pre-amendment class III devices.

29. Class III devices also include the larger category of all new post-1976 devices or already marketed devices making new claims or marketed for new intended use not yet cleared

or approved by FDA. Class III devices are the most diverse group of devices and alternative methods have been provided by Congress to FDA to help deal with oversight.

30. Following a re-evaluation of FDA's classification strategy, Congress determined it would accept the Agency's classification and review approach using 510(k) based on substantial equivalence to pre-1976 devices and passed grandfathering provisions so that the majority of medical devices on the United States market prior to 1976 (pre-Amendments) were deemed safe and effective when sold for the same pre-1976 intended use. The emphasis was shifted in the 1990s by Congress away from primary reliance on FDA's premarket review to post market surveillance with passage of the Safe Medical Device Act of 1990.

31. FDA has not been given the mandate to perform its own development and research of medical devices; it does not test or physically examine medical devices; it is not responsible for designing or conducting clinical trials; it does not write product labeling. FDA's device branch reviewers interact with marketing applications submitted by competing manufacturers within the same industry, therefore, the agency must deal with each medical device and each manufacturer individually and with dispassion. It is prohibited under the Act (21 USC Sec. 301[331]) for a manufacturer to sell a medical device in the United States that is not safe, effective and adequately labeled.

32. FDA premarket reviewers in ODE examine a sponsor's premarketing application with proposed draft labeling to determine the intended use of the product. Devices are able to be cleared by 510(k) as substantially equivalent if they have the same intended use ( 21 C.F.R.§ part 807; 21 C.F.R. §860.7 ). Congress has made the FDA the public's gatekeeper for the flow of new medical devices and it provides a minimal standard. FDA examines premarketing

applications to determine if certain conditions are met that allow it to either approve or deny clearance. Once a product is cleared for marketing, it is the primary responsibility of the manufacturer, and not the FDA, to continue to monitor the safety and performance of its product throughout the product's life cycle. It is the sponsor that updates the product labeling to ensure safety of the public.

33. It is a violation of United States Code 18 USC Sec. 1001 for a company to falsify, conceal, cover-up by trick, scheme or device a material fact, or to make any materially false, fictitious, or fraudulent statements or representations to the FDA. Such a violation carries the possibility of fine as well as imprisonment. Therefore, it is assumed by FDA's reviewers that a product manufacturer understands the potential for legal action and fines, which will serve as a deterrent to falsification and serves to help promote truthful and accurate representations to FDA.

34. The FDA requires that a representative from a company actually sign, in a submitted marketing application, a "Truthful and Accuracy Statement" as required by 21 C.F.R.§ 807.87(k) prior to FDA's acceptance of the application for review. The premarket notification statement states: "*I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.*" In a 510(k), the truthful and accurate statement must be on a separate page, **must** be identified in the table of contents and **must** be signed by a responsible person on the company required to submit the premarket notification, **not** a consultant for a submitter.

35. The FDA's review process has not been designed to identify false and misleading statements and information. As industry is aware, FDA does not have a mechanism to independently determine what information is not being provided to it by a company in a premarketing submission.

36. During the 510(k) clearance process, the FDA does have some ability, within the requirements of the Least Burdensome Method, (Food Drug and Modernization Act of 1997), to request additional information from a sponsor based on information it receives in premarketing applications. After passage of the FDA Modernization Act ("FDAMA") of 1997, the ability for FDA's reviewers to request a firm conduct additional new testing for an application was limited to only the "least burdensome method" necessary to support substantial equivalence to a predicate device. Once products have been cleared or approved, FDA has not been given a method to compel sponsors to perform additional new safety testing without having sufficient scientific justification to support a public health necessity

37. There are two common premarketing submission procedures used at CDRH to bring a new medical device or a modified medical device onto the United States market:

1) **510(k) Premarket Notification Process (21 C.F.R. 807 Subpart E)** - A sponsor of a class III medical device submits in a premarketing notification application (21 C.F.R. §807.92) its own description of a device that it intends to market in the United States to FDA. Submission of a 510(k) application first requires the payment of a Medical Device User Fee by the sponsor, with authorization by Congress through 2012, which in 2009 was $3,693 standard fee and $1,847 small business fee. The fees are authorized to subsidize the agency's review cost following the October 26, 2002 Medical Device User Fee and Modernization Act of 2002. In exchange for industry's payments of medical device user fees, FDA is to seek to become more efficient and complete the review and bring to final closure the majority of 510(k)s within 90 days. The fees are adjusted annually based on the changes in the Agency's workloads and other factors.

