## B. FDA-GENERATED PERFORMANCE STANDARDS

42. Congress reportedly assumed that FDA would issue performance standards for categories of devices to help industry expedite support of safety and effectiveness through demonstration of adherence to FDA's performance standards (21 USC 360d). However, FDA has issued a limited number of device performance standards for industry. FDA's Radiological Devices division has issued mandatory performance standards for electronic radiation emitting products (21 C.F.R. 1010-1050), such as lasers, microwave ovens, television receivers, video displays, ultrasound devices, and apnea monitors. The FDA's mandated performance standard for apnea monitors was later withdrawn. The Office of In Vitro Devices created a performance standard for Antimicrobial Susceptibility minimum inhibitory concentration (MIC) and disk diffusion devices.

43. Instead of FDA's widespread issuance of performance standards, FDA chose an alternative route. FDA chose to rely on each sponsor providing a 510(k) premarket notification submission to FDA for clearance based on substantial equivalence to a predicate device [21 C.F.R. 807.92-100].

## C. CONFORMANCE OF INDUSTRY TO FDA RECOGNIZED STANDARDS

44. In terms of a 510(k)s sponsor being able to reference voluntary industry standards, and FDA's "least burdensome" provisions of the Food Drug and Modernization Act (FDAMA) of 1997, 510(k) sponsors were allowed to reference compliance with certain FDA-recognized industry standards. Not all voluntary industry standards were deemed "recognized" by FDA and not all sections of even the recognized standards were considered acceptable to FDA. Use of industry recognized standards by a sponsor is optional and not mandatory, but was suggested by FDA to help industry reduce the burden in supporting substantial equivalence

in a premarketing submission. Each sponsor of a 510(k) has been allowed to use other alternative methods for attempting to support substantial equivalence to FDA.

45. To assist both industry and Agency reviewers with use of recognized standards, FDA issued Guidance for Industry and FDA Staff- Frequently Asked Questions on Recognition of Consensus Standards.[5] As the 2007 guidance indicated, it was issued to address FDA's implementation of section 514 [360c] (c) of the Act. The guidance did not establish legally enforceable responsibilities for industry and was part of the Agency's required Least Burdensome Approach for industry. The guidance reflected the Agency's continuing "review of the relevant scientific and legal requirements and provided the easiest way for industry to comply with those requirements". However FDA's guidance stated on page 1, "if you believe that an alternative approach would be less burdensome, please contact us so we can consider your point of view."

46. In a 510(k) submission, the sponsor was able to provide a "Declaration of Conformity" with applicable recognized consensus standards and even inapplicable requirements or deviations from a recognized standard. The sponsor was also able to specify any deviations from each applicable standard and specify what differences existed, if any, between the predicate device and the new device, with a justification for use of test results to address areas of difference. The declaration of conformance would be acceptable to FDA in lieu of any information and/or data addressed by the standard. FDA's reviewer should, however, expect to see the results of testing, when the standard merely specified a test method to be used without providing associated performance limits and/or acceptance criteria.

[5] FDA September 17, 2007 Guidance for Industry and FDA- Staff- Frequently Asked Questions on Recognition of Consensus Standards

47. The sponsor was to provide in its premarket notification the name and address of each laboratory or certifying body involved in determining conformance to applicable consensus standards and reference any accreditation for those organizations. The 510(k) could use a Standards Data Form for 510(k) s (FDA Form #3654).

48. When a 510(k) submission included a declaration of conformity to an FDA-recognized consensus standard, and the declaration of conformity appeared adequate, the FDA reviewer should consider the documentation for the aspects of the device being addressed by the standards to be acceptable. However, if the reviewer had remaining concerns about the adequacy of a recognized consensus standard for addressing particular aspects of device performance, after consultation with and concurrence by their immediate supervisor, then the reviewer should request the sponsor provide addition information for the premarket application.

49. FDA indicated in its consensus Q&A guidance (2007) that it placed all responsibility for supporting the accuracy and adequacy of the declaration of conformity on the person submitting the 510(k) application. The declaration of conformity could be based on data or information received from a component manufacturer(s), but responsibility for assuring accuracy of the information rested with the submitter of the information to FDA. The Quality Systems (QS) regulation (21 C.F.R. 820.80) further specified that there were certain management controls that need to be in place to oversee and test products provided as components.

