> Proposed Sec. 10.115(d) further provides that you may choose to use an approach other than the one set forth in a guidance document. However, the alternative approach must comply with the relevant statutes and regulations.
>
> The proposed regulation also clarifies that although guidance documents do not legally bind FDA, they represent the agency's current thinking. Therefore, FDA employees may depart from guidance documents only with appropriate justification and supervisory concurrence.
>
> Proposed Sec. 10.115(i)(2) also provides that, due to the nonbinding nature of guidance documents, certain mandatory language cannot be included in guidance documents, unless the agency' is using these words to describe a statutory or regulatory requirements. Examples of such language includes words like "shall", "must," "required," or "requirement".
>
> **H. Conforming Changes**
>
> The agency is also proposing conforming changes to its regulations at Sec. 10.90(b) that describe the agency's procedures for guidelines. For many years, the agency issued documents articulating regulatory guidance that were referred to as "guidelines." However, since the development of GGPS, the agency has moved to referring to all documents that provide you with guidance as "guidance documents." To make these regulations consistent, the agency is proposing to revise Sec 10.90(b) to eliminate reference to the term guideline, and instead cross-reference the procedures for development, issuance, and use of guidance documents at Sec. 10.115. In addition, the agency is proposing to make conforming changes throughout parts 10, 14, 19, and 25 (21 C.F.R. parts 14, 19, and 25) to ensure the term "guidance document" replaces the term "guideline," as appropriate.

76. On February 9, 2001 there was the issuance of "CDRH Manual for the Good Guidances Practices (GGP) Regulations; Final Guidance for FDA Staff". CDRH indicated that the GGP regulations (21 C.F.R.§ 10.115) went into effect on October 19, 2000 (published September 19, 2000 (65 FR 56468). In terms of the designation of draft and final guidance, use of the term "*draft*" means that the guidance document is not for implementation, it is being issued only for public comment. "*Final*" means that the FDA is implementing the guidance when it was issued. FDA continues accepting public comment on all final guidance documents. When public comment is not feasible or appropriate, FDA may issue a Level 1 guidance as an Immediately-in-Effect instead of draft. FDA implements this type of Level 1 guidance as soon

as it is available on the Internet and in hard copy. The Level 1 draft issued for public comment is marked "*Draft Not for Implementation*". All Level 1 guidances are published with a notice of availability (NOA) in the Federal Register. Generally a Level 1 guidance will have a 90 day comment period. The Level 1 final is released after completion of review of public comments for a Level 1 draft. A final guidance document can be revised by FDA at any time. When public comment is not feasible or appropriate, the level 1 is issued identified as Immediately-in-Effect and implemented immediately at time of publication. Immediately-In-Effect guidances are limited to exceptions to public participation which included: public health reasons; statutory requirements, executive order, or court order that requires immediate implementation; or the document provides a less burdensome policy consistent with public health.

77. FDA must provide for a public comment period for all drafts guidances, which are Level 1. Therefore Level 2 documents are released only in Final form without an opportunity for public comment period. Level 2 guidances can be withdrawn by FDA at any time if considered as too controversial.

78. There are three kinds of FDA guidances:1) draft; 2) Final; 3) Final, Immediately Effective. The non-binding effect statement and least burdensome statement must be placed be in all CDRH guidance documents. By regulation per 21 C.F.R. § 10.115(i)(1)(iv), the nonbinding effect statement reads:

> *This document is intended to provide guidance. It represents the Agency's current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind the Food and Drug Administration (FDA) of the public. An alternative approach may be used if such approach satisfies the requirements of the*

| |
|---|
| *applicable statute and regulations.* |

## V. BASES FOR OPINIONS #4-6

### A. SHARED CONSIDERATIONS FOR EXTERNAL INFUSION PAIN PUMP MANUFACTURES

#### 1. FDA PREMARKET REVIEW OF EXTERNAL INFUSION PUMPS

79. CDRH's device review branch that has cleared over five hundred 510(k)s submitted for general postoperative pain pumps is General Hospital Devices Branch, Division of Dental, Infection Control and General Hospital Devices, Office of Device Evaluation (ODE). An industry guidance applicable to the review activities of this branch and FDA-regulated external infusion pump manufacturers is FDA's March 1993 guidance titled "*Guidance on the Content of Premarket Notification [510(k)] Submission for External Infusion Pumps*",. The guidance was last updated in September 5, 1997. The Introduction to the guidance (page 4-5):

> This document establishes the 510(k) review requirements for external infusion pumps. The external infusion pump may be electrically powered, mechanically powered, or use an alternate energy source. Examples of devices within this generic type of include peristaltic, piston, spring-driven, syringe, and elastomeric types of pumps.
>
> EXCLUSIONS
>
> This document does not address submission for implantable infusion pumps or closed-loop devices, which require premarket approval. This document also does not cover pressure infusors for IV bags (as described in 21 C.F.R. 880.5420)
>
> Definitions:
>
> **Infusion Pump**: described in FDA regulation, 21 C.F.R. 880.5725, as "a device used in a health care facility to pump fluids into a patient in a controlled manner….The device may also operate using a constant force to propel fluid through a narrow tube which determines its flow rate…

**Elastomeric Pump**: an infusion pump which utilizes the energy in an elastic membrane to provide the force for fluid delivery...

