> The Beeline system is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Beeline system is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

121. On the same day as clearance of K032542, September 23, 2003, FDA also cleared K032642 for the Beeline Motiv Spring Pump & Kit. The 510(k) was received on August 27, 2003. The application was for a modification of K023098 to include standard procedure kits with multiport catheters. It was cleared for the same IFU:

> The Beeline system is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Beeline system is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

**f. K042228 BEELINE MOTIV, PROPOLIS PCA**

122. On August 17, 2004, McKinley submitted K042228, Beeline Motiv, Propolis PCA System & Kit, which was cleared on November 8, 2004. The predicates were K990461 and K032642. The modification to the existing Beeline system consisted of an extension of the flow rate range; addition of new medication reservoir volumes; addition of an indication for use; addition of bolus capability; addition of intermittent flow capability. Supporting other predicate devices included McKinley's Accufuser (K033039), I-Flow's "Elastomeric Pump" (K040337)(see below), the Baxter Colleague Volumetric Pump (K010566), and the SIMS Deltec CADD-Prizm Model 6101 Ambulatory Infusion System (K000842). The product code assigned by FDA was FRN and it is a prescription device. The cleared Indications for Use:

> 1. The Beeline system is intended for continuous and/or intermittent infusion of medication for general infusion use, including antibiotic delivery, chemotherapy and pain management. The Beeline system is indicated for

intravenous, intra-arterial, enteral, subcutaneous, percutaneous and epidural infusion of medications or fluids requiring continuous and /or intermittent delivery at controlled infusion rates. The Beeline system is suitable for use as an ambulatory device and is intended for use in the hospital, home environment, and alternative care sites.

2. The Beeline system is intended to provide continuous and /or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative, perioperative and postoperative regional anesthesia and pain management. The Beeline system is also intended for patient-controlled infusion using the integrated bolus device.

3. The Beeline system is intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**g. K050770 ACCUFUSER/ACCUFUSER PLUS**

123. Following up on the trend to claim reduction of narcotic use as in I-Flow's K040337, cleared May 24, 2004, McKinley submitted K050770 on March 25, 2005 as modifications to the McKinley Accufuser, Accufuser Plus and Standard Procedure Kit which was cleared on April 14, 2005. Predicates cited by McKinley were: K003915 (Accufuser HELPTechnologies, cleared 2001 510(k) submitted by Robert Bard- (see I-Flow below)); K023098 (McKinley Infuser Accufuser, cleared 2002); and K033039 (McKinley Accufuser modification, cleared 2003). The 2005 request was to modify the IFU. McKinley requested to add to the already approved IFU for its Accufuser/Accufuser Plus:

> The Accufuser and Accufuser Plus systems are intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**h. K060119 SATURATION CATHETER**

124. McKinley obtained its final clearance on April 12, 2006 of K060119 of a McKinley Saturation Catheter classified as an anesthesia conduction catheter, product code BSO.

The device claimed substantially equivalence to Micor, Inc's Wundcath Conduction Catheter K031600 & K003966 and I-Flow's Soaker Catheter K994374. The catheter is a flexible tubular infusion catheter with multiple holes (fenestrations) along the distal end of the catheter producing an infusion segment. The catheter would be available in a number of sizes and diameters. The FDA cleared the device with the product code FRN as an accessory to an FRN infusion pump.

### i. K980791 CURLIN'S CUE AMBULATORY VOLUMETRIC INFUSION PUMP CAREMED5

125. Curlin, at one time part of "Becton Dickinson Curlin, LLC," a firm based in Huntington Beach, CA, would later combine with McKinley in 2006. Curlin kept the brand names for the McKinley pumps, but has not used the name "McKinley." Curlin is now a wholly owned subsidiary of MOOG. Curlin submitted a 510(k) K980791 for clearance of its CUE Ambulatory Volumetric Infusion Pump (Care MED5)(Product Code FRN) on September 14, 1998. Becton Dickinson Curlin claimed substantial equivalence to the Sabratek 6060 HOMERUN Volumetric Infusion Pump K941984 and Abbott's Ambulatory Infusion Manager Plus (Abbott AIM Plus). The CareMED5 was called an electromechanical curvilinear (Peristaltic Action ) volumetric infusion pump. FDA cleared it as product code FRN on December 4, 1998 with the following Indications for Use:

> The CareMED5 infusion pump can be used for intravenous, intra-arterial, epidural, subcutaneous, or enteral infusions. Any therapy should be overseen by a physician or certified, licensed healthcare practitioner. The infusion pump can provide therapy to patients/users who are ambulatory and needed an alternative to receiving their medication in a restricted manner (hospital or clinic). Typically, these patients are capable of being given instruction for performing basic tasks by having a caregiver closely by, or living with them. All patients and caregivers must be instructed in the use of the CareMED5 by a qualified clinician and demonstrate an adequate level of proficiency in the use of the pump.

