- 1999 Estimated yearly loss $750K
- 2000 Estimated Run Rate $1M, based on 1st Quarter Loss of $276,000((IFLOW0021036).

182. There is also an December 19, 2000 I-Flow slide presentation titled "PainBuster Pain Management Systems Product Update:

**2 ½" Soaker Catheter Trials…**

- **Types of Procedures**
- Shoulder
- ACL-BPB graft
- **Source of Pain**
- Intra-articular
  - Subacromial Space
- **Catheter Placement**
  - Graft Site/Joint
  - Subacromial Space(IFLOW0021039)

**2 ½" Soaker Catheter Trials (cont'd)**

- Pump Contents- 71% used 0.50% Marcaine((IFLOW0021040)

**Clinicals**

- Tuckahoe Orthopedic Association-study was on hold and has resumed
- Scripps-Statistical analysis has been completed to adjust protocol and resubmit to IRB
- Dr. Nissen- 40% enrollment
- Case Reports for Academy- Knee, Shoulder and Poster Presentation((IFLOW0021048)

183. An I-FLOW PowerPoint for physicians to use, begins with the introductory slide:

**I FLOW CORPORATION**

- Initially developed this device and marketed it for use in orthopedic patients
- Particularly useful in shoulder and other joint surgery with its constant analgesic infusion into a closed space (IFLOW ESD 284540-3).

184. A May 6, 2005 email from Tricia Engle to Barbara Saint John titled Pain management meeting next Tues (underlining added for emphasis):

> I spoke to Chris Roddighiero this morning regarding our presentation new Tuesday at 12:15 for Scripps La Jolla. This is exciting for use because they want to help us standardize the ONQ throughout Scripps La Jolla. Basically, they want us to inform them of which doctors and specialties the pain pump is being utilized in now, the efficacy of the pump, list of all of our studies so they can help push the pump where it is not being used, <u>specifically in joints</u>. <u>They want to understand why the orthopedic surgeons are afraid to put these in joints at La Jolla…</u>
>
> The response from Barbara Saint John to Tricia Engel:
>
> Thanks for all of this information Tricia. With the limitation of time we may not be able to get into too much details. My preliminary thoughts are (my part) to talk about I-Flow's commitment to advancing clinical practice of pain management through:
>
> Support of studies: <u>44 completed, 60+ in progress</u> or in consideration… (IFLOW ESD 064655)

**v. I-FLOW FILED FALSE AND MISLEADING INFORMATION WITH THE SEC**

185. On March 31, 1999, I-Flow filed another 10K with the SEC. The filing once again falsely reported that tot eh SEC and investors, in June 1998, I-Flow had received permission from the FDA to market the PainBuster kit for orthopedic surgery applications. Once again this was misleading and inaccurate information (R. Bard 3/18/09, p. 273-75,L 19-22) I-Flow was aware of FDA 's decision in November 1998 that it would not clear the PainBuster for an orthopedic indication. Shane Noehre, I-Flow, acknowledged that I-Flow

would have been required to first establish safety and efficacy of its device for an intra-articular use, in order to get a premarket approval from the FDA (Shane Noehre 7/8/08; p88-9, L. 23-9).

186. In summary, I-Flow submitted requests to FDA following McKinley's September 1998 clearance of the OutBound Pump for three pending 510(k)s, including both its PainBuster and the Nerve Block Kit, to include intra-articular/synovial cavity infusion. When I-Flow informed FDA that the McKinley pump had been cleared for synovial use, FDA had the option to do nothing and allow clearance of pumps for intra-articular use. However, FDA communicated to I-Flow in January 1999 that it intended to pursue a more difficult path, namely to revise McKinley's 510(k) clearance to remove a synovial cavity indication from the cleared indication for use.

187. Despite I-Flow's best attempts during October and November 1998 to convince FDA otherwise by providing support for safety and efficacy of a new synovial/intraarticular indication, providing FDA with reports from the medical literature, I-Flow failed to persuade the FDA. There was not sufficient scientific support for safety and efficacy for a new indication and FDA denied I-Flow's requests.

188. I-Flow's February 2, 1999 letter to Hung Trinh, FDA, documents that it revised the indications for use for its pending pump 510(k)s, namely K984063, K984146, and K984638, to remove a synovial cavity infusion indication. As I-Flow indicated in its letter:

> I-Flow has agreed to remove the January 13 revision from our submission based on your statement that the McKinley will not be allowed to have an indication for use that includes synovial cavity infusions. Based on your statement, I-Flow believes the Office of Device Evaluation will require McKinley to modify their Indications for Use Statement and that the posting on the FDA 510(k) webpage will be changed."(IFLOW0013585)

189. In an August 19, 2005 pre-marketing briefing package for I-Flow's silver coated ON-Q Catheter made to respond to FDA's concerns about the catheter including a potential for intra-articular use, I-Flow told FDA that catheters "are not typically placed in intraarticular sites". I-Flow continued that " uses for catheters near joints were subcutaneous and would not compromise the synovial membrane or synovial space."(IFLOW 30641-2). I-Flow further responded to FDA's concerns about intraarticular use on November 21, 2005, it voluntarily placed a contraindication in the catheter's draft label against intraarticular placement.

190. I-Flow and FDA held a follow-up teleconference on February 21, 2006 to specifically discuss the clinical and laboratory testing necessary for I-Flow to remove the contraindication and obtain FDA's clearance of a specific new indication for joint placement. Therefore, I-Flow's interactions with FDA from 1998 through 2006 consistently showed it was aware FDA considered clearance of a pain pump and catheter for infusion in a joint space a new intended use, which had not been covered by FDA's prior clearance of an intraoperative site (soft tissue/body cavity).

