227. The following documents come from the period of development of the PainPumpII project at Stryker (underlining for emphasis):

PainPump II Functional Specifications

Draft #1

Project #1614

Project Definition

00-March-21

Luis A Diaz

1.2 INDICATIONS FOR USE(5.2.3)

Orthopedics- Continuous flow (.5cc/hr up to 8cc/hr) Options- Two site catheter insertions, modular quantity up to 400cc, maximum use 1 to 5 days (Exhibit 791).

***Project Requirements (5.4)***

***Project Driver***

This product will be driven primary (sic) by product performance and cost. Time to market in the next six month could be potential to be the driver of the project.

Performance and Claims as marketing strategy …

Flow capacity: Up to 400 cc

Infusion time: 1 to 5 days

Versatility: Potential to be used in Orthopedics, General, Obgyn, Thoracic and CV sites or any surgery procedure.

More infusion Coverage: Cover area from epidural up to 5 inches with capabilities for two catheters

***Product Success Measurement***:

The success of the product will be measured during CPT(*Note: Consumer Preference Trials) trials. A user satisfaction % of each of their needs will be evaluated between the Engineer Team, Marketing and Upper management to assure all needs are in the levels of expectations required to launch a Best in Class Product.

***Design Challenges***:

> The following are the most basic design challenges that the new design will confront:
>
> a) Ergonomics and functionality
>
> b) Flow distribution…
>
> c) Understand toxicity Levels, Biocompatibility Materials, Drug suppliers and distribution methods, most common anesthetic used…
>
> ***Potential Company Risks***:
>
> b) Medication Toxicity: More investigation in terms of all possible drugs intended to use and their indication for use..(Exhibit 791)

228. There is a memo titled "PainPump II Brainstorming" of May 10, 2000 signed by Luis Diaz and Jason Allen. Two areas were discussed, the first titled, "**Y-connector for treating subcutaneous and joint pain simultaneously**"( underlining for emphasis):

> Treat two sites for joint procedures: one catheter to fill joint space, the other catheter to treat subcutaneous tissue affected by the incision. The joint catheter could have the same configuration as the currently offered product (one-three fenestrations), while the subcut. Catheter could have a soaker configuration. The y-connector could divide the flow unevenly-possibly splitting the flow 70 subcut./30 joint. The majority of the post operative pain is coming from the soft tissue damage- let's design our product to primarily treat the tissue damage and secondarily treat the joint and bone damage.
>
> **Pressurize the soaker hose from both ends.**
>
> The majority of the problems seen with the current version of the soaker houses (*sic) on the market are caused from the lack of pressure provided to this hose. This pressure problem could be overcome by looping the catheter to provide pressure at both ends. The current product has a pressure source at one end, and the opposite end is clamped shut. The proposed idea would provide pressure at both ends of the catheter, either utilizing two pumps or one pump with two pressure ports.(Exhibit 792)

229. Two physician forms from Stryker's SIMULATION TRIAL FEEDBACK FORM/PAINPUMP II INFUSION SYSTEM included the following comments (underlining for emphasis):

Dr. Collins- general procedure- hernia gave the following feedback October 5, 2000:

> Have a warning go off if someone sets it for too high of a toxicity level!
>
> What if the reading is wrong? The present pain pump is great because there is a visual reading.
>
> Worried about puncture of bag. PUT IN A CARRY CASE! A little bulky. Can we make it smaller? Toxicity is a big problem=a law suit waiting to happen. (GR018712-3)(Plaintiffs Exhibit 783).

Dr. Mark Holder- orthopedic procedure shoulder, allograft, total knee, pump used 2 to 3 days:

> 4cc/hr should be the maximum, excellent results with 2cc/hr (due to toxicity)
>
> Reduce size by 1/3, easier for patient to wear. 370cc version "extremely heavy"
>
> Dosage: Totally disagree with anything above 4cc, unsafe (GR018707-9)(Exhibit 782).

230. There was a Stryker Instruments "Technical Report" Company Confidential dated November 28, 2001 written by Omar Velez for PainPump2 Flow Rate Testing. It appears to be a Design Document for the PainPum2. In Section 11 under CLINICAL DATA is only the following statement:

> PainPump2 does not warrant a clinical trial to demonstrate safety. A customer preference Trail (CPT) was conducted to verify that the user needs were met. The customer validation summary of those CPTs are included in this file.(GR009035).

**b. K014091 PAINPUMP**

231. On December 11, 2001, Ms. Petty, Stryker submitted K014091as a modification to is PainPump. FDA cleared the submission on December 31, 2001, product code FRN. The cleared IFU:

> Intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

### i. STRYKER HAD KNOWLEDGE OF LACK OF APPROVED LOCAL ANESTHETIC FOR CONTINUOUS INFUSION INTO A JOINT

232. Stryker design engineers did obtain local anesthetic package inserts. There is an April 10, 2000 letter from Paul D. Rosen, Medical Departments Abbott Hospital Products Division to Mr. Jason Allēn, Design Engineer, Stryker Instruments. Mr. Allen was sent the package inserts for Lidocaine and Marcaine (Bupivacaine Hydrochloride Injection, USP). The package inserts did not identify either Lidocaine or Marcaine as approved as safe by FDA for continuous intra-articular infusion (STR5855).

233. Stryker failed to identify a single local anesthetic manufacturer to partner in production of PainPump 2 kits. There is a signed July 6, 2000 Stryker/Purdue record of a business meeting held between Stryker and Purdue Pharma LP to discuss the PainPumpII Project. Attendees included Jason Allen, Nicole Petty, Luis Diaz, Steve Schewe from Stryker and James Dolan, VP of Licensing and Business Development, representing Purdue Pharma. The meeting notes had the following:

> The meeting began with Jim Dolan sharing some background information on Purdue Pharma…
>
> Next Jason and Steve shared the background of the current PainPump device, its market, and a background on Stryker Instruments and Stryker Corporation. The Purdue representatives had many questions related to the device flow rates, capacity, indications for use, catheter placement, and reimbursement structure. Mike and Brianne shared with the Stryker team that currently their local anesthetic, Chirocaine, is indicated for continuous epidural infusion but not for interarticular injection. The drug is indicated for local infiltration in surgical anesthesia and pain management. IT may be necessary that Purdue would need to submit an IND to the FDA to indicate for interarticular and local infiltration applications. This would be a considerable effort.
>
> After the current device and market were fully explained, the Stryker team shared briefly the functional specifications for the new device. Specifically, the device will hold 400cc compared to the current 120cc, allow the surgeon to program the

desired flow rate, and offer a PCA of rescue dose option. The circular fluid reservoir concept was also shared by drawing a simple schematic on the dry-erase board. Three general concepts were discussed:

1) Purdue currently offers Chirocaine in 30cc vials. With the current device, this requires the surgical staff to open 4 vials to fill it to full capacity. The new device would require 14 vials. The surgical staff typically sees opening these vials as a great nuisance, which could be avoided if Purdue offered Chirocaine in larger containers (100cc or greater)...

2) Purdue could partner with Stryker to allow Stryker to package Chirocaine with the PainPump or PainPumpII devices. This would benefit Stryker by offering its customers an added convenience while benefitting Purdue by increasing sales of their local anesthetic. Possible obstacles that need to be overcome for this to be a reality include: <u>receiving FDA approval for Chirocaine to be used in this indication</u>...This process could take anywhere from <u>3 to 12 months</u>, and is dependent on many factors.

3) Purdue could partner with Stryker, allowing the device to be filled with the local anesthetic during the manufacturing process. This is by far the most time and resource intensive proposal...(STR4668-9)

## c. K030885 MODIFICATION TO PAINPUMP2

234. Ms. Nicole Petty submitted K030885 on March 21, 2003 to modify the Stryker PainPump2 that was cleared on April 18, 2003, as product code FRN, BSO. The Stryker Pain Pump 2 had a capabilities as a 2-Site infusion set. The kit had introducer needles, syringe, dressings and catheters. The predicate was the infusion pump systems was marketed by I-Flow. The submission signed by Ms. Petty, as all the Stryker pain pump 510(k)s, "The Stryker PainPump2 does not raise any new safety and efficacy concerns when compared to similar devices already legally marketed." The PainPump 2, unlike the elastomeric infusion pump of the PainPump1, was an electromechanical pump. It could be set to provide either an hourly flow rate and/or a bolus PCA dosing option. The dosage rates and patient lock out times were programmed into the PainPump2 unit by the physician. The PainPump2 was to be contraindicated for infusion of blood, blood products, insulin or life-supporting medication.

235. The FDA's cleared IFU:

> PainPump2 is an electromechanical pump which delivers a controlled amount of medication t the patient for the purpose of managing pain. The pump delivers medication using one or both of the following drug delivery profiles: an hourly flow rate and a bolus PCA (patient controlled anesthetic) dosing option. Route so administration may be intraoperative, subcutaneous, or percutaneous. Dosage rates and patient lock out times are programmed into the PainPump II unit by the physician.
>
> The PainPump II is contraindicated for infusion of blood and blood products, insulin, or life-supporting medication.

**d. K030661 STRYKER PAINPUMP2**

236. Ms. Petty submitted K030661 on March 3, 2003 for a pain pump assigned product code MEA that was cleared May 30, 2003. The Stryker PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. The PainPump 2 is substantially equivalent to infusion pumps marketed by I-Flow. The Stryker PainPump2 catheter is equivalent in intended use to catheters marketed by I-Flow and Sims Portex. FDA's cleared IFU:

> PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rte and provides an option for patient controlled bolus doses. Medications are infused through intramuscular or subcutaneous routes.
>
> PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management, Routes of administration may be intraoperative, perineural, or percutaneous.

**e. K031249 MODIFICATION TO STRYKER PAINPUMP1**

237. Ms. Petty submitted a modification to the Stryker PainPump to FDA, K031249, on April 18, 2003, which was cleared on July 21, 2003, assigned product code FRN. The Stryker PainPump1 is a disposable syringe infuser pump that comes in kit models now available in fill

volumes of 120 to 270cc and flow rates from 0.60 up to 8.32 cc/hr. Technically, there is no Stryker PainPump cleared by FDA by a 510(k) with the trade name "PainPump 1.5", however K031249 included clearance of a Stryker PainPump 1 series to include a 270cc reservoir, which appears to be the origin of Stryker's PainPump 1.5. The predicates included pumps marketed by Stryker, I-Flow and Sgarlato. The FDA's cleared IFU:

> The Stryker PainPump delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provides an option for patient controlled bolus doses. Medications are infused through intramuscular or subcutaneous routes.
>
> The Stryker PainPump is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.

