# Appendix III, Tab 1

**Deposition of Stephen F. Badylak, July 13, 2009**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
\- - -

| | |
|---|---|
| DONNELL COX; ANITA McGINNESS and GERALD McGINNESS, husband and wife; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST, Plaintiffs, v. DJO, LLC, et al., Defendants. | Case No. CV 07-1310 AA |
| CALEB HUGGINS, Plaintiff, v. STRYKER CORPORATION, et al., Defendants. | Case No. CV 07-1671 AA |
| ELIZABETH D. CRONIN, Plaintiff, v. I-FLOW, CORPORATION, a Delaware, Corporation, Defendant. | Case No. 6:09-cv-146-AA |
| IVY LEE Y. NATIVIDAD and STEVE NATIVIDAD, Plaintiffs, v. STRYKER CORPORATION, et al., Defendants. | Case No. 6:09-cv-378-AA |

(Captions Continued on Page 2.)

DEPOSITION OF STEPHEN F. BADYLAK, D.V.M., M.D., Ph.D.

JULY 13, 2009 - VOLUME 1

ERIC J. SCHOENBORN and SUZANNE G. )
SCHOENBORN, )
Plaintiffs, ) Case No.
v. ) 6:08-cv-1419-AA
)
STRYKER CORPORATION, et al., )
Defendants. )
_______________________________)
JOHN ERIC BUTLER, )
Plaintiff, ) Case No.
v. ) 6:08-cv-588-AA
)
STRYKER CORPORATION, et al., )
Defendants. )
_______________________________)
TAMARA L. FOLKMAN, )
Plaintiff, ) Case No.
v. ) 6:09-cv-342-KI
)
DJO, LLC, et al., )
Defendants. )
_______________________________)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION
- - -

PAUL W. WESTBROOK, )
Plaintiff, ) Case No.
v. ) 5:08-cv-263-CLS
)
DJO, LLC; MCKINLEY MEDICAL, LLC; )
MOOG INC.; ASTRAZENECA PLC; )
ASTRAZENECA PHARMACEUTICALS LP; )
ASTRAZENECA LP; and ZENECA HOLDINGS, )
INC., )
Defendants. )
_______________________________)



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
- - -
TROY L. ALDERFER, )
Plaintiff, ) Civil Action No.
v. ) 1:08-cv-01297-MSK-MEH
)
BREG, INC., et al., )
Defendants. )
_______________________________)
STACEY ANN HANSEN, )
Plaintiff, ) Civil Action No.
v. ) 1:08-cv-00365-MSK-CBS
)
DJO, INCORPORATED, et al., )
Defendants. )
_______________________________)
SAMANTHA ARCHULETA and )
ROSEMARIE CARROLL, as parent )
and next friend, )
Plaintiffs, ) Civil Action No.
v. ) 1:08-cv-00962-MSK-CBS
)
DJO, INCORPORATED, et al., )
Defendants. )
_______________________________)

DEPONENT: STEPHEN F. BADYLAK, D.V.M., M.D., Ph.D.
DATE: Monday, July 13, 2009
TIME: 8:26 a.m.

LOCATION: McGowan Institute for Regenerative Medicine
100 Technology Drive, Suite 200
Pittsburgh, Pennsylvania 15219-3130

REPORTER: Michele E. French, CSR-3091, RPR, RMR, CRR



APPEARANCES:

On behalf of Plaintiffs Ivy Natividad, Eric Schoenborn, Eric Butler, Caleb Huggins, Paul Westbrook, Troy Alderfer:

KALUR LAW OFFICE
BY: LAURA B. KALUR, ESQUIRE
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225
(503) 595-4145
lbkalur@kalurlaw.com

On behalf of Defendant I-Flow:

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
BY: MAYNARD M. KIRPALANI, ESQUIRE
260 Franklin Street, 14th Floor
Boston, Massachusetts 02110-3112
(617) 422-5300
maynard.kirpalani@wilsonelser.com

On behalf of Defendant DJO, LLC:

ULMER BERNE, LLP
BY: PAUL J. COSGROVE, ESQUIRE
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
pcosgrove@ulmer.com



APPEARANCES: (Continued)

On behalf of Defendant Stryker Corporation:

SEDGWICK DETERT MORAN & ARNOLD, LLP
BY: WAYNE A. WOLFF, ESQUIRE
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105-1101
(415) 781-7900
wayne.wolff@sdma.com

On behalf of Defendant Breg, Inc.:

BOWMAN AND BROOKE LLP
BY: KIM M. SCHMID, ESQUIRE
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
(612) 339-8682
kim.schmid@msp.bowmanandbrooke.com

Pittsburgh, Pennsylvania
Monday, July 13, 2009
8:26 a.m.
* * * * *
(Badylak Exhibits 1 through 11 were marked.)
STEPHEN F. BADYLAK, D.V.M., M.D., Ph.D.,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MS. SCHMID: Counsel, let's identify ourselves for the record. My name is Kim Schmid from Bowman and Brooke on behalf of the Defendant, Breg, Inc.

MR. WOLFF: Wayne Wolff from Sedgwick law firm on behalf of Stryker Corporation.

