# Appendix III, Tab 4

**Testimony of Charles Beck, M.D., March 3, 2009**

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

DANIKA GROSSNICKLE and TIMOTHY GROSSNICKLE, husband and wife; ROBIN LABAW; CHRISTINE O'RILEY and MICHAEL O'RILEY, husband and wife; CHARLES SHWALLON and TRISHA SHWALLON, husband and wife; TROY STANPHILL and MARGARET STANPHILL, husband and wife; JUANITA BERRY and JEFFREY BERRY, husband and wife; and SCOTT ROONEY and MISTI ROONEY, husband and wife,
Plaintiffs,
vs. NO. 0703-02834

(Caption continued on next page.)

TRANSCRIPT OF PROCEEDINGS
Volume 5-A
(Pages 1016 to 1118)

BEFORE THE HONORABLE MICHAEL H. MARCUS
Tuesday, March 3, 2009



STRYKER CORPORATION, a Michigan corporation; STRYKER SALES CORPORATION, a Michigan corporation; I-FLOW CORPORATION, a Delaware corporation; PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation; TUALITY HEALTHCARE, an Oregon nonprofit corporation, doing business as TUALITY COMMUNITY HOSPITAL; and A. BROOKE BENZ, M.D., individual and doing business as BENZ BONE & JOINT CLINIC,
Defendants.



BE IT REMEMBERED THAT, the transcript of proceedings appended hereto was taken before Charlotte A. Powers, Certified Shorthand Reporter and Registered Merit Reporter, on Tuesday, March 3, 2009, commencing at the hour of 9:07 a.m., the proceedings being reported in the MULTNOMAH COUNTY COURTHOUSE, 1021 SW 4th, Room 318, Portland, Oregon.

APPEARANCES

LAW OFFICE OF JEFF WIHTOL
By Mr. Jeffrey B. Wihtol
620 SW Main Street, Suite 602
Portland, Oregon 97205
Appearing on behalf of Plaintiffs

KEATING JONES HUGHES, PC
By Mr. Robert Keating
1 SW Columbia, Suite 800
Portland, Oregon 97258
Appearing on behalf of Defendant Benz

(Appearances continued on next page.)



APPEARANCES (continued)

BARTON & STREVER, PC
Mr. William A. Barton
214 SW Coast Highway
PO Box 870
Newport, Oregon 97365
Appearing on behalf of Defendant Benz

LANE POWELL, PC
Mr. Robert Maloney
601 SW 2nd Avenue, Suite 2100
Portland, Oregon 97204
and
SEDGWICK DETERT MORAN & ARNOLD, LLP
Mr. Ralph Campillo
801 S. Figueroa Street, 19th Floor
Los Angeles, California 90017
and
BULLIVANT HOUSER & BAILEY, P.C.
By Mr. Jeffrey S. Eden
888 SW 5th, Suite 300
Portland, Oregon 97204
Appearing on behalf of Defendants Stryker

* * * * *

problems, because other doctors were starting to see these chondrolysis cases, as well. There was a big mystery about what was causing it. Different anchor types. I used multiple different anchor types in my patients, all kinds of different absorbable and non-absorbable anchors, which by the way, Dr. Benz only used metallic anchors, so only used non-absorbable. You can imagine absorbable material coming apart in the joint could contribute or potentially contribute to some problem.

But I didn't find anything consistent in my patients, and I had -- I looked at about 170 cases and about 150 patients of my own over about a year and a half, and had 12 shoulders in 10 patients develop this condition. And every single one of those patients, besides me as the common factor, had the pain pump catheters as the only common factor otherwise, except for the fact that they were instability surgeries -- shoulders for dislocating joints -- or, excuse me -- surgery for dislocated shoulder.

Q Okay, Doctor, I have just a few more questions,



and I think I'm going to wrap it up.

I don't know that I asked you this narrow question. Did you make any assumptions about whether you felt the FDA had approved use of the Stryker Pain Pump in the glenohumeral joint, given the representations of the Stryker folks?

MR CAMPILLO: Object to the form of the question.

THE COURT: Maybe what we need to do is re-pose the question without the baggage.

MR. BARTON: Okay.

BY MR. BARTON:

Q Doctor, did you make any assumptions about whether or not the FDA had approved the use of the Stryker Pain Pump in the glenohumeral joint?

A Yes.

Q And what was your assumption?

A Well, the assumption is that if the device is on the market, the FDA -- FDA has approved it to be on the market. We also understand, as physicians, that once a device is on the market, we have the right, and sometimes responsibility, if you will, to use that device



in a way that we think is an appropriate way to use it. So I think you heard the testimony yesterday.

