# Appendix III, Tab 5

**Deposition of A. Brooke Benz, M.D., August 21, 2008**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

DANIKA GROSSNICKLE and TIMOTHY GROSSNICKLE, husband and wife, ROBIN LABAW, CHRISTINE O'RILEY and MICHAEL O'RILEY, husband and wife, CHARLES SHWALLON and TRISHA SHWALLON, husband and wife, TROY STANPHILL and MARGARET STANPHILL, husband and wife, JUANITA BERRY and JEFFREY BERRY, husband and wife, and SCOT ROONEY and MISTI ROONEY, husband and wife,

Plaintiffs,

v. Case No. 0703-02834

STRYKER CORPORATION, a Michigan corporation, STRYKER SALES CORPORATION, a Michigan corporation, I-FLOW CORPORATION, a Delaware corporation, PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation, TUALITY HEALTHCARE, an Oregon nonprofit corporation, doing business as TUALITY COMMUNITY HOSPITAL, and A. BROOKE BENZ, M.D., individually and doing business as BENZ BONE & JOINT CLINIC,

Defendants.

VIDEOTAPE DEPOSITION OF A. BROOKE BENZ, M.D.

Volume I-Pages 1-305

August 21, 2008

caused you to destroy it?
A. I think the -- the length of the operation and the difficulty that we had manipulating the instruments in some way validated what Brian Allen said. And I didn't -- that caused me to be fearful.
Q. And your purpose in destroying that tape was to prevent it from getting into the hands of Stryker or I-Flow's counsel?
A. Correct.
Q. Because by the time you destroyed it you had already signed the settlement agreement?
A. That had nothing to do with the settlement agreement.
Q. I'm just asking a question.
A. And I answered it.
MR. MALONEY: I object to the answer as nonresponsive.
MR. KEATING: Well, actually it was very responsive because you started your question with the word "because."
Q. BY MR. MALONEY: Isn't it true that as of the time that you destroyed the tape you had already signed this settlement agreement?
A. I had signed it.
Q. Once you signed the settlement agreement, did that relieve fear on your part as to the plaintiffs'



claims?
A. It didn't have an impact on the plaintiffs' claims in my mind.
Q. The settlement agreement doesn't?
A. No, you were talking about the tape.
Q. No. No. No. The settlement agreement itself. Exhibit 272. Once you had entered into that agreement, didn't that give you some relief of any concern you had about the plaintiffs suing you?
MR. KEATING: I'm going to instruct him not to answer the question.
MR. MALONEY: Why?
MR. KEATING: For the reasons I've stated previously.
MR. MALONEY: It goes to his damage claim.
MR. KEATING: Well, you can maybe ask him in the next question with his other lawyer.
MR. MALONEY: Well, wait, his other lawyer's here.
MR. KEATING: No. No. During that part of the deposition, of his deposition. I'm instructing him not to answer. It's not within the scope of this deposition.
MR. MALONEY: Well, this deposition involves a number of things, including damages. And I don't have to ask it --



MR. KEATING: This deposition involves --
COURT REPORTER: I'm sorry. One at a time.
MR. KEATING: Okay. Sorry. I'll wait until you're done.
MR. MALONEY: I can ask the questions in whatever order I want. I don't have to ask all of the damage questions at the same time. And if it's logical to bring it up in connection with what I'm inquiring about now, that's my choice. His counsel for damages is present, he can object if he wishes.
MR. KEATING: I'm instructing him not to answer at this stage.
MR. BARTON: Let's first talk about the declaration, then we can move to damages. But maybe I misunderstood.
MR. MALONEY: I think you misunderstood.
As long as you're both here I don't think I am restricted.
MR. BARTON: One of the reasons I disagree with you is by and large we usually have one lawyer per side as we go along. And for me to be trammeling over the top of Mr. Keating would not be the way I've seen it done, but maybe two people game tackle one lawyer. I don't know.
MR. MALONEY: Okay.



