# Appendix III, Tab 6

**Deposition of Jason Dragoo, M.D., June 12, 2009**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JENSEN MEHARG, and her parents ROBIN MEYER and MICHAEL MEHARG,

Plaintiffs,

vs.

I-FLOW CORPORATION, ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP, ZENECA HOLDINGS, INC.,

Defendants.

Cause No. 1:08-CV-0184-DFH-TAB

CROSS-NOTICED IN VARIOUS OTHER ACTIONS

DEPOSITION OF JASON LOUIS DRAGOO, M.D.

Friday, June 12, 2009

REPORTED BY JOANNE ICHIKI, CSR #11660

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION
CASE NO: 08-CV-19

IN RE: PAIN PUMP LITIGATION
________________________________/

DEPOSITION OF JASON LOUIS DRAGOO, M.D.
Friday, June 12, 2009

REPORTED BY JOANNE ICHIKI, CSR #11660



A P P E A R A N C E S
FOR THE PLAINTIFFS:
JANET, JENNER & SUGGS, LLC
BY: ROBERT K. JENNER, ESQUIRE
1829 Reisterstown Road, Suite 320
Baltimore, Maryland 21208
(410) 653-3200
(410) 653-6903 fax
rjenner@medlawlegalteam.com

COHEN & MALAD, LLP
BY: ELIZABETH J. DOEPKEN, ESQUIRE
(VIA TELEPHONE)
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
edoepken@cohenandmalad.com

SCHACHTER & HENDY, PSC
BY: PAUL J. SCHACHTER, ESQUIRE
909 Wright's Summit Parkway, Suite 210
Fort Wright, Kentucky 41011
(859) 578-4444
(859) 578-4440 fax
pschachter@pschachter.com



A P P E A R A N C E S
FOR THE DEFENDANTS ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP AND ZENECA HOLDINGS, INC.:
ICE MILLER, LLP
BY: BONNIE L. GALLIVAN, ESQUIRE
BY: JESSICA L. BENSON COX, ESQUIRE
One American Square, Suite 2900
Indianapolis, Indiana 46282-0200
(317) 236-2181
(317) 592-5474 fax
bonnie.gallivan@icemiller.com
jessica.cox@icemiller.com

FOR THE DEFENDANT I-FLOW CORPORATION:
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
BY: MAYNARD M. KIRPALANI, ESQUIRE
260 Franklin Street, 14th Floor
Boston, Massachusetts 02110-3112
(617) 422-5300
(617) 423-6917 fax
maynard.kirpalani@wilsonelser.com



A P P E A R A N C E S
FOR THE DEFENDANT BREG, INC.:
BOWMAN AND BROOKE, LLP
BY: KIM M. SCHMID, ESQUIRE
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
(612) 339-8682
(612) 672-3200 fax
kim.schmid@bowmanandbrooke.com

FOR THE DEFENDANT SORENSON MEDICAL PRODUCTS AND SMI LIQUIDATING, INC.:
REMINGER CO. LPA
BY: BRIAN D. GOLDWASSER, ESQUIRE
525 Vine Street, Suite 1700
Cincinnati, Ohio 45202-3123
(513) 721-1311
(513) 721-2553 fax
bgoldwasser@reminger.com

Q. Did you write that E-poster?
A. Yes.
Q. But you don't remember what you wrote?
A. Because of the amount of abstracts, presentations, papers, I can't tell you the words used on the slide. And although I can tell you in general the content, I cannot give you specifics because I do not have it in front of me and there is -- so therefore, I cannot answer that.
Q. Have you published anywhere or presented anywhere where you have stated, either in writing or in a presentation orally, that local anesthetics can cause chondrocyte damage?
A. Yes, I have stated that.
Q. Where?
A. American Journal of Sports Medicine, 2008. The manuscript is entitled "The Effect of Local Anesthetics Administered Via Pain Pump on Chondrocyte Viability."
Under the Results section, it reads, "Significantly more chondrocyte necrosis was found in all cultures with medications containing epinephrine at all time points. Similar necrosis rates were exhibited in quarter percent and half percent bupivacaine compared with controls at 24 and 48



