# Appendix III, Tab 7

**Deposition of Frederick Matsen, M.D., September 4, 2009**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

CHRISTINA McCLELLAN,

Plaintiff,

v.

I-FLOW CORPORATION, a Delaware corporation; DJO, L.L.C., a Delaware corporation; and DJO INCORPORATED, a Delaware corporation, and PACIFIC MEDICAL, INC., a California corporation,

Defendants.

No. 07-CV-1309-AA

GORDON J. ADDIS,

Plaintiff,

v.

McKINLEY MEDICAL, L.L.C., a Colorado corporation; MOOG, INC., a New York corporation; DJO INCORPORATED, a Delaware corporation; DJO, L.L.C., a Delaware corporation; PACIFIC MEDICAL, INC., a California corporation, CURLIN MEDICAL, L.L.C., a California corporation, and CURLIN MEDICAL, INC., a Delaware corporation,

Defendants.

No. 07-CV-1318-AA

VIDEOTAPED DEPOSITION OF FREDERICK A. MATSEN, III, M.D.

September 4, 2009

Seattle, Washington

DONNELL COX; ANITA McGINNESS and GERALD McGINNESS, husband and wife; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST, Plaintiffs,
v. ) No. CV 07-1310 AA
DJO, LLC, et al., Defendants.

CALEB HUGGINS, Plaintiff,
v. ) No. CV 07-1671 AA
STRYKER CORPORATION; et al. Defendants.

JOHN ERIC BUTLER, Plaintiff,
v. ) No. 6:08-cv-0588-AA
STRYKER CORPORATION; et al. Defendants.

ERIC J. SCHOENBORN and SUZANNE G. SCHOENBORN, Plaintiffs,
v. ) No. 6:08-cv-1419-AA
STRYKER CORPORATION; et al., Defendants.

IVY LEE Y. NATIVIDAD and STEVE NATIVIDAD, Plaintiffs,
v. ) No. 6:09-cv-378-AA
STRYKER CORPORATION; et al. Defendants.



APPEARANCES

For the Plaintiffs:
Jeffrey B. Wihtol, Esquire
Law Offices of Jeffrey B. Wihtol
620 S.W. Main Street
Suite 602
Portland, OR 97205
503.228.1210
503.228.0016 Fax
jeff@wihtollawoffice.com

For Defendant Stryker:
Ralph A. Campillo, Esquire
Sedgwick Detert Moran & Arnold, LLP
801 S. Figueroa Street
19th Floor
Los Angeles, CA 90017
213.426.6900
213.426.6921 Fax
ralph.campillo@sdma.com

For Defendant McKinley:
Judi Abbott Curry, Esquire
Harris Beach, PLLC
100 Wall Street, 23rd Floor
New York, NY 10005
212.313.5404
212.687.0659 Fax
jcurry@harrisbeach.com

For Defendant I-Flow:
Eric J. Neiman, Esquire
Williams Kastner & Gibbs, PLLC
888 SW Fifth Avenue
Suite 600
Portland, OR 97204
503.228.7967
503.222.7261 Fax
eneiman@williamskastner.com



APPEARANCES (CONTINUED)

For Defendant DJO (appearing via phone):
James Heffner, Esquire
Morris Polich & Purdy LLP
501 West Broadway
Suite 500
San Diego, CA 92101
619.557.0404
619.557.0460 Fax
jheffner@mpplaw.com

For Defendant Breg, Inc. (appearing via phone):
Sheryl A. Bjork, Esquire
Bowman and Brooke, LLP
150 South Fifth Street
Suite 3000
Minneapolis, MN 55402
612.339.8682
612.672.3200 Fax
sheryl.bjork@msp.bowmanandbrooke.com

For Defendant Pacific Medical:
Scott J. Meyer, Esquire
Mitchell Lang & Smith
2000 One Main Place
101 S.W. Main Street
Portland, OR 97204-3230
503.221.1011
503.248.0732 Fax
smeyer@mls-law.com

Also present: James Rissell, Videographer



EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| MR. CAMPILLO | 9 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 1 | Testimony of Dr. Matsen in the Grossnickle matter. | 8 |
| Exhibit No. 2 | Declaration of Dr. Matsen. | 10 |
| Exhibit No. 3 | 7-page subpoena, dated 7/27/09. | 24 |
| Exhibit No. 5 | 3-page letter to Mr. Wihtol, dated 3/5/09. | 73 |
| Exhibit No. 6 | 22-page letter to Dr. Matsen, dated 6/7/07. | 78 |
| Exhibit No. 7 | 17-page "Dr. Benz arthroscopic intra-articular surgery list" spreadsheet. | 92 |
| Exhibit No. 8 | 3-page report by Dr. Warme. | 105 |
| Exhibit No. 9 | 32-page report of 67 new cases and 55 cases from a systematic review of the English literature. | 108 |
| Exhibit No. 10 | 2-page Paper No. 563, "Characteristics of Chondrolysis associated with intra-articular pain pumps after shoulder surgery." | 127 |
| Exhibit No. 11 | 2-page trial balance detail. | 127 |
| Exhibit No. 12 | 1-page list of references. | 132 |

answer any questions put to you by any of the lawyers in this case as truthfully as you can.
You understand that?
A I do.
Q Do you have any questions about the proceeding itself?
A I do not.
Q All right. Dr. Matsen, I'm going to start by marking as the first exhibit a declaration which apparently you signed some time ago.
I just received this. I was leaving my office in the evening of Wednesday on my way up here. I don't have extra copies of this for counsel because I got it so late, but I think everybody knows which declaration we're talking about.
(Exhibit No. 2 marked for identification.)
Q (By Mr. Campillo) Dr. Matsen, I'm going to ask you a few questions about Exhibit No. 2.
First of all, can you confirm that that is your signature on page-- it looks like Page 11 of the document.
A That's my signature on Page 11.
Q And is it accurate that you signed this declaration on August 25 of 2009?



