# Appendix III, Tab 8

**Deposition of Frederick Matsen, M.D., December 10, 2009**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

MULTNOMAH COUNTY

---

| | |
|---|---|
| MATTHEW R. BEALE and KRISTA BEALE, | ) |
| Plaintiffs, | ) |
| v. | ) No. 0801-01554 |
| STRYKER CORPORATION, a Michigan corporation; STRYKER SALES CORPORATION, a Michigan corporation; I-FLOW CORPORATION, a Delaware corporation; PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation; A. BROOKE BENZ M.D., individually and doing business as Benz Bone and Joint Clinic; and DJO and DJO INC., | ) |
| Defendants. | ) |

---

VIDEOTAPE Deposition Upon Oral Examination

of

FREDERICK A. MATSEN, M.D.

---

Taken at 1959 NE Pacific Street

Seattle, Washington

DATE: Thursday, December 10, 2009

REPORTED BY: Kristin M. Vickery, CCR, 3125

Page 2

A P P E A R A N C E S

For Plaintiffs: TOM POWERS
Williams Love O'Leary & Powers
9755 Southwest Barnes Road
Suite 450
Portland, Oregon 97225
503.946.5412
tpowers@wdlolaw.com

For I-Flow: ERIC J. NEIMAN
Williams, Kastner
888 Southwest Fifth Avenue
Suite 600
Portland, Oregon 97204
503.228.7967
eneiman@williamskastner.com
LISA C. WILLIAMS
Williams, Kastner
601 Union Street
Suite 4100
Seattle, Washington 98101
206.628.6600
lwilliams@williamskastner.com

For DJO: JAMES E. HEFFNER
Morris Polich & Purdy
501 West Broadway
Suite 500
San Diego, California 92101
619.819.2426
jheffner@mpplaw.com

Also Present: DENNIS GROSVENOR, VIDEOGRAPHER
JOHN JOHNSTON, VIDEOGRAPHER

Page 3

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Powers | 6 |
| Mr. Neiman | 32 |
| Mr. Powers | 66 |

* * *

| EXHIBIT | DESCRIPTION | FOR I.D. |
|---|---|---|
| EX. 501 | 25-page medical document Bates Nos. Matsen001 through Matsen0025. | 4 |
| EX. 502 | X-rays retained by hospital. | 4 |


Page 4

SEATTLE, WASHINGTON; THURSDAY, DECEMBER 10, 2009
9:36 A.M.
--o0o--

(Exhibits 501 and 502 marked for identification.)

MR. POWERS: This is Tom Powers, one of the attorneys for plaintiff Matt Beale. We just wanted to get it on the record that there will be some documents that may be used, particularly in cross-examination today, that are subject to a special protective order in this case.

And the parties have agreed that everybody who is here in this room is bound by the terms of that protective order, and that the documents that are used and become attached as exhibits to the transcript remain confidential and covered by that order.

MR. NEIMAN: Correct. And the -- that means that the documents, their contents, and any testimony about them is not disclosed for any purpose after this deposition ends.

MR. POWERS: That's correct, and that's the understanding between the parties here.

MR. NEIMAN: So what I think we need to do is have people who are not signatories to the protective order, being the video folk and the court reporter say they

Page 5

understand and agree.

MR. POWERS: And so we'll ask the videographer. You understand what we are talking about? Do you agree?

VIDEOGRAPHER: Yes.

MR. POWERS: And?

THE COURT REPORTER: Yes.

THE WITNESS: So, Eric, can you just explain that to me just a little bit because I don't know -- tell me what you just said.

MR. NEIMAN: Sure. When the University of Washington and your team produced documents in the Oregon federal court cases, a special protective order was entered because they're considered to be confidential and proprietary by the University of Washington.

And so that order places very -- places restrictions on what can be done with those documents because they may be used today, and because the protective order is in place, we need everybody in the room to agree that they understand that order is there.

Does that make sense?

THE WITNESS: It does. Thank you. And thank you for that concession.

MR. NEIMAN: Of course.

MR. POWERS: Yes.

VIDEOGRAPHER: Today's date is December 10th,

chondrolysis of the shoulder?
A. It is.
Q. And one of the statements here begins, quote, Although the etiology of these cases is not known for certain, unquote.
Do you agree with that statement?
A. The -- the -- the statement prior to the one that you read says that there are multiple reports in the literature of chondrolysis following arthroscopic shoulder surgery, and the second sentence referred to the first, in other words, the etiology of those cases referred to in the literature did not, as far as we could tell, lend itself to certainty.
Q. Well, what you said is the etiology is unknown?
A. The etiology of these cases, referring to the ones that were reported in the literature.
Q. And by "etiology," you mean cause?
A. That's correct.
Q. If somebody was to look at the University of Washington Department of Orthopedics today, there would be statements, more than one, that the cause of chondrolysis of the shoulder is unknown, correct?
A. I don't know if that's correct. But what -- what this -- since you're asking me about this particular statement, I think what we're trying to say is that the



etiology of the cases reported in the literature was not known for sure.
Q. And you mentioned a variety of causes, potential causes that have been identified, as -- let me start over. Okay?
A. Please.
Q. You mentioned a variety of different factors that have been identified as associated with chondrolysis of the shoulder?
A. That's correct.
Q. And those include different things that happen in arthroscopic surgery?
A. It does.
Q. Do you agree that chondrolysis of the shoulder can happen when there's no pain pump involved?
A. It can.
Q. Do you agree that chondrolysis of the shoulder can happen with no specific cause or association identified?
A. That I'm not so sure about. Because as you mentioned, there has been a progressive accumulation of knowledge about what to look for in these cases.
So the -- the -- the most robust associations that have been established so far are the use of radiofrequency devices and the use of intra-articular pain pumps.



Q. And those are associations?
A. Those are associations.
Q. And association is a completely different concept than cause, correct?
MR. POWERS: Objection. Lack of foundation.
A. If it's a cause, it's associated. It's possible that you could have an association without it necessarily being the cause.
Q. Association is something that you learn about and then investigate what the cause might be.
Do you agree with that statement?
A. It's a little bit like smoking and lung cancer. Initially, there was an association, and then, subsequently, it was proved to be the cause.
Q. And there have been many associations investigated by medicine that have proved out -- proved to not involve cause.
A. That is true.
Q. Would you agree with that?
A. That is true.
Q. That's part of what you do as a doctor and a researcher. You look at associations and try and determine if cause exists.
A. That's true.
Q. And all you're able to tell us today about this



particular subject is that there's an association, correct?
MR. POWERS: Object. Misstates prior testimony.
A. As you point out, there is a transition between associations and causation. So one could reasonably ask, how much evidence do you have to have before you move from association to causation.
What I shared with you earlier is that in -- in our review of the literature and in the case study that we did, the most common association was the use of intra-articular pain pumps. And so -- and secondly, as you know, in the case series that we did, we were unable to identify any cases of chondrolysis that were not associated with a pain pump in that case series.
So -- and furthermore, that when -- again, in the absence of pain pumps, there was no chondrolysis. So this is leading us to move from association to saying causation. And when that's coupled with some of the laboratory work on the potential toxic effects of local anesthetics on cartilage cells, it's getting to make a more robust case for causation.
Q. All you can tell us today is that you've identified an association. You can't go the next step, can you?
MR. POWERS: Objection. Misstates his prior testimony, and asked and answered.