# Appendix III, Tab 9

**Testimony of Frederick Matsen, M.D., March 5, 2009**

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

DANIKA GROSSNICKLE and TIMOTHY GROSSNICKLE, husband and wife; ROBIN LABAW; CHRISTINE O'RILEY and MICHAEL O'RILEY, husband and wife; CHARLES SHWALLON and TRISHA SHWALLON, husband and wife; TROY STANPHILL and MARGARET STANPHILL, husband and wife; JUANITA BERRY and JEFFREY BERRY, husband and wife; and SCOTT ROONEY and MISTI ROONEY, husband and wife,
Plaintiffs,
vs. NO. 0703-02834

(Caption continued on next page.)

TRANSCRIPT OF PROCEEDINGS
Volume 7-A
(Pages 1587 to 1709)

BEFORE THE HONORABLE MICHAEL H. MARCUS
Thursday, March 5, 2009



STRYKER CORPORATION, a Michigan corporation; STRYKER SALES CORPORATION, a Michigan corporation; I-FLOW CORPORATION, a Delaware corporation; PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation; TUALITY HEALTHCARE, an Oregon nonprofit corporation, doing business as TUALITY COMMUNITY HOSPITAL; and A. BROOKE BENZ, M.D., individual and doing business as BENZ BONE & JOINT CLINIC,
Defendants.



BE IT REMEMBERED THAT, the transcript of proceedings appended hereto was taken before Charlotte A. Powers, Certified Shorthand Reporter and Registered Merit Reporter, on Tuesday, March 5, 2009, commencing at the hour of 9:17 a.m., the proceedings being reported in the MULTNOMAH COUNTY COURTHOUSE, 1021 SW 4th, Room 318, Portland, Oregon.



APPEARANCES

KEATING JONES HUGHES, PC
By Mr. Robert Keating
1 SW Columbia, Suite 800
Portland, Oregon 97258
Appearing on behalf of Defendant Benz

BARTON & STREVER, PC
Mr. William A. Barton
214 SW Coast Highway
PO Box 870
Newport, Oregon 97365
Appearing on behalf of Cross-Complainant Benz

LANE POWELL, PC
Mr. Robert Maloney
601 SW 2nd Avenue, Suite 2100
Portland, Oregon 97204
and
SEDGWICK DETERT MORAN & ARNOLD, LLP
Mr. Ralph Campillo
801 S. Figueroa Street, 19th Floor
Los Angeles, California 90017
Appearing on behalf of Defendants Stryker

as of this point in time?
A That is correct.
Q Has -- has anyone -- has it been presented in any forum, other than possibly to the lawyers?
A It has not.
Q So this jury, this Court, and the people in this courtroom are the first ones to hear the outcome of this study?
A Outside our own research group, that's correct.
Q Who brought the idea of the study to you?
A The -- the history is an interesting one because I saw a patient, as I often do, who had sustained chondrolysis after treatment by a different surgeon. And I saw that patient in consultation because my major line of work is doing shoulder replacements, so that patient had come to me to find out if a shoulder replacement would be helpful to that patient.
After having seen the patient, I visited with the patient's attorney. After we concluded the interview that he had with me, I -- the attorney indicated that he had access to a group of other patients that had sustained a similar problem, and asked if I would be interested in looking at those cases from a



scientific standpoint.
And I should say here, if you don't mind, that I'm not an arthroscopic surgeon. This type of surgery is not something I do. But because of what I mentioned before, I'm always interested in studying adverse outcomes of any kind of treatment.
So I said sure, I'd like to look at those cases. And that -- that led to a study that we actually presented just last week at the American Academy of Orthopedic Surgeons' meeting in Las Vegas, and it was well-received. And that was a study in which we were able to present 65 or 67 new cases that had been previously unreported, which more than doubled the number of cases of chondrolysis from any cause that had been previously reported in the literature. So that was peer-reviewed in that sense.
Then I had another discussion with the attorney. And I said, you know, the problem with that study, the one I just referred to, is we don't know what the denominator is. We know that these cases had chondrolysis, but we don't know anything about the population from which



those patients were drawn. So we can't comment about incidents, other factors that may have been present. And so on. And I said, what would be really wonderful is if we had an entire case series from an individual surgeon.
And a little bit later, I got a call saying that such data are available, would you like to look at it. And I said yes.
So that's -- so just to be clear, there were two -- two studies, one that was presented last week by another one of our residents, and then the study that we're discussing today.
Q Just so that the record is clear, you're referring to the study that was presented at the AOS. And the speaker, I think, was Dr. Scheffel?
A That's exactly right.
Q That's a different population of patients. It was a report on a number of different physicians; in other words, it was not a report on the experience by one single doctor?
A You are correct.
Q Right. So I want to keep my questions -- at least for now -- focused on the study of the 300 and -- whatever the number is, 396 cases



that the jurors and us heard for the first time today.
A Right.
Q And so the idea germinated from a discussion you had with a lawyer.
A That -- well, the -- the idea for the first study came from the discussion I had with a lawyer. The idea for the second study came from my complaint that we didn't have the denominator. The lawyer said, what if I can get you such a study. So it was actually -- not to do too much credit here -- but it was my idea that, boy, it would be wonderful if we had a case series from an individual surgeon. And then I got the callback from the lawyer saying that such data were available.
Q Was that a lawyer from Portland?
A Yes.
Q And did the materials that were submitted to you and to your colleagues at the University of Washington to study -- to make -- to conduct the study, did they come from lawyers?
A They did.
Q Did you personally or anyone in your group go to the doctor's office, to the hospitals where