# Appendix III, Tab 10

**Deposition of Sander Greenland, September 4, 2009**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DONNELL COX; ANITA McGINNESS and )
GERALD McGINNESS, husband and wife; ) Case No.
DAVID DOOLITTLE and CAROLYN DOOLITTLE, ) CV 07-1310 AA
husband and wife; JUAN A. HUERTA; )
and KATHERINE FORREST, )
Plaintiffs, )
v. )
DJO, LLC, a Delaware Corporation; DJO, )
INC., f/k/a DJ ORTHOPEDICS, INC., a )
Delaware Corporation; I-FLOW INC., a )
Delaware Corporation; McKINLEY MEDICAL, )
L.L.C., a Colorado Corporation; MOOG, )
INC., a New York Corporation; CURLIN )
MEDICAL, INC., a Delaware corporation; )
ASTRAZENECA PLC, a United Kingdom )
Corporation; ASTRAZENECA PHARMACEUTICALS )
LP, a Delaware Corporation, ASTRAZENECA )
LP, a Delaware Corporation, ZENECA )
HOLDINGS, INC., a Delaware Corporation; )
and PACIFIC MEDICAL, INC., a )
Pennsylvania corporation, )
Defendants. )
________________________________________)

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

TROY L. ALDERFER, )
Plaintiff, ) Case No.
v. ) 08-cv-01297-EWN-MEH
BREG, INC., a California corporation )
for profit, )
Defendant. )
____________________________________)

D E P O S I T I O N

DEPONENT: SANDER GREENLAND, M.A., M.S., Dr.P.H., C.Stat

DATE: Thursday, September 24, 2009

TIME: 8:38 a.m.

LOCATION: Loews Santa Monica Beach Hotel
1700 Ocean Avenue
Santa Monica, California 90401

REPORTER: Michele E. French, CSR-3091, RPR, RMR, CRR

Page 3

APPEARANCES:
On behalf of the Plaintiffs:
WILLIAMS LOVE O'LEARY & POWERS, P.C.
BY: MICHAEL L. WILLIAMS, ESQUIRE
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225-6681
(503) 595-4145
mwilliams@wdolaw.com

On behalf of Defendant I-Flow:
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
BY: GEOFFREY M. COAN, ESQUIRE
260 Franklin Street, 14th Floor
Boston, Massachusetts 02110-3112
(617) 422-5300
geoffrey.coan@wilsonelser.com

On behalf of Defendant Stryker Corporation:
SEDGWICK DETERT MORAN & ARNOLD, LLP
BY: WAYNE A. WOLFF, ESQUIRE
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105-1101
(415) 781-7900
wayne.wolff@sdma.com

Page 4

APPEARANCES: (Continued)
On behalf of Defendant Breg, Inc.:
BOWMAN AND BROOKE, LLP
BY: JENNY A. COVINGTON, ESQUIRE
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
(612) 339-8682
jenny.covington@bowmanandbrooke.com

On behalf of Defendants McKinley Medical, Curlin Medical, and Moog:
HARRIS BEACH, PLLC
BY: FREDERICK H. FERN, ESQUIRE
100 Wall Street, 23rd Floor
New York, New York 10005
(212) 687-0100
ffern@harrisbeach.com

On behalf of Defendant Hospira, Inc. and Abbott Laboratories:
VENABLE, LLP
BY: JOHN A. McCAULEY, ESQUIRE
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400
jmccauley@venable.com

Page 5

APPEARANCES: (Continued)
On behalf of Defendant Pacific Medical:
MITCHELL, LANG & SMITH
BY: SCOTT J. MEYER, ESQUIRE (via telephone)
2000 One Main Place
Portland, Oregon 97204
(503) 221-1011
smeyer@mls-law.com

On behalf of Defendant DJO, LLC:
MORRIS POLICH & PURDY, LLP
BY: TAMMARA N. TUKLOFF, ESQUIRE (via telephone)
501 West Broadway, Suite 500
San Diego, California 92101
(619) 819-2440
ttukloff@mpplaw.com

Q Given a deposition.
A Probably on the order, I'm guessing, 20 times, over a period of about 15 years.
Q And are all of those times reflected in the list of testimony in your expert report or are there additional times that you've given your deposition that were in a different type of setting?
A Yes. There was a case in the 1980s pro bono for Consumers Union and California State that isn't listed there because it's so old.
Q Okay. Now, first of all, I just want to get a few preliminaries out of the way. You're an epidemiologist; is that correct?
A Yes.
Q And you're also a biostatistician?
A Yes.
Q But you're not an orthopedic surgeon?
A Correct.
Q And you're not a doctor?
A Correct.
Q And you've never witnessed any shoulder arthroscopic surgeries?
A Correct.
Q Are you a member of any organization who focuses its research on chondrolysis?



