# Appendix III, Tab 11

**Deposition of Armando Vidal, M.D., July 8, 2009**

* VIDEO DEPOSITION OF ARMANDO F. VIDAL, M.D. *
July 8, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 08-CV-01297 MSK-MEH

TROY L. ALDERFER,

Plaintiff,

vs.

BREG, INC.
c/o Brad Mason
2611 Commerce Way
Vista, California 92081

AND

LMA NORTH AMERICA, INC.
c/o LMA North America (Headquarters)
4660 La Jolla Village Drive
San Diego, California 92122

Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:08-cv-00365-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

vs.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.,
REABLE THERAPEUTICS, LLC, and
I-FLOW CORPORATION,

Defendants.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

Case No. 5:08-cv-00263-CLS

PAUL W. WESTBROOK,

Plaintiff,

vs.

DJO, LLC;
MCKINLEY MEDICAL, LLC;
MOOG INC.;
ASTRAZENECA PLC;
ASTRAZENECA PHARMACEUTICALS LP;
ASTRAZENECA LP; and
ZENECA HOLDINGS, INC.

Defendants.

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:08-cv-00962-MSK-CBS

SAMANTHA ARCHULETA and
ROSEMARIE CARROLL, as parent and next friend,

Plaintiffs,

vs.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.,
REABLE THERAPEUTICS, LLC,
I-FLOW CORPORATION, ASTRAZENECA
PHARMACEUTICALS LP, ASTRAZENECA LP,
and ZENECA HOLDINGS, INC.,

Defendants.

---



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

Case No. 1:08-CV-0184-DFH-TAB

JENSEN MEHARG, and her parents
ROBIN MEYER and MICHAEL MEHARG,

Plaintiffs,

vs.

I-FLOW CORPORATION, ASTRAZENECA
PHARMACEUTICALS LP, ASTRAZENECA LP,
ZENECA HOLDINGS, INC.,

Defendants.

---

APPEARANCES:

KALUR LAW OFFICE
By Laura B. Kalur, Esquire
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225
503-595-4145
lbkalur@kalurlaw.com
Appearing on behalf of Plaintiffs.

D. ROBERT JONES, PC
By D. Robert Jones, Esquire
219 West Colorado Avenue, Suite 210
Colorado Springs, Colorado 80903
719-630-1556
Jones@drjpc.com
Appearing on behalf of Plaintiffs in Colorado cases.

BOWMAN and BROOKE LLP
By Kim M. Schmid, Esquire
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
612-339-8682
kim.Schmid@bowmanandbrooke.com
Appearing on behalf of Defendant Breg, Inc.



APPEARANCES (Continued):

MORRIS POLICH & PURDY LLP
By Roger G. Perkins, Esquire
501 West Broadway, Suite 500
San Diego, California 92101-3544
619-557-0404
rperkins@mpplaw.com
Appearing on behalf of Defendant DJO, Incorporated.

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
By Maynard M. Kirpalani, Esquire
260 Franklin Street, 14th Floor
Boston, Massachusets 02110-3112
617-422-5300
maynard.kirpalani@wilsonelser.com
Appearing on behalf of Defendant I-Flow Corporation.

HARRIS BEACH, PLLC
By Pamela B. Goldsmith, Esquire
100 Wall Street, 23rd Floor
New York, New York 10005
212-687-0100
pgoldsmith@harrisbeach.com
Appearing on behalf of Defendants McKinley Medical, LLC, Moog Inc., and Curlin Medical.

Also Present: Jay R. Wren, CLVS



Pursuant to Notice and the Federal Rules of Civil Procedure, the video deposition of ARMANDO F. VIDAL, M.D. called by Plaintiffs and Defendant Breg, Inc., was taken on Wednesday, July 8, 2009, commencing at 12:35 p.m., at 2000 South Colorado Boulevard, Suite 4500, Denver, Colorado, before Alan E. Bjork, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

VIDEO DEPOSITION OF ARMANDO F. VIDAL, M.D.


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Kalur | 306, 329 |
| Mr. Jones | -- |
| Ms. Schmid | 8, 277, 325 |
| Mr. Perkins | -- |
| Mr. Kirpalani | 203, 296 |
| Ms. Goldsmith | 217, 302 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | BREG, Inc.s First Amended Notice Of Deposition Duces Tecum Of Armando Vidal, M.D., with attachment | 10 |

I N D E X (Continued)


| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 2 | Progress Notes dated 9/18/07 of Armando Vidal, M.D. | 41 |
| Exhibit 3 | Expert Report of Armando F. Vidal, M.D. Pain Pumps and Chondrolysis | 12 |
| Exhibit 4 | Deponent's complete file related to the pain pump litigation | 11 |
| Exhibit 5 | Copy of the title page and Pages 20 through 22 of the deposition of Armando F. Vidal, M.D. taken in Alderfer vs. BREG on 2/3/09 | 23 |
| Exhibit 6 | Paper No. 563 published in Shoulder/Elbow entitled Characteristics of Chondrolysis Associated with Intra-Articular Pain-Pumps After Shoulder Surgery written by Thomas Scheffel, MD, et al. | 326 |




P R O C E E D I N G S

(Exhibits 1 through 3 marked.)

THE VIDEOGRAPHER: We are now on the record. My name is Jay R. Wren, CLVS. I am a videographer for Golkow Technologies, Inc.

Today's date is July 8th 2009. And the time is 12:35 p.m. This video deposition is being held at 2000 South Colorado Boulevard, Suite 4500, Denver, Colorado, in the matter of multiple cases of which formal reading is hereby waived by all attorneys.

The deponent is Armando Vidal, MD.

And will counsel please identify themselves beginning with the attorney on my left and the deponent's right. Ms. Schmid?

MS. SCHMID: Kim Schmid from Bowman and Brooke in Minneapolis on behalf of the Defendant Breg, Inc.

MS. GOLDSMITH: Pamela Goldsmith from Harris Beach in New York on behalf of McKinley Medical and Moog Inc. in the Westbrook case.

MR. PERKINS: Roger Perkins of Morris Polich & Purdy for DJO, LLC.

MR. KIRPALANI: Maynard Kirpalani for I-Flow Corporation.



MR. JONES: Robert Jones for the plaintiffs in the Colorado cases.

