# Appendix III, Tab 12

**Deposition of Martin T. Wells Ph.D., October 5, 2009**

IN THE UNITED STATES DISTRICT
DISTRICT OF OREGON

\- - -

DONNELL COX; ANITA MCGINNESS and GERALD MCGINNESS, husband and wife; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST,
Plaintiffs,

v.

DJO, LLC, a Delaware Corporation; DJO, INC., f/k/a DJ ORTHOPEDICS, INC., a Delaware Corporation; I-FLOW INC., a Delaware Corporation; MCKINLEY MEDICAL, L.L.C., a Colorado Corporation; MOOG, INC., a New York Corporation; CURLIN MEDICAL, INC., a Delaware Corporation; ASTRAZENECA PLC, a United Kingdom Corporation; ASTRAZENECA PHARMACEUTICALS LP, a Delaware Corporation; ASTRAZENECA LP, a Delaware Corporation; ZENECA HOLDINGS, INC., a Delaware Corporation; and PACIFIC MEDICAL, INC., a Pennsylvania corporation,
Defendants.

CIVIL ACTION

NO. CV 07-1310 AA

DEPOSITION OF MARTIN T. WELLS, Ph.D.
October 5, 2009

Page 2

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

\- - -

CALEB HUGGINS, :
Plaintiff, :
:
v. :
:
STRYKER CORPORATION, :
and STRYKER SALES :
CORPORATION, Michigan :
Corporations; :
MCKINLEY MEDICAL, :
L.L.C., a Colorado :
Corporation; MOOG,INC.,:
a New York Corporation;:
ASTRAZENECA PLC, a :
United Kingdom :
Corporation; :
ASTRAZENECA :
PHARMACEUTICALS LP, a :
Delaware Corporation; :
ASTRAZENECA LP, a :
Delaware Corporation; :
and ZENECA HOLDINGS, :
INC., a Delaware :
Corporation, :
Defendants. :

\- - -

October 5, 2009

\- - -

Oral deposition of MARTIN T. WELLS, Ph.D., held at the law offices of Weitz & Luxenberg, 700 Broadway, New York, New York 10003, beginning at 9:56 a.m., on the above date, before LINDA ROSSI RIOS, RPR, CCR and Notary Public.

\- - -

Page 3

APPEARANCES:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
BY: RUSSELL T. ABNEY, ESQUIRE
218 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
russ.abney@beasleyallen.com
Counsel for the Plaintiffs

SEDGWICK, DETERT, MORAN & ARNOLD, LLP
BY: WAYNE A. WOLFF, ESQUIRE
One Market Plaza Steuart
Tower 8th Floor
San Francisco, California 94105
(415) 781-7900
wayne.wolff@sdma.com
Counsel for Stryker Corporation
and Stryker Sales Corporation

HARRIS BEACH, PLLC
BY: FREDERICK H. FERN, ESQUIRE
100 Wall Street
23rd Floor
New York, New York 10005
(212) 313-5402
ffern@harrisbeach.com
Counsel for the Defendants,
Curlin Medical, Inc.;
McKinley Medical L.L.C. and
Moog, Inc.

Page 4

A P P E A R A N C E S (cont'd.):

VENABLE, LLP
BY: JOHN A. McCAULEY, ESQUIRE
750 East Pratt Street
Suite 900
Baltimore, Maryland 21202
(410) 244-7655
jmccauley@venable.com
Counsel for the Defendants,
Abbott Laboratories and Hospira, Inc.

