# Appendix III, Tab 13

**Deposition of Suzanne Parisian, M.D., May 15, 2009**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-10052-CIV-MOORE/SIMONTON

DOUGLAS C. KILPATRICK, )
)
Plaintiff, )
)
vs. )
)
BREG, INC., a California )
corporation for profit, )
)
Defendant. )
)

VIDEOTAPED DEPOSITION OF SUZANNE PARISIAN, M.D.

May 15, 2009
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

THE WITNESS: From based on my training and review of medical devices, I would say that I would be concerned that this would be one particular thing that I would be worried about -- no, now let me finish. That it can cause an increased risk of chondrolysis due to trauma of one particular size catheter being introduced into the joint. No one's done the study. Breg hasn't done the study to scientifically -- to address that. But if I had been a reviewer, a medical reviewer looking at the 510(k), I would have asked for additional information about that size of a catheter being placed into an intraarticular space.
Q. BY MR. SHAPIRO: Dr. Parisian, let me go back to my question because you didn't answer it. You answered a different question.
Within a reasonable degree of medical or scientific probability, as you sit here today, can you tell me of any connection between the use of a 16 gauge catheter with a Breg 3000 infusion pump in an intraarticular space and causing chondrolysis?
MS. FULMER: Object to form.
THE WITNESS: I would -- yes, I can tell you. Do you want me to answer?
Q. BY MR. SHAPIRO: Yes. Do you have an opinion within a reasonable degree of medical or scientific



probability?
MS. FULMER: Object to form.
THE WITNESS: Sure. Yes, I do. And that's why I brought in the paragraphs and I discussed that. The whole next section F is talking about the catheter because of the trauma that can be produced for that catheter as opposed to -- when you put it into an intraarticular space. And if you're talking about cartilage damage, that that trauma of one catheter size fits all could actually be an increased risk for cartilage damage.
Q. BY MR. SHAPIRO: Are you an orthopedist?
A. No, sir.
MS. FULMER: Object to form.
MR. SHAPIRO: Excuse me? I asked if she's an orthopedist.
MS. FULMER: Your question is argumentative.
Q. BY MR. SHAPIRO: Are you an anesthesiologist?
A. No, sir.
Q. Are you a surgeon?
A. No, sir.
Q. Are you trained in any of those fields?
A. I'm trained to look at medical device applications and to consider risks. I was trained enough for the FDA as a pathologist who knows the anatomy to



know that that would be an issue that would be a concern.
Q. Are you trained either as an anesthesiologist, an orthopedist, or a surgeon?
A. I am not. I've said that I've been trained for the FDA to look at medical device issues, and this would have been one of the things -- and I'm not saying that it does precipitate increased chondrolysis risk. I'm saying that as a manufacturer, you can't say one size catheter is going to fit all. And so it would be something that if I was the FDA reviewer, I would have asked for more information as to how did you document that a 16 gauge catheter is not going to hurt and traumatize the intraarticular space.
Q. With all due respect, Dr. Parisian, I think you've just changed your answer. My question to you is not what you would have done as an FDA reviewer. My question to you was, within a reasonable degree of medical or scientific probability if there was an increased risk of using a 16 gauge catheter in an intraarticular fashion with an infusion pump. Is your answer yes or no?
MS. FULMER: Object to form.
THE WITNESS: And my answer is yes, as the FDA, having to think of potential risk issues, yes. I would be concerned and the FDA would have been concerned



and asked for additional information.
Q. BY MR. SHAPIRO: Did the FDA ask for any additional information about Breg's 510(k) application for the 3000 infusion pump with respect to a 16 gauge catheter?
MS. FULMER: Object to form.
THE WITNESS: No, because it was cleared as general surgery. It wasn't cleared for intraarticular use. So if you're not telling the FDA that they're intending to market it for that, they can't ask questions about intraarticular use.
Q. BY MR. SHAPIRO: Do you have any medical article whatsoever that supports your opinion that the use of a 16 gauge catheter contributes in any way to the more likely -- the greater likelihood of chondrolysis being caused other than the opinion of Dr. Parisian?
A. That it would be a concern as a medical opinion as a pathologist, no, because Breg never did the study.
Q. That wasn't my question, Dr. Parisian. I said, do you have any medical literature which supports your opinion that the use of a 16 gauge catheter within a reasonable degree of medical or scientific probability is more likely than not to cause an increased risk of chondrolysis?
A. No, because Breg didn't do the analysis.

