# Appendix III, Tab 14

**Deposition of Suzanne Parisian, M.D., July 22, 2009**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DONNELL COX; ANITA McGINNESS and GERALD McGINNESS, husband and wife; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST, Plaintiffs, v. DJO, LLC, et al., Defendants. | ) Case No. CV 07-1310 AA |
| ELIZABETH D. CRONIN, v. I-FLOW CORPORATION, a Delaware Corporation, Defendant. | ) Case No. 6:09-cv-146-AA |
| TAMARA L. FOLKMAN, Plaintiff, v. DJO, LLC, et al., Defendants. | ) Case No. 6:09-cv-342-AA |
| DANNY E. ARVIDSON and ANNE E. ARVIDSON as husband and wife; and MARCY J. LANDOLFO, Plaintiffs, v. DJO, LLC, et al., Defendants. | ) Case No. 08-CV-478-AA |

DEPOSITION OF SUZANNE PARISIAN, M.D. - VOLUME 1

Portland, Oregon - Wednesday, July 22, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-CV-01297 MSK-MEH
TROY L. ALDERFER, )
Plaintiff, )
v. )
BREG, INC., et al. )
Defendants. )
_____________________________)

Civil Action No. 1:08-cv-00365-MSK-CBS
STACEY ANN HANSEN, )
Plaintiff, )
v. )
DJO, INCORPORATED, et al. )
Defendants. )
_____________________________)

Civil Action No. 1:08-cv-00962-MSK-CBS
SAMANTHA ARCHULETA and ROSEMARIE )
CARROLL, as parent and next friend, )
Plaintiffs, )
v. )
DJO, INCORPORATED, et al., )
Defendants. )
_____________________________)

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

CHRISTINA McCLELLAN, )
Plaintiff, ) Case No.
v. ) 07-CV-1309-AA
I-FLOW CORPORATION, a Delaware )
corporation; DJO, L.L.C., a Delaware )
corporation; DJO INCORPORATED, a )
Delaware corporation, and PACIFIC )
MEDICAL, INC., a California )
corporation, )
Defendants. )
_____________________________)



UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

GORDON ADDIS, )
Plaintiff, ) Case No.
v. ) 07-CV-1318-AA
McKINLEY MEDICAL, L.L.C., a Colorado )
corporation; MOOG, INC., a New York )
corporation; DJO INCORPORATED, a )
Delaware corporation; DJO, L.L.C., a )
Delaware corporation; PACIFIC MEDICAL,)
INC., a California corporation; )
CURLIN MEDICAL, L.L.C., a California )
corporation; and CURLIN MEDICAL, INC.,)
a Delaware Corporation, )
Defendants. )
_____________________________)

DEPOSITION - VOLUME 1

DEPONENT: SUZANNE PARISIAN, M.D.

DATE: Wednesday, July 22, 2009

TIME: 9:42 a.m.

LOCATION: Williams Love O'Leary & Powers, PC
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225-6681

REPORTER: Michele E. French, CSR-3091, RPR, RMR, CRR



APPEARANCES:

On behalf of Plaintiffs McClellan and Addis:
LAW OFFICES OF JEFFREY B. WIHTOL
BY: JEFFREY B. WIHTOL, ESQUIRE
620 S.W. Main Street, Suite 602
Portland, Oregon 97205-3024
(503) 228-1210
jeff@wihtollawoffice.com

On behalf of Plaintiffs Cox, Huerta, Forrest, Doolittle:
WILLIAMS LOVE O'LEARY & POWERS, P.C.
BY: LESLIE W. O'LEARY, ESQUIRE
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225-6681
(503) 295-2924
loleary@wdolaw.com

On behalf of Defendant Breg, Inc.:
BOWMAN AND BROOKE, LLP
BY: KIM M. SCHMID, ESQUIRE
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
(612) 339-8682
kim.schmid@msp.bowmanandbrooke.com

-- continued --



APPEARANCES:

On behalf of Defendant I-Flow:
WILLIAMS KASTNER & GIBBS, PLLC
BY: ERIC J. NEIMAN, ESQUIRE
HEATHER J. VAN METER, ESQUIRE (via telephone)
888 SW Fifth Avenue, Suite 600
Portland, Oregon 97204
(503) 228-7967
eneiman@williamskastner.com
hvanmeter@williamskastner.com

On behalf of Defendant Pacific Medical:
MITCHELL, LANG & SMITH
BY: SCOTT J. MEYER, ESQUIRE (via telephone)
2000 One Main Place
101 S.W. Main Street
Portland, Oregon 97204
(503) 221-1011
SMeyer@mls-law.com

-- continued --

Page 18

pathologist. Does that answer your question?
Q I think so.
A Okay.
Q Do you have training in orthopedics?
A Well, I'm not an orthopedic physician. I have training in orthopedics, so in what capacity are you talking about?
Q Have you ever performed orthopedic shoulder surgery?
A I have not performed orthopedic shoulder surgery, that's correct, and I'm not an orthopedic surgeon. I'm not board certified as that. I've been involved in orthopedics in various other capacities.
Q Doctors can practice orthopedic surgery without being board certified; right?
A Correct.
Q Have you ever practiced orthopedic surgery?
A No, sir.
Q Have you ever held yourself out as an orthopedic surgeon?
A No, sir, but I've had to do orthopedic issues for the FDA when I was a medical officer, so that's when I was involved in orthopedics.
Q So my questions now are going to be about your experience, training, and -- your experience and training in the practice of medicine; okay?

