# EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

DONNELL COX; ANITA McGINNESS and GERALD McGINNESS, husband and wife; DAVID DOOLITTLE and CAROLYN DOOLITTLE, husband and wife; JUAN A. HUERTA; and KATHERINE FORREST,
Plaintiffs,
v.
DJO, LLC, et al.,
Defendants.
) Case No. CV 07-1310 AA

ELIZABETH D. CRONIN,
v.
I-FLOW CORPORATION, a Delaware Corporation,
Defendant.
) Case No. 6:09-cv-146-AA

TAMARA L. FOLKMAN,
Plaintiff,
v.
DJO, LLC, et al.,
Defendants.
) Case No. 6:09-cv-342-AA

DANNY E. ARVIDSON and ANNE E. ARVIDSON as husband and wife; and MARCY J. LANDOLFO,
Plaintiffs,
v.
DJO, LLC, et al.,
Defendants.
) Case No. 08-CV-478-AA

DEPOSITION OF SUZANNE PARISIAN, M.D. - VOLUME 2

Portland, Oregon - Thursday, July 23, 2009

indications, some of which would include post-operative pain.

Q Now, the pumps that we're talking about in this case are manufactured by whom?

A In terms of this case, we're talking about I-Flow, we're talking about McKinley, and we're talking about -- well, Stryker is not here at the table, but in terms of the report, we would have Stryker. We would have DJO, which is your company, which distributes pumps manufactured at one time by I-Flow or McKinley.

Q And so you anticipated my question. But you recognize, do you not, that the actual manufacturer of the pump itself is not performed by DJO?

A Yes, sir.

Q And as far as you know, the only manufacturers that are at issue in this case would be Stryker, McKinley, and I-Flow?

A No, because in terms of DJO could also be considered a manufacturer under certain categories of the FDA. They are a distributor --

Q Well --

A -- but they also have their name on a device and so they have a role as a manufacturer.

Q Okay. So let's develop some nomenclature so you and I can speak clearly. Aside from the legal definition of

manufacturer that DJO may satisfy based upon its activities as a distributor using its own labels or something along those lines, the actual fabrication, construction, and assembly of the device, if I use the word manufacturer in that way, the only three that are at issue here are I-Flow, McKinley, and Stryker?
A If you're talking about the fabrication of the device, that's correct.
Q Okay. And what if we're talking about the design of the device?
A The design of the device would be the same three companies.
Q Are you aware of any document evidencing input in the actual design of the device on the part of DJO?
A No.
Q Are you aware of any evidence whatsoever that would suggest that DJO either was asked to have or had any input into the actual design of the devices?
A No.
Q Now, from the standpoint of the devices and their design, to the extent that they were designed to perform a specific function, that is the delivery over a set period of time of a given volume of a medicine, do they perform that function properly?
MS. O'LEARY: Objection.

Q And --
A And I don't believe this has actually been addressed in terms of looking at individual pumps.
Q Right. And the fact that it hasn't been addressed means it hasn't been addressed by you or by anyone you know about; correct?
A It hasn't been addressed by the physicians or the manufacturers.
Q Okay. Or by you?
A Or by me, no.
Q Okay. Now, when we look at the DonJoy product line, are you aware -- and by that I mean to stick with the pumps. They make other things. Are you aware of or do you have any specific knowledge about the Plaintiffs known as Hansen and Archuleta?
A No, sir.
Q Did you know that there were Plaintiffs named Hansen and Archuleta?
A No, sir.
Q Do you know whether or not you have been endorsed to testify in Colorado?
A No, sir.
MS. O'LEARY: Objection.
BY MR. GODFREY:
Q You told --

Agency's continuing 'review of the relevant scientific and legal requirements and provided the easiest way for industry to comply with those requirements.'"

A Correct. And that's footnoted because that comes from the Guidance.

Q Now, when you refer to that in the shadow of your reference to the Least Burdensome Approach for industry, what is the general spirit or purpose of that subject matter, least burdensome, as it's stated there, or the easiest way for industry to comply? What are they trying to accomplish with those things?

A The least burdensome came from I believe the Food and Drug Modernization Act of 1997. They were trying to make it so that manufacturers would be able to bring products to the public in a more expedient fashion. And one of the things was that the FDA would write guidances to help industry submit better applications.

Q Now, in the next paragraph of your report you make reference to a procedure that was available, which is a 510(k) submission in which a sponsor could provide a Declaration of Conformity?

A Yes, sir.

Q Are you aware of any such Declaration of Conformity being filed by DonJoy or DJO in connection with pain pumps?

