IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:08-cv-00365-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

v.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.;
REABLE THERAPEUTICS, LLC; and
I-FLOW CORPORATION;

Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT I-FLOW'S MOTION TO EXCLUDE EXPERT OPINION ON GENERAL CAUSATION**

---

## TABLE OF CONTENTS


I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Overview of the Shoulder and Cartilage Anatomy .......................................................2

B. Overview of Chondrolysis and Development of the Medical Literature............................4

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

A. Expert Testimony Under Daubert and Rule 702 Need Only Be Reliable, Not Perfect. ..............................................................................................................16

1. Certainty is Not Required for a Causation Opinion.....................................................17

2. Epidemiological studies are not required to establish general causation.......................18

3. Disagreement with the expert's conclusions or factual basis does not affect admissibility of the testimony. ...........................................................................................18

4. Courts have upheld the admissibility of expert testimony that is based on a combination of evidence. ...................................................................................................19

5. Plaintiff's experts reasonably rely on multiple lines of both epidemiological and non-epidemiological evidence in support of their causation opinions..................................20

B. Several Courts in Other Pain Pump Actions Have Found that Plaintiffs' Experts' Testimony Satisfies the Requirements of Daubert and Rule 702 Based on Similar Evidence.....................................................................................................................22

1. McClellan v. I-Flow Corp., CIV07-1309-AA, 2010 WL 1753261 (D. Or. Apr. 29, 2010) .......................................................................................................................23

2. Schott v. I-Flow Corp., CIV1:08-cv-00323, 2010 WL 1008478 (S.D. Ohio Mar. 16, 2010): .....................................................................................................................25

3. Zink v. SMI Liquidating, Inc.,CIV.A.08-95 WOB 2010 WL 1839907 (E.D. Ky. May 7, 2010)...................................................................................................................26

4. Paugh et al. v. I-Flow Corp., CIV. 32D02-0802-CT-9 (Hendricks Cnty. Ind. Super. Ct. No. 2, Apr. 9, 2010)...........................................................................................27

5. Beale v. I-Flow Corp., Pretrial Hearing Tr. at 4-11, CIV. 0801-01554 (Multnomah Cnty. Dist. Ct., Or. Jan. x, 2010). ...................................................................28

6. Kilpatrick v. Breg, Inc., 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009). ....28

C. The Facts and Data Upon Which Plaintiff's Experts Rely Are Sufficient to Establish a Likely Causal Relationship Between Intra-Articular Infusion of Anesthetics Through Pain Pmps and Chondrolysis. ....30

1. Defendants misrepresent the significance and conclusions of the published literature, which find a cause-and-effect relationship between pain pumps and chondrolysis. ....32

2. It is not mandatory for plaintiffs' experts to subject their opinions to peer review or publication before their testimony can be admitted under Rule 702. ....36

3. Plaintiffs' experts appropriately relied on the totality of the evidence to reach an inference of causation. ....40

4. The types of epidemiological studies defendants claim are missing are not required to establish causation. ....46

5. The retrospective studies provide compelling evidence of an abnormally high incidence of chondrolysis and intra-articular use of pain pumps. ....50

(a) The Beck/Hansen Study. .... 52

(b) The Rapley Study. .... 56

(c) The Anderson Study .... 58

6. There is abundant evidence upon which plaintiff's causation experts rely on to "rule in" pain pumps as a cause of chondrolysis. ....60

7. The Law Does Not Require Evidence of a "Doubling of the Risk" to Establish Causation. ....63

8. Scientists need not know the precise mechanism for the cause of chondrolysis to form their opinions on causation. ....64

9. The animal and in vitro studies on bupivacaine infusion and chondrolysis are valid and important data supporting toxicity. ....66

10. Case reports and case series, combined with other studies, are valid and reliable sources of evidence. ....70

D. Each of Plaintiff's General Causation Experts Is Highly Qualified, and their Testimony Satisfies the Requirements of Rule 702. ....71

1. Dr. Charles Beck ........ 72

2. Dr. Jason Dragoo ........ 73

3. Dr. Stephen Badylak ........ 73

4. Dr. Armando Vidal ........ 76

5. Dr. Sander Greenland and Dr. Martin Wells ........ 80

(a.) Drs. Greenland and Wells have been qualified under Rule 702 to testify in other pain pump litigation. ........ 80

6. Dr. Frederick Matsen ........ 82

IV. CONCLUSION. ........ 84

## TABLE OF AUTHORITIES

**Cases**

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) .............................................. 22

*Beale v. I-Flow*, Multnomah County Circuit Court No. 0801-01554............................... 81

*Benedi v. McNeil-P.P.C., Inc.* 66 F.3d 1378 (4th Cir. 1995)............................................ 22

*Bitler v. A.O. Smith Corp*, 400 F.3d 1227 (10th Cir. 2005).................................. 17, 18, 64

*Bourne v. Dupond De Nemours & Co.,Inc.*, 189 F. Supp. 2d 482, 496 (S.D.W.V. 2002)67, 68

*Clausen M/V NEW CARISSA*, 339 F.3d 1049 (9th Cir. 2003).......................................... 47

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006)...... 18, 19, 52, 56, 61

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995)............ 18, 40, 63, 64

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .............................................
..................................................................... 16, 17, 18, 22, 29, 31, 36, 41, 46, 73

*Dodge v. Cotter Corp.*, 328 F.3d 1212 (10th Cir. 2003)............................................. 31, 61

*Domingo ex rel. Domingo v. TK*, 289 F.3d 600 (9th Cir. 2002)....................................... 45

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) ....................................................... 17

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................... 43, 44

*Glaser v. Thompson Medical Co.*, 32 F.3d 969 (6th Cir. 1994) ....................................... 22

*Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986 (8th Cir. 2001)................................. 47

*Goebel v. Denver and Rio Grande W. R. Co.*, 346 F.3d 987 (10th Cir. 2003) ......................
.................................................................................... 16, 18, 19, 22, 31, 41, 70

*Gomez v. Martin Marietta Corp.*, 50 F.3d 1511 (10th Cir. 1995). ................................... 17

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996)................................ 46

*Heller v. Shaw Indus. Inc.*, 167 F.3d 146 (3d Cir. 1999)........................................... 20, 22

*Hopkins v. Dow Corning Corp.*, 33 F.3d 116, 1124-25 (9th Cir. 1994)........................... 68

*Hyman & Amrstrong, P.S.C. v. Gunderson*, 279 S.W. 3d 93 (Sup. Ct. Kent. 2008), *reh'd denied*, (Apr. 23, 2009)....................70

*In re Berg Litig.*, 293 F.3d 1127 (9th Cir. 2002) .................... 63

*In re Breast Implant Litig.*, 11 F. Supp. 2d 1217 (D. Colo. 1998).................... 63

*In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 188 (S.D.N.Y. 2005).......... 47, 48

*In re Neurontin Marketing Sales Practices, and Prods. Liab. Litig.*, 612 F. Supp. 2d 116 (D. Mass. 2009)....................41, 70

*In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.*, 612 F. Supp. 2d 116 (D. Mass. 2009)....................64

*In re Paoli R. R. Yard PCB Litig.*, 35 F.3d 717, 780 (3d Cir. 1994) .................... 67

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d at 1242....... 42, 50

*In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806435 (M.D. Fla. Jun. 23, 2009)....................41, 70

*In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d 1355 (N.D. Fla. 2009) ....... 41, 70

*Joiner v. General Elec. Corp.*, 78 F.3d 524 (11th Cir. 1996), *rev'd on other grounds*, 522 U.S. 136 (1997)....................41

Kilpatrick v. Breg, Inc., 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009........ .................... 28, 29, 30, 70

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................... 17, 22

*McCarrell v. Hoffman-La Roche, Inc.*, 2009 WL 614484 (N.J. Super. App. Div. Mar. 12, 2009) ....................41

*McClellan v. I-Flow Corp.*, CIV07-1309-AA, 2010 WL 1753261 (D. Or. Apr. 29, 2010)23, 24, 25, 26, 28, 29, 36, 38, 40, 42, 47, 48, 60, 61, 63, 64, 69, 72, 81

*Metabolife Int'l v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001).................... 67

*Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062 (D. Kan. 2002). .................... 37, 38, 51, 63

*Mitchell v. Gencorp, Inc.*, 165 F.3d 778 (10th Cir. 1999) .................... 44

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005) ................ 18, 37, 46, 60

*Palmer v. Asarco Inc.*, 510 F. Supp. 2d 519 (N.D. Okla. 2007) ................................ 19, 79

Paugh et al. v. I-Flow Corp., CIV. 32D02-0802-CT-9 (Hendricks Cnty. Ind. Super. Ct. No. 2, Apr. 9, 2010) ........................................................................27, 28, 36, 43

*Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 972 F.2d 304 (10th Cir. 1992)..... 49

*Robinson v. Missouri Pac. R. Co.*, 16 F.3d 1083 (10th Cir. 1994) .................................. 22

*Ruff v. Ensign-Bickford Indus.*, 168 F. Supp. 2d 1271 (D.Utah 2001) ........... 17, 18, 22, 49

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F. 3d 77 (1st Cir. 1998)...... 22

*Schott v. I-Flow Corp.*, CIV1:08-cv-00323, 2010 WL 1008478 (S.D. Ohio Mar. 16, 2010)25, 26, 27, 28, 30, 36, 38, 43, 80, 81

*Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347 (N.D. Ga. 2001) .................... 41

*Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202 (8th Cir. 2000) ..................................... 22

*Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360-61 (6th Cir. 1992) .............. 67

*United States v. W. R. Grace*, 504 F.3d 745 (9th Cir. 2007) .......................... 19, 41, 47, 70

*Zenith Elect. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005) ........... 45

Zink v. SMI Liquidating, Inc.,*CIV.A.08-95 WOB 2010 WL 1839907 (E.D. Ky. May 7, 2010)* ................................................................................ 26, 27, 28, 30, 32, 36, 43

*Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998) .............................................. 22

**Medical Articles**

Anderson, S. L., et al., *Chondrolysis of the Glenohumeral Joint After Infusion of Bupivacine Through an Intra-articular Pain Pump Catheter: A Report of 18 Cases*, 26(4) ARTHROSCOPY 451 (Apr. 2010) ..............................................................14

Anderson, S., et al., *Chondrolysis of the Glenohumeral Joint*, J ARTHROSCOPY SUPP e13 (2008).........................................................................................................10, 58

Athwal, G., et al., *Osteolysis and Arthropathy of The Shoulder After Use of Bioabsorbable Knotless Suture Anchors*, 88-A(8) J. BONE & JOINT SURG. 1840-45 (Aug. 2006) ..................................................................................................7

Baillieul, R. J., *The peri-operative use of intra-articular local anesthetics: A review*, 60 ACTA ANAESTH BELG 101-08 (2009)...........................................................12, 13

Beck, Jr., Charles L., et al., Authors' Response to Letter to the Editor, XX:X AM. J. SPORTS MED. (2010). ....................................................................................56

Bogatch, Michael T., et al, *Is Chemical Incompatibility Responsbile for Chondrocyte Death Introduced by Local Anesthetics?* 38:3 AM. J. SPORTS MED. 520-526 (2010)65, 66

Busfield, B. and Romero, D., *Current Concepts: Pain Pump Use After Shoulder Arthroscopy As a Cause of Glenohumeral Chondrolysis*, 25(6) J ARTHROSCOPIC RELATED SURG. 647-652 (Jun. 2009) ..............................................................12

Christian F. Christiansen, et al., *Incidence and risk of Chondrolysis in Denmark: A nationwide population-based study*, 2 CLINICAL EPIDEMIOLOGY 85-89 (MAY 8, 2010)64

Chu, C. et al., *In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articular Chondrocytes,* 22 ARTHROSCOPY 693-99 (Jul. 2006)........................................9, 68, 69

Chu, C., et al., *The in vitro effects of bupivacaine on articular chondrocytes*, 90-B:6 J. BONE & JOINT SURG. (BR) 814-20 (2008) ....................................................11

Clavert, P. and Warner, J., *Panacryl Synovitis: Fact or Fiction?* 21 ARTHROSCOPY 200-03 (2005)...........................................................................................................7

Douw, C., et al., *Clinical and pathological changes in the knee after accidental chlorhexidine irrigation during arthroscopy*, 80 J. BONE JOINT SURG. (B) 437-40 (1998)..............................................................................................................5

Dragoo, J., et al., *The Effect of Local Anesthetics Administered Via Pain Pump on Chondrocyte Viability*, 36:8 AM. J. SPORTS MED. 1484-88 (Jun. 1, 2008) ............10, 68

Edwards, R. B., et al., *Thermal Chondroplasty of Chondromalacic Human Cartilage: An Ex Vivo Comparison of Bipolar and Monopolar Radiofrequency Device*, 30(1) AM. J. SPORTS MED. 90-97 (2002).........................................................................................6

Fester, E. and Noyes, F., *Postoperative Chondrolysis of the Knee: 3 Case Reports and a Review of the Literature,* AM. J. SPORTS MED. (Jun 17, 2009) (Epub ahead of print) ..12

*Golod v. La Roche*, 964 F. Supp. 841 (S.D.N.Y. 1997)...................................................65

Gomoll, A., et al., *Chondrolysis After Continuous Intra-Articular Bupivacaine Infusion: An Experiemental Model Investigating Chondrotoxicity in the Rabbit Shoulder,* 22:8 ARTHROSCOPY 813-19 (Aug. 2006)............................................................9, 68

Greenland, Sander, MODERN EPIDEMIOLOGY (3d Ed. 2008). ..........................................80

Greis, P., et al., *Bilateral Shoulder Chondrolysis Following Arthroscopy. A Report of Two Cases*, 90 J. BONE JOINT SURG. AM. 1338-1344 (2008) .......................................10

Grishko, Valentina. et al., *Apoptosis and Mitochondrial Dysfunction in Human Chondrocytes Following Exposure to Lidocaine, Bupivacaine, and Ropivacaine*, 92-A:3 J. BONE & JOINT SURG. 609 (Mar. 2010)....................66

Hansen, B. P., et al., *Podium Presentations*, AM. ACADEMY ORTHOPAEDIC SURGEONS (March 23. 2006) ....................9

Hansen, B. P., et al., *Postarthroscopic Glenohumeral Chondrolysis*, AM. J. SPORTS MED. (July 2007) Epub ahead of print....................9, 13, 54, 55

Hasan, Samer, et al., *Letter to the Editor*, XX:X AM. J. SPORTS MED. (2010) ....................52

Hogan, C. and Diduch, D., *Progressive Articular Cartilage Loss Following Radiofrequency Treatment of a Partial-Thickness Lesion*, 17(6) ARTHROSCOPY E24 (2001)....................6

Jackson, D., *Intra-articular injections of local anesthetics: How much is too much?* 28:5 ORTHOPEDICS TODAY (2008) ....................15, 69

Jay. H. Rapley, M.D., et al., *Authors' Reply* to Letter to Editor, 26:4 ARTHROSCOPY: J. ARTHROSCOPIC AND RELATED SURG. 439-443 (April 2010....................57

Karpie, J. and Chu, C., *Lidocaine Exhibits Dose- and Time- Dependent Cytotoxic Effects on Bovine Articular Chondrocytes In Vitro,* 10 AM. J. SPORTS MED. 1-6 (Jul. 2007)9, 68

Kassirer, J. and Joe S. Cecil, *Inconsistency in Evidentiary Standards for Medical Testimony*, 288:11 J. AM. MED. ASSOC. 1382 (Sept. 18, 2002). ....................20

Levine, W., et al., *Chondrolysis Following Arthroscopic Thermal Capsulorrhaphy to Treat Shoulder Instability: A Report of Two Cases.* 87 J. BONE JOINT SURG. AM. 616-621 (2005)....................6

Levy, J., et al., *Young patients with shoulder chondrolysis following arthroscopic shoulder surgery treated with total shoulder arthroplasty,* J. SHOULDER ELBOW SURG. (2008)....................4

Lo, I., et al., *Local anaesthetics induce chondrocyte death in bovine articular cartilage,* 7$^{5th}$ Annual Meeting Podium Presentations AAOS (Mar. 5, 2008) ....................9, 68

Lu, Y., et al., *Thermal Chondroplasty With Radiofrequency Energy: An In Vitro Comparison of Bipolar and Monopolar Radiofrequency Devices,* 29(1) AM. J. SPORTS MED. 42-49 (2001)....................6

McNickle, A., et al., *Postsurgical Glenohumeral Arthritis in Young Adults,* AM. J. SPORTS MED. (Jun. 9, 2009)....................10, 33

Miniaci, A. and Codsi, M., *Thermal Capsulorrhaphy for the Treatment of Shoulder Instability,* 34(8) AM. J. SPORTS MED. 1356-63 (Aug. 2006)........................................7

Nakagawa, Y., et al., *Glenohumeral Osteoarthritis Following A "Color Test" during Rotator Cuff Repair,* 57 BULL. HOSP. FOR JOINT DISEASES 216-18 (1998)....................5

Petty, D. et al., *Glenohumeral chondrolysis after shoulder arthroscopy: case reports and review of the literature.* 32 AM. J. SPORTS. MED. 509-515 (2004).............................6, 7

Piper, S. and Kim, H., *Comparison of Ropivacaine and Bupivacaine Toxicity in Human Articular Chondrocytes,* 90:5 J. BONE JOINT SURG. Am. 986-91 (May 2008)..........9, 68

Rapley, J., et al., *Glenohumeral chondrolysis after shoulder arthroscopy associated with continuous bupivacaine infusion,* 25:12 ARTHROSCOPY: J ARTHROSCOPIC AND RELATED SURG. 1367-73 (Dec. 2009) ....................................................................13, 57

Reading, A., *Chlorhexidine and chondrolysis in the knee(Letter),* 82 J. BONE JOINT SURG. (B) 620 (2000)...................................................................................................5

Reading, A., et al., *Quantitative Assessment of the Effect Of 0.05% Chlorhexidine in Rat Articular Cartilage Metabolism In Vitro and In Vivo,* 18 J. ORTHOPAEDIC RES. 762-67 (2000)...........................................................................................................5

ROTHMAN, K. AND S. GREENLAND, *Ch. 7, Cohort Studies,* 100 in MODERN EPIDEMIOLOGY 3D ED., (K. Rothman, S. Greenland & T. Lash, eds., Lippincott Williams & Wilkins 2008)...........................................................................53

S. Lance Anderson, et al. *Chondrolysis of the Glenohumeral Joint After Infusion of Bupivacaine Through an Intra-articular Pain Pump Catheter: A Report of 18 Cases,* 26:4 ARTHROSCOPY: J. OF ARTHROSCOPIC AND RELATED SURG. 451-461 (April 2010)58, 59, 60

Saltzman, M., et al., *Postsurgical Chondrolysis of the Shoulder,* 32 ORTHOPEDICS 215 (2009)...........................................................................................................10

SCHEINER, SAMUEL M., THE NATURE OF SCIENTIFIC EVIDENCE - STATISTICAL, PHILOSOPHICAL, AND EMPIRICAL CONSIDERATIONS 51, *Ch. 3,Experiments, Observations, and Other Kinds of Evidence,* (M. L. Taper and S. R. Lele ed., U. Chi. Press 2004)...................................................................................................20

Shibata, Y., et al., *Chondrolysis of the glenohumeral joint following a color test using gentian violet,* 25 INT'L ORTHOPEDICS 401-03 (2001)...................................................5

Tamai, K., et al., *Chondrolysis of the shoulder following a "color test" – assisted rotator cuff repair – a report of 2 cases,* 68(4) ACTA ORTHOP. SCAND. 401-02 (1997)............5

*van Huyssteen, A. and Bracey, D.*, Chlorhexidine and chondrolysis in the knee. 81 J. BONE JOINT SURG. (B) 995-96 (1999) ....................................................................5

Webb, S. and Ghosh, S., *Further opinion: The in vitro effects of bupivacaine on articular chondrocytes,* J. BONE JOINT SURG. (B) (2008) ..........................................................12

WEI, A. AND GALATZ, L., THE SHOULDER, VOL. 2, *CH. 19, COMPLICATIONS OF SHOULDER ARTHROSCOPY* 918 (C. A. Rockwood, et al. eds., Saunders Elsevier 4th ed 2009).........14

Wong, K. and Williams, G., *Complications of Thermal Capsulorrhaphy of the Shoulder,* 83-A Supp. 2 Part 2 J. BONE JOINT SURG. 151-155 (2001) ...........................................7

Yeger-McKeever, M., et al., *Low Doses of Bupivacaine Are Cytotoxic to Articular Cartilage In Vitro,* 7th Annual Meeting AAOS (Mar. 5, 2008) ................................9, 68

**Rules**

FED. R. EVID. 402 ........................................................................................ 28

FED. R. EVID. 403 ........................................................................................ 28

FED. R. EVID. 702 ......................................... 16, 17, 18, 19, 21, 22, 23, 28, 29, 31, 36, 46

FED. R. EVID. 703 ................................................................................... 21, 70

**Other Authorities**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, § 470 (Second ed. 2000) ...................... 42

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Epidemiology § V, p.374 (Second. Ed. 2000) ........................................................................................................50

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, SECOND (2005-06)............................. 67

Plaintiff submits this Opposition to the motion by defendant I-Flow, which defendant DJO joins, to exclude the causation testimony of Charles Beck, M.D., Frederick Matsen, M.D., Jason Dragoo, M.D., Stephen Badylak, M.D., Armando Vidal, M.D., Sander Greenland, M.A., M.S., DR.P.H., S. Stat. and Martin T. Wells, Ph.D.

## I. INTRODUCTION

The evidence of causation in this case is abundant and straightforward. It satisfies the standards for admissibility of expert testimony under Daubert and the law of the Tenth Circuit. The overly rigid "certainty" standard advocated by defendants I-Flow and DJO runs counter to both science and legal precedent. Five consecutive opinions from various federal and state courts in the pain pump litigation have rejected defendants' identical arguments, holding that the scientific evidence of causation is sufficiently reliable and relevant under Rule 702.

