# EXHIBIT 18

**REPORT OF CHARLES BECK, M.D.**
**Regarding Gordon Addis**

## I. Introduction And Credentials.

I am a board-certified orthopedic surgeon, and have been in practice in the Salt Lake City, Utah area for over 20 years. I was originally licensed in Louisiana, where I grew up and was trained. I am also licensed in Nevada and Wyoming, as well as Utah. My primary place of practice and residence is Utah.

I went to undergraduate school at LSU, Louisiana State University. I graduated with honors, magna cum laude. I received my medical degree from LSU. I was a member of AOA, Alpha Omega Alpha, which is a special honor awarded to the top one-sixth of the medical class. I also received the Orthopedic Award for Outstanding Graduating Medical Student. When I finished my orthopedic residency in New Orleans, I elected to do an extra year of fellowship training in knee and shoulder surgery, which included sports medicine, in a competitive program in Salt Lake City. I finished my orthopedic specialty training in 1987 and finished my sports medicine fellowship in 1988.

Through the end of the 1990s and the first half of this decade, I was the team physician for the U.S. Snowboard Team and still am a consultant for the U.S. Ski Team. I am a diplomat of the American Board of Orthopedic Surgery, meaning I am Board Certified in the specialty of orthopedic surgery.

I was the co-director of the Orthopedic Biomechanics Institute and Laboratory, which was the research arm of Orthopedic Specialty Hospital, from the mid 1990's until 2003 when it was disbanded. We conducted clinical research and developed orthopedic devices, implants, and surgical techniques. We also trained other orthopedic surgeons in surgical techniques we developed by sponsoring cadaveric surgical laboratories and courses in Salt Lake City. I also served as the Medical Director of The Institute for Sports, Science, and Medicine at the Orthopedic Specialty Hospital until 2003. I am currently an adjunct professor at the University of Utah, Department of Family Medicine..

I am a member of the American Orthopedic Society for Sports Medicine, the American Academy of Orthopedic Surgeons, the Arthroscopy Association of North America, and The European Society for Sports and Knee Surgery. I am also a member of several other medical professional organizations, including the Herodicus Society, which is a small group of internationally respected orthopedic surgeons from throughout the United States and Europe. I am also a member of The Magellan Society of international travelling fellows in Sports Medicine. My professional interests are in sports medicine and clinical and basic science research.

I have been elected as President of the Medical Staff of the Orthopedic Specialty Hospital on two occasions and have been a member of the American Orthopedic Society for Sports



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169



[redacted] [redacted]

Medicine Education Committee, which organizes seminars on advanced sports medicine topics for orthopedic surgeons. I have been a member of the Editorial Board of the American Journal of Sports Medicine since 2008 and have been a journal article reviewer for that journal for five years. In this role, I review articles submitted for publication in the Journal to evaluate the scientific validity of the study and the conclusions. I have also authored and co-authored a number of articles involving sports medicine, including care and treatment of the shoulder, which have been peer reviewed and published in medical journals. I have also been invited to speak and give presentations and courses in my field of interest, to present to other orthopedic surgeons, on nearly 100 occasions.

I participated in the European Travelling Fellowship in Sports Medicine, co-sponsored by The American Orthopedic Society for Sports Medicine and the European Society for Sports and Knee Surgery, in 1994. In this fellowship, three physicians under 40 years old along with an older, established expert surgeon are selected from a national pool once every two years for a European trip, and on alternate years for an Asian trip. These physicians travel for three to four weeks throughout the continent, in my case, Europe, to present research, exchange ideas, and observe surgery and the culture of our colleagues overseas.

I was selected in 2003, 2008, and 2009 for the "Guide to America's Top Physicians" by the Consumer's Research Council of America. I have also been selected, unsolicited by me, to several other honorary groups, including several Who's Who lists and other consumer guides.

I do some volunteer work, including serving for a decade in the Fourth Street Clinic (for the indigent) in Salt Lake City and as a physician in Greece for American kids of Greek descent at Ionian Village, a youth summer camp sponsored by the Greek Orthodox Archdiocese of North America, in 2003. I have also taken several youth groups to Project Mexico, a charitable organization that builds homes for underprivileged people in Tiajuana, Mexico. I have served for several years at the local and Metropolis level on councils of the Greek Orthodix Church.

I have served several times as a member of the Prelitigation Panel for Medical Malpractice Cases in the state of Utah, evaluating the adequacy of patient care of other orthopedic surgeons, and the causes of injuries suffered by their patients.

I am an expert orthopedic consultant for Regen and Depuy-Mitek, both medical device makers. I have consulted with Mitek regarding a device used for reconstructing the anterior cruciate ligament of the knee, that I helped design and develop and patent, and on which I have a royalty agreement. That particular device has nothing to do with the shoulder. Several medical device makers list me on their websites as an orthopedic surgeon who is familiar with their medical devices, including Depuy-Mitek, Regen, DJ Orthopedics, and Stryker Corporation, the last two of which also manufacture pain pumps that I am familiar with and I have used in the past. Therefore, I am familiar with medical device manufacturers, have consulted with them, and am familiar with the standard of care applicable to the safety of their devices.

I have been asked to give opinions regarding the scientific validity of considering the use



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

of a pain pump in the glenohumeral joint as a likely cause of chondrolysis. My opinions set forth in this Report are based on my education, my experience with pain pumps, and my professional training and experience as an orthopedic surgeon. In addition, I have reviewed, consulted, and relied upon certain materials in the following general categories from multiple sources:

a) Scientific and medical literature;
b) Medical records of Gordon Addis;
c) Summary of Medical Expenses;
d) Pain Pump Label; and
e) Marcaine Label.

A list of materials reviewed and referenced is attached. The opinions set forth in this report are based upon a reasonable degree of medical and scientific probability.

My hourly rate is $750 per hour. During the previous four years, I have testified as an expert at trial or by deposition in the following case: Grossnickle, et al v. Stryker Corporation, et al., Multnomah County Circuit Court Case No. 0703-02834.

## II. The Use of Pain Pumps in Shoulder Surgery.

Arthroscopic shoulder surgeries have been performed for decades. My first arthroscopic shoulder surgeries were during my orthopedic residency at LSU in the mid-80's. For the past decade, I've done almost exclusively arthroscopic surgeries when performing surgery on the shoulder. I have probably performed over 5000 arthroscopic shoulder surgeries involving the glenohumeral joint in my career. Throughout the United States and the world, thousands and thousands of arthroscopic shoulder surgeries involving the glenohumeral joint were done before the first case of chondrolysis in the joint was first reported in the medical literature, in 2004.

Starting around 1998 or 1999, the orthopedic community began hearing about using a catheter with anesthetic medications being dripped into a surgical site to cut down on post-operative pain over a period of several days following surgery. We began hearing about this in our orthopedic meetings when other orthopedic surgeons would share their experiences and what they are doing that is new and different in the field of orthopedics. This is why we go to orthopedic meetings, to learn new techniques and procedures and what is working and what is not working.

At these meetings there are a lot of medical device manufacturers that appear and set up a booth to display their devices and solicit sales to the orthopedic surgeons attending the meetings. If we weren't seeing medical device sales representatives at the meetings, we often see them in our offices or at the hospitals where we perform surgery. Sales representatives commonly bring their devices into the operating theater for us to try on our patients.

Prior to the use of pain pumps, and continuing to this day, orthopedic surgeons would very commonly inject local anesthetics into joints for either diagnostic purposes or to control



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

pain. Before pain pumps, this was usually done as a one-time injection of one to 10 ml, and rarely up to 30 ml. It occasionally was also done several times a year for treatment of arthritic joints along with a steroid. This was done for many, many years by orthopedic surgeons without evidence that we were harming our patients or that it was harmful to cartilage. An exception to this was an abandoned practice of the 1960's and 1970's in which steroid and local anesthetics were injected on game day and sometimes almost daily into the injured joints of athletes to help them continue to play their sport despite the injury. The repetitive injections were found to allow the joints to deteriorate, which was blamed on the effects of the steroid rather than the anesthetic; the practice therefore fell out of use. But this well established practice of one-time or sequential injections was far different than what occurred with the use of the pain pumps that subsequently came along.

The pain pumps inject the same pain medications, but they do it continuously, over a period of two to three days, and in a much higher volume than the profession had used for the previous one-time or even sequential injections.

The one-time injection of these commonly used anesthetics, such as Marcaine, was so well established and so widely used that I, and probably most orthopedic surgeons of the past 30 years did not read the drug maker's package insert for Marcaine, or Marcaine with epinephrine. But if we had, we would have learned little since there is no mention of using Marcaine directly within a joint space one way or another. In other words, the package labeling for Marcaine does not say whether it is approved for use in a joint or not. It doesn't mention use in joints at all. But I, and probably most other orthopedic surgeons now or previously in the past 30 years, didn't really go and review the package label for Marcaine because we were taught in medical school and in our orthopedic residencies and in our orthopedic fellowships that the drug was used commonly, and had been for many years, for one-time injections directly into the joint. This use was passed down by the orthopedic surgeons that trained us.

In the late 1990's, a number of articles and presentations at medical meetings started appearing regarding continuous injection of anesthetic medication by use of these pain pumps. And the articles, some of which were peer reviewed for their scientific validity, and others which were not peer reviewed and were simply published in what we call "throw aways," started comparing how effective these pain pumps were at controlling pain compared to the traditional methods we had been using to control pain. Some compared cost effectiveness. Some compared effectiveness in controlling pain. But as I look back now, I can't recall any at that time that were well designed specifically to see if continuous injection of these commonly used anesthetics such as Marcaine into joints, with or without epinephrine, was safe.

For example, two early efficacy studies that are sometimes incorrectly cited as showing safety of pump use in the glenohumeral joint were Mallon (2000) and Savoie (2000). Neither study, however, used the pump in the glenohumeral joint. Rather, the catheter was placed in the subacromial space:

(1) Mallon, et al, "Patient Controlled Analgesia for Acromioplasty Surgery," Journal of Shoulder and Elbow Surgery, 9:85-88 March, 2000.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

In this efficacy study, lidocaine 2% was infused not into the glenohumeral joint, but into the subacromial space for 72 hours at 2 ml/hr. Pain scores were lower in the pump group than in the control group. The patients were followed for only three days.

(2) Savoie, Mallon, "The Pain Control Infusion Pump for Postoperative Pain Control in Shoulder Surgery," Arthroscopy, 16:339-342 March, 2000.

In this efficacy study, 31 patients received a continuous infusion of 0.25% bupivacaine into the subacromial space, not in the glenohumeral joint, for 48 hours and 31 patients received saline infusions. The bupivacaine group had statistically significant lower pain scores. The patients were followed for only seven days.

However, it was common knowledge amongst orthopedic surgeons and the pain pump manufacturers and distributors that the catheters began to be placed directly into knee, shoulder and even ankle joints undergoing surgery from the time the devices were introduced. They were not put there by all surgeons or in every procedure, but they were often put there by numerous surgeons if the surgery involved the glenohumeral joint.

So I and my orthopedic colleagues looked at some of the early efficacy studies that were being published, listened to the manufacturer's sales representatives and our peers who were using the devices, and started using pain pumps on our patients in the late 1990's. In my case, I started using a much smaller pain pump, with a volume of 120 ml. and a 2 ml./hr flow rate, around 2000.

The first few times I used the pump, a sales rep was with me in the operating room making suggestions about their proper use. But after about 2 years of experience with the pumps, I concluded they did not make a whole lot of difference in terms of managing the patient's pain. Too often there were problems arising with the pumps that generated patient concern and anxiety, interfering with their and my sleep often, because of poor functionality of the pumps or because of catheter issues. In other words, the level of pain relief was minimal with these low-volume pumps and did not seem to justify their cost or the many patient telephone calls they generated. Therefore, I quit using the pain pumps on my patients following shoulder surgery around 2002. Furthermore, because of the conflicting results of the studies being published at the time on effectiveness of intra-articular use of pain pumps, there seemed to be evidence that pain pumps were an unnecessary expense. Patients had been having outpatient arthroscopic shoulder surgery since long before intra-articular or extra-articular use of pain pumps began, and still are today, and they have been adequately treated for their pain with oral and/or injectable medications. Thus, there is substantial evidence that pain pumps are not only dangerous for patients, as described below, they are also unnecessary.

Then in 2003, several sales representatives returned to see me and said that they had a new "higher volume pump." I was repeatedly asked if I would like to use the higher volume pump to see if it addressed my concerns about the inadequate pain management seen with the lower volume pumps previously used. I decided to try the pumps again. In mid-2003, I began using a higher volume pump, with about 250 ml. capacity, and a higher flow rate of about 4 ml. per hour. I used the higher volume pumps primarily in my shoulder surgery patients, placing the



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

catheter directly in a glenohumeral joint or into the subacromial space depending on the primary surgical site. I continued this practice until I finally concluded that it was causing chondrolysis in my patients in late 2005. I never had any cartilage injuries or chondrolysis in any of my patients treated with the smaller volume pain pump or in any patient I had treated prior to seeing the first chondrolysis cases appear in my patients in late 2003, about 6 months after I started using the higher volume pumps.

## III. <u>Chondrolysis</u>.

Chondrolysis is a really terrible condition. The cartilage on the surface of the joint falls apart and deteriorates and is reabsorbed. It happens rapidly, over a period of months. It sets off a whole chain of events in the shoulder that are far worse than regular osteoarthritis that is commonly seen in older people, or in younger people from trauma or genetic predisposition or any other reason. Chondrolysis occurs far more rapidly than the far more common condition of degenerative osteoarthritis, where over a period of years or decades, the cartilage deteriorates as we age, causing pain and sometimes limitation of motion in a joint. Chondrolysis is far worse than the much more common condition of arthritis. Chondrolysis does not go away. It does not just eat your joint up; it leads to a long-term ongoing crisis for that joint and its surrounding tissues that never gets better.

Chondrolysis is a peculiar condition that was almost unheard of 20 years ago, other than in the hip. When repairing a fractured or diseased hip in a child, the metal pins being used would occasionally penetrate the cartilage surface. In some of those cases chondrolysis would develop, and it was blamed on the pin penetration as other causes could not be identified. The hip would deteriorate substantially, requiring a fusion or joint replacement in some cases, or slowly becoming tolerable but stiff as the child continued to grow. That is where the term was first described 3 decades ago. It occurred very, very sporadically, very rarely. Perhaps .01 percent of people who had orthopedic surgery might encounter this horrible condition.

Where it has been mostly encountered in the last 10 years or so in orthopedics has been in the shoulder and sporadically in a few other joints, and it has been encountered in association with the use of surgical instruments such as lasers and various "heat wands", also known as radiofrequency devices, or with dyes that have been used in the joint.

