# EXHIBIT 48

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
\- - -

DONNELL COX; ANITA McGINNESS and )
GERALD McGINNESS, husband and wife; )
DAVID DOOLITTLE and CAROLYN )
DOOLITTLE, husband and wife; JUAN A. )
HUERTA; and KATHERINE FORREST, )
Plaintiffs, ) Case No.
v. ) CV 07-1310 AA
)
DJO, LLC, et al., )
Defendants. )
_______________________________________)

CALEB HUGGINS, )
Plaintiff, ) Case No.
v. ) CV 07-1671 AA
)
STRYKER CORPORATION, et al., )
Defendants. )
_______________________________________)

ELIZABETH D. CRONIN, )
Plaintiff, ) Case No.
v. ) 6:09-cv-146-AA
)
I-FLOW, CORPORATION, a Delaware, )
Corporation, )
Defendant. )
_______________________________________)

IVY LEE Y. NATIVIDAD and STEVE )
NATIVIDAD, )
Plaintiffs, ) Case No.
v. ) 6:09-cv-378-AA
)
STRYKER CORPORATION, et al., )
Defendants. )

(Captions Continued on Page 2.)

DEPOSITION OF STEPHEN F. BADYLAK, D.V.M., M.D., Ph.D.

JULY 13, 2009 - VOLUME 1

ERIC J. SCHOENBORN and SUZANNE G. )
SCHOENBORN, )
Plaintiffs, ) Case No.
v. ) 6:08-cv-1419-AA
)
STRYKER CORPORATION, et al., )
Defendants. )
______________________________________)
JOHN ERIC BUTLER, )
Plaintiff, ) Case No.
v. ) 6:08-cv-588-AA
)
STRYKER CORPORATION, et al., )
Defendants. )
______________________________________)
TAMARA L. FOLKMAN, )
Plaintiff, ) Case No.
v. ) 6:09-cv-342-KI
)
DJO, LLC, et al., )
Defendants. )
______________________________________)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION
- - -

PAUL W. WESTBROOK, )
Plaintiff, ) Case No.
v. ) 5:08-cv-263-CLS
)
DJO, LLC; MCKINLEY MEDICAL, LLC; )
MOOG INC.; ASTRAZENECA PLC; )
ASTRAZENECA PHARMACEUTICALS LP; )
ASTRAZENECA LP; and ZENECA HOLDINGS, )
INC., )
Defendants. )
______________________________________)

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
\- - -

TROY L. ALDERFER, )
Plaintiff, ) Civil Action No.
v. ) 1:08-cv-01297-MSK-MEH
)
BREG, INC., et al., )
Defendants. )
_________________________________)
STACEY ANN HANSEN, )
Plaintiff, ) Civil Action No.
v. ) 1:08-cv-00365-MSK-CBS
)
DJO, INCORPORATED, et al., )
Defendants. )
_________________________________)
SAMANTHA ARCHULETA and )
ROSEMARIE CARROLL, as parent )
and next friend, )
Plaintiffs, ) Civil Action No.
v. ) 1:08-cv-00962-MSK-CBS
)
DJO, INCORPORATED, et al., )
Defendants. )
_________________________________)

DEPONENT: STEPHEN F. BADYLAK, D.V.M., M.D., Ph.D.
DATE: Monday, July 13, 2009
TIME: 8:26 a.m.

LOCATION: McGowan Institute for Regenerative Medicine
100 Technology Drive, Suite 200
Pittsburgh, Pennsylvania 15219-3130

REPORTER: Michele E. French, CSR-3091, RPR, RMR, CRR

**that we marked I think as Exhibit Number 1 --**
A Right.
**Q -- your expert report has not been subjected to review by scientists or medical professionals in the scientific community? That's a fair statement, isn't it, sir?**
A It's a fair statement.
**Q All right.**
A That's probably why it's level five.
**Q And that's what I'm trying to get at, sir, because, in fact, the research that you personally have authored or co-authored and have published in many peer-reviewed journals, that, in fact, has been subjected to review by various editorial boards; correct?**
A Correct.
**Q And you've been asked to provide the backup data to support your statements and your opinions and your findings in your research; correct, Dr. Badylak?**
A Correct.
**Q And that is not something that you've had to do for this expert report; correct?**
A That's correct.
**Q All right. So going back to your statement that you've used, quote, "...the same scientific methodology with the same degree of rigor..." closed quote, that you use**

**in your research, that is not an accurate description of your expert report versus your peer-reviewed published articles regarding your research as a clinician or scientist; true?**

A I don't think that's true. They -- I used -- everything that I did was the same as if I was writing a manuscript or asked to write an editorial, which I've been -- asked to do. I used the same amount of rigor in writing. You know, like I said, words mean something. This is my reputation. I mean, I believe wholeheartedly every single word in this expert report. Nothing that I put in here is based on mere speculation.