A 510(k) marketing submission for a non-exempted device is to provide FDA with a supportive statement indicating the device is similar to and/or different from products of a comparable type in commercial distribution (predicate), accompanied by data to support the statement(21 C.F.R. 807.87(f). The evidence is required to provide support that the device is substantially equivalent( 21 USC 513[360c](i))[4] to a pre-Amendments (grandfathered) device or an already cleared device ("predicate") in terms of support for the "same intended use" pursuant to (21 C.F.R.§ 801.4). The 510(k) notification to FDA is to support that there are <u>no unaddressed</u> issues of safety and effectiveness. The device described in a 510(k) does not need to be currently manufactured by the sponsor to request clearance.

Based on the data provided by the sponsor in the 510(k) notification, FDA's reviewers determine if there is sufficient information to clear or not clear a product for marketing for an intended use. The draft labeling is submitted for review by FDA to support the same intended use. At the end of the review process, FDA issues either a 510(k) clearance substantially equivalent (SE) letter or a not substantially equivalent (NSE) (denial) letter. The FDA will publish on its website 510(k) clearances (not denials) and the cleared indications for use, a the sponsor's Summary of Safety and Effectiveness or Summary Statement Clearance of a 510(k) may require submission of additional clinical trial data obtained in the United States under an Investigational Device Exemption (IDE) (21 C.F.R. part 812) or further laboratory and/or bench testing to address new questions of safety and efficacy. There is no user fee for submission of an IDE application, and the Agency is to respond to the IDE request within 30 days.

[4] 21 USC 360c(i)(1)(A) For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent " or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that the Secretary by order has found that the device-(i) has the same technological characteristics as the predicate device, or (ii)(I) has different technological characteristics and the information submitted is substantially equivalent to the predicate device contains information, including clinical data if deemed necessary by the Secretary, that demonstrates the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and efficacy than the predicate device.

Commercial marketing of a cleared device can only begin in the United States after the sponsor has received the Agency's 510(k) clearance letter. A 510(k) clearance letter provides the sponsor with certain limitations or restrictions of 510(k) clearance in terms of legal marketing claims, intended use. All sponsors of cleared 510(k)s must adhere to requirements for Quality Systems including design controls, complaint file handling, failure investigation, corrective and preventive actions, statistical methods, post approval surveillance, medical device reporting, establishment registration and device listing, labeling; which will be verified at time of FDA inspection. The 510(k) cleared device is to be regulated with the same controls and requirements as its substantially equivalent predicate device.

Sponsors of cleared 510(k) devices are not permitted to represent that their product has been approved by FDA. The Agency considers such representations as misleading and can constitute misbranding (underlining added for emphasis):

Submission of a premarket notification in accordance with this subpart, and a subsequent determination by the Commissioner that the device is intended for introduction into commercial distribution is substantially equivalent to a device in commercial distribution before May 28, 1976, or is substantially equivalent to a device introduced into commercial distribution after May 28, 1976, that has <u>subsequently been reclassified into class I or class II, does not in any away denote official approval of the device.</u> <u>Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding</u>.[21 C.F.R. 807.97]

38. It is a violation of United States Code 18 USC Sec. 1001 for a company to falsify, conceal, cover-up by trick, scheme or device a material fact, or to make any materially false, fictitious, or fraudulent statements or representations to the FDA. Such a violation carries the possibility of fine as well as imprisonment. Therefore, it is assumed by FDA's reviewers and compliance staff that a product manufacturer understands the potential for legal action and fines and will provide truthful and accurate reports (premarket and postmarket) to FDA.

39. The FDA requires that a representative from a company, not a consultant, actually sign, in a submitted premarketing application, a "Truthful and Accuracy Statement" as required by 21 C.F.R.§ 807.87(k) prior to FDA's acceptance of the application for review. The premarket notification statement states: "*I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.*" In a 510(k), the truthful and accurate statement must be on a separate page, must be identified in the table of contents and must be signed by a responsible person on the company required to submit the premarket notification.