50. Members of CDRH on the Standards Task Groups (STGs) actively assess the impact of new standards, revision of existing standards, withdrawal of standards or portions of recognized standards on the premarket review process and, as appropriate, make recommendations for or against recognition by FDA. As new or revised standards are

recognized, or old standards are withdrawn, the information is published in the Federal Register and listed on CDRH's website for industry.

51. FDA has published the document "CDRH Standard Operating Procedures for the Identification of Candidate Consensus Standards for Recognition" to explain to industry the internal procedures used by the Agency to identify standards for recognition.[6] In terms of international harmonization, the FDA's policies for use of recognized consensus standard is to be consistent with International Standards Organization (ISO)/International Electrotechnical Commission (IEC) Guide 22.

52. The FDA's Consensus Standards Guidance (2007) "Introduction" has (underlining for emphasis):

> A person required to submit a premarket notification...must provide information as required by the statute and regulations to allow CDRH to make an appropriate decision regarding the clearance or approval of the submission. This guidance describes how CDRH should use information on conformance with recognized standards to satisfy premarket review requirements. It does not affect CDRH's ability to obtain any information authorized by the statute or regulations (21 U.S.C. 360d).
>
> This guidance describes how CDRH should use information on conformance with recognized standards to satisfy premarket review requirements...
>
> CDRH believes that conformance with recognized consensus standards can support reasonable assurance of safety and/or effectiveness for many applicable aspects of medical devices....information on conformance with recognized consensus standards may help establish the substantial equivalence of a new device to a legally marketed device. This information may be used to show that the new device is as safe and effective as the predicate in the areas covered by the standards....
>
> Conformance with recognized standards may not always be sufficient basis for regulatory decisions. For example, a specific device may raise a safety or effectiveness issue not addressed by any recognized consensus standard, or a specific FDA regulation may require additional information beyond what

[6] September 17, 2007 Guidance for Industry and FDA Staff Recognition and Use of Consensus Standards

> conformity to the recognized consensus standards provide. Under such circumstances, conformity with recognized standards will not satisfy all requirements for marketing, or investigating the product in the United States…

53. Under "General use in the Premarket Applications Review Process", page 6, FDA wrote:

> To simplify and streamline the premarket review process, applicants may utilize FDA recognized standards in premarket submissions….Conformity to the recognized standard should, in these cases, minimize the amount of data and documentation needed in the 510(k) submission to demonstrate substantial equivalence. However, such comprehensive consensus standards are rare.
>
> **Voluntary Conformance**
> Conformance with recognized consensus standards is strictly voluntary for a medical device manufacturer…

## D. QUALITY SYSTEMS REGULATIONS (QSR) (21 C.F.R. PART 820)

54. On May 28, 1976, the Medical Device Amendments amended the FDCA in terms of good manufacturing practices that were to be required of medical device manufacturers for the production of medical devices legally marketed in the U.S. Section 520(f) of the Act (or 21 U.S.C. 360j (f)) provided FDA with legal authority to prescribe a regulation requiring that the methods used in, and the facilities and controls used for, the manufacture, packing, storage, and installation of medical devices conform to current GMP (cGMP) requirements to assure that devices were safe and effective and otherwise in compliance with the Act. The proposed device or Aumbrella@ GMP regulation was published in the Federal Register of March 1, 1977 (42 FR 11997). The FDA had begun work on the creation of a GMP draft for medical device manufacturers starting December 1973.

55. Federal Register, Vol. 43, No. 141- Friday, July 21, 1978, **Final Rule for GMP** stated:

Consumers who use devices differ from other consumers in an important respect. They are usually injured or diseased, and thus are a population at risk. These patients, and the many health professionals who diagnose and treat their conditions, depend on and trust the medical device manufacturers to produce safe and effective devices of high quality.

Based on FDA's experience, the Commissioner believes that it is vitally important that devices be manufactured in accordance with quality assurance principles that help prevent the production of defective products that can endanger consumers. In monitoring device recalls, FDA has found that, too often, device manufacturers have fallen short in meeting the expectations of those who need and depend upon high quality medical products.

During the past several years, FDA monitored approximately 1,000 device recalls. Many of these resulted from manufacturers'= failure to follow good manufacturing practices. For example, of 232 device recalls monitored by the FDA from October 1976 through November 1977, FDA believes that 198 of them were attributable to poor manufacturing practices.

The quality assurance program mandated by this regulation is designed to be preventive. The device GMP regulation requires all device manufacturers to design, implement, and continually monitor a comprehensive quality assurance program......

The device GMP regulation has been developed in accordance with basic principles of quality assurance...

Effective date for the final GMP rule was December 18, 1978.