**Syringe Pump**: an external infusion pump which utilizes a piston syringe as the fluid reservoir and to control fluid delivery...

**Intended Use**: the objective intent of the persons legally responsible for the labeling of the device. The intent is determined by their expressions or may be shown by the circumstances surrounding the distribution of the device. The objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such representatives. It may be shown by the offering or the using of the device, with the knowledge of such persons or their representatives, for a purpose for which it is neither labeled nor advertised (801.4). Some use conditions for infusion pumps may be included single use only, home use, reusable, intravenous and intra-arterial delivery.

80. For a 510(k) submission for an external infusion pump, the sponsor is required to provide proposed labels, labeling and advertisements sufficient to describe the device, its intended use and the directions for use. For devices intended for laypersons, the labeling is to conform to 21 C.F.R.§ 801.4 and §801.5, related to intended uses and adequate directions for use. For prescription devices the labeling is to confirm to 21 C.F.R.§ 801.109 and 21 C.F.R. §801.116. Regarding the commercial labeling and marketing of the device, ODE's guidance stated "*Other provision of Part 801 are deferred for review to CDRH/OCS*[10] *Device Labeling Compliance Branch.*" Under device description, the sponsor was to provide a "clear statement of the intended use(s) of the infusion pump", and the guidance continued:

a. Specify the route(s) of administration.

b. If the infusion pump is labeled for use with a specific drug/biologic, the applicant must supply information demonstrating that use of the drug/biologic with the device is consistent with the approved drug/biologic labeling.

[10] Office of Compliance and Surveillance, CDRH, at FDA. Unlike ODE which is involved with premarket review of medical devices and determination of SE; OCS is a postmarket review branch at CDRH involved with the monitoring and determination of adulteration and misbranding and violative conduct for medical devices sold in the United States

c. Identify any specific uses for the pump…

81. If there was to be a new claim for a 510(k) for an infusion pump, such as "intra-articular use" or "orthopedic surgery," at some time in the process the General Hospital Branch Chief or the Division Director over General Hospitals Devices Branch, upon becoming aware of the new intended use or claim for the application, the reviewer had an option, based on workloads of both divisions, to obtain a consultation from or have the application transferred to a reviewer in the involved device branch, for example, Orthopedic Devices Branch, Division of General, Restorative and Neurological Devices. The Agency would also have the option to obtain a consult from another FDA center, including reviewers in the Office of Drug Evaluation (ODE)Center for Drug Evaluation and Research (CDER) if a device sponsor were making a claim about a new use of an approved drug, for example intra-articular use of a local anesthetic such as bupivacaine.

82. FDA utilizes its Establishment Registration and Product Listing databases to quickly be able to identify Specification Developers, Contract Manufacturers, Manufacturers, Repackagers and Relabelers for products both for the United States and non-United States in terms of oversight of industry, facility inspection, and requesting additional information about products.

83. Pursuant to 21 C.F.R. 880.5725, FDA grouped several types of pumps by features or characteristics and assigned an internal three digit Product Code. FDA classified elastomeric pumps under its three letter Product Code "MEB". FDA has cleared 84 MEB 510(k)s for distribution in the United States as of 2009. The Product Code "FRN" is used to designate "pump, infusion." There are more than 500 510(k)s cleared as "pump, infusion." The other

product code "MEA" is identified as "PCA" (patient controlled analgesia) pumps, with 30 510(k)s cleared for that indication. The majority of these external infusion pumps have been cleared by FDA's reviewers in the General Hospital Devices Branch.

84. The Product Listing database with the Product Codes will help FDA quickly locate members of a particular industry engaged with production and marketing of certain types of product in the United States. Under the FDA's assigned product codes for industry engaged with infusion pumps, there are 21 Establishment Registrations under product code "MEA" for infusion pumps, patient controlled analgesia (PCA). In 2009, Stryker is listed as an FDA registered establishment with MEA infusion pumps sold in the United States. Firms that are not registered with FDA in 2009 as producing MEA infusion pumps include DJO, McKinley, I-Flow, Curlin (MOOG or WalkMed).

85. Under the product code "MEB" there are 27 establishments registered with FDA listing MEB, elastomeric infusion pumps. Another manufacturer, Breg Mexico, Breg, Inc. an Orthofix Company, I-Flow and Stryker are all listed as involved with "MEB" pumps. However, DJO, McKinley, and Curlin (MOOG or WalkMed) are not listed with FDA as involved with MEB infusion pumps in the United States.

86. The third Product Code assigned by FDA for identification of external infusion pumps is "FRN." The FDA's database system is capable of returning a maximum of 100 registered establishments for this product code ( names A-So). Of the first 100 returned, Breg Mexico, Breg Inc, an OrthoFix Company; and I-Flow Corporation are listed. There is still no listing of FRN pumps for DJO, McKinley, and Curlin (MOOG or WalkMed) in 2009.