> The CareMED5 is small, lightweight and is designed to have exceptional ease so that after learning the pump features and basic programming, the pump can be operated and can be customized to the specific needs of each individual patients without the need to constantly refer to the User's Manual.(00009)

## 2. I-FLOW CORPORATION

126. I-Flow, Inc. was formed in 1985. In 1996, I-Flow Corporation acquired Block Medical, a company that manufactured and promoted general infusion pumps sold under the names Verifuse Ambulatory Pump (K902891; K934551) and HomePump (K896546;K944692) (R. Masengale 7/1/08; p16, L. 3-4; p26, L 20-24). I-Flow used the pump technology for its Vivus (K913907; K915646;K924527) and SideKick (K923875) and to develop two subsequent lines of infusion pumps called the ON-Q and PainBuster. Initially, I-Flow's plan was to have the PainBuster distributed through DJO for orthopedics (R. Masengale 7/1/08, p195-6, L.10-7). The I-Flow PainBuster Pump would be marketed by DJO with the private label name DonJoy for orthopedic indications. I-flow also had J&J's Ethicon Endo-Surgery distribute the other line of I-Flow pumps called ON-Q pump for general surgery. (R. Masengale 7/1/08 p 41-42, L. 24-2; 7/2/08. 227 L 20-23).

127. During the product development phase of the PainBuster, I-Flow's development team consisted of engineers, marketing and regulatory affairs personnel. The only employee assigned to the project with medical expertise was Kathy Thompson, a registered nurse. However, she worked on the project for marketing the PainBuster and not to address safety aspects of the pump development (Roger Massengale 7/1/08; p 31-33 L. 10-3). I-Flow's communications with its physician consultants was for product development and not to determine the safety of exposing cartilage to common local anesthetics or the effects of

increasing the amount of anesthetic delivered to joints. (Roger Massengale 7/1/08, p 70-75, L. 22-14).

128. I-Flow never did a clinical study designed by I-Flow for this purpose. This was confirmed by Alan Dine's testimony. (Alan Dine 12/16/08, p 34, L.2-6). I-Flow promoted intra-articular use while warning that "Medications must be administered per instructions provided by drug manufacturers." (IFLOW ESD 061236-7). However, I-Flow failed to warn physicians that there was no local anesthetic approved for prolonged infusion into the intra-articular space. Any physicians reviewing the labels for commonly used local anesthetics would find no mention or instructions about intra-articular use of the medications. Since not all commonly used local anesthetics still have labels published in the Physician's Desk Reference (PDR), it cannot be assumed that health care providers would always be able to locate an anesthetic's product information in the PDR to determine whether or not a drug had been approved by the FDA for use in joints.

129. I-Flow first intended to expand its PainBuster product line through obtaining FDA's clearance for "continuous infusion of a local anesthetic directly into the <u>intraoperative site</u> for postoperative pain management."(IFLOW0002682) I-Flow continued to produce the HomePump C- Series through at least 2004. The PainBuster differed from the HomePump C series in that it was designed to deliver drug via a catheter. The catheter was to be included as part of the I-Flow infusion pump kit (IFLO0002682-693).

130. The year 1998 was an active regulatory year for I-Flow. In 1998, I-Flow submitted at least four 510(k)s to FDA to obtain clearance of pain pumps: 1) K980558 PainBuster (submitted February 13, 1998, cleared May 28, 1998); 2) K 982946 PainBuster

(submitted August 21, 1998, cleared November 18, 1998); 3) K984146 Paragon (submitted November 19, 1998, cleared February 9, 1999); 4) K984502 Nerve Block(submitted December 18, 1998 , cleared March 4, 1999). Often times there would be multiple I-Flow 510(k) applications in the same review branch.

131. In I-Flow's 1997 10K Report (filed in March 1998), I-Flow told its shareholders about studies it had conducted with pain pumps for postoperative pain management, that it intended to market pumps to orthopedic surgeons and that it:

> ...recently applied for FDA permission to market a new pain management kit for use by orthopedic surgeons. Preliminary results from more than 25 patients has shown a significant reduction in pain after surgery and a significant reduction in the time for rehabilitation of the repaired limb, all with a reduction in the use of oral pain medications and their unpleasant side effects. Once permission to market is received, we intend to begin selling this new pain kit to orthopedic surgeons through a yet unnamed distribution partner.

132. Yet only one month earlier, (as discussed below), it had filed a 510(k) (K980558, PainBuster) with FDA and failed to mention to FDA that it intended to pursue the use of the pump for a new "orthopedic indication."

**a. K980558 PAINBUSTER**

133. On February 11, 1998 Robert Bard, ESQ, RAC, I-Flow's VP Regulatory and Legal Affairs, submitted 510(k) K980558, PainBuster Infusion System, to FDA. The 510(k) was cleared on May 28, 1998(IFLOW0002682-686; DJO1128-139) as a general surgery elastomeric infusion set. The predicates cited by I-Flow included the Pain Control Infusion Pump (PCIP) (K896422) distributed by Sgarlato; the I-Flow HomePump C-Series (K944692); and HomePump Eclipse (K932740). The I-Flow HomePumps were elastomeric pumps intended for "general" infusion. The Sgarlato pump predicate, manufactured by Burron/B. Braun for Sgarlato, was used

as a predicate to help expand I-Flow's pump indication for use statement, allowing I-Flow to claim as an indications for use (IFU) statement: "[*t*]*he system is indicated for the relief of pain in patients following surgery, by the continuous administration of medication into the wound site.*" (IFLOW0002682-730).