**3. DJO, LLC (DONJOY)**

191. DJO began as a Division of Smith & Nephew and then became independent of Smith & Nephew. During the 1998 initial negotiations with I-Flow, DJO was still associated with Smith & Nephew. The draft Letter of Intent was faxed to DJO from I-Flow on August 14, 1998(DJO1155-61). In terms of the current role of DJO with the intra-articular pain pumps, it is a "relabeler," distributing its own private brand "DonJoy" pain pumps which it purchases directly from I-Flow. DJO also has distributors, such as, Pacific Medical (Pac Med), that are sales representatives who work to promote and distribute DJO's products. Anyone buying a

DonJoy pain pump would view DJO (DonJoy) as responsible for having ensured safety, efficacy and adequacy of label and promotions. I-Flow from 1999 through December 2003 and then McKinley/Curlin beginning in 2004 supplied DJO with finished infusion pumps that were relabeled by DJO with the brand name "DonJoy". Therefore, DonJoy is viewed by FDA as a manufacturer responsible for ensuring adequacy of its label and warnings to health care providers and sales representatives. According to FDA, a manufacturer includes but is not limited to those who perform the functions of "relabeling."

192. DJO is registered with FDA as a United States Medical Device Establishment and it does have its own cleared 510(k)s. DJO in 2009 does not list itself on FDA's database as a relabeler or manufacturer of an infusion pump. Before involvement with pain infusion pumps, DJO was primarily engaged in the manufacture of class I orthopedic and sports bracing products, many exempted from requiring a 510(k) (Miller,3/25/09, p.17,l.6; p41, L. 20). DJO as a registered medical device establishment and holder of cleared 510(k)s is required to be knowledgeable about and have standard operating procedures (SOP) pertaining to 510(k)s, Quality Systems (21 C.F.R. 820), Medical Device Reporting (21 C.F.R. 803), post market surveillance, registration and listing, updating labeling (21 C.F.R. 801) and conducting recalls.

193. As part of DJO's Quality Systems, Mr. Miller testified that DJO in 1999 did have a SOP for complaint tracking (Miller, 3/25/09. P. 21, L. 21). DJO would receive complaints, record them and when appropriate forward them on to manufacturer of the device for investigation (Miller, 3/25/09, p. 22-3, L. 24-3). DJO did have internal procedures for monitoring statistical trends for its manufacturers. I-Flow pumps were assigned and tracked by both I-Flow and DJO numbers. (Miller, 3/25/09, p. 29 L. 13-14). As a manufacturer, DJO was

required to have procedures for training personnel, monitoring the medical literature, Corrective and Preventive Action (CAPA), component acceptance, complaint investigation and filing of mandatory Medical Device Reports (MDR) (21 C.F.R. 803), updating and review of labeling. DJO also had a duty under the act to be knowledgeable about the performance of the devices it markets and to adequately train its sales representatives and agents regarding the risks and benefits of its devices.

194. On August 31, 1998 Smith & Nephew and I-Flow entered into a Letter of Understanding for a Distribution Agreement that would give Smith & Nephew the right to distribute I-Flow's PainBuster Infusion Kits in the United States and Canada in areas of Sports Medicine, Trauma, Joint Repair, and Replacement, Podiatry and Spine and under the private brand name DonJoy. The product to be distributed was the PainBuster Kits "which are used for continuous infusion of local anesthetics into intra-operative or intra-articular sites."

195. On November 2, 1998, Mr. Bard, I-Flow wrote a letter he faxed to Dan Miller, Director of Regulatory Affairs & Quality Assurance at S&N/DJO regarding PainBuster Press Releases that Mr. Miller had forwarded on to Mr. Bard for review (IFLOW0022298). Mr. Bard had reviewed a document that contained the following sentence: "PainBuster is the first product of its kind to be cleared by the FDA for orthopedic application." As a result, Mr. Bard wrote back to Mr. Miller to clarify I-Flow's lack of an orthopedic clearance for the PainBuster:

> ...does not have any indication specific to orthopedic use. The submission currently under review includes the specifically identified "intra-articular" space/site. Clearly, intra-articular is included to allow a claim for orthopedic use however, at this time, there is no release specific to orthopedics." (IFLOW0022298)

**a. DJO's MANAGEMENT WAS AWARE THAT FDA HAD NOT CLEARED ITS PAIN PUMPS FOR INTRA-ARTCULAR USE**

196. Therefore, I-Flow did inform DJO in 1998 that the PainBuster was not FDA cleared for orthopedic or intra-articular indications. Mr. Bard's response reportedly had come as a surprise to members of DJO. As a result, there is a January 12, 1999 email from Margaret Sheehan, DJO Director of Marketing to James Dal Porto, Executive Vice-President and Chief Operating Officer I-Flow and copy to Dan Miller:

> Regulatory is requesting information on the Paragon such as the 510(k) and any changes to the product since the 510(k). Could you please have Bob Bard call Dan Miller regarding the information.
>
> In our meeting we indicated we would use the pilot study to better understand how to position the product and validate it's performance in the clinical setting.
>
> A new issue arose yesterday regarding the claims we can make with the Pain Buster. Bob Bard is indicating that we cannot use Orthopedic Surgery in our promotional materials. I'm struggling with this as it has been in all materials and is the letter of understanding. I would request that you send us all communication with the FDA on this particular issue so we can make an informed decision on the risk of the claim. Bob Bard also indicated we should use general surgery instead of orthopedic surgery, which I think we need to discuss further as this will be confusing to our customers. (Miller Exhibit 4 DJO1085-DJO1086):

197. In response to Ms. Sheehan's letter, there was a phone conference held during the second week of January 1999 between I-Flow and Smith & Nephew. In response to the phone conversation, Smith & Nephew requested "All correspondence with the FDA pertaining to the PainBuster."(IFLOWP00030480-1) Mr. Bard then advised Mr. Miller that "all discussions with the FDA concerning the PainBuster were verbal." Mr. Bard continued:

> The discussions centered around specific intended use(s) and the availability of a predicate device or supporting literature. Various pieces of literature were sent to ODE in support of intra-articular and orthopedic indications in the absence of a predicate device. The reviewer did not accept the literature as sufficient to allow a specific intended use statement for orthopedic surgery. The reviewer did

acknowledge that orthopedic and intra-articular surgery are included specific intended uses within the general use statement.(IFLOW0022299)

The 510(k) limits the product to general intraoperative use and as such, the labeling and marketing position should take both into consideration. Direct statements of "approval" by the FDA or release to market by the FDA for orthopedic use is outside of the limited permission to market granted by the Agency. Talking about the types of uses that have been made to date is a much safer road to run. (IFLOW0022299).