**f. K042405 PAINPUMP1; PAINPUMP2**

238. Stryker bundled its two 510(k) cleared PainPumps, 1.0 ( which would include the PainPump 1.5) and 2.0 into a single 510(k),submitted September 7, 2004 and cleared October 14, 2004. The 510(k) was submitted by Ms. Jennifer Mars for Stryker to obtain FDA's clearance to add a new efficacy claim to marketing and its label like I-Flow's K040337 (cleared in February 2001). The new claim was reduction of narcotic use for a patient when using a Stryker infusion pain pump for postoperative pain management.

239. Stryker's PainPump 1 was its disposable syringe infuser intended to deliver continuous infusion to a patient for pain management. The predicate was Stryker's PainPump 1(and PainPump 1.5) (K031249).

240. Stryker's PainPump2 was its electromechanical pump designed to deliver medication for pain management and/or antibiotic delivery. The predicate for the PainPump2 was Stryker's K030661 PainPump2 and K040337 I-Flow Elastomeric Pump w/bolus (ON-Q, PAINBUSTER, C-Bloc, HomePump cleared 2/13/2004).

241. The FDA's cleared IFU:

> PainPump1 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate. Medications are infused intraoperatively and postoperatively through intramuscular or subcutaneous routes.
>
> PainPump1 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> **PainPump1 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.**
>
> PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provides the option for patient controlled bolus doses. Medications are infused intraoperatively and postoperatively through intramuscular or subcutaneous routes.
>
> PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> **PainPump2 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.**

**g. K043466 STRYKER PAINPUMP2 AND STRYKER PAINPUMP2 BLOCKAID**

242. On April 19, 2005 FDA received a resubmission of a 510(k) which was originally submitted in 2004, based on the assigned 510(k) identifier, for the Stryker PainPump2. The application was cleared on May 10, 2005. The application was signed off on by Ms. Jennifer

Mars for Stryker. Stryker requested to label its Stryker PainPump2 to included delivery of narcotics and as an epidural.

243. The PainPump2 Blockaid is electromechanical and to be used for continuous peripheral nerve block. The Blockaid has a 300mL capacity, but is able to be refilled filled up to 1000mL. The predicates listed were K042405 Stryker PainPump1 and Stryker PainPump2 (cleared October 14, 2004) and K040337 I-Flow Elastomeric Pump w/bolus (ON-Q, PAINBUSTER, C-Bloc, HomePump cleared 2/13/2004)(I-Flow's new consolidated post DJO pump series).

244. The FDA's cleared IFU:

> The Stryker PainPump2 delivers controlled amounts of medication and narcotics directly to the intraoperative site for pain management. The pump infuses the medication at an hourly flow rate and provided the option for patient controlled bolus doses. Medications and narcotics are infused intramuscular, subcutaneous, and epidural routes.
>
> The Stryker PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provided the option for patient controlled bolus doses. Medications are infused through intramuscular and subcutaneous routes.
>
> The Stryker PainPump2 is intended for controlled delivery of local anesthetics and narcotics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> The Stryker PainPump2 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

245. Dr. S. Brown and A. Morrison (2004)[12] of FDA's CDRH, published the FDA's findings from review of its Medical Device Report database increased risk of infection with continuous infusion pump, a safety signal about product design for the pump manufacturers. Ms. N. Perry testified that Stryker first got wind of the Pain Pump injuring cartilage in 2005 (N. Petty, 2/20/08 p. 181, L.11). In 2004, Lori Brown, FDA

**h. K072702 STRYKER 'ANTIMIC' CATHETER (SILVER EXFEN CATHETER®)**

246. Julie Pryor submitted additional information for Stryker on February 19, 2008 for a 2007 510(k) requesting marketing clearance of a Stryker AntiMic Catheter. The 510(k), K072702 was cleared on March 19, 2008, product code BSO. The predicates with K051401 I-Flow ON-Q SilverSoaker Catheter (see above); K061250 Vygon: MultiCath Expert cleared 9/29/2006); and K043466 Stryker PainPump2.

247. The predicate Vygon MultiCath Expert is a line of multi-lumen intravascular catheters. They are composed of polyurethane impregnated with silver ion-based antimicrobial agent AgION and were available as 2-,3-,4-, and 5- lumen catheters. Expert catheters releases silver ions from a surface mineral coating applied to both the internal and external surfaces gradually.

248. The Stryker AntiMic catheter was intended to be used along with the Stryker PainPump Systems. It was to be available in the following sizes: Standard; and 2/5", 5/0" and 10" Extended Fenestration ("ExFen"). The Standard catheter had a closed tip with three holes

[12] Brown SL Morrison A E Local Anesthetic Infusion Pump Systems Adverse Events Reported to the Food and Drug Administration. Anesthesiology May 2004; Vol 100(5):1305-1306.

arranged radially along the lateral surface at the distal end of the device. The Extended Fenestration catheters had a closed tip with multiple holes arranged radially along the lateral surface at the distal end of the device.

249. The Stryker administration catheter contained an antimicrobial agent intended to inhibit the growth of microorganisms and reduce the possibility of the catheter becoming microbially compromised. It has the same technology as the I-Flow ON-Q Silver Soaker Catheter and Vygon MultiCath Expert Catheter predicates. However, unlike the I-Flow soaker catheter technology, the Stryker ExFen catheter did not utilize a <u>hollow tube</u> on <u>either the inside or outside</u> of the catheter as described in a variation of the I-Flow Soaker Catheter (K051401). The antimicrobial surface consisted of zeolite crystals containing silver ions applied as AgION that are randomly oriented on the catheter and distributed throughout the surface of the catheter

250. The Stryker AntiMic Catheter was intended to provide continuous or intermittent delivery of medication to or around surgical wound sites for preoperative, perioperative and postoperative pain management. The Stryker AntiMic Catheter was contraindicated for the epidural space and in neonatal populations. The FDA's cleared IFU:

> The Stryker AntiMic Catheter Kit is intended to provide continuous or intermittent delivery of medication (such as local anesthetics or narcotics) to or around surgical wound sites for preoperative, perioperative, and postoperative pain management. The Stryker AntiMic Catheter Kist is contraindicated for the epidural space and in neonatal populations,
>
> The Stryker AntiMic Catheter Kit contains an anti-microbial agent which may destroy or inhibit the growth of microorganisms on both the inner and outer surfaces of the catheter. The antimicrobial agent is intended to reduce the possibility that the catheter may become microbially compromised. The antimicrobial agent is not intended to be sued as a treatment for existing infections.,

251. On Stryker's website (http://www.stryker.com) May 2009, the Stryker AntiMic Catheter is marketed with the trade name "Silver ExFen Antimicrobial Cather". It is intended to reduce microbial colonization. The infusion segment listed in the 2009 PainPump2 Brochure is 2.5" or 5.0," not the 10" infusion segment of the I-Flow and Stryker 510(k)s. The Stryker Silver ExFen Brochure downloaded May 11, 2009 contains 'no contraindication or warning information about intra-articular use.. Stryker markets two silver catheter, the Standard ExFen catheters and 2-Site ExFen Catheters.

## VI. BASES OF OPINIONS #7-11

### A. SHARED ISSUES FOR EXTERNAL PUMP MANUFACTURES AN DISTRIBUTORS

#### 1. PRACTICE OF MEDICINE VERSUS A FAILURE TO WARN

252. The Food and Drug Administration was not given authority or a mandate by Congress to provide regulatory oversight over the "practice" of medicine by health care providers in the United States as it pertains to the individual care and treatment of patients. The FDA since 1976 was given new authority over industry to ensure it provides health care professionals with devices with truthful and accurate labeling, adequate instructions for use and warnings. Health care providers have come to assume that products promoted to them in the United States by industry have been found by FDA to be safe and effective for the indication for which they are being promoted by a manufacturer, and that the manufacturer would warn of risks. It is not the role of each health care provider engaged in the practice of medicine caring

for patients to independently review each new medical device and ensure that it is safe and effective and appropriately labeled. That is the role of the FDA and manufacturer.

253. As a response to the atrocities of World War II, the Belmont Report (21 C.F.R. Part 50, Appendix F) produced by the National Commission for Protection of Human Subjects of Biomedical and Behavior Research issued its conclusions in April 18, 1979 of basic guidelines for conducting ethical biomedical research. It is one of the documents relied upon by the FDA, other government agencies, and the medical device industry as a guidance to help define the difference between "research" and "practice of medicine."

> For the most part, the term "**practice**" refers to interventions that are designed solely to enhance the well being of an individual patient or client and that have a reasonable expectation of success. The purpose of medical or behavioral practice is to provide diagnosis, preventive treatment or therapy to particular individuals. By contrast, the term "**research**" designates an activity designed to test a hypothesis, permit conclusions to be drawn, and thereby to develop or contribute to generalizable knowledge (expressed, for example, in theories, principles, and statements of relationships). Research is usually described in a formal protocol that sets forth an objective and a set of procedures designed to reach that objective.

254. The oversight of the "practice of medicine" and the "physician and patient relationship" has traditionally been left to other regulatory agencies outside the FDA such as State Licensing and Medical Boards and Hospital-based peer review and credentialing bodies. For oversight of medical device manufacturers, in 1976 FDA was given Congressional authority for premarketing review, oversight of conduct of product sponsors, manufacturers, distributors, to ensure truthful and adequate labeling and promotions with a universal mandate to protect public health. Prior to the passage of the Medical Device Amendments in 1976, FDA's oversight of medical devices was primarily through oversight of product postmarketing

including labeling, misbranding and adulteration provisions of the Food Drug and Cosmetic Act.

255. In 1976, FDA's role for regulation and oversight of medical devices was dramatically changed to a system like FDA's regulation of drugs. The process included a pre- and post market phase for FDA oversight and interaction. Health care providers have come to rely in their daily practice of medicine that the ability of a manufacture to openly promote and distribute a medical device in the United States as equivalent with that manufacturer having obtained some form of minimal premarketing clearance and/or approval from the FDA.

256. However, health care providers and subsequent conduct as it relates to medical devices and patient safety have not been "exempted" by Congress from certain applicable sections of the Act. A health care provider can be viewed as device manufacturers or an agent of a device manufacturer. FDA used the FDCA to legally address physician and health care provider conduct engaged in the roles of sponsor, manufacturer, distributor that can impact public health. As example, the Act is applicable to physicians engaged in clinical investigation activities for sponsors for support of marketing applications, whether with or without an IDE. The physician is seen as a clinical investigator using patients as subjects when obtaining clinical data for sponsors to support product development, new claims or new indications. FDA can become involved with physicians when their actions enter them into marketing and promotion agreements with industry. There are situations where the Act can become applicable when a health provider's conduct falls outside the true day to day "practice" of medicine and accepted methods of peers.