MR. KIRPALANI: Maynard Kirpalani on behalf of the Wilson Elser law firm, for I-Flow Corporation.

MR. COSGROVE: P.J. Cosgrove, Ulmer & Berne, for DJO.

MS. CURRY: Judi Abbott Curry, Harris Beach, for Moog, Curlin, and McKinley.

MS. KALUR: Laura Kalur, Kalur Law Offices, for the Plaintiffs Ivy Lee Natividad, Eric Schoenborn, Eric Butler, Caleb Huggins, Paul Westbrook, and Troy



Alderfer.

MS. SCHMID: And on the phone, please?

MR. MEYER: Scott Meyer for Pacific Medical.

EXAMINATION

BY MS. SCHMID:
Q All right. Good morning, Dr. Badylak.
A Good morning.
Q Dr. Badylak, to the extent that I ask you for your opinions today during the deposition, do you understand, sir, that I'm asking you to express your opinions based upon a reasonable degree of medical certainty or medical probability?
A I understand.
Q All right. And I've had a chance, Dr. Badylak, to spend some time with your curriculum vitae. And, sir, you are not an orthopedic surgeon; correct?
A That's correct.
Q And we have marked for the record your curriculum vitae as Badylak Exhibit Number 2.
Safe for me to assume, Dr. Badylak, then, that you have never conducted any shoulder surgeries; true?
A True.
Q You have never conducted any type of arthroscopic surgery; correct?



A Correct.
Q You have no personal experience, Dr. Badylak, in using sutures, bio-absorbable or otherwise, during shoulder surgeries; correct?
A By personal experience, I assume you mean as the surgeon, that's correct.
Q Yes, that's what I mean. So it's a true statement; correct?
A Correct.
Q And, sir, you have no personal experience using anchors or tacks, bio-absorbable or otherwise, during shoulder surgery; correct?
A Correct.
Q And also, sir, fair for me to understand that you have never used monopolar or bipolar laser instruments during shoulder surgery, whether arthroscopic or open shoulder surgery; correct?
A Correct.
Q Sir, is it also correct for me to assume that you have never injected an anesthetic of any type directly into the joint space of a shoulder; correct, Dr. Badylak?
A No, that's incorrect.
Q All right. When did you do that, sir?
A I practiced sports medicine for 16 years as the head team physician for Purdue University and had multiple



opportunities for joint injections.
Q What type of anesthetic did you use for joint injection -- joint injections, sir?
A Typically it would be Marcaine or Lidocaine as the anesthetic, occasionally a steroid as a therapeutic.
Q And when you talk about a Marcaine, Lidocaine, or a steroid, is that a one-time or potentially two-time injection? In other words, it's a series; is that correct?
A Typically it was a single injection. There may have been a patient or two where we injected more than once but it would have been separated by months, usually.
Q And when you injected an anesthetic directly into the shoulder joint, sir, what type of -- you mentioned Marcaine. Can you tell me what was the concentration of Marcaine?
A Usually it was .25 percent.
Q Did you ever use .5 percent?
A I can't recall. I mean, it's been -- I haven't practiced medicine now for six or seven years, and that 16-year period before that, that's a while ago. I may have.
Q Okay. So if I understand correctly, you've injected .25, you may have injected a .5 percent Marcaine; correct?

Q All right. Is it correct, Dr. Badylak, that in your medical career that you have never actually prescribed a continuous flow infusion pump; is that correct?
A That's correct.
Q And is it correct, sir, that you have never prescribed the type of anesthetic, the volume or duration to be used in a continuous flow pain pump; correct?
A That's correct.
Q And also, sir, correct for me to understand that you have never studied -- you, personal, Dr. Badylak, in all your research and investigation, you have never studied the potential effect of anesthetics with or without epinephrine on human cartilage; correct?
A An intact cartilage? I have evaluated the effects of these drugs on human cartilage cells.
Q My question, though, sir, in terms of intact cartilage, in all the research and the investigation that you have done and that's listed on your very lengthy CV, would you agree with me, Dr. Badylak, that you personally have never researched or investigated the continuous flow of anesthetics on intact human cartilage with or without epinephrine; true?
A True.
Q All right. Have you, Dr. Badylak, ever done such testing regarding the continuous flow of anesthetics



with or without epinephrine on animal cartilage?
A Continuous flow?
Q Yes.
A No.
Q What research, Dr. Badylak, have you personally done regarding the toxicology effects of anesthetics on cartilage, whether it's done in vitro or in vivo?
A Evaluated -- well, I think the simplest way to think about it is a repeat of Dr. Chu, Dr. Connie Chu's work.
Q What do you mean, sir?
A Well, when asked to participate in this litigation, I wanted for myself to be sure that my understanding of the science, the findings, the readings were confirmed in my own hands. I don't need to repeat every study that's gone on, but simply to confirm for myself that administration or exposure of chondrocytes to Marcaine in vitro would be toxic. So I did a very small pilot study on my own just to confirm that those results were real.
Q Okay. And this pilot study was done in a laboratory setting in a petri dish; correct, sir?
A That's correct.
Q Do you have any write-up or any type of paper that I can read regarding this small pilot study that you have done?