Q Now, one area I didn't touch on, did you have any contact with the Stryker administration or the people there concerning your concerns about the pain pump?

A Yes. It was about late fall of 2004 that I realized the association. And around December 15th, as I looked back at my records, I realized that was the last date I put a pain pump catheter in a shoulder, realizing at that point there's got to be something going on here, even though nobody else can help me or help me figure this out. So I just made a decision to quit doing it, even though I'd been putting these catheters in for several years before that.

I spoke with my colleagues -- or -- and Dr. Paulos is one of them, who was actually in my -- he was a partner at the time. I spoke with a Stryker representative who had sold the pain pumps to the hospital.

Q Do you remember the name of who that might be?

A His name was Don Kelley.



Q All right.

A I don't remember the exact date, but it was either in -- around that time to, you know, mid to late December or early January --

Q Of '05?

A December 2004, January 2005.

Q What was your discussion with Mr. Kelley?

A I asked him if he had had any knowledge of pain pump catheters causing problems.

Q What did he say?

A He said no.

Q Was that important to --

A I said -- well, and I also -- excuse me.

I also said that I believe that there's an association with this same condition because I can't find any other reason for it. And I asked him, you know, if he could convey that to Stryker, maybe it would be appropriate to get a warning out and start asking around to find out if some of the other cases that were now being reported in meetings had been associated with pain pump use. And that was, again, sometime in either -- at the latest, it would have been the first part of February 2005. But I believe it was probably the end of December of 2004, I

A. As far as I know, yes. I didn't mean, "Don't use the information"; I just meant, "Don't give the paper out to" --
Q. You said --
A. -- "other people."
Q. -- "Please keep it confidential." Right?
A. Right.
Q. Okay. Doctor, also looking at Exhibit 612, the presentation -- the podium presentation, I just have a question about next to your name -- if you could enlarge where his name is, right there -- it says: "Charles L. Beck, M.D., West Jordan, Utah, c-Mitek." What does that mean?
A. That means I, at that time, was a consultant for a company called Mitek.
Q. And Mitek is the company that actually manufacturers heating and radio frequency devices of the type that have been associated with cartilage injury, aren't there -- aren't they?
A. Yes, they do, among other things; but that's not what I was associated with.
Q. Are you still a consultant to Mitek?
A. Yes. And what I'm consultant with and I have a royalty agreement about is an ACL



reconstructive device. It has nothing to do with the shoulder.
Q. I mean, if you go into the Mitek Web site, you can actually find your name and referrals to you?
A. I don't know.
Q. You never looked?
A. I never looked. Too busy.
Q. Dr. Beck --
A. I know I'm on the Stryker Web site.
Q. You are.
A. Yes, because I do Stryker joints.
Q. Thank you. Your paper, the published paper that you referenced on your direct examination -- I just have this one question -- is designated as a level 4 evidence in terms of study design; correct?
A. Yes.
Q. What is level 4?
A. Well, there's different levels of scientific validity in papers. In other words, the study that everybody wants to see is called the randomized perspective study, where you get a group of patients with one treatment, compared with only one factor different with other



patients with another treatment, and every patient is randomized and assigned totally randomly into which side of the study, and those patients follow along with a very set protocol and looked up and presented.
In this country, it's almost impossible to do that type of study, although it is done once in a while as a participant in another study. But this level 4 means it's a retrospective, meaning we're looking backwards to see what happened in these patients; it's a case series, which means we looked at these patients who had this happen to them, and just presented them for the review of those who are reading the paper. It wasn't meant or it wasn't designed to be this highly rigid, highly scientific study of A versus B. That's what it means.
MR. CAMPILLO: Thank you, sir. I have no further questions.
MR. BARTON: Doctor, a few questions for you. Going back to early --
THE COURT: By way of redirect, thank you.
MR. BARTON: Yes, Your Honor. I'm sorry.
THE COURT: That's all right.



REDIRECT EXAMINATION
BY MR. BARTON:
Q. Doctor, going back to early '05 when you started going around to the various conventions and discussing with the Stryker reps your concerns, or expressing it, I think my notes show that you were not -- you did not receive a warm welcome or much interest. I don't know if I got that correct.
MR. CAMPILLO: Let me object to the question. The preamble misstates the testimony, is leading and argumentative.
MR. BARTON: I'm going to ask him what he meant by that.
THE COURT: So the question becomes: Whatever he -- Whenever he made that warm welcome remark what did he mean by it?
MR. BARTON: Yes.
THE COURT: Is that okay?
MR. CAMPILLO: That's perfectly fine.
THE COURT: Okay. Let's go.
THE WITNESS: When I went to these different pump manufacturer booths -- and, again, this was at a medical meeting where doctors are walking around on their time off