MR. BARTON: That's isn't the way I do it.
Q. BY MR. MALONEY: All right.
Once it was destroyed, you then tossed the empty tape in a dumpster in Seaside.
A. Correct.
Q. And that was on July 26th --
A. No.
Q. -- is what you said here.
A. No.
Q. But you changed that date later.
A. Yeah. On the addendum, right.
Q. Why did you toss it in a dumpster in Seaside?
A. Because I was --
Q. Huh?
A. Because I was stupid.
Q. Well, why did you choose Seaside as opposed to Portland or any other place?
A. I have a residence there.
Q. And did you erase it when you were in Seaside?
A. No.
Q. So you erased it here in Portland.
A. Drove down to Seaside.
Q. With it?
A. Yes.
Q. For the purpose of putting it in a dumpster there?

A. I wasn't sure what I was going to do at that time, but that was what I ended up doing.
Q. Okay. But the point of it is, is that once you destroyed it here by erasing it, you concluded that you should take it to a different city to discard it. Correct?
A. No. It was just -- it was in the car.
Q. Well, did you destroy it in the car?
A. No.
Q. How did it get into the car?
A. I had taken it home to erase it.
Q. And then from there --
A. And then from there it was going to go -- I just put it in my car. I don't -- I didn't -- I didn't have any intent as to exactly what I was going to do with it, but I ended up tossing it in Seaside.
Q. But once you destroyed it at your home, you then concluded that you were going to take it in your car someplace else to get rid of the remaining evidence that the tape existed. True?
A. Okay.
Q. Isn't that true?
A. Okay. Yes.
Q. Okay. And rather than putting it in your own garbage can, or just -- or just leaving it someplace in



Portland, you thought if you took it to Seaside it would be less likely that anybody would ever know that it had ever existed because it was being discarded in that other location. Correct?
A. Okay.
Q. And was there any marking on it that would identify you as the doctor involved?
A. No.
Q. Was there any marking on it that would identify the patient?
A. No.
Q. So did anybody see you put it in the dumpster?
A. No.
Q. Was your wife with you when you went to the beach?
A. Yes.
Q. Did she have any idea what you were going to do with that?
A. No.
Q. Did she see the tape?
A. No.
Q. Did you ever talk to your wife about the tape destruction?
MR. KEATING: I'm going to instruct him not to answer that.
VIDEOGRAPHER: Two minutes' of tape left.



Q. BY MR. MALONEY: Okay. And then it took you two weeks after that before you were struck by what you had done?
A. Yeah.
Q. During that two weeks, did you think about what you had done?
A. Probably, yeah.
Q. And what did you think before you became struck at the end of two weeks? What was the sequence leading up to that point when you were struck?
A. I think I was alleved -- alleviated for a while. I had a false sense of security.
Q. Okay. Security from whom?
A. Uh --
Q. Stryker? I-Flow?
A. Actually, it's not either of you.
Q. Who were you trying to get security from?
A. It's not -- it's not -- it's not either of your pumps.
Q. Whose pump was it?
A. There is no name on the pump.
Q. So then you didn't even know whose pump it was?
A. No.
Q. So who are you seeking security from then?
A. Just -- it really doesn't pertain to either -- either claim because there's no name on -- there's no pump



name on it -- on it. So I didn't really think of it in those terms. It was -- it was more with -- with reference to my skills.
Q. But your skill was an issue in the case. Still is. Correct?
A. It looked like it, yes.
Q. Do you think your skill still is an issue in the case as we sit here today?
A. Not really, no.
Q. Did you think your skill was an issue in the case at the time you destroyed and erased this tape?
A. It could have been -- it could have been -- like in a venue like this it could have been construed as such, yes.
Q. Okay. At the time you erased and then destroyed the tape, who did you believe would potentially be able to use that tape to challenge your skill in connection with this case?
A. Uh --
Q. Was it Stryker or I-Flow?
A. Or the plaintiffs.
Q. Or the plaintiffs.
A. Yeah.
Q. It could have been any of them.
A. Exactly.