hours."
So therefore, that is a direct statement of chondrocyte loss of viability.
Q. Have you ever stated in any presentations and/or in publications that it is your belief that local anesthetics cause chondrolysis?
A. The intent of the research that I have constructed and that I have published on -- and I will stick to the peer-reviewed literature and the articles that are submitted for peer review -- that these studies were constructed to evaluate the effect of anesthetics on chondrocytes. They were not constructed to show that -- chondrolysis.
But I do believe in my professional opinion that it is a factor that is involved with the production of chondrolysis, even though these studies themselves did not involve the evaluation of chondrolysis itself.
Q. Going back to my question: Have you published anywhere or presented anywhere where you have made the statement that local anesthetics can cause chondrolysis?
MR. JENNER: Objection.
THE WITNESS: At the risk of not being accurate, I would have to read my papers to see if I



made that direct statement. But I really --
BY MS. GALLIVAN:
Q. As you sit here today, do you believe that you have published anywhere in your papers that local anesthetics can cause chondrolysis?
A. I do not believe that I have stated that they can cause chondrolysis. It is my professional opinion that they can be a factor in it. But I do not believe, and I may be mistaken, that I have made that direct statement in the literature.
Q. Have you made that direct statement in any presentations that you have made with regard to local anesthetics and pain pumps?
A. I'm unaware of the direct statement in print that I have made.
Q. Let me see if I understand correctly.
Then what you are testifying to is you are unaware of making a statement publicly in any presentations that you have made that local anesthetics can cause chondrolysis; is that correct?
A. Oh, I have been -- in presentations which I have given, I have publicly given my professional opinion that I feel that local anesthetics in -- with the use of a pain pump can be a causative factor for the development of chondrolysis.



Even though I did not study the development of chondrolysis, I studied the effect of those local anesthetics at the chondrocyte level.
Q. And at the chondrocyte level, you can't -- your study did not show that it could cause chondrolysis? This was just at the chondrocyte level; correct?
MR. JENNER: Objection.
THE WITNESS: Well, the study was constructed, not to show chondrolysis, but it was constructed to evaluate chondrocyte viability or cartilage loss. That is what we've shown in our study.
If you were to ask my professional opinion, is the chondrocyte loss that we've established in our study, is that medically probable that this cartilage loss would lead to chondrolysis, I would have to say yes.
BY MS. GALLIVAN:
Q. I understand. What I'm talking about is, in your publications, you've never made that statement; correct?
A. Which statement?
Q. That chondrocyte death can cause chondrolysis, that what you are seeing in your study

Page 134

A. One more time. Please rephrase.
Q. As of August of 2006, did you in your own mind believe that there was any conclusive evidence that establishes a definitive causation for chondrolysis?
A. In August of 2006, I felt that the listed treatments or medications were the ones that were medically probable at that time to cause chondrolysis. The term "definitive causation," I don't know as a medical doctor if I even know what that truly means.
So what I'm saying is I feel that I am identifying things that are most likely or medically probable to cause chondrolysis, but this may not be a conclusive list. And we may not know everything about the mechanisms of how these may or may not cause chondrolysis.
Q. And the four that we talked about don't have anything to do with local anesthetics; correct?
A. That's correct.
Q. Okay. If you'll turn to the next page, it says, "Burks et al has examined ten patients with florid chondrolysis after the use of pain pumps." Then you go on to say, "However, no definitive studies have been performed to clearly establish a link."
Hence, you are proposing this study; correct?
A. Are you asking am I proposing a study?
Q. Well, let's go back to the first part.
You state that "no definitive studies have been performed to clearly establish a link"; correct?
A. At the time of August of 2006; correct.
Q. Okay. So in your mind, local anesthetics -- there was no direct link of anesthetic-induced chondrolysis as of that time; correct?
MR. JENNER: Objection.
THE WITNESS: Yeah. There may have been reported cases of chondrolysis coming from a pain pump, but that in itself may not be a clear link to the development of chondrolysis.
BY MS. GALLIVAN:
Q. In fact, even as of 2008 when you published your article, you stated, and I quote, "Although a direct link of anesthetic-induced chondrolysis has not been established, multiple studies have shown the detrimental effects of local anesthesia on chondrocyte viability"; correct?
A. That's correct. So that is a correct statement that all of the pathways and changes within the joint from initial trauma to the cartilage or