A It is.
Q All right. Preliminarily, Dr. Matsen, there's references in this declaration to information related to you by University of Washington about confidentiality and proprietary matters, and I'm not seeking to ask you about any direct communications of what may have been said to you, but I want to know, who are the individuals with whom you had any conversations about the subject matter in this declaration?
A The individuals included Mr. Wihtol and a number of attorneys at the University of Washington, the principal of which was an attorney by the name of Dina Yonker, Y-O-N-K-E-R.
I also consulted initially the opinion of Margaret Peyton, who is the attorney for University of Washington Physicians, and there was one other attorney that was involved in my discussions, and I can't remember her name now, but -- I'm sorry about that, but what--
Q That's fine.
A So those were the individuals that I can recall that I consulted.
Q And during what time frame, roughly, to the extent you can recall, did those conversations take place, again



regarding the matters that are set forth in this declaration?
A I'm going to say later July and August, probably mostly in the month of August.
Q But those conversations obviously would have been-- would have taken place prior to August 25th when you signed the document?
A That's correct.
Q Dr. Matsen, in this declaration you indicate that there is certain work that you and your colleagues are continuing to do here at the University of Washington relating to the issue of chondrolysis of the shoulder and any connection that might have with local anesthetics; is that true?
A We're continuing our study of the case files of Dr. Benz. There are no other investigations that we have ongoing at this time.
Q Is it then-- let me see if I can set a little shortcut in terms of how to refer to some of the things we'll be talking about, and if you can't understand my sort of effort to simplify things, let me know, and we'll do it a different way, but as I understand it, you have done work on three separate what I would call databases relating to this issue of chondrolysis and local anesthetics, and by that I mean there's the study



you referred to relating to Dr. Benz's patients, there's another study that you and your colleagues did regarding what I'm calling the 67 patients that were accumulated, correct so far?
A You're correct so far.
Q And then you also published a case report, I should say, of a patient that had bilateral surgery and bilateral pain pumps; is that right?
A Yes.
Q I am treating those as three separate things to make our discussion more orderly.
Is it true that you've had involvement in those three studies or analyses?
A It is true.
Q And is it fair to say or conclude from your prior answer that the study regarding Dr. Benz's patients is ongoing but the other two are not?
A That is also correct.
Q Now, in the declaration, in Paragraph No. 10 specifically, Dr. Matsen, you indicate that your testimony largely centers around a single observation that you have made in connection with the work you've done on this issue.
Is that correct?
A I don't quite understand-- well--

opinions that are additional to or different than the ones that you expressed in the Grossnickle trial?
MR. WIHTOL: Object to the form of the question.
THE WITNESS: I think the only difference in my opinions that will be expressed today versus those in the Grossnickle trial will be that I would like to state that I'm not going to express my opinion based on the review of the 67 cases, and the reason for that is that I am not knowledgeable about the population from which those 67 cases came, so I don't think that that particular series of case reports that we put together and reported at the Academy, as you've referred to, has the scientific basis for an opinion on causation because of the way those cases were gathered.
In other words, those cases were specifically gathered because they had the association of pain pumps and chondrolysis. It doesn't address the population from which those patients came, so I would like to state today that the opinions that I have today are not based on those 67 cases but are based again on the three things that you and I have agreed to were the basis for the opinion.
Q (By Mr. Campillo) I appreciate that.



If someone read the transcript of the Grossnickle trial, pertaining to your testimony, would they have an understanding of, first of all, all the opinions that you will be expressing in these other cases or would they have to hear more to understand what you will be testifying about in these cases?
MR. WIHTOL: Object to the form of the question.
THE WITNESS: That's a hard question for me to answer.
I don't know exactly how people might read and interpret that transcript.
Q (By Mr. Campillo) I'll be very direct with you.
If your opinions that you're going to express in these cases are limited to what's stated in the transcript marked as Exhibit No. 1, this deposition could probably take less than an hour or two.
If you believe that your opinions go outside the scope of what's reflected in Exhibit No. 1, I think it will take considerably longer.
MR. WIHTOL: Object to the form of the question.
Q (By Mr. Campillo) I didn't finish the question though.
Having given you that preamble, can you tell me



now whether or not your understanding of what you will be testifying about at the request of the plaintiffs' lawyers in this litigation will exceed the balance of what's reflected in Exhibit No. 1?
MR. WIHTOL: Object to the form of the question.
THE WITNESS: I don't believe that, with the exception that I identified for you, that my opinions to be expressed today are going to be substantially different than what's there, but I may be wrong about that, but at least I don't believe that I've changed my mind.
The only thing I've altered has been the one exception that I mentioned to you about the role that the 67 cases should play in determining causation.
Q (By Mr. Campillo) So you've altered the basis of the opinions but not the opinions themselves?
MR. WIHTOL: Object to the form of the question.
THE WITNESS: I believe, again I could be wrong, but I believe my opinions are going to be essentially the same as those expressed in the Grossnickle case.
Q (By Mr. Campillo) We'll explore that in several ways to make sure everybody has a good understanding.



Doctor, the only reason I say this is because this is our opportunity to do two things: to find out what opinions will actually be expressed in the direct part of the plaintiffs' case through you and what the basis of those opinions are.
That's essentially what we're here to do, so to the extent that you have more opinions and more bases, we need to know all of that.
To the extent there is only one opinion, we should be honing in on that.
I'm trying to shortcut that somehow.
I'm not sure that I can completely, but that's my effort.
I want you to understand that's our primary purpose here, to understand what you're going to say and why you-- how you're supporting those opinions so there are no surprises at the time of trial.
Do you understand that?
A I completely understand what you said.
MR. WIHTOL: Counsel, would it help if I can try to limit that for you on the record so that you can understand--
MR. CAMPILLO: Be my guest, sure.
MR. WIHTOL: His opinions that will be sought are the ones expressed at the time of the