A No.
Q Other than your work as an expert preparing the expert report here, you've not edited, authored, participated in any publication of any kind concerning shoulder chondrolysis; correct?
A That's correct.
Q Are you aware of any published peer-reviewed literature which describes the biological mechanism of how chondrolysis occurs?
A I believe I saw some literature on that topic when I was reviewing materials for this case.
Q The actual biological mechanism of how it -- how it occurs in the human?
A Well, I don't recall the details of those articles that were discussing -- clinical articles that were discussing mechanisms; and since I'm not an expert in mechanisms, I didn't focus on those.
Q So that wouldn't be something that you would be comfortable talking about here today?
A Correct.
Q When did you first become aware of the disease of chondrolysis?
A I think in the course of being contacted for this case and asked to review materials.
Q So you had never heard of it before you were contacted



for this case?
A I don't recall having heard of it.
Q Okay. Are you an expert on FDA procedures or regulations?
A I wouldn't call myself an expert on that, no. I've served on FDA panels, but they're doing the decision-making; we just give our opinions.
Q Okay.
MS. TUKLOFF: I'm sorry to interrupt. It's very hard to hear the deponent on the phone. Could we put the microphone closer?
MS. COVINGTON: Sure. We're going to move a few things out of the way and see if that helps at all, and then I'm going to move it closer to him, because I'm assuming you're not having trouble hearing me.
MS. TUKLOFF: No, we can hear you.
MS. COVINGTON: Okay.
BY MS. COVINGTON:
Q Now, Dr. Greenland, is it also true that you are not a legal expert?
A Correct.
Q I've premarked as exhibits a number of documents, and I want you to take a look at them and tell me if you were provided those by your counsel.
A Yes, these look familiar. (Reviewing exhibits.) Well,



I -- there's so many, several of these, so I'm not sure what the distinctions are, and I would have to check them item by item as to each one that I've got, but I've got things that look like these.
Q Okay. I'll represent to you that the two top documents are Breg's notice to you of deposition, and Breg's Amended Notice, which just includes one additional request in Exhibit A for your PowerPoint from a recent presentation that you gave.
A Yeah, right. Oh, I haven't seen -- I don't recall having seen that.
MR. WILLIAMS: I haven't seen it, either.
THE WITNESS: So that doesn't look familiar to me.
BY MS. COVINGTON:
Q Okay. We'll deal with that later. I'm going to attach the original notice as Exhibit 1, the Amended Notice as Exhibits 2.
Mr. Fern's office also provided a subpoena to testify at deposition, which I'm attaching as Exhibit 3, and his Notice of Deposition of Expert Witness as Exhibit 4, and then your report is going to be Exhibit 5.
(Greenland Exhibits 1 through 5 were marked.)
BY MS. COVINGTON:

Page 26

statement?
A Yes.
Q In your report -- and I'm just going to give you back your report so you can look at it. And I'm starting on page 5, in the first paragraph.
A Yes.
Q In that report, you say, "I am aware of one published comparative clinical epidemiologic investigation of the association between intra-articular pump use and chondrolysis, the study by Hansen et al...."
A Yes.
Q So my first question to you is are you aware of any other peer-reviewed publications which you classify as a comparative clinical epidemiologic investigation?
A Not -- not at this time.
Q In that sentence, when you use the word comparative clinical epidemiologic investigation, can you define that terminology for us, for us lay people here?
A Yes. That would be an epidemiologic study in which there are -- in which the subjects in the study are classified into different groups and then compared on characteristics.
Q And would you -- in your report, you note that Hansen et al. characterized their study as a case series. So you do agree that the authors of the paper characterize

Page 27

their paper as a case series and not a retrospective cohort study?
A Yes. I believe they incorrectly characterized their study as a case series study.
Q Now, isn't it true that Hansen and Beck state in their paper that "Postarthroscopic glenohumeral chondrolysis has only recently been reported in the literature. The cause of this process is unknown"?
A That rings a bell from having read the article.
Q I have here, and I'll attach as Exhibit 6, the Hansen et al. paper.
(Greenland Exhibit 6 was marked.)
BY MS. COVINGTON:
Q Now, I believe it's on the first paper. They say that the cause of post-arthroscopic glenohumeral chondrolysis is unknown.
A I see that sentence, yes.
Q And isn't it also true that the Hansen-Beck article states that, "Postarthroscopic glenohumeral chondrolysis is a complication that has yet to be etiologically defined"?
A Where are you reading, sorry? (Reviewing Greenland Exhibit 6.)
MR. FERN: On page 1632, first sentence in the Discussion section.

Page 28

THE WITNESS: I don't have those numbers on this page -- copy.
MR. FERN: In the Discussion section.
THE WITNESS: Discussion section.
MS. COVINGTON: It's the --
MR. FERN: Fifth page of the article.
MS. COVINGTON: Yes.
THE WITNESS: Yes, I see it. First sentence.
BY MS. COVINGTON:
Q And in their paper, they also say, "It is likely that other unrecognized factors are also involved."
A Again, you have to point me to where they're saying that.
Q Let me ask you, do you agree that it is likely that there are other unrecognized factors that are involved in the development of chondrolysis?
A Well, that's true of everything. There's always unrecognized factors involved in everything that's sort of less obvious than a gunshot to the head.
Q Well --
A You have other factors because you know that there are some people -- not everybody who receives the particular factor here, the pain pump, not every single person gets chondrolysis. So there has to be some other factor involved, logically.