MS. KALUR: Laura Kalur for the Plaintiffs Stacey Hansen, Troy Alderfer, and Paul Westbrook from Kalur Law Office.

THE REPORTER: Please raise your right hand.

ARMANDO F. VIDAL, M.D.,

being first duly sworn in the above cause, was examined and testified as follows.

THE REPORTER: Thank you.

EXAMINATION

BY MS. SCHMID:

Q Good afternoon, Dr. Vidal.

A Good afternoon.

Q As you will recall, you and I have met once previously, correct?

A Yes.

Q And that was earlier in this year, February of 2009, where I took your deposition as a treating physician on behalf of Troy Alderfer. Do you recall that, sir?

A Yes, I do.

Q All right. And, sir, do you recall that as a result of that deposition, there was a



transcript from that deposition, correct?

A Yes.

Q Have you had an opportunity to review the transcript and verify it for its accuracy, that is, the transcript of February 3, 2009?

A Yes.

Q Were you asked by the lawyers who represented Troy Alderfer to fill out something called an errata sheet to the extent that you wanted to make any changes, edits, or additions to the transcript?

A I don't recall that, no.

Q As you read the transcript after your deposition, did you find anything in the transcript that you thought was inaccurate?

A Not to my recollection, no.

Q All right. So as you sit here today, Dr. Vidal, your deposition testimony that you gave on February 3rd, 2009, it's your testimony that it is accurate and that it was truthful testimony to the best of your ability, correct, sir?

A To the best of my ability. There may be some specifics that occur, but yes.

Q All right. And, again, in your review of the February 3, 2009, transcript, you

as well that there's likely a cause there.
And if you get -- at the end of the day, just to be clear since we're playing semantics here, I feel very strongly that Troy's chondrolysis was caused by an indwelling catheter.
Q I'm not playing semantics. I just want to be very accurate based on the documents in the record, sir.
In your last response, you said, quote, likely a cause, close quote. In your medical record, what you said was likely an association, close quote, correct?
A Correct.
Q Do you, sir, as a litigation expert --
MS. KALUR: Object --
Q (By Ms. Schmid) -- in the area of chondrolysis, do you have an understanding, sir, of the difference between an association and a cause?
A Are you asking me if I understand the legal -- is it -- if you're asking me if I -- if I understand if there's a legal difference specifically in that terminology, I would -- I would say if -- if there is a legal difference in that terminology, I'm not aware of it.



Q Okay.
A And, again, when I dictate these notes, I'm not specifically dictating to the legal definition of my choice of words.
Q And, sir, if I recall correctly, the first time that you treated a patient or saw a patient who had chondrolysis was in November of 2007; is that correct?
A No, that can't be correct because that -- the note you just provided me is from September of 2007.
Q Would you agree with me -- and I apologize if I have that date wrong -- would you agree with me, Dr. Vidal, that the first patient you saw with chondrolysis was Troy Alderfer?
A I'd say that the first patient that I recognized as being chondrolysis was Troy Alderfer. I think that they probably saw me before I saw them.
MS. SCHMID: Sorry, could you read that back.
(Last answer read.)
Q (By Ms. Schmid) I'm sorry, I don't understand that, sir.
A It's a great -- well, I'll clarify.



It's a -- I think there were probably people who were getting shoulder arthritis before we recognized this entity called chondrolysis and actually gave it that term. So Troy Alderfer is the first patient that I recognize and recall giving the title of post-arthroscopic glenohumeral chondrolysis.
Q Would you agree with me, sir, as an expert in this area, that you have within your research where you've read all these articles, that you have -- you are aware of cases of chondrolysis, shoulder chondrolysis, where no pain pump was used, correct, sir?
A Of course.
Q And, sir, you're also aware of cases where pain pumps have been used and inserted into the shoulder joint where no chondrolysis developed, correct, sir?
A Correct.
Q And would you agree with me, sir, that the literature -- the consensus of the literature is that more research and more study needs to be done to fully understand the potential cause and causes related to chondrolysis, correct?
A Repeat that last question.



Q Sure.
MS. SCHMID: Go ahead and reread it.
(Page 49, Lines 20 through 24 read.)
Q (By Ms. Schmid) The cause or causes.
A To fully understand the underlying cause and causes of chondrolysis, I would say that the consensus of the literature would agree that further study is necessary.
Q (By Ms. Schmid) And that's true as of July 8th, 2009, correct, Dr. Vidal?
A That is correct.
Q And by the way, Doctor, would you agree with me, sir, that the consensus in the medical literature as of July 8th of 2009 is that the cause -- is that the potential cause or causes associated with chondrolysis may well be multifactorial? Would you agree that that's a consensus in the medical literature?
A I would say, to be clear, that there is not a condition in the human body that isn't multifactorial. And I would say that chondrolysis is no different. So when you ask that question about the multifactorial nature of chondrolysis and try to fully understand it, I go back to my last question, which is further research is

certainly necessary.
Whether there are patient factors, genetic factors, biochemical factors, exposure factors, there is a lot that's still -- that would benefit us to understand it and to prevent it from happening in the future with other substances. So it's critical to us as providers to fully understand the issue as close as we can. So when you ask is there a consensus that it's multifactorial, I would say there's consensus for everything.
That is, every human condition is multifactorial, meaning that you can expose a human to a known toxin, and some will survive, and some won't. And there are factors that predict that and don't. And unfortunately that's the nature of the human animal, of the human organism. It's the nature of biology, which is an unpredictable science. And it's -- the bottom line is that everything, every condition, is multifactorial, and chondrolysis is included among those.
Q So it's a true statement, Dr. Vidal, that the condition of chondrolysis is multifactorial, correct?