MORRIS POLICH & PURDY, LLP
BY: TAMMARA N. TUKLOFF, ESQUIRE
501 West Broadway
Suite 500
San Diego, California 92101-3544
(619) 819-2440
ttukloff@mpplaw.com
Counsel for the Defendant, DJO, LLC
(Via telephone)

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER, LLP
BY: GEOFFREY M. COAN, ESQUIRE
260 Franklin Street
14th Floor
Boston, Massachusetts 02110
(617) 422-5300
geoffrey.coan@wilsonelser.com
Counsel for the Defendant, I-Flow Inc.
(Via telephone)

Page 5

A P P E A R A N C E S (cont'd.):

MITCHELL LANG & SMITH
BY: ROBERT L. SOKOL, ESQUIRE
2000 One Main Place
101 SW Main
Portland, Oregon 97204
(503) 221-1011
rsokol@mls-law.com
Counsel for Pacific Medical,
Inc.
(Via telephone)

BOWMAN and BROOKE LLP
BY: JENNY A. COVINGTON, ESQUIRE
150 S. Fifth Street
Suite 3000
Minneapolis, Minnesota 55402
(612) 672-3236
jenny.covington@msp.bowmanandbrooke.com
Counsel for Breg, Inc.
(Via telephone)

\- - -

A. Accuracy is a, I think, quite similar term. I think they're broad terms that a number of topics can fall under.

Q. Is it correct that precision is generally accepted to involve evaluating the role of chance in an association or potential association to determine that we can rule out random error and, therefore, we have a very precise association?

A. I think it's more than that because there could be random error, but there could be other variables intervening that you have to account for also. So it has to do with random error, but, you know, you like to have the sampling variability to be as small as possible. And so, you know, in that sense, that's where precision would come in.

Q. Does an analysis of biases and confounders fall under the accuracy terminology?



A. It could. It could. But bias could also fall under the precision, too, because you can have -- it depends on the type of bias. If the bias is systematic, then it may fall under the accuracy. But if it's sort of a bias that could cut both ways, one positive or negative, then that could fall under precision. So it depends on the context in my mind.

Q. Do other biostatisticians consider that these two areas are more clearly demarcated, precision and accuracy, to your knowledge?

MR. ABNEY: Object to the form.

THE WITNESS: I think it's semantics.

BY MR. WOLFF:

Q. Did you consider your task in this case to look at the data in the Hansen-Beck article and determine whether the association was due to chance or not?

A. Yes.



Q. And you performed a statistical analysis in that regard?

A. Yes.

Q. Did you perform any independent assessment of biases or confounders in the Hansen-Beck data?

A. No calculations. Just more of an inspection of what they said their protocols were and what he said about his protocols in his report.

Q. Did you consult with any epidemiologist concerning analysis of what type of things could be potential biases or confounders in the Hansen-Beck data?

A. No, I didn't.

Q. Did you consult with any orthopedic surgeons regarding surgical issues that could potentially be biases or confounders in the Hansen-Beck data?

A. I just relied on the paper in his report.

Q. And for Dr. Matsen's data, did you rely strictly upon Dr. Matsen's



testimony regarding analysis of potential biases and confounders?

A. Yes.

Q. You didn't consult with any orthopedic surgeons regarding those issues. Is that correct?

A. That's correct.

Q. Sir, is it correct that as a biostatistician you may be able to determine an association is real in the sense that you can rule out chance, and thus would have a very low p-value?

A. Yes.

Q. But it is also correct that even if you have a low p-value, the association that you find may not actually reflect a cause-and-effect relationship because of bias and confounding and those types of things?

A. Correct.

Q. So the fact that you have a strong association with a very low p-value does not necessarily equate with a cause-and-effect relationship having

been established. Correct?
A. As a general principle, that's correct.
Q. Is it correct in your work in this case as reflected in your expert report, that your primary role was performing a statistical analysis to determine the strength of the association and the role of chance, if any, it may play in association?
A. Yes.
Q. And that's what you understood that your task was as you were asked to do by the attorneys who retained you. Correct?
A. Correct.
Q. Exhibit 4, your expert report, does that contain all of your analysis and opinions that you formed as a result of your work in this case?
A. Yes.
Q. Prior to being retained as an expert witness for the plaintiffs in this litigation, had you performed any



review or analysis of any data concerning patients who received continuous infusion of local anesthetics via pain pumps?
A. No, I haven't.
Q. All of your work relating to the topics addressed in your expert report were performed after being retained as an expert by the plaintiffs in this litigation. Is that correct?
A. The substantive topics, that I've analyzed this type of data.
Q. But actually as far as the specific analysis as the Hansen-Beck patients, the Matsen discussed patients, and the opinions that you formed from reviewing that data and performing those analyses, that was all done in the context of your being a litigation expert for the plaintiffs. Correct?
A. Correct.
Q. How many hours would you estimate that you've spent working on these issues?
A. Roughly 20.