Page 322

introduce it at the time of trial? Yes or no?
MS. FULMER: Object to form.
THE WITNESS: I don't know if it's necessary to be discussed at trial.
Q. BY MR. SHAPIRO: I'm entitled to know what you intend to discuss at the time of trial, Doctor. Do you intend to discuss the contents of paragraph 57 at the time of trial?
MS. FULMER: Object to form.
THE WITNESS: I don't know. Because it would only be used if there was an example asked as to when I know that a manufacturer was having to be consistent with their labeling.
Q. BY MR. SHAPIRO: Do you intend to use the phrase hemodialyzer manufacturers looked the other way?
MS. FULMER: Object to form.
THE WITNESS: Well, they did.
Q. BY MR. SHAPIRO: That wasn't my question, Dr. Parisian. My question was, do you intend to use that phrase or thinking at the time of trial?
A. I don't know.
Q. Go to paragraph 58. Do you intend to use the example of Johnson & Johnson at the time of trial?
A. I could in terms of it's example -- and I brought the document, the Class I recall, so you have

Page 323

that document to ask me about. But it's again off-labeled use, unapproved use. The manufacturer had to pull the product in and the change the labeling and the information provided to physicians even though it was a Class II device that was cleared.
Q. Did you use infusion pumps as part of your clinical practice in the early 1980s, Dr. Parisian?
A. Infusion pumps, yes.
Q. Have you ever performed shoulder surgery?
A. No, no.
Q. Have you ever performed arthroscopic surgery?
A. No, sir.
Q. Have you ever trained with respect to any surgery?
A. I'm not a surgeon. I've been involved in surgery, and I've dealt with the devices, but not --
Q. That wasn't my question. Have you ever trained in any surgery?
MS. FULMER: Object to form.
THE WITNESS: No, sir. I think -- you mean am I a surgeon and have training in surgery? No, sir.
Q. BY MR. SHAPIRO: Do you intend to discuss Belmont or Helsinki?
A. Only in the context of the IDEs, if that actually is asked me in court. I don't know. It's in my

Page 324

report, but I don't know if that's going to be an issue.
Q. You speak in paragraph 78 about limited FDA agency resources.
A. Yes, sir.
Q. And that's based upon -- is that based upon any personal knowledge?
A. 78?
Q. Yes, ma'am.
A. That would be personal knowledge from '95 and also having been involved with FDA issues, watching the different reports put out by the different government agencies, looking at the FDA, realizing that the FDA's having to get funding because of their FDA inspections and difficulties with inspections, particularly in foods. So this is taken from the available information at the FDA.
Q. Do you intend to express any opinions at the time of trial that the -- that anything involved with the 510(k) application for the Breg 2000 is related to underfunding of FDA personnel or resources?
A. No, sir. I don't believe so. I believe that means not to talk about the limitations of the FDA. Is that what you're going --
Q. No, I was limiting myself to funding.
A. Okay, funding. Okay. No, I wasn't planning to

Page 325

talk about funding.
Q. Looking at paragraph 80 of your report and particularly the last four lines: QSR requires Breg to monitor the medical and scientific literature and all the complaints associated with its products' adverse events or reports associated with a similar class of products.
A. Correct. And that's in the context we spoke about before.
Q. Yes. Any knowledge that prior to October 2004, Breg received any reports of adverse events with respect to the similar products of other manufacturers?
A. For similar products, no, sir.
Q. Okay. And do they receive any such -- did they ever receive any such information? And if so, when?
A. I believe they were in discussion of -- it would have been after 2004, but it would have been in discussion of what other manufacturers are doing in terms of --
Q. Would it be fair to say that as far as you know, the first time that Breg was made aware of chondrolysis associated with the use of infusion pumps in an intraarticular application was in March 2006?
MS. FULMER: Object to form.
THE WITNESS: No. Not -- by that email that we had this morning when it was from December 2005 and