Page 19

A Yes, sir.
Q Have you ever held yourself out as an orthopedist?
A No, sir.
MS. O'LEARY: Object to the -- object to the form of the question. I might remind you that this particular topic has been addressed in one trial and two depositions. So to the extent that it's duplicative, I would ask that you refrain from replowing old ground.
BY MR. NEIMAN:
Q Have you ever practiced in the field of pain management?
A I have not practiced. I've been an expert for the FDA in pain management in terms of anesthesia devices and pain devices; but I have not practiced, if you mean taking care of patients, in pain medicine.
Q So my questions now are referring to your experience and training in the practice of medicine.
A Correct, and I did these for the FDA, so I can't separate them from medicine. That's....
Q Have you ever provided medical care as a doctor to somebody in the field of pain management?
A Well, that's a broad question because of course I've treated patients for pain. I have not been -- I mean, obviously when you work in the ER or general practice

Page 20

you treat people for pain. So are you wanting something more specific than that?
Q There's a specific field of medicine called pain management; right?
A There is. That's a different question as to treating patients for pain. So I am not a pain management physician.
Q Have you ever practiced in the field of general surgery?
A I'm not a general surgeon. I've done -- I've been involved with general surgery. And, again, I've been involved with general surgery devices. So which capacity do you want?
Q I want to know about your experience and training as a doctor providing medical care to patients.
A Correct.
Q Have you ever held yourself out as a general surgeon?
A No, I have not.
Q Are you a toxicologist?
MS. O'LEARY: Objection.
THE WITNESS: In terms of being Board certified in anatomic and clinical pathology, you actually do toxicology and you learn how to run toxicology labs. I've been involved in toxicologist, so in -- toxicology, so in what capacity are you

Page 21

talking about toxicology? I've done toxicology for the FDA as to for reviewing medical products. So are you referring to something more specific?
MR. WIHTOL: Can I -- can I object here? The objection is that this is repetitious of the information provided to you in her curriculum vitae, the two depositions, and her trial testimony. And you're also conflating her medical training with her practice of medicine with a medical specialty, which you know she -- already know she does not have from all of those sources.
So it's not only confusing to the witness, it's repetitious and it's wasting time. That's my objection. And I offer that so that maybe it offers you some guidance on how we can speed this thing up and not replow old ground and confuse the witness with conflated questions.
MR. NEIMAN: You know, respectfully, that's way more of an objection than is appropriate under local guidelines.
MR. WIHTOL: I understand that, and my -- and I don't intend to keep doing that. It was just this pattern for the last 15 minutes of that going on, and I'm trying to hope here that that helps, that we can move forward in a way that doesn't repeat and doesn't

business?
A Yes, sir.
Q And that's been your job ever since?
A That's correct. I've been involved with FDA ever since.
Q Have you had any employment other than your consulting business since 1995?
A No, sir.
Q Do you have hospital privileges anywhere?
A No, sir.
Q When was the last time you did?
A It would have been in 1989.
Q And where was that?
A That was actually when I was -- or 1990. That was when I was finishing up as a resident in pathology, so you had hospital privileges there, writing. I actually had been Board certified before I completed my residency, so I was doing pathology as a resident signing out biopsies. Pathologists don't admit patients.
Q When was the last time you wrote a prescription for a patient?
A I still can write prescriptions.
Q When was the last time you did --
A But patients --
Q -- write a prescription --



A It would have been --
Q -- for a patient?
A Well, it would have been when I was working as a physician, a general practice physician, at AVTEX Fibers. It had a population of 5,000 people that were my patients, as a benefit for the company, and it was a general practice. So I would have written a prescription then.
Q What year was the last time you wrote a prescription for a patient?
A Okay. Well, that would have been, if you look at my -- that would have been 1987. But it's interesting as a pathologist, most pathologists have never written a prescription for a patient.
Q Was 1987 the last time you wrote a prescription for a patient?
A That I was --
MS. O'LEARY: Objection.
THE WITNESS: -- their physician. I can still write prescriptions, but as a patient, that I had a doctor/patient relation, that's the last time.
BY MR. NEIMAN:
Q Have you ever prescribed for a patient a prescription medical device?
A Well, yes.