A No, sir, but a Declaration of Conformity is just in your 510(k) you say I meet these standards.
Q But the answer to my question is no?
A No.
Q And --
A I don't believe DonJoy has 510(k)s for pain pumps.
Q Are you aware of any manufacturer of the pain pumps that are at issue in this litigation having filed a Declaration of Conformity with respect to pain pumps?
A Yes, because they say -- all that is -- it's not a declaration, per se. It's basically a statement that you've fulfilled the standard --
Q But you --
A -- in terms of the materials. It's not -- it's in terms of the materials, in terms of the products have been used before, in terms of like ASTM standards, voluntary standards.
So in terms -- the manufacturer doesn't have to go out and redevelop all of these standards in order to test their material. They can cite industry standards in their 510(k).
Q A Declaration of Conformity is a term of art used in the industry for medical approval of devices; isn't that true?
A And it's exactly what I just said, that you're saying

Q In the box?
A I think I got confused on your question.
Q Let me ask the question again. Now, this will be way easy if you just focus on this. When you get this pump in a box, it has a box that has writing on it, and there's stuff in the box that has writing on it. None of that says anything about what to put in the pump; correct?
A Correct, other than --
Q Similar --
A -- it does say local anesthetic.
Q On the box or in the instructions --
A In the instructions.
Q -- that come in the box?
A Correct. It does say -- yes, it --
Q Okay. So you're -- you're sitting here today forming your opinions in this case and testifying about this case based on what you think is a statement in the box, printed on paper that comes in the box with the pump, that says put local anesthetic in here?
MS. O'LEARY: Objection.
THE WITNESS: No. It does -- in terms of -- in terms of DonJoy, there are two sets of manufacturers here. There's two sets of pumps. We've got I-Flow pumps. Later, after -- in 2004, we got a McKinley

pump. So we have different pumps, so we have different generations of labeling, each made by those manufacturers. And so there is information not necessarily what to put in the pump.

BY MR. GODFREY:

Q Okay.

A There is information of what not to put in the pump but not necessarily what to put in the pump.

Q Very good. And so when it comes to a decision made by a physician to put an anesthetic in the pump, is there any dosage guide, suggestions, or other printed material that is shipped with the pump that gives the physician drug names of any kind?

A No, sir.

Q You make a reference in your report on page 69 -- if you would turn to that.

A Yes, sir.

Q -- to a document sent in '98 from McKinley to the FDA which, as I recall, was marked as a separate exhibit yesterday. Do you recall that?

A Yes, sir.

Q Notice the third paragraph from the bottom of the page says, "The physician determines the parameters of the infusion: medication, duration, flow rate, including which location and mode of infusion best meets the

doctors, you have made reference to specific DonJoy representatives; correct?
A Correct.
Q Now, what I'm wondering is was there more than one piece of paper that you could find where on a DonJoy document there's reference to a recommendation to use the pain pump for intra-articular pain mediation in shoulder surgery?
A And the piece of paper, that would be the piece of paper I had.
Q You have a single sheet of paper?
A As in a single example of a piece of paper, yes.
Q You don't have two, you only have one?
A The one that I reference. And then we have on top of that the discussion of the training of the sales reps, so it's not just one piece of paper.
Q But you could not tell us how many doctors saw that piece of paper, could you?
A No. And, actually, to me it was that the sales reps saw the piece of paper, not the doctors.
Q And you don't know how many doctors heard from the sales reps who saw that piece of paper, do you?
A That's correct.
Q In fact, you cannot name a doctor on the planet who ever heard a recommendation from a DonJoy

representative to use a pain pump in the shoulder joint, can you?
A I don't know of any. I believe there will be other experts who are -- would discuss that.
Q Okay. And, particularly, you have no knowledge that would support the assertion that the doctor in the cases I'm defending had ever heard from a DonJoy representative about using the pump in the shoulder?
A They're going to have to testify for themselves.
Q You have no knowledge?
A I don't know what the doctors will say.
Q Okay. Now, if you are going to be critical of the contents of documentation, what you call labeling, whether it's in the box or in the form of communications by sales representatives, before you can say that those communications harm someone, you have to know at least something about whether any doctors based any medical judgments on those communications; isn't that just fair to say?
A Not in this particular case. We have -- in terms of the role of DonJoy, the Court will decide their role; but in terms of intra-articular pain pumps and that physicians were being told to use it, they will testify for themselves.
Q Okay.

# EXHIBIT "3"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-10052-CIV-MOORE/SIMONTON

DOUGLAS C. KILPATRICK, )
)
Plaintiff, )
)
vs. )
)
BREG, INC., a California )
corporation for profit, )
)
Defendant. )
)

VIDEOTAPED DEPOSITION OF SUZANNE PARISIAN, M.D.

May 15, 2009
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Q. How about nerve blocks? Are there dangers associated -- risks associated with them?

A. A very low incidence of risk.

Q. Which includes such things as stroke, correct?

A. No. Which nerve block are you talking about? You're talking about an interscalene block. You're not going to get a stroke from that.

Q. Doctor, I guess we have a fundamental difference when you tell me that there's a scientific basis for needless pain and suffering.

A. That is because of the risk-versus-benefit decision. This is an elective pain pump. And in terms of the potential benefit, to compare losing your shoulder, the risk versus the benefit, it is needless.

Q. And you feel qualified to express that opinion?

A. Yes, sir. Because that's the opinion that I would have expressed at the FDA. What is the risk versus the benefit as a physician for this device versus that device. And there is not a risk -- there's not a benefit that's justifiable to the risk of losing your shoulder.

Q. But you're not at the FDA and you don't speak for the FDA, correction, Dr. Parisian?

A. I do not speak for the FDA --

MS. FULMER: Object to form.

THE WITNESS: -- but as a clinician, the