Chondrolysis of the shoulder is an extraordinarily rare disease, especially when it occurs with rapid onset in younger healthy people. The orthopedic surgery community witnessed an epidemic of shoulder chondrolysis in the early 2000s, when defendants I-Flow, DJO and other medical device companies aggressively marketed their pain pumps for use directly into the intra-articular (joint) space and such use became widespread. Drs. Charles Beck and Brent Hansen were the first orthopedic surgeons to conduct a systematic study of this growing phenomenon. They investigated their population of 152 shoulder surgery patients and found that 63% of patients who received a pain pump in their joint space developed glenohumeral chondrolysis. In contrast, none of their patients who did not have intra-articular placement of a pain pump developed the disease. Alarmed, Drs. Beck and Hansen presented their findings at scientific meetings. They also published their work in a peer-reviewed medical journal. Their work generated an explosion of published animal, in vitro and clinical reports in the scientific literature that studied this causal relationship in more detail.

Over 29 papers on pain pumps and chondrolysis were published between 2005 and 2009, which culminated most recently in calls by the orthopedic community for a ban on the use of pain pumps in the shoulder joint space. In addition, two subsequent clinical retrospective cohort studies have validated the methodology and conclusions reached by Drs. Beck and Hansen. These studies confirmed an enormously powerful correlation between intra-articular use of pain pumps and chondrolysis. A leading textbook on arthroscopic shoulder surgery has concluded that the continuous infusion of bupivacaine through a pain pump catheter causes chondrolysis.

Plaintiff's experts uniformly rely on this impressive body of scientific literature in support of their opinions on medical causation. Defendants insist this evidence is not enough. They argue that without overwhelming and conclusive proof of causation, no expert may testify, and no plaintiff – including Stacy Hansen – may ever have her day in court. Defendants also ignore well-established Tenth Circuit precedent, which has explicitly rejected similar demands for such a stratospheric standard for admissibility. Courts in the Tenth Circuit and elsewhere have routinely deemed admissible the very sources of evidence and methodologies for medical causation relied upon plaintiffs' experts in this case. Several trial courts have already considered the same evidence and challenges leveled by defendants and have deemed it admissible. The combination of human case reports, case series, animal studies, laboratory studies and human cohort studies linking pain pumps and chondrolysis are admissible for the reasons set forth below. Defendants' disagreement with the medical literature and the inferences drawn from it by plaintiff's experts goes to the weight and credibility of their testimony. It is not a valid basis for excluding their opinions.

## II. FACTUAL BACKGROUND

### A. <u>Overview of the Shoulder and Cartilage Anatomy</u>

The shoulder has two joints: the acromial clavicular ("A-C") joint and the glenohumeral joint. As the illustration below shows, the A-C joint is at the roof of the shoulder. The

subacromial bursa is situated below the deltoid and above the rotator cuff. The glenohumeral joint is a ball-and-socket joint. The subacromial space has no articular cartilage. The glenohumeral joint does. The glenohumeral joint is an intra-articular space. The terms "joint space," "intra-articular space," "synovial cavity" and "synovial space" all mean the same thing: a joint containing synovial tissue and articular cartilage. Below the rotator cuff is the capsule. It is made of fibers and encases the glenohumeral joint. Inside the capsule of the glenohumeral joint is the synovial space.




The articular cartilage in the glenohumeral joint is a thin layer of tissue that covers the ends of bone. It provides a smooth, gliding surface to enable the bones to move. Unlike other cartilage in our bodies, articular cartilage is enclosed. It has no blood supply, lymph supply or nerves. Articular cartilage gets its nutrients from the joint. The synovial tissue (inside the joint) produces synovial fluid, which carries and diffuses the necessary nutrients into the articular cartilage matrix and the cartilage cells ("chondrocytes") that live within and continually renew the matrix of cartilage. Synovial fluid is the "lifeblood" for articular cartilage.

**B. <u>Overview of Chondrolysis and Development of the Medical Literature.</u>**

Chondrolysis is the end result of the death of the cartilage. The cartilage matrix is no longer replaced as it wears into the normal use of the joint.[1] As a consequence, there is no protective padding between the ball and socket once it wears away completely. This is a permanent loss of cartilage, which does not regenerate. The bones then rub against one another, causing a great deal of pain and stiffness. The images below illustrate the disappearance of cartilage in the shoulder of a chondrolytic joint:[2]




Because the destroyed cartilage does not grow back, chondrolysis is a permanent and devastating condition. It is much worse than ordinary arthritis in that all or almost all of the cartilage is lost, and the tissues of the joint are inflamed and contracted. There are few treatment options for chondrolysis other than pain management. Total shoulder joint replacement has had only limited success in patients with chondrolysis.[3]

---

[1] On-Line Medical Dictionary: http://medical-dictionary.thefreedictionary.com/chondrolysis

[2] Image provided courtesy of Dr. Frederick Matsen.

[3] Ex. 01, J. Levy, et al., *Young patients with shoulder chondrolysis following arthroscopic shoulder surgery treated with total shoulder arthroplasty*, J. SHOULDER ELBOW SURG. (2008).

Plaintiff Stacy Hansen underwent arthroscopic surgery of her left shoulder on June 9, 2003. She was 25 years old at the time. After surgery, she received a Dj Ortho PainBuster, I-Flow high volume pain pump. The pain pump catheter was placed in the cavity of her glenohumeral joint and infused a continuous supply of local anesthetics to the joint space for a period of at least two days. A few months later, Stacy's shoulder became increasingly stiff and painful. Subsequent x-rays showed that the cartilage in her shoulder had completely disappeared. She was later diagnosed with glenohumeral chondrolysis.

Chondrolysis is an extremely rare disease. This is especially true where it occurs with rapid onset in younger people whose joints are typically healthy. Chondrolysis of the shoulder was unknown and unreported in the medical literature until the late 1990s. At that time, three case reports by Japanese researchers unearthed a cluster of chondrolysis cases in the shoulders of seven patients after they received an injection of gentian violet, a color contrast dye, during open surgery.[4] At around the same time, three case reports and a handful of animal studies also identified chlorohexadine (irrigation solution) as chondrotoxic to the knee joint.[5] A single case report found that use of methylmethacrylate (acrylic bone cement) in the hip joint caused a similar destruction of cartilage. Surgeons quit using these substances in joint spaces; as a result, no further cases were reported in the published literature (nor were clinical trials or retrospective observational epidemiological studies conducted on the chondrotoxicity of these substances.).

---

[4] Ex. 02, K. Tamai, et al., *Chondrolysis of the shoulder following a "color test" – assisted rotator cuff repair – a report of 2 cases*, 68(4) ACTA ORTHOP. SCAND. 401-02 (1997); Ex.03, Y. Nakagawa, et al., *Glenohumeral Osteoarthritis Following A "Color Test" during Rotator Cuff Repair*, 57 BULL. HOSP. FOR JOINT DISEASES 216-18 (1998); Ex. 04, Y. Shibata, et al., *Chondrolysis of the glenohumeral joint following a color test using gentian violet*, 25 INT'L ORTHOPEDICS 401-03 (2001).

[5] Ex.05, C. Douw, et al., *Clinical and pathological changes in the knee after accidental chlorhexidine irrigation during arthroscopy*, 80 J. BONE JOINT SURG. (B) 437-40 (1998); Ex. 06, A. *van Huyssteen, and D. Bracey*, Chlorhexidine and chondrolysis in the knee. 81 J. BONE JOINT SURG. (B) 995-96 (1999); Ex.07, A. Reading, *Chlorhexidine and chondrolysis in the knee(Letter)*, 82 J. BONE JOINT SURG. (B) 620 (2000). *See also, e.g.*, Ex.08, A. Reading et al., *Quantitative Assessment of the Effect Of 0.05% Chlorhexidine in Rat Articular Cartilage Metabolism In Vitro and In Vivo*, 18 J. ORTHOPAEDIC RES. 762-67 (2000).

A second small wave of shoulder chondrolysis appeared in 2000-2001, when radiofrequency devices (sometimes called "thermal wands") became popular.[6] Surgeons used these devices to burn away excess tissue, cauterize wounds and shrink the lining of joints that had become too unstable. However, if they were used at high settings or for too long, thermal wands were hypothesized to cause the synovial fluid in the joint to overheat, killing most of the chondrocytes and destroying the cartilage. Once alerted by the medical literature, surgeons quickly changed the way they used thermal wands, employing them sparingly and at low energy settings. The reported incidence of shoulder chondrolysis cases diminished. The correlation between thermal wands and chondrolysis is established, albeit slightly. Only five cases of acute chondrolysis of the glenohumeral joint after the use of thermal wands in arthroscopic procedures have been reported in the published literature,[7] nor were any retrospective controlled epidemiological studies conducted.

Thermal capsulorrhaphy was once a popular technique to treat shoulder instability. However, due to risk of damage to the capsular tissue and clinical experience that showed it was not effective, the use of thermal capsulorrhaphy to treat instability has largely been abandoned. A survey conducted by Drs. Wong and Williams in 2001 reported 14,277 thermal capsulorrhaphy procedures from roughly 1996 to 2001, with a staggered follow-up of over 5 years of thermal capsulorrhaphy patients. In this study, the authors did not find a single case of

---

[6] Ex.09, R. B. Edwards, et al., *Thermal Chondroplasty of Chondromalacic Human Cartilage: An Ex Vivo Comparison of Bipolar and Monopolar Radiofrequency Devices*, 30(1) AM. J. SPORTS MED. 90-97 (2002); Ex.10, C. Hogan and D. Diduch, *Progressive Articular Cartilage Loss Following Radiofrequency Treatment of a Partial-Thickness Lesion*, 17(6) ARTHROSCOPY E24 (2001); Ex.11, Y. Lu, et al., *Thermal Chondroplasty With Radiofrequency Energy: An In Vitro Comparison of Bipolar and Monopolar Radiofrequency Devices*, 29(1) AM. J. SPORTS MED. 42-49 (2001).

[7] Ex.12, W. Levine, et al., *Chondrolysis Following Arthroscopic Thermal Capsulorrhaphy to Treat Shoulder Instability: A Report of Two Cases.* 87 J. BONE JOINT SURG. AM. 616-621 (2005); Ex.13, D. Petty, et al., *Glenohumeral Chondrolysis After Shoulder Arthroscopy: Case Reports and Review of the Literature*, 32 AM. J. SPORTS. MED. 509-515 (2004).

chondrolysis.[8] Similarly, Dr. Anthony Miniaci published a paper, which summarized ten other studies that had reported on an additional 259 patients who underwent thermal capsulorrhaphy. Those patients had a follow-up of between one and three years without a single reported case of chondrolysis. Dr. Miniaci expressed doubt that there is a strong correlation between radiofrequency devices and chondrolysis.[9]

Combined, these early reports of chondrolysis are important because they presented a clear signal that glenohumeral cartilage is extremely susceptible to damage from foreign substances.

Beginning in the early 2000s, surgeons also reported isolated cases of cartilage damage hypothesized to be due to the use of suture anchors.[10] The literature has suggested that it is the depth (or height) of placement of the anchors themselves, rather than the bioabsorbable panacryl sutures, which are associated with chondrolysis.[11] In any event, the damage to the cartilage in these instances is limited to the area near the anchors – typically described as "focal injury" – rather than the widespread destruction of cartilage of the entire joint.[12]

The most pronounced wave of chondrolysis began surfacing in the published literature 2004, when Petty and colleagues reported three cases of glenohumeral chondrolysis in young athletes following arthroscopic shoulder surgery.[13] Thermal devices were used in two of the three patients. The third patient, however, received a pain pump infused with a solution of

---

[8] Ex.14, K. Wong, and G. Williams, *Complications of Thermal Capsulorrhaphy of the Shoulder*, 83-A Supp. 2 Part 2 J. BONE JOINT SURG. 151-155 (2001) .

[9] Ex.15, A. Miniaci, and M. Codsi, *Thermal Capsulorrhaphy for the Treatment of Shoulder Instability*, 34(8) AM. J. SPORTS MED. 1356-63, 1362 (Aug. 2006) .

[10] *See* Ex.16, G. Athwal et al., *Osteolysis and Arthropathy of The Shoulder After Use of Bioabsorbable Knotless Suture Anchors*, 88-A(8) J. BONE & JOINT SURG. 1840-45 (Aug. 2006).

[11] *Id. See also* Ex.17, P. Clavert and J. Warner, *Panacryl Synovitis: Fact or Fiction?* 21 ARTHROSCOPY 200-03 (2005).

[12] Ex.16, G. Athwal, *supra*, at 1845.

[13] Ex.13, D. Petty et al., *supra*, (2004).

.5% bupivacaine ("Marcaine") and epinephrine. Dr. Petty and his colleagues failed to mention whether pain pumps were used in the other two cases. Although the authors determined that thermal devices played a role in two of the three cases of chondrolysis, they did not make the connection between the pain pump used in any of the patients. The authors' oversight is not surprising, since no one had yet reported a link between pain pumps and chondrolysis. But as intra-articular use of pain pumps became more and more popular in arthroscopic shoulder procedures, surgeons began seeing a surge in the number of their patients who developed chondrolysis. One of these surgeons was Dr. Charles Beck.

Dr. Beck had performed hundreds of arthroscopic shoulder surgeries at his clinic in Salt Lake City without encountering a single case of glenohumeral chondrolysis. But beginning in 2003, several of his patients developed rapid-onset chondrolysis. Ex.18, Beck Report at 6-7. Dr. Beck scrutinized his patients' records, trying to find out what could be causing them to develop this rare disease. He considered all of the potential etiologies: anchors, sutures, radiofrequency probes, irrigation fluid, pre-existing cartilage injury, surgical technique. None of these other factors could explain the injury. The only consistent common factor was use of a high volume pain pump with bupivacaine and epinephrine in the glenohumeral joint. *Id.* at 7. Dr. Beck reviewed the medical records for <u>all</u> 152 of his arthroscopic shoulder surgery patients over the same time frame. He discovered that most of his patients who had received a pain pump catheter in their joint space (63%) developed glenohumeral chondrolysis. In contrast, there were <u>no</u> cases of chondrolysis in any of his patients who did not receive a pain pump catheter in the joint space, *nor in any patient who received a pain pump where the catheter was placed near, but outside, the joint space*. *Id.* at 7-8. The only patients who developed chondrolysis were those in whom he had inserted a pain pump catheter in the joint space.

Alarmed, Dr. Beck consulted with his colleagues to find out if they were having the same experience. Dr. Paulos, a fellow surgeon in Salt Lake City, confirmed that the only patient of his

who ever received a pain pump – an NCAA football player – developed chondrolysis. *Id.* at 8. Other orthopedic surgeons also began seeing the same complications in their patients.

In July 2005, Dr. Beck presented his findings to orthopedic surgeons at a Herodicus Society meeting in Colorado. Ex.18, Beck Report at 8. Dr. Beck's presentation prompted other scientists to begin studying the toxicity of bupivacaine in animal cartilage. *Id.* Anxious to alert surgeons to this devastating complication, Dr. Beck and his colleague Dr. Hansen wrote a paper for a podium presentation at the annual meeting of the American Academy of Orthopedic Surgeons (AAOS) in March, 2006. Ex. 19, B. P. Hansen, et al., *Podium Presentations*, AM. ACADEMY ORTHOPAEDIC SURGEONS (March 23. 2006). Drs. Beck and Hansen then submitted their research for peer review and publication. Their paper was published on July 3, 2007 in the AMERICAN JOURNAL OF SPORTS MEDICINE.[14]

At about the same time, Dr. Constance Chu and her colleagues at the University of Pittsburgh published an *in vitro* study showing that a solution of 0.5% bupivacaine (the local anesthetic most commonly used in pain pumps) is cytotoxic to bovine joint cartilage after just 15 to 30 minutes of exposure. Ex. 21, C. Chu, et al., *In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articular Chondrocytes*, 22 ARTHROSCOPY 693-99 (Jul. 2006). A series of animal and *in vitro* studies built upon Dr. Beck's findings and Dr. Chu's research. They confirmed that local anesthetics in general were toxic to cartilage, and that this effect was both dose and duration dependent. These studies are too numerous to describe in detail here.[15] But it

---

[14] Ex. 20, B. P. Hansen, et al., *Postarthroscopic Glenohumeral Chondrolysis*, AM. J. SPORTS MED. (July 2007) Epub ahead of print.

[15] Ex. 22, A. Gomoll, et al., *Chondrolysis After Continuous Intra-Articular Bupivacaine Infusion: An Experiemental Model Investigating Chondrotoxicity in the Rabbit Shoulder*, 22:8 ARTHROSCOPY 813-19 (Aug. 2006); Ex. 23, J. Karpie and C. Chu, *Lidocaine Exhibits Dose- and Time- Dependent Cytotoxic Effects on Bovine Articular Chondrocytes In Vitro*, 10 AM. J. SPORTS MED. 1-6 (Jul. 2007); Ex. 24, I. Lo, et al., *Local anaesthetics induce chondrocyte death in bovine articular cartilage*, 75th Annual Meeting Podium Presentations AAOS (Mar. 5, 2008); Ex. 25, M. Yeger-McKeever, et al., *Low Doses of Bupivacaine Are Cytotoxic to Articular Cartilage In Vitro*, 7th Annual Meeting AAOS (Mar. 5, 2008); Ex. 26, S. Piper and H. Kim, *Comparison of Ropivacaine and Bupivacaine Toxicity in Human Articular Chondrocytes*, 90:5 J. BONE JOINT SURG. Am. 986-91 (May 2008);

is notable that scientists repeated these experiments in human joint cartilage tissue and reached similar conclusions. *See, e.g.*, Ex. 27, J. Dragoo, et al., *The Effect of Local Anesthetics Administered Via Pain Pump on Chondrocyte Viability*, 36:8 AM. J. SPORTS MED. 1484-88 (Jun. 1, 2008).

Soon after, other surgeons came forward, publishing reports of their patients who developed chondrolysis after receiving pain pumps. Unlike Dr. Beck's investigation, these studies did not include control groups. Nevertheless, they reported the identical experience in numerous patients. After ruling out other potential factors, these surgeons concluded that the intra-articular infusion of local anesthetics through a pain pump was the probable cause of their patients' chondrolysis and cautioned against using pain pumps in the joint space. *See, e.g.*, Ex. 28, P. Greis, et al., *Bilateral Shoulder Chondrolysis Following Arthroscopy. A Report of Two Cases*, 90 J. BONE JOINT SURG. AM. 1338-1344 (2008); Ex. 29, S. Anderson, et al., *Chondrolysis of the Glenohumeral Joint*, J ARTHROSCOPY SUPP e13 (2008) (18 patients with pain pumps developed chondrolysis); Ex. 30, A. McNickle, et al., *Postsurgical Glenohumeral Arthritis in Young Adults*, AM. J. SPORTS MED. (Jun. 9, 2009) (16 of 20 chondrolysis patients received pain pumps).

One report in particular was compelling. Ex. 31, M. Saltzman et al., *Postsurgical Chondrolysis of the Shoulder*, 32 ORTHOPEDICS 215 (2009). It involved a patient who injured both shoulders. After bilateral arthroscopic surgeries, she received pain pumps in her left and right shoulders, but the pain pump in her right shoulder malfunctioned and did not deliver any anesthetic medication into her right shoulder joint. The patient developed chondrolysis in her left shoulder but not in her right shoulder. As the authors noted, it is unusual to have a patient, who serves as both a case and control. After eliminating other potential factors, the authors cautioned that pain pumps should not be used to deliver local anesthetics in the shoulder joint space. *Id* .

A later laboratory study by Dr. Chu and colleagues confirmed that the prolonged exposure of human and bovine joint cartilage to bupivacaine at doses ranging from 0.25 to 0.5% is chondrotoxic. Moreover, bupivacaine chondrotoxicity is both dose- and time-dependent. Ex. 32, C. Chu, et al., *The in vitro effects of bupivacaine on articular chondrocytes,* 90-B:6 J. BONE & JOINT SURG. (BR) 814-20 (2008). The researchers also found a significant distinction between single injections and continuous infusion of anesthetics: although single injections of bupivacaine did not destroy joint cartilage, continuous infusion over longer periods did. The authors explained:

> These findings provide critical new information relating to current concerns on the clinical use of bupivacaine. Our results may provide an explanation for the absence of clinical reports on the association between chondrolysis and the use of intra-articular bupivacaine before the introduction of continuous-infusion pumps. In addition to systemic absorption and to the potential counteraction of the expected dilutional effects of joint fluid, continuous intra-articular infusion protocols may prolong the exposure of chondrocytes to bupivacaine. Eventually, the threshold for chondrolysis may be reached, as has been suggested clinically.

*Id* . at 818.

This mounting evidence of clinical and laboratory studies has prompted the editors of leading orthopedic journals and textbooks to conclude that the infusion of anesthetics via pain pumps into the joint space causes chondrolysis and that surgeons should avoid using pain pumps in this manner. After reviewing Dr. Chu's most recent study, journal editors Webb and Ghosh stated:

> For the first time, a rational explanation for a variable effect of intra-articular bupivacaine can be provided based on demonstration of the dose- and time-dependent chondrotoxicity of drug. It can be concluded that the continuous intra-articular administration of high-concentration bupivacaine for a prolonged duration may result in adverse clinical effects, whereas the single injection of low-concentration bupivacaine is less likely to cause harm.
>
> * * *

> [W]e must be prepared to modify our approach to drug usage in light of new knowledge of adverse effects, even turning away from previously well-recognised practices. We commend our surgical colleagues on bringing the subject of bupivacaine-associated chondrotoxicity and its potentially devastating clinical consequences to the attention of the broader medical community.

Ex. 33, S. Webb and S. Ghosh, *Further opinion: The in vitro effects of bupivacaine on articular chondrocytes*, J. BONE JOINT SURG. (B) (2008) . The editors also called for a moratorium on the use of continuous intra-articular bupivacaine to avoid exposing patients to further unnecessary harm. *Id.* A recent case report by Fester and Noyes also agreed with Dr. Chu's findings, concluding, "In summary, there is currently a significant amount of in vitro and in vivo evidence that the use of pain pumps with bupivacaine and epinephrine may lead to significant chondrolysis when placed into a joint." Ex. 34, E. Fester and F. Noyes, *Postoperative Chondrolysis of the Knee: 3 Case Reports and a Review of the Literature,* AM. J. SPORTS MED. (Jun 17, 2009) (Epub ahead of print).

Likewise, Drs. Busfield and Romero published a paper unambiguously identifying intra-articular use of pain pumps as a cause of chondrolysis, as is evident from the title itself. Ex. 35, B. Busfield and D. Romero, *Current Concepts: Pain Pump Use After Shoulder Arthroscopy As a Cause of Glenohumeral Chondrolysis*, 25(6) J. ARTHROSCOPIC RELATED SURG. 647-652 (Jun. 2009).