Chondrolysis in the last 5-6 years or so was encountered with a suddenly increased frequency. All of a sudden, many cases started showing up in different doctors' practices around the country. And it was a mystery why. The important point of this is that chondrolysis was previously very rare; unfortunately, it has now been encountered far more commonly and in my experience, in an almost predictable way we as a profession had never expected.

## IV. <u>Realization That Intra-Articular Use of High Volume Pain Pumps Was Causing Glenohumeral Chondrolysis</u>.

I had a number of patients develop chondrolysis in my practice in 2003, 2004 and 2005. I had never previously seen the condition, over my prior 25 years in medicine, other than in a textbook, journal or hearing about it once at a meeting. All of a sudden, I went from no cases in



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

a busy shoulder and knee practice to, for a while, one case coming in every week in patients that I had operated on. I did not understand initially what happened or why it happened. There was really no information in the literature or from experts in shoulder surgery about how this condition acted or how to it, either. It was extremely rare until then. Very few other orthopedic surgeons had ever seen a case of chondrolysis in the glenohumeral joint prior to 2003.

Chondrolysis is a devastating outcome for a patient. As surgeons, we take patients to surgery to try to make them better. And they usually do get better. It is devastating when one of our patients ultimately comes out much worse after the surgery than they were before it. I was very distressed by what I was beginning to see. It bothered me to the point I was not sleeping well. So, I began to try to sort out what could have happened that could cause this. I looked through my patients' records with a fine tooth comb. They were all shoulder instability patients that had arthroscopic surgery. In orthopedics, we are always trying new things: different suture anchors, different suture materials, different instruments and different techniques in order to improve the outcome. I began to look very fastidiously at what I had been doing that was different for these patients as opposed to prior patients, since I had never seen this before.

There was a big mystery about what was causing it. I have used multiple different devices in my patients over the years as new technological improvements have occurred, including all kinds of different absorbable and non-absorbable anchors and suture combinations. I had used several different anchor and suture types with these patients with chondrolysis, but I did not find anything consistent about these devices in my patients that developed chondrolysis that would implicate the devices as none were used more than a few times each in these chondrolysis patients. As I did my research, I looked hard at the different anchor and suture types because there had been some sporadic anecdotal reports that suggested some of the suture material was causing these problems, because other doctors were starting to see these chondrolysis cases, as well, and were beginning to talk among themselves "off the record" at meetings I attended. As I continued to look at the anchors as well as various fluids I had used in surgery, heat from the arthroscopic equipment, and the sporadic use by me of radiofrequency probes as possible causes, more patients came into my office with chondrolysis. It finally dawned on me in late 2004 that all of these patients all had a single association with something I had done differently during that time period than in every single patient before 2003: I was using the high volume pain pump with 0.25% Marcaine (bupivacaine) with epinephrine.

We then very carefully looked over all of the medical records of my arthroscopic shoulder surgery patients. We looked at what type of surgical procedure had been performed, the type of irrigation fluid used, whether or not a radiofrequency probe was used, and if so, what type, whether a pain pump was used, the type of sutures that were used and whether they were permanent or absorbable, the position the patient was placed in during surgery, the reason the surgery was being performed, post-operative pain medications used, degree of cartilage injury already present at the initial surgery, range of motion evaluations, radiographic changes, rheumatology lab panel results, shoulder aspiration culture results, pathology results, subsequent surgery history, and any additional complications. We thoroughly reviewed all aspects of the patients' history to look for a common factor associated with the development of chondrolysis.

I looked at about 170 surgical cases from about 150 of my own patients over about a year



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

and a half. I had had 12 shoulders in 10 patients develop this condition at the time. Every single one of those patients had the intra-articular pain pump catheter as the only common factor other than the facts that I did all the surgery and the treatment was for glenohumeral instability. Many of my previous patients had instability surgery, and all had me for their surgeon, but none of them developed chondrolysis except those who had a "high volume" pain pump used in their glenohumeral joint. The pump was the only common factor. So, I used my last pain pump December 15, 2004.

After I recognized that the pain pump had some association, along with the medication, and that was the only common thread, then I proceeded to contact different people, in particular orthopedic colleagues and pain pump manufacturers, to try to find out if anybody else was having this experience. One of the surgeons I spoke with was Dr. Lonnie Paulos, whom I practiced with in Salt Lake City. I explained to him my conclusion that the pain pumps were causing chondrolysis, and the basis for my conclusion. Dr. Paulos had a patient at the time who had developed chondrolysis, but Dr. Paulos wasn't using pain pumps. He went back and looked at the patient's records after I spoke with him, and he found that at the end of his surgery on that patient, the young physician he was training put a high volume pain pump catheter into the patient's shoulder joint after Dr. Paulos had left the operating room. His patient subsequently developed chondrolysis in that joint. It was a particularly terrible case because he was an NCAA football player. It was also significant, because that was the only time a pain pump had ever been placed in the shoulder joint in one of Dr. Paulos' patients, and that patient developed chondrolysis. So Dr. Paulos, who was a paid consultant for Stryker Corporation, who manufacturers pain pumps also, contacted Stryker several times to warn them about this complication and to suggest they conduct a safety study immediately and add immediate warnings to the pain pump labels. That was in February of 2005.

I had used my last pain pump on one of my patients on December 15, 2004. I continued to study the situation, however. Based upon my detailed evaluation of all of my patient records, I put together a presentation for my colleagues to help spread word of my findings and conclusions about the pain pump-chondrolysis association, hoping more patients would not suffer this terrible condition. I gave a presentation in July, 2005 in Vail, Colorado to my colleagues in the Herodicus Society. I explained my conclusion that high volume pain pumps when used in the glenohumeral joint were causing chondrolysis, and explained my investigation of the issue and the basis for my conclusions. My presentation was well received by my colleagues, many of whom are leading researchers and academicians. The presentation resulted in stimulating much of the research on chondrolysis that was done subsequently, including research at the University of Pittsburgh by Dr. Chu and her team, and at the Rush Medical Center in Chicago by Dr. Cole and his team. Dr. Chu's department head, Dr. Freddie Fu, and Dr. Cole were both at my presentation, and I subsequently corresponded with Dr. Cole several times about the topic as he started his research later that summer. Dr. Fu returned to Pittsburgh and introduced Dr. Chu to the concept of joint toxicity related to my presentation, and she subsequently began the research she reported on the following year.

I continued working on the issue, trying to get the word out further. I drafted a paper on the subject and was invited to give a Podium Presentation in March of 2006 at the Annual Meeting of the American Academy of Orthopedic Surgeons. That meeting was scheduled for



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

New Orleans in February, 2006 and I had made plans to go there to present my paper. But then Hurricane Katrina struck and they had to delay the meeting and move it to Chicago. My former fellowship trainee, Dr. Hansen, who helped me analyze the data on all of my patients, took my place and gave the presentation in Chicago on March 23, because I was unable to attend.

Dr. Hansen and I submitted my paper for publication in a peer reviewed journal, The American Journal of Sports Medicine. My paper went through the peer review process, being scrutinized by other expert orthopedic surgeons who remain anonymous during the review process. A few changes and modifications were suggested and I made those and the article was finally published in the American Journal of Sports Medicine in October 2007. That article explains what had happened to my patients, my experience with use of the high volume pain pumps, and the basis for my conclusion that the pain pump was the only common factor in causing the chondrolysis. Something like 60% of my patients in whom I used the high volume pain pump by placing the catheter in the glenohumeral joint with a 4 ml. per hour flow rate developed chondrolysis. I think it is still the leading case study involving patients suffering chondrolysis in the glenohumeral joint that has been published in a peer reviewed journal. I know others are in the works and hopefully will be published before too long.

I also made other attempts to notify pain pump manufacturers of this danger, trying to get the word out to prevent further patients from suffering this crippling injury. Around February, 2005, while I was at a national meeting of the American Academy of Orthopedic Surgeons in Washington, D.C., I went around to the booths set up by different pain pump manufacturers and asked the manufacturer's representatives if they had heard of any bad outcomes with these pain pump catheters. Universally I was told "No." I also asked that they please let me know if they did learn of any. I also told them that I had had some problems with the development of chondrolysis in some of my patients. I didn't feel I was being received very warmly, or that they had any interest in the matter. This was before I delivered my presentation to the Herodicus Society.

The day after after I gave my presentation to the Herodicus Society in Vail in July of 2005, I went to the American Orthopedic Society for Sports Medicine (AOSSM) meeting, just down the highway from Vail in Keystone, Colorado. Again, I walked around to the booths set up by the pain pump manufacturers and I asked the manufacturer's representative the same questions. I got the same reactions. I know that I spoke with representatives from DonJoy (later called DJ Orthopedics) at that time.

At that time, I still did not understand the precise mechanism by which the use of the pain pumps was destroying all of the cartilage in the joints. I had a theory, but it was untested and unproven. My theory was that the mixture of Marcaine with epinephrine that was commonly used, both for the one-time injections over the years as well as in the pain pumps, was highly acidic and maybe the acidity was killing the cartilage. That theory has since been disproven by the subsequent research conducted by Dr. Chu and others, who found from thir subsequent research that Marcaine and many other local anesthetics are extremely toxic in and of themselves to articular cartilage. The presence of epinephrine in the medications used in the pain pump does not make an impact on the toxicity of the Marcaine on the chondrocytes in the cartilage.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

CENTER OF ORTHOPEDIC AND
REHABILITATION EXCELLENCE

It was always a frustrating experience talking to the manufacturers' representatives at these conventions attended by orthopedic surgeons. I was met with a blank stare by most of them. I approached six or eight different pain pump manufacturers, including Stryker and DonJoy. When I asked the sales representatives to have someone from the company call me, I just received some sort of nod and a wry grin as my name was taken. I never had any response from any of them until several months after my presentation in Vail and my attempts to discuss the problem with them.

Based upon my own clinical experience, and the clinical study I performed and reported in my peer reviewed article, coupled with the subsequent research which establishes the chondrotoxicity of Marcaine (Nole, Fulkerson, Petty, Dogan, Bojescul, Hansen '06, '07, Chu '06, 08, '09, Gomol '06, Lo, Yeger-McKeever, Karpie, Piper, Anderson, Greis, Dragoo, Webb, Korotkova), it is my opinion, based upon a reasonable medical probability, that intra-articular use of pain pumps with commonly used anesthetics such as Marcaine, with or without epinephrine, are a scientically valid and plausible cause of chondrolysis of the glenohumeral joint following intra-articular use of high volume pain pumps.

## V. <u>Gordon Addis' Chondrolysis Was Caused by Use of a High Volume Pain Pump Following His March 31, 2004 Surgery</u>.

It is my opinion, to a reasonable medical probability, that the Don Joy pain pump used following his March 31, 2004 surgery was a substantial and material contributing factor in causing chondrolysis of Gordon Addis's right shoulder joint. But for the use of the pain pump, he would not have developed chondrolysis.

Based upon the records and information known to me, I conclude Gordon Addis did develop chondrolysis. Mr. Addis did not have chondrolysis at the time of his March 31, 2004 surgery. During that surgery, Dr. Bowman visually inspected the glenohumeral joint and found the cartilage to be normal, without any injury or damage. By January 10, 2007, his MR arthrogram showed joint space narrowing and near complete loss of cartilage. An X-ray and an MRI of the shoulder normally show the humeral head and the glenoid with a space between them which is filled with cartilage or fluid. If the space between the bones disappears, this mean is no cartilage left on the joint surfaces. It is bone grating against bone, an extremely painful condition.

Mr. Addis suffered a right shoulder injury on December 16, 2003. Conservative treatment consisting of numerous physical therapy visits over three months failed to provide relief from his injury. Dr. Ronald Bowman performed arthroscopic shoulder surgery on March 31, 2004 Mr. Addis's right shoulder joint.

Prior to surgery, Dr. Bowman ordered a CT/MR Arthrogram of the right shoulder. The imaging study was interpreted showing only subtle findings, probably indicating a posterior-inferior labral tear and a small partial tear or area of tendinopathy in the supraspinatus tendon. A pre-operative injection of 30 ml of 0.25% Marcaine with epinephrine 1:200,000 was administered. Dr. Bowman's arthroscopic surgery found the labrum quite stable and attached to the glenoid with focal inflammation in the posterior capsule but no laxity and negative drive-



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

through sign. The rotator cuff was intact with the exception of just a partial thickness glenohumeral side tear of the supraspinatus comprising less than 10% of the thickness of the rotator cuff and the width of approximately 15 mm. There was a mild subacromial bursitis. Most significantly, visual inspection of the glenohumeral joint revealed normal glenoid and humeral articular cartilage. Dr. Bowman performed arthroscopic debridement of the rotator cuff tear and a subacromial decompression.

At the conclusion of the surgery, Dr. Bowman used a pain pump, under direct visualization, placing one catheter in the subacromial space and one catheter in the glenohumeral joint, with each catheter delivering approximately 2 ml per hour of anesthetic medication. The pain pump used was a "Don Joy pain pump 275 ml" filled with 0.5% bupivacaine with epinephrine 1:200,000.

Two days post-operatively, Mr. Addis was seen by Dr. Bowman and his pain pump was refilled with Marcaine 50 cc x 4. On April 5, 2004, Mr. Addis was seen again by Dr. Bowman. His pain control was good. The pain pump catheters were removed, and the wounds looked excellent with no evidence of infection. The pain pump apparently functioned exactly as intended and designed to relieve post-operative pain.

The only surgical procedure done in the glenohumeral joint was mechanical debridement of the rotator cuff tear with a motorized shaver. No RF, radiofrequency, or thermal devices or treatments were used in the glenohumeral space. No bone anchors or sutures of any type were used in the glenohumeral space. No chemicals or medications of any type were used in the glenohumeral space except for the initial pre-operative injection of Marcaine with epinephrine, Marcaine with epinephrine given through the Don Joy pain pump, and epinephrine in the irrigation solution used during the surgery.

Post-operatively, Mr. Addis undertook frequent physical therapy sessions. Mr. Addis returned to work half-time on light duty and was tolerating it relatively well by May, 2004. Physical therapy continued and Mr. Addis was making good gains but reached a plateau at therapy. He still had some underlying pain and symptoms in August of 2004 but they were not significant enough to prevent return to work full-time. After the second week at work, he had increased pain. The pain continued but he was released by Dr. Bowman to any and all activities in the work place by the end of November, 2004.