It's taken into account everything that I know and understand about how the body works, from its development to its response to disease, healthy cells, diseased cells, and each of those things was developed with a high degree of scientific rigor, and all of that went into this report.

So that's why, you know, if I sound a little defensive about that, I am, because I put the same amount of work into this that I would put into any manuscript I submit for publication. It hasn't been reviewed, for obvious reasons.

MS. SCHMID: Let's take a break for lunch.

**chondrolysis; correct?**
A Correct.
**Q And you have certainly seen, sir, cases of chondrolysis reported in the available medical and scientific literature where no pain pump was used; correct?**
A Correct.
Q How can you, as a good scientist, have an opinion about the, quote, "primary cause," closed quote, of chondrolysis in the absence of any objective data or reliable medical records for each patient, looking at them one by one?
MS. KALUR: Objection.
BY MS. SCHMID:
**Q Go ahead and respond.**
A Well, there's a couple of -- it's a -- there's a couple of answers to your question, all related. First of all, there is a lot of objective data regarding the causation of intra-articular delivery of Marcaine and Lidocaine into the joint and its association with and causation of chondrolysis.
The -- I think I said earlier, and I'll repeat it just so we're on the same page, I'm a scientist that's not easily convinced of anything. And I can't think of a single data, piece of data, that would convince me that Marcaine delivered like this

would cause chondrolysis; however, the mass of data collectively is irrefutable.

I indicated earlier, no study, no individual study is perfect. Every single study is going to have holes in it. This, however, does provide the opportunity to understand the relationship between the in vitro studies that have been done by a number of investigators, the pre-clinical animal studies that build upon the in vitro data, and then the clinical case outcomes that we have seen.

Combined, I don't think there's any question that the use of a chondrotoxic agent like Marcaine delivered into the joint continuously for a period of time other than a single injection does -- doesn't cause chondrolysis. It's -- you cannot deny it.

I mean, I am a strong critic of these sorts of statements, and I'm not convinced easily. I take issue with your statement that there's no objective data. There's a load of objective data in the totality of the published literature and -- and everything else that you have, you know, in front of you in terms of what I have examined.

**Q Okay. I think I got most of what you said, so I'm going to break that down, and this is going to take some time, so bear with me.**

**opinion, sir?**
A Yes, it is.
**Q All right. And you told me that you base that upon your interpretation of the current state of scientific and medical literature; correct?**
A That's correct.
**Q And you also told me, sir, that there is no article that you can point to that says -- that provides the same opinion that you just provided today in the context of this litigation; correct?**
A There's no single article that summarizes all of the scientific literature available, that's correct.
**Q All right. Sir, would you agree with me that a certain percentage of patients who present them self with clinical findings after radiology films have been studied and have developed chondrolysis, that there could be multiple factors involved; correct?**
A That's correct.
**Q And I believe, sir, that you and I this morning, we created a list based on your testimony that contained 11 different potential contributing factors to shoulder chondrolysis. Do you recall that, sir?**
A Yes, I do.
**Q Let's assume that Patient A presents himself with shoulder chondrolysis that is confirmed by radiological**

**films; okay?**
A So we're talking hypothetical here?
**Q Yes, sir.**
A Um-hum.
**Q Yes, sir. And that this particular patient not only had a pain pump whose catheter was put into the joint space but also during the process of the arthroscopic procedure there was thermal ablation, there were bio-absorbable tacks, anchors, and sutures involved.**
**How can you, under that circumstance, sir, provide the blanket opinion that the pain pump is the quote, "primary cause," closed quote, of the chondrolysis?**
A There's a couple of reasons.
MS. KALUR: Objection, compound.
THE WITNESS: There's a couple of reasons I would state that Marcaine is the primary -- or that's what you said, Marcaine; right? Did you say Marcaine was the administered agent by the pain pump, or maybe you didn't say?
BY MS. SCHMID:
**Q No, I didn't, but would you like the court reporter to read the question back --**
A No, I understand the question.
**Q -- so you have it clearly in mind?**

A I understand the question. I just didn't want to say something if you hadn't.

The -- one of the more interesting facts that needs to be considered in this causation is the fact that prior to about 2004 there were -- chondrolysis as we defined it this morning was extraordinarily rare, but absorbable anchors and nonabsorbable anchors were present, thermal ablation was present, and many of the other things you described, and yet there was almost a dearth of literature in which patients are described with chondrolysis.