2) **Premarket Approval Application ("PMA") (21 C.F.R. part 814)** - A sponsor submits a Premarket Approval Application (PMA) for a class III medical device to FDA, which is to summarize all available and relevant valid scientific evidence to allow FDA to make a determination of safety and efficacy (21 C.F.R.§ 860.7) as well as the controls the manufacturer ahs said are necessary for manufacturing. Information in an original PMA application will include human and preclinical performance data, medical literature, proposed manufacturing controls to support to FDA that the new proposed device or new intended use is reasonably safe and effective to begin marketing in the United States. Submission of an original PMA application requires, with authorization by Congress through 2012, the payment of a Medical Device User Fee by the sponsor, which in 2009 is $200,725 standard fee and $50,181 small business fee. The first premarket application from firms with gross receipts or sales ≤$30 million is waived.

The PMA application will contain a summary of the clinical information obtained in the United States clinical trials through Investigational Device Exemption pursuant to 21 C.F.R. part 812. An original PMA will also require a review of the manufacturing establishment by the FDA to ensure that the

controls described in the PMA are actually in place as described. FDA reviews the sponsor's data provided in the PMA submission and based on the information and fulfillment of regulatory requirements can issue one of three letters: approval, approval with conditions or denial of approval. FDA will negotiate the final label with the PMA sponsor based on the information contained in the marketing submission. FDA is required to publish a Summary of Safety and Effectiveness of information it considered for a filed PMA giving the Agency's basis for its final decision.

FDA may elect to convene an external Advisory Panel of outside experts to provide it with nonbinding recommendations and/or comments as to FDA's future actions with a PMA application or similar PMA applications.

In a PMA approval letter, FDA provides a sponsor with conditions for approval (COA) describing conditions which must be complied with for a product to remain PMA- approved. The conditions include certain restrictions to ensure safety and effectiveness for the public, as well as general conditions applicable to all sponsors of a PMA-approved device including adherence to the requirements for Quality Systems including design controls, complaint file handling, failure investigation, corrective and preventive actions, statistical methods, post approval surveillance, medical device reporting, establishment registration and device listing, labeling. Failure to adhere to the conditions of PMA approval, will invalidate the PMA approval. In a PMA denial letter, FDA is required to provide a sponsor with information to help make a PMA approvable.

Changes to an approved PMA are made by a sponsor submitting a PMA Supplement (21 C.F.R.§ 814.39). Each PMA Supplement is to have sufficient information necessary to support FDA's approval of the requested change. A panel-track PMA supplement Medical Device User Fee is $150,544 standard and $37,636 small business; 180-day supplement $30,109 standard, $7,527

small business; real-time supplement $14,051 standard, $3,513 small business; 30-day notice $3,212 standard and $1,606 small business.

40. Manufacturers of pre-Amendments class III devices intended for human use, for which a PMA has not been officially requested by FDA, can continue to market a Class III 510(k) notification (21 C.F.R. 807). The annual fee for periodic reporting on a class III device is $7,025 standard and $1,756 small business fee. Class III device are required to file a premarket notification with class III certification and summary pursuant to 21 C.F.R. 807.94. FDA has the option to call for a PMA for a pre-amendment class III device or elect to reclassify the device with issuance of special controls to class I or class II (e.g., 21 C.F.R. 862.9, 21 C.F.R. 864.9) based on new information available about risk and manufacturing controls since the initial classification process. FDA also has the ability to exempt certain class I and II devices from a requirements for premarket notification. Most Class I devices and some class II devices with some exceptions reserved by the FDA have been exempted from a requirement to submit a 510(k).

41. In contrast to premarketing notification safety issues, postmarketing safety issues occurring with commercially marketed devices are primarily handled by FDA's District Office and CDRH's Office of Compliance ("OC"). Postmarketing issues shared by both 510(k) cleared and PMA approved devices can include adulteration and misbranding (21 USC 321 (n), 21 USC 352 (f) (1) and (2), 21 USC 351 (a)); Good Manufacturing Practices (GMP)/Quality Systems Regulations (QSR) (21 C.F.R. 820); Medical Device Reporting (21 C.F.R. 803); User Notifications; and Recalls.