56. The 1978 GMP regulation required a manufacturer to document in the device master record (DMR) (21 C.F.R. 820.181) any changes to device design and any associated testing (21 C.F.R. 820.100). It also required process validation to assure that devices meeting the designed quality characteristics will consistently be produced (21 C.F.R. 820.5 and 820.100). Finally, manufacturers had to have in place a formal approval procedure for any change in manufacturing process of a device including those dictated by design changes (820.100(b)(3)).

57. The FDCA's 1978 Good Manufacturing Practices (GMP) regulation did not directly address the original design of a device. In fact, it was the recognition of a need for this type of control for many types of devices that led to the inclusion of pre-production validation design controls within the Safe Medical Device Act of 1990. The new GMP with the requirement for design control regulation, FDA called the "Quality Systems Regulation" (QSR) and implemented a new authority for FDA through the Safe Medical Device Act. The Quality Systems Regulation for GMP, except for design controls, took effect June 1, 1997. Design control provisions became effective June 1, 1998.

**21 C.F.R. Sec. 820.3 Definitions** (underlining added for emphasis)

a) ***Act*** means the Federal Food, Drug, and Cosmetic Act, as amended (secs. 201-903, 52 Stat. 1040 *et seq.*, as amended (21 U.S.C. 321-394)). All definitions in section 201 of the act shall apply to the regulations in this part.

(b) ***Complaint*** means any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution.

(n) ***Management with executive responsibility*** means those senior employees of a manufacturer who have the authority to establish or make changes to the manufacturer's quality policy and quality system.

(o) ***Manufacturer*** means any person who designs, manufactures, fabricates, assembles, or processes a finished device. <u>Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions.</u>

(s) ***Quality*** means the totality of features and characteristics that bear on the ability of a device to satisfy fitness-for-use, including safety and performance.

(v) ***Quality system*** means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management.

(z) ***Validation*** means confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be consistently fulfilled.

(2) ***Design validation*** means establishing by objective evidence that device specifications conform with user needs and intended use(s).

(aa) ***Verification*** means confirmation by examination and provision of objective evidence that specified requirements have been fulfilled.

**Sec. 820.20 Management Responsibility**

a) ***Quality policy***. Management with executive responsibility shall establish its policy and objectives for, and commitment to, quality. Management with executive responsibility shall ensure that the quality policy is understood, implemented, and maintained at all levels of the organization.

(1) ***Responsibility and authority***. Each manufacturer shall establish the appropriate responsibility, authority, and interrelation of all personnel who manage, perform, and assess work affecting quality, and provide the independence and authority necessary to perform these tasks.

(3) ***Management representative***. Management with executive responsibility shall appoint, and document such appointment of, a member of management who, irrespective of other responsibilities, shall have established authority over and responsibility for:

(i) Ensuring that quality system requirements are effectively established and effectively maintained in accordance with this part; and

(ii) Reporting on the performance of the quality system to management with executive responsibility for review.

(c) ***Management review***. Management with executive responsibility shall review the suitability and effectiveness of the quality system at defined intervals and with sufficient frequency according to established procedures to ensure that the quality system satisfies the requirements of this part and the manufacturer's established quality policy and objectives. The dates and results of quality system reviews shall be documented.

(d) ***Quality planning***. Each manufacturer shall establish a quality plan which defines the quality practices, resources, and activities relevant to devices that are designed and manufactured. The manufacturer shall establish how the requirements for quality will be met.

(e) ***Quality system procedures***. Each manufacturer shall establish quality system procedures and instructions. An outline of the structure of the documentation used in the quality system shall be established where appropriate.

**Sec. 820.25 Personnel.**

a) ***General.*** Each manufacturer shall have sufficient personnel with the necessary education, background, training, and experience to assure that all activities required by this part are correctly performed.

(b) ***Training***. Each manufacturer shall establish procedures for identifying training needs and ensure that all personnel are trained to adequately perform their assigned responsibilities. Training shall be documented.

> (1) As part of their training, personnel shall be made aware of device defects which may occur from the improper performance of their specific jobs.
>
> (2) Personnel who perform verification and validation activities shall be made aware of defects and errors that may be encountered as part of their job functions.

**Sec. 820.100 Corrective and Preventive Action (CAPA).**

a) Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

> (1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;
>
> (2) Investigating the cause of nonconformities relating to product, processes, and the quality system;

(3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review.

(b) All activities required under this section, and their results, shall be documented.