87. DJO has multiple establishments registered with FDA ( DJ Orthopedics De Mexico, DJ Frameworks LTD, China; DJO France SAS; DJO, LLC CA/USA), as well as a wide variety of listed products. DJO is identified to FDA as a Manufacturer; Contract Manufacturer; Repackager; Relabeler; and Specification Developer, but just not listed for pumps. However DJO has no listing in 2009 with FDA for any involvement in any capacity with infusion pumps of any product code.

### 2. CHANGING FROM A GENERAL TO A SPECIFIC INTENDED USE

88. FDA issued "*Guidance for Industry: General/Specific Intended Use*" on November 4, 1998. The stated purpose of the document was to assist medical device manufacturers understand the principles being used by FDA to determine whether the addition of a specific indication for use to a medical device cleared for marketing with a general indication for use could trigger the need for a PMA. FDA defined a change from general to specific indication for use as:

> Any proposed increase in the level of specificity of the indication for use of medical device. A change in a device's indication for use from general to specific usually results in an indication for use that is narrower than the approved or cleared general use. Such a change or additional indication generally will narrow the indication for use with respect to function, target population, organ or organ system, tissue type, disease entity, or analyte.
>
> Regulatory Background
>
> ...Blue Book memorandum #K86-3 further states that the Center assesses any differences in indications for use in terms of the safety and effectiveness questions those differences may raise. This guidance also indicates that some modifications in indications will be considered a new use, "even though the intended effect of the new device is very similar to that of the predicate device." The Blue Book memorandum notes that slight modifications in indications for use can significantly change the intended use of the predicate device.

It should also be noted that the agency has received previous Congressional guidance which bears directly on the issue of substantial equivalence in the Report of the Committee on Interstate and Foreign Commerce on the Medical Device Amendments on 1976 (Senate Report):

> *The committee believes that the term, substantial equivalence, should be construed narrowly where necessary to assure the safety and effectiveness of a device but not narrowly where differences between a new device and a marketed device do not relate to safety and effectiveness.*

**Decision-Making Criteria**

3. *Risk*- Does a specific use introduce new risks not normally associated with the general use of the device?
4. *Public Health Impact*- Does a specific use impact public health to a significantly greater degree than the general use of the device? Differences in public health impact can result from changes in target population. These changes may have quantitative dimensions, but routinely will also affect safety and effectiveness because of major qualitative differences in how the device is to be used...
5. *Knowledge base*- Is there a body of evidence available to the agency regarding the proposed specific use that reflects existing understanding by the medical community that the more specific use is a subset of the general use, rather than a new intended use? The evidence can be derived from such sources as the medical literature and practical guidelines...

*Specific indications for use that ordinarily fall outside a general use for the purpose of determining substantial equivalence include:*

- Those indications for use that involve the diagnosis, therapy, or prevention of a particular disease entity or entities, especially where such entity carries clinical implications not normally associated with other general uses of the device...

It should be noted that the vast majority of submission for 510(k)s for specific indications for use are cleared as substantially equivalent to a legally marketed predicate for the general use. Some of these submissions require clinical data for clearance.

**Conclusion**

Determinations of substantial equivalence related to specific versus general indications are often difficult and complex. There are multiple factors that influence those determinations...Manufacturers may obtain further guidance by

communicating directly with the relevant ODE division either through submission of a 510(k) or prior to making a submission.

89. The five external infusion pump manufacturers all have received specific written guidance from FDA regarding the change from general post operative pain control to intra-articular post operative pain control (a more narrow indication). FDA determined that there was no cleared predicate pump intended for intra-articular or synovial infusion and, despite a September 30, 1998 clearance in what appears to be error, required that indication be removed from McKinley's OutBound pain pump in a letter of March 3, 1999. All subsequent continuous infusion pain pumps have consistently not been cleared for that new indication since 1998. If a pump sponsor wanted to pursue that new indication, as FDA discussed with I-Flow during a February 2006 teleconference for removing a contraindication for intraarticular placement, it would first be required to provide FDA with additional scientific data, animal and human, to support safety and effectiveness of that new indication (IFLOW30515-6). FDA would also require in the clinical protocol information about the use of a drug that was approved for the new proposed intended use. It would remain in FDA's purview to determine whether the new class III indication for intra-articular infusion could be marketed by a sponsor through either a 510(k) (21 C.F.R. 807) or a Premarketing Application (PMA) (21 C.F.R. 814).

90. The responsibility for monitoring the safety and performance of all these 510(k) cleared pumps, including the promotion, medical literature and updating of labeling rests with each manufacturer and distributor. Once ODE's reviewers have cleared or approved a device's premarketing applications for marketing, the daunting task for FDA's oversight and monitoring activities of industry and public safety for all United States medical device firms, including

distributors, shifts to CDRH's Office of Compliance (OCS) and FDA's District Offices, the postmarketing arm of FDA.