134. I-Flow's initial PainBuster came in three sizes and flow rates from 0.5-2.0ml/hr: 65ml volume, 0.5ml/hr flow rate; 125 ml volume, 1.5ml/hr flow rate; and 125 volume, 2.0 ml/hr flow rate. The catheter used was a 20gauge, 11 to 40 in length, B. Braun K813186 (B. Braun Perifix Epidural Catheter Set, Product Code BSO, anesthetic conduction catheter). The test fluid used for product design was 0.9% saline with an operating pressure of 9 to 14 psi.

135. The I-Flow PainBuster Infusion System 510(k) was assigned product code MEB. It was cleared on May 28, 1998 by FDA as intended for intraoperative (soft tissue/body cavity) site for postoperative pain management, and not intended for epidural, subcutaneous or vascular drug delivery or chemotherapy (IFLOW0002678-81).

136. At this same time, I-Flow began negotiations with Smith & Nephew, Inc, Division DJO, Bracing and Support System, to purchase and distribute I-Flow's PainBuster for orthopedic indications. On August 31, 1998, I-Flow and Smith & Nephew entered into a Letter of Understanding to enter into a future Distribution Agreement that would give S&N the right to distribute the PainBuster Infusion Kits in the United States and Canada for areas of Sports Medicine, Trauma, Joint Repair and Replacement, Podiatry and Spine. The Product as defined by the Letter of Understanding was for PainBuster kits, which are used for continuous infusion of local anesthetics into intraoperative or intra-articular sites.

137. In I-Flow's Press Release announcing the Letter of Understanding, I-Flow falsely announced it had "received approval in June 1998 from the [FDA] to market PainBuster in the United States for orthopedic surgery applications." (IFLOW0020930). The Smith & Nephew Launch Manual dated September 8, 1998 for the Pain Buster Pain Management System also falsely announced that "[t]he Corporation on June 2, 1998,received approval from the US Food and Drug Administration to market its new disposable PainBuster infusion pain management kit for orthopedic surgery applications ." (DJO0747-9).

**b. K982946 PAINBUSTER-NO ORTHOPEDIC OR INTRA-ARTICULAR INDICATION**

138. To increase the reservoir and flow rates, I-Flow submitted K982946 on August 20, 1998. The new PainBuster would be available in a new reservoir size of 270 ml volume with increased flow rates of 5.0 and 10.0ml/hr. I-Flow also requested the new indications "to provide continuous infusion of a local anesthetic directly into the intraoperative or intra-articular site for postoperative pain management"(IFLOWP0002805).

139. There was an I-Flow fax from Robert Bard to FDA reviewer, Irene Naveau, dated September 16, 1998 for the new proposed IFU. Mr. Bard wrote:

> As requested, please find attached the revised copy of the Indications for Use page from I-Flow's Corporations' Premarket Notification K982946
>
> The PainBuster is intended to provide continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) or intra-articular (within a joint) site for postoperative pain management. Additional routes of administration include percutaneous and subcutaneous infusion (IFLOWP00030544-4)

140. To provide additional information to FDA to attempt to support the safety and efficacy of the new indication, Mr. Bard sent a fax to Ms. Naveau on October 29, 1998 with the

statement that *"[t]he changes specifically clarify intra-articular use of the device and specifics for use of the various flow rates."* (IFLOWP00030457-62). FDA's reviewer was also told that the PainBuster was being used in a controlled research study for joint replacement surgery at Kettering Medical Center in Southern Ohio to determine the effectiveness of providing operative and post-operative pain relief and to determine the cost benefit to the institution.

141. The I-Flow information was not acceptable to the FDA reviewer. There are two November 4, 1998 fax messages from Mr. Bard to Ms. Naveau. The first fax:

> Please find attached the modification to the PainBuster Infusion Kit indications for use.
>
> I-Flow Corporation has agreed to delete infusion proximal to intra-articular site from the device's Indications for Use and will substitute with "...into the intra-operative site for general and orthopedic surgeries..."(IFLOWP00030539)

142. The second fax from I-Flow to FDA's Ms. Naveau:

> Please find attached Comprehensive Pain management in Outpatient Arthroscopic Knee Surgery from Sports, Medical and Arthroscopy Review 6:176-189; 1998
>
> This article gives an overview of pain management, including local anesthetic, into the intra-articular space.
>
> Once you have had a chance to review this article I would like to continue our discussion of the inclusion of delivery into the intra-articular space as part of the indication for use for the PainBuster Infusion Kit. (IFLOWP00030563).

143. Once again Mr. Bard faxed information to FDA's Ms. Naveau, now on November 9, 1998. He was now removing any reference to orthopedic surgery or intra-articular use from the indications for use:

> Please find attached the revision to the PainBuster notifications as we discussed on Monday morning.

> I-Flow Corporation has revised the submission with the deletion of the indication for use of orthopedic surgeries. We have now limited the indications to intraoperative site for general surgery (IFLOWP00030579).