**b. DJO ENTERED INTO A DISTRIBUTOR AGREEMENT WITH I-FLOW AWARE THE PAINBUSTER WAS NOT CLEARED FOR ORTHOPEDIC OR INTA-ARTICULAR INFUSION**

198. On May 12, 1999 I-Flow and DonJoy, LLC, a Delaware Liability company, entered into a Distribution Agreement. I-Flow was to manufacturer PainBuster infusion kits. DonJoy was to purchase the PainBuster infusion kits for resale in the market to market then for amelioration of pain by orthopedic surgeons performing procedures in the areas of Sports Medicine, Trauma, Joint Repair and Replacement and Podiatry. The products distributed were to include infusion pumps containing disposable elastomeric pumps proprietary to I-Flow. Pumps using gravity, springs (e.g. the Paragon and SideKick), electronics, or other non-elastomeric balloon mechanisms as a means to deliver medicines were not included in the Agreement (IFLOW0016190; IFLOW0022306; IFLOW0022309; IFLOW0022302; IFLOW0022315).

199. The Distribution Agreement of May 12, 1999 between I-Flow Corporation and DonJoy, LLC on page 1 specifically indicated that "Products" means "PainBuster infusion kits (or equivalent private labeled product) which are used for the continuous infusion of local anesthesia into intra-operative or intra-articular sites"(IFLOW0016190). The signed agreement clearly differentiated between the difference in use of the PainBuster in the intra-operative site and an intra-articular site. The "Market" was defined and limited in the Agreement to

"orthopedic procedures where the Products are used for the amelioration of pain by orthopedic surgeons performing procedures in the areas of Sports Medicine, Trauma, Joint Repair and Replacement and Podiatry" (IFLOW0016190) . Both companies signed a mutual Agreement to violate the law by agreeing to promote the PainBuster for an unapproved indication not cleared by FDA.

200. On September 24, 1999, Les Cross, President & CEO, DJ Orthopedics, LLC wrote to Mr. Donald Earhart, President of I-Flow Corporation about his serious concerns over the Distribution Agreement. DJO's President in 1999 did not express concern about patient safety and that he was aware he is marketing a PainBuster for an unapproved orthopedic use in violation of the Act. What concerned the DJO President in 1999 were the financial terms of the Minimum Purchase Agreement with I-Flow and loss of profits by competition from J&J. He began:

> The first of these pertains to the claim that the PainBuster infusion systems can be used for orthopedic applications. It was clearly our understanding, based on I-Flow's representations, that the PainBuster infusion system can be marketed for orthopedic applications. This understanding is also documented in Section 1 of the Agreement and in your press release about the Agreement. However, after conducting our own investigation, we recently learned that the PainBuster infusion system is not approved for such applications, due to the fact that I-Flow has not obtained necessary 510(k) registration. Our assent to the terms of the Agreement, including the Minimum Purchase Requirements and license royalty fee, was predicated directly on your representations regarding the acceptability of the Pain Buster infusion system for the aforementioned applications.
>
> The second issue of concern regards the material adverse effect I-Flow's distribution agreement with Johnson & Johnson (J&J) has had on our ability to market the PainBuster infusion system. While you have assured us that the J&J Agreement is limited to non-orthopedic surgical applications, certain of our hospital clients, who have elected to sue the PainBuster infusion system for both surgical and orthopedic applications, are obtaining their product requirements for both applications solely from J&J Whether intentional or not, such actions seriously encroach on our exclusive rights under the Agreement and triggers the

obligation of I-Flow and dj Orthopedics, under Section 4 of the Agreement, to renegotiate the Minimum Purchase Requirement. (IFLOW0022306-7)

201. Mr. Earhart, President & CEO, I-Flow replied to Mr. Cross, DJO with a misleading letter dated September 29, 1999. The focus of the controversy was not patient safety and compliance with the Act but rather profits:

> First, please let me assure you that—at all times after the date of the Agreement—the PainBuster infusion system has been fully approved by the FDA for use in orthopaedic applications. We simply would not, either as a matter of business ethics or social responsibility, market our products without this governmental approval in place. Enclosed is a copy of the relevant 510(k), #K982946, dated November 19, 1998, which should address any concerns you may have.
>
> On your secondary issue of concern, please be assured that I also want to address this as a high priority matter. Once again, I want to confirm that no third party has rights to market the PainBuster product for orthopaedic surgical applications...
>
> Finally, we should be very clear that the $2 million guaranteed license royalty fee is non-refundable and has nothing to do with the Minimum Purchase Requirements. As you can see, I want to immediately address any concerns you may have, but we expect timely payment of the two remaining installments of the license fee.(IFLOW0022309).

202. On October 22, 1999, Stuart Kurlander, Latham & Watkins, Attorneys at Law, on behalf of DJ O wrote to Mr. Earhart, President, I-Flow Corporation about DJO's concerns about the lack of FDA clearance for marketing of the PainBuster for orthopedic indications and the Distribution Agreement:

> We are writing on behalf of dj Orthopedics, LLC regarding serious concerns pertaining to I-Flow Corporation's performance of its obligations under and representations made in the Distribution Agreement...
>
> While we believe there are a number of issues, the focus of this letter is whether the PainBuster Infusion System can be marketed for orthopedic indications. Mr. Cross raised this in his September 24 letter and subsequent telephone conversations, and has provided us with your letter of September 29, 1999, in which you enclose a copy of a "510(k)" letter and continue to assure him that the

PainBuster Infusion System has been fully approved by the FDA for orthopedic applications.