257. However, it is the manufacturer that is held responsible by the Act to provide adequate instructions for use and adequate warnings to all health care providers engaged in their investigations in terms of clinical protocols, investigator brochures, informed consents and labeling and using its products. Manufacturers are also required by the Act to not misbrand or adulterate products sold in the United States. Labeling changes and updates can be made voluntarily by manufacturers to quickly ensure safety and efficacy of products, to address user errors, whether the product is still premarket or postmarket. Holders of cleared 510(k)s, with a few exceptions, such as a contraindication, can immediately make changes to labels improve the safety of labeling without first having to obtain approval from the FDA. Manufacturers of 510(k) products can immediately and voluntarily send out notifications, such as Dear healthcare Provider letters, to health care providers, hospitals, pharmacists, risk management, its customers, sales force, distributors without first obtaining FDA's approval.

## 2. DISCUSSION OF RISK FACTORS FOR CARTILAGE IN SCIENTIFIC LITERATURE

258. J. A. Key (1933)[13] wrote that by 1933 he was aware that there was literature that showed arthritic-like changes could be produced in joints by injecting a small amount of a strong chemical irritant into the joint. In his paper, he described being able to produce chronic progressive arthritis from repeated injection of weak acids, weak alkalies, distilled water, or salt solution into joints of animals. In terms of injury being produced in articular cartilage, he found that there were only certain areas of cells that would be immediately killed by the injections. The small superficial cells of cartilage tended to be able to survive the insult while the deeper cells in the deeper zones were killed. Necrosis and erosion of the cartilage over a joint's bearing

[13] Key JA, The Production of Chronic Arthritis by the Injection of Weak Acids, Alkalies, Distilled Water, and Salt Solution into Joints. J Bone & Joint Surg. 1933; 15:67-84

surface were usually accompanied by a proliferation of cartilage and bone around the margins of the cartilage and beneath the adjacent periosteum. The combination of central necrosis with marginal proliferation of the cartilage resulted in deformities of the joint's bearing surface. His observations supported that cartilage grows from beneath up rather than on the surface and that deeper cells are younger cells than those nearer the surface. Repeated injections caused inflammation of the synovial tissues and deformation and death of the articular cartilage. When the source of irritation was removed, the synovial tissues tended to return to normal, but the damage to the cartilage was more or less permanent. When articular cartilage was killed, it was difficult for the body to repair it because replacement cells could not freely migrate through the dense matrix to the site of injury. As a result, the dead cartilage remained in situ, preventing any further repair or replacement from adjacent living tissue. Furthermore, when cells of cartilage were killed, the surrounding matrix begin to disintegrate. Consequently, the effect of repeated minor injuries to cartilage was cumulative with time.

### 3. ARTHROSCOPIC SURGICAL PROCEDURES AND RISK FOR INJURY TO CARTILAGE

259. The use of arthroscopic procedures in orthopedics began to rapidly expand with the availability of new flexible endoscopic imaging technology in the late 1970s early 1980s. Regarding the new risk of bathing joints with solutions during arthroscopy, B. Regan et al[14], (1983) described that a standard time for arthroscopy knee procedures at their facility was fifteen to forty-five minutes, with the amount of irrigation solution being infused into a knee joint less than 500 ml. From their own observation, the authors concluded that the apparent ability of the knee to withstand the length of time and the amount of solution infused provided further that

[14] Regan, B et al Irrigating Solutions for Arthroscopy A Metabolic Study Journal of Bone & Joint Surg. June 1983. 65-A(5):629-631

"chondrocyte metabolism during such a short exposure to a limited amount of even an unphysiological solution at a pH of 5.3 is probably not a crucial issue." The authors continued:

> For operative procedures, however, the duration if the procedure is longer, and as much as 3000 ml of the solution is infused into the joint. Based on the data presented in this study, this would seem to pose a significant hazard to chondrocytes and it is likely that metabolism is severely impaired, at least for a period of time during and following the procedures. Normal cartilage my recover rapidly from such an insult, but it is possible that arthritic tissues (which generally maintain a *higher* rate of synthesis of matrix components than normal) could be severely damaged.

260. J. Fulkerson and T. Winters, Jr.[15] (1986) later began to review the long-term effects of arthroscopic procedures in terms of the selection of intra-articular irrigant solutions. The authors stated there was knowledge developing about the short-term alterations of articular cartilage environment being produced by these agents and the conditions introduced in the perioperative period. Regarding the perioperative use of local anesthetics during arthroscopy, the authors wrote (underlining added for emphasis):

> Injection of these agents can lessen pain in the postoperative period. Of immediate concern, however, is whether one is exposing the joint to unnecessary risks by limiting the protective pain response. An impactive insult, as might occur in an asensate joint, may progress to permanent cartilage degeneration.
>
> ...Loss of feedback has been demonstrated in anesthetized joints. One must be concerned about inhibition of proprioceptive response in an already injured and surgical traumatized joint.
>
> The biochemical effects of anesthetic agents are complicated. Bupivacaine (Marcaine) and lidocaine are produced in an isotonic saline solution, sometimes with a preservative methyl paraben. Nole et al. have shown that bupivacaine and saline independently cause inhibition of proteoglycan synthesis, and that the two have an additive effect. It appears the effect on cartilage is transient, as the recent electron micrographs from our lab show no evidence of ultrastructural damage to chondrocytes six days following bupivacaine/isotonic saline injection. Toxic effects of bupivacaine on other tissues, however, have been well documented.

[15] Fulkerson J P & Winters T.F Articular Cartilage Response to Arthroscopic Surgery: A Review of Current Knowledge Arthrosc: Journal of Arth and Related Surg. 1986. 2(3):184-189

261. J. Neidel et al[16] (1992) studied the effects of repeated intra-articular injection of a sterile saline solution on articular cartilage. After 20 injections into the knee joints of rabbits over a period of 4 weeks, chondrocyte glucosaminoglycan synthesis was evenly reduced in all cartilage layers and being accompanied by a depletion of the matrix. These changes were only partly reversed during a 4-week period when injections were stopped. The authors concluded that the microtrauma being produced by repeated injection into the joint and introduction of a saline solution over a short interval could produce damage to the articular cartilage.

262. S. Bulstra et al (1994)[17]discussed that synovial fluid normally maintains the physiological environment within a joint and that it supplies nutrition to the chondrocytes. During arthroscopy, the synovial fluid is replaced by irrigating solution; this may impair cartilage metabolism and especially proteoglycan synthesis. Regarding the authors' Discussion:

> The ideal irrigating solution should have compatible osmotic, pH, ion and conduction properties. Water is known to have a negative effect on cartilage metabolism. The ionic concentration of normal saline resembles that of serum and other body fluids, but it is considerably more acid (pH 5.3) than most body fluids, and it also disturbs the ionic equilibrium of the cells…
>
> Some authors have shown that even short-term exposure to irrigating fluids induced metabolic inhibition of chondrocytes. It has been considered that articular chondrocytes make a quick recovery, but we showed definite inhibition of recovery time of 16 hours with a prolonged exposure to the radiolabel. In vivo, recovery may well be even more inhibited by the inflammatory reaction of the synovium to the irrigating fluid and the arthroscopic procedure.

---

[16] Neidel, et al. Intra-articular injections and articular cartilage metabolism. An experimental study in rabbits. Arch Orthop Trauma Surg(1992) 111:237-242

[17] Bulstra SK, Kuuer R, et al. The Effect in Vitro of Irrigating Solutions on Intact Rat Articular Cartilage. J Bone Joint Surg (Br) 1994; 76-B:468-70

263. J.S. Jurvelin, et al (1994)[18] found that the physiochemical characteristics of an immersion solution for cartilage can produce significant effects on its mechanical behavior. Using bovine cartilage, the authors identified that nonionic solutions retained functional characteristics of bovine cartilage better than did traditional Ringer's solution.

264. Y. Nakagawa et al. (1998)[19]reported a case of glenohumeral osteoarthritis following a color test used during a rotator cuff repair. The pathology was associated with the injection of an intraoperative color test aqueous gentian violet solution into the joint. At follow up 25-months after surgery, the patient noticed that she still had a dullness in her right shoulder when she tried to work. The case was thought to show that use of gentian violate solution in the joint might be harmful to chondrocytes.

265. G. Liguori et al. (2002)[20] provided a case report of a 44-yr-old male undergoing knee arthroscopy with a local anesthetic that showed systemic toxicity following a postoperative injection of 0.25% bupivacaine with subsequent intravascular uptake of the local anesthetic.

266. N. Dogan et al. (2004)[21] investigated the effects of intra-articular injections of bupivacaine and neostigmine on articular cartilage and the changes in the synovial membrane of rabbit knee joints. Joints treated with bupivacaine and neostigmine showed significantly more histopathological changes than control joints. The joints injected with neostigmine showed

---

[18] Jurvelin J.S., et al. Effects of Different Irrigation Liquids and Times on Articular Cartilage: An Experimental, Biomechanical Study. Arthroc: J Arthro and Relat Surg(1994) Vol. 10 No. 6:667-672

[19] Y. Nakagawa et al. Glenohumeral Osteoarthritis Following a "Color Test" during Rotator Cuff Repair A Case Report and a Review of the Literature. Bulletin Hospital for Joint Disease 1998 Vol 57(4) 216-218

[20] Ligouri G et al Possible Bupivacaine Toxicity After Intra-articular Injection for Postarthroscopic Analgesia of the Knee: Implications of the Surgical Procedure. Anesth Analg 2002;94:1010-3

[21] Dogan N, et al. The Effects of Bupivacaine and Neostigmine on Articular Cartilage and Synovium in the Rabbit Knee Joint. J Internat Research 2004:32:513-519

significantly more cartilage changes than bupivacaine. However, bupivacaine had more articular cartilage inflammation on day 10. The authors discussed that many studies had supported the safety of intra-articular injections of bupivacaine. But, from their study, they saw there is a potential for bupivacaine to cause latent inflammation in articular cartilage and synovial membranes. When compared to injection of saline, bupivacaine produced more structural changes in chondrocytes. In the study, intra-articular bupivacaine treatment caused more inflammation than saline, but less inflammation cell infiltration, hyperplasia and hypertrophy in the synovial membrane when compared with intra-articular neostigmine. Therefore, different solutions used in joints whether as a single injection or as multiple injections could all produce different findings. The authors continued:

> Our results show that bupivacaine is an agent that can be used safely as in intra-articular injection. There have been a few case reports, however, indicating that bupivacaine can lead to a delayed hypersensitivity reaction and toxicity after intra-articular use. In this case, the histopathological changes in the joint brought about by bupivacaine might be important.