A No, didn't need one. Just simply went into the lab, which is right down the hall here, and conducted the study on my own just to be sure that I wasn't getting into something where I was necessarily taking somebody else's word for it all the time.
Q When did you do this research, Dr. Badylak?
A It's been 18, 24 months -- maybe 18 months ago, something like that.
Q And who assisted with you on this research?
A Nobody. Did it myself.
Q Do you have any tangible documents, sir, whether it's notes, whether it's photographs, data output from your laboratory testing that you did?
A No.
Q You put nothing on paper?
A Didn't need it.
Q Nothing to report?
A Walked into the lab and just did a quick pilot study on my own just to be sure that the results were going to be the same.
Q You say it was a quick pilot study?
A Um-hum.
Q What type of cartilage did you use, sir?
A Used chondrocytes. Actually got them from Dr. Chu's lab. She helped provide the cells.



Q What's your understanding of where they came from?
A Gosh, I don't recall for sure. I think they were both human and bovine chondrocytes that she had had in her lab, that way I wouldn't have to go out and harvest my own or purchase any on a -- from an established cell line.
Q What's your understanding of the condition of the human chondrocytes that you subjected to some analysis in your laboratory?
A I don't recall. Just to be clear, Miss Schmid, I just wanted to be sure that if you took chondrocytes, put them in a petri dish, exposed them to that dose of Marcaine that there would be chondrotoxic effects.
Q I understand that, but in terms of the human chondrocytes that you were evaluating that were given to you by Dr. Chu, do you know, sir, was it from a healthy knee, an arthritic knee, a patient who was an older patient? I'd like to know all that you know about the origins of these human chondrocytes that you subjected to your quick pilot study.
A Don't recall.
Q Not important to you?
A No, I didn't say it wasn't important. It was important at the time, but we're talking about something that was done 18 months ago. And, like I said, it was simply a

engineering and regenerative medicine, and that I had had -- the conversation was a back-and-forth, obviously, with questions, but I informed her of my experience in designing and developing devices for orthopedic applications and other applications, my experience with the -- working with the orthopedic industry and other medical device companies, and, you know, my experience in patient care and --
Q Did Miss Kalur ask you if you had any specific expertise as it concerns the area of shoulder chondrolysis, the diagnosis or treatment of shoulder chondrolysis, or the investigation or analysis into the potential cause or causes of shoulder chondrolysis?
A Yes.
Q And what did you say?
A We had -- well, it was a long discussion, but I had informed her that I was familiar with the condition, that I had a pretty in-depth understanding of the -- both the -- well, an understanding of the anatomy of the shoulder, the biology of cartilage cells in the shoulder and other joints; and with my degree in pathology, an understanding of the pathophysiology of disease of cartilage.
I also have experience with pre-clinical studies and with translation of pre-clinical data into



human, to the bedside. I think the entirety of that experience convinced both myself and Miss Kalur that there was a place for me in this litigation.
Q You talked about your experience in pre-clinical studies with Miss Kalur; is that correct?
A That's correct.
Q And, sir, your experience in that area has nothing to do with the potential cause or causes of chondrolysis; correct?
A Well, that's incorrect. I don't agree with that statement because the -- in understanding the cause of chondrolysis, one needs to consider the entirety of in vitro studies, pre-clinical studies, clinical experiences, case reports, so there is definitely a role.
Q Okay. Let me ask you this question, sir. What pre-clinical studies have you personally been involved in that analyzed or investigated the potential causes of shoulder chondrolysis?
A None.
Q And you talked about, sir, the -- I think you used the word the translation of clinical data to bedside; is that correct?
A Well, that's a little lay language, and you misspoke a bit. It's the translation of pre-clinical work to the



bedside. So, in other words, taking results of animal studies and using those results to eventually treat patients.
Q And would you agree with me, Dr. Badylak, that you have had no personal experience in translating pre-clinical data to human application as it concerns the potential cause or causes of shoulder chondrolysis; correct?
A Yes. You've asked me that I bet you half a dozen times this morning already and the answer is going to be the same every time.
Q Okay.
A I have no experience in chondrolysis and pre-clinical studies. So as many times as you need to take that answer and put it down, you can.
Q All right. Very good. Are you aware, Dr. Badylak, of any epidemiological studies regarding the potential cause or causes of shoulder chondrolysis?
A There are several epidemiologic studies in the list that we -- that you have in front of you.
Q Why don't you show me, sir, using Exhibit Number 11, what you consider to be epidemiological studies that investigate the potential cause or causes of shoulder chondrolysis.
A Well, we just talked about the McNickle article. I think if you want to pull that one up, we could discuss



it.
Q Do you have a hard copy of that article, sir?
A I think we both do. Give me a minute, I'll find it.
Q That would be terrific.
MS. KALUR: Here.
THE WITNESS: Okay. That would be easier, save us some time. Okay. I have it in front of me.
BY MS. SCHMID:
Q Let's go ahead. I don't have a copy of that article, sir. If I could just ask you to take it out of your notebook and I'll look at it for a minute, please, and then I'll give it right back to you.
A Okay.
Q Thank you.
(Interruption.)
MS. SCHMID: Excuse me. Let's go off the record.
(Recess - 11:07 a.m. to 11:09 a.m.)
BY MS. SCHMID:
Q Dr. Badylak, I have seen the McNickle's article, which was published on June 9th of 2009, in the American Journal of Sports Medicine. And, sir, do you understand that what this is is a retrospective review of -- or a case series, sir, and it's not an epidemiological study; correct?