Page 135 

(see above)

Page 136

injury to the cartilage to the development of chondrolysis has not been -- in other words, that complete link of all those changes and pathways has not been established.
My testimony is that the chondrocytes can be damaged with certain dose dependent administration of local anesthetics. And then if those chondrocytes are damaged, then it is medically reasonable, especially considering the other literature as a whole, including the clinical literature, that that would be a causative factor in the development of chondrolysis in that particular patient.
MS. GALLIVAN: I think he needs to change the tape and then we'll go on.
THE VIDEOGRAPHER: This is the end of Videotape No. 2 of the June 12, 2009 testimony of Dr. Jason Dragoo. We are off the record at 1:44 p.m.
MS. SCHMID: Madam Court Reporter, could you please just read that last answer back while he's changing the tape?
(Record read.)
MS. SCHMID: Thank you.
(Discussion off the record.)
THE VIDEOGRAPHER: This is the beginning of Videodisk No. 3 of the June 12, 2009 testimony of Dr. Jason Dragoo. We are on the record at 1:46 p.m.
BY MS. GALLIVAN:
Q. Dr. Dragoo, I want to take you back to August of 2006 when you made the statement in this outline, "However, no definitive studies have been performed to clearly establish a link."
So back in August of 2006, there was no nothing definitive to establish a link between local anesthetics and chondrolysis; correct?
MR. JENNER: Objection.
THE WITNESS: And I feel that I've answered that to the best of my ability on the last answer. I have nothing further to add to it.
BY MS. GALLIVAN:
Q. Were there any studies in August of 2006 that showed a definitive link between chondrolysis and local anesthetics? First let's start with: Were there any human studies?
A. Not to my knowledge.
Q. Okay. Were there any animal studies that you believe definitively could show that there was chondrolysis being developed in humans as a result of local anesthetics as of August of 2006?
A. Rephrase your question. My problem with the question is: Are you referring to the use of human

Page 137 

(see above)

made by the surgeon, not that we are sacrificing patient safety, but we have to make an assumption because we can only read some much. There's only so much time that's available.
BY MS. GALLIVAN:
Q. So when you say you assume it was tested, you assume it was tested by whatever sales rep came in to you and said "You can use this particular device"?
A. No.
MR. JENNER: Objection.
BY MS. GALLIVAN:
Q. Then who do you assume tested it?
A. The companies.
Q. Which company?
A. Who are selling the products.
Q. Which product?
MR. JENNER: He said "products."
BY MS. GALLIVAN:
Q. Which particular products?
A. Again, this is away from my expert testimony. But if you are selling a product that has local anesthetic in it, then I would assume that the company that was selling that kit, so to speak, would have then examined all of it.



Or if the company was selling individual components and the medication was separate from the kit, but if there was somewhere on some of the packaging that that medication was to be used in there, whoever put that packaging together should have tested that because they are giving then the physicians the opinion that the idea that this has been used before. And it is reasonable, I think, for physicians to assume that it is safe. Otherwise, why would companies be then coming to us with unsafe and unproven technology?
Q. There were other risk factors listed for potential chondrolysis in your report as well as articles; correct? Those would include thermal probes; is that correct?
A. Thermal probes have been listed in previous articles as a causative factor for chondrolysis, yes.
Q. Yes. So if someone is looking at any particular individual who has chondrolysis and potential causes, a thermal probe should be in their differential diagnosis, if a thermal probe was used, as a potential cause?
A. When a patient has chondrolysis, all of the known causes of chondrolysis should be considered. And therefore, when you distill down what risk