from here forward for purposes of the cases that you have been listed as an expert that we're here on today?
A I do not.
Q Other than what I'm calling patient files from the Benz group or the 67 and the medical records, if any, regarding Patients McClellan or Addis, have you received medical records, office notes, hospital records of any other litigant for your review or comment or testimony?
A Not that I can recall.
Q Dr. Matsen, who maintains the data, and by that I mean the electronic data, that maintains the information extracted from the patient files, the Benz patient files, that then is put into the Excel spreadsheet?
A That spreadsheet exists-- again, if I can back up, there really hasn't been maintenance in the sense of updating it or whatever since the initial data were collected.
Am I clear on that?
Q You are now, yes.
A So-- I mean, the data sheet is the data sheet, so it's like we have these observations, which are recorded in the data sheet, which is my understanding that you have, and that data sheet exists in the hands of the



co-investigators who are subjecting those data to analysis, and so each of the investigators has a copy of that data sheet, as you do, and are using those data in their analysis.
Q So any one of them can download that data sheet -- you're calling it a data sheet -- and make a disc out of it or print it or do whatever they want with it?
A They have been instructed not to do that, but in theory, they could do that.
Q But each has possession of the complete data sheet?
A The same data sheet that you and I looked at at the Grossnickle trial.
Q All right. And it's your testimony that that data sheet, which was marked as Exhibit No. 917 in the Grossnickle trial, has not been altered, modified, added to in any way, shape or form since it was printed on whatever day that was printed?
A That's my understanding, but again, I haven't looked at it then, but to my knowledge I don't believe that there's been any new data that's come to bear on that data sheet.
Q Okay. Putting aside the questionnaires-- we are going to call that step two or a separate data set for purposes of our discussion, if that's all right?
A It's absolutely fine with me.



Q Okay. Now, who are the investigators that have access to that data sheet today?
A The resident that's worked with me on this, his name is Brett Wiater, and the statisticians include Nayak Polissar and another individual who I only call Moni, M-O-N-I, and I don't recall even his last name. It's from a different country, and I don't-- I'm sorry, I don't recall his last name. I could provide that to you, but I don't have it at the top of my head now.
Q Okay. If we have a break at some point this morning, you can find that name, that would be helpful, but if not, we can get it otherwise.
A I will get it to you.
Q As I understood your testimony in the Grossnickle trial though, there was also a research nurse involved as part of your team.
Is that Ms. Moerer?
A It is.
Q So the research nurse was not part of the University of Washington then?
A No, sir.
She was employed by me from the funds that I identified for you at the Grossnickle trial, and today-- again, I don't know Ms. Moerer, but she's a person that I actually employed to help with the



study.
Q And she was identified and suggested for this project by Mr. Wihtol?
A That's correct.
Q What information were you provided about her qualifications, background, training or experience?
A Only that she had done this kind of work before, that she was a nurse, and so she was aware of the requirements for patient confidentiality, and that this was the kind of work that she did.
That was essentially all that was provided for her.
I haven't looked at her CV or anything beyond that.
Q So that information was transmitted to you verbally by Mr. Wihtol or someone in his office?
A By Mr. Wihtol.
Q Okay. You were not presented with any credentials, like you said, by way of a CV, resume or anything else, true?
A That's correct.
Q Do you know what experience, background or training she has that qualifies her to be described as a research nurse?
A I don't have any information, other than what I've

shared with you.
Q And is the-- that nurse, and I keep forgetting-- Ms. Moerer, the person who had the primary responsibility for-- I'm going to say keying or inputting the data extracted from the medical records into the data sheets?
A That's correct.
Q Let me see if I can understand.
From the actual redacted patient files that you received by way of CDs or I think there was an external drive as well, did the data go directly-- the information extracted from those records, go directly into the spreadsheet or the data sheet or was there some forms that were filled out; in other words, the data came from the records onto a form for someone else to then key into the spreadsheet?
A The spreadsheet was completed by Ms. Moerer from the redacted records.
I can't tell you for sure what the process was. Whether she had some sort of intercalary sheet, as you're referring to, I don't know that.
Did I understand your question?
Q Yes, you did.
Did either your resident or the statisticians directly extract data from the medical records and



input it into the data sheets?
A Yes.
Q Okay. Did they divide up that responsibility or can you explain to us how that worked, if you would, the extraction of the data and getting it into the data sheet?
A So the statisticians had nothing to do with the entering of data.
Both Moni and Nayak were the two statisticians. They had nothing to do with the way the data were entered.
Brett's job was to review-- I think this is good that I explain this to you.
It wasn't Sue's job to determine what the diagnosis was, unless that was identified in the medical records by Dr. Benz. So if Dr. Benz said, "This patient has chondrolysis," she would say, "Dr. Benz identified this patient's chondrolysis."
As we discussed at the Grossnickle trial, we used two criterion for establishing the diagnosis of chondrolysis. One was a generalized loss of cartilage as manifested by x-ray, and the other was a generalized loss of cartilage identified at surgery. So again, in some cases she had access to an x-ray report that said, "There's loss of articular



cartilage," so she put that down under the column of x-ray findings.
What Brett did was to look at the data sheet that she had prepared and to cross-check that in each case, reviewing the medical records, and reviewing all available x-rays to make sure that he concurred with her assessment.
The other thing that we-- we looked at various other variables, with which you are familiar, I believe, such as the details of the operative procedure, was radio frequency used, was it inside or outside the joint, what kind of operation was it, was it a slap repair, was it a capsulorrhaphy, was it a rotator cuff repair, and so on.
Brett's job was to take the basic data that Sue collected and to make sure that he agreed with her assessment, so what she did was to get the gender and as much as she could, the specifics, out of the chart, but his job was to validate the data by going back to the primary source documents and validating that information.
Q So Dr.-- how do you pronounce his last name?
A Wiater.
Q And that's spelled W-I-A-T-E-R?
A Yes, sir.