Page 29

Q And do you agree that post-arthroscopic glenohumeral chondrolysis is a complication that is yet to be etiologically defined?
A That's outside my expertise.
Q Would you agree that post-arthroscopic glenohumeral chondrolysis, that the cause of the process is unknown?
A I don't think that's -- the cause isn't a good characterization because there are always multiple causes involved. Again, as witnessed by the fact that you don't have complete causation, you don't have every single patient getting chondrolysis.
Q So you would agree, then, that it's multifactorial?
A Everything is in a trivial, logical sense.
Q And in their Conclusion section on page 6, it says at the bottom of that paragraph, "We believe that further investigation of the possible association of pain pump use with chondrolysis is warranted."
Would you agree that their use of the word "association" is appropriate?
A Yes. It's because even if the -- even if there is a real effect, it's still an association. Association is a broader term and it subsumes effect in this case.
Q But you agree that in their article, they never go further than using the broad term "association"?
A I'll take your word for it. I haven't gone through the

Q The 2008 edition?
A Yes.
Q Okay. Would you also agree that confounding is guaranteed in the epidemiologic assessment of medical devices because the indications for treatment with medical technology are almost always indicators of special risk; and, therefore, persons who are selected for special treatment will automatically be at different risk from those who receive more standard treatment?
A I think that's a fairly reasonable statement. Can you read it back?
Q Sure. Confounding is guaranteed --
A I can stop you there. It's -- I guess in my approach to things, and I have to make this comment because of the way you stated it, and I listened to that. I'm working with co-authors and sometimes things are stated in a more -- how would we say -- prose style. I, being more the statistician probabilist, would like to say things with a -- just always with a little bit of probabilistic allowance for the fact that exceptions occur.
As soon as you say something never happens, it's going to happen. Like, for example, people say all swans are white, and they did in Europe and then



they discovered Australian and New Zealand, where swans are black. But, so, I always want to inject a little bit of -- just a little bit of allowance for the fact that sometimes in history things happen.
Q So you recognize that statement as being from one of your publications in which a co-author was involved?
A Sounds like something like that.
Q Okay. And with the exception of the word "guaranteed," you would agree that the indications for treatment with medical technology are almost always indicators of special risk; and, therefore, persons who are selected for special risk -- or, excuse me, for special treatment will automatically be at different risk from those who receive more standard treatment?
A Yes.
Q You agree with that portion of the statement?
A Yes.
Q And with respect to the first part, confounding is guaranteed, how would you change that --
A I would say --
Q -- in your view as a statistician?
A I would say something, put something like very likely or extremely likely, depending.
Q So you would change the statement to confounding is extremely likely because...?



A Yes.
Q Okay. And isn't it also true that selection bias and confounding are concepts that may overlap?
A Yes.
Q Would you agree that because many types of selection bias cannot be controlled in the analysis, prevention of selection bias by appropriate control selection can be critical?
A Yes.
Q And in the context of the paper by Hansen, do we have any evidence at all that selection bias was controlled for?
A I don't think so, and I don't think -- no. In fact, I know they didn't take any procedures to try and adjust for possible selection bias.
Q Okay. Now, how do we know that Hansen's null finding with respect to cases in their nonexposure group is valid? Did they follow up and trace all of the patients?
A Well, they did their charts, chart reviews.
Q Did they -- did they chart review all of the patients that did not receive pain pumps?
A "On chart review of 152 patients" -- I'm reading on what is page 5 on my copy, and just above the discussion. "On chart review of the 152 patients



treated in the same time frame...." So I take that as meaning, and this related statements in the paper, that they did chart reviews on all these patients in this time frame, including ones who did not receive the pump and received other procedures. So I'm just going by what they stated.
Q When they did these chart reviews, what was the timing of that in relationship to when these patients received their treatments?
A Let's see. They don't state explicitly, that I see here, that that point -- let me just check. (Reviewing Greenland Exhibit 6.) They simply say that they reviewed the records of these 152 patients, so perhaps you can restate your question in light of that.
Q You've read through and it simply states that they performed a chart review of patients, but isn't it true that we have no indication of when that chart review occurred in relationship to when the patients actually received their shoulder surgeries?
A Well, presumably it happened afterwards, since the whole discussion here is in the context of going back and checking their records after having decided to do the study.
Q Sure, but --
A That it indicates that this is all done after the

would be important to those in the field who are reading the journal that it's about to be published in?
A Yes.
Q And in this situation, the American Journal of Sports Medicine would be directed to orthopedists or sports medicine physicians?
A Yes.
Q So is it -- I see, sir, that you serve as a referee for a host of epidemiological journals as well as other journals, including the Journal of American Medical Association; is that true?
A Yes.
Q And also New England Journal of Medicine; is that true?
A Yes.
Q Does the New England Journal and JAMA utilize a system to rate the level of evidence before a publication?
A I don't know. It's not something when I review for them I'm involved with.
Q And how about the American Journal of Epidemiology, or Epidemiology, the Annals of Epidemiology, where you also serve as a reviewer?
A They don't use that.
Q Is the issue regarding the level of evidence partly a function of study design, sir?
A Yes, as far as I understand it.