A Chondrolysis is no different than any other human condition and is therefore multifactorial.
Q Thank you. And, sir, during your prior response, you listed a number of potential factors in the area of research. And can we agree, Dr. Vidal, that as of today, that not all potential factors or risks or causes that may be associated with chondrolysis are yet known?
A The reason that is true is because there are substances that will probably cause chondrolysis in the future that we're not even aware of.
So, again, going back to that, that -- you can say that literally about almost any condition. But yeah, yes, the answer is yes.
Q I want to be very specific --
THE VIDEOGRAPHER: I'm sorry, your microphone would be better on.
MS. SCHMID: Oh, gosh.
Q (By Ms. Schmid) I want to be very specific, Dr. Vidal, just specific to chondrolysis. Okay?
A Yes.
Q And the question is, would you agree



with me, sir, that based on the current state of medical and scientific literature, that the consensus in the scientific community is that as of today, July 2009, that we don't yet know, we have not yet identified all potential cause or causes that may be associated with chondrolysis? And I'm talking about products and substances that are in the environment today.
A Can you -- because that was a long question --
Q Yes.
A -- would you repeat the question from start to finish, please.
(Page 52, Line 25 through Page 53, Line 8 read.)
A I think we have -- we are getting a firm understanding of things that cause chondrolysis. And I think that we are -- further study is necessary, in the consensus, to understand all the factors that can contribute to chondrolysis because there -- there are likely -- there can be -- meaning that this can cause chondrolysis. That can cause chondrolysis. And yes.
Q (By Ms. Schmid) So it's your expert



opinion, Dr. Vidal, that further research, further investigation and analysis is necessary in order to fully understand all the causes or potential causes that may be associated with chondrolysis, correct?
A Absolutely --
Q All right.
A -- because the reason that's critical is I may come to some definitive conclusion that indwelling catheters and Marcaine does it, or X, Y, or Z substance does it, right? But I want -- I don't want to just stop there because I'm a clinician and because I take care of patients, and my primary goal is to my patients. So I don't want to say, Okay. We figured it out. It's just this one substance and put your head in the sand and ignore that there could be other causes.
So -- so, yes, so I guess even if you figure out all the factors that contribute to chondrolysis, as far as we understand it, it doesn't exclude one from being a cause. Does that make sense? Maybe I'm not being clear.
Q Let me ask it to you this way, Dr. Vidal --
A Please.

A Basic science literature and basic science studies are not necessarily subject to that same level of evidence.
Q Simple question, Dr. Vidal, can you point to me any studies, any research, that isn't -- that are not Level 4 or Level 5? Can you just identify that for me?
A Yes. I guess that was --
Q Fine.
A That -- that would be more clear.
Q Yeah.
A So I'm going to give you a couple.
Q Sure.
A I'm going to give you Connie Chu, "In Vitro Exposure to 0.5 percent Bupivacaine Is Cytotoxic to Bovine Articular Chondrocytes."
THE REPORTER: Could you slow down just a little bit?
MS. SCHMID: Yeah, you need -- I'm sorry, Dr. Vidal, our reporter --
A I'll give you -- I'll give you -- I'll give you the article, and I'm just going to give you a couple of examples to be clear. So Connie Chu, Arthroscopy, Volume 22, No. 7, July of 2006.
I'm going to give you Samantha Piper,



JBJS American, 2008. I'm going to give you Karpie and Chu, AJSM. I can't -- I can't find the year on this. I guess what I'm saying is the laboratory research, the in vitro research --
Q Uh-huh.
A -- is not subject to those levels.
Q Okay. And I -- let me ask you, sir, for example, on the Connie Chu, the Karpie papers, Gomoll's papers, would you agree with me, sir, that the in vitro research that they have done looking into the issue of whether or not certain chemicals are chondrotoxic to bovine or human cartilage in a petri dish, that those articles all come with the warning by the author that this is not to be equated with the development of chondrolysis in a human shoulder, correct?
A Equated with? I would agree with that.
Q Yeah. Let's go back to your -- sir, let's go back to your expert report, please. And I think you still have a copy of it, Dr. Vidal, somewhere in --
A I think so somewhere. It doesn't seem to --
Q That's all right. We'll wait until you



get to it.
A I got it.
Q Okay. I wanted to talk to you, sir, as I mentioned earlier, you reference about 20 -- you reference specifically 25 different articles throughout your expert report. And the first article that you reference, sir -- I'm on Page 2 of your expert report -- was a report by Dr. Damon Petty that was issued in 2004, correct?
A Yes, correct.
Q And would you agree with me, sir, that Dr. Damon Petty's case report did not reach any conclusion about the cause or potential causes of chondrolysis, correct?
A Correct.
Q And, in fact, in Dr. Petty's 2004 case report where he looked at three individuals, would you agree with me, sir, that the three individuals all developed shoulder chondrolysis, correct?
A Yes.
Q Two of them actually used lasers during the surgical treatment, correct?
A Yes.
Q And there were no pain pumps in those two patients, correct?



A Correct.
Q And yet they developed shoulder chondrolysis, correct?
A Yes.
Q And the third patient did use a pain pump, correct?
A Yes.
Q Do you -- do we know whether or not it was a subacromial or an intra-articular placement of a catheter?
A I would have to refer to the article.
Q And if you'd like to do that, sir, please, go ahead.
A I believe it was the second case.
Q Yes, yes, it's Case 2 in his report.
A Yes, Case 2, if I recall, yeah. He does not specify where the location of the pain pump was.
Q Why do you say, in your expert report, sir, that the -- that this patient used a, quote, intra-articular pain catheter, close quote? What's the basis of your statement in your expert report, sir?
A I would say actually that's inaccurate.
Q "Inaccurate," correct?

Page 82

A Yes.
Q In other words, we don't know the placement of the catheter in Case Report No. 2 from Dr. Petty's 2004 article, correct?
A Correct.
Q So that would be a change that we would make to your expert report, correct?
A Yes.
Q All right.
A That would be a first, actually, if it was subacromial. Chondrolysis after a subacromial pain pump, that would be the first report if that was done, if that was inaccurate.
Q I don't know if there's a question pending, but my --
A It's just an observation. I was just thinking of it as you said it.
Q -- question to you, Dr. Vidal, is you state, in your expert report -- which I assume you reviewed very carefully prior to signing, correct?
A Yes.
Q -- that it was an "intra-articular pain catheter." And I want to know the basis for your statement that it was an "intra-articular" placement. And as you sit here today, you have no