Q. You've produced an index card with some dates and some numbers. Is that correct?
A. Yes.
Q. I'm going to mark that as Exhibit 6.
\- - -
(Exhibit Wells-6, Index card, was marked for identification.)
\- - -
BY MR. WOLFF:
Q. And can you tell me generally what the information on that index card refers to?
A. The number of hours I worked on certain dates.
Q. And can you tell me what you did on those dates as indicated on that card?
A. I don't remember the details, but this is just -- the first dates were the preparation of the report, trying to do some background reading, and write my report. And then 10/3, this



Saturday, I actually reviewed, read things before coming down.
Q. Did you meet with attorneys for the plaintiffs prior to your deposition today?
A. Yesterday.
Q. How long did -- that was -- yesterday was what, October 4?
A. I didn't fill out my date.
Q. How many hours did you spend working on these issues yesterday?
A. Two, three. I'm not sure.
Q. Did that involve meeting time with Mr. Abney?
A. We had lunch and chatted over lunch.
Q. What did you discuss during your meeting with the plaintiffs' attorney yesterday?
A. Just the general logistics of the deposition, some issues about this case. And then other projects that Mr. Abney is working on.
Q. As far as this case goes,

can't remember the details. And there are a number of occasions, but I can't recall the details of the study. I remember suggesting a retrospective cohort study, but I can't remember the details.

Q. Well, if any of the articles -- strike that.

Have you participated in designing a retrospective cohort study that has went on to be peer reviewed and published?

A. I don't think I have.

Q. Have any of the studies that you've authored or coauthored involved performing a statistical analysis where data was extracted from another study identified as a case series such as the Hansen-Beck study?

A. No, I can't think of one.

Q. Have any of the studies that you've authored or coauthored involved data that was extracted solely from litigation testimony such as provided by



Dr. Matsen?

A. No, I have not.

Q. Are you aware of any publication in a peer-reviewed journal analyzing data where the data was extracted solely from litigation testimony of a paid expert?

A. I can't recall.

Q. Are you aware of any published peer-reviewed article analyzing the data where the data was extracted solely from another study identified as a case series?

A. I can't think of one.

Q. Do you have an opinion whether a statistical analysis of two cohorts where the data was obtained strictly from litigation testimony of a retained expert would pass peer review?

A. It depends on the data, it depends on a lot of things. It's hard to -- it's hard to think about in the abstract without actually knowing what was going on and what the data was about,



how it was generated. I just can't say.

Q. Has it ever occurred in any of the journals for which you're an editor --

A. No.

Q. -- to your knowledge?

A. No.

Q. Sir, your expert report identified as Exhibit 4 is unpublished. Correct?

A. Yes.

Q. Has it been subject to peer review?

A. No, it hasn't.

Q. And it's fair to describe the analysis and opinions set forth in Exhibit 4 are those of you in the capacity as an expert witness in this litigation. Correct?

A. Correct.

Q. Did you see in Dr. Greenland's testimony where he commented upon whether he thought his expert report was in a form that would be sufficient to



pass peer review and be published?

A. I don't remember.

Q. Do you have an opinion whether your expert report is in a form currently where it would be sufficient to pass peer review and be published in any of the journals in which you're an editor?

A. I think it would have to be written in a more concise manner, more analysis of various issues would have to be put in. It's fairly written -- as it is, it's written fairly general.

Q. So in its current state it would not be publishable in any peer-reviewed journal that you're aware of. Correct?

A. It's not written for a peer-reviewed journal. So it would have to be written for that purpose. It's written for this purpose, not a publication purpose.