Q And when was the last time you did that?
A But if -- well, if you look at what prescription medical devices are, they can be an IV, because that's not an over-the-counter product. That would be something that's limited to a healthcare provider.
So the term prescription medical device means that it is not something that a lay consumer would use. So it's -- in the hospital you would have prescription devices routinely. So as a physician, physicians use prescription devices all the time.
Q When was the last time you prescribed a medical device for a patient? What year?
A It would have been when I was treating patients. If you take an ankle brace, if you take a -- you know, putting on a cast, if you use a splint. And so I did that routinely for AVTEX Fibers. I had an x-ray facility and I would treat injuries on site, so those are prescription devices.
Q What was the year when you last prescribed a medical device for a patient of any kind?
A Well, the last time I was treating patients as a physician was 1987, so it would have been in that period of time. Pathology, you don't prescribe many prescription devices for a patient.
Q Have you ever performed as the primary surgeon or an



assistant or resident orthopedic surgery?
A Have I been involved in orthopedic surgery? Yes.
Q And when was the last time you did that?
A When I did my flexible internship, I took a rotation for two months in orthopedics. And so I worked in the ER with orthopedics and I did orthopedic surgery as an assistant. I wasn't the primary surgeon.
Q Could you tell me what year that was?
A That would have been back in the '70s, in terms of my training. I guess it's '78, '79, that I was doing a rotation in orthopedics.
Q Have you ever participated as a doctor in arthroscopic shoulder surgery?
A No. I've reviewed the -- I've reviewed arthroscopic devices for the FDA but not participated in them.
Q So have you ever as a physician participated in arthroscopic shoulder procedures?
A No, sir. No one at the FDA does participate in surgery as a rule. They're reviewing documents, so the FDA physicians are not practicing medicine.
Q So at any time in your medical career have you participated in arthroscopic shoulder surgery?
A No, sir, but I believe there are a lot of experts who have in this case.
Q Have you ever been involved with implanting an external

Page 102

will be -- and also Fosamax. Some of these cases are repeat cases of other things that I have testified in terms -- and so they're just multiple cases. They're not new cases.
Q Now, do you have a calendar with all of your scheduled court dates on it?
A Yes, sir, but the calendar changes. As you know, court dates change all the time.
Q Where do you maintain that calendar?
A On my desk.
Q Do you use paper or computer?
A It's paper.
Q Okay.
A It's an old-fashioned paper calendar.
Q Of all of the court appearances you currently have scheduled, what percentages -- in what percentage will you be testifying on the Plaintiff's case?
A In all of those cases it will be Plaintiff's. I have -- I take defense cases, but all the things, court cases, are Plaintiff's.
Q Right, and it's just court cases I'm asking about now. Is all of the court testimony that you currently have scheduled for Plaintiffs?
A Yes, sir.
Q And do you have other depositions scheduled in any type

Page 103

of case at this time?
A Yes, sir. I have a deposition scheduled, a repeat deposition from another case. It was a -- gave an MDL and now the state wants a deposition.
Q What state?
A State of Montana.
Q Is that the only deposition you have currently scheduled?
A No, I have another deposition. That's in -- when is that? I have a deposition scheduled next week for the Bausch & Lomb case that's going to court.
Q So you have two depositions that are presently scheduled?
A Yes, sir.
Q Any others?
A Not right now, no, sir.
Q In both of those cases in which you are scheduled to give depositions, are you on the Plaintiff's side?
A Yes, sir.
Q And are you working on other types of cases in which court testimony and deposition testimony have not been scheduled?
A Yes, sir.
Q And of those cases, what percentage is for Plaintiffs?
A Of those cases, I would say that 95 percent is

Page 104

Plaintiffs, 5 percent would be defense.
Q And is it still correct that about 90 percent of your professional time is spent doing litigation matters?
A Presently. And as I stated before, it changes every year, but right now it would be mainly litigation.
Q For about the last four years it's been 90 percent litigation?
A At least -- at least three or four years, but I still do manufacturing issues.
Q Last October, in the human tissue litigation in October, your testimony was excluded?
A No. The -- that was not my testimony about the FDA, because that's really what I had been identified as an expert on, to talk about the FDA. The judge said he had no problem with the FDA.
The issue was a scientific issue as to whether human tissue, once it's processed, could still continue to have infection. The judge had a particular reason that he wanted to know that information. I provided the FDA and the CDC information, and that wasn't adequate for the judge, but that was not my role in the case. My case -- the role was the FDA.
Q In the human tissue litigation, was some of your testimony excluded in an opinion by Judge Martini last October?

Page 105

A I just explained what it was. It wasn't my opinion in terms of my report and my deposition. It was the information that I provided him about the transfer of infectious disease. There's no science at this point in time that's been developed to answer Dr. -- Judge Martini's question, so I gave him the FDA and the CDC information.
That wasn't sufficient for him. And so he, I believe, gave a summary judgment based on whether he thought there was a transmission of disease, not on my role, which was the FDA, which he said I was fine to talk about. And that was for a biologic product, so....
Q Is it your understanding that at least part of your testimony was excluded by that judge?
MS. O'LEARY: Objection.
THE WITNESS: In that context. That wasn't my role in the case. The information I gave him didn't answer his question. So, yes, that was excluded, but not the role that I was identified for, which was to talk about biologics.
BY MR. NEIMAN:
Q Now, where else has your testimony been excluded besides the human tissue litigation?
A There was a case in Montana, in terms of Oakberg, and