A more recent review article, published by Baillieul and colleagues, is a useful example of how real world scientists have concluded that pain pumps cause chondrolysis, based on a comprehensive assessment of the available literature. Ex. 36, R.J. Baillieul, *The peri-operative use of intra-articular local anesthetics: A review*, 60 ACTA ANAESTH BELG 101-08 (2009). As the authors stated, the purpose of their paper was "to summarize the available literature on intra-articular local anesthetics in terms of efficacy, clinical use, relative effectiveness compared to other analgesic procedures, side effects and possible toxicity." *Id.* at 101. After reviewing many of the same studies plaintiffs' experts did, the authors found little evidence supporting the

efficacy of intra-articular infusion of local anesthetics for pain management compared to placebo. *Id.* at 106. Based on their review of the published literature, the authors concluded:

> Continuous intra-articular infusion of local anesthetic has not been demonstrated to be an effective analgesic strategy after arthroscopy. **Furthermore, there is a strong correlation with post-operative chondrolysis after shoulder surgery. We hence advise against the use of continuous intra-articular local anesthetics**.

*Id* (emphasis added).

A new retrospective comparison study, published in December 2009 by J. Rapley and colleagues, validated the clinical findings of Drs. Beck and Hansen. Ex. 37, J. Rapley et al., *Glenohumeral chondrolysis after shoulder arthroscopy associated with continuous bupivacaine infusion*, 25:12 ARTHROSCOPY: J ARTHROSCOPIC AND RELATED SURG. 1367-73 (Dec. 2009). In this study, the authors investigated all arthroscopic shoulder surgery patients of a single surgeon between 2000 and 2007.

The study found that 19% (3 of 16) of the patients with intra-articular placement of the high volume pain pump developed chondrolysis, while none of the patients with low volume pain pumps or those with subacromial placement developed chondrolysis. Notably, these results are similar to the Beck/Hansen study, which found no incidence of chondrolysis in patients who used a low volume pain pump or had the pump catheter placed outside of the joint space. Ex. 20, Hansen and Beck (2007) at 2, 5; Ex.18, Beck Report at 5. The higher incidence rate of chondrolysis observed in the Beck/Hansen study is likely due in part to the use of bupivacaine with epinephrine.

A leading medical textbook on the shoulder (of which Dr. Matsen is an editor) acknowledges bupivacaine in pain pumps as a cause of chondrolysis:

> **BUPIVACAINE-INDUCED CHONDROLYSIS**
>
> **There is a growing body of evidence linking intra-articular infusion of bupivacaine with or without epinephrine via a pain pump to postoperative chondrolysis. In fact, many instances of chondrolysis after thermal capsulorrhaphy may be related to**

> **the use of pain pumps.** Hanson and colleagues retrospectively evaluated 12 shoulders with chondrolysis after glenohumeral arthroscopy. In the study time period, 19 patients had arthroscopic capsular procedures with high-flow pumps delivering bupivacaine with epinephrine. Of these, 12 developed chondrolysis. Gomoll and coworkers studied the effects of bupivacaine with and without epinephrine on chondrocytes in rabbit shoulders. Bupivacaine infusion had a substantial chondrotoxic effect as measured by sulfate uptake, cell viability and histologic grade. Chu and colleagues demonstrated that 0.5% bupivacaine had cytotoxic effects on bovine chondrocytes after only 15 or 30 minutes of exposure. **At this time, infusion pumps containing bupivacaine should not be placed intra-articularly after arthroscopic capsular procedures.**

Ex. 38, A. WEI AND L. GALATZ, THE SHOULDER, VOL. 2, *CH. 19, COMPLICATIONS OF SHOULDER ARTHROSCOPY* 918 (C. A. Rockwood, et al. eds., Saunders Elsevier 4th ed 2009) (emphasis added).

The evidence continues to accumulate. In April, 2010, Dr. Lance Anderson and his colleagues published a follow-up to their initial case series of 18 patients reported in an abstract in 2008. Ex. 39, S. L. Anderson et al., *Chondrolysis of the Glenohumeral Joint After Infusion of Bupivacine Through an Intra-articular Pain Pump Catheter: A Report of 18 Cases*, 26(4) ARTHROSCOPY 451 (Apr. 2010). This retrospective analysis of consecutive patients is identical in design to the study by Drs. Beck and Hansen. Dr. Anderson et al. did a comprehensive review and follow-up of the entire population of two surgeons' arthroscopy patients during the time period in which the surgeons were using pain pumps in the intra-articular space ("IAPPs"). Within that timeframe, there were 113 arthroscopies, in which 45 pain pumps were used. Bupivacaine with epinephrine was the medication used in the IAPPs. Chondrolysis developed in 16 of 32 patients (40%) who received high-flow IAPPCs and in 2 of 12 patients (16.7%) who had low-flow IAPPs, for an overall attack rate of 50% in the cohort of patients with IAPPs. In contrast, there were no cases of chondrolysis among the cohort of patients who did not receive pan pumps. Furthermore, there have been no further cases of chondrolysis in the two surgeons' practice, either before they started using IAPPs or after they stopped using them. *Id.*at 457. The

authors did not perform a statistical analysis of their cohorts. Instead, they submitted their findings as a "case series" even though their study included and described comparison groups.

In summary, there are now three published retrospective cohort studies, each of which find an alarmingly high rate of chondrolysis in patients whose shoulder joints were exposed to the continuous infusion of local anesthetics through pain pump catheters (Beck, Rapley and Anderson). In each of these studies, there were no cases of chondrolysis in any of the patients who did not receive pain pumps in the glenohumeral joint. Moreover, each of these studies finds that the association is dose-dependent: low volume pain pumps are less likely to cause chondrolysis than high volume pain pumps.

It is no surprise that surgeons have recently abandoned the use of pain pumps in the glenohumeral joint space. Nearly every relevant medical article now discourages this practice. Medical school students and surgical residents are now taught to avoid placing the pain pump catheters in the joint space because it ruins cartilage. In an interview with the chief medical editor of the journal ORTHOPEDICS TODAY, Dr. Chu noted, "The most important recommendation I have made to [medical residents and fellows] is to avoid continuous intra-articular infusion of local anesthetics. The in vitro data consistently show a dose and time dependent chondrotoxicity of both bupivacaine and lidocaine suggesting this is a class effect of local anesthetics." Ex. 40, D. Jackson, *Intra-articular injections of local anesthetics: How much is too much?* 28:5 ORTHOPEDICS TODAY (2008).

It has become generally accepted in the orthopedic surgery community that continuous infusion of local anesthetics through a pain pump into the joint space causes chondrolysis. This knowledge derives from a confluence of human case reports, case series, animal and in vitro studies (of both human and animal tissue), and retrospective cohort epidemiological data. Combined, these sources are compelling and consistent evidence of causation. It would be both infeasible and unethical to conduct prospective epidemiological trials on humans to see if pain

pumps cause chondrolysis: the evidence of serious harm to patients is so strong that no Institutional Review Board would ever approve such a study.

Notably, there are no contrary studies demonstrating that intra-articular use of pain pumps does not cause chondrolysis. The literature is also significant because, taken as a whole, it validates the methodology plaintiffs' experts used in reaching the same conclusion the authors did – that intra-articular use of pain pumps is a case of chondrolysis.

## III. ARGUMENT

### A. Expert Testimony Under Daubert and Rule 702 Need Only Be Reliable, Not Perfect.

Defendant selects quotes from various cases to suggest that the standard for admissibility of expert testimony is extremely rigid and mandates the exclusion of evidence that does not rise to the level of perfection. This narrow view, however, is what led to the adoption of *Daubert* and the current Federal Rules of Evidence. These doctrines adopt a general approach of relaxing the traditional barriers to opinion testimony and embody a governing principle favoring admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-588 (1993) (*citing* FED. R. EVID. 401, 402 and 702). Therefore, defendants wrongly imply that the standard for admissibility of scientific testimony in this Circuit is higher than mandated by the Supreme Court and the Federal Rules of Evidence.

Rule 702 of the Federal Rules of Evidence provides that expert testimony that will assist the trier of fact is admissible if it is based upon sufficient facts or data, the methodology is reliable, and if the expert has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. Generally, an inquiry under Rule 702 assesses the expert's testimony as a whole, not individual data sets that underlie the expert's opinion. *Goebel v. Denver and Rio Grande W. R. Co.*, 346 F.3d 987, 993, 996 (10th Cir. 2003) (affirming district court's holding that studies relied upon by expert should be considered as a whole, not in isolation, to assess the reliability of general causation opinion).

The Supreme Court developed criteria to evaluate the admissibility of expert testimony under Rule 702 in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Court overturned the "general acceptance" rule under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Under *Daubert*, an expert's opinion no longer had to gain "general acceptance in the field to which it belongs" to be admissible. Instead, scientific evidence is reliable under Rule 702 if it based on an assertion that is grounded in the methods of science. *Daubert*, 509 U.S. at 590. The focus must be on principles and methodology, not its conclusions. *Id.* at 596.

Emphasizing that the inquiry is a flexible one, the Court listed four nonexclusive factors of reliability to replace the *Frye* test: (1) whether the scientific theory or technique can be (or has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known rate of error; and (4) whether the theory or technique is accepted in the relevant scientific community. *Id.* at 593-94. These criteria are not exhaustive, however, and a trial judge has broad discretion to consider a variety of other factors, depending on the factual circumstances. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999). Testing, for example, is not necessary in every instance to establish reliability under *Daubert. Bitler v. A.O. Smith Corp,* 400 F.3d 1227, 1236 (10th Cir. 2005). The Tenth Circuit recognizes that the district court need not "recite the *Daubert* standard as though it were some magical incantation, or apply all of the reliability factors suggested in *Daubert* and *Kumho.*" *Ruff v. Ensign-Bickford Indus.*, 168 F. Supp. 2d 1271, 1276 (D.Utah 2001).

**1. *Certainty is Not Required for a Causation Opinion.***

While experts' opinions must be based on facts that enable them to express a reasonably accurate conclusion as opposed to speculation or conjecture, absolute certainty is not required. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995). As the Supreme Court noted, when assessing the expert's methodology, the inquiry should not be aimed at "the exhaustive search for cosmic understanding but for the particularized resolution of legal

disputes." *Daubert,* 509 U.S. at 597. "Thus it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant." *Bitler*, 400 F.3d at 1234.

**2. *Epidemiological studies are not required to establish general causation.***

Courts frequently depend on epidemiological studies in assessing the reliability of expert testimony. Where epidemiology is available, it cannot be ignored. Because it is the best evidence of general causation, experts must at least address it. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005). However, epidemiological evidence is not the sole method of establishing causation. *Id.* at 882. In some cases, the expert does not have the benefit of years of epidemiological studies, particularly where the substance at issue is not typically tested by scientists and toxicologists. *Ruff,* 168 F. Supp.2d at 1279.

**3. *Disagreement with the expert's conclusions or factual basis does not affect admissibility of the testimony.***

The absence of consensus in the medical community on general causation does not invalidate an expert's opinion. *Goebel*, 346 F.3d at 991. Moreover, not knowing the precise mechanism by which a particular agent causes a disease is not fatal to the Rule 702 inquiry. *Bitler*, 400 F.3d at 1238 n. 7. "Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." *Id. , citing Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) (emphasis in the original). Thus, although expert testimony must be based on a reliable methodology, the offering party need not prove that the expert is "indisputably correct" for the testimony to be admissible. *Bitler,* 400 F.3d at 1233.

The evidentiary requirement of reliability is not perfection; it is lower than the standard of correctness. *Cook v. Rockwell Int'l Corp.,* 580 F. Supp. 2d 1071, 1085 (D. Colo. 2006). Likewise, the existence of uncertainties in an expert's underlying data may affect the weight to

be accorded the testimony, not its reliability. *Id.* at 1091. If the expert's testimony meets the threshold for reliability under Rule 702, it is up to the jury to decide whether the expert used the best or most reliable methodology, how much weight it deserves, and which of the competing experts' opinions should be credited. The jury makes the ultimate determination of whether the expert's testimony is correct. *Id.* at 1085.

Likewise, disagreement with the expert's conclusions or the factual basis for them, goes to the weight the jury must give the evidence, not its admissibility. Here, defendants and their experts strongly dispute the conclusions reached by plaintiffs' experts. Specifically, they claim that the studies plaintiffs' experts' rely upon do not include magic words concluding that the association between pain pumps and chondrolysis is "proven" or "definitive" or "generally accepted." As one court observed, "The scholarly process invites debate about new research and, without more, the fact that one scientist disagrees with another does not provide a basis for the Court to disregard an expert witness' reliance on a study." *Palmer v. Asarco Inc.*, 510 F. Supp. 2d 519, 527 (N.D. Okla. 2007). That there is room for a difference of opinion within the underlying scientific community is not grounds to invalidate an otherwise reliable opinion. *Id.*

**4. *Courts have upheld the admissibility of expert testimony that is based on a combination of evidence.***

Rule 702 requires the district court to examine the proffered evidence in its totality, not in isolation. *See Goebel*, 346 F.3d at 993; *United States v. W. R. Grace*, 504 F.3d 745, 762, 765 (9th Cir. 2007). The reason is fundamental: Good science demands that experts consider all of the available data when making judgments on causation. In fact, it is unscientific to ignore the totality of data. As Dr. Samuel Scheiner, a leading scholar of the scientific method, has explained:

> How do we come to conclusions in science? What sorts of evidence do we use and how do we use them? … My major contention is that all types of evidence play a role; that scientific decisions are based on the consilience of the evidence, the bringing together of different, even disparate, kinds of evidence. Scientists

> are like detectives. Each datum is a clue, a piece of evidence, with conclusions built on the totality of the evidence: all observations plus any background information plus the logical relationship among all of this information."

Ex. 41, Samuel M. Scheiner, The Nature of Scientific Evidence - Statistical, Philosophical, and Empirical Considerations 51, *Ch. 3,Experiments, Observations, and Other Kinds of Evidence*, (M. L. Taper and S. R. Lele ed., U. Chi. Press 2004) (citations omitted).

In the real world practice of medicine, physicians do not wait for definitive studies to make a diagnosis to a reasonable degree of medical probability. *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). "In clinical medicine, a biologically plausible relationship, physiological studies of a drug, or even a handful of case reports can be useful in individual cases in helping a practitioner make judgments about cause and effect relationships." Ex. 42, J. Kassirer and Joe S. Cecil, *Inconsistency in Evidentiary Standards for Medical Testimony*, 288:11 J. Am. Med. Assoc. 1382, at 1384 (Sept. 18, 2002). As plaintiff's expert Dr. Martin Wells explained, although case reports and case series alone may not establish a cause and effect relationship, scientists must take them into account with all of the other available evidence available. Ex. 43, Martin T. Wells Dep. at 626-627 (Feb. 22, 2010).

For this very reason, courts widely recognize that experts' causation testimony is reliable when the foundations of their opinions are based on a variety of consistent lines of scientific evidence.

### 5. *Plaintiff's experts reasonably rely on multiple lines of both epidemiological and non-epidemiological evidence in support of their causation opinions.*

The multiple lines of evidence presented by plaintiffs' experts in this case, including retrospective cohort studies, peer reviewed case reports, animal and toxicology data, and the experts' own clinical experiences, are of the type routinely relied upon by medical professionals. For that reason, courts routinely uphold the totality of these sources as reliable foundations for causation opinions.

Plaintiffs' experts rely in part on a statistical analysis of the data from the study by Drs. Hansen and Beck, which quantifies the strong association between pain pumps and chondrolysis. In addition, the non-epidemiological lines of evidence are compelling because they support the epidemiological findings and are consistent with one another.

It was early case reports and Dr. Beck's study of his own patients that put orthopedic surgeons, researchers and pain pump manufacturers on notice that the use of pain pumps may be causing chondrolysis. Those early reports led other scientists to conduct animal studies, as well as *in vitro* studies in both animal and human cartilage. The laboratory studies generated additional case series involving numerous patients who developed chondrolysis. Subsequent *in vitro* studies identified a dose- and duration-response threshold. It is this combination of published, peer-reviewed clinical, animal and *in vitro* studies – all of which point in the same causal direction – as well as textbook references and clinical experience, that provide much of the foundation for the testimony of plaintiffs' experts. They employed the same scientific technique their peers in the orthopedic community used to reach the conclusion that the use of pain pumps in the intra-articular space is more likely than not a cause of chondrolysis.

In fact, the same combination of data led many study authors to urge their colleagues to avoid using pain pumps in the joint space. These studies are what ultimately convinced orthopedic surgeons throughout the country to stop using pain pumps in this manner. They are the type of evidence reasonably relied upon by experts in the field in forming inferences of causality concerning pain pumps and chondrolysis. FED. R. EVID. 703.

The following legal principles therefore govern the facts of this case and guide the evaluation of the experts' opinions and testimony under Rule 702:

- Epidemiological studies and conclusive acceptance of cause-and-effect relationships are not required for an expert to testify on general causation.[16]

[16] Courts in other circuits have also held that expert testimony may be admissible where it is based on reliable non-epidemiological lines of evidence. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,

- Published peer-reviewed studies are reliable sources of evidence to base expert testimony.
- A proper Rule 702 analysis requires the court to assess the evidence as a whole, not in isolation.
- Lack of textual authority or a study's failure to establish causation goes to the weight it should be accorded but is not grounds for exclusion.
- An expert's testimony on causation is unreliable if it fails to "rule in" plausible causes.

In summary, the Tenth Circuit takes a liberal approach to the admissibility of expert testimony. "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations." *Robinson v. Missouri Pac. R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994). As long as an expert's analogical reasoning is based on objective, verifiable evidence, the testimony is admissible. *Goebel*, 346 F.3d 991. Excluding expert testimony under Rule 702 "has been the exception rather than the rule." *Ruff*, 168 F.Supp.2d at 1276, *citing Goebel*, 346 F.3d at 991. The purpose of the *Daubert* inquiry is to make sure that an expert, whether basing testimony on professional studies or personal experience, employs the same level of intellectual rigor in the courtroom as she uses in her field of expertise. *Kumho Tire*, 526 U.S. at 152. Each of plaintiff's experts satisfies that standard.

**B. Several Courts in Other Pain Pump Actions Have Found that Plaintiffs' Experts' Testimony Satisfies the Requirements of *Daubert* and Rule 702 Based on Similar Evidence.**

Defendants have distorted and downplayed the recent decisions by other courts in the pain pump litigation. After exhaustive briefing and hearings on the same body of research and

(Cont.)

161 F. 3d 77, 83-84 (1st Cir. 1998); *Zuchowicz v. United States*, 140 F.3d 381 (2d Cir. 1998); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154-55 (3d Cir. 1999); *Benedi v. McNeil-P.P.C., Inc.* 66 F.3d 1378, 1384 (4th Cir. 1995); *Glaser v. Thompson Medical Co.*, 32 F.3d 969, 972 (6th Cir. 1994); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208-09 (8th Cir. 2000); *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1060 (9th Cir. 2003); *Ambrosini v. Labarraque*, 101 F.3d 129, 136 (D.C. Cir. 1996).

expert testimony, those courts held that the evidence of general causation is sufficiently reliable and relevant under Rule 702 to present to a jury. Plaintiff summarizes those decisions below:

**1. *McClellan v. I-Flow Corp.*, CIV07-1309-AA, 2010 WL 1753261 (D. Or. Apr. 29, 2010)**

In the District of Oregon, there are presently more than two dozen pain pump plaintiffs, whose actions against I-Flow, DJO and other defendants are pending before Chief Judge Ann Aiken. Beginning last November, Judge Aiken held *Daubert* hearings on the combined defendants' challenges to the testimony of all 11 plaintiffs' experts on general causation. Many of those same experts are also designated as experts in this action. On April 29, 2010, Judge Aiken issued a lengthy opinion and order.

In *McClellan,* the defendants waged the same attacks on plaintiffs' experts as they do here: that medical science lacks sufficient data regarding the cause of chondrolysis and no conclusive evidence, such as epidemiological studies, provides a causal link. Specifically, the defendants focused their arguments on: lack of certainty of evidence; the lack of epidemiological evidence, the insufficiency of medical studies to support causation (such as laboratory and animal studies and case series) and their reliance on the totality of medical evidence.

The court addressed each of these charges. First, the court found that the focus of *Daubert* is whether the expert's testimony is based on scientific reliable and relevant evidence, not whether plaintiffs' experts can prove the point of their testimony. *Id.* at *8. The court observed that causation in pain pump cases is not nearly as problematic as causation in toxic exposure or pharmaceutical cases, where the plaintiffs suffer from a latent disease or systemic injury unrelated to the area or purpose of the exposure. *Id.* at *9. Rather, "not only does a direct physical correlation exist between the point of exposure and the resulting injury to the shoulder joint, there is an appreciable temporal relationship between the exposure to continuous infusion and the development of chondrolysis. *Id.* at 10.

The court further found that the lack of epidemiological evidence is not necessary to establish causation, "particularly in a case where no epidemiology 'rules out' continuous infusion as a cause of chondrolysis." *Id.* at *14. As the court noted, chondrolysis is an extremely rare disease, which makes it difficult to study. Moreover, the court found, it would be unethical to do the types of randomized controlled epidemiological studies that defendants claim are necessary given the potential for irreversible harm. *Id.*

The court rejected defendants' argument that plaintiffs' experts could not reliably extrapolate the animal and *in vitro* toxicity studies to humans because physicians routinely rely on such studies, along with other factors, to determine causality. *Id.* at *16. In addition, many of the peer reviewed literature on pain pumps and chondrolysis include discussion of these very studies as important evidence to support the correlation. *Id.* Furthermore, these studies demonstrate a basic dose-response relationship between continuous infusion of local anesthetics and chondrotoxicity. *Id.*at 17.

Likewise, the court held that the evidence provided in published case series was compelling and demonstrated a strong association between pain pumps and chondrolysis. Along with *in vitro* and animal studies, case series are routinely considered and relied upon by physicians in the normal course of their profession. *Id.* at *20. In the same vein, doctors and scientists consult multiple sources of data and consider them as a whole – not in isolation – as part of their practice in assessing causality and in diagnosing and treating patients. *Id.*

Finally, the court disagreed with defendants' argument that plaintiffs' experts' opinions should be excluded because they are not "generally accepted" within the medical or scientific communities. As the court emphasized, it is not the experts' *opinions* that are assessed for general acceptance, but the methodology they employed in reaching their conclusions. The court found that the experts' methodology, which consisted of their knowledge and clinical experience, combined with their review of the medical literature and patient records, was generally accepted.