Mr. Addis apparently continued full-time at work but returned to Dr. DiPaola in October, 2006 reporting that over the prior several months he had experienced increasing pain and stiffness in his shoulder and now had difficulty performing overhead tasks. Dr. DiPaola noted that he'd had a Marcaine pump at the time of Dr. Bowman's surgery, with the catheter placed into the joint space, and questioned whether this could be contributing to some extent to his problem. Dr. DiPaola saw Mr. Addis again in January 2007. He had popping and crepitation in the joint. Dr. DiPaola again noted the intra-articular use of the pain pump and questioned whether this could place him at risk of chondrolysis.

On January 10, 2007, an MR arthrogram of the right shoulder was performed and it showed severe degenerative change involving the glenohumeral space, with joint space



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

narrowing and subchondral irregularity secondary to near complete loss of articular cartilage. Numerous subchondral cysts were identified both within the subcortical surface of the humeral head as well as the bony glenoid fossa.

Dr. DiPaola saw Mr. Addis for an office visit on January 11, 2007 and explained the results of the MR arthrogram, his diagnosis of chondrolysis and the extensive degenerative disease of his shoulder. His plan was to refer Mr. Addis to an orthopedic shoulder specialist.

Mr. Addis saw Dr. Gramstad on May 10, 2007. Dr. Gramstad's impression was right shoulder post-arthroscopic chondrolysis. To rule out infection, Dr. Gramstad ordered an aspiration of the right shoulder and culture. A fluoroscopic guided joint aspiration of the right shoulder and culture was performed on May 24, 2007. The final report on May 27, 2007 reported scant growth staphylococcus species, coagulation negative, and no anaerobic organisms were isolated. Dr. Gramstad followed up on the shoulder aspiration on June 5, 2007 with a limited tagged white cell study. The result was more suggestive of inflammation rather than osteomyelitis. A second fluoroscopic guided joint aspiration was performed on June 20, 2007. The culture grew out no organisms. Infectious disease consultation felt there was a fairly low suspicion for infection in the right shoulder. This means the bacteria found with the initial culture were likely contaminants and not really cultured from the shoulder joint.

On June 29, 2007, Dr. Gramstad performed a right total shoulder arthroplasty with humeral head resurfacing and biologic soft tissue Achilles tendon allograft resurfacing of the glenoid. Dr. Gramstad found no signs of infection with severe articular cartilage fragmentation and subchondral pitting of the humeral head as well as the glenoid. His findings confirmed his clinical impression that Mr. Addis' shoulder was not infected. Cultures taken showed no growth after five days. He was placed on a permanent restriction of 10-20 pounds of lifting.

Mr. Addis then returned for frequent physical therapy sessions. He reported he was definitely better following the total shoulder arthroplasty. But in January 2008, he reported he was completely off of work with recurrence of discomfort in the shoulder. X-rays revealed some osteolysis at the medial calcar and erosion of the glenoid with some reactive bone at the inferior glenoid and proximal medial shaft.

Dr. Gramstad's work-up for possible infection of the shoulder joint, with shoulder aspiration and culture, revealed staph in thioglycolate broth only. Dr. Gramstad felt there was no infection.

Dr. Gramstad took Mr. Addis to surgery again on January 25, 2008 for a right shoulder arthroscopic extensive debridement of intra-articular and subacromial space with removal of allograft tissue. Dr. Gramstad found intense intra-articular synovitis, central destruction of allograft tissue with peripheral remnants, an intact rotator cuff, the humeral prosthesis did not appear loose, and patchy osteolysis of the glenoid with exposed cancellus bone. Deep wound cultures showed no growth after three days. Mr. Addis returned to frequent physical therapy visits.

An evaluation in September 2008 indicated Mr. Addis was capable of full-time work in



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE

8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

the light to medium range of physical demand. In October, 2008, Mr. Addis wanted to return to work in some capacity although he was still having flare-ups of pain. Dr. Gramstad last saw Mr. Addis on January 8, 2009, when he was felt to be medically stationary. Mr. Addis reported feeling good with occasional shoulder aches when he lifts too much and was taking over-the-counter pain medications and wanting to return to work.

I used the differential diagnosis or differential etiology methodology by considering all scientifically plausible causes of chondrolysis and determining which of those plausible causes could be ruled out in his case, leaving the most likely and probable cause for his chondrolysis. I considered the following possible causes of the chondrolysis which destroyed Mr. Addis' right shoulder joint:

1. <u>Possible Pre-March 31, 2004 Causes</u>.

Dr. Bowman visually inspected the condition of the cartilage throughout the glenohumeral joint during the surgery on March 31, 2004. Dr. Bowman found the articular cartilage in the joint to be normal. This is not consistent with chondrolysis. I am therefore able to rule out to a high degree of medical probability any possible cause of chondrolysis in the plaintiff's glenohumeral joint that occurred prior to the March 31, 2004 surgery. Based upon a reasonable medical probability, I conclude that the cause of the chondrolysis suffered by the plaintiff occurred on or after March 31, 2004.

2. <u>Cartilage Damage from Instruments</u>.

Damage caused by instruments is usually localized damage in one area, not a complete, uniform loss of cartilage. Moreover, there is no evidence to support cartilage damage from instruments during the March 31, 2004 surgery. Dr. Bowman did an arthroscopy and debridement of the partial thickness rotator cuff tear. These procedures have been performed in the glenohumeral joint hundreds of thousands of times without ever being associated with chondrolysis. I know of no mechanical cause of injury to the cartilage in this case. Moreover, I am unaware of any studies establishing that localized injury from instruments or other localized mechanical damage results in chondrolysis of the joint.

3. <u>Doctor Incompetence</u>.

I am not aware of any doctor incompetence.

4. <u>Inflammatory Arthritis and Infection</u>.

Uniform joint space narrowing can be caused by inflammatory arthritis and infection. Inflammatory arthritis includes conditions such as rheumatoid arthritis and psoriatic arthritis. With inflammatory arthritis the body destroys its own cartilage and completely wipes out all the cartilage, and uniform joint space narrowing occurs. The other possibility is infection. With infections, the body's own white cells are trying to attack the bacteria but they also destroy the cartilage, and the same uniform joint space narrowing appears.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted] [redacted]

Rheumatoid arthritis is straightforward to rule out. It is not caused by surgery and usually does not develop quickly. Typically, over months and years the joints slowly start to hurt and they get inflamed. Usually multiple joints are involved and blood tests such as sedimentation rate and rheumatoid factor become strongly positive. There is no evidence Mr. Addis has rheumatoid arthritis.

With infections in the joint, the patient becomes very ill. Infection can be contracted after surgeries. But normally, with the infection, swelling and pain occur. The patient usually gets a fever, will be very fatigued, feel very sick, and the joint is going to be quite painful and swollen. Mr. Addis did not have any symptoms whatsoever to suggest an infection. After Mr. Addis' diagnosis with chondrolysis, and before Dr. Gramstad's June 29, 2007 surgery, fluoroscopic aspiration of his right shoulder was undertaken and cultured. The culture revealed scant growth of staphyloccus species, coagulation negative, with no anaerobic organisms isolated. Dr. Gramstad followed up his shoulder aspiration with a limited tagged white cell study which was more suggestive of inflammation than osteomyelitis. And the shoulder aspiration was repeated on June 20, 2007. The culture revealed less than 1 WBC and after four days of incubation there was no growth of aerobic or anaerobic bacteria. Dr. Gramstad felt that infection was unlikely and that the indications of inflammation were due to the chondrolysis in the glenohumeral joint. The bacteria found were therefore felt to be contaminants of the culture rather than being from the shoulder joint.

At surgery on June 29, 2007, Dr. Gramstad found no signs of infection. Dr. Gramstad observed no granulation tissue or abnormal synovium during this surgery. Tissue samples revealed chronic inflammation and lymphocytes but no polymorphonucleocytes and no evidence of acute infection. Dr. Gramstad agreed with his clinical suspicion that Mr. Addis' shoulder was not infected. I agree. So that rules out both rheumatoid arthritis and infection.

5. <u>Gentian Violet Solution/Chlorhexidine/Methylmethacrylate</u>.

Years ago a gentian violet solution was used to examine the joint to see if there was a penetrating injury through the joint capsule. We found out that solution caused chondrolysis, so almost no one uses that anymore. Nor were chlorhexidine or methylmethacrylate used on Mr. Addis. These chemicals all had been associated with chondrotoxicity. (Tamai, Nakagawa, Douw, van Huyssteen, LeClaire.) But they were not used on Mr. Addis.

6. <u>Heat - Thermal Energy</u>.

Dr. Bowman did not use any thermal or RF treatments or devices in the glenohumeral joint of Mr. Addis. There is no evidence of heat having anything do with the cause of the chondrolysis in Mr. Addis. Dr. Bowman did use a Mitek vapor to ablate adherent tissue in the subacromial space, but he used no thermal devices or treatments of any type in the glenohumeral space where the chondrolysis developed. Although there is some indication in the published literature that excessive radiofrequency used in the joint can cause chondrolysis (Lu, Edwards, Levine, Lubowitz, Good), I am unaware of any evidence that use of RF or thermal in the



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted] [redacted]

subacromial space is associated with the onset of chondrolysis in the glenohumeral space.

7. Hardware, Bone Anchors, Permanent or Loose.

Plaintiff did not have any anchors or sutures placed in his shoulder, of any type. I therefore can rule out any of these as possible causes of the chondrolysis.

8. Dr. Bowman's Experience with Chondrolysis.

I have been asked to assume that Dr. Bowman has been doing arthroscopic shoulder surgeries in the glenohumeral joint for many years prior to, and after, March 31, 2004, and has never had a patient develop chondrolysis unless a high volume pain pump was used in the joint following a surgery. The fact that he never had a patient suffer chondrolysis of the glenohumeral joint unless a high volume pain pump was used intra-articularly following the surgery, is highly probative of the cause of the chondrolysis in plaintiff. We know that not every patient using a pain pump in their glenohumeral joint following surgery develops chondrolysis. But the fact that no patients of Dr. Bowman's have developed chondrolysis over the years he has done arthroscopic shoulder surgeries, unless a high volume pain pump was used in their glenohumeral joint, is highly probative of the cause. I conclude that this factor as well implicates intra-articular use of the pain pump following the March 31, 2004 surgery as the probable cause of the plaintiff's chondrolysis.

Conclusion: My bottom-line conclusion, after considering all scientifically plausible causes of glenohumeral chondrolysis, and ruling out those that are inapplicable to Mr. Addis' history and circumstances, is that based upon a reasonable medical probability Mr. Addis' chondrolysis was caused by intra-articular use of the high volume pain pump in his glenohumeral joint following the March 31, 2004 surgery.

## VI. Severity Of Injury And Prognosis.

The injury suffered by Mr. Addis is severe. It is devastating. He went from a typical younger, active person, to having a severe disability to the point where he has had his glenohumeral joint destroyed permanently. It is not a mild problem, it is a severe problem. He has pain, loss of motion, loss of function, and weakness of the right arm.

Because Mr. Addis has an artificial shoulder joint now, his function and strength in his upper extremity will be less than normal permanently. He will have ongoing shoulder pain. The more he uses his right upper extremity, the more wear and tear will result and the sooner he will need more surgery to replace the artificial shoulder. Mr. Addis will no longer be able, during the rest of his life, to engage in moderate to heavy lifting with his right upper extremity or ordinary manual labor type occupations. This has resulted in the need for Mr. Addis to look for a new type of occupation that he is able to perform with his limitations. This adjustment will probably cause him anxiety and mental distress as he deals with the uncertainty of his economic future and his future employability.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

Mr. Addis will probably require revision shoulder replacement surgery in the future as his artificial joint wears out. It will be costly in today's dollars, and the cost of medicine keeps rising. He will also require pain medications for life for his shoulder pain.

## VII. The Roles of the Manufacturer, The FDA, and the Orthopedic Surgeon Respecting Pain Pump Safety.

The label on the pain pump specifically said that it was intended for the continuous injection of anesthetic medications directly into the intraoperative site. For orthopedic surgeons who were doing arthroscopic surgery in the glenohumeral joint, that is the "intraoperative site." There was nothing in the labeling of DonJoy's pain pumps which told orthopedic surgeons like myself or Dr. Bowman that the pump was not to be used in the joint space. And in my experience, pain pump sales representatives never told us not to use the pain pump directly in a joint space.

I was never told the pain pumps were never FDA approved for use in the shoulder joints. This would have been important information for me and other surgeons to know as a careful and prudent orthopedic surgeons, because if a device carries an FDA approval, then the doctor will typically assume that some type of rigid safety research has been done to approve it for that particular application. And if the FDA has rejected use in joints, that will be a red flag safety concern for surgeons.

Orthopedic surgeons generally expect and assume that medical device makers voluntarily put safety first with their medical devices. The entire system of medical device safety in the United States is based upon trust.

Orthopedic surgeons, who use prescription medical devices often, rely upon and trust the medical device manufacturer to put safety first. Orthopedic surgeons almost never conduct their own independent research, testing, or thorough review of the medical literature for purposes of evaluating the safety of using a prescription medical device as directed by the manufacturer. Orthopedic surgeons generally assume that the manufacturer has done all of that under the supervision of the FDA before it would ever place its medical device out in the market for use by unsuspecting doctors on their patients. It would be extremely impractical, time consuming, wasteful and expensive for each orthopedic surgeon to conduct his own independent research, testing, and medical literature review each time he uses a prescription medical device. Orthopedic surgeons don't have the time, resources, and often the experience necessary to conduct the research, testing, and thorough medical literature review necessary to establish the safety of a particular use of a prescription medical device. The reality is that those obligations all fall on the medical device manufacturer, not the surgeons.

Orthopedic surgeons, like all physicians in this country, take an oath to do no harm to their patients. It would be unethical for an orthopedic surgeon to subject his patients to an untested, and possibly unsafe medical device without a full disclosure to the patient and without



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

giving the patient a full opportunity to either consent to accept the risk of using an untested and potentially unsafe medical device or refusing such an experimental treatment. When orthopedic surgeons performing arthroscopic shoulder surgery in the glenohumeral joint are repeatedly told by the manufacturer that its pain pump is intended to be used to continuously inject anesthetic medication "directly into the intraoperative site," orthopedic surgeons assume, and have the right to assume, that the manufacturer has done the necessary research, testing, and thorough review of the medical literature to establish that such a use of its pain pump is going to be safe for the surgeon's patients. Any manufacturer that fails to take these necessary steps before promoting such a use of its pain pumps fails to exercise the degree of care required of all reasonable, competent, and safety conscious medical device manufacturers.