Enter pain pumps and delivery of these anesthetic agents into the joint and the number of cases explodes. So any reasonable person would start to say what is the difference between 2004, '6, '8, and prior to 2004, and there's only one factor.

**Q Which is...?**

A The delivery of these agents by the pain pump.

**Q Do you know what the term temporal relationship means, Doctor?**

A Yes, I do.

**Q And would you agree with me, sir, that your last answer is an example of a temporal relationship?**

A My last answer defined that as an interesting finding that raises the level of suspicion why this particular

causative agent would be at the top of the list, because prior to that time everything else that you listed existed and there weren't any cases. After that time, a new factor is involved, and now all of a sudden the number of cases explodes.

To me one has to now rule out the fact that this is not the causative agent, the primary causative fact. And in my opinion, the more work that was done to investigate the causative agents, and particularly the use of the pain pump, all it did was confirm that this was, indeed, the primary cause of chondrolysis.

MS. SCHMID: Madam court reporter, could you read that answer back to me, please.

(Record read as follows:

ANSWER: "My last answer defined that as an interesting finding that raises the level of suspicion why this particular causative agent would be at the top of the list, because prior to that time everything else that you listed existed and there weren't any cases. After that time, a new factor is involved, and now all of a sudden the number of cases explodes.

To me one has to now rule out the fact that this is not the causative agent, the primary causative fact. And in my opinion, the more work that was done to investigate the causative agents, and particularly

the use of the pain pump, all it did was confirm that this was, indeed, the primary cause of chondrolysis.")

BY MS. SCHMID:

**Q Okay. You said in that last answer, sir, that prior to pain pumps there weren't any cases. I don't think that's what you intended to say, is it?**

A I don't think I said any. I said there was a dearth of reports.

**Q That's not what the court reporter has down. In your last answer, sir, you said, quote, "there weren't any cases," closed quote, prior to pain pumps. Do you recall saying that, sir?**

A Well, it's a matter of record. If I said none, it was -- I'm referring to the same -- you know, this is why words are important; right?

**Q I agree they are, yes.**

A So I'll restate that.

**Q Okay. Very good.**

A Prior to 2004, there were very few cases. It was considered to be an exceedingly rare condition. So it existed. You know, as a matter of fact, several times today I identified factors that existed prior to 2004 that were causative factors of chondrolysis. Gentian violet, for example, everybody agrees.

So I think my testimony over the course of

the day has acknowledged that there were cases prior to 2004. The point of the answer was that after 2004, the curve sky-rockets. What's the new -- who's the new player in the game? It's the pain pumps and the delivery of Marcaine or Lidocaine into the joint.

**Q What curve are you talking about, sir?**

A That was an expression, a phrase.

**Q Okay. Do you have any data, sir, regarding the number of shoulder chondrolysis cases that were identified prior to 2004 versus anytime after 2004?**

A I could estimate. No hard data, but we can defer to Matsen's poster earlier this year and add 67 cases to it. We can talk about Hansen's 11 cases. We can, you know, talk about the individual, smaller cases. But already in that number right there you've got more collectively than were present in all the years prior to 2004.

**Q Let me ask --**

A And we're talking about a five-year period of time.

**Q And I think, sir, in the Hansen article, that was published in 2007; correct?**

A I think it was 2007.

**Q And would you agree with me, sir, that that concerned 10 patients, 12 shoulders; correct?**

A Correct.

extensive amount of time talking about what the cause of chondrolysis was. So you're -- you're splitting hairs with the way that -- the difference in the questions.

You know, I recognize where we are, Miss Schmid, on this. I think I've given you the answer that you want. I've said that in all of the information that you have in front of you, that I have read, that I have available to me, there is not a single article but there is a collection of articles that provide compelling evidence that the use of the pain pump causes chondrolysis. So that's really clear. I've given you the answer that you want. I -- I don't know -- I don't know why you think that's nonresponsive. What more can I possibly say?

**Q Are you finished?**

A Now I think you're trying to get a rise out of me or something because I'm very calm. I'm very clear about this. I don't know how much more clear I can be. I'm finished, yes. I've answered your question. I've done the best that I possibly can. If my answer isn't what you want to hear, I am sorry. It's my opinion.

**Q Are you finished answering now, sir?**

A Yes.

Q All right. Let's ask this question. Can you hand me

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF INGHAM )

I, MICHELE E. FRENCH, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

Dated: 7-21-09 ______________________________

Michele E. French, CSR-3091, RMR, CRR
Notary Public, Ingham County, Michigan

My Commission expires: December 2, 2011