**Sec. 820.198 Complaint Files.**

a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that:

(1) All complaints are processed in a uniform and timely manner;

(2) Oral complaints are documented upon receipt; and

(3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

(b) Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary. When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate.

(c) Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary.

(d) Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by § 820.198(e), records of investigation under this paragraph shall include a determination of:

(1) Whether the device failed to meet specifications;

(2) Whether the device was being used for treatment or diagnosis;

(3) The relationship, if any, of the device to the reported incident or adverse event.

(e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The record of investigation shall include:

(1) The name of the device;

(2) The date the complaint was received;

(3) Any device identification(s) and control number(s) used;

(4) The name, address, and phone number of the complainant;

(5) The nature and details of the complaint;

(6) The dates and results of the investigation;

(7) Any corrective action taken; and

(8) Any reply to the complainant.

[61 FR 52654, Oct. 7, 1996, as amended at 69 FR 11313, Mar. 10, 2004]

**Sec. 820.250 Statistical Technique**

(a) Where appropriate, each manufacturer shall establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling, and verifying the acceptability of process capability and product characteristics.

## E. MANDATORY MEDICAL DEVICE REPORTING (21 C.F.R. PART 803)

58. **Sec. 519 [360i] Records and Reports on Devices:**

(a) General rule

Every person who is a manufacturer or importer of a device intended for human use shall establish and maintain such records, make such reports, and provide such information, as the Secretary may by regulation reasonably require to assure that such device is not adulterated or misbranded and to otherwise assure its safety and effectiveness. Regulations prescribed under the preceding sentence—

(1) shall require a device manufacturer or importer to report to the Secretary whenever the manufacturer or importer receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices--
(A) may have caused or contributed to a death or serious injury, or
(B) has malfunctioned and that such device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur;

(2) shall define the term ``serious injury'' to mean an injury that--
(A) is life threatening,
(B) results in permanent impairment of a body function or permanent damage to a body structure, or
(C) necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure;

(3) shall require reporting of other significant adverse device experiences as determined by the Secretary to be necessary to be reported;

59. Under 21 C.F.R. 803.1, first effective December 13, 1984, FDA required a device manufacturer or importer to report to FDA whenever they became aware of information that reasonable suggested that one of their marketed (commercially distributed) devices:

1. May have caused or contributed to a death, or serious injury or

2. Has malfunctioned and that the device or any other device marketed by the firm would be likely to cause or contribute to a death, serious injury, or serious illness if the malfunction were to recur.

60. Under Section 519(a) and (b) of the Food Drug and Cosmetic Act (FDCA), (See above), manufacturers, initial distributors of medical devices (importers), distributors, and later user groups were required to comply with certain mandatory Medical Device Reporting (MDR) requirements. Manufacturers and importers of devices report MDRs directly to FDA. Whereas, user groups may report directly to manufacturers and distributors or to FDA. The MDR provisions supplemented, and did not supersede, provisions of the FDCA for regulation of medical device, particularly GMP provisions of 21 C.F.R. Part 820. Under GMP requirements, a manufacturer was required to investigate the reported failure of a device or any of its components to meet the performance specifications and to establish and maintain a written record of the investigation and follow up; establish and maintain a complaint file; allow access to, and copying of files by an authorized FDA representative.

61. A manufacturer or an importer must report to FDA each time it becomes aware of a reportable event (death, serious injury, or malfunction) which is likely to cause or contribute to a death or a serious injury if it recurs, even if an event of the same or similar nature has been reported previously or if it is believed to be the result of user error, faulty service or maintenance, etc. However, if there is more than one source of information concerning the same patient and event, only one report is required to be filed with FDA.

**21 C.F.R. 803.3 Definitions**

(c) ***Become aware*** means that an employee of the entity required to report has acquired information reasonably suggesting a reportable adverse event has occurred;

(1) Device user facilities are considered to have "***become aware***" when medical personnel, as defined in paragraph(s) of this section, which are employed by or otherwise formally affiliated with the facility, acquire such information about a reportable event.

(2) Manufacturers are considered to have ***become aware*** of an event when:

(i) Any employee becomes aware of a reportable event that is required to be reported within 30 days or that is required to be reported within 5 days under a written request from FDA under

. 803.53(b); and

(ii)Any employee, who is a person in management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or a person whose duties relate to collection and reporting of adverse events, becomes aware that a reportable MDR event or events, from any information, including trend analysis, necessitates remedial action to prevent an **unreasonable risk** of substantial harm to the public health.