### 3. VERBAL COMMUNICATIONS WITH FDA EMPLOYEES

91. If a manufacturer wanted to request to receive an official advisory opinion from FDA on a matter of general applicability, for example, the approval process necessary for marketing of intra-articular pain pumps, pursuant to 21 C.F.R.§ 10.85 Advisory opinion, the request for such an opinion could be denied by FDA if: the information provided to FDA to consider was incomplete on which to base an informed advisory opinion; the Commissioner concluded that an advisory opinion could not be reasonably given on the matter involved; or the matter had already been adequately covered by a prior FDA advisory opinion.(i.e., opinions of 1998-9). A request for an advisory opinion from FDA is to be submitted to FDA in accordance with 21 C.F.R.§ 10.20 in the form described in "Request for Advisory Opinion."

92. The Commissioner may respond to either an oral or written request to the agency as a request for an advisory opinion, in which case the request will be subsequently filed with the Division of Dockets Management. An advisory opinion represents the formal position of FDA on a matter and obligates the agency to follow it until amended or revoked. An advisory opinion may be used in administrative or court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement. Regarding opinions obtained from FDA employees, according to 21 C.F.R. §10.85(k):

> A statement made or advice provided by an FDA employee constitutes an advisory opinion only if it is issued in writing under this section. A statement or advice given by an FDA employee orally, or given in writing but not under this section or 10.90, is an informal communication that represents the best judgment of that employee at that time but does not constitute an advisory opinion, does not

necessarily represent the formal position of the FDA, and does not bind or otherwise obligate or commit the agency to the views expressed.

## 4. METHODS FOR OBTAINING CLINICAL DATA FOR FDA APPROVAL IN THE UNITED STATES

93. FDA views the manufacturers,, sponsors, and distributors, McKinley, I-Flow, Stryker, and DJO as legally responsible for ensuring the safety of patients enrolled in their clinical studies intended for future device marketing and claims. FDA requires all sponsors of human research to ensure the safety of the public with investigational devices. Intra-articular use of pain pumps as encouraged by these firms is investigational and an unapproved use of a combination of a drug and a device instilled in a joint space for post operative pain. Such research can only be legally and ethically performed in the United States with, at a minimum, oversight and monitoring of an Institutional Review Board (IRB). The study is a significant risk study and should also be performed under either an FDA approved IDE (device) or IND (drug).

94. FDA requires sponsors of clinical investigations to ensure that both the investigators (physicians) and patients are adequately informed about the potential risks of an investigation. Subjects must first sign an adequate informed consent before voluntarily being enrolled in a study. An investigator is required to sign an Investigators Agreement to abide by the protocol. The investigators are to receive Investigator Brochures providing information about the potential risks and benefits for subjects, the protocol, and how to complete the Case Report Forms for data collection. The investigation sponsor is required to maintain patient reports and records and to notify FDA of adverse events occurring in its studies.

95. McKinley, I-Flow, Stryker, and DJO have each been a **"sponsor"** of investigational intra-articular continuous infusion since 1999 using investigational local

anesthetics for post operative pain management following orthopedic procedures. Unfortunately, the studies have been performed without the knowledge and consent of the investigators or the patients and without informing the sales representatives, and without approval of the FDA. Some of the rare studies have had involvement of an IRB. According to FDA, the definition of a sponsor is one that:

> .....initiates but does not actually conduct the clinical investigation. An entity other than an individual (e.g. a corporation) which uses one or more of its own employees to conduct an investigation that is has initiated is considered to be a sponsor of the investigation and its employees are considered to be "**investigators**". Financial agreements, incentives, consulting agreements, contracts or other benefits can "initiate" or trigger research or procedures that change the standard accepted practice of medicine or treatment.

96. United States sponsors are legally responsible for the conduct of clinical investigators, assurance of safety of the subjects, accountability and control of its investigational products, documentation of valid informed consent, report and record keeping, ensuring IRB approval and reporting adverse events to investigators and FDA. Since no local anesthetics were currently approved for infusion into a joint, the use of any local anesthetic for the new indication or intra-articular infusion was investigational.

97. For the components of clinical investigations, FDA uses the following definitions:

> A "**subject**" is a human who voluntarily agrees to participate in a clinical investigation, either as an individual on whom or on whose specimen an investigational device is used. The subject may also serve as a control. A subject may be of normal health or may have a medical condition or disease. The subject has the moral, ethical and legal right in the United States to be adequately informed prior to enrollment in an investigation regarding the known and unknown risks and benefits and then to voluntarily elect to participate or not participate after the risks and benefits have been explained.

An "**unanticipated adverse device effect**" is considered to be any serious adverse effect on health or safety, any life threatening problem or death caused by, or potentially associated with a device, if that effect, problem, or death was not previously identified in nature, severity, or degree of incidence in the IDE application; or any other serious problem associated with a device that relates to the rights, safety, or welfare of subjects. 21 C.F.R. 860.7 lists the definition of a well-controlled clinical investigation.