144. Mr. Bard sent another fax, November 11, 1998 to Ms. Naveau regarding re-opening I-Flow's proposed IFU to allow an orthopedic surgery indication, not an intra-articular indication:

> I have sent revised pages for the PainBuster premarket notification (K982946). However, before you implement the changes provided, please review the attached articles,
>
> The articles report the use of slow continuous infusion of local anesthetics for post operative pain management specifically during orthopedic surgeries
>
> A short abstract of a 1994 study by Wilkes and Thomas reports the use of bupivacaine for post surgical bone grafts from the iliac crest. The Discussion finds continuous infusion more effective than single infiltration. In the 1998 article (Anesth Anal 1998;87:88-92) three methods of pain management are studies including continuous infusion , continuous epidural and PCA IV. This article was the subject of a follow on study of 540 subjects. The results are similar to the Wilkes abstract.
>
> Please review the attached articles and abstracts to determine whether there is sufficient clinical data to support an orthopedic claim. If you find the data supportive, disregard my earlier fax deleting orthopedic surgeries. If you are unable to find the data supportive, proceed with my latest revisions deleting orthopedic surgeries. (IFLOWP00030588).

**i. FDA DENIED I-FLOW's INTRA-ARTICULAR AND ORTHOPEDIC SURGERY CLAIM**

145. Based on I-Flow's cleared indication for use for K982946 FDA's reviewers determined that I-Flow had failed to provide sufficient valid scientific evidence to support a new indication for orthopedic surgery and/or intra-articular use. (R. Bard 3/18/09. P 122-164, L5-22; IFLOWP00030544-5;IFLOWP00030547; IFLOWP00030563; IFLOWP00030565; IFLOWP00030539; IFLOWP00030541; IFLOWP00030579; IFLOWP00030581-2;

IFLOWP00030588). The final cleared IFU on FDA's 510(k) website Summary- "REVISED INDICATIONS FOR USE (NOVEMBER 9, 1998) (underlining added for emphasis):

> The Painbuster is intended to provide continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management. Additional routes of administration include percutaneous and subcutaneous infusion.

**c. K984146 PARAGON (INTRAVENOUS INFUSION SYSTEM)**

146. Only days after approval of the PainBuster on November 9, 1998 without orthopedic indications or intra-articular use, on November 19, 1998 I-Flow submitted K984146 requesting to extend the indications for its existing Paragon Infusion Kit (K923875). The 510(k) was for clearance of the Paragon Basal/Bolus Administration Sets without a modification of the Paragon pump (IFLOW0014123-4). The requested IFU included:

> 1) to provide a continuous basal level infusion of medication and to allow patient controlled bolus delivery
>
> 2) epidural, intramuscular, and subcutaneous routes of administration, in addition to intravenous administration (IFLOW0014123-41; IFLOW0014145)

147. According to Mr. Bard, Dan Miller of DJO had called him to inform him about the clearance of McKinley's OutBound 510(k) for placement of a catheter in the synovial cavity (Bard, 3/18/09, p.220-22; L3-8). Upon learning of McKinley's September 30, 1998 (K982256) clearance for a synovial cavity indication, I-Flow revised its own IFU for the Paragon to now include a "synovial cavity" indication on January 13, 1999 (IFLOW0014052-3; IFLOW0003107-9).

148. FDA, however, indicated to I-Flow on February 2, 1999 that the McKinley Outbound 2 pain pump would not be allowed to have a new indication of synovial cavity

infusion. I-Flow's Robert Bard sent a letter via fax to H. Trinh, FDA's reviewer for the McKinley Outbound Pump2 that revised I-Flow's proposed IFU for the still pending K984063, K984146, and K984638. Mr. Bard wrote:

> Pursuant to our conversation of February 2, 1999, I have made the following changes to the above referenced premarket notifications
>
> **K984063** The Indications for Use description has been change to a single statement....
>
> **K984146** A supplemental submission was made on January 13, 1999 to include synovial infusions as an additional indication for use. The basis of this supplemental submission was the finding of a predicate device (the McKinley Outbound K982256) that included synovial cavity infusion as an indication for use.
>
> I-Flow has agreed to remove the January 13 revision for our submission based on your statement that the McKinley will not be allowed to have an indication for use that includes synovial cavity infusions. Based on your statement, I-Flow believes the Office of Device Evaluation will require McKinley to modify their Indications for Use Statement and that the posting on the FDA 510(k) webpage will be changed....
>
> **K984638** The Indications for Use description has been changed....(IFLOW0013585-6).

149. On February 9, 1999, FDA cleared the I-Flow Paragon Infusion Kit 510(k) with the newly proposed IFU:

> (1)Continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management
>
> (2) percutaneous, subcutaneous, intramuscular and epidural infusion as additional routes of administration.(IFLOW0013240-2)

150. Unlike the post operative pain management infusion pumps, I-Flow did obtain clearance for a new IFU including "orthopedic surgery" but not the synovial cavity or intra-articular space. The FDA's March 4, 1999 cleared IFU:

> The Nerve Block Infusion Kit is intended to provide continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion include percutaneous, subcutaneous, epidural and into intraoperative sites.(IFLOW0004802-04)

151. I-Flow had voluntarily chosen to revise its indications on the assumption FDA would ask McKinley to withdraw the indication for synovial cavity infusion. On February 9, 1999, FDA cleared I-Flow's Paragon Infusion Kit for the following indications for use:

> Continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management.
>
> Percutaneous, subcutaneous, intramuscular and epidural infusion as additional routes of administration.