Based on the information you have provided and on our independent investigation, contrary to your repeated representations, we do not believe that the PainBuster Infusion System is FDA approved for orthopedic application. The reasons for this conclusion are:

- The 510(k) letter you provided (Re: number K982946), dated November 18, 1998, notes the following indications for use:

  There is no express mention of approval for orthopedic surgical applications...

- We have retained a prominent consultant experienced in FDA matters, to advise us with respect to whether the aforementioned 510(k) letter constitutes FDA approval of the PainBuster Infusion System for orthopedic applications. The consultant has advised us that it is not so approved...

For the foregoing reasons, we believe that the PainBuster Infusion System does not have FDA approval for orthopedic surgical applications...To date, the only assurance for orthopedic applications are your representations—no other source supports that view

Absent reliable proof that I-Flow has obtained FDA approval for orthopedic applications for the PainBuster Infusion System, we believe that I-Flow's failure to obtain such approval constitutes a material breach of the Agreement, which would trigger dj Orthopedics' termination rights under Section 15 of the Agreement. Moreover, in the event I-Flow has not obtained FDA approval for orthopedic applications, dj Orthopedics may no longer be able to market such products for orthopedic applications, as contemplated under the Agreement. This will deprive dj Orthopedics of the benefits it contemplated under the Agreement and may have significant adverse monetary consequences.

Accordingly, we request that you immediately provide all information you have in your possession or under your control which provides adequate assurances that the PainBuster Infusion System can be legally marketed for orthopedic applications.(IFLOW0022302-5).

203. There was a seven page October 29, 1999 response letter from Howard Holstein, Hogan & Hartson, attorneys for I-Flow, hand delivered, to S. Kurlander, Esq at Latham & Watkins regarding the Distribution Agreement between DJO and I-Flow. Mr. Holstein begins by reference to an October 25, 1999 letter where he advised Mr. Kurlander that his firm had been

retained to represent I-Flow in the matter. Mr. Holstein wrote regarding the marketing status of the PainBuster pump, that DJO had been fully aware of FDA's clearance limitations and inability to promote the PainBuster for orthopedic indications before they entered into the Distribution Agreement (May 1999) with I-Flow; that FDA had not contraindicated the PainBuster for orthopedic use; that FDA's clearance of a Nerve Block Infusion kit, with three new components and pumps, has also clearance of a PainBuster configuration for orthopedic use:

> In your letter, you stated your view that approval of the PainBuster Infusion System for general surgical application does not include approval for orthopedic surgical application. This simply is not the case. As discussed in more detail below, in May 1998, I-Flow first obtained FDA clearance under the premarket notification provisions of Section 505(k) of the Federal Food, Drug and Cosmetic Act ("FDC ACT"), 21 U.S.C.§ 360(k), to commercially distribute (i.e. "to sell") the PainBuster for use in postoperative pain management, Therefore, I-Flow and, under the terms of the Agreement, DonJoy are lawfully authorized to sell the PainBuster to orthopedic surgeons performing procedures in sports medicine, trauma, joint repair and replacement, and podiatry.
>
> 1. On May 28, 1998, FDA cleared I-Flow's first in a series of premarket notification ("510(k)") submission (K980588) for an infusion kit containing an elastomeric pump. ...
>
> When FDA cleared 510(k) number K980558, such clearance permitted the Company to sell the PainBuster for use in postoperative pain management in all types of surgery, including orthopedic surgery. I-Flow also understood, however, that the Company could not actively promote the PainBuster explicitly for sue in orthopedic surgery.
>
> The difference between FDA's authorization to sell the PainBuster for use for postoperative pain management, on the one hand, and promotion of the device for a specific type of surgery, including orthopedic surgery, on the other hand, was made clear during discussions with DonJoy following FDA's clearance of 510(k) number K980558. Thus DonJoy fully understood that it could lawfully sell the PainBuster to orthopedic surgeons performing procedures in the areas of sports medicine, trauma, joint repair and replacement, and podiatry, but that it could not lawfully promote the PainBuster specifically for use in pain management following orthopedic surgery. Although FDA contraindicated a number of specific uses, it did not contraindicate orthopedic use, which the agency could have done were it concerned about the use.

DonJoy obviously was well aware of the promotional limitations because it was aware that I-Flow submitted a second 510(k) (K982946) to FDA to seek, among other things, clearance to promote the PainBuster specifically for use in orthopedic pain management.

2. I-Flow, with DonJoy's knowledge submitted a second 510(k) (K982946) for the PainBuster to FDA on August 1998. FDA cleared that 510(k) submission on November 28, 1998. Such clearance allowed the PainBuster to be sold "to provide continuous infusion of a local anesthetic directly into the intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management." Additional routes of administration of the device cleared by FDA included percutaneous and subcutaneous infusion. As with the first 510(k) (K980558), the FDA-cleared labeling included several contraindications...Again, despite extensive discussions between Company and FDA, no contraindications for orthopedic use was required.

   In response to a request by FDA during its review of the second 510(k) submission, I-Flow deleted references in the submission to specific use of the PainBuster in orthopedic surgery.

   Following the deletion, FDA cleared the 510(k) and allowed the PainBuster to be sold and promoted with the more general claim for use in "general surgery". As noted, orthopedic use was not prohibited.

   All of the discussion between I-Flow and FDA focused on specific intended use(s) and the availability of a predicate device or literature to support the ability to promote the specific orthopedic surgery indication for the PainBuster. In the absence of a specific predicate device, the FDA reviewer did not accept literature as sufficient to allow a specific intended use statement for orthopedic surgery in the product labeling. The reviewer acknowledged, however, that orthopedic and intra-articular surgeries are included intended sues within the "general surgery" indication for use.