## 4. ORTHOPEDIC SURGEONS BEGAN TO EXAMINE THE RISKS AND BENEFITS OF POST OPERATIVE CONTINUOUS INFUSION WITH LOCAL ANESTHETICS

267. Articles began to be published which debated the use of local anesthetics like bupivacaine for continuous infusion by intra-articular pain pumps as elective post-operative pain management following orthopedic and arthroscopic procedures. F. A. Barber et al[22] (2002) evaluated the effectiveness of a local anesthetic continuous-infusion pain pump on postoperative pain after outpatient shoulder surgery using bupivacaine. B. Ilfeld et al (2002)[23] expressed

[22] Barber FA Morley AH The Effectiveness of an Anesthetic Continuous-Infusion Device on Postoperative Pain Control Journal of Arthro & relate Surg January 2002 Vol 18(1):76-81

[23] Ilfeld BM Morey T, et al. The Delivery Rate Accuracy of Portable Infusion Pumps Used for Continuous Regional

concerns that the performance of the post-operative pain pumps, which could infuse potentially toxic medications, had not been independently investigated. The authors felt that the pain pump power source and the ambient temperature would also impact the pump's infusion rate, with differences in pump flow rates having a potential impact on patient safety and outcome.

268. In an article for *Orthopedics Today* by P. McGee (2004)[24], the usefulness of the post operative pain pumps for pain management came into question. "We lost some of our enthusiasm for the pumps when the techniques evolved into more arthroscopic approaches", the article continued"[w]e also found that we could get good analgesia with an interscalene block. The article had that "[i]n 1994, Mallon published the first study on the use of pain pumps." Regarding the lack of adequate clinical studies from a healthcare providers perspective, McGee wrote about a need for more research about pain pumps:

> Ticker and other agree that more data might help persuade surgeons to use these tools. There are now, at most, 15 published studies on pain pumps, and most of those focus on their use in the shoulder. Many surgeons who have used the pumps believe that more randomized, blinded trials could clarify whether lidocaine, marcaine or some other drug is best to sue, and what rate of drug infusion is optimal. Duralde said studies could also be done to examine the possible placebo effect of patient-controlled analgesia.

269. AP Boss, et al (2004)[25], wrote that the "continuous subacromial infiltration of 0.25% bupivacaine at a rate of 6 mL/h is concluded to be <u>ineffective</u> in providing pain relief supplementary to patient-controlled analgesia after open rotator cuff repair and acromioplasty."

---

Anesthesia. Anesth Anal 2002; 95:1331-6.

[24] McGee P. Pain Pumps: Efficacy and usefulness debated for shoulder repair. Orthopedics Today May 2004; 24:1(http://www.orthosupersite.com/print.asp?rID=1794

[25] Boss AP et al Continuous subacromial bupivacaine infusion for postoperative analgesia after open acromioplasty and rotator cuff repair: Preliminary results

D C Quick et al (2003)[26] concluded that use of the" device presented some inconveniences to the surgical staff and the patient. It was concluded that use of this particular device in these particular applications is not justified." S. Klein et al (2003)[27] performed a comparator study at Duke University Medical Center between post operative pain relief from interscalene blocks versus intra-articular infusion for post-operative pain management for rotator cuff surgery. The primary measurement used did not support there was adequate pain relief provided by the intra-articular pain pump infusions when compared to interscalene blocks.

270. W.M. Ciccone et al (2008)[28] concluded that the interscalene regional block provided more pain relief than infusion pumps immediately after arthroscopic shoulder surgery. Also, the infusion pumps did not significantly reduce pain levels after the block wore off.

## 5. REPORTS OF CHONDROLYSIS IN THE MEDICAL LITERATURE ASSOCIATED WITH ARTHROSCOPIC PROCEDURES

271. The medical literature began to report physicians describing clustering of patient case reports all with chondrolysis associated with arthroscopic procedures. D. Petty (2004)[29] and colleagues began their article by noting, "glenohumeral chondrolysis is a rare and devastating complication of shoulder arthroscopy." The authors continued, "[t]here had been no cases of glenohumeral chondrolysis reported after routine shoulder arthroscopy in the medical literature and now his group had three". These authors now reported rapid glenohumeral joint

[26] Quick DC Guanche CA Evaluation of an anesthetic pump for postoperative care after shoulder surgery. J Shoulder Elbow Sur 2003; 12:618-21.

[27] Klein S M et al The difficulties of ambulatory interscalene and intra-articular infusions for rotator cuff surgery: a preliminary report Can J Anesth 2003 Vol 50(3): 265-269

[28] Ciccone WJ et al. Assessment of Pain Relief Provided by Interscalene Regional Block and Infusion Pump After Arthroscopic Shoulder Surgery Journ of Arthrosco & Related Surg, January 2008; Vol 24(1):14-19.

[29] Petty DH et al Glenohumeral Chondrolysis After Shoulder Arthroscopy. Case Reports and Review of the Literature. Amer J of Sports Med 2004 Vol 32 (2): 509-515

destruction in three young patients following elective shoulder arthroscopy. The authors did not know the cause of the chondrolysis but the speculated that in the cases heat produced in the joint from new use of a thermal ablator for the procedures may have been a possible cause of a once formerly rare event.

272. AH Gomoll, et al. (2006)[30] concluded from his animal research of chondrotoxicity that continuous intra-articular infusion of bupivacaine, both with and without the use of epinephrine, was able to produce significant histopathologic and metabolic changes in articular cartilage. The findings of Gomoll (2006) paralleled the prior scientific literature and findings about cartilage toxicity described by Key (1933). For Gomoll, et al., from his studies bupivacaine demonstrated it was capable of producing profound chondrotoxic effects in an experimental model simulating the clinical use of postoperative pain pumps for orthopedic surgery. The authors cautioned against the future use of such pain pumps in smaller joints with minimal clearance or dilution of local anesthetic such as occurs with residual hematoma and where continuous exposure of cartilage to bupivacaine would be expected. The same animal chondrotoxicity data and conclusions were published again in Europe by RW Kang[31]. At the American Academy of Orthopedic Surgeons in 2006, there was a Podium Presentation by B. Hansen, C. Beck and R. Townsley (2006)[32]. The presentation included their review of 152 patient charts for 177 shoulder arthroscopies performed from January 1, 2003 to December 31, 2005. The charts were examined for evidence of post-operative chondrolysis. The authors found

[30] Gomoll AH, et al. Chondrolysis After Continuous Intra-Articular Bupivacaine Infusion: An Experimental Model Investigating Chondrotoxicity in the Rabbit Shoulder J. Arthos & Relat Surg. August 2006; Vol 22(8):813-819

[31] Kang RW Gomoll AH, et al Chondrolysis after Continuous Intra-Articular Bupivacaine Infusion An experimental model investigating chondrotoxicity in the rabbit shoulder. European Cells and Materials Suppl 1, 2006; Vol 12: 61.

[32] Hansen B Beck C Townsley Post-arthroscopic shoulder chrondrolysis with associated intra-articular Pain Pump Catheter use. March 23, 2006 (http://www3.aaos/anmeet2006/podium/podium.cfm?Pevent=360)

twelve shoulders for ten patients that had gone on to develop chondrolysis. 83% of those patients required to have a subsequent surgical procedure.

273. Dr. C. Chu, et al (2006)[33] conducted a study using bovine cartilage which showed 0.5% bupivacaine solution was cytotoxic to articular chondrocytes and articular cartilage *in vitro* after only 15 to 30 minutes exposure. The areas of intact bovine articular surface had shown some chondroprotective effects. The authors continued:

> Because healthy chondrocytes are important for maintenance of the cartilage matrix, chondrocyte loss may contribute to cartilage degeneration. This study shows a cytotoxic effect of 0.5% bupivacaine solution on bovine articular chondrocytes in vitro. Although these results cannot be directly extrapolated to the clinical setting, the data suggest that caution should be exercised in the intra-articular use of 0.5% bupivacaine.

274. The same authors followed up with a 2008 study, C. Chu (2008)[34]. Using an *in vitro* human chondrocyte model, the authors used time-lapse confocal microscopy of the articular chondrocytes to show >95% cellular death after exposure to 0.5% bupivacaine for 30 minutes. Both human and bovine chondrocytes, when exposed to 0.25% bupivacaine, had a time-dependent reduction in viability. The longer the exposure times of cartilage to bupivacaine, the higher the chondrotoxicity. Cellular death of cartilage persisted even after the 0.25% bupivacaine solution was removed. The authors continued:

> After exposure to 0.25% bupivacaine for 15 minutes, flow cytometry showed bovine chondrocyte viability to be 41% of saline control after seven days. After exposure to 0.125% bupivacaine for up to 60 minutes, the viability of both bovine and human chondrocytes was similar to that of the control group. These data

33 Chu C R, Izzo, NJ et al. In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articuarl Cartilage. Jounr Artho & related Surg July 2006; Vol 22(7):693-699.

34 Chu CR, et al The in vitro effects of bupivacaine articular chondrocytes Joun of Bone & Joint Surg. June 2008; Vol 90-B(6):814-815.

show that prolonged exposure to 0.5% and 0.25% bupivacaine solutions are potentially chondrotoxic.

275. Dr. Chu (2009) was one of several authors in a later study also looking at the effects of injection of local anesthetic lidocaine (Xylocaine) and the corticosteroid methylprednisolone.[35] The injection of lidocaine as an intraarticular nerve block for arthroscopic procedures is in the product insert for that anesthetic. The results showed a dose and time-dependent decrease in chondrocyte viability after exposure to clinically relevant doses of methylprednisolone. Lidocaine and Methylprednisolone are commonly used together as an injection for a treatment of a painful and acutely or chronically inflammed knee. The methylprednisolone is added to lidocaine to help reduce the amount of inflammation in the knee. The authors found that the combination of methylprednisolone and lidocaine together, despite the long-term empirical use together, was actually chondrotoxic. Virtually no cells survived after treatment. In addition, the methylprednisolone had failed to reduce the inflammatory effect as anticipated, but rather appeared to potentiate the chondrotoxicity. This *in vitro* study however, provided important new information on the potential negative effects of two common drugs on articular cartilage following a single intraarticular injection.

276. G. Poehling[36](2009), wrote in his editorial that :

> In addition, for those who missed (the rather tart) dessert the first, second, and third times around, high levels of bupivacaine are cytotoxic to chondrocytes, and continuous intra-articular infusion of bupivacaine cannot be recommended pending research to the contrary.

[35] Seshadri V, Coyle C, Chu C Lidocaine Potentiates the chondrotoxicity of Methylprednisolone. Joun Arth & Related Surg April 2009 Vol 25(4);337-347.

[36] Poehling GG, Editorials Editor-in-Chief Keeping it Short: Evidence-Based International Systematic Reviews, Rotator Cuff, Knee Posterolateral Corner, and Bupivacaine Chondrotoxicity. Journ of Arthroscop & Related Surg March 2009 Vol 25(3):223

277. Alan Anz, et al (2009)[37], reflecting the result that a lack of appropriate premarketing research by manufacturers as to the types of drug that might be best suited for combination with its infusion intraarticularly for postoperative pain produced, wrote:

> Intra-articular bupivacaine infusion is an effective analgesic strategy and is frequently used in both office and outpatient surgical settings. This study provides evidence that the continued usage of postoperative bupivacaine continuous infusion pumps may have a detrimental effect on chondrocytes, Morphine has been shown to be an effective intra-articular analgesic, and its anti-inflammatory role seen in this study makes it a potential alternative to bupivacaine.