Page 106

A Well, I -- I think the disconnect here is perhaps your definition of an epidemiologic study and mine. I consider this to be an epidemiologic study.
Q What's your definition of an epidemiological study?
A Oh, an epidemiologic study is identifying -- is first questions to be answered, asked and answered, or series of questions. A population is identified. Criteria are set, inclusion criteria that define the parameters of the study, and then findings are -- are obtained. It can either be retrospective or it can be prospective.
Q Am I correct, sir, that what Dr. McNickle did is that he took a retrospective look at 20 individuals and compiled the results that were known, because this was retrospective, into something that's called a level four evidence of case series; correct?
A Correct.
Q And if other experts uniformly in this litigation have stated that no epidemiological testing exists regarding the potential cause or causes of shoulder chondrolysis, would you agree or disagree with those other experts?
A Well, each expert has got his own area of expertise. My opinion is that this -- in fact, if one looks under materials and methods, the word epidemiology is the subheading, and it defines a period of time, five

Page 107

years, and inclusion criteria for this epidemiology. This is an epidemiologic study. So if the other experts either aren't aware of this or choose not to call it an epidemiologic study, that's their opinion.
Q All right. And what's a -- what does the standardized rate of error mean, sir?
A Standardized rate of error?
Q Yes, sir.
A I'm not familiar with that terminology, but are you talking about -- are you talking about statistical analysis?
Q Yes, sir.
A Like P values?
Q No. Standardized rate of error in data analysis.
A That terminology is new to me. I published 200 plus articles, use statistics all the time, but I'm not familiar with that term.
Q Okay.
A I'm not an epidemiologist.
Q Okay. Can you explain to me, sir, why in McNickle's article 20 percent of the patients -- let me look at this. 20 percent of the patients who presented with what they are calling, quote, "glenohumeral arthritis," closed quote, did not have the use of an intra-articular pain pump?

Page 108

A I'm sorry, I was half reading this. Did you ask me why 20 percent of the patients with that problem did not have a pain pump?
Q Yes.
A I think the logical conclusion is that something else caused their glenohumeral arthritis.
Q Would you agree with me, sir, that shoulder chondrolysis is multifactorial in nature?
A I would agree that there are several causes of post-arthroscopic glenohumeral chondrolysis, and that if that's your definition of multifactorial, then the answer is yes.
Q And can you identify for me, sir, based on your research and your reading of the available literature, what are the potential factors that may be associated with shoulder chondrolysis?
A The use of Marcaine at high doses as delivered by pain pumps is a potential cause. Cyclohexadiene has been shown to be a cause. Gentian violet, g-e-n-t-i-a-n, violet, is a cause. Trauma can be a cause. There's been -- you used the word potential. Thermal, the use of thermal ablation or thermal treatment of the anterior capsule has been suggested as a cause. So there are several potential causes.
Q Have you read any literature, sir, where the -- where

Page 109

they have identified bio-absorbable tacks or anchors used in shoulder surgeries as a potential cause of shoulder chondrolysis?
A The -- I have read some articles that have talked about the use of the absorbable anchors, and I think to be inclusive we should probably include that in the list but the presentation is a bit different.
Q And have you read in the literature, sir, cases of bio-absorbable sutures that have been identified as a potential cause of shoulder chondrolysis?
A Yeah, same answer, though; the presentation is a little bit distinct with those anchors and the sutures.
Q Have you read in the available literature, sir, that some of the scientists and researchers in the area of the potential cause or causes of shoulder chondrolysis have found articles to support that some individuals may have a genetic predisposition or an autoimmune deficiency?
A I recall reading those in the articles. I don't remember the exact contents -- context, but most good articles that review these are very comprehensive and they would list, for example, rheumatoid arthritis as a potential predisposing factor.
Q And I'm trying to make a list, sir, of all the -- of the potential causes of shoulder chondrolysis according

Q And would you agree, sir, that that is another potential factor that has been identified in the literature; correct?
A Correct.
Q All right. Sir, have you, in your work as a medical doctor, ever diagnosed a patient with shoulder chondrolysis?
A Not by the definition we're using, I have not.
Q Have you, sir, in your work as a medical doctor ever treated a patient with shoulder chondrolysis?
A No.
Q Have you, sir, ever studied the radiology films of patients with shoulder chondrolysis?
A No.
Q Would you agree with me, sir, that the only way to clinically diagnose a patient with shoulder chondrolysis is to look at radiology films; correct?
A Well, radiographic imaging is always used with the clinical information, the clinical presentation; crepitation, soreness, the range of motion. So imaging provides an extremely valuable diagnostic tool but no radiologist would read the image without a knowledge of the clinical symptoms and signs. I'm done.
Q All right. Would you agree with me, sir, that to make a definitive diagnosis of shoulder chondrolysis that



the healthcare practitioner must review the films or the radiographic films of the patient; correct?
A Correct.
Q All right. And you've never done that, sir; correct?
A That's correct.
MS. KALUR: I'm going to object to form on that last question.
MS. SCHMID: What was wrong with the form?
MS. KALUR: I'm not quite sure if you're referring to specific patients or just in general if he's reviewed radiology, so if you can clarify your question.
MS. SCHMID: Sure. I'd be happy to.
BY MS. SCHMID:
Q Have you, Dr. Badylak, in all your years of experience as a medical doctor and as a scientist and a researcher, have you ever looked at any radiology films of a patient who has presented with shoulder chondrolysis?
A No.
Q Okay. And did you understand my question earlier to ask for that same information, sir?
A Well, I can understand both interpretations.
Q All right.
A But the answers are the same for both.