factors or causative agents that patient was actually treated with, then we can do our best to say, "Well, this is the reason why chondrolysis occurred."
Q. There are a couple that you haven't listed, and let me ask you whether you think they may be potential causes.
What about instability?
A. Which joint are we speaking?
Q. Shoulder.
A. Shoulder. Shoulder instability. To my knowledge, there is no study which shows the severe degeneration of articular cartilage on both sides of the joint with continued instability of the shoulder. In other words, recurring dislocations typically are not associated with the progression of osteoarthritis or chondrolysis.
Q. What about the initial injury itself --
MR. JENNER: Objection.
BY MS. GALLIVAN:
Q. -- which led to the need for arthroscopy surgery?
A. To determine if injury itself was a causative factor in chondrolysis, you would have to do a natural history study, right, to see if patients who are treated from a trauma and then subsequent



instability and patients who are not treated for their instability. And that would be the only way to know that, if the disease itself would have progressed, surgery or not.
To my knowledge, there is no studies that show that initial trauma causes chondrolysis.
Q. Do you believe that chondrolysis is going to be the result for any patient who has a pain pump?
A. No, I do not.
Q. How do you explain that?
A. Patient variability. Different sensitivity to medications. The possibility of having different metabolism or catabolism of the product. So metabolism, breakdown of the medication. In other words, the medication may stay in certain joints or individuals longer than the other. Certain cartilage may be thinner than others, and therefore, more susceptible. There may be some damage to cartilage.
But bottom line is there has been a lot of pain pumps that have been dispensed. And it is pretty clear in my mind as a professional that not all of them have developed chondrolysis. What makes certain people susceptible is unknown at this time.
Q. Is there any dose or duration that does not cause chondrolysis, in your opinion?

MR. JENNER: Objection.
MR. KIRPALANI: Objection.
THE WITNESS: We have not studied that.
BY MS. GALLIVAN:
Q. Do you understand what the mechanism of action is by which chondrolysis develops under your positing that it's local anesthetics in a pain pump?
A. One more time, please. Mechanism of action of --
Q. What causes chondrolysis. You posit or you opined that chondrolysis can develop from the use of a pain pump with continuous infusion of local anesthetics; correct?
A. Correct.
MR. KIRPALANI: Objection.
BY MS. GALLIVAN:
Q. What is the mechanism of action by which that occurs?
A. Although we have established with basic science studies that chondrocyte death can occur with the administration of -- dose dependent administration of local anesthetics through a pain pump, the entire link, the entire path or the steps that are involved with chondrolysis are not all elucidated.



However, as I discussed previously in this testimony, we then have to look at the medical probability of a shoulder without or with a loss of chondrocytes, plus then coming into the available literature of what has happened and the reports that there are, I think that it is medically probable that the loss of chondrocyte viability, is medically probable that that will continue on to chondrolysis.
Q. When you drafted your second report for peer review, when was that? Do you know the date?
A. Are you asking for the date that it was turned into the journal?
Q. Yes.
A. Completed and initially for review?
Q. Yes.
A. Approximately one month ago.
Q. And I know you told me this, but what is the journal?
A. American Journal of Sports Medicine.
Q. Did you review the literature to be sure that you had all of the recent studies with regard to bupivacaine and any association with chondrolysis before you submitted this for peer review?
A. References for study are not meant to be all encompassing, but they are meant to be reflective of



the creation and the nature of your experiment.
So at no time do I profess that this -- that all of the studies on bupivacaine and the safety or the lack thereof of the medications, or all the pain pump studies are in our reference section, but that they are a reflection of the current science and set the tone for the creation of the study.
So it is not a complete list. We did our best to include the most relevant ones, but it is not complete.
Q. So you believed that the Gomoll paper was an important paper?
A. Yes. But not -- that it's an important paper and may not be necessary to include in our study, though. It is a very important paper in all this, but that does not mean it has to be referenced in every single paper.
(Whereupon, Defendants' Exhibit 19 was marked for identification.)
BY MS. GALLIVAN:
Q. Let me hand you what's been marked as Exhibit 19.
Why did you not include Gomoll's 2009 study? It went out for online publication October 2nd of 2008. It was published in 2009, January 14th.