Q So Dr. Wiater would have looked at all 396 patient records?
A And the x-rays.
Q Okay. The statisticians were not involved in that process, meaning the review of the records or the x-rays, the extracting of data or the inputting of data, correct?
A That's correct.
Q And I understand that you did not participate in that process either.
Is that true?
A That's correct.
Q What was the role of the two statisticians?
Let's take them separate. I think it will be clearer.
One you said his name was Nayak Polissar. Can you spell that for us?
A P-O-L-I-S-A-R, I believe.
I can't tell you that they had different roles.
They worked together. They are a group of statisticians that we can hire for consultation, and I've hired these same two statisticians to work with us on other papers.
Q So they're not direct employees of the University of Washington?

issues concerning shoulder chondrolysis following arthroscopic shoulder surgery where pain pumps were used.
A I don't think so. Again, I can't remember the exact dates that I became aware of this as a problem.
Q Okay. So does this appear correct to you, that as of May of 2007, you would have disclaimed any real experience on this particular issue?
A It's possible.
Again, I don't have any information, other than what's on this page.
Q Do you have any reason to suspect that this information summarized by Mr. Wihtol is inaccurate in any way?
A I don't have an opinion one way or the other.
Q Now, by May 7th, 2007, you had, as I understand it, treated Patient McClellan-- had a different last name originally, correct?
A As I sit here, I don't know if I ever treated her actually or-- I saw her-- I don't know-- as I expressed to you before, sir, I don't recall the exact date I saw her.
But as you know, I was sort of a late arrival on the scene of chondrolysis.
Q Is it accurate to say that at some point in time while



you were talking to Mr. Wihtol about one of his clients that had initiated or was considering litigation concerning chondrolysis, that that's what first inspired your interest or sparked your interest in this issue?
A I think that's probably right.
Q Okay. And that's something that happened after May 7th of 2007?
A I don't know the exact date.
Q Now, prior to that conversation with Mr. Wihtol, whenever it occurred, had you made any systematic study of the literature that related to the issue of shoulder chondrolysis after arthroscopy?
A I think not.
Q And one of the reasons for that, Dr. Matsen, is that arthroscopy is not your direct area of interest, correct?
A That is correct.
Q Let me ask you this: Assuming that at some point in time, whenever that was, you conveyed to Mr. Wihtol, via Fred, a message that you did not feel you had experience in this regard and would not be returning his call, what changed? What changed your mind in that regard?
A I don't know for sure.



There again, I ask your forgiveness in not being able to remember all the chronologies, but it's true that the topic of chondrolysis became increasingly important in shoulder circles. In the American Shoulder & Elbow Surgeons and the Academy and various other groups of which I'm a member, there's an increasing amount of conversation about this particular condition and what might cause it.
My general awareness was going up, my curiosity about this was going on up, but you are absolutely correct in saying I do not do arthroscopic surgery and I haven't experienced this particular event in my own practice, so from a specific practice standpoint, I didn't have an interest, but in terms of my interest as an academic shoulder surgeon, my interest was progressively piqued by what this previously not well described entity was.
Q And the first time that you began to do any systematic detailed analysis of that issue was after you met with Mr. Wihtol?
A That's correct.
Q If you look at the second page of Exhibit No. 6, this is now dated March 18th, 2008, and by that time it appears you had agreed to at least undertake a review of certain medical records, correct?



A That's correct.
Q Do you know when that decision was made; that is, that you would agree to study some patient records?
A I don't recall the date.
Q Sometime before March 18th?
A Yes.
Q Okay. If you'd look at the next item, it's a letter dated May 8th, 2008, so by this time-- let me ask you this: Was this the first time that you actually received materials for review or did you receive materials prior to May 8th, 2008?
A I don't know.
Q Okay. Skipping a couple of pages, on October 31-- do you see the October 31 letter, 2008?
A I do.
Q Here there's a reference to a spreadsheet that was sent to you by Mr. Wihtol.
Do you have any recollection what the spreadsheet was?
A I have a vague recollection, which was that someone else, and I don't know if it was Mr. Wihtol's office or other individuals, had prepared an analysis of these patients. That's all I can recall.
Q Now, there's a reference here to 600 patients.
What significance does that have to you, if any?

study?
A That's correct.
Q Okay. A January 27th letter is the next one in the stack.
Do you have that in front of you?
A I do.
Q It's a reference to a CD containing medical literature.
My question to you: Prior to receipt of this CD, had you conducted any sort of systematic review of the literature available in the published domain, peer-reviewed journals, regarding the issues that are addressed in your reports?
A We did that review as a part of the paper that we presented at the Academy, the one that had the 67 cases in it, and part of that paper, as you and I talked about before, was a systematic review of the published literature.
Q When was that review actually conducted, the reading of the papers?
A I don't know exactly.
It would obviously have to be prior to the Academy meeting, but I don't remember the exact date of the Academy meeting, but it would have been, I think, March--



Q The meeting was February 24th through 26th, roughly, of 2009?
A So we would have had to-- so again, my memory may not be completely clear on this, but it would have had to have been prior to the Academy meeting.
Q Sometime in the latter part of 2008?
A Probably.
Q And is it fair to say that the idea for the study of the 67 cases was also sparked by your conversations with Mr. Wihtol?
A That's correct.
Q And that sometime after that idea came to light, you did the study of the literature for purposes of the comparison?
A That's right.
Q Is it also accurate to say that prior to your review of the literature in connection with the AAOS presentation and ultimately made in February of 2009, prior to that review of the articles, you had not systematically studied the literature relating to shoulder chondrolysis post arthroscopy?
A That's correct.
Q Now, if we look at February 5, 2009, quickly, you're still receiving records, and they're being apparently sent to Ms. Moerer at the same time by Mr. Wihtol?



A That's what's suggested by this letter.
Q So the analysis of the Benz patient data for the first phase was not completed as of February 5, correct?
A Yes.
Q And then if you look at the next one, February 9, 2009, you're receiving materials, as is Ms. Moerer, from Mr. Wihtol?
A That's what's indicated by this letter.
Q If you look at the next letter, February 20, 2009, more materials being sent to you?
A Okay.
Q Is that true?
A Yes.
Q When did you finish actually receiving documents that were the subject of your trial testimony and the data sheet as it existed at the time you testified in Grossnickle?
A I don't know.
Q So it would be sometime between February 20, 2009 or thereabouts and the time you testified, right?
A Should have been, yes.
Q The next letters I think have to do with communications between you and Mr. Wihtol pertaining to Christina Blouin, B-L-O-U-I-N, now known as McClellan, right?