Q And would it be fair to say when Dr. Hansen and Beck did this prospective case review, their study design was as a case series?
A It didn't look that way to me, by my definition.
Q It did not look that way to you?
A No.
Q But I'm asking based upon what you read and based upon the discussion that the authors had here, was it their intention to be publishing a case series?
A I -- I don't know.
Q Okay. Well --
A You're asking about their intention. I don't see -- I don't know what their intentions, original intentions were or what developed in the course of peer review.
Q Well, let's -- sir, if you can flip to the first page of the article before you.
A Yes.
Q Second full paragraph, second sentence.
A Yes.
Q "The purpose of this retrospective case review is 2-fold:"
A Um-hum.
Q Does that set forth the intentions of the author in publication of this article?
A Well, yes, as it -- their statement, as it may have



been modified by peer review, because you don't -- when I read these things, I look at it, and I understand this came from some draft. Originally there was something submitted, and I don't know what that looked like and how much it changed in response to it.
Q Okay. So all we have is the final paper that was published?
A Correct.
Q But based upon the final paper that was published --
A Yes.
Q -- the authors, and with or without comment by the editors and the referees, this was -- the purpose of this paper was a retrospective case review, was it not?
A Well, I read -- I read it literally, and I'll say -- this is what they say, "...first, to report our experience with this condition, and, second, to attempt to discern its origin by looking at factors common to these cases to identify present and future patients at risk for developing this condition." That's what they say.
Q The authors did not say that we were doing a cohort retrospective study?
A Correct.
Q And, Doctor, it may be implied, but I don't know if you were actually asked. Prior to drafting your report of



August 24th, did you ever have occasion to speak with Dr. Hansen, Dr. Beck, or Nurse Beck?
A No.
Q Did you ever ask to see the underlying data on which this case series paper was based?
A No.
Q Did you ever ask Mr. Williams if that information would be available to you?
A I don't recall.
Q Did Mr. Williams ever offer it to you?
A I don't think so, no.
Q Is it fair to say, Doctor, that the information on which your August 24th report is based is only what's within the publication in the American Journal of Sports Medicine?
A That and the other things cited.
Q Okay. But information regarding the Hansen and Beck study, all the data came within the five pages of this article?
A Correct.
Q And primarily you were looking at Table 2, were you not, sir, which appears on page 1630 of the journal?
A No, I wouldn't say primarily. I would say that was among other things discussed in the text, as well.
Q Well, that gives the most informative information

regarding patients, regarding confounders, regarding other exposures that these various surgical patients were exposed to?
A Potential confounders, yes.
Q And, Doctor, as an epidemiologist, in the papers that you've published and in the book chapters that you've had occasion to author and books that you wrote with Dr. Rothman, epidemiologists typically use standardized methods to describe disease occurrence in human population?
A Yes. So?
Q And in doing that, the epidemiologist evaluates casual factors --
A Causal.
Q I'm sorry -- causal factors but cannot reach definitive conclusions based upon the results of one small scale study. Is that also true, sir?
A I think that's generally true.
Q And is it true in this case? Is that -- does that general rule apply to this situation?
A I would -- I would say --
(Interruption.)
(Discussion off the record.)
THE WITNESS: I'm sorry, you'll have to repeat.



MR. FERN: No problem. Michele, can we have that last Q read back, please. Thank you.
(Record read as follows:
QUESTION: "-- causal factors but cannot reach definitive conclusions based upon the results of one small scale study. Is that also true, sir?
ANSWER: I think that's generally true.
QUESTION: And is it true in this case? Is that -- does that general rule apply to this situation?")
THE WITNESS: And I would say this is -- if there's any situation I've encountered where that rule doesn't seem to be as, let's say, as imperative, it's this one. I would put it in the context of saying that, as I said in my report, there isn't just this study. Along with it there's some collateral evidence that I talk about in the report, and that supports the hypothesis.
So the extremity of the association is such that it's, from my -- my expert judgment, it's hard to come up with a plausible alternative explanation, especially given that the effect in question appears, from what I've read in the literature, to be consistent with the mechanisms that have been observed and, therefore -- and the toxicity of these, what's being



injected and so forth.
So putting that all together led me to, well, state the conclusion here that's probably more definitive than most anything I normally would think would be possible from a case series like that.
I say -- and let me quote my own report, the end of it, just so we're clear. "In summary, causation of chondrolysis by some aspect of intra-articular use of pain pumps is far more credible and consistent with other findings than alternative explanations that have been offered for the dramatic association observed in these studies. Thus" -- I say -- "with high scientific certainty, I would infer that the intra-articular placement of pain pump catheters was a primary and essential contributing factor to the development of chondrolysis in the cases reported by Hansen et al. and Dr. Matsen."
So that's the basis for my sounding definitive in that situation, this situation. That summarizes it. In other words, as I said earlier this morning, the book and all those kinds of statements, while I ordinarily agree with, they're talking about situations in which the association is far smaller. The association in controversy, in play, is far smaller than what's seen in this situation.