Page 83

basis for that statement or conclusion, correct?
A I'm agreeing with you, yes.
Q Yes. Then, sir, the second piece of literature that you reference in your report is the Hansen study that was published in July of 2007, correct, sir?
A That's correct.
Q And bear with me just a minute, please, Dr. Vidal. And, sir, the first part of Dr. Hansen's article concerns a case report or case studies of 10 patients involving 12 shoulder surgeries, correct?
A Yes.
Q And Dr. Hansen noted that -- as you do, sir -- that there were several common factors shared between these 10 patients; is that correct, sir?
A 12 patients?
Q 10 patients, 12 shoulders.
A Oh, yes, yes.
Q Is that correct, sir?
A Yes.
Q And you state, sir, in your expert report, that several common factors were identified. And would you agree with me, sir,

Page 84

although you don't state it in your expert report, that those common factors included the use of sutures?
A Yes.
Q Included the use of anchors?
A Yes.
Q And included the use of thermal devices; is that --
A That was --
Q -- correct, sir?
A Yes.
Q And, sir, I think we established this earlier, but I want to make sure it's clear on the record. The Hansen July 3, 2007, article does not come to any conclusion regarding the cause or -- strike that.
The Hansen July 3, 2007, article does not conclude that the intra-articular placement of a catheter with a continuous flow anesthetic directly into the joint can cause or does cause chondrolysis, correct?
A He concluded that it was highly associated.
Q That wasn't my question. My question --

Page 85

MS. SCHMID: And I move to strike.
Q (By Ms. Schmid) My question, Dr. Vidal, is very specific.
A Uh-huh.
Q The Hansen July 3, 2007, paper does not stand for the proposition that the intra-articular placement of a catheter with a continuous flow anesthetic directly into the joint can cause or does cause chondrolysis? That's a true statement, isn't it, sir?
A That the Hansen article does not propose that --
Q I did not say "propose."
A Conclude that -- that it can cause chondrolysis?
Q Can or does.
A The -- the study wasn't designed to look at causal relationships, so I would say yes. That's your -- yeah, that's an accurate statement.
Q You would agree with me, sir, that Dr. Hansen's paper does not conclude that the intra-articular flow of anesthetic does cause or will cause chondrolysis? It does not reach that conclusion, correct?
A It was not designed to reach that

Page 98

you've listed in your report, I see the words "association," "risk factor," "potential," "likely," but in none of those articles do I see the word does or will cause. Would you agree with me, Dr. Vidal, that in the 25 articles that you referenced to your expert report, that not one of them comes to the conclusion that a continuous flow of anesthetic in the shoulder does cause or will cause chondrolysis, yes or no?
A Yes.
Q (By Ms. Schmid) Thank you.
MS. SCHMID: Why don't we go ahead and take a five-minute break.
THE VIDEOGRAPHER: The time is 2:37. We're going off the record. This is the end of Tape 2.
(Recess from 2:37 p.m. to 2:46 p.m.)
THE VIDEOGRAPHER: The time is 2:46. We're back on the record. This is beginning of Tape 3.
MS. SCHMID: Thank you.
Q (By Ms. Schmid) Dr. Vidal, just before we broke, you agreed that none of the 25 articles that you cite as a reference to your expert report concludes that a continuous flow anesthetic into

Page 99

the shoulder joint does or will cause chondrolysis. Do you recall that, sir?
A Yes.
Q And this morning, Dr. Vidal, before we got on the record, Ms. Kalur provided us with a two-page printout of some additional technical literature that you have reviewed. And I'm just going to help you find that, if I can. We marked it as part of your work file, Exhibit 4.
MS. KALUR: Those two stacks right there? Is that it, or . . .
MS. SCHMID: No.
THE DEPONENT: You may still have it.
MS. SCHMID: Okay. Let me look, sorry.
THE DEPONENT: No worries.
MS. SCHMID: Bear with me just a minute, please.
THE DEPONENT: I think it's in -- oh, you know what, it's -- it's in the back of this.
MS. SCHMID: Is it?
THE DEPONENT: Yeah.
MS. SCHMID: Thank you.
Q (By Ms. Schmid) All right. Dr. Vidal, so as I was saying, we were provided, prior to the

Page 100

start of your deposition today, with a two-page document that's got medical articles -- additional medical articles listed on both sides of each page, so I guess four pages of additional medical literature, Dr. Vidal. And can you identify from that additional list of medical or scientific literature, Dr. Vidal, any of those articles wherein the conclusion that is reached is that the intra-articular flow of anesthetic does or will cause chondrolysis?
A Cause, I would say -- again, going back to that term, I would say no.
Q Thank you. Can you identify for me, Dr. Vidal, any medical or scientific literature anywhere in the world where the -- the conclusion is reached that the intra-articular flow -- continuous flow of anesthetic does or will cause chondrolysis?
A I would have the same answer, which is, in this case, specifically with regard to cause, as we discussed, none of the articles have been designed to study that, so the answer is no.
Q So correct for me to understand, sir, that as of July 8th, 2009, there is no published literature anywhere in the world wherein the

Page 101

conclusion reached is that the intra-articular application of a continuous flow anesthetic does or will cause chondrolysis, true?
A No study in the world literature has been designed to answer that question, true.
Q Let's just make it very clean. Whether or not the study was designed to answer such a question, let's just start very cleanly, here's the question: Is it correct that as you sit here today, Dr. Vidal, you cannot identify a single study, piece of research or literature wherein it concludes that the intra-articular flow -- continuous flow of anesthetic will or does cause chondrolysis, yes or no?
A Yes, you're correct, there is no study like that.
Q Thank you.
A I couldn't remember if that was a positive or negative question.
Q I agree. I agree. It gets to be a long day. Let's go back to your report, please. Oh, by the way, excuse me, before we go back to your report, we were talking earlier about the Hansen/Beck paper, Dr. Vidal, which is the second paper that you reference in your report. And

article is dated 2009; is that correct, Dr. Vidal?
A That's correct.
Q And do you see, sir, that Dr. Saltzman states, at the beginning, quote, The etiology of these cases is not known for certain?
A Yes, that is what it says.
Q And do you agree with Dr. Saltzman that as of 2009 the etiology into the cause or causes of chondrolysis is, quote, not known for certain, period, close quote?
A Correct, that's what it says.
Q All right. And that's your opinion, sir?
A I'm sorry, you're asking my opinion?
Q Yes, I am.
A Oh, I thought you were asking me if that's what it said. If -- I would say that all the possible causes of chondrolysis are not known for certain. I would agree with that statement.
Q As of -- as of July 8th, 2009 --
A Correct.
Q -- we do not yet know all the potential cause or causes of chondrolysis, correct?
A Correct.
Q All right. And so you agree with