Q. You haven't presented any of your findings or opinions in any

scientific meeting, have you?
A. No, I haven't.
Q. Would you agree with me that to become -- let me strike that.
Would you agree that the fact that you drafted this expert report as a retained expert for one side in the litigation would be a consideration that publishers in peer review publications would consider in determining whether or not an article is worthy of publication?
A. I think it should be noted, but it depends how the data was generated, what biases there are or aren't. It's too abstract a question to deal with precisely. So it doesn't -- it wouldn't preclude publication, but the paper would have to be written accordingly and submitted and go through the refereeing process.
Q. Sir, you indicated that you performed a literature review of articles relating to this issue of pain pump use and development of chondrolysis. Is that



correct?
A. Yeah, I did some literature search. Yes.
Q. Did you consider your literature search to be comprehensive on that subject?
A. No, I didn't. No.
Q. Are you aware of any peer-reviewed publication that has concluded that a cause-and-effect relationship has been developed -- excuse me, been established -- let me start over again.
Are you aware of any peer-reviewed publication where it is concluded that a cause-and-effect relationship between the use of pain pumps delivering local anesthetics continuously and the development of chondrolysis has been established?
A. No, I haven't seen any.
Q. Is it correct that the only opinions that you have seen relating to this issue of a cause-and-effect



relationship having been established between the use of pain pumps delivering local anesthetics continuously and the development of chondrolysis is, in fact, your own expert report?
A. I believe Professor Greenland also comes to that conclusion.
Q. Did Dr. Greenland state anywhere in his report that a cause-and-effect relationship has, in fact, been established between the use of pain pumps and the development of the chondrolysis?
A. I believe he says there's strong evidence for a causal relationship.
Q. Did you read Dr. Greenland's deposition where he qualified his conclusion in that regard?
A. I can't remember the details.
Q. Other than Dr. Greenland's expert report in this litigation, are you aware of any other writing where it is --



a conclusion is made that a cause-and-effect relationship exists between the use of pain pumps and development of chondrolysis?
A. I'm not aware of any.
Q. Would you agree that there are no randomized clinical trials relating to -- strike that.
Would you agree that there are no randomized clinical trials that establish the -- a causal relationship between pain pump use and chondrolysis?
A. I don't think it would be ethical to do a randomized clinical trial.
Q. That wasn't my question. Are you aware of any in publication?
A. No, I'm not.
Q. Are you aware of any retrospective cohort studies that have been published in a peer-reviewed journal wherein they are identifying themselves as a retrospective cohort study that addresses the relationship between pain

but they didn't design -- they weren't designing with those issues. Not that it says in the paper.

Q. Would it be a better design of a retrospective cohort study to include control of those potential confounders in the study design?

A. It would be helpful, yes.

Q. And that wasn't done here. Correct?

A. It wasn't done.

Q. The same way with background health issues or other factors that may affect a patient's outcome, prior disease status, surgical technique issues, those type of things were not controlled for by the authors in performing this review. Correct?

A. They were just reporting the cases.

Q. So it's correct?

A. Yes, that's correct.

Q. Would you agree that there's a potential for an unrecognized factor to



be present in the Hansen-Beck study which could either magnify or reduce the association found?

A. That's not my expertise.

Q. What do you mean?

A. It's a medical issue.

Q. But there's always a potential for an unrecognized factor to be playing a role in the association you found either magnifying or reducing. Correct?

A. Just speculation. I don't know.

Q. You're not offering any opinion one way or the other regarding any of the surgical or medical issues that potentially could play a role in the development of chondrolysis in these patients. Correct?

A. No, I'm not offering any medical opinion.

Q. Now, from the Hansen-Beck analysis that you did, is it correct that you're not able from just one analysis --



excuse me, analysis of a single dataset, to offer any opinion regarding the generalizability of these results to another population?