*Id.* at *22. More important, given that physicians no longer use pain pumps in the joint space, and a medical textbook warns against such use, "it can be inferred that the medical community generally accepts not only the methodology relied on by plaintiffs' experts, but their conclusions that continuous infusion can cause chondrolysis." *Id.* at *23.

The court held that the causation testimony of plaintiffs' experts, including Drs. Badylak, Beck, Dragoo and Swanson, was admissible. The court did exclude the opinions of Drs. Matsen, Greenland and Wells. Specifically, the court found that Dr. Matsen's unpublished study of 396 patients had been tainted because of the appearance of influence from one of plaintiffs' counsel and because the statistical data in Dr. Matsen's study, which is currently undergoing journal peer-review, is likely to change. *Id.*at *25-31, *41 n. 31. The court excluded the opinions of Dr. Wells and Greenland regarding their analysis of the Beck/Hansen study for different reasons. Although it found that the methodology used by both epidemiologists to analyze the data was reliable, the court did not find their testimony to be particularly helpful or relevant. First, neither expert is a medical doctor, so they could not generalize the data to the general population. And second, the high degree of association between pain pumps and chondrolysis is so obvious that an expert is not required to infer causation. *Id.*at *43. However, the court did hold that these experts could testify in rebuttal should defendants "open the door," thus making their opinions relevant. *Id.* at *43.

**2. *Schott v. I-Flow Corp.*, CIV1:08-cv-00323, 2010 WL 1008478 (S.D. Ohio Mar. 16, 2010):**

Judge Arthur Spiegel recently considered defendant I-Flow's challenges to the general causation testimony of Drs. Dragoo, Greenland and Wells in six pain pump actions pending in the Southern District of Ohio. There, I-Flow launched the same attacks of plaintiffs' experts as it did in *McClellan.* After conducting a full evidentiary hearing, the court held that all three experts' opinions met the *Daubert* criteria:

> The Court sees more than adequate evidence that the expert opinions in this case have been published, subjected to peer review, and are generally accepted by the medical community. The combination of cohort studies, animal studies, and in vitro human cartilage studies demonstrates that the experts' causation opinions are supported by science.

*Schott* at *6.

Like Judge Aiken, Judge Spiegel was unconvinced by defendant I-Flow's contention that plaintiffs' experts' testimony was litigation-driven and unreliable because the opinions expressed in their reports and depositions were stronger than the language they used in their published studies. *See id.*at *3. The court found that these attacks "boil[ed] down to semantics" and held that the body of published studies on the relationship between intra-articular use of pain pumps and chondrolysis provides an adequate foundation for general causation testimony. *Id.* at *6. The court also noted that it was disingenuous for the defendant to "clamour for" epidemiological studies to prove causation, since it would unethical for such studies to be conducted. *Id.*

**3. *Zink v. SMI Liquidating, Inc.*,CIV.A.08-95 WOB 2010 WL 1839907 (E.D. Ky. May 7, 2010)**

SMI, a pain pump manufacturer, filed a motion before Judge Bertelsman in the Eastern District of Kentucky to exclude the general causation testimony of Dr. Dragoo and the specific causation testimony of Dr. Samer Hasan. In its attack of Dr. Dragoo, SMI made the same array of arguments that the defendants did in *Schott* and *McClellan.* In particular, SMI faulted Dr. Dragoo's cartilage study, among others, for failing to demonstrate causation definitively. The court rejected this argument because such "definitive" experimentation on humans would be unethical. *Zink* at *2. Furthermore, defendant's own expert, Dr. Petty, acknowledged that the mechanism for causing chondrolysis, is the damage to chondrocytes demonstrated by Dr. Dragoo's study. *Id.*

The court also rebuffed defendant's argument that the causal association between pain pumps and chondrolysis is not "well-accepted" in the scientific community. As the court pointed out, the defendant's expert admitted that the link was well known and accepted. *Id.* The court

found the *Schott* opinion persuasive and adopted its reasoning. The court held that the evidence of general causation was sufficiently reliable to pass muster under Rule 702. *Zink.* at *3. The court also ruled that the differential diagnosis employed by Dr. Hasan in determining the cause of chondrolysis in the plaintiff was appropriate and reliable. *Id.* at *4.

**4. *Paugh et al. v. I-Flow Corp., CIV. 32D02-0802-CT-9 (Hendricks Cnty. Ind. Super. Ct. No. 2, Apr. 9, 2010).***

Defendant I-Flow challenged each of plaintiffs' causation and regulatory experts in a consolidated pain pump action of two plaintiffs pending in state court in Indiana. As it has done in every other case, I-Flow argued that the current state of scientific knowledge lacks definitive proof that intra-articular use of pain pumps can cause chondrolysis. The trial court disagreed:

> The Court also finds ample evidence that the orthopedic experts have been published, subjected to peer review, and have applied techniques to their analysis that are generally accepted by the medical community. The experts have relied upon cohort studies, animal studies, and in vitro human cartilage studies demonstrating that the experts' causation opinions are supported by science. The law of Indiana permits an expert to rely upon the totality of evidence before him in formulating his opinions. The Court finds the Plaintiffs' experts are highly skilled in their respective fields and finds their methodologies sound. The Court is satisfied that the body of publications regarding the relationship between chondrolysis and anesthetics provides a basis for the general causation testimony offered I this case.

*Id.*at 6. Accordingly, the court denied defendant's motion in its entirety.[17]

[17] In a separate order, the *Paugh* court granted plaintiffs' motions to exclude I-Flow's causation expert, Dr. Burkhead, from presenting opinions that: (1) pain pumps delivering local anesthetics (without epineprhrine) do not cause chondrolysis; (2) It is the epinephrine contained within certain local anesthetic formulations that is the cause of chondrolysis; and (3) young people are prone to develop chondrolysis because their shoulder growth plates have not completely closed. The court held that these opinions are "unreliable, devoid of scientific support, and cannot withstand scrutiny under Indiana Rule of Evidence Rule 702 and *Daubert…*" *Paugh et al. v. I-Flow Corp.*, Civ. 32D02-0802-CT-9, Order Granting Plaintiffs' Motion to Exclude Certain Opinions of Wayne Z. Burkhead, Jr., M.D. (Hendricks Cnty. Super. Ct. No. 2, Apr. 24, 2000). Plaintiff presumes Dr. Burkhead will not be offering such testimony in this case.

**5. *Beale v. I-Flow Corp.*, Pretrial Hearing Tr. at 4-11, CIV. 0801-01554 (Multnomah Cnty. Dist. Ct., Or. Jan. x, 2010).**

The first pain pump trial in the country against defendant I-Flow took place last January in state court, in Portland, Oregon. Before trial, defendant I-Flow filed a motion to exclude the causation testimony of Dr. Matsen and other plaintiffs' experts. I-Flow advanced the same arguments in *Beale* as it and other defendants did in *Paugh, Zink, Schott* and *McClellan.* After extensive briefing and oral argument, the court held that the evidence upon which Dr. Matsen and other experts relied were sufficiently reliable and relevant under Oregon's Evidence Code 702 and 402-403 (which are identical to FED. R. EVID. 702 and 402-403). Tr. at 4-11. Dr. Matsen, Dr. Greenland and several other orthopedic surgeons testified at trial. The jury awarded a verdict of $5.45 million.

***6. Kilpatrick v. Breg, Inc., 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009).***

This was the first *Daubert* opinion issued in a pain pump action. Defendants rely heavily on it. The court excluded the general causation opinion of Dr. Gary Poehling, a prominent orthopedic surgeon. The court found that the four studies Dr. Poehling relied upon for his causation opinions were insufficient because each study, standing alone, could not reliably prove causation. At best, they suggested only an association. *Id.* at *5. The court took special aim at the Beck/Hansen study, declaring that the study's finding of a 63% injury rate (12 out of 19 shoulders exposed to pain pumps developed chondrolysis) implied an "error rate" of 40%. *Id.* at *5-6. Because the authors could not explain why nearly 40% of the patients exposed to pain pumps avoided the same ill fate as the other 63%, the court concluded that the Beck/Hansen study failed to satisfy the "good science" standard demanded by *Daubert* and Rule 702. *Id.* at 6.

Although defendants seek refuge in *Kilpatrick*, they fail to acknowledge the factual differences in that case. There, the plaintiff presented only one causation expert. The plaintiff's expert did not have the benefit of several more recent studies, including the retrospective cohort studies by Drs. Rapley and Anderson. The defendant in *Kilpatrick* convinced the trial judge that

the 37% of patients in Dr. Beck's study who were lucky enough to avoid getting chondrolysis constituted a 37% "error rate." As any epidemiologist can attest, the fortunate individuals who do not get sick or die from toxic exposures do not represent "error rates," as defendants would have us believe. This proposition appears nowhere in any epidemiological textbook or treatise. For obvious reasons, it has not been subjected to academic peer review, let alone, published in a scientific journal. The "error rate" theory advanced by defense lawyers is a classic example of junk science. Unfortunately, the plaintiff in *Kilpatrick* did not have adequate time to designate an epidemiologist in rebuttal to dispel this lawyer-generated misconception. The case is currently on appeal to the Eleventh Circuit. The "error rate" and the court's evaluation of each study in isolation are among the several points of error raised by appellants. Rule 702 does not impose upon litigants the Orwellian standards demanded by the trial court in *Kilpatrick.*

In fact, the *Kilpatrick* decision has been strongly criticized by other courts in the pain pump litigation. In *McClellan*, Judge Aiken was "unpersuaded" by the defendants' reliance on *Kilpatrick. McClellan*, 2010 WL 1753261, at *11. As she explained:

> If 100% of patients receiving continuous infusion must develop chondrolysis before an expert may reliably opine on causation, expert testimony would hardly be necessary. Given that the court did not cite statistical or epidemiological evidence in assessing a "40% error rate," one can only surmise that it was the court's own finding, one made without evidentiary support. However, Rule 702 imposes on the court neither "the obligation" nor "the authority to become [an] amateur scientist[ ] in order to perform" its gatekeeping role.

*Id.* at *12, *quoting Daubert*, 509 U.S. at 600-01 (Renquist, C.J., concurring in part).

Judge Aiken found "that the district court in *Kilpatrick* went far beyond its gatekeeping function and failed to distinguish between the threshold question of admissibility of expert testimony and the persuasive weight to be accorded such testimony by a jury." *Id.* (internal quotations and citations omitted).

Likewise, in *Schott*, Judge Spiegel declined to follow the holding in *Kilpatrick*:

> The Court respectfully disagrees with the Southern District of Florida's conclusion regarding the Hansen study, which showed 13 out of 19 patients treated with pain pumps developed chondrolysis. The Court has found no authority for the proposition that because 40% of patients did not develop chondrolysis, such minority of patients constitutes an "error rate." The Court acknowledges difficulty with extrapolation from such a small sample. However, the Court believes that when taken together with the body of medical evidence, which is greater than that before the Florida court, the Hansen study only affirms the admissibility of the expert opinions as to general causation.

*Schott*, 2010 WL 1008478, at *6.

The court in *Zink* also rejected the notion espoused in *Kilpatrick* that a reported incidence of harm less than 100% constituted an "error rate": "Defendants cite no authority to support the proposition that a product is not unreasonably dangerous just because it does not harm every person who uses it." *Zink*, 2010 WL 1839907, at *2.

In sum, the *Kilpatrick* opinion should be given little, if any, weight. The record in that case was not nearly as well developed, and the court's analysis has been widely discredited.

**C. <u>The Facts and Data Upon Which Plaintiff's Experts Rely Are Sufficient to Establish a Likely Causal Relationship Between Intra-Articular Infusion of Anesthetics Through Pain Pmps and Chondrolysis.</u>**

The evidence of causation in this case is not complicated. Plaintiff does not allege a systemic illness from defendants' product. Nor is her condition a latent one that occurred years after exposure. Rather, plaintiff suffered a complete loss of shoulder cartilage shortly after a pain pump delivered a continuous infusion of local anesthetics to her shoulder joint. Nevertheless, defendants treat this case as if it were a groundwater contamination toxic tort. They contend that causation is a complete conundrum that cannot be solved without exhaustive prospective controlled human studies establishing background rates, relative risks, threshold dose levels and the like. However, defendants turn a blind eye not only on common sense, but also on real world science. They also misinterpret the legal requirements for admissibility under

*Daubert* and Rule 702. In fact, other courts in the pain pump litigation have consistently rejected identical arguments urged by defendants here.

Defendants wage a number of attacks on plaintiff's experts, claiming their methodologies are unreliable. For one thing, they accuse the experts of concocting their opinions for litigation simply because they did not submit their Rule 26 reports for publication in a medical journal. Defendants also assail plaintiff's experts for drawing inferences from the totality of the evidence, for relying on differential diagnosis, animal studies, and case series. They berate the evidence for lacking epidemiological studies and claim the experts' opinions are not generally accepted.

Defendants' chief contention, however, is that the testimony of plaintiff's experts must be excluded because no peer-reviewed published researcher has used definitive enough words to describe the causal relationship between pain pumps and chondrolysis.

This argument is flawed in two respects. First, there is no legal requirement of conclusive proof or universal acceptance of a theory before an expert can testify on causation. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). Second, defendants ignore the strong consensus that has evolved – as documented by the progression of the medical literature – that intra-articular use of pain pumps causes chondrolysis. Instead, defendants selectively extract fragments from certain medical articles to suggest that no one really knows for sure whether pain pumps cause chondrolysis. In doing so, defendants misconstrue the role of observations made in the literature versus scientific judgments inferred from it. Defendants also misquote and mischaracterize the literature by lifting statements out of context. At the same time, defendants fail to acknowledge contrary statements in several published papers that do conclude that pain pumps are a likely cause of chondrolysis. And most important, defendants cannot point to a single scientific experiment that refutes causation. *See Goebel,* 346 F.3d at 996.

The methodology supporting plaintiff's experts' opinions easily meets the threshold for admissibility. Plaintiff addresses each of defendants' attacks below.

**1. *Defendants misrepresent the significance and conclusions of the published literature, which find a cause-and-effect relationship between pain pumps and chondrolysis.***

Defendants paint a distorted picture of the published literature on pain pumps and chondrolysis. They cite a list of articles and selected quotes to lead the court to believe that the authors express doubt about the causes of chondrolysis. I-Flow Br. at 2-3. However, most of these articles were published between 2004 and 2007. The bulk of the literature on the relationship between pain pumps and chondrolysis has been published since 2007.

For example, defendants cite the early article by Dr. Petty, published in 2004. Back then, chondrolysis from pain pumps had never been previously documented in the literature. Dr. Petty's paper was the first to report chondrolysis in a patient who received a pain pump. It is not surprising that he did not appreciate this potentially causal relationship, since it was practically unheard of at the time. Recently, Dr. Petty, now a defense expert, admitted under oath that the potential risk of chondrolysis from intra-articular use of pain pumps is "well described and accepted in the community." *See Zink,* 2010 WL 1839907, at *2.

Defendants also cite the 2006 podium presentation by Drs. Beck and Hansen, and their peer-reviewed paper published in 2007. As described above, Dr. Beck's presentation is what prompted other scientists to conduct toxicity studies to shed light on whether this relationship was due to the toxicity of the local anesthetics, as opposed to the invasiveness of the catheter placement. At the time these papers were presented, Dr. Chu and others had not yet published their studies on animal and human cartilage. Those studies appeared in the literature beginning in 2007, and they confirmed what Dr. Beck had suspected – that continuous infusion of local anesthetics through high volume pain pumps were toxic to joint cartilage.

Similarly, defendants quote an editorial by Drs. Lubowitz and Poehling, which was published in 2007, simultaneously with the publication of the Beck/Hansen paper in a different journal. At that time, studies were only beginning to emerge about the risk of chondrolysis from pain pumps. I-Flow Br. at 2-3, Appx. I, Tab 6. Defendants did not bring to the Court's attention

the previous paragraph of the editorial, which states: "What is more, chondrolysis has been reported to be caused by the use of gentian violet *and with intra-articular use of a pin pump. Additionally, in animal and in vitro models, chondrolysis or chondrocyte cytotoxicity has been found to result from extreme levels of local anesthetic infusion*." *Id.* (emphasis added).

Also on defendants' list is an article published in 2009 by Allison McNickle and colleagues. It was a report of 20 patients who developed chondrolysis; 16 of them received pain pumps in the shoulder joint (Ex. 30, McNickle 2009). Defendants only quote selected statements to suggest that the role of pain pumps in causing chondrolysis is unknown. What the authors meant was that the effectiveness of intra-articular placement of pain pumps to control post-operative pain has not been proven and that there are complications associated with their use." *Id.* at 6. Defendants left out the most relevant finding of the study:

> Similarly, 16 young adults of this cohort had bupivacaine pain pumps and noted a return of symptoms at approximately 6 months postoperatively … **The damage – chondrocyte death – likely occurred with exposure to bupivacaine**, as has been demonstrated in vitro with as little as 15 minutes of exposure.

*Id.* (emphasis added).

Another article defendants mention is a paper by Coobs and LaPrade. I-Flow Br. at 2. But that article had nothing to do with pain pumps. The authors presented four cases of chondrolysis they attributed to the use of thermal devices. Defendants apparently cite the article to make the point that no one knows what causes chondrolysis. But these authors specifically found that "overtreatment with the thermal device can immediately and permanently damage the capsule. The mechanism of this process can potentially play a role in the chondrolysis that occurred in our patients."[18]

---

[18] Ex. 44, Benjamin R. Coobs and Robert F. LaPrade, *A Case Report & Literature Review - Severe Chondrolysis of the Glenohumeral Joint After Shoulder Thermal Capsulorrhaphy*, 38(2) AM. J. ORTHOPEDICS E34 - E37 (Feb. 2009)

Defendants quote the article by Kang et al. entirely out of context. I-Flow Br. at 2. The purpose of that article was not to investigate the causes of chondrolysis, but to enlighten orthopedic surgeons on the difficulties associated with anterior shoulder instability repair before, during and after surgery. The paper did, however, mention the post operative use of pain pumps as an important risk to avoid. Unfortunately, defendants cited only a fragment of the authors' discussion, which in its totality, states as follows:

> Severe glenohumeral chondrolysis is a rare but serious complication that has been associated with anterior shoulder instability repair. Although the exact cause of chondrolysis after labral repair has not been determined, **evidence suggests an association with thermal capsulorrhaphy or the use of an intra-articular pain pump after surgery (Fig 4)**. Specifically, Hansen et al. reported on the use of intra-articular bupivacaine and epinephrine pain pumps and found that glenohumeral chondrolysis developed in 12 of 19 patients (63%). This rapid progression of cartilage loss on the glenoid and/or humeral head surface is devastating for the patient, and very few treatment options exist once the diagnosis has been made… Although, to date, no single etiology has been identified as the cause of chondrolysis associated with anterior shoulder instability repair, **because of the devastating nature of this complication, we recommend avoidance of thermal capsulorrphaphy and the implantation of intra-articular pain pumps until more definitive data are available.**

I-Flow Br. Appendix I at Tab 1 (p.913-14) (emphasis added).

It is clear from the context that the authors used the term "exact cause" to mean the *mechanism* by which pain pumps cause chondrolysis. At the time their paper was published, Kang and colleagues had not yet read the retrospective cohort studies by Rapley and Anderson, which provide even more definitive data on causation. Nowhere in this article do the authors express doubt that a causal relationship exists.

The case study by Saltzman et al., cited by defendants, reported on a patient who had surgeries with pain pumps in both shoulders. However, the pain pump in one shoulder didn't function properly, so it did not infuse any medication into the patient's shoulder joint. The pain pump in the other shoulder worked well. The patient developed chondrolysis in the shoulder

with the functioning pain pump but not in the other shoulder. Again, defendants have cited only the sentence it wants the Court to see but omitted the authors' conclusions:

> Although it is not possible to prove that infusion of lidocaine through an indwelling catheter led to chondrolysis in our patient, the unique circumstances of our case provide a rare opportunity for comparison. The main difference was a functioning indwelling catheter used on the side that ultimately developed chondrolysis and a nonfunctioning catheter use on the side that did not develop chondrolysis. Taken in conjunction with other reports on the chondrotoxic effects of lidocaine, we caution against the use of continuous lidocaine infusion in the shoulder joint via an indwelling catheter.

I-Br. at 2, Appx. I, Tab 4 (p. 4).

Defendants' reliance on Dr. Bailie's paper is a non sequitur. In his paper, Dr. Bailie stated that there wasn't enough information to conclude that pain pumps could cause chondrolysis. However, in his deposition, Dr. Bailie clarified that he submitted his paper for publication in late 2006 or early 2007, before the latest medical literature was available. His paper was not published until 2009, so its conclusions were out of date. Ex. 45, Bailie dep. at 22-23, 39-40 (Sept. 25, 2009). Dr. Bailie's opinions on causation have evolved, based on the current state of scientific knowledge, as he recently testified to defense counsel:

> Q: As of today, 2009, has anyone established pain pumps as the cause of chondrolysis?
>
> A: **The orthopedic community has established that it is probably the primary cause that we're talking about now.** In other words, in the last five years, that is the number one thing. It's at every meeting. **And it is established that it is the primary culprit is the local anesthetics with indwelling pain catheters**.
>
> Q; And I want to make sure we're using the same language. I think what you're saying – please tell me if I'm wrong – is that currently pain pumps are suspected to be the most likely cause of chondrolysis.
>
> A: **They are strongly suspected enough that it's accepted to be cause and effect in the orthopedic community.** So that goes back to the large anecdotal stuff that we talked about.

(Ex. 45, Bailie dep. at 161-162) (emphasis added).