Orthopedic surgeons will generally assume that when a pain pump manufacturer advertises and promotes use of its pain pumps directly in the glenohumeral joint, that the FDA has not repeatedly rejected pain pump manufacturers' requests for FDA clearance and approval of such use. The standard of care of a reasonable, careful, competent, and safety conscious medical device manufacturer required that it inform orthopedic surgeons that the FDA had rejected use of pain pumps directly in joint spaces. Orthopedic surgeons need to know this because it is a red flag signifying that the safety of such use of a pain pump is in doubt. By allowing orthopedic surgeons to believe that the safety of intra-articular use of pain pumps had been adequately established, pain pump manufacturers used unsuspecting patients throughout this country as guinea pigs and test subjects, without their knowledge and without their consent. This put countless patients and their families at risk of life-changing, severe, and permanent injuries to their shoulder joints.

There are many time-proven alternatives for pain management other than pain pumps, that have been used successfully for decades prior to the introduction of ambulatory pain pumps at the beginning of this decade, and which are still being successfully used today, now that many orthopedic surgeons are finally learning about the risks of intra-articular use of pain pumps. Because pain pumps are an unnecessary medical device for use after arthroscopic shoulder surgery, orthopedic surgeons would rarely if ever recommend or use pain pumps directly in the glenohumeral joint if they had simply been advised that the safety of intra-articular use of pain pumps had not been fully tested, the medical literature relating to safety had not been thoroughly reviewed, the safety was therefore unknown, and the FDA had repeatedly rejected requests for approval of use directly in the joint space. But if the pain pump manufacturer had adequately warned orthopedic surgeons of this, pain pump usage and sales probably would have declined.

Every prescription device or drug comes with a label, a package insert. And the label spells out exactly what indications it can be used for; meaning how it can be used. The label also has the contraindications, meaning how it shouldn't be used. And then it goes into quite a bit of detail. It states how you actually can put it in. That's called on-label use. The package insert is directed to the doctor and its purpose is to make sure the device is used properly. To the extent there is a use that the FDA rejected, that particular use should be set forth in a warning in the package insert.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

Doctors are allowed to use things for what we call "off-label use." In other words, even though it's not indicated by the company and not approved by the FDA, the FDA basically says, that doctors can use their best judgment and use a medication or device for something other than what it was originally meant for and approved for. In these cases, the patient has a right to know, and should be told, if it is an off-label use. An example of such a discussion is "I really think this is in your best interests. I have nothing else that can treat this problem. But it's not approved by the FDA for this use." So that's off-label use.

The patient has a right to know because the patient assumes, if you're using something, everything is fully approved. And it's just an ethical obligation on the doctor's part to let the patient know that it's not approved for that. You must explain to the patient why you're using it, and then the patient can decide whether or not he/she wants to take the chance to allow the treatment to be used. However, the surgeon cannot tell the patient if the manufacturer never tells the surgeon that the use is not FDA approved, and in fact has been repeatedly rejected by the FDA. It is especially egregious and reckless for a medical device maker to withhold from orthopedic surgeons the fact that the FDA has repeatedly rejected the very use it is promoting, use directly in the glenohumeral joint.

## VIII. <u>The Manufacturer's Pain Pump Labeling And Its Instructions For Use Were Inadequate And Omitted Necessary Warnings Against Intra-Articular Use.</u>

For decades before pain pumps became available, orthopedic surgeons would frequently make one-time injections into joint spaces of commonly used anesthetics, such as .25% or .5% Marcaine, or 1-2% lidocaine, in volumes of about 30 ml. more or less. The orthopedic surgical community believed that those one-time injections were not harmful to their patients or to their cartilage.

When pain pumps came along at the beginning of this decade, they were promoted for use directly in the joint space. Surgeons were told by the label of the pain pump that they were intended to inject anesthetic medication directly into the intraoperative site. For surgeons doing arthroscopic shoulder surgery in the glenohumeral joint, this meant that the pumps were intended to inject pain medications directly into the glenohumeral joint.

Given the decades-long practice of one-time injections of these medications directly into the shoulder joint, the absence of any warnings that the safety of such use was unknown, had not been adequately tested, was not FDA approved, and the FDA had repeatedly rejected requests for such use, led trusting orthopedic surgeons to use the pumps in joints. Nothing in the label told the United States medical profession any of these crucial red flags that would have warned surgeons that such use of pain pumps was risky for their patients.

The simple statement in the label of the pain pump used on the plaintiff that the orthopedic surgeon should follow the instructions of the manufacturer of the anesthetic medication they put in the pump was likewise inadequate. The manufacturers of Marcaine and Marcaine with epinephrine provide no warnings or instructions regarding intra-articular use of



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST | WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

the drug at all. So by referring orthopedic surgeons to the label for Marcaine, the manufacturer of the pain pump told the surgeon nothing about the risks involved and the uncertainty of the safety of intra-articular use of pain pumps.

Pain pumps were promoted for intra-articular use in many ways. Sales representatives for the pain pump manufacturers made their rounds speaking with physicians in their offices and in hospitals, telling physicians such as myself that pain pumps could be used by placing the catheter directly into the area being operated on, wherever that was. Manufacturers therefore indirectly promoted intra-articular use at their sales booths and at conventions of orthopedic surgeons, as well. I was also personally told the pump could be used wherever local anesthetics are used by sales representatives of pain pump manufacturers when I asked about using the pain pumps in joints.

Orthopedic surgeons learn about the safe use of prescription medical devices in a number of ways. They learn information by reading the product label, for example. But if the product label fails to contain the necessary warnings and adequate instructions, that will not help an orthopedic surgeon avoid injury for his or her patients.

Orthopedic surgeons also learn from each other. If one surgeon is encouraged to use a pain pump by putting the catheter directly in the shoulder joint and the surgeon is unaware of any harm caused from that, other orthopedic surgeons will be encouraged to try the same thing after learning about their colleague's experience. The medical device manufacturer is the true expert regarding the safety of its device. Orthopedic surgeons rely upon the manufacturer to tell us how to safely use the device, and how to avoid unsafe uses, and the manufacturer is required to do so in its device labeling. Surgeons also rely upon the sales force to personally instruct and show us how to safely use the device, and to tell us how not to use the device. Indeed, sales representatives for pain pump manufacturers routinely promote their devices by explaining that other surgeons are getting good results by using their product in a certain way, such as placement of the catheter in the shoulder joint.

Orthopedic surgeons also learn information from their colleagues at conventions and seminars. Usually there are booths set up at such conventions and seminars where sales representatives of pain pump manufacturers will market and promote their products to orthopedic surgeons attending the meetings.

Surgeons will also learn how to safely use prescription medical devices by peer-reviewed articles published in the medical literature they commonly read. If studies have not been done on the safety of intra-articular use of pain pumps, such articles will not be published, and the U.S. medical community will not be adequately warned, until some surgeon, like me, somewhere in the United States, finally puts two and two together and realizes that his or her patients are being permanently injured and the high volume pain pumps are the likely suspect in causing the harm, and starts spreading the alarm.

Like most ordinary folks, orthopedic surgeons who have used a particular medical device



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

CENTER OF ORTHOPEDIC AND REHABILITATION EXCELLENCE

previously, and are familiar with it, and have previously read the manufacturer's instructions for using the device, will not re-read those instructions each time they use the device. If a manufacturer really wants to get the attention of an orthopedic surgeon about a change in its label or the addition of a warning against intra-articular use, it must do so in a way that is truly calculated to get the surgeon's attention. Merely changing the labeling to add a warning without notifying surgeons that they need to re-read the labeling because warnings have been added will be inadequate. The word won't get out. And merely posting a warning on the manufacturer's website against intra-articular use of pain pumps will also be inadequate. As you might imagine, surgeons don't sit at the computer surfing medical device manufacturers' websites looking for new warnings that have been posted.

There are tried and true methods of getting the attention of physicians about new safety concerns and new warnings. One method is to send a "Dear Doctor" letter to the types of physicians who customarily use the device in question. In this case, it would be a Dear Doctor letter sent to all orthopedic surgeons advising them that intra-articular use of pain pumps is risky, rejected by the FDA, and may cause harm to their patients. But the manufacturer in this case chose not to send Dear Doctor letters. It still hasn't sent such letters.

Another tried and true method is to place a large red or brightly colored warning sticker on the cover of the pain pump package so that before the package is even opened at the hospital, the surgical team is aware that a new warning has been added and that they need to review the revised instructions for use which contain the new warning. But the manufacturer chose not to do that either.

Another tried and true and commonly used method is to have the company's sales representatives directly contact the doctors they typically call on to personally warn the doctors about a known danger of using a device or medication, much in the same way these companies see doctors to advertise and promote new products. This never happened, either.

Manufacturers can place prominent advertisements in the journals read by orthopedic surgeons to advise the orthopedic surgical community in the United States that intra-articular use of pain pumps is unsafe. But the manufacturer chose not to do that either.

Placing "silent" warnings in revised labels, without notifying orthopedic surgeons that a new warning has been added and that they need to re-read the revised labeling, may prevent loss of sales once surgeons learn of the risk and stop using pain pumps in shoulder joints, but it puts additional patients at risk and uses them as unconsenting test subjects. To my knowledge, I-Flow and DonJoy still have not warned orthopedic surgeons throughout the United States that their pain pumps should not be used in joint spaces in a manner that is truly designed to drive the message home to all of us.

The pain pump manufacturer's distributors and sales force play a vital role in communicating with orthopedic surgeons. They have face-to-face contact with the surgeons, either in the hospital or in the physician's office. Sales representatives are often present in the



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted] [redacted]

CENTER OF ORTHOPEDIC AND
REHABILITATION EXCELLENCE

operating room when their device is being used by a surgeon, overseeing the proper use of the device and instructing the physicians on the use of the device as necessary. Because of the personal contact that the sales force has with the surgeons, they can communicate directly to the surgeons any risks or unsafe uses of the device. But if the manufacturer and/or distributor withhold information from the sales force, then of course they cannot communicate what they have not been told. If the manufacturer and/or distributor withhold the vital fact that the FDA had repeatedly rejected requests for intraarticular use of pain pumps, then its sales force would be unaware of that information and could not communicate it directly to the orthopedic surgeons. The only reason to withhold such vital information from the sales force would be a financial reason. If surgeons were aware that the FDA had repeatedly rejected intra-articular use of pain pumps, then very few surgeons would opt to recommend and use the pumps in that manner, resulting in declining sales of the pumps. It would constitute a great disregard for the safety of patients and their families for a manufacturer and/or distributor to fail to disclose the FDA's repeated rejections of intra-articular use of pain pumps to its sales force.

Based upon the foregoing, it is my opinion that the manufacturer, distributor, and seller of the pain pump used on the plaintiff were negligent, and failed to meet the applicable standard of reasonable care and safety consciousness, in each of the respects alleged in the Complaint, and that their negligence was a substantial contributing factor in causing the plaintiff to suffer chondrolysis of the glenohumeral joint. But for their negligence, in one or more of the respects alleged, the plaintiff would not have suffered glenohumeral chondrolysis.

I reserve the right to amend or supplement this Report in the event that additional pertinent information becomes available or additional issues which are not adequately addressed in this Report are raised in reports of other experts.

Dated: May 27, 2009

Charles Beck, M.D.



CHARLES L. BECK, JR., MD
ORTHOPEDIC SURGERY/SPORTS MEDICINE
REAL
8785 SOUTH 3590 WEST WEST JORDAN, UTAH 84088 | OFFICE: 801.568.3480 | FAX: 801.562.3169

[redacted]

# APPENDIX 1

Documents Reviewed By Charles Beck, M.D.

Complaint–Specifications of Negligence:

- In failing to instruct or warn the U.S. medical community that the safety of the device had not been established for use in the shoulder joint space;
- In failing to disclose to the U.S. medical community that continuous injection of commonly used anesthetics, such as lidocaine or marcaine with or without epinephrine, in volumes of 250 cc's or more, over two days or more, into the shoulder joint space, may cause serious and permanent injury to the joint cartilage;
- In failing to include a precaution against placing the catheter of the pain pump directly in the shoulder joint space;
- In failing to provide to the U.S. medical community adequate instructions for the safe use of the device, specifically failing to identify quantities, flow rates, and types of anesthetic medications that could be safely and effectively used in the shoulder joint space;
- In failing to disclose to the U.S. medical community that the effectiveness of the device was uncertain for use directly in the shoulder joint space;
- In failing to disclose to the U.S. medical community that the FDA had considered requests to add use of the pain pump in a joint space as an indication for use in pain pump labels, but would not clear the addition of this use of pain pumps;
- Designing and manufacturing a product designed to deliver, over time, dangerously high doses of pain medications directly into shoulder joints;
- Promoting and marketing the pain pump for use in the joint space after the FDA had considered and rejected such an indication for use;
- In failing to test the pain pumps to establish that they could safely be used within the shoulder joint space; and
- In failing to disclose to the U.S. medical community that testing to establish safety of using the pumps in a joint space had not been done.

Medical Records:

Occupational Orthopedics
Legacy Good Samaritan Hospital
Gregory Gramstad, M.D./NW Surgical Specialists, P.C.
Southwest Washington Medical Center
Vancouver Clinic
Legacy Salmon Creek Hospital
Legacy Laboratory Services
Southwest Washington Regional Surgery Center
West Portland Physical Therapy

Concentra Medical Centers
Robert J. Gross, M.D.
Providence Portland Medical Center
Pharmacy Records
Pacific Medical Group (Eugene A. Stevens, M.D.)
Head & Neck Surgical Associates
Legacy Emanuel Hospital
Oregon Health Sciences University
Hooper Detoxification Center
CRC/Allied Health Services

Imaging Studies:

1/29/04
1/10/07
5/10/07
5/24/07
6/12/07
6/20/07
6/29/07
6/30/07
7/16/07
8/28/07
10/4/07
1/7/08
1/11/08
1/25/08
3/13/08
5/7/08
9/19/08
1/8/09

DonJoy Pain Control Device Label
Marcaine and Marcaine With Epinephrine Label

DONJOY®

# Pain Control Device

## Local Anesthesia Kit Clinician Directions for Use

### DESCRIPTION

The DonJoy Local Anesthesia Kit is a completely disposable, non-electronic system that is designed specifically for pain management applications. The kit includes a DonJoy pump, a catheter for infusion directly into the surgical site, and convenient accessories & prep materials to set up the device.

The DonJoy device uses sustained pressure to deliver a continuous infusion of medications. The infuser consists of a clear medication reservoir and a dedicated, flowrate-controlling Infusion Set.

### INDICATIONS FOR USE

The DonJoy system is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.