(d) ***Caused or contributed*** means that a death or serious injury was or may have been attributed to a medical device, or that a medical device was or may have been a factor in a death or serious injury, including events occurring as a result of:

(1) Failure;

(2) Malfunction;

(3) Improper or inadequate design;

(4) Manufacture;

(5) Labeling; or

(6) User error.

62. In order to facilitate a continuous upgrading of device labeling, manufacturers **(* not FDA)** are expected to monitor device usage and promptly and voluntarily revise its product

label's warnings and precautions sections based on the device use experience to protect the public and remain in compliance with the Act. FDA performs a quick pre-market review of draft labeling with a 510(k) submission to support the intended use and claims of substantial equivalence. The manufacturer (*not FDA) is responsible for upgrading its own device label and labeling once the device is market. Events that precipitate changes of labeling are the types of events usually required to be reported to FDA under the Medical Device Reporting regulation (MDR) 21 C.F.R. Part 803.

## F. DEVICE LABELS AND LABELING

According to the Food Drug and Cosmetic Act (FDCA):

**SEC. 502. [352]**

A drug or device shall be deemed to be misbranded -

(a) If its labeling is false or misleading in any particular

(f) Unless its labeling bears:

(1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users....

63. When reviewing FDA's procedures, it is important to understand how the FDCA and as a result the industry defines the terms labels, labeling and misbranding of medical devices. The Federal Food Drug and Cosmetic Act (FDCA- 21 USC) defines label, labeling and misbranding as follows:

**201 (k)** The term label means a display of written, printed, or graphic material upon the immediate container of any article.

> **201 (m)** The term labeling means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.
>
> **201(n)** If an article is alleged to be misbranded because of the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling of advertising thereof or under such conditions of use that is customary or usual.

64. The phrase "false and misleading" does not mean only that a statement is untrue, fraudulent or deceptive. Labeling can be deemed to be in violation of the Act by FDA if it proves deceptive or misleading for the intended reader. The word "misleading" means that the labeling is deceptive if it creates or leads to a false impression in the mind of the reader. A "false impression" may result not just result from a false statement, but also can be created in the mind of the reader through methods of ambiguity, misdirection or failure to reveal material facts relevant to statements being made. In other words a label that remains silent to certain consequences can be as deceptive. In terms of my experience with FDA's consideration of violations of the Act for misbranding (21 USC 321(n)) for both drugs and devices, the FDA takes into consideration representations being made or suggested about a product, including sales representatives, advertising and promotions. FDA considers for determination of misbranding, all information provided from a manufacturer, whether oral, word, design or any combination of all factors. FDA also considers the extent to which labeling, advertising or marketing fails to reveal material facts to the user in the light of representations or that it fails to provide the user with warnings about consequences which can occur.

65. In terms of FDA's consideration of 'intended use' for either a medical device (21 CFR 801.4) and/or a drug (21 CFR 201.128), and whether a product has a new intended use that has not been first appropriately accepted by FDA for start of marketing, FDA, for either a device a drug manufacturer, considers the objective intent of the persons legally responsible for the labeling of the product. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. The objective intent may, for example, according to FDA "be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. 801.4(device) and 21 C.F.R. 201.128(drug) further discuss the manufacturers' duties for oversight of intended use by:

> If a for example, a packer, distributor, or seller intends for an article for different uses than those intended by the person from whom he received the drug (devices), such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug (device) introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug (device) which accords with such other uses to which the article is to be put.

## G. PREMARKET PROCESS TO ADDRESS "OFF LABEL" OR UNAPPROVED USE

66. The terms 'Intended Use' refers to the "*objective intent*" of the persons legally responsible for the labeling of the device. The objective intent may, for example, be shown by labeling claims, advertising matter, or through oral and/or written statements made by sales representatives. It may be shown by the offering or the using of the device, with the knowledge of such persons or their representatives, for such purpose for which it may not have been labeled nor specifically advertised (21 C.F.R.§ 801.4; 21 C.F.R.§ 201.128).The intended use of a device

or a drug, whether prescription or nonprescription, is the key identification to be made by both the FDA and the sponsor and it is the foundation of all decisions for premarket regulations of products either through approval or clearance for marketing by FDA.