An "**Institutional Review Board**" (IRB) is required to consist of a minimum of five members who posses varying backgrounds to promote a complete and adequate review of research activities conducted at the institution. The IRB members are to possess a professional competence necessary to review the specific research activities. IRB members are required to be knowledgeable about the issues involved in the proposed investigation. An IRB member is permitted to be involved in the research being reviewed by the IRB, but that member may not vote on approving or disapproving the proposed research nor may they be involved in the continuing review of the research (21 C.F.R. 56.107(e)).

98. Since 1971, FDA has required that all clinical studies involving investigational "FDA-regulated products" performed using human subjects within institutions in the United States have review, approval and monitoring by an IRB. In 1976, medical device clinical trials were specifically required to have IRB review, approval and monitoring as the result of passage of Medical Device Amendment (MDA).

**21 C.F.R. 50.20 General requirements for informed consent**

Except as provided in §50.23, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative. No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's rights, or releases or appears to release the investigator, the sponsor, the institution, or its agents from liability for negligence.

**21 C.F.R. 50.25 Elements of informed consent**

(a) Basic elements of informed consent. In seeking informed consent, the following information shall be provided to each subject:

(1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental.

(2) A description of any reasonably foreseeable risks or discomforts to the subject.

(3) A description of any benefits to the subject or to others which may reasonably be expected from the research.

(4) A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject

(6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained.

(8) A statement that participation is voluntary, that refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled.

99. It would have been a reasonable expectation of an orthopedic surgeon from 1998-2009, that responsible orthopedic manufacturers, distributors or sales representatives would share a similar concern about their patients' safety and would adequately warn about a lack of adequate testing and a lack of an approved local anesthetic for an intra-articular infusion. An orthopedic surgeon from 1998-2009 would also assume that a responsible firm would have informed physicians that its orthopedic pain pump devices for intra-articular use were considered investigational by FDA and that a manufacturer would inform them if it had failed to conduct adequate testing and review of the medical literature to determine the benefits for the physicians'

patients were not commensurate with the risk. At an absolute minimum, orthopedic surgeons would reasonably expect to be notified or warned by the manufacturer and distributors that the FDA had repeatedly rejected intra-articular use of pain pumps.

100. It is a Prohibited Act and violation of the FDCA pursuant to 21 USC 301[331] for anyone to introduce or deliver into interstate commerce any drug or device that is adulterated or misbranded. As a relabeler of pain pumps, DJO received in interstate commerce misbranded and adulterated devices for intra-articular use through 2003 from I-Flow and then from McKinley/Curlin. Receipt of adulterated (class III and investigational) or misbranded devices is prohibited. DJO was aware from 1998 through 2009 that the pain pumps it received and relabeled and sold were not approved by FDA for intra-articular indication yet failed to reveal that very material fact to either physicians, its own sales representatives or sales forces of its distributors including Pacific Medical, as required by 21 USC 321(n) and 21 C.F.R. 1.21.

### 5. MANUFACTURER'S OBLIGATION PURSUANT TO THE ACT TO CONTROL USE OF 510(k) CLEARED PRODUCT

101. The first example of a manufacturer's responsibilities for controlling the use of its devices, involves reuse of hemodialyzers, a component that goes inside the hemodialysis machine to filter (dialyze) the patient's blood. In the hemodialysis industry, physicians independently began to reuse of hemodialyzers for the same patient to reduce the loss of blood in priming the device at each dialysis session. As a result, the hemodialysis industry began to develop products specifically intended to help with reuse of hemodialyzers. FDA cleared these devices as accessories to hemodialysis machines to facilitate unapproved use of hemodialyzers by 510(k). Individual hemodialyzer manufacturers, aware of the new unapproved use of their devices by physicians, provided physicians with no reuse guidance, testing or label instructions

or warnings regarding the risks of "off-label" use to ensure safety of patients. Not all hemodialyzers, cleared for single use, were equally able to be safely reprocessed. The manufacturers remained silent about the risks for each of its products.

102. In 1995, based on FDA's concerns about public health and disease transmission, FDA issued its Hemodialyzer Reuse Labeling Guidance. Manufactures of hemodialyzers, not the physicians, were held by FDA as legally responsible under 21 C.F.R. 801.4 for providing adequate instructions for use and warnings based on the intended use for their hemodialyzers. All hemodialyzers were required to be adequately labeled by each manufacturer based on the intended use of the product. All promotion and representations made by manufacturers were to be consistent with its hemodialyzer's 510(k) cleared intended use and label. Manufacturers of hemodialyzers who continued to intend products for "single use" were legally required to ensure the use of the product by physicians was as "single use" or be held in violation of the Act by FDA. In other words, the FDA considered it the responsibility of the manufacturers, not the medical community, to be aware of this off-label use, and that the manufacturer had a duty to disclose to healthcare providers not to use the product in a manner inconsistent with the label.