152. On March 3, 1999, FDA wrote to McKinley to officially correct the agency's prior 510(k) clearance for the Outbound 2 pump, removing clearance of a synovial cavity indication. The revised cleared intended use for McKinley's K982256 as of March 3, 1999 on FDA's website:

> The Outbound infuser is indicated for intravenous, intra—arterial, subcutaneous, epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Outbound pump is also intended to provide continuous infusion of a local anaesthetic directly into the intraoperative site for postoperative pain management.

**d. K984502 NERVE BLOCK INFUSION KIT**

153. On December 17, 1998, I-Flow submitted a Nerve Block Infusion Kit, K984502 as a new product line. The I-Flow 510(k) was submitted before McKinley had to officially remove the September 30, 1998 synovial indication for its label (March 3, 1999) and prior to I-Flow revising its indications for the Paragon (February 2, 1999). The 510(k) was cleared on March 4, 1999, after the formal request for revision of the OutBound 510(k) removing synovial

cavity. The predicate devices cited by I-Flow for the Nerve Block Kit included its two PainBuster 510(k)s, K980558 and K982946; the Sgarlato Pain Control Infusion Pump (PCIP); I-Flow HomePump; McKinley Outbound pump and B. Braun's Continuous Nerve Block Set, an anesthesia conduction set, product code CAZ.

154. The Nerve Block pump design was similar to I-Flow's PainBuster but with a new IFU and multiple new configurations. The kit had three new pump models and three new kit components to facilitate placement of anesthetic conduction, regional and local anesthesia (IFLOW0002982-91). I-Flow sought the proposed new IFU for the new line of products:

> To provide continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion include percutaneous, subcutaneous, epidural and into the intraoperative (soft tissue/body cavity) site and <u>synovial cavity</u> (IFLOW0002982-012)

155. I-Flow sought with the Nerve Block Kit to obtain clearance of both a new orthopedic and a new synovial cavity indication. The product was to be indicated for continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion included percutaneous, subcutaneous, epidural and into intraoperative sites but not synovial cavity.

156. However, as FDA was apparently not adequately informed, I-Flow intended to use the "orthopedic surgery" indication gained from clearance of the Nerve Block Kit to expand indications to include the infusion pump PainBuster. The I-Flow plan misrepresented to FDA that it had an off-label intention, which included a plan to stretch FDA's latest clearance for the

Nerve Block kit, with its multiple pumps and accessories for anesthesia, when used as a single configuration of the PainBuster pump minus the anesthesia accessories as intended for orthopedic use.

157. Therefore, I-Flow, despite previous interactions with FDA, which included providing medical literature and the best information available to attempt to support a new indication, had failed to convince the FDA to clear the new indication for the PainBuster. Furthermore, the agency had taken steps to correct and error and ensure that there was no infusion pump cleared for intra-articular, synovial and orthopedic use.

158. I-Flow's creative but incorrect interpretation of FDA's clearance of the I-Flow Nerve Block kit was discussed in an October 29, 1999 letter from Howard Holstein, Hogan & Hartson, representing I-Flow, to S. Kurlander, Latham & Watkins, representing DJO. Mr. Holstein failed in his discussion to include all the many predicates cited by I-Flow to FDA as support for substantial equivalence for "continuous nerve block" including B. Braun's Continuous Nerve Block Set (not just the catheter). The reference to a continuous nerve block set to FDA implies planned marketing of infusion pumps as substantially equivalent to product code, CAZ, an anesthesiology device described under 21 C.F.R. 868.5140(Anesthesia Conduction Kit-. An anesthesia conduction kit is made of components necessary for delivery conduction, regional or local anesthesia. The device may contain syringes, needles, and drugs). Therefore, the 510(k) informed FDA that I-Flow intended to market its Nerve Block Kit consistent with its cleared intended use as a predicate anesthesia kit.

159. I-Flow did not appear to adequately inform FDA before clearance on May 4, 1999 that I-Flow intended to represent that one configuration of the Nerve Block Kit, without its

conduction components and accessories, was the PainBuster kit for orthopedic surgery. There is nothing in the Nerve Block clearance to have permitted promotion for "intra-articular" use.

Mr. Holstein wrote:

> One of the Nerve Block infusion kit configurations is identical to the PainBuster device. The Nerve Block infusion kit also provides several configurations of the PainBuster using various pump models and components. Although the Nerve Block infusion kit includes three new pump models and three new kit components (insulated Touhy needle, hemostasis valve assembly, and hookup wire), the Nerve Block kit does not require, for example, that the device be configured with the Touhy needle or any of the alternative new kit components or pump models for pain management in orthopedic surgery.
>
> ...As discussed above, I-Flow claimed in 510(k) number K984502 that the Nerve Block infusion kit is substantially equivalent to the PainBuster infusion kits which FDA cleared for marketing under 510(k) number K980558 and K982946 (IFLOW0022320)...