   ...I-Flow again understood, however, that FDA's clearance of 510(k) number K982946 did not permit the Company to actively promote the device for such specific use.

   All of this information was communicated to DonJoy in a facsimile dated January 25, 1998, from Bob Bart of I-Flow to Dan Miller of DonJoy. Therefore, DonJoy was well aware of this information before it entered into the Agreement....

3. At no time during I-Flow's discussions with FDA regarding the specific indications for use of the PainBuster during the agency's review of 510(k) number K980558 and K982946 did the agency ever suggest that the labeling of the device should state that it is contraindicated for use in orthopedic surgery...Had FDA intended to contraindicate use in orthopedic surgery, it certainly knew how to do it.

4. On March 4, 1998, FDA cleared I-Flow's third in a serious of 510(k) submissions for an infusion kit containing an elastomeric pump (K984502). I-Flow changed the trade name of the device from PainBuster to "Nerve Block". FDA cleared the device "to provide continuous infusion of local anesthetic near a nerve for regional anesthesia and pain management of pre-operative, perioperative and postoperative general and orthopedic surgery."...The clearance was granted prior to the date of the agreement (May 121, 1999)

   While this third 510(k) did not change the ability to sell the PainBuster for orthopedic use, FDA's clearance of 510(k) number K984502 now permits I-Flow and DonJoy to promote the PainBuster specifically for use in pain management...including orthopedic surgery.

5. One of the Nerve Block infusion kit configurations is identical to the PainBuster device. The Nerve Block infusion kit also provides several configurations of the PainBuster using various pump models and components. Although the Nerve Block infusion kit includes three new pump models and three new kit components (insulated Touhy needle, hemostasis valve assembly, and hookup wire), the Nerve Block kit does not require, for example, that the device be configured with the Touhy needle or any of the alternative new kit components or pump models for pain management in orthopedic surgery.

   ...As discussed above, I-Flow claimed in 510(k) number K984502 that the Nerve Block infusion kit is substantially equivalent to the PainBuster infusion kits which FDA cleared for marketing under 510(k) number K980558 and K982946 (IFLOW0022320)...

   In addition, I-Flow and, by extension, DonJoy are lawfully permitted to promote the infusion kits to which the Company previously assigned the PainBuster trade name for general surgery, including orthopedic surgery, as long as those devices are substantially the same as the Nerve Block device, which they are. Therefore, all of the I-Flow infusion kits containing an elastomeric pump that FDA has cleared to market under 510(k) numbers K980558, K982946, and K984502 can be lawfully sold and promoted for sue in pain management in general surgery, including orthopedic surgery, regardless of the trade names under which they are distributed.

   Under Section 12 of the Agreement, DonJoy acknowledges that the infusion kits containing an elastomeric pump it purchases from I-Flow shall be sold to DonJoy on a private label basis and shall be resold by DonJoy under a trade mark or trade name of DonJoy. As also stated in Section 21, DonJoy acknowledges that except by agreement in writing, no product purchased by DonJoy under the Agreement shall be marketed or sold by DonJoy under any I-Flow trademark, trade name or logo. Thus, except with I-Flow's express written permission, DonJoy cannot market the elastomeric infusion pumps it purchases from I-Flow under the PainBuster or Nerve Block trade names. It can sell those devices, however, under any other lawful trade name even though I-Flow initially assigned the PainBuster

or Nerve Block trade name to the infusion kits cleared by FDA under 510(k0 numbers K980558, K982946, and K984502.

Under the terms of the Agreement, I-Flow is obligated to provide DonJoy with infusion kits containing a disposable elastomeric infusion pump. Those devices can be provided to DonJoy under the PainBuster or equivalent private trade name as long as the devices can be lawfully sold for use in the management of orthopedic pain. All of the infusion kits that I-Flow has provided, is providing, and will provide to DonJoy under the terms of the Agreement can be lawfully sold by DonJoy to orthopedic surgeons performing procedures in the areas of sports medicine, trauma, joint repair and replacement, and podiatry.

I-Flow has met and is continuing to meet all of its commitments to DonJoy under the terms of the Agreement. In taking this effort to detail fully the relevant history and legal issues, I-Flow trusts this matter has been resolved and that there are no further misunderstandings with regard to the terms of the Agreement (IFLOW0022315-21).

## c. DJO PURCHASED AND SOLD I-FLOW PAINBUSTER INFUSION PUMPS FOR UNAPPROVED ORTHOPEDIC INDICATIONS THROUGH DECEMBER 2003

204. As indicated in Mr. Holsteins' October, 1999 letter, DJO purchased finished pumps directly from I-Flow and relabeled them as DonJoy Pain Pumps for promotion. According to Mr. Miller, who left DJO in 1999, DJO routinely did review the indications for use to see that the devices' information provided to them was consistent with the FDA cleared indications for use (Miller, 3/25/09, p. 61, L. 12). Mr. Miller did not recall ever having reviewed any I-Flow drug information for DJO at time of product launch. (Miller, 3/25/09, p. 62, L. 6) However, when asked about catheter placement in the shoulder, he stated "I just don't know if catheter placement would be covered in the Indications for Use."(Miller, 3/25/09, p. 62-3, L.25-2). I-Flow provided the marketing materials for its pumps including its Catheter Placement Technique Guide.

205. According to the 1999 Distribution Agreement, all customer complaints were to be forwarded by DJO to I-Flow Customer Service. I-Flow was then to report back to DJO the analysis of the complaint. DJO was to handle all interactions with customers. I-Flow was to

provide technical support to DJO on the operation and use of the products.(IFLOW ESD 121971)

206. The distribution arrangement between DJO and I-Flow would last until December 2003. At that time, I-Flow took over its own pump distribution, merging its two pump lines into a single pump line it called On-Q PainBuster.