278. A responsible pump manufacturer would have first conducted an adequate search of animal cartilage studies, first obtained knowledge about the properties of cartilage, first become aware of 1990s arthroscopic medical literature and risks of irrigants in a joint. A responsible pump manufacturer would also have considered FDA's 1998 safety concerns about clearing continuous infusion of a joint space. Then, if still convinced an intraarticular pain pumps was still a feasible product, a responsible pump manufacturer's next step would have been to take all available information to design and test pain pump systems and medications for creation of reliable pump systems with adequate instructions for use to safely infuse a patient's joints post operatively for elective pain control. However, the three manufacturers, McKinley, I-Flow and Stryker, all failed to take the appropriate steps of research and development, all failed to adequately design and test and all failed to create reliable and safe systems for intraarticular use. The three manufacturers went able to prematurely get through the 510(k) process to market poorly developed products. The lack of adequate premarket research and development however did eventually get uncovered in 2006 by physicians reporting of chondrolysis.

[37] Anz A, Smith M, et al The Effect of Bupivacaine and Morphine in a Coculture Model of Diarthroidal joints, Journ Arthosc & Related Surgery Article in Press, 2009 (Vol xx(X):xxx (M00020)

### 6. DESPITE THE RISKS AND SAFETY SIGNALS, MANUFACTURERS AND DISTRIBUTORS CONTINUE TO PROMOTE INTRAARTCULAR INFUSION WITH LOCAL ANESTHETICS TO PHYSICIANS

279. Despite the scientific literature that discussed chondrotoxicity and delicacy of synovial membranes, chondrocytes and the cartilaginous joint environment, pump manufacturers and distributors like McKinley, I-Flow, DJO and Stryker continued to promote unapproved use of bupivacaine with its pain pumps for continuous intra-articular infusion. All of these firms failed to inform or train its sales representatives and employees about the risk of intra-articular injection, that such use was investigational since it had not been cleared by FDA.

## B. PUMP MANUFATURER POST MARKETING CONDUCT

280 As has already been discussed above, it is the pain pump manufacturers and distributors that have the primary continuing duties and obligations for monitoring and ensuring the safety and performance of its products, not the FDA. It is a Prohibited Act (21 USC 331) to sell either a drug or device in the United States that is not safe and effective and adequately and truthfully labeled. Manufacturers also have a duty to update labeling, marketing, communications to provide adequate instructions for use and warnings. All the pain pump manufacturers and distributors discussed have failed to adequately monitor and warn.

### 1. MCKINLEY/CURLIN/MOOG

281. After January 2004, DJO participated in the distribution of the McKinley pain pumps (Beeline Systems and Accufuser/Accufuser Plus)(See discussion of DJO below). According to testimony by Ms. Coulter at DJO as well as testimony from Pacific Medical, Curlin/MOOG made modifications to its pain pump label regarding the risk of intra-articular use

and failed to tell anyone. Curlin/MOOG did not send out a Dear Healthcare Provider Letter or even a letter for its distributors, sub-distributor, sales force. DJO received no letter from Curlin/MOOG about label changes. As a result of Curlin's failure to update DJO, DJO sent out its own letter to customers informing them that there had been changes made to the pump's labels.

282. At the end of 2005, McKinley first reported to FDA that "Surgeons have reported a 'higher than normal incidence of chondrolysis' in shoulder-surgery patients when using local anesthesia kits."

283. In October 2007, Ms. Coulter first DJO heard from Mr. Buck, there was discussion within McKinley/Curlin/Moog, was considering a disclaimer for the kit telling healthcare providers not to infuse an epinephrine containing product.

284. DJO's first and only action to independently notify its current customers purchasing pumps about the risk of chondrolysis was August 11, 2008. (K Coulter 3/24/09, p. 135, L. 15-17, Coulter Exhibit 35). Curlin/MOOG had no input into the DJO letter. DJO's letter was sent out only to purchasing customers, not physicians or health care providers, when it realized that it had not been informed by Curlin/MOOG that it had updated its own pump product labeling warnings regarding intra-articular use (K Coulter 3/24/09p. 139, L. 23-25).

## 2. I-FLOW CORPORATION

285. I-Flow utilized multiple marketing tools and methods to promote off-label intra-articular use, including training its sales staff specifically to promote intra-articular use (C.

Pritchard 2/20/09 p 58-60, L. 16-17; p 174-5, L. 7-24; p 176 L 4-9). I-Flow gave its sales staff direction sheets titled Catheter Placement Techniques.

286. In May 2004, each manufacturer, including I-Flow had a safety signal about risks of indwelling pain pumps when Dr. Brown, FDA published the agency's findings about adverse events associated with pain pumps in *Anesthesia*[38]. The FDA discussed adverse events associated with use of indwelling pain pump systems for 40 patients. The authors wrote, "[t]he consequences of these adverse events were typically severe and required intervention and additional medical and surgical treatment." The authors also concluded:

> …the reports provide a potentially important signal, suggesting a need for further investigation of the relation between use of pumps for direct continuous infusion of anesthetics and other drugs into surgical wounds and tissue necrosis, serious infection, or cellulitis
>
> ..These reports may represent sentinel evens, i.e. an early warning that is representative of a problem that is widespread, or alternatively, these may be isolated events.(IFLOW ESD 001372-373).

287. Alan Dine, Director of Clinical Research, I-Flow wrote about the Brown (2004) article: "…the purpose of this article remains unclear, however it seems to be aimed at increasing awareness about the use of local anesthetic infusion pumps and the need for institutions and practicing physicians to populate the MDR database." He continued (underlining added for emphasis) "[a]s this is a case report and lacking scientific depth in any area, the true purpose of the paper is to raise awareness to the <u>need for further surveillance of this technique and others</u>." He concluded that I-Flow "will continue to aggressively investigate

[38] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

complications like these and make changes to our labeling and training when we have scientific evidence of cause and effect."(IFLOW ESD 001568-0)

### i. I-FLOW FAILED TO ADEQUATELY INVESTIGATE COMPLAINTS OF CHONDROLYSIS

288. On July 27, 2004, I-Flow Territory Manager Cheryle Pritchard emailed a report back to I-Flow that she had learned of eight college age patients with "instability repairs who receive pain pumps and developed a virus that caused chondrolysis." (IFLOW ESD 001153). The information was reported to Alan Dine, and despite his conclusions about surveillance and aggressive investigation of complaints for the FDA's Brown (2004)[39] article, he let the I-Flow investigation essentially stop with him (A. Dine 12/6/08, p. 57, L. 14-24; p 66, L 22-25; p. 67 L. 1-15). Mr. Dine stated he never told anyone at I-Flow about the e-mail. (A. Dine 12/16/08, p73, l. 6-13). I-Flow's executive management is held directly responsible by FDA under the Quality System Regulations and pursuant to 21 CFR§ 820.20 for establishing policies and procedures, selection of personnel and adequacy of training that ensures quality procedures are understood and implemented at all levels. Quality Systems includes the handling of complaints like received from Ms. Pritchard, conduction of further investigation by I-Flow, quality control corrective and preventive action (CAPA) and timely adverse event reporting to FDA(21 CFR§ 803). Mr.Dine had received a very serious complaint from the field, Yet as a direct result of his lack of actions, the complaint failed to be entered into I-Flow's complaint database. Because the event was not entered into the database, no investigation was conducted and no one considered whether the

[39] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

filing of a timely MDR pursuant to 21 CFR 803 was required. The information from the field literally hit a wall with Mr. Dine and was lost.

289. Available to I-Flow in 2004, if a search had been conducted of the literature or I-Flow had monitored the medical literature for reports of chondrolysis was Petty (2004)[40]. The article reported three cases of glenohumeral chondrolysis following arthroscopic shoulder surgery, one patient had a pain pump. The patients, as in the Pritchard email were young, a16-year old male and two 18-year old female athletes. The authors noted that no other case of glenohumeral chondrolysis secondary to shoulder surgery had been previously reported and they found only two other case reports on chondrolysis secondary to shoulder surgery in the world literature. Yet, I-Flow through Ms. Pritchard had received a report of eight college age patients, and Petty (2004) had reported on an additional one patient in the year 2004 all with chondrolysis and pain pumps. The reporting of a previously rare condition occurring in an unusual population, young patients, associated with an unapproved combination of products following the same procedure, arthroscopic shoulder surgery, should have raised a big red flag for a responsible manufacturer with a robust surveillance system.

290. In January 2006, an orthopedic surgeon in Montana, a "big user of pain pumps"(IFLOW0001041) notified I-Flow of three patients, female athletes with no prior history of health problems, who developed chondrolysis following the use of an ON-Q pump (IFLOW ESD 10065)(2006-00013;206-00015; 2006-00016)(IFLOW000968). Complaint 2006-00013, female had a shoulder procedure(arthroscopic Bankhart Repair) September 23, 2004, and

---

[40] Petty DH et al Glenohumeral Chondrolysis After Shoulder Arthroscopy. Case Reports and Review of the Literature. Amer J of Sports Med 2004 Vol 32 (2): 509-515

developed symptoms of grinding by seven months (IFLOW0001024). Complaint 2006-00015 is a 13 year old female, had her procedure in August 2005 and began having grinding symptoms at 3 months(IFLOW0000988). Complaint 2006-00016 is a 19 year old female, had a shoulder procedure in June 2005, and grinding symptoms at 3 months,)(IFLOW0001006). All patients had the ON-Q PainBuster (100ml x 2ml/hr) for 48 hours and good results with pain pump (IFLOW0001038). Patients would require an arthroplasty in the future. The Evaluation Summary for the FDA used for the three MDRs:

> The device involved in this incident is not available for evaluation; therefore, our results and conclusion are based on the information that was given to I-Flow by the initial reporter.
>
> Based on the information provided, we are unable to determine whether our device caused or contributed to the reported incident.
>
> We have reviewed our complaint data base dating back to 2002, and no other incidents were found. This incident is one of three for "chondrolysis" involving the same surgeon and reported at the same time
>
> This is a very rare incident. In addition, the attached study shows that the disease pathophysiology is currently not understood. (IFLOW0000972)

291. Risk information not provided to FDA, but the Montana physician also reported to I-Flow that one of his colleagues had 15 of chondrolysis he attributed the cause to the "pain pump"(IFLOW0001041)- not I-Flow pumps. Other physicians began to openly express concerns about the pain pumps. Again, additional signals for a responsible company that was intent on monitoring product performance and safety. The Montana "big user of pumps" asked if I-Flow had received other reports. (IFLOW0001041)

292. I-Flow did submit the three Montana reports to FDA as MDRs in February 2006 as chondrolysis post shoulder surgery. The Manufacturer's narrative on the MDR has:

> "Co has reviewed co's complaint database dating back to 2002, and no other incidents were found...This is a very rare incident. In addition, the attached study shows that the disease pathophysiology is currently not understood."