Q Still no?
A No.
MS. SCHMID: Let's go off the record for a minute here, please.
(Discussion off the record.)
BY MS. SCHMID:
Q Okay. I'm returning to you, Dr. Badylak, the McNickle article that you handed me earlier, sir. Thank you.
A Yep.
Q On our list, sir, of potential causes of shoulder chondrolysis, we've identified Marcaine. You said in, quote, "high doses," closed quote. Cyclohexadiene, gentian violet, trauma, thermal ablation, anchors, sutures, autoimmune diseases, rheumatoid arthritis, protruding or proud anchors, and we've added the idiopathic, unknown disease etiology; correct?
A Correct. I am not sure if you said trauma in there.
Q I did, sir.
A Yeah.
Q Any other potential causes that you are aware of from reading the 57 articles that are listed on this new appendix?
A Well, I guess to be clear --
Q Sure.
A -- Marcaine represents a class of anesthetic agents.



So Lidocaine, for example, would be part of that, that whole class of, quote, caines. It's just that Marcaine is the most commonly used and talked about, but the others would be included in that category.
Q What do you mean, sir, what's your definition of a high dose of a caine anesthetic?
A Well, this, I believe, relates to one of the earlier discussion points in that interview Doug Jackson did with Dr. Chu, when she talked about threshold. And the dose refers to the concentration of the drug. So we've got -- if we talk about Marcaine, specifically. If we talk about Marcaine, there's .25 and .5 percent are the most commonly used concentrations.
At that -- obviously the .5 percent is a higher dose. The length of time that the dose is in contact with the tissue, in this case the articular surface of the glenohumeral joint, so time becomes one of the variables in dose.
The second -- an additional factor would be -- and it's related to the second -- is how quickly it's turned over or whether it's diluted with normal joint fluid. The reason I bring that up is because I think a mechanism by which epinephrine would increase the dose is by decreasing the turnover of normal joint fluid, thus increasing the length of time of exposure.

A I don't think we ever used the term general causation, but we are aware that each other is an expert in this litigation.
Q Have you ever talked to Dr. Basamania about the preparation of your report or the opinions in your report?
A No.
Q Have you ever read Dr. Basamania's report?
A No, but -- no. I was going to say, I can imagine, but I don't.
Q Have you read the report of Dr. Gary Poehling, sir?
A Yes, I have.
Q Have you ever spoken with Dr. Poehling?
A No.
Q And I think you told me this earlier, so I apologize if I'm repeating, but, sir, the only lawyer that you've ever spoken with is Laura Kalur; is that correct?
A Yes, Miss Kalur and I, it's my only communication with a lawyer.
Q All right. Sir, the bottom of page 1 of your expert report, under "Summary of Opinions," you say, quote, "...I used the same scientific methodology with the same degree of rigor that I use in my research." Period, closed quote. And there you're talking about, sir, the process by which you developed and arrived at



your conclusions as a litigation expert versus papers that you have published in peer-reviewed journals as a researcher or scientist; correct?
A That's correct. I'd like to clarify something. I'm trying to think of what bothers me about your question, and I'm not sure what you mean by litigation expert. I mean, I'm an expert in what I do. I've been asked to provide an opinion in this litigation, but, I don't know, something about calling me a litigation expert bugs me, I'm not quite sure, because this is not what I do for a living.
Q And I appreciate that, sir, but you understand that you're here to provide deposition testimony as an expert on behalf of the Plaintiffs in litigation involving shoulder chondrolysis; correct?
A Sure. You know, again, I think we both hopefully mean the same thing. I'm an expert in this litigation. And if you'd like to say it in that way, I am perfectly happy with it.
I guess I just wanted to be on record as the fact that I -- if somebody else would read this and think litigation expert, you know, a layperson might think of that as something different, and I want it just clear. I don't do this for a living. I'm an expert in this litigation.