A. Because, again, we run literature searches and write a paper at a certain period of time. A paper could truly never be done if you kept waiting for the new literature to go, more literature, more literature. You have to put a stopping point on it to write your paper; otherwise, it can never be finished.
Q. Have you seen this paper before?
A. I have seen the paper before and I just have not read it recently.
Q. This paper found that when Gomoll, who had looked at the chondrocytes in his study a few days or a few hours after the bupivacaine was continuously infused and the chondrocytes were dead, he sacrificed them after three months and the tissue simple analyzed with live/dead cell assay showed that there was no permanent damage to the chondrocytes; correct?
A. I haven't read the paper recently, so I cannot comment on it. I will be happy to read it if you'd like me to.
Q. Wouldn't that be an important paper where it shows no permanent damage to the chondrocytes?
MR. JENNER: Objection.
THE WITNESS: It can be as long as it's constructed correctly and there's a control group, a

damage control group, because rabbits have been known to heal their own cartilage lesions. So I would have to read this and find that they injured the contralateral shoulder and that that hadn't healed.
BY MS. GALLIVAN:
Q. If you would go to the last page, 77.
A. Okay. I'm there.
Q. He states that, "If these findings can be extrapolated to human cartilage, surpassing a yet to be determined threshold concentration, or other factors besides bupivacaine exposure, would likely be required before permanent cartilage damage such as chondrolysis ensues."
So you would not agree with that assessment of his paper?
A. Again, I can't make a comment on a paper that I haven't read recently, and I'm happy to read it and then give you my professional opinion of the sentence. But taken out of context, I don't know -- it may or may not be a significant statement, but I'd have to read the article.
Q. What is your basis for saying that rabbits can regenerate their own cartilage?
A. My own personal research experience. It's well known.



Q. Is that published anywhere?
A. Oh, yes.
Q. Where is that?
A. I'm sorry. Are you saying are -- do I have any rabbit studies published, or have I published in the literature that it is well known that cartilage tissue remodels itself if young rabbits are used?
Q. The latter part.
A. I haven't made that statement. It is well known in the scientific community, and I do have previous rabbit studies that have been published, and I do have controls for that purpose.
Q. That show what?
A. That show that the rabbit age and the maturity of the rabbits that I used in the study to regenerate their articular surface did not heal their own defects, because I made a defect in the other side and didn't treat it.
Q. Can humans regenerate?
A. No. They can regenerate very little bits of cartilage, but not a defect.
Q. So what you're saying is neither rabbits nor humans can regenerate a defect?
MR. JENNER: Objection.
THE WITNESS: Okay. Rabbits can regenerate



a defect, and that was my initial testimony. Rabbits can regenerate a defect. Humans cannot.
BY MS. GALLIVAN:
Q. Can chondrolysis be idiopathic?
MR. McCAULEY: I'm sorry. Can you say that louder, Bonnie?
BY MS. GALLIVAN:
Q. Can chondrolysis be idiopathic?
A. I've seen no reports in the literature that report idiopathic causes of chondrolysis.
Q. Do you believe it can be?
A. No, I do not.
Q. Are you aware of the Herman article in 1980 or the Kahn article in 1983 where it showed chondrolysis as idiopathic?
MR. JENNER: If you'd like to show him the studies, I'm sure he would be glad to look at them.
THE WITNESS: I will be glad to look at them. And no, I'm not familiar with them.
BY MS. GALLIVAN:
Q. Does cervical radiculitis pain often mimic pain associated with shoulder pathology?
A. Far from my testimony. Again, one more time. Does --
Q. Does cervical radiculitis pain often mimic