A Yes.
Q Is that an approximate date as to when you agreed to consult with Mr. Wihtol concerning at least that patient?
A I don't recall any specifics about the date, other than what's reflected here.
Q There's another letter in the stack dated June 1, 2009, regarding McClellan.
It says, "Enclosed on a CD ROM is a copy of Plaintiffs' expert reports."
Do you see that?
A I do.
Q Have you taken the time to study or evaluate those reports?
A I haven't.
Q Is it fair to say that those reports do not form any basis of your opinions?
A That's correct.
Q Then the last letter I will ask you about is the July 8, 2009 letter that I alluded to earlier where Mr. Wihtol was indicating you would be compensated for deposition at a rate of $500 an hour?
A That's correct.
Q So is it fair for me to conclude that the change in rate occurred sometime after July 8th, 2009?

Page 106

A I would.
Q What is the orthopedic research report?
That seems to be the name of what's printed on the bottom of this document.
Do you see it right there on--
A I do.
Q What is that?
A Well, behind you, you see a list of these reports, and what we do every year is we try to turn out--
Q May I grab one?
A Please.
--a group of articles about the work that the faculty and the residents have been doing.
We send those to alumni and to other chairmen in other departments to let them know what's going on here.
Q One of these is done each year?
A Yes, sir.
Q So the 2009 report would include what we marked as Exhibit No. 8?
A Right, and I think it's the white one in the far corner there.
Q May I grab that?
A Please. There's one closer to you.
Q May I keep one?

Page 107

A I'll even autograph it for you.
If I'm correct, I think on Page 42 of that, you should find the article that you have marked as Exhibit No. 8.
Q Are the articles that are included in these annual compendiums, are they a combination of items, such as reprints of articles that have appeared elsewhere or are these the only place where these articles appear or something else?
A These are de novo summaries of things people have been doing, so they are not reprints of published articles or abstracts.
They are written in a particular format. The bullet points you see there, same number of pages, about a thousand words and some figures to try to make it something that people not as-- non-orthopedic surgeons could at least see and appreciate.
Q Tell me again, to whom is this compendium supplied each year.
A Again, if you want to know the exact list, you can go to Fred and get that from him, but it's sent to our alumni, to other chairmen across the country, to donors, to other chairmen in the school of medicine, to people in administration, hospital executives, and

Page 108

so on.
Q Are the items included in the compendium peer reviewed, other than within your own department?
A No.
I review each of these articles, so any errors in them are my fault.
Q Okay. Now, what you produced for me, which, by the way, you know we had to return those, so I hadn't seen it since the trial until it was reproduced two days ago-- did you understand that?
A I didn't.
Q Because I think in your declaration you indicated some of these things have been given to counsel for Stryker, and that was indeed true, but the spreadsheet, this manuscript as well as the disc of the spreadsheet were all returned to Mr. Wihtol during the trial.
I just wanted you to know that.
A Thank you.
Q Let me show you what we will mark as No. 9, and I only have two copies, but I think you all have seen it. It was recently produced.
(Exhibit No. 9 marked for identification.)
/////

Page 109

Q (By Mr. Campillo) This was the manuscript that was prepared by you and your group, the same group that generated Exhibit No. 8, the item that went into the university compendium, right?
A That's correct.
Q And you told me during the trial of Grossnickle that this had been submitted to the American Journal of Sports Medicine for possible publication, right?
A That's correct.
Q What happened to that request?
A They didn't accept it.
Q Okay. Where is the communications, the correspondence, the e-mails, however the manuscript was submitted to the American Journal and the responses or response, where is that material?
A So they sent it back saying that they didn't accept it, so we have revised this and have resubmitted it to a different journal.
Q Okay. But my question is: Who maintains that file or the material of the submission, the rejection, the resubmission? Where is that?
A Again, I think there's an expectation that we keep a lot of stuff that we don't keep, so I don't keep-- I've had many papers, unfortunately, that have been submitted and not published, and I try to forget that

Q Are you aware of any data suggesting even that there's something about the mechanical properties of the pain pump or the materials used in the catheter, the physical configuration of the catheter that contributes to the outcome of chondrolysis?
A I'm not aware of those data.
Q So the data that you have reviewed or that has been discussed has to do with the effects of the local anesthetics and not the components or the materials used in the pain pump or the various components of the pump, true?
A Again, we don't know for sure what it is about the infusion, and if I can just say two more sentences about that. You're correct, there is a plastic catheter that's put inside the joint, so that's one possibility. There's what's in that plastic, there's what's in the infusion, and that can include the solution, can include the local anesthetic, can include epinephrine, and we have not done any work that differentiates the effect of the plastic catheter from the Marcaine or Bupivacaine or the lidocaine or the epinephrine.
Q At least here in this publication, as well as in the manuscript, the focus is the infusion of local anesthetics and not the mechanical aspects of the pump or the catheters, true?



A We didn't have any data specifically on those mechanical aspects.
Q So what I said is true for that reason?
A Yes.
Q I'm not--
A What I said is true, which is that it's some combination of the catheter plus what's infused in the catheter, and we didn't do work that differentiated one from the other.
Q But you have no data that would implicate the catheter specifically as you sit here today, do you?
A Nor do we have data that excludes it as a possible contributing cause, so it's just an unknown for us.
Q Doctor, referring to Exhibit No. 9, the manuscript we've discussed, there is a discussion of six limitations, and I can't tell you the page because I didn't mark it, but you, I think, very openly discussed six limitations to this study that you are aware of that are referenced right in the body of that, correct?
A I see those.
That's on Page 13, if you wish.
You have been very patient with me in allowing me to correct and recorrect--
Q Just trying to get all the facts out.