BY MR. FERN:
Q So, sir, because of -- because in your opinion this association is far smaller, you are now violating all the general rules --
A No, it's far larger.
Q Can I finish? I will allow you to finish --
A Okay, sorry.
Q -- when you are speaking. So, sir, because you find this association to be far larger than anything you've seen before, you are violating the general principles of epidemiology that you have wrote in your book and agree that other -- that other epidemiologists are constrained to follow?
A I wouldn't say I'm violating it in the way you put it. I'm recognizing that any principle one lays down one day is going to run up against situations in which it may not be applicable anymore. Just like --
Q So --
A -- if you go fast enough, Newtonian physics won't hold anymore.
Q So you are telling us, sir, that your findings in this case are the basic exception to the rule?
A Not the basic, but the --
Q Or the exception to the rule?
A It's a situation in which that rule is going to --

Page 142

Q It was after this?
A Yes.
Q Okay. So this association, Doctor, that you found, do you consider this to be a causal link?
A Well, if it turns out that it's causal, yes. I mean, I'm not sure what you're asking. Do I think -- would I bet -- look, the way I think of these things, and that's expressed, for example, in chapter 18 of that book, "Modern Epidemiology," third edition, is that when it comes down to it, is what would I bet? Would I bet that there -- that it is a causal link? Yes, I would bet that it is a causal link.
If you want to disregard my opinion because I'm not an orthopedic surgeon or because I'm considered biased or whatever, that's fine. Would you bet -- would you have one of these put in your shoulder and ask yourself that question? That's what I would say to anybody. Well, read this literature, read my report, form your own opinion and ask yourself would you, if they want to stick one of these pumps intra-articularly into your shoulder for this, would you go ahead with it in light of what you know now?
Q So --
A That's it.
Q Are you done?

Page 143

A Yeah.
Q Thank you. So my -- just to close up this area, have any other scientists, whether it be epidemiologist or other scientist, or physicians accepted or endorsed your opinion that intra-articular use of pain pumps causes chondrolysis?
A No one that I know of.
Q Thank you. You told us before you have no intentions at the current time of publishing this. Do you have any intentions of doing a poster presentation or other type of presentation in any other Epidemiological Society meeting that you might be attending in the next year?
A You mean about this?
Q Yes.
A Well, the more you ask me about this, the more I'm thinking, well, maybe I should go ahead with this.
Q Well, as we sit here today --
A Yes.
Q -- before I got into this area of questioning --
A You're encouraging me.
Q -- was it your intention to present this at any Epidemiological Society meeting?
A No.
Q And, therefore, so it's not your intention as you sit here today to share with peers or any other epidemiologist to see whether or not they would agree with your opinions?

Page 144

A Well, as we sit here today it's actually changing, this dynamic of sitting. And, you know, more and more you're starting to convince me that perhaps I ought to do this.
Q Doctor, your opinion is based upon -- primarily based upon the case series, is primarily based upon the Hansen and Beck case series as well as the in vitro and animal studies that we spoke about before?
A Yes.
Q So that is basically one study --
A Well, there's also Matsen.
Q Okay. We'll get to in a moment.
A Okay.
Q So you also -- you believe that Dr. Matsen's testimony that you read from the Grossnickle trial also supports your hypothesis and your opinion?
A Looks to me that it does.
Q And would you also agree with me, sir, that if there were other studies that -- whether studies with more power, better controlled, better blinded, a larger study population, all of that would either -- would give your opinion either more credence or -- would give your opinion more credence?

Page 145

A Well, if they came to the same result.
Q Correct.
A They could also go against it.
Q But there are no other studies which would help support your opinion?
A I'm not aware of any.
Q Let's talk about, sir, if we can, some issues. You deem the Matsen -- excuse me. You deem the Hansen and Beck study to be a retrospective cohort study; correct?
A That's how it looks to me, yes.
Q So define for us so we can be talking on the same playing field what the criteria for a retrospective cohort study is.
A Go back and identify a cohort or cohorts of subjects, in this case patients, and you look at what happens in them or the records show what happens in them over time.
Q Okay. And in creating a -- in those cohorts is a nonexposed group and an exposed group?
A That's usually how it's done but there are variations.
Q And in selecting the nonexposed group, is it fair to say it's an important consideration in creating the study to try and match that group as closely as possible to the exposed group but for the variable?

series.
Q Then -- okay.
A That's it.
Q But more importantly, if you look at the Hansen and Beck article, the authors, when it says study design on page 1, the authors, the referees, the editors of the journal all defined it as case series and that's how it was published?
A It was published as a case series.
Q And if you found, Doctor, that the Hansen and Beck study was, in fact, a case series, then Mr. Williams wouldn't have any further need for your services; is that fair?
A No, I don't think that's true, no.
Q Well, if you found this to be a case series, Doctor, you wouldn't have been requested to draft a report and submit a bill for your services; is that true?
A Only Mr. Williams can answer that. Regardless of whether I call it a case series or retrospective cohort, the table and the data and the analyses in my report still stand.
Q But the data and the table and the analyses are only effective if you define this case series as a retrospective cohort study?
A No, that's not true. It doesn't matter whether I



define my car as a compact or an intermediate. If I do an oil change on it, I have to use the right weight oil. It has no bearing at all. It's just -- it's just a classification scheme. Whether I classify you, you know, as tall or short or anything has no bearing on how I'm really going to fit you as a suit. It ultimately comes down to the details of fitting you, and same here. This is -- that whole issue about classification, whether this is a case series or not, is ultimately -- it's arguing about semantics. The analysis stands regardless of what you call it.
Q Doctor, did you believe, as you sit here and when you were retained by Mr. Williams, that you have a vested interest in finding an association between pain pump exposure and chondrolysis?
A That's a good question. Do I? I don't know.
Q Well, let's talk about it. Your -- in the past, your work has been predominantly on behalf of Plaintiffs in numerous types of litigation; correct?
A Especially when named.
Q Is that correct?
A Um-hum.
Q Okay.
A When a named expert, yes.
Q And we talk about betting. I'd be willing to bet