Dr. Saltzman who stated in his 2009 abstract that the etiology of chondrolysis is, quote, not known for certain, period, close quote? You agree with that statement, correct?
A Yes.
Q All right. Then, sir, let's -- you also, in your expert report, Dr. Vidal, you referenced an article by Greis, G-r-e-i-s?
A Greis (pronouncing), yes.
Q Is it Greis?
A Yeah, Pat Greis.
Q Okay. Have you spoken with Pat Greis?
A Not about this.
Q Have you spoken with Pat Greis about his article and his research --
A No.
Q -- into chondrolysis?
A No.
Q All right. And if you could, sir, if you could pull out Dr. Greis's article and have that in front of you, please. And you just tell me when you're ready.
A I'm ready.
Q Okay. Thank you. And, Dr. Vidal, Dr. Greis's article, G-r-e-i-s, is published



in 2008 in the Journal of Bone and Joint Surgery; is that correct, sir?
A Yes.
Q And I refer you, Dr. Vidal, if you could turn to Page 1343 of the Greis article --
A Okay.
Q -- and you see, sir, in the first column, the first full paragraph where Dr. Greis is talking about -- he -- first of all, the Dr. Greis paper is about two case reports, correct?
A Yes.
Q Two different patients, correct?
A Correct.
Q And Dr. Greis states on Page 1343, quote, In evaluating the two patients in our report, we realized that the exact cause of the chondrolysis remains unknown, period, close quote. Have I read that correctly, Dr. Vidal?
A Yes, you have.
Q And do you agree with that statement made by Dr. Greis?
A Again, I think, going back to earlier testimony, I think that being 100 percent certain about anything is impossible. So I -- I interpret that the same way I interpreted Troy Alderfer's



shoulder early on, but -- so yes, I would -- the short answer is I would agree with that.
Q I wasn't asking for 100 percent certainty in my question, was I, sir?
A Exact causes would be 100 percent certainty, so I -- I think you were, and I would say that I -- I'd agree with that. They can't determine the exact cause with 100 percent certainty.
Q Do you recall, sir, that at the beginning of the deposition I asked -- I told you that when I asked you for your opinions, that I wanted you to express your opinions based on a reasonable degree of medical certainty or probability? Do you recall that, sir?
A Yes.
Q And that still holds true even though we've taken a break, I guess, twice now this afternoon. So, Dr. Vidal, when I'm asking you for your opinions, your analysis, your expert opinions, do you understand that I'm asking those to a reasonable degree of medical certainty and probability?
A As they refer to my opinions, yes.
Q Yes. And do you, Dr. Vidal, do you

agree with Dr. Greis that the exact cause of chondrolysis remains unknown? Do you agree with that statement?
A This is a -- this is like Yogi Berra. It's like -- I always -- you know, so to a reasonable degree of medical certainty, I can't be 100 percent certain of what the cause was. It's like I'm 100 percent certain 50 percent of the time. It's kind of a Yogi Berra kind of -- kind of comment. So my opinion, in terms of the medical exact cause, is that with a high probability of medical certainty, I cannot tell you 100 percent that that was the cause of chondrolysis. So that would be my answer.
Q We might just be, you know, I think maybe misunderstanding each other. I'm not asking you, Dr. Vidal, to offer an opinion as to the two patients that are part of Dr. Greis's --
A True.
Q -- case report. Okay?
A Right.
Q Do you understand that, sir?
A Yes, uh-huh.
Q What I'm asking, sir, is that as a general statement, as a generalized opinion, do



you agree with Dr. Greis who says the exact cause of chondrolysis remains unknown? Do you hold that as an opinion?
A Again, I guess I -- I'm not being clear. The -- to a reasonable degree of medical certainty, which is the standard that you just pointed out --
Q Yes, sir.
A -- I cannot say 100 percent that that was the exact cause of the chondrolysis. That's my answer.
Q I'm not asking you about a cause for these two patients.
A Right, so -- or -- or that -- or that Marcaine -- or that the exact cause of chondrolysis can be known in every case is -- would that be more accurate?
Q Let's do this --
A Yes, please.
Q -- I think this will be more simple --
A Okay.
Q -- because I believe we've established this already --
A Yeah.
Q -- as you sit here today, it is your



medical and expert opinion that we do not yet know the cause or causes of chondrolysis, correct?
A Correct.
Q All right. Let's go on, then, Dr. Vidal, to -- I wanted to ask you, sir -- let's take a hypothetical, Dr. Vidal. Assuming that arthroscopic surgery was performed on a shoulder in March of 2004 --
A Uh-huh.
Q -- March of 2004, what knowledge, what discussions, what research data, et cetera, was available, in the medical or scientific community, regarding the potential association of a continuous flow anesthetic into the shoulder potentially causing chondrolysis?
A Very little. Actually none, really. In that specific -- that specific example I'd say there was none.
Q As of March 2004?
A Yeah.
Q Correct. I'm -- I'm looking now, Dr. Vidal, at Page 3 of your expert report, which is your last page, and I'm under the section of "Opinions" and "Conclusions." And you've reached five of them. And earlier in the day today we



made a change to your Opinion No. 5, and we edited the world "possible" and changed it to the word "likely," correct?
A Correct.
Q Let's look at your Opinion No. 5, Dr. Vidal. Is it your opinion, Dr. Vidal, that a continuous flow of anesthetic into the shoulder joint does or will cause chondrolysis?
A It is my opinion that the continuous flow of intra-articular Marcaine or local anesthetic into a shoulder following surgery can cause -- will cause chondrolysis, yes.
Q Can cause or will cause?
A Can cause.
Q Can cause?
A Yes.
Q You do not, sir, hold an opinion that it does cause or will cause; is that correct?
A That it -- repeat those words at the end.
Q I sure will. And I want us to be very in tune with each other --
A Yeah, absolutely.
Q -- at this point, Dr. Vidal, because semantics are very important.