A. I think you have to look at it in concert with other types of analyses, what the science says, you know, what are the precise measures that are used in this study. You can't generalize it to an area that wasn't discussed, you know, certain other types of medicines and things that you can use as an example as evidence to say in this case, what would happen in other settings which would be quite similar.

Q. Well, let's break that down, Doctor. I don't think you answered my question.

First of all, with the Hansen-Beck study, we already determined it looked at particular doses and durations of medications in the pain pump delivered intraarticularly. Correct?

A. Correct.



Q. You certainly can't generalize the results of the Hansen-Beck article to populations that didn't use pain pumps in that same manner. Correct?

A. Correct.

Q. Even though looking at patients who may have used pain pumps in the same manner as described in the Hansen-Beck article, because this is analysis on one single group of patients, 30 shoulders, is it correct that you cannot generalize even those results to another population just based on the single set of data?

A. No. I think it can suggest some of the associations, and the other physicians doing -- using these procedures should be aware that it could happen.

Q. I'm not quibbling with you that it could suggest an association. My point is just that, that it might form a basis to hypothesize that this same outcome could occur in other patients

under the exact same ways, exact same use situations as described in Hansen-Beck, but it certainly doesn't establish that you're able to generalize to a broader population just from this one patient series. Correct?

MR. ABNEY: Object to the form.

THE WITNESS: Not to a broad population, but of individuals that are of this profile and are using pain pumps of this type at this dose.

BY MR. WOLFF:

Q. It suggests that there could be an issue. Correct?

A. Correct.

Q. It doesn't establish a cause-and-effect relationship between pain pump users in the Hansen-Beck article and similar users in another setting with a different surgeon, different facilities and other different factors going on. Correct?



MR. ABNEY: Object to the form.

THE WITNESS: I think that there's certain principles you have to assess when you're looking at causation. And this is very strong evidence for usage of this type that there is something -- that there's a problem with the use of the pain pump like this, and there's strong evidence that it's causing chondrolysis in this setting.

BY MR. WOLFF:

Q. Doctor, I move to strike that. That wasn't my question.

I'm really getting at, I understand your opinion that you looked at different data together and come to a conclusion. I'm isolating on the Hansen-Beck study and the analysis you did on that data by itself. Okay?

A. Okay.

Q. That study and the analysis



you did does not establish a cause-and-effect relationship by itself between the use of the pain pump in the exact manner it was used in the study and the development of chondrolysis. Correct?

A. It's very important --

Q. Is that correct? First you have to answer my question. Is that correct?

MR. ABNEY: No, no. Let him answer the question. Don't cut him off.

THE WITNESS: It's an important piece of evidence.

BY MR. WOLFF:

Q. By itself it doesn't establish a cause-and-effect relationship. Right?

A. Whenever you're establishing cause, there's many principles involved. So one thing doesn't make it, but you look at it in concert with a number of other --



Q. That's all I'm trying to take it is one step at a time. The analysis you did set forth in your expert opinion paper on the Hansen-Beck data by itself does not establish a cause-and-effect relationship between the use of intraarticular pain pumps in the exact manner as reported in the article and the development of chondrolysis. Correct?

A. That's not well defined, because you can look at any one piece of evidence and you'll never establish anything. You have to take it in concert with a number of other pieces of evidence. So it's a logically inconsistent question because you can't ever use one thing to establish causation. You'd have to use a variety of pieces of evidence. So the notion is, you know -- it's not a reasonable question to that level.

Q. Move to strike that as well, Doctor.

But since your -- from what you just told me, you can't use one single piece of data to establish a cause-and-effect relationship, means by definition you can't use your analysis of the Hansen-Beck data to establish cause-and-effect relationship between intraarticular use of pain pumps in the exact manner described in Hansen-Beck and the development of chondrolysis. Correct?

MR. ABNEY: Object to the form.

THE WITNESS: I think it's a very important piece of evidence that goes into the whole suite of facts to produce strong evidence for a causation.