Moreover, Dr. David Weinstein, plaintiff's treating surgeon, testified that the medical literature definitively establishes a cause-and-effect relationship between the medications used in pain pumps and chondrolysis. Ex. 46, Weinstein Dep. at 138 (May 11, 2009). In fact, he believes that of all the potential risk factors, pain pumps are the most strongly related to chondrolysis. *Id.*

Aside from defendants' experts, there is no question that the orthopedic community now believes that continuous intra-articular infusion of pain medications from pain pumps is a leading cause of chondrolysis. The quantum of information that plaintiffs' experts use to base their opinions is of the type typically relied upon by other experts in the orthopedic field. The same body of literature has convinced surgeons to avoid using pain pumps in the joint space. The evidence should be sufficient for plaintiffs' experts as well. In fact, several courts have found that the medical community accepts not only the methodology relied on by plaintiff's experts, but their conclusions as well, that continuous infusion of anesthetics via pain pumps can cause chondrolysis. *See McClellan*, 2010 WL 1753261, at *23; *Schott*, 2010 WL 1008478, at *6; *Zink*, 2010 WL 1839907, at *2; *Paugh*, Ex. 47 at 6.

**2. *It is not mandatory for plaintiffs' experts to subject their opinions to peer review or publication before their testimony can be admitted under Rule 702.***

Defendants contend that the opinions of plaintiff's experts are unreliable because they did not submit them for peer review and publication in a medical journal. This argument fundamentally confuses the *Daubert* inquiry. Rule 702 and *Daubert* require that the expert base his/her *theory* on a reliable foundation. One of the *Daubert* criteria is whether the theory advanced by the expert has been subjected to peer review and publication. In this case, the theory that intra-articular use of pain pumps can cause chondrolysis is backed by a volume of authorities, including the retrospective studies by Beck/Hansen, Rapley, Anderson, several case reports, case series, toxicology studies and textbook references, all of which have been peer-reviewed and published in reputable medical journals. There is no legal precedent, and certainly

no mandate in any case cited by defendants, that require experts to submit the contents of their Rule 26 reports for peer-review and publication before their testimony will be admitted.

Defendants cite to *Norris v. Baxter Healthcare*, 397 F.3d 878, 866 (10th Cir. 2005) for the proposition that the plaintiffs' experts' testimony must be excluded because their opinions were not peer reviewed or published. Defendants misconstrue the holding. The *Norris* court found that the opinions of the experts were unreliable because the *theory* they espoused was never published in a peer-reviewed journal. In fact, the experts had completely ignored or failed to account for a large volume of epidemiological studies to the contrary, which concluded there was no causal link between silicone and systemic autoimmune disease. The crux of the court's criticism of the experts was this:

> Plaintiff and her experts have to base their positions on reliable studies and methodology. In failing to properly address the previous and contrary views, Plaintiff's experts made their opinions and testimony unreliable as to the issue of general causation.

*Id.* at 886.

The court's concerns in *Norris* are a far cry from this case. Plaintiff's experts rely on an abundance of peer-reviewed, published clinical studies that describe a likely relationship between pain pumps and chondrolysis, as well as *in vitro* and animal studies that document the chondrotoxicity of continuous infusion of local anesthetics through pain pumps.

Defendants also selectively quote from *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1071 (D. Kan. 2002). But defendants omitted to mention the court's acknowledgment that "[t]he fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id.* at 1073 n. 32. In *Miller*, the plaintiffs alleged that Zoloft, an antidepressant drug, caused their 13-year old son to commit suicide. The plaintiff's expert relied on his study of 20 volunteers, a meta-analysis of Pfizer data and an

analysis of Koch's Postulates. The district court excluded the testimony of plaintiffs' expert for several reasons: First, the study he conducted was not designed to examine the risk of suicide, but rather, the therapeutic benefits of antidepressants. In addition, the study was highly subjective because its measurement of outcomes was based on interviews with the patients, and there was no "unexposed" group in his study. *Id.* at 1080. The court also found that the expert focused on the association between the drugs and suicidal ideation rather than suicide itself. *Id.* More important, the expert failed to account for a large body of epidemiological studies that contradicted his opinions. *See id.* at 1081. And he failed to assess alternative explanations for the association. *Id.*

In this case, the body of literature plaintiff's experts rely upon strongly and consistently supports a causal relationship. There are no studies that contradict these findings. Furthermore, the courts in *McClellan* and *Schott* sharply disagreed with defendants' argument that the experts' failure to submit their causation theories to peer review renders their testimony worthless. *McClellan*, 2010 WL 1753261, at *21-22; *Schott*, 2010 WL 1008478, at *6. In *McClellan*, the court pointed to the testimony of Dr. Dragoo to explain why the opinion of an expert may be stated in stronger terms in a Rule 26 mandated report than in a research paper:

> [I]n the medical literature and in the medical peer-reviewed literature, statements outside the direct boundaries of research [are] not allowed. And that's the difference between the facts and the statements that are presented in the scientific literature and professional opinion or what is happening beyond this [study], because this is just a reflection of the exact study that was here, and not incorporating all of the other factors that are required for evaluation of the development of chondrolysis. So it cannot be stated here. Do I think it is a causative factor? Yes, but it is not stated in here by convention.

*McClellan*, 2010 WL 1753261, at *21-22 (*quoting* Dragoo Dep. June 12, 2009, p.50).

Defendants take particular aim at Dr. Matsen, deceptively claiming he acknowledged "that his study was universally rejected by peer-reviewed journals." *See* I-Flow Br. at 16. What Dr. Matsen was referring to was an earlier paper on a limited number of patients, upon which he

neither cites in his report nor relies upon for his opinions. Dr. Matsen's other study of 396 patients, on which he bases his opinion in large part, is currently undergoing peer review by a medical journal.[19] In a similar vein, defendants also misrepresent Dr. Dragoo's testimony by selectively quoting only pieces of his entire response, to suggest that he was not as careful in litigation as he is in his research. I-Flow Br. at 16. Here is the entirety of Dr. Dragoo's explanation of how he drafted his expert report:

> Q: And that's what I'm trying to get at, sir, because, in fact, the research that you personally have authored or co-authored and have published in many peer-reviewed journals, that, in fact, has been subjected to review by various editorial boards; correct?
>
> A: Correct.
>
> Q: And you've been asked to provide the backup data to support your statements and your opinons and your findings in your research; correct, Dr. Badylak?
>
> A: Correct.
>
> Q: And that is not something you've had to do for this expert report; correct?
>
> A: That's correct.
>
> **Q: All right. So going back to your statement that you've used, quote, "…the same scientific methodology with the same degree of rigor…" closed quote, that you see in your research, that is not an accurate description of your expert report versus your peer-reviewed published articles regarding your research as a clinician or scientist; true?**
>
> **A: I don't think that's true. They – I used – everything that I did was the same as if I was writing a manuscript or asked to write an editorial, which I've been – asked to do. I used the same amount of rigor in writing. You know, like I said, words mean something. This is my reputation. I mean, I believe wholeheartedly every single word in this expert report. Nothing that I put in here is based on mere speculation.**
>
> **It's taken into account everything that I know and understand about how the body works, from its development to its**

[19] As explained below, plaintiff does not intend to proffer Dr. Matsen or his retrospective study of 396 patients at trial until it completes peer review and is published.

> **response to disease, healthy cells, diseased cells, and each of those things was developed with a high degree of scientific rigor, and all of that went into this report.**
>
> **So that's why, you know, if I sound a little defensive about that, I am, because I put the same amount of work into this that I would put into any manuscript I submit for publication. It hasn't been reviewed, for obvious reasons.**

Ex. 48, Badylak Dep. at 135-136 (Jul. 13, 2009) (emphasis added for portion of testimony omitted by defendants).

Defendants cite *Daubert II* in support of their charge that the testimony of plaintiffs' is unreliable because it was not previously vetted by a peer-reviewed journal. I-Flow Br. at 17. But what *Daubert II* really held was that experts whose testimony is not based on independent research must back their opinions with "research and analysis supporting the proferred conclusions [that] have been subjected to normal scientific scrutiny through peer review and publication." *Daubert v. Merrell Dow Pharms., Inc.* 43 F. 3d 1311, 1318 (9th Cir. 1995) (*"Daubert II"*).

So long as the experts identify objective scientific sources and adequately explain how the evidence supports their opinion, the lack of peer review does not invalidate their opinions. *McClellan,* 2010 WL 1753261, at *22. That is precisely what plaintiffs' experts have done here. While the lack of peer review may be an appropriate subject for cross-examination, it is not grounds for exclusion. *Id.*

**3. *Plaintiffs' experts appropriately relied on the totality of the evidence to reach an inference of causation.***

Defendants declare that it is unscientific for plaintiff's experts to consider the universe of available studies on continuous infusion of local anesthetics and glenohumeral chondrolysis in forming their opinions. Instead, defendants assert that the experts may only rely on individual pieces of literature that state in precise terms that there is a "definitive" or "proven" causal link. *See* I-Flow Br. at 17. Not only is this view myopic; it runs counter to scientific method and legal authority.

No single item of evidence alone can conclusively establish causation. But "it may serve as one component, that when added to others, does prove causation." *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1359 (N.D. Ga. 2001), *citing Joiner v. General Elec. Corp.*, 78 F.3d 524, 531 (11th Cir. 1996), *rev'd on other grounds*, 522 U.S. 136, 146-47 (1997). The Tenth Circuit so holds. In *Goebel*, the Court of Appeals agreed with the district court's finding that the plaintiff's expert properly relied on a review of the medical literature as a whole: "The court emphasized that '[a]nalyzing each individual article and requiring that each article fully support Dr. Teitelbaum's theory, instead of focusing on the cumulative weight of the evidence, would be overemphasizing [his] conclusions, as opposed to his methodology.'" *Goebel*, at 993. (internal citations omitted).

This doctrine is not unique to the Tenth Circuit. Courts widely recognize that expert causation testimony is reliable when it is based on the totality of consistent evidence. *See, e.g., United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) (district court's insistence on a document-by-document analysis of the evidence rather than assessing it as a whole constituted an abuse of discretion); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806435, at *8 (M.D. Fla. Jun. 23, 2009) (finding that expert's reliance on a combination of epidemiological studies, animal studies, case reports, and analogy to similar drugs as "confirmatory pieces of the totality of the evidence" satisfied *Daubert*); *In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d 1355, 1374 (N.D. Fla. 2009) (expert did not rely on case reports alone for his opinion, but also his personal clinical experience with the toxin, therefore, his testimony was admissible); *McCarrell v. Hoffman-La Roche, Inc.*, 2009 WL 614484, at *27 (N.J. Super. App. Div. Mar. 12, 2009) (upholding the admissibility of expert's testimony based on a combination of case reports, peer-reviewed journals, animal studies, a pre-clinical human study and a biologically plausible explanation); *In re Neurontin Marketing Sales Practices, and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 158-59 (D. Mass. 2009) (finding plaintiffs' experts

general causation opinions admissible based on an FDA meta-analysis, case report data, animal studies, *in vitro* studies and adverse event report data); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242 (W.D. Wash. 2003) (focus of the *Daubert* inquiry must be based on consideration of the evidence as a whole, not in isolation).

In this litigation, defendants have vigorously attacked Dr. Beck's retrospective study of 152 shoulder surgeries, dismissing it as a "collection of case reports" and thus lacking in scientific validity. In addition, defendants discredit plaintiffs' experts for deriving their opinions on causation by collecting and reviewing individual peer reviewed and published clinical and toxicology studies. But as any scholar will tell you, it is unscientific to ignore the totality of the data. Scientists do not look at a particular piece of the evidence puzzle in isolation and disregard the rest. The scientific method *requires* an expert to look at all of the best available evidence and, in assessing its reliability, make sure that each piece of data is consistent with the others. It is what scientists do every day in making judgments about causation. *See* § 470 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Second ed. 2000) at p. 645.

Other courts in the pain pump litigation have disavowed the identical arguments defendants make here, that plaintiffs' experts' reliance on medical literature is nothing more than their own "*ipse dixit.*" In *McClellan,* for example, the court rejected defendants' assertion that such methodology reaches the "outer limits" of medical knowledge. *McClellan,* 2010 WL 1753261, at *21. There, the court explained, "An expert's obligation to explain the basis for a proffered opinion does not mean that each piece of data must support causation when considered in isolation. To the contrary, physicians routinely consult multiple sources of data in the normal course of their practices." *Id.* at *20. The court concluded that reliance on the totality of medical evidence is a valid methodology. *Id.* at *21. Moreover, the court held, the evidence sufficiently, even if not conclusively, supports their opinions." *Id.*

In *Schott*, the court similarly held that the totality of various types of studies demonstrated that the experts' opinions were supported by science. *Schott*, 2010 WL 1008478, at *6; *see also Zink*, 2010 WL 1839907, at *3 (adopting *Schott* opinion that the body of publications regarding the link between chondrolysis and local anesthetics is a valid basis for the experts' opinions).; Ex. 47, *Paugh*, Memorandum and Order at 6 ("The law of Indiana permits an expert to rely upon the totality of the evidence before him in formulating his opinions.")

The cases cited by defendants do not aid their argument. For example, defendants refer to *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) for the dubious proposition that every article relied upon by an expert must – standing alone and in isolation from the rest of the scientific evidence – conclusively establish causation before the expert can reach a reliable opinion. I-Flow Br. at 19. That is not at all what the Supreme Court held.

In *Gen. Elec. Co.*, plaintiffs' expert relied on four epidemiological studies to support his conclusion that PCB exposure could cause lung cancer. In examining the four studies, the Court found that none of them supported the opinion testimony of the expert, but *not* because the studies failed to each conclusively establish causation, as defendants in this case argue. Instead, as the Court discussed, the authors of one of the four studies stated that "there were apparently no grounds for associating lung cancer deaths" with PCB exposure. *Gen. Elec. Co.* , 522 at 145. In this case, absolutely none of the articles that plaintiff's experts rely on deny an association between pain pumps and chondrolysis; in fact, most of them suggest at least a probable association.

Similarly, while the second study in *Gen. Elec. Co.* noted an increased incidence of cancer among workers exposed to PCBs, the increase was not statistically significant and the authors "did not suggest" a causal link. *Id* . In contrast, the articles that plaintiff's experts cite affirmatively *do* suggest a probable link between the continuous infusion of pain medication via pain pumps and the onset of cartilage damage and chondrolysis.

In addition, the Court in *Gen. Elec. Co.* noted that the expert's reliance on a third study was scientifically unsound because that study did not involve an analysis of the specific chemical at issue in the expert's opinion (PCBs), but instead focused on a different chemical exposure altogether. *Id.* at 146 . In this case, all of the studies relied upon by plaintiff's experts specifically investigate the relationship between the intra-articular infusion of local anesthetics through a pain pump and chondrolysis. The clinical reports establish the association, and the laboratory reports explore the relationship further by studying the toxicity of the infusion of the medication on both animal and human cartilage.

Finally, the fourth study in *Gen. Elec. Co.* involved subjects exposed to multiple potential carcinogens, and the authors made no reference to a specific association between PCBs and lung cancer deaths – the disease suffered by the plaintiff. *Id.* The literature plaintiff's experts rely on, in contrast, *does* refer specifically to the infusion of pain medication directly into the shoulder capsule via pain pump as a potential cause of chondrolysis of the shoulder – the same condition suffered by plaintiff.

Defendants also erroneously rely on *Mitchell v. Gencorp, Inc.*, 165 F.3d 778 (10th Cir. 1999) to suggest that plaintiff's experts have no reliable evidence to back up their opinions. *Mitchell* involved expert testimony linking occupational benzene exposure to chronic myelogenous leukemia. The expert's testimony was excluded for the simple reason that had no data at all showing that the plaintiff had ever been exposed to benzene – there was "no occupational exposure data" for the expert to rely on. *Id.* at 781. The Tenth Circuit described the expert's opinion as "guesswork" because there was no evidence <u>whatsoever</u> that the plaintiff was exposed to benzene. *Id.* at 781-82. *Mitchell* does not apply here. Plaintiff's expert' opinions rely on a wealth of published, peer reviewed data not available to the expert in *Mitchell*, and is nothing like the "mere guesswork" described by the Tenth Circuit.

In *Domingo ex rel. Domingo v. TK,* 289 F.3d 600 (9th Cir. 2002), the plaintiff alleged that complications leading to a lengthy surgery caused him to suffer from fat embolism syndrome, or "FES." The Ninth Circuit held that the animal studies relied upon by the expert did not support his theory that hip replacement surgery could cause FES. Rather, the studies showed only that researchers attempted to reduce the release of fat emboli into the blood stream. Those studies did not attempt to demonstrate that the increase in duration of surgery that releases fat emboli into the bloodstream increases the risk of FES. *Id.* at 606. Nowhere did the court hold that it was unscientific for an expert to rely on multiple studies. The court merely found that the studies relied upon must be pertinent to the injury at issue. There is no question here that the literature relied on by plaintiff's experts, which includes animal, *in vitro* and human studies, addresses the issue of the toxicity to shoulder cartilage of medications infused into the joint space by a pain pump.

*Zenith Elect. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005) does not involve medical causation and has no application to this case. *Zenith* was a breach of contract dispute over the defendant's failure to pay for the cable boxes Zenith delivered. The defendant filed a counter-claim against the plaintiff, contending the boxes were defective, which cost the defendant market share. The defense expert proffered that had the boxes worked correctly, WH-TV would have experienced rapid growth rivaling that of its main competitor. The expert, however, did not rely on any market share data whatsoever to support the claim. Instead, he relied on his knowledge of the industry, which the court excluded because the testimony amounted to "intuition." *Id.* at 419. Defendants cannot seriously argue that plaintiffs' experts have nothing but their own tuition to rely on, when they cite to dozens of studies – in some cases, their own published research – that specifically address the relationship between pain pumps and chondrolysis.

**4. *The types of epidemiological studies defendants claim are missing are not required to establish causation.***

Another fallacy advanced by defendants is their insistence that no study short of an epidemiological study – in particular, a randomized prospective controlled study – can ever pass muster for general causation under *Daubert.* This tortured interpretation of *Daubert* and Rule 702 runs afoul of Tenth Circuit law and the great weight of legal authority.

Repeatedly, the Tenth Circuit has held that epidemiological evidence is not the sole method of establishing causation. The leading decision is *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005). *Norris* was a case in which plaintiff alleged that silicone breast implants caused her to develop a systemic autoimmune disease. The plaintiffs' experts had no epidemiological data to rely upon for their causation opinions. In contrast, there were numerous epidemiological studies that found no association between silicone implants and autoimmune disease. In excluding the testimony, the Tenth Circuit distinguished between situations where there is no epidemiological evidence either way and where there is epidemiological data that disproves causation:

> This is not a case where there is no epidemiology. It is a case where the body of epidemiology largely finds no association between silicone breast implants and immune system diseases. We are not holding that epidemiological studies are always necessary in a toxic tort case. We are simply holding that where there is a large body of contrary epidemiological evidence, it is necessary to at least address it with evidence that is based on medically reliable and scientifically valid epidemiology.

*Id.* at 882.

Defendants cite to cases such as *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996) and others like it to support their position. However, the causation testimony in those cases was of the same ilk as that in *Norris*: the experts had insufficient evidence to counter the large quantity of contrary epidemiological data that refuted causation.

Federal courts in the Tenth Circuit and other jurisdictions have made clear that where there is little or no epidemiological evidence either way to address general causation, experts

may rely on other sources of evidence to support their positions. *See W.R. Grace*, 504 F.3d at 765; *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 992 (8th Cir. 2001). *See also In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 188 (S.D.N.Y. 2005) ("To hold opinions of scientists inadmissible unless backed by statistically significant results from tightly controlled (and very expensive) experiments" does not comport with Rule 702). The REFERENCE MANUAL agrees with the many decisions that "correctly [reject] the claim that epidemiological evidence is required before a scientific hypothesis can be considered valid under Rule of Evidence 702." § 346 REFERENCE MANUAL at 494.

There are often good reasons why epidemiological studies cannot be conducted. For example, in *Clausen M/V NEW CARISSA*, 339 F.3d 1049, 1060 (9th Cir. 2003), the court observed that the paucity of literature regarding the causal relationship between low level toxicity of oil and shellfish disease is understandable, because "[o]il spills, fortunately, are a rare enough occurrence, and the opportunities for scholarly research are few." Here, as the *McClellan* court explained, "It is undisputed that chondrolysis is a rare disease, with few people exposed to potential causes and fewer actually developing the disease… Moreover, ethical considerations preclude randomized, controlled epidemiological studies of continuous infusion given the potential for irreversible harm." *McClellan*, 2010 WL 1753261, at *14.

In the Ephedra product liability multidistrict litigation, the defendants argued that the burden was on the plaintiffs to produce epidemiological studies with statistically significant results and an odds ratio of at least 2.0 to prove that ephedra was capable of causing strokes and heart attacks. The court disagreed, finding that it would have been impossible to do such studies now that the FDA had taken ephedra off the market. "Furthermore, as discussed below, such studies are extremely expensive. Further still, such studies, when performed on human beings, are potentially dangerous, unless they are retrospective in nature (*i.e.*, after-the-fact), in which

case they become even more difficult and expensive." *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d at 189.

In this case, it would be unfeasible now to conduct prospective epidemiological studies on pain pumps and chondrolysis because surgeons no longer place pain pump catheters in the shoulder joint space, and the FDA has issued public statements explicitly ordering the manufacturers to warned surgeons not to use pain pumps in this manner. Ex. 49 (FDA Bulletin 2009). It is therefore cynical for defendants to suggest that injured plaintiffs have the burden to conduct the types of epidemiological studies that were not done, especially when defendants were in a far better position to do these studies.

Ironically, defendants cite the very papers that called for further studies to argue that there is a lack of definitive evidence of causation. Despite being on notice of the need for further investigation, the defendants failed to conduct a single epidemiology study to confirm or disprove the association between intra-articular placement of pain pumps and chondrolysis. The defendants have only themselves to blame for their assertion that "medical science lacks sufficient data about the background rate and relative risk of chondrolysis." Thankfully, concerned scientists performed studies at their own expense when it became apparent that the pain pump manufacturers had no interest in conducting or funding them.

Defendants, through the mouths of their experts, also take the extreme position that only Level I prospective randomized clinical trials can ever definitively establish a causal link between pain pumps and chondrolysis. Of course, as the *McClellan* court has noted, such studies could never ethically be done. The REFERENCE MANUAL explains, "When an agent's effects are suspected to be harmful, we cannot knowingly expose people to the agent." § 339 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 484 and n.14 ("Experimental studies in which human beings are exposed to agents known or thought to be toxic are ethically proscribed.") In this case, once the early case reports and laboratory studies suggested that the use of pain pumps in

the joint space could cause chondrolysis – a devastating and permanent condition – it became unethical to conduct prospective clinical trials to "test" the hypothesis. No institutional review board would ever approve such a study, and no human being would ever voluntarily consent to participate in such a dangerous experiment.