The DonJoy system is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

### CONTRAINDICATIONS

The DonJoy system is contraindicated for:

- Infusion of blood and blood products.
- Infusion of insulin.
- Infusion of critical or life-supporting medications whose stoppage, interruption, over-delivery or under-delivery would likely cause serious injury or death.
- Infusion of any solution that is incompatible with the fluid path materials.
- Use in ambulatory regimens by patients who do not possess the mental, physical or emotional capability to self-administer their therapy; or who are not under the care of a responsible individual.

### PRECAUTIONS

Before use, the user must become thoroughly familiar with the information contained in the device operating instructions.

The DonJoy system is intended for single patient use only. Do not reuse. Do not resterilize.

It is the responsibility of the clinician using the DonJoy system to ensure that the medications or fluids are used only according to the physician's infusion therapy prescription.

As with any infusion system, medications or fluids may interact with the components of the DonJoy system. Before use, consult the pharmaceutical manufacturer's precautions and guidelines, and ensure that the medication is prepared and administered in accordance with the drug manufacturer's package insert.

As with any infusion system, purge all air from the infusion line before connecting to the patient.

Do not fill the medication reservoir with more than the maximum reservoir volume. Filling beyond the maximum volume could damage the infuser and cause injury or fluid leakage.

Do not attempt to disassemble the DonJoy pump. Doing so could damage the infuser and cause injury or fluid leakage.

Do not drop the infuser, strike it against hard objects or otherwise subject it to extreme physical stress. Doing so could damage the infuser and cause injury or fluid leakage. If the infuser is subjected to any trauma, it must be checked for damage or leakage before use. If any problems are detected, discontinue use.

The device flow rate will vary according to the infusion set used. Use only the dedicated infusion sets authorized by dj Orthopedics for use with the DonJoy pump.

For models with an integrated set, the device flow rate is fixed and predetermined. Take care to select the appropriate nominal flow rate and reservoir size for the prescribed therapy.

Do not remove the DonJoy infusion set after it has been connected to the infuser. Removal of a connected set may cause fluid leakage.

Do not use a microwave, oven, or water bath to warm the contents of the DonJoy pump.

The DonJoy system should be stored in a clean, dry environment. It is the clinician's responsibility to instruct the patient on the proper storage of medications or fluids.

It is the responsibility of the clinician to ensure that the patient is educated in the proper use of the DonJoy system.

Do not use the DonJoy system if the packaging has been previously opened or damaged. Sterility is not guaranteed for a product whose package has been opened or damaged.

CAUTION: Please be aware that the actual rates at which medication is delivered and the total amount of medication that the patient receives can vary as much as +/-15%, depending on the reservoir size and chosen flow rate. Please take the variance of the medication delivered into consideration in determining both the rate and duration of delivery of the medication in order to reduce the probability of an adverse event.

CAUTION: Federal (USA) law restricts this device to sale by, or on the order of, a physician.

### TECHNICAL SPECIFICATIONS

Fluid Path Materials

Infuser: Polypropylene, silicone, butyl rubber, nitrile rubber. **Latex-free. DEHP-free.**

Set: PVC, polyethylene, acrylic, polycarbonate, silicone, glass, cellulose acetate, PTFE. **Latex-free. Set contains DEHP unless otherwise stated on product labels.**

Filter: 1.2-micron air-eliminating filter

Operating Pressure: 6 psi average

Fill Volume:

Small infuser = 100 mL + 10 mL optional overfill

Large infuser = 275 mL + 10 mL optional overfill

System Residual Volume: < 5 mL

(includes medication reservoir and tubing set)

Flow Rates for Standard Sets:

0.6 to 8 mL/hr (use only flow sets approved by dj Orthopedics for use with the DonJoy pump)

System Accuracy: +/- 15% of nominal flow rate

Operating Temperature: The system is calibrated to deliver solution at the labeled nominal flow rate when the temperature of the infusate in the distal Luer is **86° F / 30 C** (skin temperature). Flow rate increases approximately 1% per 1 F / 0.56 C increase in temperature.

Fluid Viscosity: The system is calibrated using **5% dextrose in water** (D5W) as the infusate. Flow rate increases as fluid viscosity decreases (e.g., sterile water will flow approximately 10% faster than D5W).

Head Height: The system is calibrated with the infuser **18" / 45.7 cm** below the infusion site at the patient. Flow rate decreases approximately 6% for every 10" / 25 cm that the infuser is lowered.

Flow Profile:

DonJoy Pain Control Device Flow Profile
(Medication Reservoir filled to nominal volume)




### USING THE LOCAL ANESTHESIA KIT

NOTES: All kit components are **latex-free and DEHP-free.**

Use the prep tray, designed to hold 300 mL, to transfer medication from the vials to the 60 cc transfer syringe.

1. Insert the Introducer approximately 3 – 5 cm away from the intraoperative site, and advance the Introducer into the surgical wound site.
2. Remove the stylet from the Introducer.
3. Insert the marked tip of the catheter through the Introducer and into the surgical wound site.

CAUTION: Do not withdraw the catheter through the introducer. Doing so may damage the catheter or cause it to dislodge into the insertion site.

4. Remove the Introducer while holding the catheter securely in place.

IMPORTANT:

To help avoid accidental needlesticks, follow your facility policies regarding safe use and disposal of medical sharps devices. Obtain prompt medical attention if injury occurs.

Unless directed otherwise by your facility policies, do not reshield a used introducer. Discard unshielded Introducer in an approved sharps collector.

5. Insert the catheter into the Tuohy-Borst Adapter and tighten (omit this step if using a fixed-hub catheter).
6. Using the 5 cc syringe, flush the catheter to verify patency.

7. Attach the catheter/T-B Adapter to the DonJoy infusion set and tighten.
8. Secure the catheter in place with steri-strips or other securement device.
9. Apply dressing to the catheter site if desired.

## FILLING THE MEDICATION RESERVOIR

CAUTION: As with any sterile product, use aseptic technique when preparing the DonJoy pump system for use.

NOTE: The DonJoy medication reservoir should never be filled beyond the maximum fill volume capacity referenced in the technical specifications section.

1. Inspect the kit to confirm that it has not been opened or damaged. *Sterility is not guaranteed for a product whose package has been opened or damaged.* Confirm the nominal flow rate and reservoir capacity prior to opening the package.
2. Remove the Luer cap from the filling port. For models with an integrated set, close the tubing clamp.
3. Fill the sterile transfer syringe with the medication to be dispensed.
4. Connect the filled syringe to the infuser filling port and transfer the medication into the medication reservoir. Repeat until the desired volume of medication has been transferred into the infuser.

   NOTE: The volume marks printed on the DonJoy pump medication reservoir provide approximate volume indication only and are not intended to be used for precise measurements.
5. After the medication reservoir has been filled, disconnect the transfer syringe and replace the Luer cap on the filling port. If using a tamper-evident cover, snap the cover over the filling port.
6. For models with a separate set:

   a) Remove and discard the cap from the proximal connector (the connector with an extended male Luer and located nearest to the tubing clamp).

   b) Close the tubing clamp.

   c) Using a quick, continuous motion, insert the proximal connector with the extended male Luer into the medication reservoir port fill port while turning the connector in a clockwise direction. Secure the connection, but do not overtighten it.
7. Fill in the appropriate patient information on the medication label and affix to the medication reservoir.

## PRIMING AND DELIVERY

1. Leaving the clamp closed, examine the medication reservoir for air bubbles. While rotating the infuser, gently tap the bottom on your work surface until the small air bubbles have moved into a single bubble underneath the tubing outlet.
2. After the air bubbles are collected into a single bubble, place the infuser flat on a work surface with the tubing outlet pointing up.
3. Remove the cap from the distal end of the set and open the tubing clamp. Fluid will flow toward the patient end of the set, purging air from the system. As fluid reaches the filter, hold it so the outlet (toward patient) points up and tap the filter to eliminate residual air.
4. Confirm that fluid is dripping from the distal end of the tubing at the expected flow rate (1 mL/hr = approximately 1 drop every 3 minutes).
5. When priming is complete, close the clamp.

   NOTE: For short-term storage of the primed infuser, reattach the cap to the distal Luer connector.
6. Attach the primed system to the patient's catheter.

   IMPORTANT: Tape the distal luer connector to the patient's skin. See the Technical Specifications section for appropriate operating temperature.
7. Open the clamp to start the infusion.
8. Place the infuser in the protective carrying pouch during the infusion.

## INFORMATION FOR DAILY USE

Use the DonJoy patient quick reference card to assist with patient education and daily use instructions.

Do not immerse the DonJoy pump in water or other fluids. When showering, the patient should keep the Infuser outside of the shower or place it in a waterproof bag.

To protect the DonJoy pump from damage during daily activities, use the specially designed protective carrying pouch at all times.

During medication delivery, check for the following:

The DonJoy pump is emptying.

There is no leakage from the DonJoy system.

There is no air in the DonJoy system.

The DonJoy infusion set is not kinked.

All connections are secure.

The patient is not experiencing side effects, which may include but are not limited to:

- Increased pain
- Redness, swelling or discharge at the catheter or incision site
- Skin rash or hives
- Metallic taste in patient's mouth
- Light-headed or dizzy feeling
- Excitation or restlessness
- Excessive drowsiness

To monitor the infusion progress, open the carrying pouch from time to time and read the position of the dark ring against the graduation scale on the DonJoy pump medication reservoir.




The DonJoy pump is a disposable device and does not require periodic maintenance. If desired, the infuser may be cleaned using a cloth dampened with water. To avoid damaging the Infuser, do not use any cleaning agents. Take care to prevent entry of any foreign substances inside the DonJoy infuser. Do not disable the DonJoy infuser.

Manufactured for and distributed exclusively by:

dj ortho™ NEVER STOP GETTING BETTER™

dj Orthopedics, LLC
2985 Scott Street
Vista, CA 92081-8339 U.S.A.
Toll Free: (800) 336-6569
Fax: (800) 936-6569
www.djortho.com

Authorized Representative:

EU Authorized Representative: Quality First International Limited, 20 Eversly Road, Bexhill-On-Sea, East Sussex TN40 1HE UK

© 2003. All rights reserved. DonJoy is a registered trademarks of dj Orthopedics. U.S.

Patent D453830.

A4801816 P-6528-0 REV. 8/03

# MARCAINE®

Bupivacaine Hydrochloride Injection, USP

# MARCAINE®

With Epinephrine 1:200,000 (as bitartrate)

Bupivacaine Hydrochloride and Epinephrine Injection, USP

## DESCRIPTION

Bupivacaine hydrochloride is 2-Piperidinecarboxamide, 1-butyl-N-(2,6-dimethylphenyl)-, monohydrochloride, monohydrate, a white crystalline powder that is freely soluble in 95 percent ethanol, soluble in water, and slightly soluble in chloroform or acetone. It has the following structural formula:



Epinephrine is (-)-3,4-Dihydroxy-α-[(methylamino)methyl] benzyl alcohol. It has the following structural formula:



MARCAINE is available in sterile isotonic solutions with and without epinephrine (as bitartrate) 1:200,000 for injection via local infiltration, peripheral nerve block, and caudal and lumbar epidural blocks. Solutions of MARCAINE may be autoclaved if they do not contain epinephrine. Solutions are clear and colorless.

Bupivacaine is related chemically and pharmacologically to the aminoacyl local anesthetics. It is a homologue of mepivacaine and is chemically related to lidocaine. All three of these anesthetics contain an amide linkage between the aromatic nucleus and the amino, or piperidine group. They differ in this respect from the procaine-type local anesthetics, which have an ester linkage.

*MARCAINE*—Sterile isotonic solutions containing sodium chloride. In multiple-dose vials, each mL also contains 1 mg methylparaben as antiseptic preservative. The pH of these solutions is adjusted to between 4 and 6.5 with sodium hydroxide or hydrochloric acid.

*MARCAINE with epinephrine 1:200,000* (as bitartrate)—Sterile isotonic solutions containing sodium chloride. Each mL contains bupivacaine hydrochloride and 0.0091 mg epinephrine bitartrate, with 0.5 mg sodium metabisulfite, 0.001 mL monothioglycerol, and 2 mg ascorbic acid as antioxidants, 0.0017 mL 60% sodium lactate buffer, and 0.1 mg edetate calcium disodium as stabilizer. In multiple-dose vials, each mL also contains 1 mg methylparaben as antiseptic preservative. The pH of these solutions is adjusted to between 3.4 and 4.5 with sodium hydroxide or hydrochloric acid. The specific gravity of MARCAINE 0.5% with epinephrine 1:200,000 (as bitartrate) at 25° C is 1.008 and at 37° C is 1.008.

## CLINICAL PHARMACOLOGY

Local anesthetics block the generation and the conduction of nerve impulses, presumably by increasing the threshold for electrical excitation in the nerve, by slowing the propagation of the nerve impulse, and by reducing the rate of rise of the action potential. In general, the progression of anesthesia is related to the diameter, myelination, and conduction velocity of affected nerve fibers. Clinically, the order of loss of nerve function is as follows: (1) pain, (2) temperature, (3) touch, (4) proprioception, and (5) skeletal muscle tone.

Systemic absorption of local anesthetics produces effects on the cardiovascular and central nervous systems (CNS). At blood concentrations achieved with normal therapeutic doses, changes in cardiac conduction, excitability, refractoriness, contractility, and peripheral vascular resistance are minimal. However, toxic blood concentrations depress cardiac conduction and excitability, which may lead to atrioventricular block, ventricular arrhythmias, and cardiac arrest, sometimes resulting in fatalities. In addition, myocardial contractility is depressed and peripheral vasodilation occurs, leading to decreased cardiac output and arterial blood pressure. Recent clinical reports and animal research suggest that these cardiovascular changes are more likely to occur after unintended intravascular injection of bupivacaine. Therefore, incremental dosing is necessary.

Following systemic absorption, local anesthetics can produce central nervous system stimulation, depression, or both. Apparent central stimulation is manifested as restlessness, tremors and shivering progressing to convulsions, followed by depression and coma progressing ultimately to respiratory arrest. However, the local anesthetics have a primary depressant effect on the medulla and on higher centers. The depressed stage may occur without a prior excited state.

*Pharmacokinetics:* The rate of systemic absorption of local anesthetics is dependent upon the total dose and concentration of drug administered, the route of administration, the vascularity of the administration site, and the presence or absence of epinephrine in the anesthetic solution. A dilute concentration of epinephrine (1:200,000 or 5 mcg/mL) usually reduces the rate of absorption and peak plasma concentration of MARCAINE, permitting the use of moderately larger total doses and sometimes prolonging the duration of action.