67. As stipulated in Section 513(i) of the Act, FDA may issue an order of substantial equivalence for a premarketing application only upon making the determination that the device to be introduced into commercial distribution has the same intended use as the predicate device and is as safe and effective as a legally marketed device. Section 513(i)(1)(E) of the Act generally limits the determination of the intended use of a device that is the subject of a premarket notification to the proposed labeling (Section 201(m)) contained in the submission. Proposed labels, labeling and advertisement sufficient to describe the device, its intended use, and the directions of use are required to be submitted in a 510(k) for review during the substantial equivalence determination (21 C.F.R. 807.87(e)).

68. According to ODE's Blue Book Memorandum #K 86-3[7], "[o]rdinarily, intended use is determined by reference to 'labeling' or 'promotional claims: only in rare cases might it be necessary to infer intended use from other types of information." The device reviewer would be also be trying to bring the 510(k) to closure within the mandatory Medical User Fee due date of 90 days. FDA' s December 3, 2002 guidance[8] which superseded FDA's January 30, 1998 guidance, discusses the regulatory process or hurdles that a CDRH reviewer would have to go through in order to persist to attempt to limit a device's proposed labeling if he/she is aware that

[7]#K86-3 entitled Guidance on the Center for Devices and Radiological Health's Premarket Notification Review Program (June 30, 1986) (http:..www.fda.gov/cdrh/k863.html)

[8] December 3, 2002 Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff (Update to K98-1) that supersedes the Guidance for Industry and CDRH Staff Issued January 30, 1998

there may be a potential for the sponsor to promote a product for off-label or unapproved use (

page 4):

> In addition to the restrictions regarding the determination of intended use, the law defined the procedures to be followed if the Office Director believes "that there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling for the device" that such use could cause harm." (See Section 513(i)(1)(E)(ii). These procedures are described below.
>
> **PROCEDURES**
>
> **A. Procedures for Division Staff**
>
> In determining the intended use of a device that is the subject of a 510(k), reviewers should continue to follow Blue Book #K86-3 guidance, which states that the intended use of the device should be determined by the proposed labeling for the product. As defined above, this includes the actual label for the device and any accompanying information such as direction for sue and promotional materials.
>
> In reviewing the premarket notification, there may be rare instances in which the design of the device or published literature referencing the subject device or a similar device, would lead one to believe that there may be an intended use different than that appearing in the labeling. If this situation occurs, the reviewer should bring the discrepancy to the attention of senior division management.
>
> The reviewer and division management should consider:
>
> - Whether there is a **<u>reasonable likelihood</u>** that the device will be used for an intended use not identified in the proposed labeling for the device, **<u>and</u>**
> - If such use **<u>could cause harm</u>** to the patient or the consumer.
>
> If, while reviewing the 510(k), the division makes the determination that there is a reasonable likelihood that the device will be used for an intended use other than that in the proposed labeling (hereinafter referred to as off-label use) that could cause harm, the review of the submission should proceed as follows. The reviewer should discuss all deficiencies with regard to the submission, except those regarding the off-label use, with the firm and resolve the deficiencies in accordance with established division procedures. Once all other outstanding issue have been resolved, the reviewer will promptly bring the concern about the off-label use to the attention of the Chief of Premarket Notification Section (Chief), Program Operations Staff (POS). The Chief will be responsible for coordinating the resolution of the off-label use issue with the appropriate Office Director. If, while reviewing the 510(k), the reviewer observes no deficiencies that prevent a substantial equivalence recommendation other than the concern regarding an off-

label use, the division should bring that concern to POS as soon as the review of the 510(k) is complete.

Devices that are substantially equivalent to legally marketed devices that have limitations regarding off-label use imposed by the Office Director under Section 513(i)(1)(E) should be subject to the same limitations. Review divisions should be vigilant in identifying devices that fall within this category. When a review division encounters a device that should be subject to the same limitations regarding off-label use as the predicate, the review division should retrieve a copy of the predicate device's "substantially equivalent (SE) with limitations" letter and forward it with the submission to POS as described above.[9]

**Procedures for the Office Director**

When the Office Director receives a referral for POS regarding off-label use, the Office Director will evaluate the information provided and determine if the two statutory criteria are met. That is, the Office Director must decide (1) if there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling and (2) if such use could cause harm to the user. If the Office Director determines that these criteria are not met, the Office Director should document the discussion and the Office should promptly issue a "substantially equivalent" (SE) letter. If, however, the Office Director believes that the two criteria are met, the 510(k) submitter will have an opportunity for consultation.

**Consultation**

Consultation between the Office Director and the 510(k) submitter may take the form of a telephone call or a meeting. The form of the consultation will depend on the needs of both parties and the most expedient path to resolution.