103. Another example of an obligation of a manufacturer to ensure consistent use of its 510(k) cleared devices according to its cleared label occurred in 2004 and involved a biliary stent being used for a new and unapproved indication. Johnson & Johnson ("J&J") conducted a voluntary product recall to curb "off label" use by physicians with its biliary stent. The recall was based on public health safety and a manufacturer's legal requirement under the Act to provide health care providers with adequate instructions and warnings according to its intended use (21 C.F.R. 801.4). In April 2004, J&J was required to voluntarily conduct a Class I recall of

its Precise Rx Biliary Stents. The Precise Rx Biliary Stents are class II 510(k) cleared biliary stents considered a palliative device for patients with biliary obstruction from cancer. As palliative devices, these stents are cleared based only on mechanical testing, with no requirement for clinical trials and human data. The recall was conducted because J&J "became aware" of "off- label" ( unapproved use) by cardiologists of the biliary stent for a new and unapproved intended use, namely cardiac coronary artery stenting. The Precise biliary stents were being used by physicians, as a result of J&J representations, as coronary artery vascular stents. When intended as a vascular stent, the same stent design became a class III device now requiring clinical trials, and FDA's PMA approval of both the device and label. J&J's biliary stent was not approved as a vascular stent, and at that time was considered an investigational vascular stent available only at approved investigational sites for approved clinical investigators under an FDA approved IDE.

104. J&J was required to remove all violative Precise biliary stents from the United States market and submit a new 510(k) requesting to add a new contraindication to the stent's label contraindicating vascular use. J&J sent out a notification to healthcare providers warning that "off-label" use of its Precise biliary stent was contraindicated and investigational and not shown to be reasonably safe or effective. FDA also required that all J&J's promotions for the Precise Biliary Stent be consistent with the class II cleared intended use until time of PMA approval.

### 6. FAILURE TO REVEAL MATERIAL FACTS

105. Among the general provisions of the regulations implementing the Federal Food Drug and Cosmetic Act is 21 C.F.R.§ 1.21. The regulation is applicable to the conduct of all

firms involved with relabeling, distribution or sales of FDA- regulated products sold within the United States pursuant to 21 USC 321(n), 21 USC 325(a) and (f)(1)& (2). All manufacturers, relabelers, and distributors have a duty to adequately warn of risks and to protect the public. Pursuant to 21 C.F.R. 1.21:

> (a) Labeling of a food, drug, device, or cosmetic shall be deemed to be misleading if it fails to reveal facts that are:
>
> (1) material in light of other representations made or suggested by statement, word, design, device or any combination thereof; or
>
> (2) Material with respect to consequences which may result from use of the article under: (i) The conditions prescribed in such labeling or (ii) such conditions of use as are customary or usual.
>
> (b) Affirmative disclosure of material facts pursuant to paragraph (a) of the section may be required among other appropriate regulatory procedures, by (1) Regulations in this chapter, promulgated pursuant to section 701(a) of the act; or
>
> (2) Direct court enforcement action.

106. A label that indicates a infusion pump can be used in an "intraoperative site," when being promoted by a sales representative to an orthopedic surgeon, misrepresents that the device can be used in an "orthopedic" intraoperative site and that there is a drug approved by FDA as safe and effective for that indication. This is especially true if the surgery was in a joint, an intra-articular operative site. Unless the surgeon is told otherwise by either product information, including warnings or by an adequately trained and knowledgeable sales representative, falsely implies ability to use the pump safely and effectively for post operative pain management following an arthroscopic and/or joint surgery. The failure of so many pump manufacturers to appropriately and adequately reveal the material facts about the limitations and

risks of continuous infusion pain pumps for orthopedic indications and intra-articular infusion directly contributed to patient injuries.

## B. FDA CLEARANCE OF MANUFACTURERS, RELABELERS AND DISTRIBUTORS EXTERNAL INFUSION PUMP 510(k)s:

1) **MCKINLEY;**
2) **I-FLOW;**
3) **DJO;**
4) **STRYKER**

### 1. MCKINLEY, INCORPORATED

### a. K971844 OUTBOUND2

107. McKinley Incorporated's, 510(k) K971844 Outbound-2 System was received by FDA on October 27, 1997 and cleared on January 23, 1998. The OutBound 2 was cleared with the following indications for use (IFU) as a prescription device:

> The McKinley OUTBOUND-2 is indicated for patients requiring intravenous, intra-arterial, subcutaneous, or enteral administration of medication. It is convenient for use by ambulatory patients.(PUB000001)-

108. The pump was assigned by FDA Product Code "FPA," intravascular administration set. Of a return of over 100 registered and listed firms on FDA's website making a product under FPA ( names from A-K), in 2009 DJO and Curlin products are not listed with FDA. The designation by FDA as FPA indicated that the FDA did clear the McKinley device not as a patient controlled analgesia(PCA) infusion pump but rather based on the syringe design. (See Hung Trinh memorandum July 21, 1998 below).