**e. K991543 INTRAOP CATHETER**

160. R. Bard submitted a 510(k) for I-Flow to market the IntraOp Catheter on September 7, 1999 cleared by FDA on October 25, 1999. The IntraOp Catheter was substantially equivalent to the Teleflex Medical Epidural Catheter (K840202) and B. Braun Perifix Set (K813186) and Epimed International FETH-R_KATH catheter. The IntraOp Catheter is identical to the Teleflex Medical epidural catheter with the exception of a hollow fiber in the inner diameter of the distal end of the catheter. The IntraOp Catheter is manufactured by TFX of the same plastics as the predicate. There are no specific drugs referenced in the labeling for the IntraOp Catheter, however, the IntraOp Catheter is intended for use with general anesthetics and narcotic medications. The FDA's cleared IFU:

> The **IntraOp Catheter** is intended to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and nerve trunks outside of the epidural space. Routes of administration may be either intraoperative, intramuscular, subcutaneous or percutaneous.

**f. K994374 I-FLOW SOAKER CATHETER**

161. Two months after FDA's clearance of the IntraOp catheter (K991543), I-Flow's Stanley Fry submitted 510(k) K994374 for clearance of I-Flow's Soaker Catheter on December 27, 1999. The Soaker Catheter was claimed to be substantially equivalent to the predicate I-Flow IntraOp Catheter (K991543); Teleflex Medical (TFX) Epidural Catheter (K840202); B. Braun Perifix Set (K813186) and Epimed International FETH-R_KATH catheter. The 510(k) was to add an additional model to the Soaker Catheter family of products. The Soaker Catheter consisted of a Teleflex Medical (TFX) Epidural Catheter (K840202) with the insertion of a hollow fiber membrane in the inner diameter of the distal end of the catheter. The catheter had a closed end tip with multiple holes arranged radially along the lateral surface at the distal end of the device. The addition of the hollow fiber was to allow unimpeded flow of medication to the end of the infusion segment producing a more even distribution of medication along the catheter. However, as not discussed by I-Flow in the published summary of safety and efficacy, for an indwelling catheter that may remain in the body for several days, the inclusion of an additional hollow fiber chamber provides an additional area for growth of microorganisms and infection.

162. The device would come in 20 GA with a 6.5cm (2.5in) infusion segment (K991543). The device would also come in 20 GA with a 12.5cm (5.0 in) infusion segment. Each of the catheter sizes would be available as a separate catheter with a currently marketed catheter connector (a Touhy Borst type is an example) or an attached luer lock connector.

163. The Soaker Catheter may consist of a kit that includes components that are legally marketed and will be used in I-Flow's Pain Management Systems such as K982946 and K984502 including the On-Q, PainBuster and Nerve Block pain management kits. The catheter

is intended to deliver local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration cam be intraoperative or percutaneous.

164. THE FDA' cleared IFU:

The **Soaker Catheter** is intended to be used as follows:

1. With I-Flow Corporations' PainBuster, ON-Q and Nerve Block pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration may be intraoperative or percutaneous.

**g. K022869 SOAKER CATHETER**

165. Shane Noehre submitted a Special 510(k) on August 29, 2002, cleared September 20, 2002 requesting to make a minor modification to I-Flow's soaker catheter. The change proposed a "slight design that has the membrane along the outside diameter of the catheter" instead of inside diameter. I-Flow requested to be able to move the hollow fiber to the outside of the catheter instead of the inside. The predicates were I-Flow Soaker Catheter K991543 (I-Flow IntraOp) and K994374 (I-Flow Soaker Catheter).

1. With I-Flow Corporations' PainBuster, ON-Q and Nerve Block pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration may be intraoperative, percutaneous or perineural.

**h. K043456 MODIFICATION TO SOAKER CATHETER**

166. Shane Noehre submitted K043456 on December 15, 2004 for a modification to the I-Flow Soaker Catheter K994374, which was cleared on January 11, 2005. I-Flow cited the

predicates as K991543, K994374 and K022869. The I-Flow Catheter now was to consist of three design options utilizing infusion segments ranging from epidural (0.5) to now include a new 10 inches. The standard epidural catheter had 3 radial holes at the distal tip with an approximate infusion segment length of 0.5 inch. The Fenestrated Catheter was a modified epidural catheter with multiple holes (fenestrations) at the distal end allowing up to a new 10 inch infusion segment. The Soaker Catheter is a modified epidural catheter with multiple holes at the distal end to a 10 inch infusion segment. The new version of the I-Flow Catheter contained a hollow fiber either along the inner lumen or along the outside diameter of the distal end of the catheter to provide even distribution of medication along the infusion segment. I-Flow claimed that there was no difference between the performance (safety and efficacy) of the predicates and the new catheters with addition of a longer 10 inch infusion segment.

167. FDA's cleared IFU:

1. With I-Flow Corporations ON-Q, PainBuster and C-bloc pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves, Routes of administration may be intraoperative, percutaneous, epidural or perineural. The Soaker version of the I-Flow Catheter is contraindicated for the epidural space.