207. When DJO's contract ended with I-Flow, DJO in 2004 entered into another distribution agreement with McKinley and in 2007 McKinley/Curlin. DJO continued to distribute and promote DonJoy elastomeric pumps, after January 2004, McKinley's BeeLine was relabeled as a DonJoy Pump and still promoted for unapproved orthopedic indications(S. Rogow, 3/27/09 p.19, L. 6-11).

208. An email was sent January 10, 2002 from Patti Gerke, Sales Marketing Manager, DJO, to Distributors, Sales Representatives, Sales & Marketing titled "PainBuster and Columbia Contract", related to changes in J&J's contract with I-Flow.

> HUGE OPPORTUNITY!!
>
> J&J ON-Q pump WAS on the Columbia Contract. When J&J stopped distributing the ON-Q December 31st, the ON-Q came off the contract! Now the Columbia customers are looking to PainBuster as a replacement!(PACMED02355)

209. On April 24, 2002 there was another email from Patti Gerke again with wide release to General Manager, Distributor Partners and Sales marketing titled VERY IMPORTANT PainBuster INFORMATION. The announcement had:

> On April 23, 2002, I-Flow Corporation filed a complaint, in the Superior Court of the State of California for the County of Orange, claiming that dj Orthopedics, LLC and DonJoy, LLC breached the Distribution Agreement for the sale of

PainBuster products in the orthopedic market in the United States and Canada. The complaint seeks unspecified money damages and an injunction to enjoin sales outside of the orthopedic market and to prevent combinations of products within a single package.

While the complaint contains various legal theories, the thrust of the allegations is that dj Orthopedics, LLC and its sales representatives have been selling the PainBuster products outside the orthopedic market, for general surgical applications, and have sold "kit" that include Soaker catheters. We urge you to continue in your efforts to sell Painbuster products. Nothing in the lawsuit will stop our ability to act as distributor at this time. We also wish to remind you, as we have in the past, that our market is for orthopedic applications. Continue to confine your sales to that market only.

In that we do not and have never made a "kit" that includes a Soaker catheter, we do not expect that it will add to your burden to avoid I-Flow's allegations.

We have reviewed the allegations of the complaint and conducted our own internal investigation and believe strongly that the complaint is without merit. We intend to vigorously defend the claims and believe that we have a counter-claim against I-Flow upon its own breaches of the Distribution Agreement.

210. Patti Gerke wrote to Donald Earhart, President & CEO, I-Flow Corporation on August 4, 2002 regarding the Distribution Agreement and proposing a few potential modifications to Amendment #2. Under labeling, DJO forwarded its own attachment with slight modifications to the label. DJO wanted to keep the name "PainBuster Management System" and did not want to change the name to "Relief System" as proposed by I-Flow. Second, Ms. Gerke maintained that DJO customers (including the HPG) have always purchased "PainBuster Soaker Catheters.. To be consistent, DJO proposed to continue to call the catheters "PainBuster Soaker Catheters" so as not to confuse customers. However, I-Flow responded that the labeling "ON-Q with it unique package would be reserved for distribution to HPG accounts only."

211. Ms. Gerke maintained that DJO had found that they sold by fill volume and flow rate. Therefore they wanted to keep that information as more prominent than the "2 Day"

portion. I-Flow's response however was that they were " finding it less confusing to surgeons if we label for days of pain relief available instead of the pump's volume and flow rate."

212. Ms. Gerke wrote that they still had substantial existing inventory, so it was difficult for DJO to purchase 3000 additional kits. DJO wanted to discuss the possibility further with I-Flow about consigning the inventory. I-Flow's response was that:

> If you do not believe DJ O can sell at least 3000 of the new kits to HPG over the remaining 17 months on our Contract, it does not make sense for either of use to pursue this change to our existing business relationship. I will be investing sales time, nursing in-service time and marketing materials to help dj O increase revenues and profits. I need something in return to cover these costs. However, if djO is willing to share these costs, I will be willing to accept a Purchase Order for less than 3000 units.
>
> If djO places an order for 3000 units to be shipped before September 27, 2002, I will rebate $35 instead of the proposed $30 on the 3000 catheters purchased in June. After that, the rebate will be $30. All other aspects of our relationship, including the right to return excess inventory, will continue as defined in the original Contract.
>
> We would consider reworking inventory for a reasonable charge, Better yet, after the initial 3000 new kits purchased, we could consider a trade-in value for the old kits if used to purchase additional new HPG kits.(IFLOW ESD 040082-3; IFLOW ESD 040093-4).

213. Mr. Rogow, when asked what led to DJO's discontinuing the I-Flow pump, answered that "[i]t turned into a partnership that wasn't beneficial for us to stay in due to distribution conflicts." He continued that I-Flow decided to employ "I believe a direct sales force, so we were competing with a very similar product to the company that was manufacturing the product, and for us as salespeople or an organization, exclusivity is always a better option."(S. Rogow, 3/ 27 /09, p. 57, L. 1-9).

**d. DJ O HAS BEEN A FINANCIAL SPONSOR OF INTRA-ARTICULAR STUDIES**

214. Roger Massengale of I-Flow had in his a file an article by Dr. Hoenecke, an orthopedic surgeon, Division of Orthopedic Surgery, Scripps Clinic, La Jolla, California, titled a "Case Report Continuous Local Anesthetic Infiltration" published in *Orthopedic Technology Review*, Vol. 3 No.2 March/April 2002. The case report involved the use of a disposable infusion pump (dip) with a 20 gauge catheter for pain management following a knee anterior cruciate ligament (ACL) surgery conducted at Scripps Clinic, La Jolla, California. The study was performed to evaluate the use of these devices following knee procedures. The discussion included the use of bupivacaine, but failed to indicate that there was no local anesthetic approved for continuous intra-articular infusion. Regarding the procedures which failed to describe the effects on cartilage, the author wrote:

> Most of the failures of the technique involve incorrect placement or dislodgement of the catheter from the wound site. It is important to place the catheter under direct or arthroscopic visualization. The catheter needs to be immediately taped in place and flushed with saline or bupivacaine to keep it from clotting off.
>
> No toxic effects of bupivacaine on articular cartilage have been reported. One study of bolus injection of bupivacaine and saline injection demonstrated a transient inhibition of sulfate uptake by chondrocytes. This temporary effect appeared to be primarily related to the saline effect on articular cartilage[11].
>
> The placement site for shoulder rotator cuff repair is usually in the subacromial space through the anterior deltoid...For intra-articular labral or capsular repairs, the catheter may be placed in the glenohumoral joint through the rotator interval....