293. Kathy Thompson, who circulated the complaint from the Montana surgeon within I-Flow stated, "[t]his is one of those complaints that will take some investigation to try to determine whether the use of ON-Q contributed in any way." There is no information about the aggressiveness of the investigation that was actually conducted by I-Flow in 2006.

294. On March 23, 2006, orthopedic surgeons Brett Hansen and Charles Beck made a presentation at an orthopedic medical conference reporting that 12 shoulders of 10 patients exposed to a pain pump and Marcaine developed shoulder chondrolysis. None of the patients that did not receive a PainPump developed chondrolysis. The authors concluded that:

> Although the exact etiology and mechanism of chondrolysis is still unknown, we believe there is a significant and previously unrecognized risk associated with the use of IAPPC's [intra-articular pain pump catheters] and bupivacaine with epinephrine. IAPPC's should be used with caution until the safety of constantly infusing local anesthetics intraarticularly is better defined (IFLOW ESD 067213; IFLOW ESD 096167).

295. Despite the mounting safety signals for unapproved product in the medical literature, adverse event reports and conferences, I-Flow continued not to test its pain pump and bupivacaine in terms of potential risk to cartilage and cause of chondrolysis. I-Flow also did not attempt to get feedback from its sales representatives directly from the field as to physician reports of patient outcomes. Dr. Dragoo, Stanford, though Barbara St John in late 2006 contacted Mr. R Massengale, I-Flow to request support from I-Flow to conduct animal studies. Mr. Massengale testified that I-Flow's response was that "they were not interested in pursuing a study". (R. Massengale 12/9/08. P 48-9, L. 22-20; 50 l 5-13).

296. Barbara St. John, in an email entitled "Chondrolysis" on March 7, 2006 to Kathy Thompson, Alan Dine, and Roger Massengale, wrote:

> Apparently the question about chondrolysis is coming up again. This time in San Fran....Chris O'Neill asked if I could come up with an explanation for his region to arm them with responses to objections. Maybe we can talk about this tomorrow so we can come up with a standardized response (IFLOW ESD 079634).

297. Alan Dine in a March 31, 2006 email entitled "Chondrolysis" sent to I-Flow's Clinical, Sales and Inside Sales reported:

> I have had a few inquiries into the relationship of infusion pumps to reports of chondrolysis...It appears from the data we currently have that the cause of chondrolysis in these patients may be related to the use of epinephrine in the pump. We continue to review the data on these events and report any new findings to you. (IFLOW ESD 067186)

298. In response to Alan Dine's email, Barbara St. John referred to the Hansen and Beck presentation that prompted inquiries about chondrolysis writing "Hopefully we can throw some water on the fire and put it out before it does much damage." (IFLOW ESD 079092).

299. Cheryle Pritchard, Arizona Territory Management for I-Flow, reported a cluster of patients' cases with chondrolysis on June 27, 2006. This time, Ms. Pritchard reported that multiple surgeons noted an increase in patients developing chondrolysis. Ms. Pritchard was told by one surgeon that "although your company would be angry, you should discourage surgeons from using the pump in joints." Ms. Pritchard continued in her email: "[m]any many surgeons bring this topic up to me every day- ortho and non-ortho." (IFLOW ESD 080457-458; IFLOW ESD 067210).

300. A financial analyst for I-Flow discussed another case of chondrolysis. In September 2006 the analyst described a surgeon who, when after his patient used a PainBuster,

upon re-opening the area found that at the surgical site "all the articular cartilage was gone." The surgeon had come to the conclusion that" the constant infusion of the joint with the local anesthetic was responsible for the damage." (IFLOW ESD 059323-4).

301. I-Flow's response to the reports was that the same problem had not been seen in their clinical trials. Orlando Rodrigues, Vice President of Marketing, who had received the September 2006 report, testified that of the 30 or 40 clinical studies that had been done with the pumps in various surgical specialties, none of the clinical studies that he was aware of had examined the issue of intra-articular placement of a catheter infusing general anesthetic at a flow volume of greater than 100cc unto a joint space (O. Rodrigues 12/11/08 p. 129-130, L. 23-16).

302. Internally, the concern about chondrolysis was increasing as in the medical community, but I-Flow did not take active and effective steps to address the safety issue. Territory Manager, Amy Harper, wrote to Barbara St. John asking for a copy of the articles discussed "a few weeks ago concerning the use of marcaine and potential cartilage damage." She asked, "Do we have a response yet?" Ms. St. John replied:

> Our response is still pending. I will attach the two articles, but I would be pretty careful about how you use them because those orthopods could make trouble for you elsewhere if they spread the word to their friends. Our official reply to this at this point is "We're looking at the data."(IFLOW ESD 082733).

303. Despite all of this discussion about risk of chondrolysis, I-Flow continued to provide physicians with information about the glenohumeral joint placement of a catheter. On October 16, 2006, Group Marketing Director Julie Schneider provided a Territory manager with a PowerPoint presentation to show to an orthopedic surgeon that might serve as one of I-Flow's speakers. Two of the slides reference glenohumeral placement as a use for surgeons (IFLOW

ESD 096941; IFLOW ESD 096943-63, 965). Ironically, at the same I-Flow was providing the October 2006 about use in joints, I-Flow silently revised its DFU to warn against catheter placement in a joint space (IFLOW ESD 31243).

304. I-Flow September 24, 2008 letter to FDA:

> Enclosed herewith are twenty (20) MDRs reflecting lawsuits that have been served on I-Flow. These lawsuits and MDRs were previously referenced in the letter sent to FDA on August 19, 2008. We have not previously filed MDRs in relation to these lawsuits because product identification has not yet been confirmed in all the lawsuits that I-Flow has received. However, taking the conservative approach, we are filing the enclosed MDRs for those lawsuits.(IFLOWP00030501)
>
> I-Flow report # 2026095-2008-00144, patient identifier 080754, chondrolysis event date event date "February 2006". Report filed with FDA 2008IFLOWP00030504)

305. An example of one of the I-Flow MDRs from a lawsuit filed with FDA in 2008:

> ADDITIONAL MANUFACTURER NARRATIVE (H10))
>
> The ON-Q Pump Direction For Use (DFU) contain a warning that states: "Avoid placing the catheter in joint spaces." Although there is no definitive established causal relationship, some literature has shown a possible association between continuous intra-articular infusions (particularly with bupivacaine) and the subsequent development of chondrolysis (DFU 1034265, Rev. G)
>
> I-Flow has also prepared a technical bulletin entitled "What We Know About Chondrolysis Today" (1303722, Rev. E)
>
> If additional information that is pertinent to this event becomes available, I-Flow will submit a follow-up report. (IFLOWP00030506)

306. FDA was not told that the label was changed after the woman's surgery, October 2006, and physicians were not notified. Also the technical bulletin was released in August 2007. None of the statements are applicable to this patient. Since the report is from a litigation, no further investigation will be conducted by I-Flow. (IFLOWP00030510) Under Corrective

Action: QA-1099: A warning is in the DFU and a Technical Bulletin is available to address Chondrolysis (IFLOWP00030510)

307. I-Flow has still not sent out a notification to physicians not to use the Pain Pump for intra-articular infusion based on the unacceptable risk of chondrolysis (permanent disability) from an elective post operative pain management.

### ii. I-FLOW FAILED TO WARN PHYSICIANS OF THE RISK OF CHONDROLYSIS

308. Dr. Brian Badman, who had used the catheter through 2007 for joint placement in his patients, in his "complaint with how things were handled" to I-Flow, noted that the label warning was changed in late 2006 to recommend to avoid intra-articular use, yet he complained, "at no time was I notified by either your company or your rep of this change." He continued, "if a notification had been made, at least three cases would have been prevented in my opinion." Dr. Badman reported to I-Flow that he had a 100% rate of chondrolysis when he used the high flow pump. With respect to the three patients that would not have had pumps and been spared chondrolysis, he wrote: "[t]his has devastated my patients' lives permanently resulting in a catastrophic outcome." (IFLOW ESD 078437-8; IFLOW ESD 077512-3)

309. I-Flow did file an MDR for Dr. Badman's 2006 events late for his three patients who developed chondrolysis after the switch to the high flow pump in October 2007. The Manufacturer's narrative submitted to FDA stated:

> In late 2006, in light of the possible connection between the use of bupivacaine in the intra-articular space and the onset of chondrolysis as suggested in the literature, and in an abundance of caution, I-Flow modified the ON-Q directions for use (DFU) by adding a warning to avoid placing the catheter intraarticularly.

310. FDA was not told that I-Flow did not notify physicians of the change to its labeling through a Dear Doctor letter or through training of its sales representatives (IFlow ESD 031243; B. St. John 12/15/08 p52, L. 9-14). I-Flow did not conduct a recall of inventory to update the labels and it did not add new warning stickers to its remaining product. Therefore, the label change may have occurred in October 2006, but with I-Flow's lack of efforts to notify physicians it could take months to years for the new label to be in the field and months to years for the physicians to learn about the change. I-Flow did not conduct a formal voluntary recall to remove violative product with inadequate warnings (Roger Massengale 12/10/08, p. 144, L.5-19) I-Flow did not monitor its sales force to ensure the adequacy of its actions and that sales representatives and health care providers were aware of the new DFU (B. St. John 12./15/08, p. 63, L. 5-9).

311. I-Flow's new 2006 Warning:

> Avoid placing the catheter in joint spaces. Although there is no definitive established causal relationship, some literature has shown a possible association between continuous intra-articular infusions (particularly with bupivacaine) and the subsequent development of chondrolysis (IFLOW ESD 031243-4).

312. I-Flow prepared a Technical Bulletin entitled "*Continuous Infusion in Restrictive Spaces: Volume and Flow Rate Selection*" to include the same DFU Warning (IFLOW ESD 067865). Don Earhart, President I-Flow, however, halted the release of the Bulletin (IFLOW ESD 095744). An alternative I-Flow Technical Bulletin concerning chondrolysis was later released in August 2007 titled "*What We Know About Chondrolysis Today*".(IFLOW ESD 105895). I-Flow's President, Don Earhart, directly disregarded patient safety when he prevented the release of any formal notification, such as a Dear Health Care Provider Letter to health care providers, operating room managers, clinical and hospital risk managers that would reasonably

have been expected to be read warning about the risks of chondrolysis which had been causally associated with intra-articular infusion. His actions failed to inform users about I-Flow's voluntary October 2006 changes to the product's label.

313. Instead I-Flow delayed and released a Technical Bulletin in August 2007. Without a formal communication that could effectively alert about risks, namely the risk of intraarticular use and chondrolysis and lack of an approved local anesthetic for infusion into a joint, a health care provider in an operating room who had already implanted pain pumps or who had interacted with sales representatives that downplayed the risks would have been unlikely to review the Pain Pump's new warning when it finally did appear with the product.