Q Correct. And what you do for a living, I think we established early on, Dr. Badylak, is you do not have clinical, medical, or scientific research background into the cause or causes of shoulder chondrolysis; correct?
A Yeah. We said that several times.
Q Okay.
A Hopefully we're saying the same thing. I just want it on record, you know, of my -- my definition of what I'm doing here.
Q And when you talked about the use of the same scientific methodology, what do you mean by that, sir?
A Well, I like to consider myself a good scientist and there are standards by which I operate and that I insist people in my laboratory operate by in terms of conducting experiments, making reports, evaluating reports, reading papers, reviewing. There's a lot of activity involved in what I do. Each of those activities and tasks has got a certain standard. And if we're going to compete at the highest level, I think our standards have got to be at the highest level.
Q And as a good scientist, sir, would you agree with me that details are important; correct?
A Absolutely.
Q The accurate and correct interpretation of data is



important; correct?
A Correct.
Q The use of data that is free from bias is important; correct?
A Right, scientific bias. I think we're talking about the same thing, scientific bias, right.
Q The subjecting a theory to a controlled set of tests is -- is important to a scientist; correct?
A It's important. But, again, each type of study that you do lends itself to different -- different standards. There are certain types of studies, for example, that might be impossible to use all the controls that you want, for example.
So, but I think -- I hope we're saying the same things; that controls are important, absence of bias is important, attention to detail is important, yes. It's just I don't want to give the impression that every -- every study or every publication can abide by the same set of rules because it would be apples and oranges.
Q Would you agree with me, sir, that as a good scientist that it's important to subject theories and hypotheses and speculations to controlled, repeatable tests or controlled repeatable research; correct?
A Whenever possible.

Page 134

Q And that includes from the time of its initial application to reviewers of the medical journal to commentary going back to the authors and then fine-tuning the article. There's just a lot of work, detailed, exacting science, that goes into a peer-reviewed published article; correct?
A Yes. It's a painful process.
Q It is a painful process. One that you are very familiar with; correct, Dr. Badylak?
A Yes.
Q And would you agree with me, sir, that that is not a process that you had to go through when you prepared your expert report in this case; correct?
A Oh, I disagree. Every article I read I -- I considered that sort of -- it's become part of the way I review everything. Words mean things. Sentences mean things. And that's sometimes while you'll find me -- I don't mean to correct you, but I want to be sure that we're saying exactly the same things --
Q Sure.
A -- because words have meaning, and I want to be sure that the words that come out of my mouth mean what I intend for them to mean.
Q What I meant -- and I'm sure I was not clear in my last question, Dr. Badylak -- is that your expert report

Page 135

that we marked I think as Exhibit Number 1 --
A Right.
Q -- your expert report has not been subjected to review by scientists or medical professionals in the scientific community? That's a fair statement, isn't it, sir?
A It's a fair statement.
Q All right.
A That's probably why it's level five.
Q And that's what I'm trying to get at, sir, because, in fact, the research that you personally have authored or co-authored and have published in many peer-reviewed journals, that, in fact, has been subjected to review by various editorial boards; correct?
A Correct.
Q And you've been asked to provide the backup data to support your statements and your opinions and your findings in your research; correct, Dr. Badylak?
A Correct.
Q And that is not something that you've had to do for this expert report; correct?
A That's correct.
Q All right. So going back to your statement that you've used, quote, "...the same scientific methodology with the same degree of rigor..." closed quote, that you use

Page 136

in your research, that is not an accurate description of your expert report versus your peer-reviewed published articles regarding your research as a clinician or scientist; true?
A I don't think that's true. They -- I used -- everything that I did was the same as if I was writing a manuscript or asked to write an editorial, which I've been -- asked to do. I used the same amount of rigor in writing. You know, like I said, words mean something. This is my reputation. I mean, I believe wholeheartedly every single word in this expert report. Nothing that I put in here is based on mere speculation.
It's taken into account everything that I know and understand about how the body works, from its development to its response to disease, healthy cells, diseased cells, and each of those things was developed with a high degree of scientific rigor, and all of that went into this report.
So that's why, you know, if I sound a little defensive about that, I am, because I put the same amount of work into this that I would put into any manuscript I submit for publication. It hasn't been reviewed, for obvious reasons.
MS. SCHMID: Let's take a break for lunch.

Page 137

MS. KALUR: Okay.
(Luncheon recess - 11:59 a.m. to 1:11 p.m.)
BY MS. SCHMID:
Q Dr. Badylak, before we broke for lunch, we were talking about the last sentence on page 1 of your expert report. And, sir, is that a sentence that you created or crafted on your own?
A No, that's something that Miss Kalur provided and then asked me whether or not it was true.
Q Okay. And when did Miss Kalur provide that sentence to you, sir?
A In that last -- as I had indicated, at the very end, when I said, okay, I've got all of the information that I feel is important in here, and what I need help with is the boilerplate for these sorts of expert reports, so that's the first time I saw that.
Q Okay. As you look at your five-page expert report, can you point me to any other language or sentences that was provided to you by Miss Kalur?
A (Reviewing Badylak Exhibit 1.) The -- if you continue beyond that sentence that you read, the next couple of sentences, where it talks about -- well, actually the next sentence is -- is mine, in terms of using my education, but the following paragraph, "I hold my opinions to a reasonable degree of scientific and

Page 154

would cause chondrolysis; however, the mass of data collectively is irrefutable.

I indicated earlier, no study, no individual study is perfect. Every single study is going to have holes in it. This, however, does provide the opportunity to understand the relationship between the in vitro studies that have been done by a number of investigators, the pre-clinical animal studies that build upon the in vitro data, and then the clinical case outcomes that we have seen.

Combined, I don't think there's any question that the use of a chondrotoxic agent like Marcaine delivered into the joint continuously for a period of time other than a single injection does -- doesn't cause chondrolysis. It's -- you cannot deny it.