pain associated with shoulder pathology?
A. Define "often."
Q. Can that kind of pain mimic shoulder pathology?
A. Yes.
Q. What are you charging for your consultation?
A. Which consultation? This one?
Q. In this particular case.
MR. JENNER: What is your fee for your time?
THE WITNESS: An hourly fee?
BY MS. GALLIVAN:
Q. Yes.
A. I think $600.
Q. How much have you charged the plaintiffs to date?
MR. JENNER: If you know.
THE WITNESS: I don't know.
(Whereupon, Defendants' Exhibit 20 was marked for identification.)
BY MS. GALLIVAN:
Q. Can you identify what Exhibit 20 is?
A. It's a Journal Listing.
Q. What does that mean?
A. I have no idea. Maybe it's a bill.
Q. It was produced to us as a bill that you had

A. Yes. I'm from -- right, yes.
Q. Okay. Now, do you -- did somebody tell you in your meetings that there's a different standard for peer-reviewed literature in terms of what you can and cannot say and what you can and cannot say in terms of an opinion in court?
A. Oh, boy. I lost -- rephrase your question, please.
Q. Do you believe that there's a different standard for what you can say as a scientist in a peer-reviewed publication and what you can say as a scientist in a court of law?
MR. JENNER: Objection.
THE WITNESS: I still honestly do not understand the question.
BY MR. McCAULEY:
Q. I think you said earlier today that by convention in a peer-reviewed journal you couldn't make the causation opinion; you couldn't get that published in a peer-reviewed journal by convention?
A. Got it. Got it.
Q. Right?
A. Got it, yes.
Q. And the convention is not just some arbitrary convention; it's convention that's been



developed over many, many years of scientific research --
A. Correct.
Q. -- and understanding; correct?
A. Correct.
Q. It's a very important convention to scientists?
A. Correct.
Q. That, in order to make these causation opinions in a peer-reviewed journal, you have to satisfy a very large number of criteria; right?
A. Correct.
Q. And you haven't satisfied that large number of criteria in accordance with this scientific convention sufficient to put it in a peer-reviewed journal; isn't that true?
MR. JENNER: Objection.
THE WITNESS: It was just not what we were studying. It was different than the problem that we were studying.
BY MR. McCAULEY:
Q. I understand. But in your expert report that you're submitting for court, you make these causal connections, and that's why I'm asking you whether you think there's a different standard for a



scientist giving opinions in a peer-reviewed journal than a scientist offering opinions in a court of law.
MR. JENNER: Objection.
THE WITNESS: Sure. And my response to that is that we are not giving opinions in the peer-reviewed literature. We are giving results and conclusions of the experiment. But in what I am asked is for professional or expert testimony.
So we're drawing in different things, as I stated in Paragraph Number 3, that my conclusions or taking my research and then drawing steps or conclusions or medical probability from my research to chondrolysis has to do with -- and it is in Paragraph 3 -- education, research experience, communication with colleagues, and a constant review of the peer-reviewed literature. So I am giving you more than opinion now as a professional witness than I do give you, because they're not asking me for my opinion in the peer-reviewed literature.
It's not a different standard, but it's asking for different things. And I am being asked for my professional opinion, so I have to gather all of this available evidence together and give you that, and that's different than the results of my one paper.



BY MR. McCAULEY:
Q. Right. Because your one paper, for purposes of science, really, you can just for purposes of science and your fellow scientists, all you're permitted to do in a peer-reviewed literature is report what happened in your experiment; correct?
MR. JENNER: Objection.
THE WITNESS: Right.
BY MR. McCAULEY:
Q. And draw whatever conclusions are scientifically valid to draw from that?
MR. JENNER: Objection.
BY MR. McCAULEY:
Q. Right?
A. And we are -- when we are able.
Q. Before you say "and we are able"; is that right?
A. Rephrase, please.
Q. In your peer-reviewed journal, scientific convention developed over long years of research and analysis is that you should not be offering causation opinions based on the evidence that you adduced with your experiment; true?
A. If your experiment does not study that.
Q. Right. Your experiment did not study that,