A The fact that I was so forthcoming about the second limitation, which we can read in just a minute, makes me think that this is the most recent version of this paper because that was one of the criticisms of the previous reviewers was that I didn't emphasize enough that these cases had come from an attorney, so in this particular manuscript, I went overboard to try to make that point.
This makes me think that this is the most current version. I may be wrong about that.
Q Just for the record, the second point that you are referring to is where it says, "Because the cases in the case series were referred by legal office, there was selection bias in the inclusion of cases in which local anesthetics were infused after arthroscopy."
A You are correct.
Q And that's what you were emphasizing so the world who would read this would know that this was a biased population?
A That's right.
I have also said, and I will just remind everybody, that those 67 cases are not contributing to my opinion about the causation, so I just want to make sure that I remind us of that.
Q I think we've heard that now a couple of times, but



yes, we understand that.
For purposes of the data discussed in Exhibit No. 9, no statistical analysis was performed, correct?
A That's correct.
Q In fact, with regards to the opinions that you expressed at the trial of Grossnickle, at least through that point in time no statistical analysis was done of that data either, correct?
A When you say "those data," are you referring to the Benz study?
Q I am.
A At that time there had been no statistical analysis of those data either.
Q And that is what's going on now, that data is being analyzed in whatever way by your team and includes some sort of statistical analysis?
A It does.
Q But that's not part of your knowledge base as of the time of the Grossnickle trial, your testimony there, or what you purport to rely upon for purposes of your opinions in this case or these cases, true?
A True.
Q I believe somewhere in here, and I don't need to find it, there's a reference to the fact that arthroscopic surgeries result in the perfusion into

the glenohumeral joint of fluids under pressure for an extended period of time and that the irrigation solutions do not have the same temperature, oxygenation, pH, viscosity and nutrients that do synovial-- normal synovial fluid, right?
A Correct.
Q Is that one of the reasons you don't do arthroscopic surgeries?
A No, that's not a reason.
I'm just not good at it. That's the reason I don't do it, but the observation we're trying to make is that whether we're using a pain pump to infuse local anesthetic or whether we're doing arthroscopic surgery, the fluid that is bathing the cartilage is not the normal stuff that is bathing your and my cartilage right now.
What I do believe I know from the literature is that the way cartilage is nourished is by that fluid.
Q The normal fluid?
A By the normal fluid, so in your joint and mine, good things are in that joint fluid, and that fluid-- I think we discussed it a little bit at the Grossnickle trial.
When the cartilage is squeezed and then unsqueezed, it's a little bit like a sponge, and it



soaks up that joint fluid, and that fluid has oxygen and sugars and proteins and stuff, and that's how it stays healthy.
You can imagine a world in which that normal fluid was not there. The squeezing then caused the cartilage to imbibe a fluid that was not adequately nutritious for it.
We're just trying to look at the whole picture here, and we observed that during arthroscopy, it is not physiological fluid, and with the infusion of local anesthetics afterwards, it's not the normal fluid.
It's possible if you extend this out over a long enough period, that could be one of the factors.
Like you, we don't know if it's the pain pump, catheter, what's infused or the length of time or whatever it is, and it may not necessarily be a toxic effect. It could be a nutritional effect, and that's-- we're just trying to throw out a number of considerations hoping that somebody will explore these further.
Q So you would agree--
A Was that clear?
Q Absolutely.
You would agree that there's no scientifically



demonstrated answers to those questions as we sit here today?
A Well, I think that with the Benz study, we got-- we made some progress along those lines, and I think you're planning to go into that later.
Q We will, but my question is: Is there, for example, an established mechanism of action by which-- demonstrated by which local anesthetics may contribute to chondrolysis?
A That work has been predominantly done by other people. It's in the literature, and you are aware of Dr. Chu's work where she tried to show that the concentration of Marcaine was an important factor, and that if we used more concentration of Marcaine, there was a greater degree of insult to cartilage than there was with a lower concentration.
Everything else being equal, that would seem to say that either-- what we proposed here was not a correct theory because everything else was equal, other than the concentrations of Marcaine.
Q And my point is, in terms of the mechanism of actions, is it your view that today how that occurs in humans has been established?
A I don't know exactly from my knowledge base how the use of postoperative infusion of local anesthetics,



the mechanism by which it contributes to the development of chondrolysis, I don't know what that molecular mechanism is.
Q And to your knowledge, has that been-- has anyone published something that you would consider as scientifically demonstrating that mechanism of action in human beings?
A Not in human beings.
Q The work that's reflected in Exhibits No. 8 and No. 9 and that we have discussed at great length already is work that you consider to be complete, correct?
A Yes.
Q Other than possibly having that published, the work itself, the conclusions that you can draw from the data are complete?
A Yes.
Q And now that research, at least in abbreviated fashion, has been made public to anyone who can access the University of Washington's database, correct?
A That's correct.
Q So are you aware of any privacy reasons that would prevent you from producing what I'm calling the underlying study documents, the protocol, the IRB approval, communications with the journals, that

Page 162

want to take all day, but it strikes me if you do that systematically, that is if you don't count the second or third procedure on the same shoulder on the same patient, you are going to end up with a lot less than 396.
A You may be right. I haven't asked that particular question, but that's why I have the statisticians and Brett doing this, so they developed the logic that said that we ought to only count each shoulder once.
Q But when you testified in Grossnickle, you indicated there were 396 surgeries that you were evaluating and testifying about or from, and you are not sure, as you sit here right now, how that number ties into the 404 separate listings on that exhibit, true?
MR. WIHTOL: Objection.
THE WITNESS: I tried to give you the best explanation that I had, which is the discrepancy, I believe, is due to the fact that the same shoulder had, in certain cases, not many cases, but in certain cases had multiple procedures.
Q (By Mr. Campillo) Have you seen, Dr. Matsen, the data itself on the screen, on a computer screen?
A I've seen it on a screen. I really haven't seen it very much in this form.
Q I don't expect you to read it, but is that what you

Page 163

see, something along those lines with different colors?
A Right.
Q And obviously the columns can be spread out so you can look across, where here you have to kind of paste sheets together, right?
A I understand.
Q What do the colors mean?
A I'm not sure.
Q You don't know?
A I didn't put the colors in there.
Q There's some lines that are shaded.
If you see Line No. 14--
A I see that.
Q Actually, you can see it on the hard copy too?
A I can.
Q What does that mean?
A I'm not sure.
Q Who would be the best person or persons to answer these kinds of questions, what the coloring means, what the shading means, things like that?
A That is, again, Brett Wiater's data sheet.
Q So he would be the best person?
A Well, it depends on what information you're looking for.