that -- on your direction, which way your biases lean when contacted by counsel to reach an opinion.
A When contacted or which?
Q Well, when contacted.
A Oh, afterwards.
Q Okay. So just like in the chromium exposure cases against Pacific Gas & Electric in L.A. --
A Yes.
Q -- do you recall those? And then contamination cases against Lockheed Martin, also here in Los Angeles?
A Yes.
Q And Thimerosal cases, the vaccine causing autism, when, in fact, Mr. Williams, the very firm who retained you on this case, you reached an opinion on their behalf in those vaccine cases in Washington, D.C.?
A Do you know what that opinion was?
Q I know what that opinion was, Doctor.
A I do.
Q We'll get there. I'm not asking you for that opinion today.
A The opinion was that I said I do not think it causes --
Q Well, your opinion was, Doctor, that you needed further data in order to reach an opinion.
A Yes.
Q And you -- and you submitted an affidavit or a report



saying there were three studies that didn't give you enough information to reach an opinion --
A Yes.
Q -- correct?
A Yes.
Q But here you -- yes or no, do you deem to have enough data based upon this one Hansen and Beck article with the data that's provided therein?
A Yes.
Q Okay.
MR. FERN: Good time to break.
MR. WILLIAMS: Okay.
(Luncheon recess - 1:04 p.m. to 2:01 p.m.)
MR. FERN: Okay. Let's go back up on the record.
BY MR. FERN:
Q Dr. Greenland, good afternoon. We have -- we're going to continue on some other issues regarding your report, where we stopped earlier this morning.
I want to talk to you about the methodology of collection of the data which you drew your opinion and conclusions. Part of your opinion or supporting your opinion was Dr. Matsen's data from the 396 patients that he had reviewed; is that correct?
A Yeah.

Page 294

Q And then if you got the evidence that it was only those who were drinking raw milk as opposed to pasteurized milk, that would help you even more?
A Yes.
Q And then if you got evidence that all of the people who were drinking raw milk bought it from the Piggly-Wiggly instead of from the Super Fresh, that would give you even more data to make your opinion more narrow and more credible; is that right?
A Well, you're using the term narrow differently -- now I realize how you're using the term -- than I would. I would say it makes the opinion -- it's more focused in the sense that now it appears to be homing in on what precisely the agent is.
Q All right. And so the more precise and specific the data you have, the more precise and specific conclusions you can draw from that data?
A Right.
Q Okay. Now, in the Hansen-Beck study, and we've been through whether -- whether there's bias errors and all of those things, and I don't want to go over that again. Actually, I do but I'm not going to. But the Hansen-Beck study is pretty specific, isn't it, in terms of what the patients, the cases received; right?
A Yes.

Page 295

Q It's specific that they received a particular brand of pain pump?
A Yes.
Q It's specific that they received a certain kind of anesthetic; right?
A Yes.
Q That anesthetic was Bupivacaine with epinephrine?
A Yes.
Q And it's specific that they all received .25 percent --
A Yes.
Q -- in concentration?
A Yes.
Q And it's specific that they all received a pump loaded with 250 milliliters; correct?
A Yes.
Q We can check the data if you want, but with a flow rate of 4.16 milliliters per hour?
A Yes.
Q All right. So it's -- and so we have a pretty specific set of data about what these patients received; right?
A Yes.
Q So from that data, assuming you can draw conclusions, and I'm not going to -- again, we've been through whether it's proper to make the inferences you're making. I'm not going to go over that again. But to

Page 296

the extent that there are proper inferences to be made, it's with respect to those specific factors that we know about, that are all common to the Hansen-Beck cases?
A Yes. I should say that in reality, by my perspective, we haven't been over whether the inferences I made were proper but rather what the deficiencies of the studies were. I would gladly accept the challenge that my inferences were not really proper.
Q I'm sure you would, and you're -- you're being challenged by lawyers in this case, not by peers; right?
A Right, but peers would be welcomed, too.
Q All right. But your study -- I guess we've been over this -- hasn't been subjected to that rigorous kind of peer review?
A Correct.
Q You've got some lawyers taking pot shots who have never studied epidemiology and maybe haven't studied college math but --
A They're doing a good job, though.
Q Doing a good job, doing the best we can but -- but they're not peers and they're not -- they're not epidemiologists.
A That's how I would put it. They're not epidemiologists

Page 297

or peers in the narrow technical sense, I mean.
Q Right. And you would expect that your peers would have some very significant questions about that paper if you submitted your opinion to a journal? The way it's written now --
A Yes.
Q -- to submit that to a journal and ask them to publish that, you wouldn't expect that paper to be published in a peer-review journal?
A Certainly not like it is.
Q It would need a lot more information than what's in there; right?
A More work.
Q A lot more work?
A Or a lot more caution.
Q And a lot more caution; right?
A Yes.
Q In other words, peer-reviewed journals don't allow you to -- to give opinions that are -- well, I'm going to strike the question.
Let me -- let me go back to -- let me go back to what we were talking about, which is the very specific data you have about this patient population of cases. And when I say cases, I think I'm saying it the way you say it. The cases are those who got