Page 150

correctly?
A Yes.
Q Now, I would like you to tell me, Dr. Vidal, what peer reviewed articles come to -- have the same opinion that you just enunciated.
A The clinical articles I assume you're referring to because --
Q Outside the context of litigation, focusing on peer reviewed medical or scientific articles, can you identify for me any of them that support your opinion that prolonged exposure to Marcaine is more likely than not a causative factor in the development of chondrolysis?
A I would say that on an individual basis, each of those articles taken individually, you will not find one that makes that conclusion. That conclusion is based, again, on not only mine but others' interpretation of the literature as a whole, the -- our clinical training, our experience, our -- our ability to interpret the results of these articles because I don't think any of these articles would make that assertion because, again, they're not designed -- any of them were not designed on an individual basis to

Page 151

make that determination.
The clinical -- the basic science studies are just showing that when you expose these chondrocytes to these substances, they die. And the clinical studies, essentially, in a nutshell, are, I'm an orthopedic surgeon. I'm seeing a ton of these things occur. And I'm describing how they're occurring. So they're not trying to explain why they occur. They're describing to the community that these are occurring.
So to reiterate, on an individual basis, I would say none of them would support that because they weren't designed to do that. But it is my opinion that others, when you take a look at it as a whole, that that's the case.
MS. SCHMID: Move to strike as nonresponsive.
Q (By Ms. Schmid) Dr. Vidal, can you identify for me any peer reviewed article, in the scientific or medical communities, published anywhere in the world, that agrees with your opinion that prolonged exposure to Marcaine is more likely than not a causative factor in the development of chondrolysis?

Page 152

MS. KALUR: Asked and answered.
Q (By Ms. Schmid) Can you identify one single such peer reviewed article?
A Again, I -- I -- I want to direct you back to my last answer, which is, in summary, on an individual basis, there is not -- and I've said this several times now -- there is not a single article that was designed to draw that conclusion, and therefore there is not a single article, in the world literature, that makes that conclusion, but it doesn't make the conclusion wrong.
MS. SCHMID: I'm going to, again, move to strike as nonresponsive.
Q (By Ms. Schmid) And we can just keep going with this. Let me ask the question again, Dr. Vidal.
MS. KALUR: Objection, asked and answered.
MS. SCHMID: I haven't asked my question.
MS. KALUR: Well, you said you're going to ask it again.
MS. SCHMID: You might want to --
MS. KALUR: It would be asked and answered --

Page 153

MS. SCHMID: -- have your witness answer my questions, then.
MS. KALUR: Go ahead.
Q (By Ms. Schmid) Dr. Vidal --
A Yes.
Q -- can you identify for me any article anywhere in the world in a peer reviewed journal which agrees with your conclusion that prolonged exposure to Marcaine is more likely than not a causative factor in the development of chondrolysis?
A I guess --
MS. KALUR: Objection, asked and answered.
A -- I'll -- I'll reiterate my response.
Q (By Ms. Schmid) Yes or no, can you identify any?
A There is no paper on an individual basis in the world literature that draws that conclusion.
Q (By Ms. Schmid) That's fine.
Dr. Vidal, can you identify for me any -- I believe you told me that there were, quote, others, close quote, who hold this opinion. Do you recall saying that, Dr. Vidal?

Page 154

A Yes.
Q Outside the litigation arena, outside the area of expert -- of litigation experts such as yourself, can you identify anyone else who holds the opinion that prolonged exposure to Marcaine is more likely than not a causative factor in the development of chondrolysis?
A Absolutely.
Q Who?
A There are -- several of my colleagues, all of my partners, several of the guys that I've trained with. And I'll tell you, I think it's evidenced by the fact that I would challenge you to find a surgeon who still puts intra-articular catheters into people's shoulders after arthroscopy.
Q Let me ask you this question, Dr. Vidal: Have you found, in any peer reviewed published literature, any scientist or medical professional who agrees with the opinion that you've stated?
A And you're saying specifically in the literature --
Q Yes.
A -- that draws that conclusion in print

Page 155

is what you're specifically asking?
Q Correct.
A Okay. I just need one second, please.
Q No problem. Take your time.
A I would say in print that specifically says that it is a cause of chondrolysis, I'm not sure that I've seen that in print. I'm not saying it doesn't exist. But does that answer your question?
Q As an expert, sir, in the area of general causation --
A Uh-huh.
Q -- in terms of shoulder chondrolysis, if such an article existed anywhere in the world literature in a peer reviewed journal, you would know about it, correct?
A In a peer reviewed journal?
Q Yes.
A Yes.
Q And as you sit here today, there is no such article that appears in a peer reviewed journal that agrees with your opinion as you've expressed on general causation, correct?
A In general, peer reviewed articles and peer reviewed journals do not publish opinions.

Page 156

Q That's not my question to you --
A Well, it doesn't exist.
Q -- Dr. Vidal.
A The question is does it exist in the peer reviewed literature? What I'm telling you is that doesn't -- opinions don't exist in the peer reviewed literature. So the -- the -- the -- the -- the opinion in the opposite direction doesn't exist either because people don't publish opinions in literature, not in the peer reviewed literature.
Q Are you finished?
A Yes.
Q Can you point me to any literature anywhere in the world where it arrives at the same opinion that you've just enunciated, which is, prolonged exposure to Marcaine is a more likely than not causative factor in the development of chondrolysis?
A I would say no.
Q None, correct?
A Correct.
Q You've never seen such an opinion in print anywhere in the world literature, correct?

Page 157

A Specifically, again --
Q Staying with my question.
A Staying with your question of causes of chondrolysis in print that says that word causes, and, again, the burden that we have as physicians is a little different than the standard that you have, but yes, I would say, in the medical literature, which is a different standard than a legal standard, that does not exist.
Q I didn't ask you about a legal standard or a medical standard, did I, Dr. Vidal? Did I?
A I was answering your question.
Q Let me say you haven't answered my question, so I'm going to ask it again.
A Sure.
Q And I want you to answer my specific question. Okay?
A Okay.
Q Can you identify any literature that exists anywhere in the world that agrees with your opinion that prolonged exposure to Marcaine is a likely causative factor -- is a more likely than not causative factor in the development of chondrolysis? That's a yes or no. Can you identify?