BY MR. WOLFF:

Q. I'm not quarreling with you, that's your opinion. I just want to get -- I think I have it, I just want to make sure the record is clear, that your analysis of the Hansen-Beck data by



itself does not establish a cause-and-effect relationship as we discussed. Correct?

A. It's an important piece of the set of evidence that you have.

MR. McCAULEY: Object. Move to strike. Nonresponsive.

MR. ABNEY: I don't think you can make that objection.

MR. WOLFF: I'll make it then.

BY MR. WOLFF:

Q. Doctor, I think you've told me this, I just want to make sure the record is clear. Because you said no single data -- that piece of data can do it, and I'm just asking you to confirm that your analysis of the Hansen-Beck article is a single piece of data that cannot be used by itself to establish a cause-and-effect relationship. You would agree with that. Correct?

A. Yes. It's a single piece that will be used, that can be used,



correct.

Q. Can be used in concert with other data?

A. With other things.

Q. But by itself does not, correct?

A. It's an important single piece that when used with others will help us to understand the relationship.

MR. WOLFF: Move to strike as nonresponsive.

MR. ABNEY: It is responsive. He's answering your question.

MR. WOLFF: I need a simple answer to the question.

MR. ABNEY: He's given you an answer many times. It's just not the answer you want, but he's given you an answer.

BY MR. WOLFF:

Q. Doctor, I understand -- let me just back up a second.

I understand your opinion



completely. This is an important -- your analysis of the Hansen-Beck is an important piece of data that fits into a larger amount of evidence that you're using to form an opinion. Is that correct?

A. Yes.

Q. Just for the record, to make sure we're all clear, though, your analysis of the Hansen-Beck data does not by itself establish a cause-and-effect relationship between the use of intraarticular pain pumps in the manner exactly described in Hansen-Beck and the development of chondrolysis. Correct?

MR. ABNEY: Objection. Asked and answered five times.

BY MR. WOLFF:

Q. Is that correct by itself?

A. I have to give the same answer. It's an important piece.

MR. ABNEY: Begin with yes or no and then explain if you want to. That's what he's been doing.

not due to chance. Correct?
A. And the -- that's correct. And also the lower confidence limit is so high.
Q. That by itself does not account for potential biases and confounding in the results, though. Correct?
A. Correct.
Q. You then go on to state that "The magnitude of odds ratio and risk difference results are far too large to be plausibly explained by any other factor that has been shown linked to chondrolysis." And you point to -- you refer to your paragraphs 7 to 9. Correct?
A. Correct.
Q. And what you're referring to there is the other authors, Hansen and Beck, and the testimony of Matsen concerning efforts that they did to address confounding and bias. Correct?
A. Correct.



Q. You're not making any independent opinion in this litigation regarding the role that bias and confounding may have on these results. Correct?
A. Correct. I'm using their expertise.
Q. Would you agree that the same potential for confounding and bias applies to both the Hansen-Beck review as well as the Matsen review?
A. I believe there's a possibility, but it's to be investigated to see if it's a reality.
Q. And it hasn't been investigated as we're sitting here today. Correct?
A. Correct.
Q. Did you read where Dr. Greenland stated that it's not appropriate to replicate a study by using another study that has the same confounding and biases present?
A. I don't remember.



Q. Would you agree with that concept?
A. It seems like a reasonable concept.
Q. Doctor, you also discuss in your report an analysis of the first four criteria of Bradford-Hill. Is that right?
A. Yes.
Q. What is the Bradford-Hill criteria of causation just generally?
A. It's a set of principles or guidelines that one could look at when trying to assess causality.
Q. And you've identified those in paragraph 14 of your report?
A. Those are the traditional ones, yes.
Q. And you indicate that based on your background as a biostatistician, you're able to comment on the first four of those criteria. Correct?
A. I can use what I know, but then the other criterion, you have to use



the expertise of biologists or doctors or whatever other experts there are.
Q. Okay. Is it correct what you're saying here is that you have, in your opinion, found a strong association between the use of pain pumps as described in the Hansen-Beck article and the development of chondrolysis. Correct?
A. Correct.
Q. But to determine whether there's actually a real cause-and-effect relationship, you need to address other things?
A. Correct.
Q. And you're addressing the first four criteria of this set of nine criteria that Bradford and Hill have come up with. Correct?
MR. ABNEY: Object to the form.
THE WITNESS: Yes. Bradford-Hill is one person.
BY MR. WOLFF:

A. And seeing that these other analyses give associations of a similar magnitude, saying that similar results are being found. But we'd like to know more -- I'd like to know more about the Matsen before I could really make a firm conclusion.