Aside from epidemiological data, plaintiffs' experts rely on a wealth of non-epidemiological sources of evidence, including published, peer-reviewed clinical, animal and laboratory studies that specifically address the relationship between chondrolysis and the continuous infusion of anesthetics into the joint space. These studies meet the standards for reliability and relevance under Rule 702. Any criticisms of each of these studies individually, such as their failure to establish causation definitively, go to the weight they should be accorded, not their admissibility. *Ruff*, 168 F. Supp. at 1283.

Finally, defendants mischaracterize the significance of the court's analysis in *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1554, *aff'd*, 972 F.2d 304 (10th Cir. 1992). *Renaud* was a groundwater contamination case, in which a class of plaintiffs alleged that leaking hydrazines or NDMA caused their cancer. However, the plaintiffs' experts could not establish that the plaintiffs had been exposed to the chemical because there was no data, other than a single water sample from defendants' waste water pond, two years after plaintiffs' alleged exposure, to measure the contaminants in water samples. The court held that even without such direct evidence, plaintiffs could present circumstantial evidence, which would include either additional water samples or epidemiological data showing an abnormally high incidence of cancer in that population. There was none, so the court granted defendants' summary judgment motion.

In contrast, plaintiff in this case has proof of exposure to pain pump medications. She has proof that her shoulder cartilage quickly disappeared after exposure. She has evidence from three published retrospective comparison studies showing that intra-articular use of pain pumps

resulted in an abnormally high incidence of chondrolysis. And she has laboratory studies demonstrating that the continuous pain pump infusion of local anesthetics, at the dose and duration used in her pain pump, permanently destroys human joint cartilage.

**5. *The retrospective studies provide compelling evidence of an abnormally high incidence of chondrolysis and intra-articular use of pain pumps.***

When epidemiological studies do exist, they are well received by courts in mass-tort litigation. *In re Phenylpropanolamine,* 289 F. Supp. 2d at 1239. Well-conducted studies are uniformly admitted. *Id.* However, there is no such thing as a perfect epidemiological study. *Id.* at 1240. And an epidemiological study, by itself, cannot objectively "prove" general causation. Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Epidemiology § V, p.374 (Second. Ed. 2000). Even the best of studies do not demonstrate more than a high probability of a causal relationship between exposure to an agent and a disease. Rather, causation is a *judgment* for epidemiologists and others interpreting the epidemiological data to make. *Id.* (emphasis added) That is precisely what plaintiff's experts did here. They considered three epidemiological cohort studies, all of which yield consistent and valid data, which the experts interpreted. From this data, plaintiff's experts made a judgment on causation. They found that the association between intra-articular use of pain pumps was extremely strong, which supports a solid inference of causation.

Defendants object to plaintiff's characterization of these published papers as observational epidemiological studies because Dr. Beck and Dr. Anderson submitted their studies as "Level IV case series." (Dr. Rapley et al. submitted their study as a "Level III retrospective comparison study). That is true. None of the authors of these papers conducted a statistical analysis of their data to compute a hazard rate ratio (sometimes called an "odds ratio"). They were more concerned about alerting their surgical colleagues to these alarming findings and to urge them to quit using pain pumps in the joint space. Nevertheless, each of these studies contains an "exposed" group, i.e., a defined population of patients who underwent arthroscopic

shoulder surgery and received a pain pump in their glenohumeral joint, and a "control" group, i.e., a defined population of arthroscopy patients who did not receive a pain pump in the shoulder joint. In each study, the authors provided a comparison of incidence rates of chondrolysis among both groups. And in each instance, the authors explained why other potential risk factors, such as the use of thermal energy, suture anchors, and bioabsorbable sutures, were unlikely to contribute to the cases of chondrolysis. Consistently, the authors reported that these same alternative factors were present in the unexposed groups, and none of those patients developed chondrolysis. Moreover, none of the studies' authors encountered chondrolysis either before or after the period in which they used pain pumps in the joint space. The existence of exposed and unexposed groups in each of these studies provides data to measure the strength of the association between pain pumps and chondrolysis. *See Miller,* 196 F. Supp. 2d at 1080 ("determining the strength of association "requires at least two groups of subjects, one exposed to the agent of interest (sertraline), the other not exposed, so that rates of the outcome event (suicide) can be determined and compared.").

Plaintiff would not feel the need for the testimony of epidemiologists, were it not for defendants' insistence that epidemiological studies are a *sine qua non* to prove causation. After all, the law of the Tenth Circuit (and virtually every other jurisdiction) makes clear that epidemiology is not necessary to establish causation, especially – as here – there are no contrary epidemiological studies that show <u>no</u> causal connection. But as long as defendants persist in their mantra that nothing short of epidemiological studies showing more than a doubling of the risk can ever suffice to prove that pain pumps can cause chondrolysis, plaintiff should be permitted to counter this allegation through her epidemiologist experts. Their testimony will help explain to the jury how these studies are structured, how they went about comparing the data for the exposed versus control groups, and the strength of the association the studies found between intra-articular use of pain pumps and chondrolysis, as expressed as a hazard rate ratio.

The existence of any uncertainties in the experts' underlying data affect the weight to be accorded the testimony, not its reliability. *Cook*, 580 F. Supp. 2d at 1091. Defendants can raise any weaknesses in their methodology during cross-examination.

**(a) The Beck/Hansen Study.**

Before this litigation began, Dr. Charles Beck and his colleague Brett Hansen published a study that found a startlingly high percentage (63%) of chondrolysis among his patients who had been treated with continuous intra-articular infusions of bupivacaine and epinephrine through a pain pump following shoulder surgery. In contrast, none of his patients who were not treated with pain pumps in the joint developed chondrolysis. (Ex. 20). Although Dr. Beck referred to his study as a Level IV case series, by structure and definition, it is a Level II retrospective cohort epidemiological study. (Ex. 50). Dr. Beck explained that he did not submit his paper as an epidemiological study because he felt it was more important to alert orthopedic surgeons of this condition right away than to wait and hire a biostatistician to compute the odds ratios. (Ex. 51. Charles Beck, MD dep. at 449-450 (Aug. 31, 2009)).

Recently, Dr. Hasan[20][21] and colleagues submitted a letter to the editor of THE AMERICAN JOURNAL OF SPORTS MEDICINE clarifying that, by design the Beck/Hansen study is a Level 2 retrospective cohort study. The letter has been reviewed and accepted for publication in the journal's next edition. Ex. 52 The authors reported the results of their statistical analysis of the data, which found an "extremely large odds ratio and risk difference between the Pain Pump and No Pain Pump groups with respect to chondrolysis." They concluded these findings "are far beyond what could occur by chance and far too large to be credibly explained by any other factor that has been linked to chondrolysis." *Id.*

---

[20] Dr. Hasan has been retained as a causation expert by plaintiffs in a separate pain pump action.

[21] Samer Hasan, et al., *Letter to the Editor*, XX:X AM. J. SPORTS MED. (2010).

Cohort studies are a common tool used by epidemiologists and other scientists to compare and measure and compare adverse health outcomes in one or more study cohorts. Ex. 53, K. ROTHMAN AND S. GREENLAND, *Ch. 7, Cohort Studies*, 100 in MODERN EPIDEMIOLOGY 3D ED., (K. Rothman, S. Greenland & T. Lash, eds., Lippincott Williams & Wilkins 2008). A "cohort" is defined as a group of people who share a common experience or condition. *Id.* Often, if there are two cohorts in a study, one of them is called the "exposed cohort," i.e., those individuals who have experienced a putative causal event or condition. The other is referred to as the "unexposed," or reference cohort. *Id.* Cohort studies may be prospective (i.e., they follow cohorts going forward in time) or retrospective (studying a group of subjects historically where an adverse outcome already occurred). *Id.* at 109; § 340 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 486 n.19.

As described in the REFERENCE MANUAL, in cohort studies the researcher identifies two groups of individuals, or cohorts: 1) individuals who have been exposed to a substance that is considered a possible cause of a disease; and 2) individuals who have not been exposed. The researcher follows both groups for a specified length of time, and then compares the proportions of individuals in each group who develop the disease. The researcher would compare the "controls", i.e., the unexposed individuals who developed the disease (b/(a+b) with the proportion of exposed individuals who developed the disease (d/(c+d). If the exposure causes the disease, the researcher would expect a greater proportion of the exposed individuals to develop the disease than the unexposed individuals. The design of the cohort study and its tabulation, as cited on page 486 and 487 of the REFERENCE MANUAL, are shown as Figure 1 and Table 1 below:

Figure 1. Design of a Cohort Study




Table 1. Cross-Tabulation of Exposure by Disease Status

| | No Disease | Disease |
|---|---|---|
| Not Exposed | a | b |
| Exposed | c | d |

The Hansen/Beck study consists of two "cohorts" of arthroscopic shoulder surgeries. The first cohort is the surgeries in which the shoulder joint space was exposed to a pain pump. The second cohort is the surgeries in which the shoulder joint space was not exposed to a pain pump. (Ex. 54 at 5.)

The total population in the Hansen/Beck study consisted of 152 patients of Dr. Beck who had 177 shoulder surgeries over a 19-month period between August 2003 and March 2005. (Ex. 20, at 2). This was the time period in which Dr. Beck used high volume pain pumps in his patients' shoulder joints. The "exposed" cohort included 19 shoulders. Twelve of the 19 shoulders, or 63%, developed chondrolysis. *Id.* at 5-6. The unexposed cohort, where no pain pumps were used in the joint space, included 158 arthroscopic shoulder surgeries. *Id.* Dr. Beck further analyzed his patients to see if the arthroscopic procedure itself – particularly

shoulder stabilization – could have been the culprit. Of the 30 stabilization procedures, 19 shoulders were exposed to intra-articular pain pump infusions. Twelve of the 19 shoulders developed chondrolysis. None of the 13 shoulders treated for arthroscopic stabilization without pain pumps developed chondrolysis. Again, the hazard rate for chondrolysis in the exposed cohort was 63%. *Id.* at 5.

In addition, Dr. Beck also reanalyzed the data to find out whether subacromial (outside the glenohumeral joint) placement of pain pump catheters caused chondrolysis. Of the 104 patients with subacromial placement, none developed chondrolysis. *Id.* Dr. Beck also considered other suspected etiologic factors, such as thermal wands, type or irrigation fluid, the use of loose metallic hardware and various suture and anchor types. *Id.* Because a few, but not all patients were exposed to one or another – or a combination – of these factors, none of them could be rationally implicated as an alternative explanation. As the authors noted, "the 1 consistent factor in every patient with chondrolysis is that all of the patients received intra-articular pain pump catheters that eluted 0.25% bupivacaine and epinephrine, and all were arthroscopic capsular procedures." *Id.*

Dr. Beck's study also had two other cohorts: those patients using small volume/flow rate pumps prior to August 2003, and those using high volume/flow rate pumps after August 2003. None of Dr. Beck's patients who received the low volume pain pumps developed chondrolysis. This demonstrates a dose-response relationship. (Ex.18 at 8).

Of significance, the authors reported they had <u>no</u> other patients with chondrolysis either before or after the dates of the study. *Id.* at 6. This "dechallenge" finding is important. As the REFERENCE MANUAL observes, when "eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship." (at p.534).

Defendants deny that Dr. Beck's study is a retrospective cohort analysis because he submitted it to the journal as a Level 4 case series study. But in his response to the

Letter to the Editor by Hasan et al., Dr. Beck explained that his intent in publishing his findings as a case series "was to bring to the attention of the orthopaedic community as rapidly as possible the concerns we had about what we believe to be an extremely strong association between severe glenohumeral chondrolysis and the use of pain pump catheters with bupivacine and epinephrine." Ex. 55 (Beck et al. *Authors' Response* 2010). Furthermore, Dr. Beck's published study contains all of the data necessary to conduct a statistical analysis. Dr. Beck's study meets the definition of a retrospective cohort study. Dr. Beck's failure to use these magic words to describe his study does not alter the fact that it was structured as a cohort analysis. Criticisms of an expert's application of a particular methodology go to the weight, not the admissibility, of his testimony. *Cook*, 580 F. Supp. 2d at 1091.

Plaintiffs retained two renowned epidemiologists to assess the validity and statistical power of Dr. Beck's study. Dr. Sander Greenland and Dr. Martin Wells independently undertook a statistical analysis using the methodology described above in the REFERENCE MANUAL. They both found that the magnitude of risk for the pain pump (exposed) cohort compared to the no-pain pump (unexposed) cohort was enormous: the median unbiased estimated odds ratio (sometimes called "relative risk") was 321. (Ex. 54 at 6; Ex. 56 at ¶ 8). As Dr. Greenland observed, "This is a larger association than that seen between some of the deadliest exposures and death. For comparison, the association between a lifetime of smoking a pack of cigarettes a day and lung cancer is on the order of 10." (Ex. 54 at 17). As noted above, the risk calculations of Dr. Beck's study by Drs. Greenland and Wells were replicated by Dr. Hasan and colleagues in their report published recently in the American Journal of Sports Medicine.

**(b) The Rapley Study**

In December 2009, Dr. J. Rapley and colleagues published a retrospective comparison cohort study. It validated the clinical findings reported by Drs. Beck and Hansen.

Ex. 37, J. Rapley et al., *Glenohumeral chondrolysis after shoulder arthroscopy associated with continuous bupivacaine infusion*, 25:12 ARTHROSCOPY: J ARTHROSCOPIC AND RELATED SURG. 1367-73 (Dec. 2009). In this study, the authors investigated all arthroscopic shoulder surgery patients of a single surgeon between 2000 and 2007. The purpose of the study was to measure the incidence rate of chondrolysis when a pain pump is used in the joint space versus in the subacromial space. The study consisted of two qualifying groups of patients with no pre-existing shoulder conditions: 29 patients who had pain pumps inserted in the glenohumeral joint, and 36 patients who had pain pumps inserted in the subacromial space. Of the 29 patients with intra-articular placement of the pump catheter, 13 used a low volume/low flow pain pump, and 16 patients received a high volume/high flow pain pump. A solution of .5% bupivacaine without epinephrine was used in all of the surgeries. At the beginning of the study, the authors hypothesized that chondrolysis is not caused by subacromial use of pain pumps and that chondrolysis was an uncommon complication of intra-articular use of pain pumps.

The study found that 19% (3 of 16) of the patients with intra-articular placement of the high volume pain pump developed chondrolysis. *Id.* at 1372. In contrast, none of the patients with the low volume/low flow pain pumps and none of the patients with subacromial placement developed chondrolysis. This finding surprised the authors. It refuted their hypothesis that chondrolysis was an uncommon complication, noting that "a 20% incidence of glenohumeral chondrolysis cannot be considered 'uncommon.'" *Id.* The authors further observed that the clinical response was related to concentration of the drug and pump volume, and that epinephrine (not used in this study) may worsen the effect. *Id.* Dr. Rapley, et al. causally attribute their patients' chondrolysis to the continuous infusion of local anesthetics into the joint space through a high volume pain pump.[22]

[22] Ex. 57, Jay. H. Rapley, M.D., et al., *Authors' Reply* to Letter to Editor, 26:4 ARTHROSCOPY: J. ARTHROSCOPIC AND RELATED SURG. 439-443 (April 2010).

While they acknowledge that the Rapley study is small, Dr. Wells and Dr. Greenland consider it to be a significant piece of statistical evidence that high-volume pain pumps cause chondrolysis. Ex. 43, Wells Dep. at 596-97. Ex. 57, Greenland Dep. at 502-503, 515 (Feb. 24, 2010).

**(c) The Anderson Study**

In 2008, Lance Anderson and colleagues published a case series of 18 patients in their practice who developed chondrolysis, which the authors said were likely caused by intra-articular use of pain pumps.[23] Since then, the combination of laboratory studies, recent case reports and their own clinical experiences with their 18 patients led the authors to perform a retrospective review of all of their patients who had arthroscopic shoulder surgery during the same time as their chondrolysis patients. The authors' intent was to ascertain the incidence rate of the development of chondrolysis in patients with pain pumps in comparison to their surgery patients who did not receive pain pumps. [24]

During the time period that the authors used pain pumps, they conducted 113 shoulder arthroscopies; of those, 45 pain pumps ("IAPP") filled with bupivacaine and epineprhrine. As shown in Table 2 below, chondrolysis developed in 16 of 32 patients who received high-volume IAPPs (40% incidence rate), and in 2 of 12 patients with low-volume IAPPs (16.7% incidence). Overall, the incidence rate was 50% in the cohort of patients with IAPPs. There were <u>no</u> cases of chondrolysis in the "No IAPP" cohort.

---

[23] Ex. 29, S. Anderson, et al., *Chondrolysis of the Glenohumeral Joint*, J ARTHROSCOPY SUPP e13 (2008).

[24] *See* Ex. 39 S. Lance Anderson, et al. *Chondrolysis of the Glenohumeral Joint After Infusion of Bupivacaine Through an Intra-articular Pain Pump Catheter: A Report of 18 Cases*, 26:4 ARTHROSCOPY: J. OF ARTHROSCOPIC AND RELATED SURG. 451, 457 (April 2010).

TABLE 2. *Summary of Use of IAPPCs and Development of Chondrolysis*

| | Chondrolysis | | | No Chondrolysis | | |
|---|---|---|---|---|---|---|
| | Surgeon A | Surgeon B | Total | Surgeon A | Surgeon B | Total |
| IAPPC | | | | | | |
| High flow | 7 | 9 | 16 | 7 | 9 | 16 |
| Low flow | 1 | 1 | 2 | 6 | 4 | 10 |
| Unknown | 0 | 0 | 0 | 1 | 0 | 1 |
| No IAPPC | 0 | 0 | 0 | 33 | 32 | 65 |
| Total | 8 | 10 | 18 | 47 | 45 | 92 |

NOTE. Surgeon B had 1 patient exposed to a low-flow IAPPC at index surgery and then a high-flow IAPPC at repeat arthroscopy. This patient has been included in the high-flow group. Surgeon B also had 2 patients exposed to a high-flow IAPPC at index surgery and then another high-flow IAPPC at repeat arthroscopy. These patients are included in the high-flow group. There were 3 patients (2 from surgeon A and 1 from surgeon B) who did have pain pumps inserted, but they were placed subacromially. These patients are not included in the data table.

The authors noted that the incidence rate in their study for high volume pain pumps was comparable to the incidence rate reported by Drs. Beck and Hansen in their study. *Id.* at 459. The authors also went to great lengths to account for and eliminate other potential causal factors: First, no thermal energy was used in any of the surgeries. *Id.* at 456. Second, suture anchors or tacks did not likely contribute to the patients' chondrolysis because there was no focal chondrolysis as is typically seen with chondral damage from tacks. Instead, the chondral wear pattern was too extensive. In addition, there were no loose or prominent anchors. Third, bioabsorbable sutures were ruled out because the authors could not find any suture fragments. Furthermore, sutures were widely used in *all* patients, including those in the IAPP cohort who did not develop chondrolysis, as well as those in the "no IAPP" cohort. The authors also noted that they have used tacks and sutures in their patients for years without witnessing chondrolysis. *Id.* at 460. Infection was not a likely cause, either; these patients did not experience symptoms of infection. Many had laboratory work-ups. Finally, the authors pointed out that there have been no cases of chondrolysis in their practice, either before they began using IAPPs or after they

discontinued their use. *Id.* at 457. The authors acknowledged that study was "a retrospective case series" rather than a statistical study. However, in their published paper, they provided all of the data necessary to compute a hazard rate ratio for pain pump use and chondrolysis. Furthermore, the study compares the incidence rate of chondrolysis in the IAPP, or "exposed" group (40% high volume) to that of the no-IAPP, or "control" group (0%).

**6. *There is abundant evidence upon which plaintiff's causation experts rely on to "rule in" pain pumps as a cause of chondrolysis.***

Once again, defendants argue that there must be conclusive evidence of general causation before an expert can employ differential diagnosis to "rule in" intra-articular use of pain pumps as a cause of chondrolysis. I-Flow Br. at 22-23. They repeat their mantra that general causation can only be established by definitive epidemiological studies. Because none such studies exist, plaintiff's experts flunk the *Daubert* test because they cannot conduct a reliable differential diagnosis to "rule in" pain pumps as a cause and "rule out" other factors as less likely.

As described above in great detail, neither the Tenth Circuit nor any other jurisdiction requires definitive epidemiological evidence to establish general causation. Nevertheless, defendants cite *Norris* and other cases involving breast implant litigation to make the point that without such data, it is impossible to tease out one factor among many that may contribute to the disease in question. That may be true in the case of environmental toxic exposures, or pharmaceutical or medical device cases that involve long-term exposures, years of latency and systemic diseases. This injury is not so complicated. The court in *McClellan* recognized the distinction between cases involving complicated biological explanations and those where a specific injury arises in physical and sequential proximity to an acute exposure:

> In contrast, plaintiffs allege the localized injury of glenohumeral chondrolysis after anesthetics were continuously and directly infused into their shoulder joints – a part of the human body that is encased and has no blood supply. Further, plaintiffs and other patients developed chondrolysis within a relatively short time after arthroscopies with continuous infusion, and reports of chondrolysis increased dramatically after physicians began administering local

> anesthetics via pain pumps. Thus, not only does a direct physical correlation exist between the point of exposure and the resulting injury to the shoulder joint, there is an appreciable temporal relationship between the exposure to continuous infusion and the development of chondrolysis.

*McClellan,* 2010 WL 1753261, at *10.

Under the facts and circumstances of this case, conclusive evidence of causation is not necessary for plaintiff's experts to testify. The evidentiary threshold for reliability is not perfection; it is lower than the standard of correctness. *Cook,* 580 F. Supp. 2d. at 1085. Neither *Daubert* nor Rule 702 demands absolute certainty before an expert may testify on causation. *Dodge,* 328 F.3d at 1222.

Defendants accuse Dr. Beck of using a "faulty method" of assessing causation by quoting him as saying he reached his conclusion that continuous infusion of local anesthetics was the cause of chondrolysis because he "[could not] find any other reason for it." I-Flow Br. at 23.