The onset of action with MARCAINE is rapid and anesthesia is long lasting. The duration of anesthesia is significantly longer with MARCAINE than with any other commonly used local anesthetic. It has also been noted that there is a period of analgesia that persists after the return of sensation, during which time the need for strong analgesics is reduced.

The onset of action following dental injections is usually 2 to 10 minutes and anesthesia may last two or three times longer than lidocaine and mepivacaine for dental use, in many patients up to 7 hours. The duration of anesthetic effect is prolonged by the addition of epinephrine 1:200,000.

Local anesthetics are bound to plasma proteins in varying degrees. Generally, the lower the plasma concentration of drug the higher the percentage of drug bound to plasma proteins.

Local anesthetics appear to cross the placenta by passive diffusion. The rate and degree of diffusion is governed by (1) the degree of plasma protein binding, (2) the degree of ionization, and (3) the degree of lipid solubility. Fetal/maternal ratios of local anesthetics appear to be inversely related to the degree of plasma protein binding, because only the free, unbound drug is available for placental transfer. MARCAINE with a high protein binding capacity (95%) has a low fetal/maternal ratio (0.2 to 0.4). The extent of placental transfer is also determined by the degree of ionization and lipid solubility of the drug. Lipid soluble, nonionized drugs readily enter the fetal blood from the maternal circulation.

Depending upon the route of administration, local anesthetics are distributed to some extent to all body tissues, with high concentrations found in highly perfused organs such as the liver, lungs, heart, and brain.

Pharmacokinetic studies on the plasma profile of MARCAINE after direct intravenous injection suggest a three-compartment open model. The first compartment is represented by the rapid intravascular distribution of the drug. The second compartment represents the equilibration of the drug throughout the highly perfused organs such as the brain, myocardium, lungs, kidneys, and liver. The third compartment represents an equilibration of the drug with poorly perfused tissues, such as muscle and fat. The elimination of drug from tissue distribution depends largely upon the ability of binding sites in the circulation to carry it to the liver where it is metabolized.

After injection of MARCAINE for caudal, epidural, or peripheral nerve block in man, peak levels of bupivacaine in the blood are reached in 30 to 45 minutes, followed by a decline to insignificant levels during the next three to six hours.

Various pharmacokinetic parameters of the local anesthetics can be significantly altered by the presence of hepatic or renal disease, addition of epinephrine, factors affecting urinary pH, renal blood flow, the route of drug administration, and the age of the patient. The half-life of MARCAINE in adults is 2.7 hours and in neonates 8.1 hours.

Amide-type local anesthetics such as MARCAINE are metabolized primarily in the liver via conjugation with glucuronic acid. Patients with hepatic disease, especially those with severe hepatic disease, may be more susceptible to the potential toxicities of the amide-type local anesthetics. Pipecoloxylidine is the major metabolite of MARCAINE.

The kidney is the main excretory organ for most local anesthetics and their metabolites. Urinary excretion is affected by urinary perfusion and factors affecting urinary pH. Only 6% of bupivacaine is excreted unchanged in the urine.

When administered in recommended doses and concentrations, MARCAINE does not ordinarily produce irritation or tissue damage and does not cause methemoglobinemia.

### *INDICATIONS AND USAGE*

MARCAINE is indicated for the production of local or regional anesthesia or analgesia for surgery, dental and oral surgery procedures, diagnostic and therapeutic procedures, and for obstetrical procedures. Only the 0.25% and 0.5% concentrations are indicated for obstetrical anesthesia. (See WARNINGS.)

Experience with nonobstetrical surgical procedures in pregnant patients is not sufficient to recommend use of 0.75% concentration of MARCAINE in these patients.

MARCAINE is not recommended for intravenous regional anesthesia (Bier Block). See WARNINGS.

The routes of administration and indicated MARCAINE concentrations are:

| | |
|---|---|
| • local infiltration | 0.25% |
| • peripheral nerve block | 0.25% and 0.5% |
| • retrobulbar block | 0.75% |
| • sympathetic block | 0.25% |
| • lumbar epidural | 0.25%, 0.5%, and 0.75% (0.75% not for obstetrical anesthesia) |
| • caudal | 0.25% and 0.5% |
| • epidural test dose | 0.5% with epinephrine 1:200,000 |
| • dental blocks | 0.5% with epinephrine 1:200,000 |

(See DOSAGE AND ADMINISTRATION for additional information.)

Standard textbooks should be consulted to determine the accepted procedures and techniques for the administration of MARCAINE.

### *CONTRAINDICATIONS*

MARCAINE is contraindicated in obstetrical paracervical block anesthesia. Its use in this technique has resulted in fetal bradycardia and death.

MARCAINE is contraindicated in patients with a known hypersensitivity to it or to any local anesthetic agent of the amide-type or to other components of MARCAINE solutions.

### *WARNINGS*

**THE 0.75% CONCENTRATION OF MARCAINE IS NOT RECOMMENDED FOR OBSTETRICAL ANESTHESIA. THERE HAVE BEEN REPORTS OF CARDIAC ARREST WITH DIFFICULT RESUSCITATION OR DEATH DURING USE OF MARCAINE FOR EPIDURAL ANESTHESIA IN OBSTETRICAL PATIENTS. IN MOST CASES, THIS HAS FOLLOWED USE OF THE 0.75% CONCENTRATION. RESUSCITATION HAS BEEN DIFFICULT OR IMPOSSIBLE DESPITE APPARENTLY ADEQUATE PREPARATION AND APPROPRIATE MANAGEMENT. CARDIAC ARREST HAS OCCURRED AFTER CONVULSIONS RESULTING FROM SYSTEMIC TOXICITY, PRESUMABLY FOLLOWING UNINTENTIONAL INTRAVASCULAR INJECTION. THE 0.75% CONCENTRATION SHOULD BE RESERVED FOR SURGICAL PROCEDURES WHERE A HIGH DEGREE OF MUSCLE RELAXATION AND PROLONGED EFFECT ARE NECESSARY.**

LOCAL ANESTHETICS SHOULD ONLY BE EMPLOYED BY CLINICIANS WHO ARE WELL VERSED IN DIAGNOSIS AND MANAGEMENT OF DOSE-RELATED TOXICITY AND OTHER ACUTE EMERGENCIES WHICH MIGHT ARISE FROM THE BLOCK TO BE EMPLOYED, AND THEN ONLY AFTER INSURING THE *IMMEDIATE* AVAILABILITY OF OXYGEN, OTHER RESUSCITATIVE DRUGS, CARDIOPULMONARY RESUSCITATIVE EQUIPMENT, AND THE PERSONNEL RESOURCES NEEDED FOR PROPER MANAGEMENT OF TOXIC REACTIONS AND RELATED EMERGENCIES. (See also ADVERSE REACTIONS, PRECAUTIONS, and OVERDOSAGE.) DELAY IN PROPER MANAGEMENT OF DOSE-RELATED TOXICITY, UNDERVENTILATION FROM ANY CAUSE, AND/OR ALTERED SENSITIVITY MAY LEAD TO THE DEVELOPMENT OF ACIDOSIS, CARDIAC ARREST AND, POSSIBLY, DEATH.

Local anesthetic solutions containing antimicrobial preservatives, i.e., those supplied in multiple-dose vials, should not be used for epidural or caudal anesthesia because safety has not been established with regard to intrathecal injection, either intentionally or unintentionally, of such preservatives.

It is essential that aspiration for blood or cerebrospinal fluid (where applicable) be done prior to injecting any local anesthetic, both the original dose and all subsequent doses, to avoid intravascular or subarachnoid injection. However, a negative aspiration does not ensure against an intravascular or subarachnoid injection.

MARCAINE with epinephrine 1:200,000 or other vasopressors should not be used concomitantly with ergot-type oxytocic drugs, because a severe persistent hypertension may occur. Likewise, solutions of MARCAINE containing a vasoconstrictor, such as epinephrine, should be used with extreme caution in patients receiving monoamineoxidase inhibitors (MAOI) or antidepressants of the triptyline or imipramine types, because severe prolonged hypertension may result.

Until further experience is gained in pediatric patients younger than 12 years, administration of MARCAINE in this age group is not recommended.

Mixing or the prior or intercurrent use of any other local anesthetic with MARCAINE cannot be recommended because of insufficient data on the clinical use of such mixtures.

There have been reports of cardiac arrest and death during the use of MARCAINE for intravenous regional anesthesia (Bier Block). Information on safe dosages and techniques of administration of MARCAINE in this procedure is lacking. Therefore, MARCAINE is not recommended for use in this technique.

*MARCAINE with epinephrine 1:200,000* contains sodium metabisulfite, a sulfite that may cause allergic-type reactions including anaphylactic symptoms and life-threatening or less severe asthmatic episodes in certain susceptible people. The overall prevalence of sulfite sensitivity in the general population is unknown and probably low. Sulfite sensitivity is seen more frequently in asthmatic than in nonasthmatic people. Single-dose ampuls and single-dose vials of *MARCAINE* without epinephrine do not contain sodium metabisulfite.

### *PRECAUTIONS*

**General:** The safety and effectiveness of local anesthetics depend on proper dosage, correct technique, adequate precautions, and readiness for emergencies. Resuscitative equipment, oxygen, and other resuscitative drugs should be available for immediate use. (See WARNINGS, ADVERSE REACTIONS, and OVERDOSAGE.) During major regional nerve blocks, the patient should have IV fluids running via an indwelling catheter to assure a functioning intravenous pathway. The lowest dosage of local anesthetic that results in effective anesthesia should be used to avoid high plasma levels and serious adverse effects. The rapid injection of a large volume of local anesthetic solution should be avoided and fractional (incremental) doses should be used when feasible.

**Epidural Anesthesia:** During epidural administration of MARCAINE, 0.5% and 0.75% solutions should be administered in incremental doses of 3 mL to 5 mL with sufficient time between doses to detect toxic manifestations of unintentional intravascular or intrathecal injection. Injections should be made slowly, with frequent aspirations before and during the injection to avoid intravascular injection. Syringe aspirations should also be performed before and during each supplemental injection in continuous (intermittent) catheter techniques. An intravascular injection is still possible even if aspirations for blood are negative.

During the administration of epidural anesthesia, it is recommended that a test dose be administered initially and the effects monitored before the full dose is given. When using a "continuous" catheter technique, test doses should be given prior to both the original and all reinforcing doses, because plastic tubing in the epidural space can migrate into a blood

vessel or through the dura. When clinical conditions permit, the test dose should contain epinephrine (10 mcg to 15 mcg has been suggested) to serve as a warning of unintended intravascular injection. If injected into a blood vessel, this amount of epinephrine is likely to produce a transient "epinephrine response" within 45 seconds, consisting of an increase in heart rate and/or systolic blood pressure, circumoral pallor, palpitations, and nervousness in the unsedated patient. The sedated patient may exhibit only a pulse rate increase of 20 or more beats per minute for 15 or more seconds. Therefore, following the test dose, the heart rate should be monitored for a heart rate increase. Patients on beta-blockers may not manifest changes in heart rate, but blood pressure monitoring can detect a transient rise in systolic blood pressure. The test dose should also contain 10 mg to 15 mg of MARCAINE or an equivalent amount of another local anesthetic to detect an unintended intrathecal administration. This will be evidenced within a few minutes by signs of spinal block (e.g., decreased sensation of the buttocks, paresis of the legs, or, in the sedated patient, absent knee jerk). The Test Dose formulation of MARCAINE contains 15 mg of bupivacaine and 15 mcg of epinephrine in a volume of 3 mL. An intravascular or subarachnoid injection is still possible even if results of the test dose are negative. The test dose itself may produce a systemic toxic reaction, high spinal or epinephrine-induced cardiovascular effects.

Injection of repeated doses of local anesthetics may cause significant increases in plasma levels with each repeated dose due to slow accumulation of the drug or its metabolites, or to slow metabolic degradation. Tolerance to elevated blood levels varies with the status of the patient. Debilitated, elderly patients and acutely ill patients should be given reduced doses commensurate with their age and physical status. Local anesthetics should also be used with caution in patients with hypotension or heartblock.

Careful and constant monitoring of cardiovascular and respiratory (adequacy of ventilation) vital signs and the patient's state of consciousness should be performed after each local anesthetic injection. It should be kept in mind at such times that restlessness, anxiety, incoherent speech, lightheadedness, numbness and tingling of the mouth and lips, metallic taste, tinnitus, dizziness, blurred vision, tremors, twitching, depression, or drowsiness may be early warning signs of central nervous system toxicity.

Local anesthetic solutions containing a vasoconstrictor should be used cautiously and in carefully restricted quantities in areas of the body supplied by end arteries or having otherwise compromised blood supply such as digits, nose, external ear, or penis. Patients with hypertensive vascular disease may exhibit exaggerated vasoconstrictor response. Ischemic injury or necrosis may result.

Because amide-local anesthetics such as MARCAINE are metabolized by the liver, these drugs, especially repeat doses, should be used cautiously in patients with hepatic disease. Patients with severe hepatic disease, because of their inability to metabolize local anesthetics normally, are at a greater risk of developing toxic plasma concentrations. Local anesthetics should also be used with caution in patients with impaired cardiovascular function because they may be less able to compensate for functional changes associated with the prolongation of AV conduction produced by these drugs.

Serious dose-related cardiac arrhythmias may occur if preparations containing a vasoconstrictor such as epinephrine are employed in patients during or following the administration of potent inhalation anesthetics. In deciding whether to use these products concurrently in the same patient, the combined action of both agents upon the myocardium, the concentration and volume of vasoconstrictor used, and the time since injection, when applicable, should be taken into account.

Many drugs used during the conduct of anesthesia are considered potential triggering agents for familial malignant hyperthermia. Because it is not known whether amide-type local anesthetics may trigger this reaction and because the need for supplemental general anesthesia cannot be predicted in advance, it is suggested that a standard protocol for management should be available. Early unexplained signs of tachycardia, tachypnea, labile blood pressure, and metabolic acidosis may precede temperature elevation. Successful outcome is dependent on early diagnosis, prompt discontinuance of the suspect triggering agent(s) and prompt institution of treatment, including oxygen therapy, indicated supportive measures and dantrolene. (Consult dantrolene sodium intravenous package insert before using.)