**Resolution**

Following consultation, one of three actions may ensue.

First after discussing the off-label use issue with the firm, the Office Director may decide that the two criteria regarding off-label use have not been met and direct the division to issue a substantial equivalence determination.

---

[9] When the station is encountered, CDRH has determined that the most expedient course of action is for POS to send a draft "SE with limitations" letter to the submitter of the pending 510(k). The letter will propose the identical limitations imposed by the Office Director on the predicate device. The submitter will have an opportunity to assent or to request a telephone call or meeting with the Office Director, in accordance with the procedures outlined in the "Consultation" section of this memorandum. In cases where the submitter assent to the proposed limitations, the Office Director will immediately issue a final order.

Alternatively, if the Office Director believes that there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling and that this use could cause harm, the firm will have the opportunity to:

- Modify the device design to address the off-label use; or
- Request a written determination for the Office Director.

If the modified design satisfies the Agency's concerns regarding off-label use, the division will issue a substantially equivalent determination.

Finally, if the firm either fails to modify the device or decides to request a written determination from the Office Director, the Office Director will issue an "SE with limitations" letter within 10 days of the consultation.

The "SE letter with limitations" letter (the letter) will advise the 510(k) submitter that the Office of Director has determined that :

- there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling for the device; and
- Such use could cause harm.

According to ODE Blue Book #K97-1 entitled, "Deciding When to Submit a 510(k) for a Change to and Existing Device" http://www.fda.gov/cdrh/ode/510kmod.html, manufacturers are permitted to make certain labeling changes without submission of a new 510(k). The labeling submission included in the "SE letter with Limitations," however, are required by Section 513(i)(1)(E) of the Act. Therefore, a manufacturer must submit a new 510(k) before these limitations are modified in any way or removed from the device's labeling.

69. **Directions for Use** provides directions under which the intended user, whether a practitioner (trained health care provider)(21 C.F.R.§ 801.109; 21 C.F.R. 201.57) or layman (e.g., patient or unlicensed health care provider)(21 C.F.R. §801.5; 21 C.F.R. 201.5), can use a device safely and for the purposes for which it is intended. Directions for use also include indications for use and appropriate contraindications, warnings, precautions and adverse reaction information. All manufacturers of medical devices as well as drugs are required to provide the intended user with adequate instructions for use and warnings to avoid misbranding (21 USC 502[352](f)(1) & (2). Manufacturers of both FDA-regulated drugs and devices are prohibited

from statements or labeling which render a device and/or drug misbranded by false and misleading representations with respect to another device, drug, food or cosmetic. (21 C.F.R. 801.6; 21 C.F.R.§ 201.6). A drug is misbranded if it is dangerous to health when used in the dosage or manner prescribed, recommended, suggested , or suggested in a label (21 USC 502[352](j)

70. **Safety and Effectiveness Considerations** (21 C.F.R. 860.7) in determining the safety and effectiveness of a device for its intended use, the following factors are to be considered and addressed in the device' s labeling by the inclusion of appropriate information:

a) the persons for whose use the device is represented or intended;

b) the conditions of use for the device, including conditions of use prescribed, recommended or suggested in the labeling or advertising of the device, and other intended conditions of use;

c) the probable benefit to health from the use of the device weighed against any probable injury of illness from such use;

d) the reliability of the device;

e) and other relevant factors.

71. **Indications for Use** identifies the target population in a significant portion of which sufficient valid scientific evidence has demonstrated that the device, as labeled, will provide a clinically significant result and at the same time not present an unreasonable risk of illness or injury associated with the use of the device.

72. In terms of a combination of products (drug/device):

**21 C.F.R. 801.6: Medical devices; misleading statements**

Among representations in the labeling of a device which render such device misbranded is a false or misleading representation with respect to another device or a drug or food or cosmetic.

## H. FDA'S GOOD GUIDANCE PRACTICE (21 C.F.R.§ 10.115)

73. According to February 14, 2000 (Volume 65, N. 30 proposed rules Good Guidance Practices pages 7321-7330), the FDA's February 1997 Good Guidance Practice (GGP) document provided FDA's working definition of guidance; established a standard way of naming FDA guidance documents; described the legal effects of guidance documents; established practices for developing guidance documents and receiving public input; established ways for making guidance documents available to the public; and provided information concerning the agency's existing appeals produced for disputes regarding guidance documents.