### b. K982256 OUTBOUND LABEL CHANGE

109. On June 23, 1998 Suzanne Dennis, Director of Regulatory Affairs and Quality Assurance at McKinley sent a letter to FDA requesting to make a label change for its OutBound Family of disposable ambulatory infusion pumps. The request was assigned K982256 by FDA. The letter stated McKinley's new request:

> The intended use of the pumps-precisely-controlled infusion of medications of fluids- will not be affected by the proposed modification. The proposed modification is to add the term "synovial cavities" to the list of infusion sites. There have been no changes made to the device to accommodate the proposed labeling.
>
> The outbound family of ambulatory infusion pumps provide Continuous, Intermittent and Patient Controlled Analgesia (PCA) infusion. The pump is indicated for intravenous, subcutaneous, enteral, epidural and arterial infusion of antibiotics, analgesics, chemotherapeutic agents and other medications. Detailed product information can be found in previously submitted 510(k)s listed in Section A.
>
> The following information is being provided in compliance with C.F.R. 807.87 (FOIS-000051)
>
> APPENDIX 2-DESCRIPTIVE COMPARISON TO A LEGALLY MARKETED DEVICE
>
> McKinley Medical believes that there have been no significant changes to the device with the addition of an alternate infusion site. The intended use of the device- precisely controlled infusion of medications or fluids- has not changed. The proposed modification listed in Appendix 1 provides physicians with an additional infusion site for the infusion of medications
>
> The physician determines the parameters of the infusion: medication, duration, flow rate, including which location and mode of infusion best meets the needs of the patient.
>
> The addition of intrasynovial cavities (areas surrounding bone) as an infusion site does not introduce new risks not normally associated with the use of the device,
>
> Orthopedic surgeons are currently using a substantially equivalent pump (I-Flow Disposable 'PainBuster') for this indication (FOIS-000057).

110. McKinley assured the FDA that it had already determined that continuous infusion into the synovial cavity would raise no new risks. It was the responsibility of McKinley and not FDA to have first determined through its own testing or review of the medical literature if that was indeed a truthful statement. As a follow-up to its request, McKinley sent a July 7, 1998 letter referencing its phone call with FDA on July 7, 1998. To complete the more recent requirements to allow filing of a 510(k) application for review by FDA, McKinley sent FDA an Indications for Use (IFU) Form and a signed Truthful and Accurate Statement. The requested new McKinley IFU included "synovial cavity" in the singular and not plural:

> The Outbound infuser is indicated for intravenous, intra-arterial, subcutaneous, epidural, and synovial cavity infusion of medications or fluids requiring continuous delivery at controlled infusion rates (FOIS-000040).

111. The FDA's assigned reviewer for the McKinley K982256 510(k) was Hung Trinh, GHDB/DDIGD/ODE/CDRH. He made a July 21, 1998 memorandum to the official 510(k) record regarding a summary of a phone conversation held with Ms. Dennis, McKinley and his rationale for placing the 510(k) "on hold" to stop the FDA's review clock and provide McKinley with time to provide the additional information to complete the review of the 510(k). H. Trinh wrote (underlining added for emphasis):

> I contacted Ms. Dennis and told her that the predicate devices she cited do not have the same indication:"...for synovial cavity infusion of medications or fluids requiring continuous delivery at controlled infusion rate." I asked her to clarify the intended use statement. She indicated that she has seen other devices that are used for postoperative pain management, and would like to extend the device's indication to include postoperative pain management. I told her that she would need to specify a legally marketed device that has the same intended use. She may even want to consider modifying her intended use to be consistent with other legally marketed device. In addition she would also need to compare the characteristics of her device to those predicate devices. The comparative characteristics could include volume, flow rate, <u>pressure output</u>, and route of administration. Where there are differences, justification should be provided to

> show that no new safety or effectiveness issues are raised, Ms. Dennis understands that the submission will be placed on hold pending the receipt of additional information.(FOIS-000034)

112. There is a July 21, 1998 internal email from Ms. Dennis to Steve Bush and Randy Hoffman, McKinley, titled "synovial site-FDA contact:"

> Received a phone call a few minutes ago from FDA. Indicated they were having trouble finding a predicate device. I re-iterated IFlow approval. They asked me to fax the flyer which I did. I asked them to please help since I wasn't able to obtain labeling, but they obviously had recently approved it. And would they please help....
>
> He did state that during chats with orthopedics they mentioned that their current devices have some sort of pressure relief valve to assure that too much pressure doesn't build up (GR001558).

113. Ms. Dennis wrote back to FDA, "Per our telephone conversation of July 29, 1998, enclosed are the requested documents: Revised Indications for Use Form; Comparison of Predicate Devices"(FOIS-000012). For comparison of volume, flow rate, pressure and route of administration, Ms. Dennis sent a paper with a handwritten note with SE PCIP K898422 (there is no such pump in database) and K980558 I-Flow's PainBuster (see below). McKinley re-submitted its official response and amended 510(k) information and indications for use on August 14, 1998, thus restarting the Agency's review clock.