### i. K040337 I-FLOW ELASTOMERIC PUMP

168. On May 19, 2004, after I-Flow took over the distribution of its pain pumps from both DJO and J&J, with consolidation of its many pump lines into a single pump series. I-Flow submitted K040337 for a device which it generically called "I-Flow Elastomeric Pump." The 510(k) was cleared as product code MEB on May 24, 2004. The predicates cited by I-Flow

included its ON-Q, PainBuster, C-Bloc, Eclipse, C-Series, Easypump, and Homepump. For device description, I-Flow wrote in its published Summary of Safety and Effectiveness (a document that is not required to be reviewed by FDA for the 510(k)) that:

> The current package labeling of the I-Flow Elastomeric Pump does not reference specific types of surgeries or potential benefits. This 510(k) proposes a labeling change that would reference the specific type(s) of surgery and potential benefits that are supported by published clinical studies.
>
> The I-Flow Elastomeric Pump was used in the published clinical studies. The device was used according to FDA cleared indications for use (i.e. intraoperative or perineural anesthetic delivery to relieve pain at the surgical site). I-Flow believes this change would not impact safety or efficacy and is supported by published clinical studies in widely known and esteemed journals.

169. FDA's cleared IFU for the I-Flow Elastomeric Pump:

> 1. The I-Flow Elastomeric Pump is intended for continuous and/or intermittent infusion of medications for general use, including antibiotic delivery, chemotherapy and pain management. Routes of administration include the following: intravenous, intra-arterial, subcutaneous, intramuscular and epidural.
>
> 2. The I-Flow Elastomeric Pump is also intended for continuous and/or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative, perioperative and postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural or percutaneous.
>
> 3. The I-Flow Elastomeric Pump is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**i. I-FLOW WAS REQUIRED TO ADD A CONTRAINDICATION FOR INTRA-ARTICULAR USE**

170. As discussed, I-Flow took over complete distribution activities for its elastomeric pumps in 2004. I-Flow submitted a 510(k) K051401 on June 1, 2005 to FDA's Anesthesiology Devices Branch requesting to market an On-Q Catheter, an anesthetic conduction catheter, as either I-Flow's fenestrated or soaker catheter models, now coated with silver and called ON-

Antimicrobial Catheter, product code BSO (21 C.F.R. 868.5120). The predicate catheter was the ON-Q Catheter (K043456) formerly called the I-Flow Catheter.

171. The fenestrated catheter was a modified epidural catheter with multiple holes at the distal tip for a 10 inch infusion segment. The soaker catheter was also a modified epidural catheter with multiple holes at the distal end up to a 10 inch infusion segment, however, it had a hollow fiber along the inner lumen to provide even distribution of medication along the entire infusion segment.

172. The 510(k) was to request to add a silver coating to I-Flow's catheter as an antimicrobial agent to destroy or inhibit the growth of microorganisms on both the inner and outer surface of the catheter. The longer a catheter would stay in place in a patient, the greater the risk of infection. Postoperative infusion catheters could remain in the surgical site for greater than three days, increasing the risk for infection.

173. The silver coating was intended to help reduce the possibility that the catheter may become compromised with microorganisms and is not intended to treat existing infections. The silver is to reduce binding of organisms (biofilm) to the catheter. The use of silver as a antimicrobial agent dates back to prior to 1938 and the Federal Food, Drug and Cosmetic Act, so that silver is a pre-amendment drug.

174. On August 3, 2005, FDA wrote to I-Flow to request additional information, thus, placing the 510(k) review "on hold." FDA's letter stated that the use of silver in the epidural space was a "new and novel" approach, that the release of silver ions in the body might be a drug, and that some recent articles had questioned the prophylactic antibiotic use for continuous

epidural use. The safety of silver had not been established for use in the epidural space because of proximity to the central nervous system. Predicate devices such as urinary and central venous catheters with silver coatings were not indicated for use in the epidural space.

175. I-Flow subsequently indicated that the epidural space was only one of several areas in the body where the catheter may be indicated. I-Flow agreed to "contraindicate the use in the epidural space". As a result of the FDA's concerns, I-Flow also requested a meeting with members of FDA, which was held on August 24, 2005(IFLOW30640).

176. Prior to the meeting, on August 19, 2005, I-Flow hand delivered to FDA's catheter reviewer Michael Husband, Anesthesiology & Respiratory Devices Branch, a letter from James S. Black, Hogan & Hartson LLP. The letter was to represent I-Flow's position on the clearance of silver catheters (IFLOW30568). According to I-Flow's record of the FDA meeting titled "FDA Meeting Minutes," I-Flow in 2005 was willing to document that it had provided <u>misleading information</u> to FDA's reviewers regarding I-Flow's current status of placement of I-Flow catheters within the intra-articular space:

> The letter indicated, among other things, that I-Flow would contraindicate the catheter for the epidural space, that use in surgical wounds was the product's principal indication, that the company viewed central venous catheters, urinary catheters, mediastinal drainage catheters, and other catheters with silver coatings as good predicates because they contact similar tissues and have similar mechanisms for making available similar amounts of silver, that the silver coating was safe, that the silver was not intended to have a prophylactic sue in the body, but only a use for reducing the microbial load on the catheter , and that silver coatings on catheters had been traditionally viewed by FDA as device components and not as drug substances.
>
> The meeting resolved most of the issues raised in FDA's August 3, 2005 letter.(IFLOW30640-1)
>
> **Q3** FDA expressed concerns about the locations in which the catheter will be placed and whether those sites have had silver used in them before. Specific

concerns were raised with the following use locations: epidural, intra-articular, large neurovascular bundles, and neonates. FDA indicated that the instructions for use should contain appropriate cautions or warnings regarding placement of the catheter in those locations and in neonates.

**A3** I-Flow discussed where the catheter is used particularly, including intraoperative sites. The catheters are not typically placed in intra-articular sites, nor are they recommended for neonates. The epidural space will be contraindicated, I-Flow agreed to provide labeling containing cautions and warnings regarding the uses noted above. FDA indicated that current uses for silver included uses in subcutaneous, subfascial, and intramuscular areas, in abdominal wounds, and in the thoracic cavity, among others. I-Flow indicated that uses for the catheters near joints were subcutaneous and would not compromise the synovial membrane or synovial space.

In regard to administrative matters, FDA indicated that the file had been "on hold" since August 3, 2005, and that the review was 63 days into the cycle. Accordingly, 27 days remain. FDA indicated that a hold can be up to 180 days. I-Flow indicated it would apply for an extension of time to obtain the information needed to gain 510(k) clearance.(IFLOW30641-2).

177. Mr. Husband, FDA reviewer, sent an email to Shane Noehre, I-Flow on November 21, 2005 regarding the agency's completion of K051401/S001. The agency's review of the supplemental I-Flow material had been completed and the agency had additional questions/comments for I-Flow:

1. You have stated in the Directions for Use that the device is contraindicated for use in the epidural space and for neonates. Please provide separate statements for each of these contraindications. You have also provided a caution statement that "recommends" against intra-articular placement. Please revise this to be a contraindication stating that the device is not for use in the intra-articular space.(IFLOW30534).

178. I-Flow responded to FDA and Mr. Husband on November 21, 2005 for statement #1 (above), adding a contraindication to use of the I-Flow catheter in the intra-articular space.

**a.** The following statements (see below) have been added to the Contraindications section of the ON-Q Antimicrobial Catheter Directions (DFU):

- The ON-Q Antimicrobial Catheter is not intended for placement in the epidural space
- The On-Q Antimicrobial Catheter is not intended for use in neonates
- The On-Q Antimicrobial Catheter is not intended for placement in the intra-articular space.(IFLOW30527)

### ii FDA DESCRIBED THE PROCESS FOR I-FLOW TO REMOVE THE INTRA-ARTICULAR CONTRAINDICATION

179. On February 21, 2006 I-Flow recorded "Meeting Minutes" of a conference call held with FDA to discuss how I-Flow could obtain specific indications for perineural and intra-articular placement of the SilverSoaker catheter (K051401) and remove the contraindication. The meeting was between I-Flow and FDA 's members of Anesthesiology & Respiratory Devices Branch (ARDB) and Infection Control Devices Branch (ICDB):

- FDA's position is that the proposed indications would require human clinical trials. Removing either the Caution statement for large neurovascular bundles (LNB) or the Contraindication for intra-articular would require the same data. The agency is specifically concerned about signs and symptoms of neurotoxicity. We would have to demonstrate the absence of neurotoxicity. The typical regulatory path is as follows:

  animal study →pre-IDE→IDE→510(k)

- For intra-articular placement, the following specific issues would need to be addressed in the clinical data (animal then human):
  - Define the usual time-frame
  - Which joints would be used? Two or more joints should be evaluated
  - Histology in the joint
  - Synovial membrane
    - Synovial fluid over time
    - Protein over time
  - Inflammation over time(IFLOW30515-6)

### iii I-FLOW PROMOTED INTRAARTICULAR CATHETER PLACEMENT

180. In I-Flow's "One-One Marketing Tactics Memo", I-Flow did marketing that instructed physicians on catheter placement. The "Jan Fronek, MD" ON-Q Catheter Placement Technique was designed as if for educational purposes and represents the technique used by the above surgeon". However, the information, even through represented as information coming from a private physicians, is labeled was for I-Flow, for example ONQ PainBuster and constitutes misbranding (21 USC 201(m)) and promotion an unapproved indication, adulteration, to physicians when provided by I-Flow.(IFLOW ESD 00548-9;IFLOW ESD 006938-0; IFLOW ESD 015414-5) The Catheter Placement Technique states:

> Catheter Placement Catheter can be placed intra-articular... (IFLOW ESD 006866.

### iv. I-FLOW ENGAGED IN CLINICAL TRIALS FOR INTRA-ARTICULAR USE

181. There is an April 10, 2000 I-Flow slide presentation titled "PainBuster Pain Management Systems Product Update".

> **Clinicals**
>
> - Tuckahoe Orthopedic Association- subject enrollment is over 70%
> - Scripps- Changes to protocol necessary due to intra-articular catheter placement; resubmission to IRB
> - Dr. Nissan-33% enrollment, moving forward slowly
> - Drs. Curry and Brown- just received IRB Approval, coordinating the start with the surgeons.(IFLOW0021031).
>
> **Selling Issues Remain the Same**
>
> - Ethicon selling Orthopedics