215. Dr. Hoenecke was a clinical investigator for DJO. He received financial support from DJO for his investigations with continuous infusion pain pumps and local anesthetics for orthopedic surgery. The funding for Dr. Hoenecke continued from DJO even after the

[11] Nole R, Munson NM, Fulkerson JP. Bupivacaine and saline effects on articular cartilage. Arthroscopy. 1985:1(2):123-127.

distribution agreement with I-Flow ended in 2003. In a letter of December 12, 2001 to DJ Orthopedics and Patti Gerke from Cathi Rabago, Scripps Clinic, Ms. Rabago wrote:

> Enclosed you will find an invoice and full copy of the signed agreement for "A Double-Blind, Prospective Randomized Study of Continuous Infiltration of Bupivacaine and Placebo to Evaluate the Efficacy of Local Anesthetic for the Management of Pain Following Elective Arthroscopic Repair of the Rotator Cuff"(DJO9526).

216. According to the "Form of Clinical Research Agreement", an agreement was entered into on November 9, 2001, between Dr. Hoenecke, Scripps and DJO. The proposed study was to be completed by June 6, 2003. The "Engagement of Researcher" was by DJO (DJO9528). The final report was to be provided to DJO (DJO9529). In terms of ownership of the data:

> The Researcher hereby grants to DJO, and DJO hereby accepts, a worldwide, perpetual, non-exclusive, royalty- free license (with the right to sublicense) in and to any and all Research Data to use for any purpose whatsoever during and after the term of this Agreement; including without limitation, the right to copy, reproduce, transmit, publish, distribute, modify, adapt, translate or prepare derivative works from the Research Data for any purpose during the term of the Agreement and subsequent to any termination of this Agreement.
>
> The Researcher shall submit any intended publication or oral presentation to DJO, thirty (30 ) days prior to public presentation or submission to a publisher. DJO shall review such intended publication or presentation within (14) days of receipt thereof. DJO shall provide comments to the Researcher, which the Researcher will consider in good faith. (DJO9530).

217. DJO had recently been supplying infusion pumps for a pediatric study being conducted in Philadelphia, PA. Ms. Coulter received an email from Jonathan Beus dated June 13, 2007, subject Continuous Intraarticular Infusion Study at the Children's Hospital in Philadelphia" which had:

> Just wanted to send you an update concerning the study at our institution that DJO Orthopedics is supplying pain control device for. Our investigators recently became aware of some in vitro studies suggesting that intraarticular bupivacaine may cause chondrolysis. Until more research is done on the possible clinical implications of these findings, we have decided to temporarily place the study on hold. I have attached the letter that we sent to our Institutional Review Board explaining our actions as well as some corresponding literature. Please let me know if you have any questions or need any additional information.(Coulter, 3/24/09, p.183, L. 7-18)

218. Ms. Coulter of DJO had been providing the investigators with DJO infusion pumps for the study. However, she stated she was not familiar with the parameters of the study and was not positive as to who started or maintained the study. (K Coulter 3/24/09, p. 183-4, L. 7-3).

## e. DJO STUDIES OF INTRAARTICULAR USE ARE NOT SUPPORTIVE OF BENEFIT

219. On January 13, 2005, Heinz Hoenecke, Scripps Clinic wrote to Colin Gregersen, Manager, Applied Research, DJ Orthopedics a letter titled RE: Pain pumps study. He began "[w]e have completed the 60 patients in the rotator cuff repair study". He goes on:

> We noticed quite a variation in pain reports even in the placebo group making it difficult to reach statistical significance with 60 patients....
>
> The study neither supports nor defeats the use of pain pumps although we had expected a more dramatic result with the pump, especially the 5 ml one. With the 5ml pump, we observed an interesting trend towards more pain than with the placebo although not significant. The 2 ml pump trended toward less pain than the pump with placebo but again not significantly different from the other groups.
>
> I don't know about the future use of pain pumps. We have continued to use them. It could be the rotator cuff repair is not a good pain model for any studies even if it is arthroscopic. Previous studies with subacromial decompression (Savoie) showed a significant decrease in pain and narcotic use.
>
> Our ACL study showed a decrease in pain by about one third also. This is similar to several other pain pump studies that were no controlled as well. Most other pain pump studies were not double blind placebo controlled as ours have been

> This does not answer the question whether a basal flow or patient controlled bolus would work better. We only looked at Marcaine (Bupivacaine) as an anesthetic but there may be better options…
>
> Enclosure: Invoice inclosed(sic) for $3,500.(DJO9558-9)

220. In a September 26, 2002 email from Colin Gregersen to Michael McBrayer et al Subject OrthoIndy PainBuster review, he wrote:

> My two cents:
>
> 1) Agreeing to this study would be purely a business decision. We currently have two PB studies for rotator cuff repair underway and a knee arthroscopy PB study about to begin.
>
> 2) Savoie's study has demonstrated the efficacy of pain management for arthroscopic repair.
>
> 3) If we chose to move forward, then I would like to ask then to revise their protocol based on my comments. This includes hypothesis development, a sample size justification, and a literature review by the authors. I fear that they do not have a good grasp on the pain management literature….These are important as I would hate for use to fund a study that was either 'inconclusive' or reflected negatively on our product (due to poor methods, not actual ineffectiveness of the device)(ENJ)-00093304-5)
>
> A follow-up email from Glade Pauley to Colin Gregersen, titled OrthoIndy PainBuster Review
>
> Sorry, Colin- I do not like your premise. WE want THEM to do business with US rather than the competition. Unlike Black and Lynch (a couple of sticks in the mud who I know from their days as Cleveland Clinic Fellows and both non-bracers for the most part) this group has unbelievable market share, capital resources, and influence over an entire state. They use the most products from other people!...
>
> You may not want to hear it, but WE are the ones who have to make the investment up front, because they have the business spread around elsewhere. We are compelled to front end load. Lynch and Black are two members of a group at an academic institution where we already have some good quality relationships and history of physician support. They can and should do their own research (EDJO-00093303).

**4. STRYKER CORPORATION**

221. Stryker is a major world-wide orthopedic firm. It was formed in Kalamazoo, Michigan in 1941 by Dr. Homer Stryker, an orthopedic surgeon. Stryker Endoscopy has obtained clearance of arthroscopic infusion pumps (K910858;K963304). Stryker entered into the external infusion pumps for post operative pain management through its acquisition of rights to McKinley's OutBound Pump. The focus of Stryker's marketing activities in the United States has been primarily orthopedics products.

**a. K003543 STRYKER PAINPUMP II**

222. Ms. Nicole Petty, Stryker submitted K003543 on November 17, 2000 for a 510(k) for its PainPump 2 that would be cleared by FDA on June 5, 2001. According to Ms. Petty, the Pain Pump 2 had a new increased reservoir size of 250cc when compared to the prior designs (Petty, 2/20/08, p175, l.15-17).

223. In January 2001 Stryker made a change to its Pain Pump 1 to 1.5, revision G to increase the size of the reservoir to 270cc (FET0159). During the 510(k) review of the PainPump 2, according to Ms. Perry, FDA did not request additional information about Stryker's rationale for changing the reservoir size or testing of the new reservoir. Instead, for the PainPump 2, a software controlled device, FDA requested additional information about the device's software and biocompatibility testing. Based on Ms. Petty's testimony the reservoir was increased by Stryker based on the market's asking for it. "Our customers wanted to be able to infuse more medication when using the Pain Pump". In terms of the PainPump 2, she continued that at the same time, competitor I-Flow did provide a similar large reservoir (Petty,

7/20/08 p.180, L.9-17). ( I-Flow already had a 270cc pump at that time, so the modification of the PainPump 1 to the PainPump 1.5 reservoir had been made to match the I-Flow 270 cc reservoir size.) Ms. Petty did not recall seeing any Stryker assessment of the safety of increasing the pump volume from 100 cc's to 270 cc's (N. Petty 7/20/08 p. 172, L. 4-24). If there had been discussion taking place about the reservoir size, she would have been involved in those discussions if a risk analysis took place. (N. Petty 7/20/08, p 173, L. 2). The Stryker plan in 2000 for its PainPumps was to increase the reservoir size up to 400ccs. Stryker in 2009 sells pain pumps with 400 cc reservoirs.

224. On March 28, 2001 Ms. Petty, Stryker wrote to FDA to amend its PainPump 2 IFU to include a new indication for infusion into the synovial cavity. The letter was the result of a phone conversation she had with FDA on March 15, 2001. The letter included that the McKinley's Outbound Infusion Pump, which was cited as one of Stryker's predicates devices, was initially "cleared for that use". Ms. Petty continued (underlining added for emphasis) "[a]ccording to McKinley Medical LLP, the synovial cavity was later removed to avoid confusion." (GR004493). Ms. Petty later testified that Stryker did not understand what the confusion had been at the time it sent the letter to FDA as to why the indication was removed (N. Petty, 7/24/08, p.16:9; NPET-000105). According to Ms. Petty, Stryker had requested that McKinley provide it with all the regulatory records before Stryker acquired the rights to the pump technology from McKinley, but it did not receive all the records until after the acquisition. Stryker had obtained the rights to sell the Outbound pump, later renaming it the Stryker PainPump 1.0, in 1999 (N. Petty 7/20/08 p. 155 L. 18).

225. Ms. Petty indicated that a risk assessment is part of Stryker's usual due diligence process before purchasing technology but she did not recall any risk assessment being done that dealt with intra-articular use. (N. Petty 7/20/08, p/148, L 19). Stryker had closed the deal with McKinley and then found out after the deal was completed that the synovial space indication had been revoked by FDA. Stryker had been lead to believe by Ms. Dennis, McKinley, that it had been cleared (N. Petty 7/20/08 p.151, L12-24). Stryker's understanding had been that the FDA had approved use in the synovial space for the Outbound until it later found out from FDA sometime after 1999 that it was not cleared. When Stryker approached FDA seeking clearance, Stryker believed there was a McKinley predicate. (N. Petty 7/20/08 p, 155-6, L. 18-12). Ms. Petty testified that Stryker had a discussion internally that it wanted to add the synovial use. When Stryker requested to add it, the FDA then told Stryker to redact it because there was not a predicate device with that indication. She did not recall who had the discussion within Stryker trying to add the indication (Petty, 7/20/08, p. 152, L. 17-24). The Stryker marketing department was in favor of adding an indication for use in the synovial space. (N. Petty 7/20/08 p/ 154, L. 14).

226. On June 5, 2001 FDA cleared the 510(k) but without Stryker's requested synovial cavity indication. FDA assigned product code FRN. The FDA's cleared IFU:

> Pain Pump II is an electromechanical pump which delivers a controlled amount of medication to the patient for the purpose of managing pain. The pump delivers medication using one or both of the following drug delivery profiles: an hourly flow rate and a bolus PCA (patient controlled anesthetic) dosing option. Routes of administration may be intraoperative, subcutaneous or percutaneous. Dosage rates and patient lock out times are programmed into the PainPump II unit by the physician.
>
> The PainPump II is contraindicated for infusion of blood and blood products, insulin, of life-supporting medication.