314. Furthermore, I-Flow failed to voluntarily conduct a recall of product remaining in the field with pre-October 2006 product labeling to update the label to include a warning about chondrolysisi. By I-Flow's not conducting an official product recall as required pursuant to 21 CFR 806.10 with notification of FDA in 10-working days, the agency was not alerted by I-Flow to the safety issue of chondrolysis which had been associated with unapproved intraarticular infusion with local anesthetics. FDA was not given an opportunity to classify the health risk for the public in 2006 pursuant to 21 CFR §7.41. FDA was not permitted to comment on I-Flow's label change and proposed communications to health care providers. FDA was not alerted to monitor the adequacy of I-Flow's voluntary recall plans and warning. According to 21 CFR§ 806.10:

> (a) Each device manufacturer or importer shall submit a written report to FDA of any correction or removal of a device initiated by such manufacturer if the correction or removal was initated :
>
> (1) To reduce a risk of health posed by the device; or

> (2) To remedy a violation of the act caused by the device which may present a risk to health unless the information has already been provided…

(b) The manufacturer or importer shall submit any report requird by paragraph 9a) of this section within 10-working days of initiating such correction or removal.

### iii. I-FLOW CAUSED LOCAL ANESTHETIC MANUFACTURERS' DRUGS TO BE MISBRANDED DRUGS

315. On June 26, 2008, the Richard Maround, General Counsel, APP Pharmaceuticals, LLC ("APP") wrote to I-Flow regarding the violative nature of its conduct:

> I am writing now to explain our position further and to ask once again that I-Flow Corporation ("I-Flow") immediately cease and desist from referencing any product of APP Pharmaceuticals…in its promotional materials and activities for the ON-Q Pain Relief System. It is our position that your promotional materials and activities mislead the public and violate FDA regulations, federal trademark laws, and numerous state statutes barring unfair business practices.
>
> You insist that your promotional materials and activities are "purely educational, not promotional." We strongly disagree. I refer you to the FDA's November 1997 Guidance for Industry-still current and in effect- titled *,Industry-Supported Scientific and Educational Activities.* That guidance distinguishes between unregulated educational materials and programs that are "truly independent from substantive influence by the marketers of regulated products." From FDA-regulated promotional materials and programs that are "not functionally independent [from and are] subject to influence by such marketers. Certainly I-Flow's materials-including, as just one example, I-Flow's "Technical Bulletin"-cannot be deemed "truly independent from substantive influence" by I-Flow. We note that your Technical Bulletins typically include your company's logo, your website address, a corporate telephone number, and I-Flow's registered trademark for the ON-Q Pain Relief System. Such materials and activities are regulated by the FDA under the Food, Drug and Cosmetic Act. Far more troubling, your promotional materials and activities appear to promote the use of APP products for unapproved uses, a clear violation of the FDA regulations (see, e.g., 22 C.F.R.§202.1(e)(6)(i)). It must be emphasized that I-Flow's promotion of unapproved uses for APP products with the ON-Q Pain Relief System constitutes a violation of FDA regulations whether or not I-Flow uses APP trademarks or simply generic names. We cannot stand by while I-Flow violates FDA regulations. Unless I-Flow immediately ceases and desists from such activities, APP will have no other choice but to report your unlawful promotional activities to the FDA.

> We further note that I-Flow's unauthorized use of APP's registered trademarks such as Naropin® (USPTO registration number 2130448) and Sensorcaine® (USPTO registration number 1313013) constitutes an act of trademark infringement (15 U.S.C. §§1114,1125)...
>
> Most troubling for APP is the potential for I-Flow's unlawful promotional materials and activities to mislead the public. We believe there is a substantial probability that the public, including medical and health professionals, may be mislead into believing that APP endorses the use of its product in conjunction with I-Flow's ON-Q Pain Relief System-a use that has never been approved by the FDA or thoroughly tested for safety and efficacy...We consider I-Flow's promotion of APP's products for uses that are unapproved by the FDA to be irresponsible, unethical , and unlawful (APP0335609-10)

**3. DJO**

**i. DJO FAILED TO TRAIN ITS OWN EMPLOYEES AND SALES REPRESENTATIVES ABOUT LACK OF FDA CLEARANCE OF INTRA-ARTICULAR USE**

316. On August 2000, DJO sent a SELLING BULLETIN to Distributor Partners and Sales Consultants, the subject was PainBuster and Controlling Pain Column in NURSING, July 2000. The title of the presentation was CONTROLLING PAIN: SOOTHING THE ACHE OF JOINT SURGERY. Sales was provided a copy of a recent question/answer column published in NURSING regarding the PainBuster Pain Management System for postoperative pain management following total joint surgery. The column was written by Karen Kettelman, RN, CAN, BA, Pain Management Coordinator Pain Service, Doctors Medical Center, Modesto, CA. It was suggested by DJO management that the reference could be used to share in–servicing the nursing staff on the PainBuster System. The Seller Bulletin failed to provided information to the sales representative or the nursing staff that the PainBuster was not cleared for an orthopedic surgery indication or for placement of a catheter in the intraarticular space. The Seller Bulletin also did not inform that bupivacaine was not approved by FDA for continuous infusion into a joint. The Bulletin, going to be handed out by DJO sales force failed to warn that there was no

information about long-term effects of infusion of bupivacaine into a joint. The reprint is not fair and balanced and constitutes providing false and misleading promotional materials for the pump sets. The reprint also misbrands bupivacaine, when provided by a pump manufacturer or agent, failing identify to the health care provider that the article is discussing investigational use of both a drug and a device. The reprint has the following question and answer:

> **QUESTION**: In my surgical unit, we have a new device for pain control after total joint surgery: a small pump that continuously infuses local anesthetic into the surgical site. Can you tell me more about it?
>
> **ANSWER:** The PainBuster, introduced by I-Flow Corporation and distributed by DJ Orthopedics, is the first infusion pump approved by the Food and Drug Administration for orthopedic applications....
>
> **Starting the infusion**
>
> At the end of the surgical procedure, the surgeon places microbore tubing attached to the pump in the joint or other surgical site....
>
> **Minimal adverse reactions**
>
> The risk of adverse reactions from this treatment is low. Although cardiotoxicity is a risk associated with L.V. Bupivacaine, it's not as much of a concern when the drug is infused locally into the surgical site.(DJO853-5)

317. Patti Gerke's document files contain one example of violative slide presentation training given to DonJoy sales force and distributors and is titled "PainBuster"(Exhibit 48). The second page has "*Objectives of the PainBuster Training*". It is followed by "*Important Clinical Information*" which included "*What do you known about Bupivacaine, Lidocaine and Ropivacaine?*"(DJO0716) In terms of the comparison between the use of narcotics versus local anesthetics, the benefits for use of local anesthetics are said to be " *minimal side effects, direct to the site, Bupivacaine (Marcaine), Lidocaine (Xylocaine) Ropivacaine (Naropin)*" and "*accepted treatment pre-op and post-op as a bolus*"(DJO0718). The presentation does state "*not to go to the cost*" since the PainBuster is an increase in cost versus the cost of using pain medications

(DJO0719). The next slide is titled " *What do we know about Bupivacaine (Marcaine)?* " and provides that there are 10cc, 30cc and 50cc vials, the daily dosage limit – 400mg...(DJO0720). "*What do we know about Lidocaine (Xylocaine)*?", provides there are 2cc-50cc vials, .5%, 1% concentrations (1.5% and 2% also) and the daily dosage limit- 300mg without epinephrine, 500 mg with epinephrine(DJO0721). "*What do we know about Ropivacaine (Naropin*)?", the slide provides it is available in 10, 20, 30, 100 and 200 cc vials, 0.2%, 0.5%, 0.75% and 1% concentrations, daily dosage limit-770mg(DJO0722) The types of surgeries for the pump are listed to include: Knee, Shoulder, Elbow, Foot & Ankle, Hand & Wrist (DJO0725).

318. The training presentation continued: "*When you get "Toxicity questions,*" the recommendation was to follow drug manufacturer's recommendations for proper dosing; the sales person was told that "*the manufacturer of Marcaine (Abbott Labs) does not recommend exceeding 400mg/day.*" The training indicates to the sales force that they will "*Need to be able to calculate the 24 hour dose including the bolus.*".(DJO0727).

319. Ms. Gerke testified that in the training sides, when she reached "*Catheter Placement –Case Reports,*" that slide information was normally presented by a physician (P. Gerke,3/26/09,p.102-3, L. 9-3). The slide indicated that for knee surgeries, the catheter goes in the joint or graft site..., for shoulder surgeries it is placed in the subacromial space or the joint (DJO0730). Therefore, it is clear from the presentation and testimony of Ms. Gerke, as well as other at DJO, that DonJoy, in cooperation of I-Flow before 2004, was teaching the DonJoy PainBuster distributors and sales force about intra-articular catheter placement and warning them that they will need to be facile with calculation of dosing of common local anesthetics. There is no mention for sales representatives that any of this is considered as investigational.

320. The DJO training included a discussion of current pump competition. There was discussion of the strengths and weaknesses of Sgarlato, Stryker PainPump-McKinley OutBound; Stryker Pain Pump [2], Zimmer Palm Pump; Breg PainCare 2000, 2000L, 3000; and Alpha 200 (DJO00732-8).

321. According to Scott Rogow, a former DJO Manager of Education and Training, the primary method for training DonJoy new sales force was at the DJ University, using a PowerPoint presentation. During the time he was DJO's Manager of Education and Training, he had been unaware of DJO having its own Catheter Placement Guide (s. Rogow, 3/27/09 p. 54, L. 23)(DJO05399). He indicated that he did review the local anesthetics was part of the sales representative training (S. Rogow, 3/27 /09, p. 55, L. 15). When he was DJO's marketing manager for the pain pump line, he testified that <u>no one ever informed him</u> that orthopedic surgery or intra-articular use was unapproved or considered as off-label. (S. Rogow, 3/27 /09, p. 57, L. 6-20). Therefore, it is highly unlikely he would have conveyed that information to the new sales force at any time in any training.

322. Kyle Coulter became responsible for managing and in-servicing for DonJoy pumps in 2006, when DJO was selling McKinley/Curlin pumps. The DonJoy pumps beginning in 2004 were relabeled McKinley BeeLine pumps with a later change to the Accufuser and involvement of Curlin in 2007 (K. Coulter, 3/24/09, p. 57, L. 4-14). Her job at DJO meant "basically being responsible for education, answering questions and basically providing sales support to the field and support to customers." (K. Coulter, 3/24/09, p. 20, L. 8-11). Her contact at McKinley/Curlin was Jim Buck.

323. Ms. Coulter began that DJO would never send out its own warnings without first consulting with the manufacturer. (K Coulter 3/24/09, p91, L.21). It was her policy that she wouldn't discuss physician complaints with sales representatives unless specifically instructed she was able to do so from regulatory or legal (K. Coulter 3/24/09, p. 92-3 L. 23-1) In terms of her Pain Control Device In-Service Presentations (EDJ-5578-5591), she told health care professionals that it was up to them where they placed a catheter. (K. Coulter, 3/24 /09, p. 59, L. 16-18). At the training, she would show how to put the pumps together (K Coulter, 3/24/09 p. 59, L.21-22).

324. Ms. Coulter indicated that she would not recommend the use of any medication to be put in the pump, and in relation to toxicity, she referred people to the PDR (K.Coulter, 3/24 /09, p. 60, L. 6-11). She was unsure who was responsible for recommendations of drugs such none are recommended by DJO. (Coulter 3/24/09, p. 204 L. 2-3). She did not discuss warnings about use of local anesthetics with the sales representatives in her training session. (K. Coulter, 3/24 /09 p, 67, L. 21). However, she was unaware of physicians filling the pumps with anything other than local anesthetics (K. Coulter 3/24/09, p. 76, L. 15). When shown the January 30, 2009 FDA announcement of the safety signal seen with unapproved use of the infusion pump combined with bupivacaine and chondrolysis, she answered that "[i]t doesn't mention, though, which or where." (KCoulter 3/24 /09, p.77, L. 12). DJO is a distributor, so if a manufacture deemed a product safe, then per the manufacturer's recommendations, DJO assumes the device is safe.(K. Coulter 3/24/09, p. 204, L. 15-18)

325. Just as testified by Mr. Rogow, Ms. Coulter answered that she had never been told or made aware that intra-articular infusion of bupivacaine was an unapproved use (KCoulter,

3/24 /09 p. 78, L. 3-11). In all her interactions with personnel from McKinley or Curlin, no one had ever discussed with her that intra-articular injection of a local anesthetic by an infusion pump was not approved by FDA (KCoulter, 3/24 /09, p. 77, L. 21).Therefore, since she has never told, she had not trained sales representatives that intra-articular infusion of a local anesthetic was unapproved (KCoulter, 3/24/09 p. 78, L. 7)

326. Ms. Coulter first became aware of the issue of reports of chondrolysis in August 2006. (K Coulter 3/24/09, p. 81, L. 12). However, she didn't discuss the studies of chondrolysis at training session, nor did she discuss chondrolysis and toxicity of the shoulder at her in-service training session since the presentation was not intended just for orthopedic use. (K Coulter 3/24 /09, p.60, L. 20). She only answered questions about chondrolysis when specifically asked for information. She stated that in terms of her training work, "she pretty much shows up, does her part and then goes back to work"(K. Coulter, 3/24/09, p. 68, L. 20).

327. She has received no guidance from McKinley or Curlin to add any specific warnings to her presentation with respect to the pain pump and shoulder surgery (K. Coulter, 3/ 24 /09, p. 61-16, L. 24-4). Her last training session was November 2008, and she had obtained no feedback about reports of chondrolysis. It was up to Marketing if they wanted her to obtain feedback from sub-distributors. The Catheter Line Placement Guide used by DJO was created by Curlin/McKinley. It is used by DJO per McKinley/Curlin's recommendation as a hand out and it is used by sales representatives (K. Coulter 3/24/09, p.108-9, l. 9-18).

328. When she was asked if it was her opinion whether physicians independently perform their own research as to the safety of medical devices they buy from DJO. Her answer was that "they can and they should" (K Coulter, 3/24/09, p. 111, L. 22-23).

329. In terms of sale's training about off-label use, the only discussion she was aware of regarding off-label uses by DJO at its training session was for DonJoy's Regeneration section. That discussion was done by Shannon Small for DonJoy Bone Stimulators. The off-label use of these devices is a topic connected to the current use of bone stimulators and which sales representatives need to be informed (Coulter, 3/24 /09 p. 70-71, L.10-5).

330. DJO's first and only action to independently notify its current customers purchasing pumps about the risk of chondrolysis was August 11, 2008. (K Coulter 3/24/09, p. 135, L. 15-17, Coulter Exhibit 35). Curlin had no input into the writing of DJO's letter. DJO sent out a letter to its purchasing customers, not physicians or health care providers, when it realized that it had not been informed by Curlin that it had updated its own pump product labeling warnings regarding intra-articular use. (K Coulter 3/24/09p. 139, L. 23-25).

331. As a result of DJO coming across the changes in the Curlin labels, DJO sent out a letter. Ms. Coulter said a letter was sent from DJO to distributor Pacific Medical as a courtesy. There were no further recommendations from DJO provided to sales and distributors like Pacific Medical as to what should be done with the new risk information. Ms. Coulter had met with Don Roberts, DJO Legal, before sending out the letter. There was no plan for DJO to notify physicians of the changes in the Curlin label. DJO did not post the letter on its website, but the letter is used as DJO's statement that there have been changes to the instructions.(K Coulter, 3/24/09, p. 190-1, L. 5-13; Exhibit 35; 192, L. 23-25).

332. When DJO is asked about chondrolysis as a result of injecting local anesthetic into the shoulder joint, Ms. Coulter indicates that DJO refers everybody to its current updated patient instructions given to DJO by the manufacture (K. Coulter, 3/24/09, p. 192, L. 8-10). She

would now refer a sales representative to the current instructions, the updated warnings, and say per the manufacturer's recommendations "refer to the new warnings." (K Coulter 3/24/09, p. 193 L.4-7)

333. As a distributor of purchased and relabeled finished goods, DJO looks to its device manufacturer (supplier) to provide it with adequate and accurate information that would indicate whether its product was safe or unsafe. (K Coulter3/24/09 181, L. 20-23). If Curlin made a recommendation that one of its products was unsafe, DJO would go by whatever the manufacturer recommended to address the problem. (K. Coulter 3/24/09, p. 182, L. 11-13).

334. In October 2, 2007, Ms. Coulter had sent an email to Tom Armbrust and asked him "*Ok, can you say, exit strategy*?" She indicated at her deposition that what she had meant was that "it might be a time to stop selling the pain pumps." (Coulter 3/24/09, p. 144, L. 16-17). However, she acknowledged that was a decision of upper management whether or not DJO would continue to sell pain pumps (K. Coulter 3/24/09, p. 144, L. 21-22).

335. Ms. Coulter was asked whether Curlin stopped selling pain pumps and did a recall, would DJO also stop selling pain pumps. She answered that it would not be her call (Coulter 3/24/09, p. 200, L. 17). Ms. Coulter was never told about complaints of chondrolysis and had never seen any prior to her deposition (Coulter 3/24/09, p. 84, L. 12). Ms. Coulter had tried to look into the issue of chondrolysis for the sub-distributor, Brian Balliant, who had a surgeon with few cases, she forwarded the information on to legal and regulatory and also asked the manufacturer for guidance as to what the Curlin position statement would be.(Coulter, 3/24/09, p. 87-88, L. 10-23). Her assumption was that the issue had just been brought to the attention of Moog when she was informed by Jim Buck about Curlin/Moog discussions of

putting a disclaimer in the pump kits not to infuse or include epinephrine in October 8, 2007 (Coulter 3/24/09, p. 89-90, L. 17-4). She looked to Curlin for guidance or any direction or if there was anything to say or anything to add(Coulter, 3/24/09, p.89 l.20-23)

### ii. DJO AND MCKINLEY LAUNCHED ACCUFUSER AND USED BREG'S WHITE PAPER DOWNPLAYING RISK OF CHONDROLYSIS

336. Ms. Coulter had received a Breg White Paper about the controversy of chondrolysis from Jim Buck McKinley/Curlin for inclusion in the DJO's Curlin Accufuser launch materials in approximately April 2004 (Coulter 3/24/09 p. 178, L. 21). She sent it out to DJO's entire sales force and distributor partners. (Coulter 3/24/09, p. 175-6, L. 25-22). On page 28 she wrote:

> Many of you are facing the objection of Chondrolysis. Many physicians are misinformed about this topic. As of today, the research on this topic is sparse and inconclusive. This should not stop you from selling pain pumps. Here is the rebuttal from the competition to combat the objection of pain pumps causing chondrolysis.(Coulter 3/24/09, p. 178,L. 4-10)

337. P. Cawley, Vice President Research, BREG, Inc., an Orthofix Company, another pain pump manufacturer, which promoted intra-articular use, wrote a white paper titled "*The Controversy Regarding Chondrolysis Following Arthroscopic Shoulder Surgery: A Review of the Literature and Discussion of Potential Etiologies*." The paper focused on the other causes of chondrolysis, including surgery, trauma, congenital, thermal/laser, bioabsorbable implants, and irrigating solutions. It also indicated that local anesthetics have been successfully used as a single bolus injection with arthroscopy without any reports of obvious or immediate side effects. Breg found support in that on that over the last decade, the FDA had received only 34 adverse events associated with these device applications. Breg should have been aware that the number

of reports received by the FDA in its MDR database is not a valid measure of true risk or incidence of chondrolysis associated with intra-articular continuous infusion by pumps.

338. Mr. Cawley continued "[o]f over 80 published studies on effects of pain pumps on the efficacy of pain pumps for postoperative pain control, seven have addressed the efficacy for postoperative pain control following arthroscopic shoulder surgery. The only complication reported involved difficulty removing catheters placed intra-articularly. There is a discussion of NSAIDS and genetic predisposition. The author wrote:

> For these reasons, intra-articular placement of these catheters in the shoulder is probably not warranted. Subacromial and extracapsular placement of these catheters may decrease concerns that may exist related to the continuous infusion of the local anesthetic agent directly onto the articular cartilage for an extended period.

3339. Under the discussion:

> The apparent rarity of chondrolysis following arthroscopic surgical procedures of the shoulder is unfortunate because of the devastating nature of the disease, particularly in young athletes. The one potential factor that has stimulated the most discussion recently is the use of pain pumps to control postoperative pain. The paper presented by Hansen et al at the most recent meeting of the American Academy of Orthopedic Surgeons is persuasive in its implication of pain pumps. However, the paper presented by Larsen et al at the same meeting implicates the use of thermal devices. In their excellent case reports and review of the literature, Petty et al note that the pathophysiology and natural history of this condition are unknown and further note a number of factors that might contribute to the development and progression of this disease. None of the publications regarding the efficacy of pain pumps for postoperative pain control reported chondrolysis as a complications. Gobezie et al reported on a series of 687 patients over a five year period in whom chondrolysis was not reported as a complication. Based on the limited data available, it would appear that avoiding the intra-articular placement of the pain pump catheter in the shoulder may help to decrease concerns related to continuous infusion of the local anesthetic agent directly onto the articular cartilage for an extended periods.sho

> Of note is that there have been no published reports of chondrolysis associated with the use of intra-articular pain pumps in the knee. Because of the larger volume and the ability to place the catheter without concern for the impingement