I mean, I am a strong critic of these sorts of statements, and I'm not convinced easily. I take issue with your statement that there's no objective data. There's a load of objective data in the totality of the published literature and -- and everything else that you have, you know, in front of you in terms of what I have examined.

Q Okay. I think I got most of what you said, so I'm going to break that down, and this is going to take some time, so bear with me.

Page 155

A Um-hum.

Q Can you point me, Dr. Badylak, to any medical or scientific literature that appears in a peer-reviewed journal wherein the conclusion is reached that the mass of data is irrefutable that the continuous infusion of Marcaine into the joint causes chondrolysis?

MS. KALUR: Objection, asked and answered.

THE WITNESS: Well, the --

MS. SCHMID: That was just his -- he just gave me a new answer, so your objection is not appropriate.

BY MS. SCHMID:

Q Go ahead.

MS. KALUR: Don't comment on my objections.

THE WITNESS: The -- I think what you're asking for is an article or you're asking me to find an article that will have taken into account the mass of data and come to this conclusion; right?

BY MS. SCHMID:

Q Correct.

A I'm not aware of a single article that does that, and I can speculate as to -- as to why, as well. There are, you know, a lot of different people very interested in this topic right now, people with -- scientists with interest and expertise in in vitro studies, scientists

Page 156

with expertise in pre-clinical studies, clinicians that are interested in it, and each of them publish in their own area.

There's very little reason for any of those individuals to try to go out and gather the world's data as we're sitting here and come to that conclusion. So it's not surprising that you don't find one article that brings all of this together. It wouldn't be a single article; it would be a -- it would be a book.

Q Well, but, sir, you have expressed the opinion in the context of the litigation in five pages, but you're saying if you express the opinion in a peer-reviewed journal it would have to be a book?

A If you wanted to collect all of the -- we've got three binders here worth of the information. This is an opinion. It's based upon my interpretation of all of the data that's in front of you.

Q Okay.

A I can put my opinion down in five pages. I do not have to recap every article to summarize my -- summarize their findings or present my opinion.

Q All right. Just so I'm clear, sir, then, it is your personal opinion that the continuous infusion of Marcaine into the shoulder joint causes chondrolysis and that is an irrefutable conclusion; is that your

Page 157

opinion, sir?

A Yes, it is.

Q All right. And you told me that you base that upon your interpretation of the current state of scientific and medical literature; correct?

A That's correct.

Q And you also told me, sir, that there is no article that you can point to that says -- that provides the same opinion that you just provided today in the context of this litigation; correct?

A There's no single article that summarizes all of the scientific literature available, that's correct.

Q All right. Sir, would you agree with me that a certain percentage of patients who present them self with clinical findings after radiology films have been studied and have developed chondrolysis, that there could be multiple factors involved; correct?

A That's correct.

Q And I believe, sir, that you and I this morning, we created a list based on your testimony that contained 11 different potential contributing factors to shoulder chondrolysis. Do you recall that, sir?

A Yes, I do.

Q Let's assume that Patient A presents himself with shoulder chondrolysis that is confirmed by radiological

films; okay?
A So we're talking hypothetical here?
Q Yes, sir.
A Um-hum.
Q Yes, sir. And that this particular patient not only had a pain pump whose catheter was put into the joint space but also during the process of the arthroscopic procedure there was thermal ablation, there were bio-absorbable tacks, anchors, and sutures involved.
How can you, under that circumstance, sir, provide the blanket opinion that the pain pump is the quote, "primary cause," closed quote, of the chondrolysis?
A There's a couple of reasons.
MS. KALUR: Objection, compound.
THE WITNESS: There's a couple of reasons I would state that Marcaine is the primary -- or that's what you said, Marcaine; right? Did you say Marcaine was the administered agent by the pain pump, or maybe you didn't say?
BY MS. SCHMID:
Q No, I didn't, but would you like the court reporter to read the question back --
A No, I understand the question.
Q -- so you have it clearly in mind?



A I understand the question. I just didn't want to say something if you hadn't.
The -- one of the more interesting facts that needs to be considered in this causation is the fact that prior to about 2004 there were -- chondrolysis as we defined it this morning was extraordinarily rare, but absorbable anchors and nonabsorbable anchors were present, thermal ablation was present, and many of the other things you described, and yet there was almost a dearth of literature in which patients are described with chondrolysis.
Enter pain pumps and delivery of these anesthetic agents into the joint and the number of cases explodes. So any reasonable person would start to say what is the difference between 2004, '6, '8, and prior to 2004, and there's only one factor.
Q Which is...?
A The delivery of these agents by the pain pump.
Q Do you know what the term temporal relationship means, Doctor?
A Yes, I do.
Q And would you agree with me, sir, that your last answer is an example of a temporal relationship?
A My last answer defined that as an interesting finding that raises the level of suspicion why this particular



causative agent would be at the top of the list, because prior to that time everything else that you listed existed and there weren't any cases. After that time, a new factor is involved, and now all of a sudden the number of cases explodes.
To me one has to now rule out the fact that this is not the causative agent, the primary causative fact. And in my opinion, the more work that was done to investigate the causative agents, and particularly the use of the pain pump, all it did was confirm that this was, indeed, the primary cause of chondrolysis.
MS. SCHMID: Madam court reporter, could you read that answer back to me, please.
(Record read as follows:
ANSWER: "My last answer defined that as an interesting finding that raises the level of suspicion why this particular causative agent would be at the top of the list, because prior to that time everything else that you listed existed and there weren't any cases. After that time, a new factor is involved, and now all of a sudden the number of cases explodes.
To me one has to now rule out the fact that this is not the causative agent, the primary causative fact. And in my opinion, the more work that was done to investigate the causative agents, and particularly



the use of the pain pump, all it did was confirm that this was, indeed, the primary cause of chondrolysis.")
BY MS. SCHMID:
Q Okay. You said in that last answer, sir, that prior to pain pumps there weren't any cases. I don't think that's what you intended to say, is it?
A I don't think I said any. I said there was a dearth of reports.
Q That's not what the court reporter has down. In your last answer, sir, you said, quote, "there weren't any cases," closed quote, prior to pain pumps. Do you recall saying that, sir?
A Well, it's a matter of record. If I said none, it was -- I'm referring to the same -- you know, this is why words are important; right?
Q I agree they are, yes.
A So I'll restate that.
Q Okay. Very good.
A Prior to 2004, there were very few cases. It was considered to be an exceedingly rare condition. So it existed. You know, as a matter of fact, several times today I identified factors that existed prior to 2004 that were causative factors of chondrolysis. Gentian violet, for example, everybody agrees.
So I think my testimony over the course of

the day has acknowledged that there were cases prior to 2004. The point of the answer was that after 2004, the curve sky-rockets. What's the new -- who's the new player in the game? It's the pain pumps and the delivery of Marcaine or Lidocaine into the joint.
Q What curve are you talking about, sir?
A That was an expression, a phrase.
Q Okay. Do you have any data, sir, regarding the number of shoulder chondrolysis cases that were identified prior to 2004 versus anytime after 2004?
A I could estimate. No hard data, but we can defer to Matsen's poster earlier this year and add 67 cases to it. We can talk about Hansen's 11 cases. We can, you know, talk about the individual, smaller cases. But already in that number right there you've got more collectively than were present in all the years prior to 2004.
Q Let me ask --
A And we're talking about a five-year period of time.
Q And I think, sir, in the Hansen article, that was published in 2007; correct?
A I think it was 2007.
Q And would you agree with me, sir, that that concerned 10 patients, 12 shoulders; correct?
A Correct.



Q And nowhere in Hansen's article does he come to the conclusion that the continuous flow of anesthetics was, quote, "the primary cause," closed quote, of chondrolysis; correct?
A Well, I'll repeat an earlier answer, and that is that no single -- in any of the literature that you've got in front of you that I provided for you, no single document will come to that conclusion. It's the collection of documents. It's the totality of the information.
Q Okay. Just so I have your testimony straight, sir, no single article in the medical or scientific community comes to the conclusion that you have reached as an expert that a continuous flow of anesthetics is, quote, "the primary cause," closed quote, of chondrolysis; correct?
A I'll correct something you said. You said in the medical and scientific literature. I said in what's provided in front of you, in the literature that I have reviewed, I do not believe that there is any one -- that any one of these documents can come to the conclusion that the use of the pain pump was the primary cause of chondrolysis in these patients. It is the totality of this information that is so compelling.
Q I need to break this down, Dr. Badylak.



A Sure.
Q Okay. I want to talk about individual articles first.
A Sure.
Q Okay. Would you agree with me, Dr. Badylak, there is no single article in your -- I believe you cited to 67 different articles in your Attachment A, that states the same conclusion that you have reached in your opinion number 1, which is that a continuous flow of anesthetics directly into the joint is the, quote, "primary cause," closed quote, of chondrolysis? Do you agree with that statement?
A Miss --
Q Yes or no? And then we're going to talk about the totality.
A Then there's a -- you're asking a question that's a yes or no. I've answered this question for you six times already today. I have said there is no single -- single article that states that the use of the pain pumps, delivery of intra-articular Marcaine, is the primary cause. I've stated that. I'll state it again, for the eighth time today. I don't know how many different ways you want me to say that.
So there's no dispute. We agree on that. The information, however, though, is that -- available in the totality of what's in front of you is so



compelling that nobody can come to any other conclusion, in my opinion.
MS. SCHMID: Move to strike as nonresponsive.
MR. KIRPALANI: Can we go off the record?
MS. KALUR: At this time we need to take a quick break.
(Discussion off the record.)
BY MS. SCHMID:
Q All right. You're making me work very hard, Dr. Badylak, but that's all right. Let me just ask this question again.
I think we've marked, sir, somewhere today a copy of an amended list of articles. And do you have that in front of you, sir?
A Yes, I do.
Q And that's exhibit number, what?
A 12, I believe.
Q Okay. And how many articles are on that list, sir?
A 56.
Q All right. So here's the question, very simply. In your Exhibit 12, which you've prepared, which identifies 56 different medical or scientific articles, can you identify any single article which states your opinion and agrees with your opinion that the continuous flow of anesthetics directly into the