Page 164

What I did, when I testified for Grossnickle, is I counted up the-- I looked at each case of chondrolysis and I looked to see if it was associated with the use of an intra-articular infusion of local anesthetic, and I counted the number of cases to the best of my ability from the data sheet, making the assumptions that I've told you about today, that we only counted each shoulder one time, and that was the basis for the pie graph and for the data sheet and my observation that in this particular group there was not any example of a case of chondrolysis that was not associated with an infusion, so--
Q How did you do that?
Did you do that by looking at a screen, a laptop screen or a computer screen, or did you do it by having the computer add up columns?
A No. I did it manually, yeah.
Q We have five minutes.
Go ahead.
So you did it manually?
A I did it on a piece of paper, just looking at the screen just like you were doing there.
So I said, "Okay. One, two, three"--
Q You counted sticks?
A I counted patients and said, "Okay. This one got

Page 165

chondrolysis." Then I looked at the question and said-- if it had an intra-articular pain pump or not.
Q Okay.
A And that is what I testified on because again, as you've illuminated, we didn't have the statistical analysis that is underway now.
Q So you basically looked at two columns, was there a pain pump used and has there been a diagnosis of chondrolysis, basically, and counted those up?
A That's right.
Q Okay. And you really, for purposes of your testimony in Grossnickle, didn't look at any other data in these data sheets?
A That's right.
Q Is there a dictionary somewhere that defines each of the columns, what's supposed to be tracked in each column and what-- not the intent but--
A I understand what you're asking.
There are some abbreviations used here. Some of them are obvious, but--
Q All I'm asking right now, before--
A Is there a dictionary? I don't know if there's a dictionary.
Q Who would know that?
A Brett.

disclosed that bias, for example, in the study of the 67 cases.
In the Benz study, because it's a retrospective cohort level two study, I think the risk of bias is low.
Q Are you familiar with the concept of confounding?
A I might not know as much about it as you do, but I have heard the concept before.
Q What is your understanding of what confounding factors are?
A A confounding factor would be an unrecognized factor that may lead you to the wrong conclusion.
In other words, one might, in a study, forget to control for gender, and gender may be a surrogate for the type of operation or the dose of a medicine, so one might erroneously attribute it to the medicine when the real effect was a gender effect.
Q Wearing skirts and cervical cancer, would that be a confounding factor, the wearing of skirts?
A That's too complicated an analogy for me because I don't know if guys that wear skirts are at risk or not.
Q For cervical cancer, I doubt it.
A You'd have to help me with that.
Q Are you familiar with the concept of



misclassification?
A I am not sure I know what that means.
Q Have you had any formal training in epidemiology?
A I have taken some courses in it, but this is-- because I want to do this study right, this is why I had people formally trained in the science of statistics and epidemiology manage this study for me.
Q How many projects have you worked with these two individuals on prior to this one?
A Maybe four.
Q Okay. Both of them, four each or the same four projects--
A They work together, so they help each other.
Q Looking at Exhibit No. 19, the line graphs that we've talked about confirms what you told us earlier, that you believe the dates of the study range from 1996 through 2008, right?
A That's correct.
Q And your understanding is that this-- the patient records that were sent to you only dealt with patients who had arthroscopic shoulder surgery by Dr. Benz during that period?
A That's correct.
Q So to the extent that Dr. Benz has treated patients with open surgery, you haven't evaluated that data in



any way, shape or form, true?
A We have not.
Q Have any of the patients that you've done open surgery on ever developed chondrolysis after the surgery?
A No.
Q Using the definition that you gave us for chondrolysis, either radiographically or by reference to an op report, have any of the patients you've ever done orthopedic-- I'm sorry, open surgery on, developed loss of joint space, say, within five or six years after your operation on their shoulder?
A I can't recall any.
The only mechanism that I'm aware of by which that might happen would be an infection that would destroy all the cartilage, and I don't think we've had--
Q So you've never had a case in which your patient underwent some sort of procedure and developed significant progressive arthritis that showed on x-ray as a diminution in joint space four or five years after?
A Not that demonstrated the criteria that you and I discussed for chondrolysis, which is a global loss of articular cartilage over the humeral head and glenoid.
There have been cases that have had localized loss, for example rubbing on a bone graft that I put



in would be an example, but not this very characteristic loss of every bit of cartilage on the ball and every bit of cartilage on the socket.
Q My question was-- the last question had to do with loss of joint spaces that you could see on x-ray.
You've had patients, haven't you, that have developed loss of joint space from an x-ray perspective within, say, five years after your procedure?
A So again, my response is I've had a case where, for example, I've put a bone graft for somebody who is having a deficient glenoid, screwed it in place because they were missing half of their shoulder and it was dislocating, and those people have lost the joint space local to where that bone graft was, but they haven't lost it globally, so maybe that is helpful in your--
Q Okay. I've covered a lot of this already, which is good.
The first phase of the study, that is the-- basically the substance of your testimony in the Grossnickle trial, has that aspect of the study been submitted for peer review or for publication purposes to anyone or any organization?
A I mentioned to you earlier that that paper is in the

Page 226

process of preparation.
Q Okay. You mean apart from the ongoing analysis of the data?
A Certain sections of that paper have been written, like the introduction, which isn't going to change, a lot of the discussion, the basic methods that we went about.
The specifics of the data and the data analysis haven't been completed because that part of the study hasn't been completed.
Q Will you wait until you finish what we've been calling phase two, the follow-up aspect of the study, before you attempt to publish any of it?
A No.
Q So you are going to seek to publish the first part solo?
A Yes.
Q Okay. And who drafted whatever draft is in the works as we sit here today?
A Brett has largely drafted the introduction and the discussion and the part of the methods that had to do with the data collection, and Moni and Nayak are in the process of finalizing the methodology for the statistical analysis and the results of the statistical analysis.

Page 227

Q But just of phase one?
A Again, to remind us all, no one has done anything on stage two because I haven't seen the data-- excuse me, I just want to make sure we're clear on that.
I thought that I clarified that earlier in the day.
Phase two has gone nowhere.
Q Okay.
A I haven't seen the data, Moni hasn't seen the data. There's no resident involved. Nayak hasn't seen the data.
You've seen the data, Jeff has seen the data, Sue has assembled the data, but it's off in the distance.
Our goal is to try to get phase one of the Benz study submitted soon.
Q You will wait until the two statisticians have finished the analysis that they're doing that you just discussed with them six weeks ago, when that phase is finished, the write-up of the manuscript will be completed and then submitted?
A That's correct.
Q And you estimate that will happen at the end of this year?
A I sure hope so.
Q Other than Dr. Wiater and the two statisticians and yourself, has anyone to date been involved in the

Page 228

analysis or the writing up of the manuscript?
A No.
Q Do you expect that anyone else will be involved in analyzing the data and/or writing up any aspect of the manuscript, other than the four?
A No.
Q Have you determined to what journal or journals you will submit the finished manuscript once it is finished?
A We are going to try again to get it in JBJS.
Q Why is that your first choice?
A Because that's the premier journal in the field.
Q And if you don't succeed there, what's the second best journal in the field in your judgment?
A You already know the answer to that.
Q The Journal of Sports Medicine.
A And then you know the answer to your next question.
Q I get it.
Do you have any anticipation of presenting that data anywhere, and I mean outside of the university or your immediate colleagues, before you submit anything for publication?
A We will submit this to the Academy and to the meetings of the American Shoulder & Elbow Surgeons.
Q For presentations probably next calendar year?

Page 229

A Similar to the one we-- the one that we did with Pete Scheffel, which is Exhibit No.-- back here somewhere.
Q So for you to get the opportunity to make a presentation at next year's meetings, an abstract would have to be submitted fairly soon?
A Yes. I'm not sure exactly what the date is.
Q Are you working currently or is someone in your group working currently in preparing an abstract for purposes of the presentations?
A Brett is supposed to be doing that.
Q Have you seen a draft?
A I'm not sure.
I think there is a draft and I think I've seen it.
Q Now, the first part of the first part of Dr. Benz's study was simply adding up the cases, as you did on your way to testify at the Grossnickle trial, and present the fact that all the cases with chondrolysis in that patient population had used a pain pump and that none of the cases in which the pain pump was used had yet been determined to have chondrolysis, correct?
A I was coughing when you said the second part.
The first part of what you said was correct, which is all the cases that had chondrolysis had pain pump, and then I coughed when you were saying the second part.

not rely on Items 2 and 3 of that page?
A I'm going to--
MR. WIHTOL: Object to the form of the question.
THE WITNESS: Can I look at your Page 2 and 3?
I'm not trying to-- can I just look at it?
Q (By Mr. Campillo) Sure. There's nothing that-- yours doesn't look the same?
A I'm just not following your-- Items No. 2 and 3, so--
Q Let me direct you better. I want to make sure the record is clear.
I am looking at Page 3 of Exhibit No. 20.
A So I understand your question now.
I decided-- I can't tell you exactly when, but I decided based on a lot of the reviews that we got of the 67 case paper that had been repeatedly rejected by journals -- we've discussed that already -- that the editors were right, that that did not provide useful information about the risk of chondrolysis following the use of pain pumps because we didn't know the denominator.
I can't tell you when exactly that-- when exactly I came to that, but it seemed reasonable based on the things that you and I have discussed today, didn't



know the denominator, and there was bias in the selection of those 67 patients, so they couldn't really be used as anything other than case reports.
Q Okay. Dr. Matsen--
A Am I not answering your question?
Q You are.
I am trying to refresh your recollection on the dates, if I can.
When you signed this document on May 25, 2009, you already knew that that study had been rejected by at least one, maybe two, and possibly three journals; isn't that right?
A Again, I don't think I can tell you the exact dates that I got the rejection from the journal-- the American Journal of Sports Medicine.
Q Okay.
A My personal experience in treating a chondrolysis patient-- once again, I don't think I have enough experience treating chondrolysis patients to make conclusions based on such a small N, and once again I'm suffering from a denominator problem; in other words, I've never had or recognized a case of chondrolysis on a surgery I did, so everybody that has chondrolysis that I see got here because they had the problem, so again, I don't know statistically what



that means.
What I asked is that we revise the basis for this is on my understanding of the literature and the Benz series phase one that we've been discussing.
Q I understand that, but I guess my question is: Didn't you know the limitations of your study on the 67 cases and the limitations of reliance on a single case report at the time that you generated those articles or manuscripts concerning these two items?
A I probably should have.
Q In fact, you recognized many limitations on the manuscript that you provided to me at the time of trial in early March of 2009, correct?
A That's correct.
Q And you were aware of their limitations back then. Yet in late May of 2009, you listed these items here as things you were relying upon?
A I did rely on them, but I shouldn't have.
Q Is it fair to say, Dr. Matsen, that your first decision that you might-- would not rely on these matters for your opinions in these cases came after the subpoenas were served on you and when Stryker asked you to provide the underlying data for these two items as well as other things, and that that was, at least from a timing standpoint, when you reconsidered



reliance on these two materials?
A That could have had a factor, since this document does relate to these proceedings, and I want to be sure that I was clear for you on the basis of which I was going to render opinions, and when the subpoenas started to come, that could have placed a-- caused me to re-examine the basis for my opinions.
Q Is that what happened or is there a different scenario?
I just want to understand--
A I wanted to make sure that I made the case-- the data on which my opinions were established as simple as possible, so getting rid of evidence that I had considered that still could be considered to be relevant but it didn't seem to be necessary.
MR. CAMPILLO: Let's take a recess and reassess where we are.
VIDEOGRAPHER: This is the end of Tape No. 6 and the time is 4:14.
(Recess 4:14 to 4:21 p.m.)

VIDEOGRAPHER: We are now back on the record. The time is 4:21. This is the beginning of Tape No. 7.
Q (By Mr. Campillo) Dr. Matsen, regarding the 67