A The 19 is the denominator.
Q Right. The denominator is 19?
A Yes.
Q And if you added all of those cases where he used pain pumps and did not get chondrolysis, you would have -- you would have 12 out of whatever additional number that was --
A Right.
Q -- right? That would reduce the percentage, depending on how large the denominator became?
A Yes.
Q And we simply don't know that?
A Correct.
Q We do know that he was using pain pumps, or at least I think you know that he was using pain pumps for several years before his first case of chondrolysis cropped up?
A Right, although I'm not sure if he was using the same pump or the same solution and so forth.
Q Okay. So that -- I mean, that goes to my point, though. If he's not using the same pump or the same solution or the same -- the same flow rate, you can't really draw any conclusions other than as to those specific factors; right?
A Right, you can't separate those factors.
Q Right. It wouldn't be appropriate to say as an



epidemiologist that the evidence shows that using a pain pump intra-articularly with plain Bupivacaine at 2 milliliters an hour is associated with getting chondrolysis; you don't have any data to show that?
A Right.
Q And you don't have any data to show that using Bupivacaine in any kind of a pain pump without epinephrine causes chondrolysis?
A Right. Right. All I have is this -- that this particular complex that was used, all the details that you laid out, that that combination shows this huge association with the outcome, and that could be because it's one of the factors in there or some interaction of two of the factors in there, and I could not make a separate statement about any of them based on the data that I have seen.
Q Okay. And so I just -- I just want to be clear, because you've been designated in a case that I'm involved in, and I'm not involved in any of the Oregon cases, and that case did not involve any Bupivacaine with epinephrine. So you wouldn't be able to say anything meaningful about Bupivacaine, plain Bupivacaine in a pain pump in that case, could you, from an epidemiological standpoint?
A All I could say is what I've said. I could just



repeat, saying this particular combination has, and here's the study, shows this huge association. This is not a study of Bupivacaine alone. If your question is on Bupivacaine alone, we would need some data on Bupivacaine alone.
Q Right. Which you don't have?
A Which I do not have.
Q Right. Okay. Now --
A Unless in Matsen, that Matsen thing, that turns out that's all Bupivacaine alone, but I don't know that.
Q I think we've seen that Matsen -- well, we don't have the Matsen data --
A Right.
Q -- to show that?
A We just have that little report that was there.
Q Right. When you're looking at the -- when you're looking at the data from Hansen-Beck -- and I want to see if I understand your definitions. A case, a case report is a report of chondrolysis if that's the event we're looking for?
A Um-hum.
Q Right? A case series means an article that talks about more than one case of chondrolysis?
A Right. Usually related cases in that here's a practice that forms a series or here is a monitoring system that



forms a series, here's the Kaiser group.
Q Okay. All right. And what you're looking at in the Beck data is you're saying -- you're saying it's not a case series because he studied cases and non-cases together?
A Right.
Q And it's that -- it's that factor that you've got both cases and non-cases together in the same practice with similar surrounding circumstances that you think is epidemiologically significant? That is, you can compare one to the other?
A Right.
Q When you do a relative risk analysis, what you're saying is that doing X is riskier than doing Y; right?
A Yes.
Q And in this case you're comparing X is using a pain pump and Y is not using a pain pump?
A Right.
Q And so you could also say looking at the Hansen-Beck data, you could also take another cut at the data and you could say that in that set of data, X would be having shoulder stabilization surgery or having some other kind of arthroscopic surgery in a shoulder; right?
A Yes.

Page 318

Q And the paragraph above there says, "Additional 13 patients were treated with arthroscopic stabilization but no pain pump catheters." Do you see that?
A Yes.
Q Okay. That's the number 13 reported; correct?
A Yes.
Q And if you go to the abstract of the paper, under Results, fourth line down, it says, "...only 19 shoulders, of 30 with capsular procedures, had intra-articular pain pump catheters...." Do you see that?
A Yes.
Q So if you take 19 away from 30, that leaves you with 11; correct?
A Yes.
Q So from reviewing the Hansen-Beck transcript, we don't know whether it was 11 or 13 based on that discrepancy in the numbers; correct?
A Well, it depends on which one of these we take as our source; right?
Q Right, but since they're both in there, you don't know which one is correct; is that right?
A 30 arthroscopic stabilization procedures, 19 shoulder -- yeah, you're right. You're right.
Q Okay. So the -- there's a discrepancy within the

Page 319

author's paper itself; correct?
A Well, hold on, let me just read it carefully and see if -- additional 13 patients. Think about that. I seem to remember noticing this before and concluding something based on what they were saying and what they printed elsewhere in the paper but let me try to remember.
30...from that it does look like there's 11. The denominator is 11 among the procedures, but they say -- then they say an additional 13 patients.
Q Okay. There's an error somewhere, we just don't know where it's at; correct?
A Right.
Q There is an error somewhere in the manuscript, we just don't know -- in that regard, we just don't know which one is correct and which one is not correct?
A It appears that way, from my understanding.
Q Okay. Thank you, Doctor. Now, we talked a little bit about the fact that you used the Mansen [sic] data -- excuse me, you used the Matsen data as confirmatory or auxiliary or something to that effect.
A Ancillary was the word I used.
Q Ancillary. Thank you. And that goes to the issue of what's sometimes called replication in epidemiology?
A Yeah.

Page 320

Q You don't want to -- you want to see results replicated --
A Yes.
Q -- to understand if they're reliable or not; correct?
A You could put it that way.
Q Okay. And we also talked earlier about the fact that a number of the same issues with regard to confounding and bias appeared in the Hansen-Beck data as well as the Matsen data; correct?
A Yes.
Q Okay. Now, here is where I was referring to your article where the lead author is Christenfeld. Do you agree that simple replication is not a solution to the problem -- for problems where this -- excuse me, where the same problems may be present in further studies?
A Right, where the same problem may be present in further studies.
Q Right. Replication doesn't apply if you have the same problems that carry on through additional studies; correct?
A Right.
Q Okay. And then the next thing, Doctor, real quickly, you also state in the article that, "Causal inference from observational data thus has to contain a judgmental component which can vary across experts."

Page 321

A Yes.
Q That's what you wrote. And you admitted that there are other experts who could review the same data and come to a completely different conclusion than you did; correct?
A Yes.
Q And you're not offering an opinion in this case that there has been a consensus formed within the scientific community with regard to a cause and effect relationship having been established between intra-articular pain pump use and the development of chondrolysis; is that correct?
A Yeah, that's certainly correct, that I'm not offering that sort of opinion.
Q That's all I have. Thank you.
A And if I was -- I would also add at the end of this report, if I was -- because there was some question about the numbers. If I was to write this today, in light of the examination that you've all given me here, education you've all given me about this topic, I would -- certainly I would word that, my conclusion, I think more cautiously.
Q With regard to replication?
A With regard to the whole matter.
Q Okay. Thank you.

Page 322

A Yes.
Q In other words, it would be -- the language you would use would be much more cautious with regard to whether a cause and effect relationship has, in fact, been established than is actually stated in your report?
A Well, you say whether my opinion is -- how firm I would say. Here I would say summary causation of chondrolysis by some aspect of intra-articular use of pain pumps, I would say it seems to me far more credible, and I would say some aspect of use of the way it was used, these procedures were used in Hansen and Matsen. That was something actually that occurs to me I should have said there.
I said at the end about it's Hansen and Matsen, but limiting it that it could be that whenever they did the pain pump, okay, whenever they used them they also used a particular kind of suture that they -- they only used it when they used the pain pumps. And when they used something else -- when they were doing some other procedure, they didn't use that suture, and that suture was responsible.
So what I'm trying to tell you is that you've emphasized to me that without that further data, there is no way to be sure that it isn't some aspect of something surrounding, something to do with what they

Page 323

did always when they used the pain pumps and didn't do when they didn't use those intra-articular pain pumps that is something about that, and I don't have enough orthopedic surgery knowledge to certainly have a judgment about that.
Q Thank you, Doctor.
A You're welcome.
MR. WILLIAMS: Everybody else done? I have a couple questions.

EXAMINATION

BY MR. WILLIAMS:
Q I'd like to try to focus right away on this alleged error in -- or discrepancy in Beck's study. Can you just show me what he was just asking you about, where there seemed to be a difference in the number of either shoulders or patients.
A I think what was confusing us was here in the Results they say in only 19 shoulders, of 30 capsular procedures. Then when you go to the paragraph before the Discussion, just above the Discussion heading, they say, again, 30 arthroscopic stabilization procedures, 19 shoulders, and 17 patients, were given intra-articular pain pump catheters. Then they say, "An additional 13 patients were treated with arthroscopic stabilization but no pain pump

Page 324

catheters...."
Q But 13 plus 17 is the 30; right?
A That's what I would have thought.
Q Well, what's -- where is the alleged mistake? I don't understand what the alleged mistake is.
A Well, they say 30 procedures, but if you have 17 patients with 19 shoulders done, and 13 patients that were treated arthroscopic stabilization with no pain pump catheter, so presumably they didn't have dual shoulders, 13 plus 19 gives you 32 procedures.
Q Oh. But if they're using the word procedure to describe a patient, whether or not they had one or both shoulders done, that would resolve that discrepancy?
A I think -- I think it's bad -- it's bad wording on the part -- their part.
Q Okay.
A And that really it's 30 patients, not procedures, but they -- you know, we'd have to ask them.
MR. WOLFF: Well, you don't know; right?
THE WITNESS: Have to ask Dr. -- one of the participants to be sure.
BY MR. WILLIAMS:
Q Now, let's go to the typos in your report --
A Right.
Q -- and just clarify what those were about. There was

Page 325

one where you put a 9 instead of a 7?
A Right. This is going straight from the table. That's a typo, so 9 should have been 7.
Q That's on page 6 of your report --
A Right.
Q -- in paragraph number 3?
A Right.
Q Okay.
A But that doesn't change the numbers.
Q And the 7 represents what, though? What --
A Oh, that's -- it's this number here.
Q Oh, I see.
A No chondrolysis under the people who had the pump.
Q All right. Now, what effect -- did that error, the fact that you typed a 9 instead of a 7 in that paragraph, did that change any numbers that matter in the report?
A No.
Q Why not?
A Well, at least as far as I know, and I will check this just to be sure, but that's just a typographic error. I mean, that's something I often do is actually accidentally type a 9 instead of a 7 or a 7 for a 9.
Q Okay.
A Especially if it's anything to do with handwriting.