Page 158

A The reason I'm hesitating is because the more likely than not is a legal term. So we don't --
Q That's a term that you gave me, Dr. Vidal.
A I -- well, I gave it to you in the setting of a legal opinion, not in terms of a -- I didn't put it in my note. I didn't -- so I gave it to you in the setting of a legal opinion. So you're asking me does the medical literature give a legal opinion on the -- on the more likely than not causative factor of chondrolysis. I'd say no. The answer to your question is no.
Q That's not my question.
A Yes, it was.
Q Excuse me?
A I believe -- my interpretation of your question was that was your question, but if you want to ask it again, I'll try -- I'll do my best to answer it.
Q Dr. Vidal, do we need to get a judge on the line so that I can get a straight answer from you?
A We can try to ask it again, and I'll see --

Page 159

Q All right.
A I'll do my best.
Q Very good. Can you identify for me, Dr. Vidal, anywhere in the world literature wherein the research article, data, et cetera, agrees with your opinion that you've expressed today, as a litigation expert, that, quote, prolonged exposure to Marcaine more likely than not is a causative factor in the development of chondrolysis?
MS. KALUR: Object --
Q (By Ms. Schmid) That's a yes or no question.
A No.
Q I'm asking can you identify? And your answer is no; is that correct?
A Correct.
Q It took us a long time to get there.
A Well, I think it's a -- it's a black and -- it's a black and white question for a not black and white answer.
Q Can you identify for me, Dr. Vidal, any tests that you are aware of anywhere in the world that would agree with your opinion that prolonged exposure to Marcaine more likely than not is a

Page 160

causative factor in the development of chondrolysis?
A Is there a test that agrees with my opinion?
Q Yes.
A I would argue that all of the biologic -- all of the in vitro studies that we did agree with that opinion. They don't disagree with that opinion. So yes, I would say all of the basic science papers that we discussed agree with that opinion.
Q Okay. We're going to go through those.
A Okay.
Q When you talked about in vitro, I believe you talked to me about Connie Chu's articles, a couple of her articles, correct?
A Yes.
Q And can you point to me where in Connie Chu's articles -- you've got them in front of you --
A Uh-huh.
Q -- where do they state that prolonged exposure to Marcaine more likely than not is a causative factor in the development of chondrolysis? And take your time.

Page 161

A Actually I -- I don't need any time. The -- those articles, so the Connie Chu article, for instance, that demonstrated 99 percent chondrocyte death with exposure to Marcaine, I would say that that article is in agreement with my opinion, meaning I don't think it's divergent from my opinion.
If the question specifically is does that article state the statement that you just made, I would say no. That article does not state that. But I would not say that that article disagrees with my opinion.
Q Which specific Chu article are you talking about?
A Pick one, any of them.
Q No, I'm asking you.
A Okay. Fair enough. So we'll -- we'll take the Arthroscopy 2006 article, which is in here somewhere. So Arthroscopy 2006, again, going to the first one that we discussed with the greater than 99 percent chondrocyte and the apoptosis observed in all the bupivacaine exposed cultures, again, I would say that those findings agree with my opinion. They certainly don't disagree with my opinion.

Page 286

A I actually don't think that that's not appropriate if you present a peer reviewed article that justifies that conclusion.
Q Have you seen such an article?
A We've touched on this already.
Q And the answer is no?
A Correct.
Q Yeah. And I'm going to be jumping around here a little bit. You mentioned earlier, in response to some questions, that you have a CD or a disk in your office that contains literature that was provided to you by the plaintiffs' lawyers, but you did not bring that disk with you to today's deposition, correct?
A Correct.
Q Is there anything else other than the disk and potentially some billing records that you did not bring with you to today's deposition that we requested in our deposition notice and duces tecum?
A Not to my recollection.
Q Okay. And you're willing to produce the billing records on this other disk that's not here today, correct?
A I can produce the disk shortly, as soon

Page 287

as you guys want me to.
Q Okay. When you were being asked questions by Mr. Kirpalani -- oh, it was maybe not me, but I apologize, but by the other attorney, by other counsel regarding the last sentence on Page 3 of your expert report where you said that you "reserve the right to amend or supplement" --
A Correct.
Q -- and you gave an answer that -- along the lines that if additional information became available. Next question was, Well, what do you mean by that, and you said something about, Well, for example, if an article came out that, quote, conclusively shows causal relationship, close quote. Do you recall that question and answer, Dr. Vidal?
A I do.
Q And it is your testimony today, sir, that there is no literature that conclusively shows a causal relationship between continuous flow anesthetic and the development of chondrolysis, correct?
A Again, I have to stick by the answer that I've given several times, which is, there's

Page 288

no individual article that make that assertion.
Q Thank you. Differential diagnosis, you understand what that means, correct, sir?
A I've heard of it.
Q All right. And that's something that you employed, I take it, sir, when you prepared your general causation report in this case, correct?
A Correct.
Q And you understand, sir, that in the medical and scientific community in the -- in the process of a differential diagnosis methodology, you go through -- your first step is to identify a comprehensive list of all possible causes of this injury or ailment, correct?
A Correct.
Q All right. And would you agree with me, sir, that as we sit here today, that it's not possible for anyone to identify this comprehensive list of all possible causes because we don't yet know all the causes that may be associated with chondrolysis, correct?
A Incorrect.
Q Are you saying, Dr. Vidal, that it's your testimony that as you sit here today, the

Page 289

medical and scientific community has compiled a comprehensive list of all possible causes of chondrolysis?
A That's not what I said, no.
Q Okay. Would you agree with me, Dr. Vidal, that the medical and scientific community today does not yet know what all potential causes may be as it concerns chondrolysis?
A Correct.
Q And would you agree with me, sir, that if you don't yet know what all the potential causes are, that you cannot, as you sit here today, prepare this comprehensive list of all possible causes, correct?
A I disagree.
Q Well, let me --
A Can I clarify because it may make it -- it may save you a question or two. So we don't know what all the causes are. We know several causes. And for all we know, in 10 years that's it. That's the end of the list. We don't find any more causes. And we figure out exactly what -- what were the mechanisms that dictated chondrolysis from each of these individual things.

to cause chondrolysis in some patients?
MS. SCHMID: Objection.
MS. GOLDSMITH: Objection.
MR. KIRPALANI: Objection.
A Yes.
MS. SCHMID: Did you say yes to that question?
MS. GOLDSMITH: What was the question? Did you understand the question?
MS. KALUR: Strike that.
MS. SCHMID: Will you mark that question? I'm going to go back to that.
MS. KALUR: Of course.
MS. SCHMID: In fact, I'm seriously considering -- Court Reporter, could you just read that question back for me?
MS. KALUR: I'll just write it down.
(Page 323, Lines 1 and 2 read.)
MS. KALUR: I think I struck the question.
MS. SCHMID: Oh, I thought you were striking --
MS. GOLDSMITH: I thought you were striking her --
MS. KALUR: No, I struck the question,



so . . .
MS. SCHMID: Okay. Thank you.
MS. GOLDSMITH: Or withdrawn the question.
Q (By Ms. Kalur) I think Mr. Kirpalani was asking you about human cartilage and regeneration or regrowth.
A Uh-huh.
Q Is it possible for someone with chondrolysis to regrow cartilage?
A No.
Q If a small area on either the glenoid or the humeral head is injured, does it fill in with anything?
MS. SCHMID: Objection.
A If there's -- generally it's felt that it would not fill in, no, if it's a -- if there's a chondral -- especially if there's a full thickness cartilage injury at that level.
Q (By Ms. Kalur) So is there any controversy going on right now that you are aware of that someone with chondrolysis can regrow all their cartilage?
A No, absolutely not.
THE VIDEOGRAPHER: A good time to



change the tape?
MS. KALUR: Sure. Go ahead.
THE VIDEOGRAPHER: The time a 8:17. We're going off the record. This is the end of Tape 7.
(Recess from 8:17 p.m. to 8:24 p.m.)
THE VIDEOGRAPHER: The time is 8:24. We're back on the record. This is the beginning of Tape 8.
Q (By Ms. Kalur) All right. Dr. Vidal, is the process of combining basic science, case series, and studies and clinical experience to form conclusions typical and customary in your field of medicine?
A Yes.
Q Throughout today's deposition and the numerous questions and answers put to you, has your opinion, as stated in your expert report, changed in any way other than the wording of "likely"?
A I -- I think that the gist of it really hasn't.
Q Do you hold all those opinions you have expressed, in your expert report, to a reasonable degree of medical certainty?



A Yes.
MS. KALUR: Okay. Kim, go ahead.
MS. SCHMID: Okay.
EXAMINATION
BY MS. SCHMID:
Q Dr. Vidal, you were asked a question by Ms. Kalur where the preamble was, quote, one known cause, close quote, of chondrolysis is continuous flow of anesthetic, and you agreed with that question. Do you recall that, sir?
A Yes.
Q Can you identify for me, sir, any piece of literature in a peer reviewed journal where --
MS. KALUR: Objection, asked and answered repeatedly.
MS. SCHMID: May I finish?
MS. KALUR: Sure, and I'll just object again. Go ahead.
A Please.
Q (By Ms. Schmid) Can you identify for me, sir, any piece of literature, in a peer reviewed journal, where it states that a continuous flow of anesthetic is, quote, a known cause, close quote, of chondrolysis?
MS. KALUR: Objection, asked and

Page 326

answered.
A No.
Q (By Ms. Schmid) The answer is no, you cannot, correct?
A Correct.
Q Because there is no such article that says a continuous flow of anesthetic is, quote, a known cause, close quote, of chondrolysis, true?
A There is no article that uses those specific two words next to each other --
Q Correct.
A -- yes.
Q Dr. Vidal, you were also asked some questions about Scheffel -- Scheffel's and Matsen's 2009 poster presentation. You recall that, correct, sir?
A Yes.
Q About 66 patients?
A Yes.
Q I'm going to hand that back to you, sir.
MS. SCHMID: And, in fact, if we can get this marked as an exhibit, please, Court Reporter.
THE DEPONENT: Yes.

Page 327

MS. SCHMID: The back is fine. That's no problem.
(Exhibit 6 marked.)
MS. SCHMID: Thank you.
Q (By Ms. Schmid) I take it, sir, that the document that we've marked as Vidal Exhibit No. 6 is something that was supplied to you by plaintiffs' lawyers, correct?
A Correct.
Q And it was in a notebook today that you didn't even realize that this particular article was in there, correct?
A There's so many articles in here. I did not realize that was in there.
Q True, true. Would you agree with me, sir, that this February 2009 poster presentation by Scheffel and Matsen discusses the characteristics of chondrolysis? And in there it repeatedly talks about a, quote, association, close quote, and nowhere does it use the word, open quote, cause, close quote?
A The word cause does not appear in their abstract.
Q Correct. Sir, and the way that they, Scheffel and Matsen, discuss the role of pain

Page 328

pumps, if any --
A Uh-huh.
Q -- regarding chondrolysis is they talk about it in terms of a, quote, association, close quote, correct?
A They say -- they use the term "association" once and "associated" twice.
Q Correct. And, in fact, the full use of the word, as they say, quote, can be associated, close quote; is that correct?
A Yes.
Q And, sir, in terms of quote, associations, close quote, they go on to discuss radiofrequency and laser devices, correct?
A Correct.
Q They go on to discuss intra-articular injection of dyes, correct?
A Yes.
Q All right. Let me remind you to put that back in your notebook so you don't lose that --
MS. KALUR: Well, did you mark that?
MS. SCHMID: Oh, we did mark it, I apologize.
MS. KALUR: I'll get you another copy.

Page 329

THE DEPONENT: I'll leave it on top here.
MS. SCHMID: That's all the questions I have. Thank you.
MS. KALUR: All right. I have just -- did you have -- I have one -- one or two more.

EXAMINATION

BY MS. KALUR:
Q Dr. Vidal, is it customary and standard, in your field of medicine, to base a medical opinion of causation only on medical articles and case reports?
MS. SCHMID: I'm sorry, Mr. Court Reporter, could you read that back to me, please? I didn't --
THE DEPONENT: Actually, I need to read -- if you could read it back to me as well.
MS. SCHMID: Thank you.
(Last question read.)
MS. SCHMID: Objection.
MR. KIRPALANI: Objection.
A I wouldn't say that's --
MS. SCHMID: I don't understand, Laura, if that's a question as a medical professional or as a litigation expert.