Q. Considering that we don't know much about the Matsen data at this point, if there were other patient studies that were put forward to you that conflicted with those results, you wouldn't be able to use the Matsen data as supporting the information in the way that you just described. Correct?

A. I would have to know more about the conflicting data. It's just hard to say in the abstract.

Q. You need to know more about the Matsen data itself and the conflicting data. Correct?

A. Correct.

\- - -

(A recess was taken from



1:09 p.m. to 1:16 p.m.)

\- - -

BY MR. WOLFF:

Q. Doctor, I'm going to try to finish up quickly and take a lunch break, and then we'll give the other attorneys here a chance to ask questions.

I want to go to your point of your report where you talk about considerations of other possible explanations, and you reference a report by a defense expert, Judith Jones. Is that correct?

A. Yes.

Q. Did you have some criticism in the report of Dr. Jones and/or her opinion?

A. It was no particular criticism. It was just broad with no firm conclusion. It seemed factual. But it didn't address any solution or didn't look at any data. It was just a general exposition about what are possible confounders.



Q. When you say "broad," you mean her report was broad in the sense that it addressed those issues?

A. It mentioned a lot of issues, yes.

Q. But there was no statistical analysis of any data, is that what you're saying?

A. Yes. And it wasn't specific and didn't talk about mechanisms. It was just generalities.

Q. We talked earlier about the fact that the only patient data that's reported in the Hansen-Beck article relates to the actual cases of patients who received intraarticular pain pumps and developed chondrolysis. Correct?

A. Correct.

Q. And do you disagree that it's not a proper study design for a retrospective cohort study to only look at the factors associated with the cases and not the other patients in the other cohort?



MR. ABNEY: Object to the form.

THE WITNESS: I think it would be better to have that incorporated in the design, but we don't have that -- I don't have that information.

BY MR. WOLFF:

Q. And not having that incorporated in the design could well have an effect on your analysis in this case. Correct?

A. It seems it's more of a sort of issue of magnitudes, how -- are those design issues going to cut the odds ratio by two, three, four, ten? What's the level of the effect? It's hard to know. It's hard to know.

Q. Sitting here today, you don't know. Is that correct?

A. I do not know.

Q. I don't know if you saw it in Dr. Greenland's deposition, I asked him to consider a hypothetical whereby

could write a fairly strong paper if you had a better set of data to analyze. I don't have any plans on writing a paper.
Q. Well, did you ever ask Mr. Williams if you could have access to the Hansen and Beck data?
A. No, I didn't.
Q. Are you aware that Dr. Beck is now producing his data that was the basis for this opinion?
A. That would be great.
Q. Well, were you aware of that, sir?
A. No, I wasn't.
Q. And were you aware that Dr. Matsen has been court ordered to produce the data that was the underlying basis for his testimony in the Grossnickle case?
A. No, I didn't know that.
Q. Did Mr. Williams offer that information to you?
A. No, he didn't.
Q. Sir, when was it -- I know



your report is dated, I believe, August 24 of 2009. When was it, sir, that you first reached your opinion that intraarticular use of pain pumps causes chondrolysis?
A. I think that's a Sunday. I think I wrote most of my report on the 29th. I worked on it those three days fairly intense, intensely.
Q. Really. So how is it that your report is dated August 24 if you reached your opinions after the report is dated?
A. Maybe it's misdated. I thought these were the right dates.
Q. Well, Doctor, let me hand you a copy of your report which I believe you have in front of you. If you turn to page 8, that's your signature on the left-hand side, sir?
A. Yes.
Q. Under your signature it says, "Martin T. Wells" and it says, "August 24, 2009"?



A. Right.
Q. And now we have marked as Exhibit 6 which is a photocopy of that index card in which you're tracking your time in order to be compensated for your testimony and reaching your opinion, you have August 28, six hours and August 29, seven hours?
A. Okay.
Q. And you just told me that it was during that time you wrote the report and reached your opinion?
A. One of the dates are off. I'm not sure if it's this date or -- I don't remember. I know I submitted it on a Sunday.
Q. August 29 is a Sunday. But your report is dated five days before you told me you just finished writing the report.
A. Then it has the wrong date on it.
Q. You signed it with the wrong date?



A. I must have, yes.
Q. So that's when you wrote your report and reached your opinion. When was it, sir, that you reached a -- first created a hypothesis or a belief that the use of intraarticular pain pumps causes chondrolysis?
A. I think it's just as I was developing my report.
Q. So it was on August 28 to 29, during that time period?
A. That time period. This could be a typo. I mean, that's also quite possible, because I'm my own secretary.
Q. So having never heard of chondrolysis before, never having read the Hansen and Beck article before, knowing nothing about orthopedic surgery, on 8/27 you spent four hours doing some research on PubMed, and then you reached a hypothesis and you reached a conclusion and drafted this eight-page report with your opinion on or about August 28 to

Q. And confidence intervals, may be slightly more complicated, they seem that way to me, but an undergraduate student with a calculator can do those?

A. They have to know what they mean.

Q. They have to know what they mean, but presumably in an undergraduate course, that's what they learn. Right?

A. Uh-huh.

Q. Yes? You have to say yes.

A. Yes.

Q. I'm trying to understand whether you bring anything to the analysis that goes beyond what, say, an undergraduate can do. What you did is you didn't design the study. Right?

A. Correct.

Q. You didn't look at the underlying data after the study was done?

A. Correct.

Q. You didn't bring any expertise to bear on that except to say that in your expertise, you realized that



there were things that would be much more -- that would be helpful to know as a scientist. Right?

A. Correct.

MR. ABNEY: Objection. Asked and answered.

BY MR. McCAULEY:

Q. So what did you do to the data that couldn't really be done by one of your undergraduates?

A. I have computer packages that computes all these things. If you know how to compute them, and it's interpreting them, interpreting the results.

Q. What do you mean "interpreting"?

A. Trying to understand what the magnitude of the odds ratios are. Dealing with the zero cell. Having -- you know, understanding what you would have to do in order to get around this infinity -- infinite odds ratios. And then knowing that this is -- this has a



cohort, retrospective cohort structure. Once you have that, it's simple calculations. But most statistical procedures are just that, there are some calculations. There's actually knowing what to do when, and interpreting them is the key. It's all four functions. Addition, subtraction, division, multiplication.

Q. If it's so simple to do this from the Beck data, and you're drawing this causal inference, and you think that's a legitimate scientific inference to draw, what explanation do you have for the fact that nobody in the world, in the world, in the peer-reviewed literature has made this causal connection?

A. Did they have the data? That's the question. If they had the data and they were working with an epidemiologist or biostatistician, most likely they could have. But did somebody that knew how to analyze the data have the data. And if they did, it's very



likely they would have found the connection.

Q. But you don't know that because you haven't seen the data, because if you saw the data, you might find some significant flaws in it that you hadn't seen before. Right?

A. We don't know that.

Q. Right?

A. It's all a hypothetical.

Q. I mean, it wouldn't be that hard for Beck to get together with someone like you or one of your students to do this analysis and eureka, he's published in a journal that says, hey, it's a causal connection?

A. If he's interested. I mean, I'm very busy, but, you know, it's a possibility if he -- but I think the issue is we have to really look at the data and see if it's available and, you know, does he have it. I don't know. I think it's oftentimes as easy to say just get the data. It's not always that easy.