Defendants lifted this sound bite from pages 1107 and 1108 of Dr. Beck's testimony in the *Grossnickle* trial. But defendants did not bother to provide the Court the context. Dr. Beck was relating a discussion he had with a Stryker representative in late 2004 or early 2005, when he began seeing several chondrolysis cases in his shoulder surgery patients:

> Q: What was your discussion with Mr. Kelley?
>
> A: I asked him if he had any knowledge of pain pump catheters causing problems.
>
> Q: What did he say?
>
> A: He said no.
>
> Q: Was that important to –
>
> A: I said – well, and I also – excuse me. I also said that I believe there's an association with this same condition because I can't find any other reason for it. And I asked him, you know, if he could convey that to Stryker, maybe it would be appropriate to get a warning out and start asking around to find out if some of the other cases that were now being reported in meetings had been associated with pain pump use. And that was, again, sometime in either – at the latest, it would have been the first part of February

> 2005. But I believe it was probably the end of December of 2004, I actually said that.
>
> Q: Okay. So that – looking at our calendar up here, that would have been right about here in December '04 and early '05; is that right?
>
> A: That's correct.
>
> Q: All right. And did you have any further contact or response from the Stryker people concerning your complaints and suggestions?
>
> A: I – well, I didn't get a whole lot of response other than no, I haven't heard anything. And I said, would you please contact people and let me know. And I didn't really hear anything back. I began talking with my colleagues and peers saying: Have you heard of this? And one of them was Dr. Paulos, who, at that time, he had a patient come into his office who had the condition.

Ex. 59. Dr. Beck, *Grossnickle* Trial Tr. at 1107-1108.

Dr. Beck was not explaining the methodology for his study or opinions, as defendants insinuate. To the contrary, he was describing to the jury his early attempts to contact Stryker to alert it to a potential connection between pain pumps and chondrolysis, which he was alarmed to observe in his own patient population. It was this fruitless communication with Stryker that prompted Dr. Beck to conduct his own clinical investigation of his 152 arthroscopic surgery patients to confirm whether intra-articular use of pain pumps, and not something else, was causing this devastating injury.

Throughout his study, his Rule 26 report, his trial testimony in *Grossnickle* and his multiple depositions in this litigation, Dr. Beck has explained in exquisite detail how he designed and conducted his study of 152 patients. He also testified at length concerning how he went about considering and ruling out other potential etiologies (anchors, sutures, radiofrequency probes, irrigation fluid, pre-existing cartilage injury, surgery technique) in arriving at his diagnoses. Defendants' devious accusations that Dr. Beck and others lack any foundation for their opinions are untrue. This pattern of misquoting plaintiffs' experts is unfair and

unproductive; it does not assist the Court or the parties in assessing the quality of the evidence under *Daubert*.

**7. *The Law Does Not Require Evidence of a "Doubling of the Risk" to Establish Causation.***

Yet again, defendants persist in their assertion that only epidemiological evidence of a "doubling of the risk" chondrolysis before plaintiff's experts can express an opinion on causation. To support their claim, defendants rely on the Ninth Circuit's decision in *Daubert II*, 43 F.3d at 1320, which in turn, was cited by the Colorado district court in *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217 (D. Colo. 1998). Subsequently, however, the Ninth Circuit has clarified that the doubling-of-the-risk standard applies only to specific causation – not general causation. *In re Berg Litig.*, 293 F.3d 1127, 1130 (9th Cir. 2002). Even then, the doubling standard "is a measure courts use to determine whether a substance is capable of causing harm in the absence of any evidence other than epidemiological evidence of toxicity."[25] *In re Berg Litig*, 293 F.3d at 1129.

As the court explained in *McClellan*, the "doubling of the risk" line of authorities is inapplicable to pain pump cases. "Here, plaintiffs' alleged injury renders these cases distinguishable from those requiring such data, and plaintiffs do not rely solely on epidemiological studies." *McClellan,* 2010 WL 1753261, at *11 n.8.

Defendants also accuse plaintiffs' epidemiologists for engaging in scientific chicanery because they do not "make any independent findings about background rates." I-Flow Br. at 25. Without such evidence, defendants contend, their conclusions are unreliable. Not true. Several studies have made the point that chondrolysis is a very rare disease. Beck and Anderson

[25] At least one court within the Tenth Circuit declined to adopt the 2.0 relative risk calculation as the standard for admissibility of expert testimony. *Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1079 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004), *cert. denied*, 543 U.S. 917 (2004). Instead, the court agreed with scientific and legal authorities who have observed that a threshold of 2.0 is an arbitrary cut-off and only one piece of evidence to consider in evaluating the reliability of expert testimony.

reported that they never witnessed a single case of chondrolysis before or after the time they used pain pumps in the joint space. The absence of chondrolysis in the unexposed groups alone suggests that the incidence of the disease is rare. And a study from Denmark estimates the incidence rate of chondrolysis at 5.5 per 10 million person-years.[26] The study concluded that chondrolysis is a rare disease – so rare, in fact, that no diagnostic code existed for it before 1994. *Id.* at 88. By far, the highest incidence of chondrolysis occurred in conjunction with orthopedic surgery. Although the study did not identify a case or control that included a diagnostic code for pain pump treatment in Denmark, *Id.* at 86, they noted that the highest association in the literature between chondrolysis and arthroscopic surgery involved the intra-articular use of pain pumps. *Id.* at 85. Given the absence of even a control diagnostic code for pain pumps, the most likely explanation is that surgeons in Denmark did not use pain pumps following arthroscopic surgery.

**8. *Scientists need not know the precise mechanism for the cause of chondrolysis to form their opinions on causation.***

Defendant argues that plaintiff's experts' testimony must be excluded because the scientific community does not know the precise mechanism for how and why people develop chondrolysis. However, not knowing the mechanism by which a particular toxic agent causes a particular injury does not invalidate an expert's testimony. *Bitler,* 400 F.3d at 1238 n. 7. "Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." *Id.*, *citing Daubert II,* 43 F.3d at 1314 (emphasis in the original). *See also In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.,* 612 F. Supp. 2d 116, 149 (D. Mass. 2009) (expert's causation testimony admissible despite robust debate in the scientific community on the proposed mechanism); *McClellan,* 2010 WL 1753261, at *17 (causation testimony is reliable

---

[26] Ex. 60, Christian F. Christiansen, et al., *Incidence and risk of Chondrolysis in Denmark: A nationwide population-based study,* 2 CLINICAL EPIDEMIOLOGY 85-89 (MAY 8, 2010).

even though experts are not certain why bupivacaine is chondrotoxic or how the damage is caused to cartilage).

In *Golod v. La Roche*, 964 F. Supp. 841 (S.D.N.Y. 1997), the defendant leveled the same criticisms of the experts' testimony as defendants do here, claiming that the plaintiff's experts lacked reliable foundation because the mechanism and definitive cause remained unknown. The court disagreed:

> Although these sources do not definitively prove causation or establish a mechanism of toxicity, they are a sufficient basis upon which to base a medical opinion. The fact that these physicians are unable to describe the mechanism by which Tegison caused its adverse effects is irrelevant. The mechanisms of both therapeutic and toxic effects of drugs are often unknown.

*Id.*at 858.

In their attempt to deconstruct the numerous studies on chondrolysis, defendants confuse the concept of "cause" with "mechanism" of cause. Defendants quote various authors, including Dr. Beck, as saying that because the cause of chondrolysis is unknown, there is insufficient knowledge to conclude that pain pumps are a possible cause. However, defendants fail to mention that Dr. Beck made this comment in his paper in 2006, when the association was first being reported. His paper led to dozens of other published studies, which confirmed this relationship.

These subsequent toxicological studies confirmed that the association was not due to some mechanical factor, but rather, was the result of the toxicity of bupivacaine and other local anesthetics on cartilage. Research continues to this very day to determine precisely *how* it is that the infusion of these local anesthetics destroys the cartilage cell. For example, a study by Dr. Bogatch and colleagues acknowledges, "The mechanism of how the local anesthetics cause chondrocyte death is not clear."[27] Ex. 61 at 520. The authors found that chemical

[27] Ex. 61 at 520, Michael T. Bogatch, et al, *Is Chemical Incompatibility Responsbile for Chondrocyte Death Introduced by Local Anesthetics?* 38:3 AM. J. SPORTS MED. 520-526 (2010).

incompatibility between local anesthetics and human synovial fluid may explain how cartilage cells die following exposure. *Id.*at 526. "Given the results from the present study and previous studies, physicians should be warned of the chondrotoxicity of intra-articular local anesthetics due possibly to the chemical incompatibility of the drugs with synovial fluid." *Id.*

A new study by Valentina Grishko and colleagues also observed that numerous studies "clearly establish the chondrotoxicity of bupivacaine and lidocaine."[28] The authors acknowledged that the "complete understanding of the exact mechanisms involved" has not been elucidated. Their study found that damage to DNA, leading to mitochondrial damage, may explain the process of cartilage cell death when exposed to continuous infusion of local anesthetics. *Id.*

The body of evidence upon which plaintiff's experts rely establishes a cause-and-effect relationship between continuous intra-articular infusion of local anesthetics and chondrolysis in a dose- and duration-dependent manner. Just how it is that the infusion of these drugs destroys the cells of the cartilage is still being investigated. Likewise, scientists have yet to determine precisely how cigarette smoking causes lung cancer, but it doesn't prevent them from concluding that a causal relationship exists. Experts can reliably infer causation without universal and often unattainable knowledge of the mechanism by which it occurs.

### 9. *The animal and* in vitro *studies on bupivacaine infusion and chondrolysis are valid and important data supporting toxicity.*

Defendants allege that animal and *in vitro* studies are *per se* inadmissible because they cannot be extrapolated directly to human beings in the clinical setting. Therefore, in defendants' view, scientists must ignore such evidence, no matter how compelling. But if defendants were

---

28 Ex. 62, Valentina Grishko et al., *Apoptosis and Mitochondrial Dysfunction in Human Chondrocytes Following Exposure to Lidocaine, Bupivacaine, and Ropivacaine*, 92-A:3 J. BONE & JOINT SURG. 609, 617 (Mar. 2010).

correct, researchers would never conduct toxicology studies because they would have no scientific value.

In the real world, animal and *in vitro* studies are routinely conducted because they provide critical information on the toxicity of certain exposures in humans in a way that observational studies cannot. As the REFERENCE MANUAL points out, "because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure." § 405 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 564-65. It is standard to conduct these studies to determine dose-response relationships of compounds. They are helpful in understanding the mechanisms of toxicity and extrapolating data to humans. *Id.* at 566.

Courts have long recognized the usefulness of animal tests. "There can be no dispute that properly designed and conducted animal testing can yield relevant and useful information in the field of human toxicology. *Bourne v. Dupond De Nemours & Co.,Inc.*, 189 F. Supp. 2d 482, 496 (S.D.W.V. 2002), *citing Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360-61 (6th Cir. 1992). "Animal studies often comprise the backbone of evidence indicating biological hazards, and their legal value has been recognized by federal courts and agencies." *Id.* The Ninth Circuit held that it was an abuse of discretion for the trial court to exclude expert testimony based on animal studies merely because of a species gap or difficulties in extrapolation to humans. *Metabolife Int'l v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001).

Animal and *in vitro* studies are even more important when, as here, they are taken together with human studies, as the cumulative and consistent body of data tends to support causation. *See, e.g., In re Paoli R. R. Yard PCB Litig.*, 35 F.3d 717, 780 (3d Cir. 1994) (distinguishing cases where animal studies were inadmissible because most involved use of animal studies that were contradicted by extensive epidemiological data that failed to support

causation); *Hopkins v. Dow Corning Corp.*, 33 F.3d 116, 1124-25 (9th Cir. 1994) (admitting expert testimony based in part on general scientific knowledge established by animal studies); *Bourne*, 189 F. Supp. 2d at 496-97 (finding consistent animal studies admissible).

Plaintiffs agree with defendants that, animal and *in vitro* studies, standing alone, are insufficient to establish causation. Here, multiple lines of human and relevant animal and *in vitro* studies on human cartilage all point in the same direction of causation. Thus, the toxicological data from these studies are admissible lines of evidence that plaintiffs' experts properly rely upon.

Defendants might have a plausible argument that plaintiffs' experts' testimony should be excluded in animal and laboratory experiments disproved the association shown by the clinical reports. But in this case, the animal and *in vitro* studies on the effect of local anesthetics on cartilage are compelling, and they strongly support the clinical findings. Researchers began conducting these studies after Dr. Beck presented his clinical findings at various symposia in 2005 and 2006. Their purpose in performing the studies was to determine whether the pain medications in the pain pumps were responsible for the destruction of shoulder cartilage – as opposed to some other factor. In 2006, Dr. Constance Chu and her colleagues at the University of Pittsburgh published an *in vitro* study showing that a solution of 0.5% bupivacaine (the local anesthetic most commonly used in pain pumps) is cytotoxic to bovine joint cartilage after just 15 to 30 minutes of exposure. (Ex. 21) A series of animal and *in vitro* studies soon followed, which built upon Dr. Beck's findings and Dr. Chu's research. They confirmed that local anesthetics in general were toxic to cartilage, and that this effect was both dose and duration dependent. These studies are too numerous to describe in detail here. *See* Exs. 22, 23. 24, 25, 26. But it is notable that Dr. Jason Dragoo and colleagues repeated these experiments in human joint cartilage tissue and reached similar conclusions. (Ex. 27).

The most recent study by Dr. Chu – which defendants rarely mention – confirmed that the prolonged exposure of human and bovine joint cartilage to bupivacaine at doses ranging from 0.25 to 0.5% (the doses typically used by surgeons in pain pumps) is chondrotoxic. Moreover, bupivacaine chondrotoxicity is both dose- and time-dependent. (Ex. 32) Dr. Chu's study also found that although single injections of bupivacaine did not destroy joint cartilage, continuous infusion over longer periods did. (Ex. 32 at 818). Dr. Chu believed that the laboratory data, which confirmed the clinical reports by Drs. Beck, Greis, Anderson, McNickle and other surgeons, was convincing enough to recommend to medical students and residents to avoid using pain pumps in the joint space. (Ex. 40).

Likewise, the orthopedic community had no difficulty extrapolating Dr. Chu's data to their patients. The court in *McClellan* pointed out that many of the peer-reviewed articles cited by plaintiffs and their experts included discussions of the *in vitro* and animal studies, including those of Drs. Chu and Gomoll. "Several articles not only cite Dr. Chu's studies, but give credence to the correlation between chondrocyte damage and exposure to local anesthetics. Thus, defendants cannot credibly argue that the reliance on in vitro and animal studies is scientifically invalid in this case." *McClellan,* 2010 WL 1753261, at *16.

Furthermore, the animal and laboratory experiments bolster the findings in Dr. Beck's cohort. Unlike the patients who received high volume/high flow pain pumps in the joint space, none of Dr. Beck's patients who received low volume/low flow pain pumps developed chondrolysis. In fact, Dr. Beck had <u>no</u> other patients with chondrolysis either before or after the dates of his study, when he quit using pain pumps in the joint space altogether. The animal and *in vitro* data provide additional supportive evidence of a dose- and duration-response relationship.

In the real world, scientists in the field of orthopedic surgery have found both the animal and *in vitro* bovine and human cartilage studies sufficiently relevant to extrapolate to the clinical

setting, especially when combined with other data, including the *Beck* study. The Rules of Evidence permit plaintiffs' experts to rely on such data because it is "of the type typically relied upon by experts in the particular field." FED. R. EVID. 703. Defendants' attempt to invalidate testimony based on this evidence is contrary to reality and the dictates of good science.

**10. *Case reports and case series, combined with other studies, are valid and reliable sources of evidence.***

Plaintiff agrees that, by themselves, case reports cannot establish a cause-and-effect relationship. And plaintiff has repeatedly emphasized that her experts base their opinions not only on case reports and case series, but also on multiple lines of scientific evidence. Nevertheless, defendants once again contend that each piece of evidence, standing alone, must prove causation. Universally, courts have condemned this sophistry. *Goebel,* 346 F.3d at 993; *W.R. Grace*, 504 F.3d at 765; *In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d 1355, 1374 (N.D. Fla. 2009); *In re Neurontin Marketing Sales Practices and Prods. Liab. Litig.,* 612 F. Supp. 2d 116, 158-59 (D. Mass. 2009); *Hyman & Amrstrong, P.S.C. v. Gunderson*, 279 S.W. 3d 93 (Sup. Ct. Kent. 2008), *reh'd denied*, (Apr. 23, 2009); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806435, at *8 (M.D. Fla. Jun. 23, 2009).

And, as described above, five courts have admitted plaintiffs' experts testimony in the pain pump litigation based on the same foundation of evidence, which included case reports and case series. These same courts have disavowed the rigid study-by-study approach taken by the district court in *Kilpatrick*.

Furthermore, plaintiff finds it disingenuous that defendants assert that case reports are inherently unreliable, given that defendants' own experts admit that they rely on case reports to support their opinions that other agents can cause chondrolysis. For example, Dr. Wayne Burkhead devotes a significant portion of his report to other causes of chondrolysis, relying exclusively on case reports. Ex. 63, Burkhead Report at 13-14 (Aug. 26, 2009). Dr. Burkhead bases some of these conclusions on just one case report. He attributes his opinion that bipolar

ablative devices can cause chondrolysis to a single case report by Good. A case report by Athwall supports his opinion that absorbable suture anchors cause chondrolysis. *Id.* at 14. Two case reports prove to Dr. Burkhead that gentian violet causes chondrolysis. Ex. 64, Burkhead dep. at 35:17 – 36:11 (Aug. 31, 2009). A single case report convinced him that the use of chlorhexidine as an irrigant in the knee joint causes chondrolysis. *Id.* at 70:10 – 71:1. Dr. Burkhead also extrapolates from case reports involving young patients to reach his conclusion that the growth plate in the humerus is causally associated with chondrolysis. *Id.* at 144:6 – 146:6.

Plaintiffs' experts do not deny that some of these other factors are possible causes of chondrolysis. But if case reports are good enough for defendants' experts to reach inferences of causation, they should suffice for plaintiffs' experts as well.

**D. Each of Plaintiff's General Causation Experts Is Highly Qualified, and their Testimony Satisfies the Requirements of Rule 702.**

Plaintiff has designated seven experts whom she offers to testify on general causation, *i.e.*, whether the continuous infusion of local anesthetics through a pain pump catheter can cause chondrolysis in some people. Dr. Vidal is a board-certified orthopedic surgeon in Colorado. His practice is focused almost exclusively on sports medicine and shoulder surgery. Dr. Vidal has conducted laboratory research on cartilage restoration and repair. He has personally seen and treated patients with chondrolysis. Drs. Dragoo and Badylak have expertise in human cartilage. Their testimony is helpful in understanding the toxic effects of local anesthetics on the cartilage in the glenohumeral (shoulder) joint and the overall scientific evidence on pain pumps and chondrolysis. Plaintiff hopes to call one or the other of these two experts at trial, but not both. But given multiple trial settings, it is not feasible to designate one expert in the event he is unavailable for this trial. Likewise, Drs. Greenland and Wells both have similar expertise in epidemiology and biostatistics. Their testimony will help the jury understand the design and

results of the retrospective cohort studies, as well as the strength of the association between pain pumps and chondrolysis. Plaintiff expects to bring one of these experts to trial.

**1. Dr. Charles Beck**

Dr. Beck is a board certified orthopedic surgeon with over twenty years experience in Salt Lake City. He is also a research scientist. Dr. Beck conducts clinical trials and serves as a consultant to medical device companies working on improvements in orthopedic surgery technology. Dr. Beck was the first orthopedic surgeon to investigate systematically the sudden appearance in 2003-2004 of shoulder chondrolysis in many of his patients. He began alerting the orthopedic surgery community about the hazards intra-articular placement of pain pumps catheters in 2005. Dr. Beck presented his scientific findings to his colleagues at the March 2006 annual meeting of orthopedic surgeons, and finally published the full study in the American Journal of Sports Medicine, a peer reviewed journal, in 2007.

Defendants attack Dr. Beck's methodology of relying on his study and others. But defendants' chief complaint appears to be that because the opinions he provided in his Rule 26 report are worded more strongly than the study he conducted several years ago. On that basis, defendants claim his opinions are unscientific because they are "made for litigation." Plaintiff has previously responded to this argument and will not re-hash it here. But it is worth noting that other courts have rejected the identical attacks on Dr. Beck in other pain pump cases. As the court in *McClellan* pointed out, "The purpose of the Hansen/Beck study was to present information about patients who developed chondrolysis after receiving continuous infusion pain pumps; it was not intended as a review of all relevant information to ascertain causes of chondrolysis." *McClellan,* 2010 WL 1753261, at *32. Dr. Beck should be entitled to rely on *all* of the available evidence, including the mounting evidence of causation that accumulated after he published his study in 2007.

**2. Dr. Jason Dragoo**

Dr. Jason Dragoo is an Assistant Professor of Orthopedic Surgery at Stanford University and head team physician for Stanford University Athletics. For many years, he has conducted research on articular cartilage and how to restore it. Dr. Dragoo began conducting research on the toxicity of the local anesthetics in pain pumps in 2005, which he has published. He runs a full-time lab at Stanford experimenting with stem cells and cartilage.

Defendants misleadingly imply that Dr. Dragoo "doesn't know what causes chondrolysis." That accusation is absurd, because his testimony is clear that the *mechanism* of how the continuous infusion of local anesthetics causes chondrolysis is not certain. Defendants' confusion over the terms "cause" versus "mechanism" of cause should not cloud the reliability of Dr. Dragoo's opinions, based in part on his own published research, combined with other studies on the relationship between pain pumps and chondrolysis.

As they do with Dr. Beck, defendants erroneously argue that Dr. Dragoo should not be permitted to draw a stronger inference of causation than the authors of individual studies did. As discussed *supra*, the papers cited by defendants were submitted for publication before the authors had the benefit of more recent studies. And in many of these papers, the authors concluded that pain pumps were the likely cause of their patients' chondrolysis. Dr. Dragoo and the other experts are making the same informed judgments that scientists do every day when they review all of the available sources of data and reach inferences of causation. Defendants simply disagree with their conclusions. The standard for admissibility is the reliability of the methodology the expert applied, not the correctness of the conclusions. *Daubert*, 509 U.S. at 590.

**3. Dr. Stephen Badylak**

Dr. Stephen Badylak is an MD, Ph.D. (Anatomic Pathology) and Doctor of Veterinary Medicine who conducts research on tissue regeneration at the University of Pittsburgh, where he

is a full professor in both the Departments of Surgery and Bioengineering. He is the Director of the Center for Preclinical Studies and Deputy Director of the McGowan Institute for Regenerative Medicine. Before moving to Pittsburgh in 2003, Dr. Badylak was head team physician for Purdue University for 15 years. He spends much of his time conducting research on various aspects of injuries to joints and limbs.

Defendants falsely claim that Dr. Badylak relied on a "handful of studies and articles" for his opinion. I-Flow Br. at 38. In fact, Dr. Badylak relies on the same body of literature that the other experts do, in addition to his clinical experience and training with cartilage. Ex. 65, Badylak report (May 31, 2009).

Throughout their brief, defendants incorrectly insist that the admissibility of plaintiffs' causation testimony requires the presence of a scientific journal article stating, unequivocally, that the use of pain pumps is with certainty the one and only cause of chondrolysis following shoulder surgery. In an effort to find support for this flawed interpretation of the *Daubert* analysis, defendants state that Dr. Badylak himself concedes that no one article definitively established causation with certainty.

What defendants omit, of course, is the real point of Dr. Badylak's testimony, that "There's a load of objective data in ***the totality*** of the published literature" supporting the conclusion that the continuous infusion of pain medication via pain pumps can cause chondrolysis. Ex. 48, Badylak Dep. at 154:19-20 (July 13, 2009) emphasis added. Dr. Badylak later stressed that it is the "collection of articles" that provide compelling evidence of causation. *Id.*, 168:9-12. Dr. Badylak readily agreed that no one data point or one single article was sufficient to support his opinion. He emphasized again, however, that his opinion relies on considering all of the evidence, not just pieces of evidence in isolation, and that his opinion is based on studies in different fields that are consistent in supporting an association between pain pumps and chondrolysis:

> "I'm a scientist that's not easily convinced of anything. And I can't think of a single data, piece of data, that would convince me that Marcaine delivered like this would cause chondrolysis; however, ***the mass of data collectively is irrefutable."*** I indicated earlier, no study, no individual study is perfect. Every single study is going to have holes in it. This, however, does provide the opportunity to understand the relationship between the *in vitro* studies that have been done by a number of researchers, the pre-clinical animal studies that build upon the *in vitro* data, and then the clinical case outcomes that we have seen. Combined, I don't think there's any question that the use of a chondrotoxic agent like Marcaine delivered into the joint continuously for a period of time other than a single-injection does—doesn't cause chondrolysis. It's—you cannot deny it."

Ex. 48, Badylak Dep. at 153:22-25- 154:1-15 (July 13, 2009).

Defendants' selective snapshots of Dr. Badylak's deposition utterly fail to communicate the meaning of his testimony.

In addition, defendants contend that Dr. Badylak relies on a "temporal relationship" for his causation opinion. I-Flow Br. at 38-39. Nowhere in his report does Dr. Badylak state that his opinion depends on the notion that the use of pain pumps precedes the onset of chondrolysis. Instead, defendants pluck a selected quote from his deposition testimony. This is yet another example in which defendants have taken expert witness' testimony out of context. As their set-up for the argument they make here, defendants' lawyers presented a hypothetical question to Dr. Badylak:

> Q: Let's assume that Patient A presents himself with a shoulder chondrolysis that is confirmed by radiological films; okay?
>
> A: So we're talking hypothetical here?
>
> Q: Yes, sir.
>
> A: Um-hum.
>
> Q: Yes, sir. And that this particular patient not only had a pain pump whose catheter was put into the joint space but also during the process of the arthroscopic procedure there was thermal ablation, there were bio-absorbable tacks, anchors, and sutures involved. How can you, under that circumstance, sir, provide the

> blanket opinion that the pain pump is the quote, "primary cause,' closed quote, of the chondrolysis?

Ex. 48, Badylak dep. at 157:24-25-158:1-13 (July 13, 2009).

In his response, Dr. Badylak explained that surgeons used frequently used thermal ablation, tacks, anchors and sutures before they started using pain pumps in the joint space, yet there was a dearth of reports in the medical literature linking those techniques to chondrolysis. *Id.* at 159. Not liking his answer, defense counsel then repeatedly attempted to force Dr. Badylak to agree with her that his explanation was an example of a "temporal relationship." *Id.* at 160-162.

Dr. Badylak's observation in response to the defense lawyer's hypothetical question is not the sole basis for his opinion, or even a significant one. More than anything, it reflects an historical fact that defendants are hard-pressed to deny. Dr. Badylak's testimony is entirely consistent with the findings of several surgeons, including Drs. Beck and Dr. Anderson, who, in their studies, concluded that it was unlikely that sutures or other hardware contributed to the development of chondrolysis. The only consistent factor was the intra-articular placement of a pain pump. Without question, Dr. Badylak's observation was based not on personal opinion and a theory limited to temporal relationships, but on findings in the published medical literature and his clinical experience.

**4. Dr. Armando Vidal**

Dr. Vidal is a board-certified Orthopedic Surgeon. He is currently assistant professor of orthopedic surgery at the University of Colorado-Denver School of Medicine. His practice is devoted entirely to sports medicine and shoulder surgery, including arthroscopic surgery. As part of his profession, Dr. Vidal has conducted laboratory research on chondrocytes and cartilage restoration, which he also teaches to students and colleagues. Dr. Vidal also has clinical experience diagnosing and treating cartilage injury, including chondrolysis. He has also treated patients who developed chondrolysis after arthroscopic shoulder surgery. *See* Ex. 66, Vidal

Report at 2. Before he was retained as an expert, Dr. Vidal believed that the intra-articular infusion of anesthetics via pain pumps was a likely cause of chondrolysis, based on his clinical experience treating patients with this exposure. Ex. 67, Vidal Dep. at 40-43 (July 8, 2009).

Defendants misleadingly suggest that Dr. Vidal's opinions were weak, because he testified that the cause of chondrolysis is "multifactorial," and therefore, "further study is necessary." Again, defendants lift these words out of context. But as Dr. Vidal explained, every disease or condition has more than one cause. Dr. Vidal's testimony, placed in context, is as follows:

> I would say, to be clear, that there is not a condition in the human body that isn't multifactorial. And I would say that chondrolysis is no different. So when you ask that question about the multifactorial nature of chondrolysis and try to fully understand it, I go back to my last question, which is further research is certainly necessary.
>
> Whether there are patient factors, genetic factors, biochemical factors, exposure factors, there is a lot that's still – that would benefit us to understand and to prevent it from happening in the future with other substances. So it's critical to us as providers to fully understand the issue as close as we can. So when you ask is there a consensus that it's multifactorial, I would say there's consensus for everything.
>
> That is, every human condition is multifactorial, meaning that you can expose a human to a known toxin, and some will survive, and some won't. And there are factors that predict that and don't. And unfortunately that's the nature of the human animal, of the human organism. It's the nature of biology, which is an unpredictable science. And it's – the bottom line is that everything, every condition, is multifactorial, and chondrolysis is included in those.

Ex. 67 Vidal Dep. at 49-50.

Dr. Vidal clarified that by stating "further study is necessary," he meant that the medical community still does not completely understand the *mechanism* by which pain pump infusions cause chondrolysis. Specifically, more studies are needed to explore what role factors such as genetic susceptibility play in predisposing some people to develop chondrolysis. *Id.* at 92-93.

Defendants fault Dr. Vidal for expressing his causation opinions more strongly than the authors of the published papers did in addressing the findings of their research. Specifically, defendants attack him for opining that intra-articular use of pain pumps "can" cause chondrolysis when, for example, Dr. Beck stated in his paper that pain pumps were "strongly associated" with chondrolysis and that "further research is necessary." However, Dr. Vidal explained that researchers can't ethically state in their papers that their studies definitively prove causation because they are constrained to limit their conclusions to the findings of the particular experiment. *Id.* at 65-67. "But the benefit of scientific literature is that you can have – you have the ability to independently evaluate that and put it in the context of other papers." *Id.* at 66.

No researcher could conclude that the results of his single study proves a cause-and-effect relationship. "But you do take the combination of that paper and the next paper and the following paper and – and the – and the basic science research looking at the effects on these things and you can – you can say, You know what, this is all adding together." *Id.* at 67.

Defendants spent several hours debating Dr. Vidal in the semantics of "certainty" and the fact that no author used that word to conclude that continuous infusion of anesthetics causes chondrolysis. But as Dr. Vidal pointed out, in describing their research findings, scientists use the term "certainty" to mean 100 percent certainty, as opposed to more-likely-than-not. *Id.* at 42-43. By training, no scientist can ever tell you that they're 100 percent certain about almost any phenomenon. *Id.* at 44. Furthermore, researchers don't publish opinions on cause-and-effect relationships in the published literature. They report on the findings of their particular studies. *Id.* at 155-156.

Repeatedly, Dr. Vidal explained that a single study alone cannot prove a causal relationship, but combined with others, they can provide inferences of causation. *Id.* at 319-320. As part of their clinical practices, physicians regularly arrive at medical opinions by

extrapolating from *in vitro* and animal studies. *Id.* at 130-131, 171-173. This process is an essential part of clinical medicine:

> Q: How is it that you, Dr. Vidal, as a litigation expert, can extrapolate from Dr. Gomoll's own clinical study and reach a conclusion which Dr. Gomoll won't reach in a scientific setting?
>
> A: Because the onus on him on this paper was not to make that determination. The onus on him was to – the onus on this paper is different than what I do on a clinical basis every day. When he did this paper, he was looking at the injury to articular cartilage from bupivacaine and the response of those chondrocytes to bupivacaine. He was not – he was taking it from Point A to Point B. He wasn't trying to get to Point Z. My job when I evaluate patients, when I treat patients, is to take that Point A to Point B and that Point D to Point F and that Point H to J, and there are a bunch of gaps in between, and to make an educated assessment. And we do that every day on a clinical basis. And there are a lot of things that go into that recipe.
>
> So just like if you're doing a criminal case, and you've got a lot of circumstantial evidence, you've got a gun, you've got fingerprints, you've got all these things, but you didn't see anybody pull the trigger, you don't have that Level 1 data, but you've got a lot of circumstantial evidence that points in that direction.
>
> MS. SCHMID: Move to strike as nonresponsive and incomprehensible, frankly.

*Id.* at 171-173.

The defendants' refusal to accept Dr. Vidal's explanation illustrates the rancorous tone they have taken in this litigation. Nevertheless, defendants' disagreement with the inferences and conclusions reached by Dr. Vidal, based on all of the available literature, is not a valid basis to exclude his testimony. Dr. Vidal's methodology is the same that his peers use in gathering the evidence to assess causation. The fact that defendants and their experts strongly disagree with plaintiff's experts on the weight of the studies can be brought out in cross-examination. "But if experts in the field would rely on these articles and the theories involved are generally acceptable, defendants have not shown that [the expert's] testimony is wholly unreliable." *Palmer*, 510 F. Supp. 2d at 519.

**5. Dr. Sander Greenland and Dr. Martin Wells**

Dr. Greenland is one of the world's most renowned epidemiologists. He is both author and editor of the leading textbook for courses in advanced epidemiology, MODERN EPIDEMIOLOGY (3d Ed. 2008). Dr. Greenland's textbook has also been authoritatively cited in innumerable peer-reviewed journal articles and treatises, including the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, in large measure because of the text's coverage of issues in determining causes of effects and effects of causes.

Dr. Greenland holds a Doctorate of Public Health and is a full professor of both Epidemiology and Statistics at UCLA. He is consulted on epidemiological questions by numerous business and government organizations, and he has published more than 300 papers in the peer-reviewed literature. Dr. Greenland's Rule 26 report and curriculum vitae are attached as Ex. 54.

Martin Wells, Ph.D. is the Chair of the Department of Statistical Sciences at Cornell University. He is professor of Clinical Epidemiology and Health Services Research at Cornell's Weill Medical School. Dr. Wells also serves on the editorial board of several statistical science journals and has published extensively in the scientific literature. Like Dr. Greenland, Dr. Wells was retained by plaintiffs to conduct a statistical analysis of the data available in Dr. Beck's and Dr. Matsen's studies. Independently, and using the same methodology as Dr. Greenland to analyze retrospective cohorts, Dr. Wells reached identical conclusions on the calculations of risk and statistical significance. Dr. Wells' Rule 26 report and curriculum vitae are attached as Ex. 56.

(a.) <u>Drs. Greenland and Wells have been qualified under Rule 702 to testify in other pain pump litigation.</u>

Recently, two courts have deemed Dr. Greenland's and Dr. Wells' expert testimony admissible, rejecting many of the same arguments by defendants concerning the validity of the underlying data. *Schott v. I-Flow Corp.*, 1:08-cv-00323, 2010 WL 1008478 (S.D.

Ohio Mar. 16, 2010); *Beale v. I-Flow Corp.,* 0801-01554 (Multnomah Cnty Cir. Ct. Ore.). Dr. Greenland testified at the *Beale* trial, which resulted in a $5.45 million verdict for plaintiffs.

Despite multiple rulings from courts in the pain pump litigation that there are sufficient facts and data to support general causation, even in the absence of definitive epidemiological evidence, defendants persist in arguing that causation cannot be reliably established without statistical evidence showing at least a doubling of risk. The thrust of defendants' attacks on both experts is the fact that these papers – as do all studies – contain limitations. However, these flaws do not undermine the experts' conclusions.

Defendants point out that the court in *McClellan* – in contrast to the *Schott* and *Beale* courts – excluded the testimony of Drs. Greenland and Wells. However, the *McClellan* court did indeed find that the methodology both experts used to calculate the odds ratios for chondrolysis from Dr. Beck's study was reliable. *McClellan*, 2010 WL 1753261, at * 43. The court found that their testimony was not necessarily relevant or helpful because Dr. Greenland testified that the association between pain pumps and chondrolysis was both enormous and obvious:

> [T]he strength of this association is so much that it's far beyond the usual subtleties that we have to deal with in epidemiology. This is – this is on the level of common sense. And it was taught to me when I was a student that a classic epidemiology, like an outbreak when you see these enormous associations, is a good measure of common sense, and you have to look at this kind of level of association and say – you don't have to be – have to have a PhD in epidemiology or anything to say – to ask yourself would I want to have this procedure done to me.

*Id.*at *42.

Moreover, the court held that if the defendants "opened the door" at trial in a way that makes Dr. Greenland's and Dr. Wells' testimony relevant or helpful, she would allow them to testify in rebuttal. Here is it is clear that defendants will doggedly pursue their theory at trial that plaintiff cannot prove causation without statistical data from epidemiological studies

demonstrating a relative risk of greater than 2.0. Such data do exist from the Beck, Rapley and Anderson cohort studies. Given that defendants have already opened the door in their *Daubert* motion, plaintiff should be permitted to present Drs. Greenland and/or Wells to counter defendants' theory. The experts' testimony is both relevant and helpful to demonstrate that the strength of the association between intra-articular use of pain pumps and chondrolysis shown by these studies is far higher than the threshold demanded by defendants to establish causation.

**6. Dr. Frederick Matsen**

Dr. Matsen is the Chair of Orthopedic Surgery at the University of Washington. He has been a board certified orthopedic surgeon for 34 years. Dr. Matsen has conducted extensive research on the shoulder and has served as a scientific consultant to several medical device companies. He is one of the four editors of the leading textbook on the shoulder, entitled THE SHOULDER. The fourth edition of this two-volume treatise was published this year.

Plaintiff does not intend to present Dr. Matsen as a causation expert witness until his study of 396 patients has been published. As explained more fully below, it has been submitted to a journal for peer-review and publication.

Defendants devote considerable effort attacking Dr. Matsen for matters he does *not* rely on for his opinion that continuous infusion of local anesthetics can cause chondrolysis. Since Dr. Matsen does not formulate his opinions on either his personal experience with patients suffering from chondrolysis or the "67 Study" (other than the extent to which both are part of his professional experience), it is perplexing why defendants find them of such interest. Dr. Matsen's opinion is not based on either of these points. Thus, they are irrelevant to whether Dr. Matsen's general causation opinion is reliable and admissible, except in one regard: Defendants contend that Dr. Matsen's interest in chondrolysis and his resulting opinions arise from his role as a testifying expert in this litigation. But the "67 Study" refutes that contention. Dr. Matsen undertook the "67 Study" at a time when his only connection to this case was as a

consulting physician concerning plaintiff's condition and prognosis. (Ex. 68, Grossnickle Trial. at 1635:10-25, 1636:1019 (March 5, 2009)) Therefore, the "67 Study" is relevant only in that it shows that Dr. Matsen's interest in the causes of chondrolysis preceded his role as a testifying expert in litigation.

The main focus of defendants' attacks on Dr. Matsen is on the 396 patient study, which consists of his team's statistical analysis of the patients of Dr. Benz, a surgeon from Portland, Oregon. Dr. Benz was a defendant in *Grossnickle v. Stryker*. Dr. Matsen analyzed Dr. Benz's patient records covering all arthroscopic surgeries in the shoulder joint he performed over a 12-year period. Defendants' overarching argument is that the 396 Data is unreliable and therefore, Dr. Matsen's testimony as a whole is unreliable.

Defendants' criticisms of the 396 patient study as "litigation biased" are exaggerated. Dr. Matsen conceived the idea for the study, and he designed and directed every aspect of the study. (Ex. 68, *Grossnickle* Trial Tr. at 1636:20-25, 1637:1-8, 1638:4-16, 1727:25, 1728:1-11) The data was analyzed by an "independent team," assembled by Dr. Matsen, consisting of a resident, a statistician, and a research nurse. (Ex. 68, *Grossnickle* Trial Tr. at 1639:23-25, 1640:1-25, 1641:1-6) Furthermore, the study was funded by an endowment to the University of Washington. (Ex. 68, *Grossnickle* Trial Tr. at 1615:12-20.)

Any weaknesses that defendants attribute to "litigation bias" are neutralized by the fact that Dr. Matsen and his team at University of Washington have submitted their statistical analysis for peer-review and publication to the Journal of Bone & Joint Surgery. The study addresses the criticism by defendants that other confounding factors were not analyzed. Dr. Matsen has received favorable and helpful comments from the peer reviewers, including the statistical reviewers. The reviewers expressed great interest in Dr. Matsen's study. Dr. Matsen has incorporated the reviewers' suggestions. Meanwhile, Dr. Matsen's study was also accepted

by peer-review and presented for presentation as a poster at the annual meeting of the American Academy of Orthopaedic Surgeons in the spring of 2010.

Because Dr. Matsen is reworking his statistical analysis as suggested by the journal's peer-reviewers, the numbers he cited in previous drafts of his manuscript will likely change. Therefore, Drs. Greenland and Wells will not be asked to testify concerning the odds ratios reported in Dr. Matsen's study until the final data are published.

## IV. CONCLUSION

The testimony of plaintiff's experts far exceeds the standards for admissibility of testimony under Rule 702. They are not based on a "parroting" of lawyer opinion, as defendants contend. Rather, the experts follow the scientific and generally accepted methodology of carefully considering all of the available published peer-reviewed data from clinical, animal and laboratory investigations, as well as their own clinical experience. Plaintiffs' experts rely on the same body of evidence that their peers do in reaching inferences on causation. The evidence is compelling, as shown by the overwhelming consensus in the community of orthopedic surgeons that intra-articular use of pain pumps is a known cause of chondrolysis. Defendants and their cadre of experts may dispute the conclusions drawn by plaintiffs' experts, but disagreement over conclusions is not a valid basis for exclusion of their testimony. Significantly, defendants cannot point to a single study that refutes causation. For these reasons, defendants' motion to exclude the general causation opinions of Drs. Badylack, Beck, Dragoo, Greenland, Matsen, Vidal and Wells should be denied.

Dated: July 28, 2010.

Respectfully submitted,

By: /s/ Leslie W. O'Leary

Leslie W. O'Leary, OSB No. 99090
loleary@wdolaw.com
Michael L. Williams, OSB No. 78426
mwilliams@wdolaw.com

Thomas B. Powers, OSB # 98393
tpowers@wdolaw.com
Heather A. Brann, OSB #040495
hbrann@wdolaw.com
WILLIAMS LOVE O'LEARY & POWERS, P.C.
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 295-2924
Facsimile: (503) 295-3720

Laura B. Kalur, OSB No. 023424
lbkalur@kalurlaw.com
Kalur Law Office
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 595-4145
Facsimile: (503) 295-3720

D. Robert Jones, CSB No. 25393
Jones@drjpc.com
D. Robert Jones, PC
219 West Colorado Ave Suite 210
Colorado Springs, CO 80903
Telephone: (719) 630-1556
Facsimile: (719) 630-7004

Ernest Franklin Woodson, ASB No. 0479-W66E
frank.woodson@beasleyallen.com
Beasley Allen Crow Methvin Portis & Miles, P.C.
234 Commerce St.
Montgomery, AL 36104-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was served electronically via the Court's electronic filing system on the 28th day of July, 2010, according to this Court's provision for service on the following:

Jeffrey R. Pilkington, Esq.
jeff.Pilkington@dgslaw.com
Jordan Lipp, Esq.
Jordan.lipp@dgslaw.com
Davis Graham & Stubbs LLP
1550 – 17th Street, Suite 500
Denver, CO 80202
Telephone: 303-892-9400
Facsimile: 303-893-1379

Chad J. Layton, Esq.
clayton@smsm.com
Erin N. Graham, Esq.
egraham@smsm.com
Segal McCambridge Singer & Mahoney, Ltd.
233 South Wacker Drive
Sears Tower, #5500
Chicago, IL 60606-6306

*Attorneys for I-Flow Corporation*

Brett Marshall Godfrey, Esq.
godfrey@godlap.com
James A. Johnson
johnson@godlap.com
Godfrey & Lapuyade, PC
9557 S. Kingston Court
Englewood, CO 80112
Telephone: 303-228-0700
Facsimile: 303-228-0701

*Attorneys for DJO, Incorporated f/k/a DJ Orthopedics, Inc.*

WILLIAMS LOVE O'LEARY & POWERS, P.C.

/s/ Leslie W. O'Leary
Leslie W. O'Leary, OSB No. 99090
loleary@wdolaw.com

cc: Co-counsel