*Use in Head and Neck Area:* Small doses of local anesthetics injected into the head and neck area, including retrobulbar, dental, and stellate ganglion blocks, may produce adverse reactions similar to systemic toxicity seen with unintentional intravascular injections of larger doses. The injection procedures require the utmost care. Confusion, convulsions, respiratory depression, and/or respiratory arrest, and cardiovascular stimulation or depression have been reported. These reactions may be due to intra-arterial injection of the local anesthetic with retrograde flow to the cerebral circulation. They may also be due to puncture of the dural sheath of the optic nerve during retrobulbar block with diffusion of any local anesthetic along the subdural space to the midbrain. Patients receiving these blocks should have their circulation and respiration monitored and be constantly observed. Resuscitative equipment and personnel for treating adverse reactions should be immediately available. Dosage recommendations should not be exceeded. (See DOSAGE AND ADMINISTRATION.)

*Use in Ophthalmic Surgery:* Clinicians who perform retrobulbar blocks should be aware that there have been reports of respiratory arrest following local anesthetic injection. Prior to retrobulbar block, as with all other regional procedures, the immediate availability of equipment, drugs, and personnel to manage respiratory arrest or depression, convulsions, and cardiac stimulation or depression should be assured (see also WARNINGS and Use in Head and Neck Area, above). As with other anesthetic procedures, patients should be constantly monitored following ophthalmic blocks for signs of these adverse reactions, which may occur following relatively low total doses.

A concentration of 0.75% bupivacaine is indicated for retrobulbar block; however, this concentration is not indicated for any other peripheral nerve block, including the facial nerve, and not indicated for local infiltration, including the conjunctiva (see INDICATIONS and PRECAUTIONS, General). Mixing MARCAINE with other local anesthetics is not recommended because of insufficient data on the clinical use of such mixtures.

When MARCAINE 0.75% is used for retrobulbar block, complete corneal anesthesia usually precedes onset of clinically acceptable external ocular muscle akinesia. Therefore, presence of akinesia rather than anesthesia alone should determine readiness of the patient for surgery.

*Use in Dentistry:* Because of the long duration of anesthesia, when MARCAINE 0.5% with epinephrine is used for dental injections, patients should be cautioned about the possibility of inadvertent trauma to tongue, lips, and buccal mucosa and advised not to chew solid foods or test the anesthetized area by biting or probing.

**Information for Patients:** When appropriate, patients should be informed in advance that they may experience temporary loss of sensation and motor activity, usually in the lower half of the body, following proper administration of caudal or epidural anesthesia. Also, when appropriate, the physician should discuss other information including adverse reactions in the package insert of MARCAINE.

Patients receiving dental injections of MARCAINE should be cautioned not to chew solid foods or test the anesthetized area by biting or probing until anesthesia has worn off (up to 7 hours).

**Clinically Significant Drug Interactions:** The administration of local anesthetic solutions containing epinephrine or norepinephrine to patients receiving monoamine oxidase inhibitors or tricyclic antidepressants may produce severe, prolonged hypertension. Concurrent use of these agents should generally be avoided. In situations when concurrent therapy is necessary, careful patient monitoring is essential.

Concurrent administration of vasopressor drugs and of ergot-type oxytocic drugs may cause severe, persistent hypertension or cerebrovascular accidents.

Phenothiazines and butyrophenones may reduce or reverse the pressor effect of epinephrine.

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** Long-term studies in animals of most local anesthetics including bupivacaine to evaluate the carcinogenic potential have not been conducted. Mutagenic potential or the effect on fertility has not been determined. There is no evidence from human data that MARCAINE may be carcinogenic or mutagenic or that it impairs fertility.

**Pregnancy Category C:** Decreased pup survival in rats and an embryocidal effect in rabbits have been observed when bupivacaine hydrochloride was administered to these species in doses comparable to nine and five times respectively the maximum recommended daily human dose (400 mg). There are no adequate and well-controlled studies in pregnant women of the effect of bupivacaine on the developing fetus. Bupivacaine hydrochloride should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. This does not exclude the use of MARCAINE at term for obstetrical anesthesia or analgesia. (See Labor and Delivery.)

**Labor and Delivery:** SEE BOXED WARNING REGARDING OBSTETRICAL USE OF 0.75% MARCAINE.
MARCAINE is contraindicated for obstetrical paracervical block anesthesia.

Local anesthetics rapidly cross the placenta, and when used for epidural, caudal, or pudendal block anesthesia, can cause varying degrees of maternal, fetal, and neonatal toxicity (See Pharmacokinetics in CLINICAL PHARMACOLOGY.) The incidence and degree of toxicity depend upon the procedure performed, the type, and amount of drug used, and the technique of drug administration. Adverse reactions in the parturient, fetus, and neonate involve alterations of the central nervous system, peripheral vascular tone, and cardiac function.

Maternal hypotension has resulted from regional anesthesia. Local anesthetics produce vasodilation by blocking sympathetic nerves. Elevating the patient's legs and positioning her on her left side will help prevent decreases in blood pressure. The fetal heart rate also should be monitored continuously and electronic fetal monitoring is highly advisable.

Epidural, caudal, or pudendal anesthesia may alter the forces of parturition through changes in uterine contractility or maternal expulsive efforts. Epidural anesthesia has been reported to prolong the second stage of labor by removing the parturient's reflex urge to bear down or by interfering with motor function. The use of obstetrical anesthesia may increase the need for forceps assistance.

The use of some local anesthetic drug products during labor and delivery may be followed by diminished muscle strength and tone for the first day or two of life. This has not been reported with bupivacaine.

It is extremely important to avoid aortocaval compression by the gravid uterus during administration of regional block to parturients. To do this, the patient must be maintained in the left lateral decubitus position or a blanket roll or sandbag may be placed beneath the right hip and gravid uterus displaced to the left.

**Nursing Mothers:** It is not known whether local anesthetic drugs are excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when local anesthetics are administered to a nursing woman.

**Pediatric Use:** Until further experience is gained in pediatric patients younger than 12 years, administration of MARCAINE in this age group is not recommended. Continuous infusions of bupivacaine in pediatric patients have been reported to result in high systemic levels of bupivacaine and seizures; high plasma levels may also be associated with cardiovascular abnormalities. (See WARNINGS, PRECAUTIONS, and OVERDOSAGE.)

## *ADVERSE REACTIONS*

Reactions to MARCAINE are characteristic of those associated with other amide-type local anesthetics. A major cause of adverse reactions to this group of drugs is excessive plasma levels, which may be due to overdosage, unintentional intravascular injection, or slow metabolic degradation.

The most commonly encountered acute adverse experiences which demand immediate counter-measures are related to the central nervous system and the cardiovascular system. These adverse experiences are generally dose related and due to high plasma levels which may result from overdosage, rapid absorption from the injection site, diminished tolerance, or from unintentional intravascular injection of the local anesthetic solution. In addition to systemic dose-related toxicity, unintentional subarachnoid injection of drug during the intended performance of caudal or lumbar epidural block or nerve blocks near the vertebral column (especially in the head and neck region) may result in underventilation or apnea ("Total or High Spinal"). Also, hypotension due to loss of sympathetic tone and respiratory paralysis or underventilation due to cephalad extension of the motor level of anesthesia may occur. This may lead to secondary cardiac arrest if untreated. Factors influencing plasma protein binding, such as acidosis, systemic diseases which alter protein production, or competition of other drugs for protein binding sites, may diminish individual tolerance.

**Central Nervous System Reactions:** These are characterized by excitation and/or depression. Restlessness, anxiety, dizziness, tinnitus, blurred vision, or tremors may occur, possibly proceeding to convulsions. However, excitement may be transient or absent, with depression being the first manifestation of an adverse reaction. This may quickly be followed by drowsiness merging into unconsciousness and respiratory arrest. Other central nervous system effects may be nausea, vomiting, chills, and constriction of the pupils.

The incidence of convulsions associated with the use of local anesthetics varies with the procedure used and the total dose administered. In a survey of studies of epidural anesthesia, overt toxicity progressing to convulsions occurred in approximately 0.1% of local anesthetic administrations.

**Cardiovascular System Reactions:** High doses or unintentional intravascular injection may lead to high plasma levels and related depression of the myocardium, decreased cardiac output, heartblock, hypotension, bradycardia, ventricular arrhythmias, including ventricular tachycardia and ventricular fibrillation, and cardiac arrest. (See WARNINGS, PRECAUTIONS, and OVERDOSAGE sections.)

**Allergic:** Allergic-type reactions are rare and may occur as a result of sensitivity to the local anesthetic or to other formulation ingredients, such as the antimicrobial preservative methylparaben contained in multiple-dose vials or sulfites in epinephrine-containing solutions. These reactions are characterized by signs such as urticaria, pruritus, erythema, angioneurotic edema (including laryngeal edema), tachycardia, sneezing, nausea, vomiting, dizziness, syncope, excessive sweating, elevated temperature, and possibly, anaphylactoid-like symptomatology (including severe hypotension). Cross sensitivity among members of the amide-type local anesthetic group has been reported. The usefulness of screening for sensitivity has not been definitely established.

**Neurologic:** The incidences of adverse neurologic reactions associated with the use of local anesthetics may be related to the total dose of local anesthetic administered and are also dependent upon the particular drug used, the route of administration, and the physical status of the patient. Many of these effects may be related to local anesthetic techniques, with or without a contribution from the drug.

In the practice of caudal or lumbar epidural block, occasional unintentional penetration of the subarachnoid space by the catheter or needle may occur. Subsequent adverse effects may depend partially on the amount of drug administered intrathecally and the physiological and physical effects of a dural puncture. A high spinal is characterized by paralysis of the legs, loss of consciousness, respiratory paralysis, and bradycardia.

Neurologic effects following epidural or caudal anesthesia may include spinal block of varying magnitude (including high or total spinal block); hypotension secondary to spinal block; urinary retention; fecal and urinary incontinence; loss of perineal sensation and sexual function; persistent anesthesia, paresthesia, weakness, paralysis of the lower extremities and loss of sphincter control all of which may have slow, incomplete, or no recovery; headache; backache; septic meningitis; meningismus; slowing of labor; increased incidence of forceps delivery; and cranial nerve palsies due to traction on nerves from loss of cerebrospinal fluid.

Neurologic effects following other procedures or routes of administration may include persistent anesthesia, paresthesia, weakness, paralysis, all of which may have slow, incomplete, or no recovery.

## *OVERDOSAGE*

Acute emergencies from local anesthetics are generally related to high plasma levels encountered during therapeutic use of local anesthetics or to unintended subarachnoid injection of local anesthetic solution. (See ADVERSE REACTIONS, WARNINGS, and PRECAUTIONS.)

**Management of Local Anesthetic Emergencies:** The first consideration is prevention, best accomplished by careful and constant monitoring of cardiovascular and respiratory vital signs and the patient's state of consciousness after each local anesthetic injection. At the first sign of change, oxygen should be administered.

*The first step in the management of systemic toxic reactions, as well as underventilation or apnea due to unintentional subarachnoid injection of drug solution, consists of immediate attention to the establishment and maintenance of a patent airway and effective assisted or controlled ventilation with 100% oxygen with a delivery system capable of permitting immediate positive airway pressure by mask.* This may prevent convulsions if they have not already occurred.

If necessary, use drugs to control the convulsions. A 50 mg to 100 mg bolus IV injection of succinylcholine will paralyze the patient without depressing the central nervous or cardiovascular systems and facilitate ventilation. A bolus IV dose of 5 mg to 10 mg of diazepam or 50 mg to 100 mg of thiopental will permit ventilation and counteract central nervous system stimulation, but these drugs also depress central nervous system, respiratory, and cardiac function, add to postictal depression and may result in apnea. Intravenous barbiturates, anticonvulsant agents, or muscle relaxants should only be administered by those familiar with their use. Immediately after the institution of these ventilatory measures, the adequacy of the circulation should be evaluated. Supportive treatment of circulatory depression may require administration of intravenous fluids, and when appropriate, a vasopressor dictated by the clinical situation (such as ephedrine or

IFLOW0003421

epinephrine to enhance myocardial contractile force).

Endotracheal intubation, employing drugs and techniques familiar to the clinician, may be indicated after initial administration of oxygen by mask if difficulty is encountered in the maintenance of a patent airway, or if prolonged ventilatory support (assisted or controlled) is indicated.

Recent clinical data from patients experiencing local anesthetic-induced convulsions demonstrated rapid development of hypoxia, hypercarbia, and acidosis with bupivacaine within a minute of the onset of convulsions. These observations suggest that oxygen consumption and carbon dioxide production are greatly increased during local anesthetic convulsions and emphasize the importance of immediate and effective ventilation with oxygen which may avoid cardiac arrest.

If not treated immediately, convulsions with simultaneous hypoxia, hypercarbia, and acidosis plus myocardial depression from the direct effects of the local anesthetic may result in cardiac arrhythmias, bradycardia, asystole, ventricular fibrillation, or cardiac arrest. Respiratory abnormalities, including apnea, may occur. Underventilation or apnea due to unintentional subarachnoid injection of local anesthetic solution may produce these same signs and also lead to cardiac arrest if ventilatory support is not instituted. *If cardiac arrest should occur, successful outcome may require prolonged resuscitative efforts.*

The supine position is dangerous in pregnant women at term because of aortocaval compression by the gravid uterus. Therefore during treatment of systemic toxicity, maternal hypotension or fetal bradycardia following regional block, the parturient should be maintained in the left lateral decubitus position if possible, or manual displacement of the uterus off the great vessels be accomplished.

The mean seizure dosage of bupivacaine in rhesus monkeys was found to be 4.4 mg/kg with mean arterial plasma concentration of 4.5 mcg/mL. The intravenous and subcutaneous $LD_{50}$ in mice is 6 mg/kg to 8 mg/kg and 38 mg/kg to 54 mg/kg respectively.

## DOSAGE AND ADMINISTRATION

The dose of any local anesthetic administered varies with the anesthetic procedure, the area to be anesthetized, the vascularity of the tissues, the number of neuronal segments to be blocked, the depth of anesthesia and degree of muscle relaxation required, the duration of anesthesia desired, individual tolerance, and the physical condition of the patient. The smallest dose and concentration required to produce the desired result should be administered. Dosages of MARCAINE should be reduced for elderly and debilitated patients and patients with cardiac and/or liver disease. The rapid injection of a large volume of local anesthetic solution should be avoided and fractional (incremental) doses should be used when feasible.

For specific techniques and procedures, refer to standard textbooks.

In recommended doses, MARCAINE produces complete sensory block, but the effect on motor function differs among the three concentrations.

0.25%—when used for caudal, epidural, or peripheral nerve block, produces incomplete motor block. Should be used for operations in which muscle relaxation is not important, or when another means of providing muscle relaxation is used concurrently. Onset of action may be slower than with the 0.5% or 0.75% solutions.

0.5%—provides motor blockade for caudal, epidural, or nerve block, but muscle relaxation may be inadequate for operations in which complete muscle relaxation is essential.

0.75%—produces complete motor block. Most useful for epidural block in abdominal operations requiring complete muscle relaxation, and for retrobulbar anesthesia. Not for obstetrical anesthesia.

The duration of anesthesia with MARCAINE is such that for most indications, a single dose is sufficient.

Maximum dosage limit must be individualized in each case after evaluating the size and physical status of the patient, as well as the usual rate of systemic absorption from a particular injection site. Most experience to date is with single doses of MARCAINE up to 225 mg with epinephrine 1:200,000 and 175 mg without epinephrine; more or less drug may be used depending on individualization of each case.

These doses may be repeated up to once every three hours. In clinical studies to date, total daily doses have been up to 400 mg. Until further experience is gained, this dose should not be exceeded in 24 hours. The duration of anesthetic effect may be prolonged by the addition of epinephrine.

The dosages in Table 1 have generally proved satisfactory and are recommended as a guide for use in the average adult. These dosages should be reduced for elderly or debilitated patients. Until further experience is gained, MARCAINE is not recommended for pediatric patients younger than 12 years. MARCAINE is contraindicated for obstetrical paracervical blocks, and is not recommended for intravenous regional anesthesia (Bier Block).

*Use in Epidural Anesthesia:* During epidural administration of MARCAINE, 0.5% and 0.75% solutions should be administered in incremental doses of 3 mL to 5 mL with sufficient time between doses to detect toxic manifestations of unintentional intravascular or intrathecal injection. In obstetrics, only the 0.5% and 0.25% concentrations should be used; incremental doses of 3 mL to 5 mL of the 0.5% solution not exceeding 50 mg to 100 mg at any dosing interval are recommended. Repeat doses should be preceded by a test dose containing epinephrine if not contraindicated. Use only the single-dose ampuls and single-dose vials for caudal or epidural anesthesia; the multiple-dose vials contain a preservative and therefore should not be used for these procedures.

*Test Dose for Caudal and Lumbar Epidural Blocks:* The Test Dose of MARCAINE (0.5% bupivacaine with 1:200,000 epinephrine in a 3 mL ampul) is recommended for use as a test dose when clinical conditions permit prior to caudal and lumbar epidural blocks. This may serve as a warning of unintended intravascular or subarachnoid injection. (See PRECAUTIONS.) The pulse rate and other signs should be monitored carefully immediately following each test dose administration to detect possible intravascular injection, and adequate time for onset of spinal block should be allotted to detect possible intrathecal injection. An intravascular or subarachnoid injection is still possible even if results of the test dose are negative. The test dose itself may produce a systemic toxic reaction, high spinal or cardiovascular effects from the epinephrine. (See WARNINGS and OVERDOSAGE.)

*Use in Dentistry:* The 0.5% concentration with epinephrine is recommended for infiltration and block injection in the maxillary and mandibular area when a longer duration of local anesthetic action is desired, such as for oral surgical procedures generally associated with significant postoperative pain. The average dose of 1.8 mL (9 mg) per injection site will usually suffice; an occasional second dose of 1.8 mL (9 mg) may be used if necessary to produce adequate anesthesia after making allowance for 2 to 10 minutes onset time. (See CLINICAL PHARMACOLOGY.) The lowest effective dose should be employed and time should be allowed between injections; it is recommended that the total dose for all injection sites, spread out over a single dental sitting, should not ordinarily exceed 90 mg for a healthy adult patient (ten 1.8 mL injections of 0.5% MARCAINE with epinephrine). Injections should be made slowly and with frequent aspirations. Until further experience is gained, MARCAINE in dentistry is not recommended for pediatric patients younger than 12 years.

Unused portions of solution not containing preservatives, i.e., those supplied in single-dose ampuls and single-dose vials, should be discarded following initial use.

This product should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Solutions which are discolored or which contain particulate matter should not be administered.

Table 1. Recommended Concentrations and Doses of MARCAINE

| Type of Block | Conc. | Each Dose (mL) | Each Dose (mg) | Motor Block [1] |
|---|---|---|---|---|
| Local infiltration | 0.25% [4] | up to max. | up to max. | — |
| Epidural | 0.75% [2,4] | 10-20 | 75-150 | complete |
| | 0.5% [4] | 10-20 | 50-100 | moderate to complete |
| | 0.25% [4] | 10-20 | 25-50 | partial to moderate |
| Caudal | 0.5% [4] | 15-30 | 75-150 | moderate to complete |
| | 0.25% [4] | 15-30 | 37.5-75 | moderate |
| Peripheral nerves | 0.5% [4] | 5 to max. | 25 to max. | moderate to complete |
| | 0.25% [4] | 5 to max. | 12.5 to max. | moderate to complete |
| Retrobulbar [3] | 0.75% [4] | 2-4 | 15-30 | complete |
| Sympathetic | 0.25% | 20-50 | 50-125 | — |
| Dental [3] | 0.5% w/epi | 1.8-3.6 per site | 9-18 per site | — |
| Epidural [3] Test Dose | 0.5% w/epi | 2-3 | 10-15 (10-15 micrograms epinephrine) | — |

[1] With continuous (intermittent) techniques, repeat doses increase the degree of motor block. The first repeat dose of 0.5% may produce complete motor block. Intercostal nerve block with 0.25% may also produce complete motor block for intra-abdominal surgery.
[2] For single-dose use, not for intermittent epidural technique. Not for obstetrical anesthesia.
[3] See PRECAUTIONS.
[4] Solutions with or without epinephrine.

## *HOW SUPPLIED*

**These solutions are not for spinal anesthesia.**

Store at controlled room temperature, between 15° C and 30° C (59° F and 86° F).

*MARCAINE* —Solutions of MARCAINE that do not contain epinephrine may be autoclaved. Autoclave at 15-pound pressure, 121° C (250° F) for 15 minutes.

0.25%—Contains 2.5 mg bupivacaine hydrochloride per mL.

List 1559 Single-dose ampuls of 50 mL, box of 5
List 1559 Single-dose vials of 10 mL, box of 10
List 1559 Single-dose vials of 30 mL, box of 10
List 1587 Multiple-dose vials of 50 mL, box of 1

0.5%—Contains 5 mg bupivacaine hydrochloride per mL.

List 1560 Single-dose ampuls of 30 mL, box of 5
List 1560 Single-dose vials of 10 mL, box of 10
List 1560 Single-dose vials of 30 mL, box of 10
List 1610 Multiple-dose vials of 50 mL, box of 1

0.75%—Contains 7.5 mg bupivacaine hydrochloride per mL.

List 1582 Single-dose ampuls of 30 mL, box of 5
List 1582 Single-dose vials of 10 mL, box of 10
List 1582 Single-dose vials of 30 mL, box of 10

*MARCAINE with epinephrine 1:200,000* (as bitartrate)—<u>Solutions of MARCAINE that contain epinephrine should not be autoclaved and should be protected from light. Do not use the solution if its color is pinkish or darker than slightly yellow or if it contains a precipitate.</u>

0.25%— with epinephrine 1:200,000
Contains 2.5 mg bupivacaine hydrochloride per mL.

List 1746 Single-dose ampuls of 50 mL, box of 5
List 1746 Single-dose vials of 10 mL, box of 10
List 1746 Single-dose vials of 30 mL, box of 10
List 1752 Multiple-dose vials of 50 mL, box of 1

0.5%—with epinephrine 1:200,000
Contains 5 mg bupivacaine hydrochloride per mL.

List 1749 Single-dose ampuls of 3 mL, box of 10
List 1749 Single-dose ampuls of 30 mL, box of 5
List 1749 Single-dose vials of 10 mL, box of 10
List 1749 Single-dose vials of 30 mL, box of 10
List 1755 Multiple-dose vials of 50 mL, box of 1

0.75%—with epinephrine 1:200,000
Contains 7.5 mg bupivacaine hydrochloride per mL.

List 1750 Single-dose ampuls of 30 mL, box of 5

℞ only

**APPENDIX 2**

Scientific and Medical Literature Reviewed By Charles Beck, M.D.


(1) Mallon, "Patient Controlled Analgesia for Acromioplasty Surgery," Journal of Shoulder and Elbow Surgery, 9:85-88 March, 2000

(2) Savoie, Mallon, "The Pain Control Infusion Pump for Postoperative Pain Control in Shoulder Surgery," Arthroscopy, 16:339-342 March, 2000

(3) Hansen, C. Beck, E. Beck, Townsley, "Post Arthroscopic Glenohumeral Chondrolysis," American Journal of Sports Medicine, 35:1628-1634 (October 2007)

(4) Nole et al "Bupivacaine and Saline Effects on Articular Cartilage," Arthroscopy, 2:123-7 (1985)

(5) Fulkerson and Winters, "Articular Cartilage Response to Arthroscopic Surgery: A Review of Current Knowledge," Arthroscopy, 3:184-89 (1986)

(6) Petty et al, "Glenohumeral Chondrolysis After Shoulder Arthroscopy," Am J. Sports Med, 32(2):509-515 (March 2004)

(7) Dogan et al, "The Effects of Bupivacaine and Neostigmine on Articular Cartilage and Synovium in the Rabbit Knee Joint," J Int Med Res, 32:513-519 (September-October 2004)

(8) Bojescul et al, "Case Report - Idiopathic Chondrolysis of the Ankle," Arthroscopy: The Journal Of Arthroscopic And Related Surgery, 21:224-227 (February 2005)

(9) Hansen et al, "Post-Arthroscopic Shoulder Chondrolysis With Associated Intraarticular Pain Pump Catheter Use," AAOS Podium Presentation, March 22-26, 2006, Chicago, IL

(10) Chu et al, "In Vitro Exposure to .5% Bupivacaine is Cytotoxic to Bovine Articular Chondrocytes," Arthroscopy: The Journal Of Arthroscopic And Related Surgery, 22:693-699 (July 2006)

(11) Chu et al, "The In Vitro Effects of Bupivacaine on Articular Chondrocytes," Journal of Bone and Joint Surgery, 90-B:814-820 (June, 2008)

(12) Chu and Coyle, "Chondrocytes Fail to Recover From Lidocaine-Induced Injury," 2009 Annual Meeting Poster Presentation #P437, AAOS, Las Vegas, February 25-28, 2009

(13) Gomoll et al, "Chondrolysis After Continuous Intra-Articular Bupivacaine Infusion: An Experimental Model Investigating Chondrotoxicity in the Rabbit Shoulder," Arthroscopy: The Journal of Arthroscopic and Related Surgery, 22:813-819 (August 2006)

(14) Lo et al: "Local Anesthetics Induce Chondrocyte Death in Bovine Articular Cartilage." 2008 AAOS Meeting Paper

(15) Yeger-McKeever, et al: "Low Doses of Bupivacaine Are Cytotoxic to Articular Cartilage In Vitro." 2008 AAOS Meeting Paper

(16) Piper and Kim: "Ropivacaine is Less Cytotoxic Than Bupivacaine to Human Articular Chondrocytes." 2008 AAOS Meeting Paper

(17) Piper and Kim, "Comparison of Ropivacaine and Bupivacaine Toxicity in Human Articular Chondrocytes," Journal Of Bone And Joint Surgery, 90:986-991 (May 2008)

(18) Dragoo et al: "Effect of Local Anesthetics Delivered via Perioperative Pain Pumps on Chondrocyte Viability." 2008 AAOS Meeting Paper

(19) Dragoo et al, "The Effect of Local Anesthetics Administered via Pain Pump on Chondrocyte Viability," American Journal of Sports Medicine, 36:1484-1488 (August, 2008)

(20) Karpie et al, "Lidocaine Exhibits Dose and Time Dependent Cytotoxic Effects on Bovine Articular Chondrocytes In Vitro," American Journal of Sports Medicine, 35:1621-1627 (2007); e-published July 2007

(21) Anderson et al, "Chondrolysis of the Glenohumeral Joint," Arthroscopy Supplement, Vol. 24:E13-E14 (June 2008)

(22) Greis and Burks, "Bilateral Shoulder Chondrolysis Following Arthroscopy: A Report of Two Cases," Journal of Bone and Joint Surgery, Vol. 90:1338-1344 (June 2008)

(23) Webb and Ghosh (Consultant Anesthetists, Cambridge, UK), Further Opinion-"Intra-articular injection of bupivacaine: Primum non nocere," British Journal of Bone and Joint Surgery (2008)

(24) Korotkova et al, 2009 AAOS Annual Meeting Poster Presentation #P452 "Chondrotoxicity of pH and Epinephrine Found in Local Anesthetics Administered by a Pain Pump," Las Vegas, February 25-28, 2009

(25) Tamai et al, "Chondrolysis of the Shoulder Following a "Color Test"-Assisted Rotator Cuff Repair-a Report of 2 Cases," Acta Orthopaedica Scandinavica, 68:401-402 (1997)

(26) Nakagawa et al, "Glenohumeral Osteoarthritis Following a 'Color Test' During Rotator Cuff Repair," Bulletin of the Hospital for Joint Diseases, 57:216-218 (1998)

(27) Douw et al, "Clinical and Pathological Changes in the Knee After Accidental Chlorhexidine Irrigation During Arthroscopy," The Journal Of Bone And Joint Surgery, 80-B 437-440 (1998)

(28) van Huyssteen, "Chlorhexidine and Chondrolysis in the Knee," Journal of Bone and Joint Surgery (British) 81-B:995-6 (1999)

(29) LeClaire et al, "Rapid Chondrolysis After an Intra-articular Leak of Bone Cement in Treatment of a Benign Acetabular Subchondral Cyst: an Unusual Complication of Percutaneous Injection of Acrylic Cement," Skeletal Radiology, 29:275-278 (2000)

(30) Lu et al, "Thermal Chondroplasty with Radiofrequency Energy," American Journal of Sports Medicine, 29:42-49 (2001)

(31) Edwards et al, "Thermal Chondroplasty of Chondromalacic Human Cartilage," American Journal of Sports Medicine, 30:90-97 (2002)

(32) Levine et al, "Chondrolysis Following Arthroscopic Thermal Capsulorrhaphy to Treat Shoulder Instability," Journal of Bone and Joint Surgery, 87A:616-621 (2005)

(33) Lubowitz, "Glenohumeral Thermal Capsulorrhaphy is Not Recommended-Shoulder Chondrolysis Requires Additional Research," Arthroscopy, 23:687 (2007)

(34) Good, "Glenohumeral Chondrolysis After Shoulder Arthroscopy With Thermal Capsulorraphy," Arthroscopy, 23:797.EL 797.E1-EL 797.E5 (2007)