74. On November 21, 1997, the President signed Food and Drug Modernization Act (FDAMA) into law (Public Law No. 105-115), Section 405 of FDAMA, which added section 701(h) to the Act (U.S.C. 371(h), established certain aspects of the 1997 Good Guidance Practice (GGP) document as law. It also directed the agency to evaluate the effectiveness of the 1997 GGP document and then develop and issue regulations specifying the FDA's policies and procedures for issuance of guidance documents. As a result, the FDA proposed changes to 21 C.F.R. part§ 10 to clarify procedures about guidances.

75. The Presidential Memorandum of Plain Language on June 1, 1998, directed FDA to ensure that all its guidance documents are clear and easy-to read. The 1997 GGP document explained its purpose was to ensure the agency guidance documents are developed with proper amount of participation to have users have easy access to guidance documents and that guidance

documents are not treated as binding requirements for industry or FDA. The agency also wanted to ensure that every part of the agency followed these same policies and procedures. The FR continued regarding the proposal for 21 C.F.R. 10.115 [Final Rule 65 FR 56477, September 19, 2000 see below] :

> The 1997 GGP document also clarified what does and does not constitute a guidance document, and it provided examples.
>
> The 1997 GGP documents stated that guidance documents themselves do not create rights or responsibilities under the law, and guidance documents are not legally binding on you or on the agency. Instead, guidance documents explain how the agency believes the law applies to certain regulated activities. The 1997 GGP document also noted, however, that guidance document represents the agency's current thinking on a subject addressed in the document, and it is intended to ensure consistency in the application of laws and regulations. Therefore FDA supervisors will take steps to ensure that their employees do not make determinations that are different from what is in a guidance document without appropriate justifications and supervisory concurrence....
>
> Under the 1997 GGP document, the agency adopted a two-level approach to the development of guidance documents. Level 1 guidance documents were defined as those documents directed primarily to applicants/sponsors or other members of the regulated industry that set forth first interpretations of statutory or regulatory requirements, changes in interpretation or policy that are of more than a minor nature, unusually complex scientific issues, or highly controversial issues. Level 2 guidance documents included all other documents.
>
> For a Level 1 guidance document, which the agency defined as generally more controversial or new, FDA calls for public input, in most cases, before the document goes into effect. For a level 2 document, which is generally less novel or controversial in nature, FDA calls for your comments when the document is issued.
>
> The 1997 GGP document established certain standard elements that are included in all guidance documents, including: A standard way of referring to guidance documents; a statement of nonbinding effect; the absence of any language implying that the documents is mandatory; and other standard information, such as date of issuance and whether a document is draft or final.

**Statutory Requirements Under FDAMA**

Section 701(h) of the act (21 U.S.C. 371(h)) codifies certain parts of the 1997 GGP document. Section 701(h)(1)(A) of the act requires the agency to develop guidance documents with public participation and to ensure that information identifying the existence of such documents and the documents themselves are made available to you both in written form and, as feasible, through electronic means.

Section 701(h) (1) (A) of the act further explains that guidance documents shall not create or confer any rights for or on any person, although they represent the views of the agency on matters within its jurisdiction.

*Definitions*

Proposed Sec. 10.115(a) explains that "Good Guidance Practices (GGP's) set forth FDA's policies and procedures for developing, issuing, and using guidance documents."

Proposed Sec 10.115(b) (1) defines the term "guidance document"... [t]he agency defines guidance documents as those prepared by FDA staff, applicants/sponsors, and the public that describe the agency's interpretation of or policy on a regulatory issue.

The proposed regulation states that guidance documents include, but are not limited to, documents that relate to: (1) The design, production, manufacturing, and testing of regulated products; (2) the processing, content, and evaluation/approval of submissions; and (3) inspection and enforcement policies.

In addition, the agency is clarifying what is not a guidance document. As discussed in the 1997 GGP document, documents that would fall into the nonguidance category include: (1) Those relating to internal FDA procedures; (2) agency reports, (3) general information documents provided to consumers and health professionals, (4) speeches, (5) journal articles and editorials, (6) media interviews, (7) press materials, (8) warning letters, or (9) other communications directed to individual persons or firms.

As discussed above, proposed Sec. 10.115(c_ (3) defines "you" as all affected parties outside of the agency.

**B. Legal Effect of Guidance Documents**

Consistent with section 701(h) (1) (A) and (h) (1) (B) of the act, proposed Sec 10.115(d) describes the nonbinding effect of guidance documents. Specifically, it provides that guidance documents do not establish legally enforceable rights or responsibilities. They do not legally bind you or the agency.