114. In a Memo to the Record 510(k) Review, dated September 29, 1998 by H. Trinh, the day prior to FDA's clearance of McKinley's OutBound 510(k), he wrote indicating there was no agency plan to clear the new indication of synovial cavity for the OutBound pump:

> SUMMARY DESCRIPTION OF THE SUBMISSION UNDER REVIEW:
>
> The firm intends to expand their indication to include"...continuous infusion of a local anesthetic directly into the operative site for postoperative pain

management." The firm has removed the previous claims regarding the synovial cavity infusion of medication.

INTENDED USE:

The device is indicated for intravenous, intra-arterial, subcutaneous, and epidural infusion of medication or fluids requiring continuous delivery at controlled infusion rates.

The device is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

115. In an unexpected twist, on September 30, 1998 FDA issued a 510(k) clearance letter for K982256 which included the new indication for synovial cavity, the McKinley pre-August 1998 proposed IFU. The 510(k) clearance letter began "[w]e have reviewed your Section 510(k) notification of intent to market…"(GR004486). FDA cleared the following IFU for the McKinley Outbound Disposable Infuser:

Indications for Use

The Outbound infuser is indicated for intravenous, intra-arterial, subcutaneous, epidural, and synovial cavity infusion of medications or fluids requiring continuous delivery of controlled rates. (GR004488).

116. As will be discussed further below, it was I-Flow's request for a 510(k) clearance of synovial clearance with McKinley as a cleared predicate, that appeared to notify FDA that McKinley's clearance had included an intended use for synovial cavity.

### i. FDA NOTIFIED MCKINLEY IN WRITING THAT IT REVOKED THE SYNOVIAL CAVITY INDICATION- MARCH 3, 1999

117. Despite the 510(k) clearance of September 30, 1998, on March 3, 1999 FDA, in an unusual move for FDA , it sent a revised 510(k) clearance letter to Ms. Dennis and McKinley regarding the agency's retraction of a synovial cavity indication from the OutBound 2 Disposable Infusion Pump. FDA provided no additional public explanation for its actions. The

510(k) clearance letter was signed by Timothy Ulatowski, Director, Division of Dental, Infection Control and General Hospital Devices. The agency's letter began:

> This letter corrects our substantially equivalent letter of August 14, 1998, regarding the Indications for Use (enclosed).
>
> We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent [(for the indications for use stated in the enclosure)] to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976...(FOIS-000071)
>
> **Indications for Use:**
>
> The OutBound DIP is indicated for intravenous, intra-arterial, subcutaneous, and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The OutBound pump is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.
>
> (FOIS-000014; FOIS-000073)

**c. K990461 MCKINLEY SP DISPOSABLE INFUSION PUMP (BEELINE SYSTEM)**

118. On May 13, 1999, McKinley submitted K990461 for a McKinley SP (Spring Pump) Disposable Infusion Pump obtaining 510(k) clearance on June 30, 1999. The device would be marketed by McKinley under the name "BeeLine System". The cleared IFU:

> The McKinley SP is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The McKinley SP is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

**d. K023098 ACCUFUSER/ACCUFUSER PLUS**

119. In September 2002, McKinley submitted K023098 for clearance of an Accufuser; Accufuser Plus; Standard Procedure Kit, an elastomeric infusion pump kit, product code MEB. The new 510(k) was for a modification to an existing device K003915 Accufuser and Accufuser

Plus. Predicates include K013928 Breg Corporation, PainCare 3000 and 32000, and Accessory kit; K014091 Stryker Pain Pump and Accessory Kit; K020862, I-Flow Infusion Pump and Administration Set. The modifications to the Accufuser included: two new proposed IFU; expansion of the bolus delivery range; addition of two bolus lockout times; addition of one reservoir volume size by combining two reservoirs; addition of flow rates for bolus devices; and addition of a standard procedure kit. FDA assigned the product a product code MEB. The cleared IFU for the Accufuser:

> The Accufuser and Accufuser Plus systems are intended for general infusion use. Routes of infusion include intravenous, percutaneous, intra-arterial and epidural, and into the intra-operative (soft tissue/body cavity) site. The Accufuser Plus is also intended for a patient-controlled infusion using the integrated bolus button. General infusion uses include pain management for preoperative, perioperative and postoperative surgery.
>
> The Accufuser and Accufuser Plus systems are also intended for continuous and/or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative , perioperative and postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural or percutaneous.
>
> The Accufuser/Accufuser Plus system is suitable for use in an ambulatory device and is intended for use in the hospital, home environment or alternative care sites.

**e. K032542 BEELINE MOTIV**

120. McKinley then submitted in August 27, 2003 a Special 510(k) K032542 to request clearance of a modification to its June 30, 1999 McKinley Sp (Beeline System) K990461. The modification was called Beeline Motiv. McKinley cited K990461 as well as K023098 Accufuser and Accufuser Plus as the predicates. FDA cleared the Special 510(k) on September 23, 2003. The Beeline Motiv was cleared with the same IFU as the McKinley SP (BeeLine System), with FDA assigned product code FRN: