# EXHIBIT 67

---

* VIDEO DEPOSITION OF ARMANDO F. VIDAL, M.D. *
July 8, 2009

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 08-CV-01297 MSK-MEH

TROY L. ALDERFER,

Plaintiff,

vs.

BREG, INC.
c/o Brad Mason
2611 Commerce Way
Vista, California 92081
AND
LMA NORTH AMERICA, INC.
c/o LMA North America (Headquarters)
4660 La Jolla Village Drive
San Diego, California 92122

Defendants.

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:08-cv-00365-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

vs.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.,
REABLE THERAPEUTICS, LLC, and
I-FLOW CORPORATION,

Defendants.

---

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

Case No. 5:08-cv-00263-CLS

PAUL W. WESTBROOK,

Plaintiff,

vs.

DJO, LLC;
MCKINLEY MEDICAL, LLC;
MOOG INC.;
ASTRAZENECA PLC;
ASTRAZENECA PHARMACEUTICALS LP;
ASTRAZENECA LP; and
ZENECA HOLDINGS, INC.

Defendants.

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:08-cv-00962-MSK-CBS

SAMANTHA ARCHULETA and
ROSEMARIE CARROLL, as parent and next friend,

Plaintiffs,

vs.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.,
REABLE THERAPEUTICS, LLC,
I-FLOW CORPORATION, ASTRAZENECA
PHARMACEUTICALS LP, ASTRAZENECA LP,
and ZENECA HOLDINGS, INC.,

Defendants.

---

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

Case No. 1:08-CV-0184-DFH-TAB

JENSEN MEHARG, and her parents
ROBIN MEYER and MICHAEL MEHARG,

Plaintiffs,

vs.

I-FLOW CORPORATION, ASTRAZENECA
PHARMACEUTICALS LP, ASTRAZENECA LP,
ZENECA HOLDINGS, INC.,

Defendants.

---

APPEARANCES:

KALUR LAW OFFICE
By Laura B. Kalur, Esquire
9755 SW Barnes Road, Suite 450
Portland, Oregon 97225
503-595-4145
lbkalur@kalurlaw.com
Appearing on behalf of Plaintiffs.

D. ROBERT JONES, PC
By D. Robert Jones, Esquire
219 West Colorado Avenue, Suite 210
Colorado Springs, Colorado 80903
719-630-1556
Jones@drjpc.com
Appearing on behalf of Plaintiffs in
Colorado cases.

BOWMAN and BROOKE LLP
By Kim M. Schmid, Esquire
150 South Fifth Street, Suite 3000
Minneapolis, Minnesota 55402
612-339-8682
kim.Schmid@bowmanandbrooke.com
Appearing on behalf of Defendant
Breg, Inc.

APPEARANCES (Continued):

MORRIS POLICH & PURDY LLP
By Roger G. Perkins, Esquire
501 West Broadway, Suite 500
San Diego, California 92101-3544
619-557-0404
rperkins@mpplaw.com
Appearing on behalf of Defendant
DJO, Incorporated.

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
By Maynard M. Kirpalani, Esquire
260 Franklin Street, 14th Floor
Boston, Massachusets 02110-3112
617-422-5300
maynard.kirpalani@wilsonelser.com
Appearing on behalf of Defendant
I-Flow Corporation.

HARRIS BEACH, PLLC
By Pamela B. Goldsmith, Esquire
100 Wall Street, 23rd Floor
New York, New York 10005
212-687-0100
pgoldsmith@harrisbeach.com
Appearing on behalf of Defendants
McKinley Medical, LLC,
Moog Inc., and Curlin Medical.

Also Present: Jay R. Wren, CLVS

Pursuant to Notice and the Federal Rules of Civil Procedure, the video deposition of ARMANDO F. VIDAL, M.D. called by Plaintiffs and Defendant Breg, Inc., was taken on Wednesday, July 8, 2009, commencing at 12:35 p.m., at 2000 South Colorado Boulevard, Suite 4500, Denver, Colorado, before Alan E. Bjork, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

VIDEO DEPOSITION OF ARMANDO F. VIDAL, M.D.


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Kalur | 306, 329 |
| Mr. Jones | -- |
| Ms. Schmid | 8, 277, 325 |
| Mr. Perkins | -- |
| Mr. Kirpalani | 203, 296 |
| Ms. Goldsmith | 217, 302 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | BREG, Inc.s First Amended Notice Of Deposition Duces Tecum Of Armando Vidal, M.D., with attachment | 10 |

there. But I think the emphasis should also be placed on a lot of -- in the majority of the education that we do on a day-to-day basis isn't tangible. So the absence of a tangible document, because I don't know if it exists or not, is not synonymous with a lack of that experience.

**Q Have you ever put pen to paper in any shape, form, or fashion, Dr. Vidal, where you have said you personally hold the opinion that a continuous flow anesthetic causes chondrolysis?**

A I think that my general causation report and the report that I formulated for Hansen is pretty clear that intra-articular indwelling catheters that elute specifically Marcaine are cause -- do have a causal relationship to the development of chondrolysis.

**Q Outside of the litigation arena, have you ever -- just as a medical doctor --**

A Uh-huh.

**Q -- sir, have you ever put pen to paper, not as a litigation expert but as a medical doctor, where you said it is your medical opinion that a continuous flow of anesthetic directly into the shoulder joint may cause or does cause shoulder chondrolysis?**

A Yes. And actually you're aware of that because when Troy Alderfer developed shoulder chondrolysis well before I was ever involved with any litigation, it was clear that that was my opinion, that he developed chondrolysis likely from his intra-articular catheter.

**Q Okay. Just so that -- just so you and I both have a clear recollection, let's actually look at that record --**

A Yes, please.

**Q -- Dr. Vidal, because I think you will see that's not what your record says. And let's -- I'm going to hand you a two-page document, Dr. Vidal, which has been previously marked as Vidal Exhibit No. 2.**

A I have a request. Do you actually have his entire chart because taking one note out of context can be misleading.

**Q I don't have his entire chart.**

A Oh, okay.

**Q But this is the -- I'm going to represent to you, Dr. Vidal, that this was the specific document that was at issue in your February of 2009 deposition. And you see, sir, on Page 2 of Exhibit 2 where you say, quote,**

**Although it is impossible to be able to denote the cause of his chondrolysis, I think there is likely an association there, period, close quote. Have I read that correctly, Dr. Vidal?**

A You -- you read a portion of it correctly. I'd -- I'd prefer to read the whole -- you read -- the part that you read is correct. My assessment on Troy was that he has "Left shoulder DJD/chondrolysis status post-arthroscopic stabilization."

My "Plan" was that "I had a long discussion with Troy. I had an opportunity to once again review his operative note. It is interesting because he did have an indwelling catheter placed in the joint with continuous Marcaine. There is recent data that would strongly suggest that Marcaine can be chondrotoxic especially in the shoulder. There are two papers both from Pittsburgh and . . . Rush . . . which would suggest that. Although it is impossible to be able to denote the cause of his chondrolysis, I think there is an association there."

The interesting thing is the standard that I'm held to as a physician is different than the standard that you're held to, meaning that I

-- I'm trying to get to the bottom of Troy's shoulder. I'm trying to figure out exactly what caused his shoulder as his treating physician. I don't -- I want to know with 100 percent certainty everything that potentially could have caused Troy to have a bad shoulder because it's not normal to have a bad shoulder at 30, or however old he is.

The other part of that and going back to your standard is that there is likely, meaning more likely than not, an association between the presence of an indwelling Marcaine catheter and the development of his chondrolysis.

So your purposes and my purposes are different in that regard, would you agree?

Q Just so the record is clear --

THE VIDEOGRAPHER: Your microphone?

MS. SCHMID: Gosh, I'm so sorry.

**Q (By Ms. Schmid) Just so the record is clear, Dr. Vidal, in terms of what you wrote in your medical record regarding Troy Alderfer, in terms of the potential cause or causes of his chondrolysis, it was your medical opinion, sir, at the time you wrote this medical record, that it was, quote, impossible, close quote, to denote the cause of his chondrolysis. Is that**

**a fair statement?**

A The statement -- your question is did I make that statement? And I would argue that, of course, I made that statement. It's in print. Now, I'll give you an analogy. So somebody gets shot in the heart. You can say, How do you know that patient didn't have a heart attack the second before that bullet hit his heart? I can't. I could never. If you asked me that question, I'd say, Well, that's -- that's a pretty ridiculous question, right? I mean that's kind of silly. What are the chances of that? But if you said -- if you said, Is that 100 -- Are you 100 percent certain that he didn't have a heart attack before he got shot? I'd say, Gosh, I can't be 100 percent certain. I can't be 100 percent certain about anything in medicine. There's not a physician that could tell you they're 100 percent certain about almost any phenomenon.

So, again, going back to your question, I stand by that. I'm not 100 percent certain that his chondrolysis was caused by Marcaine. I want -- I do stand by the fact that it's impossible to note the clear cause of his chondrolysis, but I think that there is a likely

Q Sure.

MS. SCHMID: Go ahead and reread it.

(Page 49, Lines 20 through 24 read.)

**Q (By Ms. Schmid) The cause or causes.**

A To fully understand the underlying cause and causes of chondrolysis, I would say that the consensus of the literature would agree that further study is necessary.

**Q (By Ms. Schmid) And that's true as of July 8th, 2009, correct, Dr. Vidal?**

A That is correct.

**Q And by the way, Doctor, would you agree with me, sir, that the consensus in the medical literature as of July 8th of 2009 is that the cause -- is that the potential cause or causes associated with chondrolysis may well be multifactorial? Would you agree that that's a consensus in the medical literature?**

A I would say, to be clear, that there is not a condition in the human body that isn't multifactorial. And I would say that chondrolysis is no different. So when you ask that question about the multifactorial nature of chondrolysis and try to fully understand it, I go back to my last question, which is further research is

certainly necessary.

Whether there are patient factors, genetic factors, biochemical factors, exposure factors, there is a lot that's still -- that would benefit us to understand it and to prevent it from happening in the future with other substances. So it's critical to us as providers to fully understand the issue as close as we can. So when you ask is there a consensus that it's multifactorial, I would say there's consensus for everything.

That is, every human condition is multifactorial, meaning that you can expose a human to a known toxin, and some will survive, and some won't. And there are factors that predict that and don't. And unfortunately that's the nature of the human animal, of the human organism. It's the nature of biology, which is an unpredictable science. And it's -- the bottom line is that everything, every condition, is multifactorial, and chondrolysis is included among those.

**Q So it's a true statement, Dr. Vidal, that the condition of chondrolysis is multifactorial, correct?**

A -- to your question.
Q Sure.
THE DEPONENT: Can you repeat what she said.
(Page 65, Lines 15 through 21 read.)
A I understand -- so if I understand your question correctly, when an author states, in a paper, that there's an association between whatever phenomenon you want to study and chondrolysis, that they are not specifically saying that there's a cause, then I would say, of course, I understand that's what the authors is saying because that's what the author is saying.
Now, that's not to say that I'm not able to draw my own conclusions. That's why they when they publish a paper they have their materials and methods. That's why I'm able to -- to gather the data from various articles.
So is there one article that sticks out and says this is the cause? The -- and when an author says there's an association there, do I assume they're saying there's a cause? I don't assume anything more than what the author says, but I certainly have the independent ability to look at their materials and methods to look at

their -- the way they did their study, to look at their results. And then they can -- their discussion is their conclusion, their interpretation of those results.

But the benefit of scientific literature is that you can have -- you have the ability to independently evaluate that and put it in the context of other papers.

So I'll -- I'll be honest, I don't think that you're ever going to see a paper like that. And the reason why is because it would be amazingly unethical -- or unethical -- that's the wrong term -- to do a causal project like that.

I'm on the IRB for the Colorado combined institution. So -- so I review several of the IRB protocols that come through for -- for our panel. It would be impossible to -- to study a condition that you have a high suspicion can cause harm to a patient and establish exactly what you're saying, specifically where somebody says, This is the clinical cause in a human organism in their shoulder.

So the -- the bottom line is that you'll never see that. You will never see a paper on whether or not -- a blind controlled study

whether or not arsenic is fatal because people know that. So it's a very good question. And I think actually it's a wonderful question because your question is specifically when you look at a paper, do you take -- you know, when an author says there's an association there, do you say, Oh, there's just an association there. I don't think you necessarily have to have the author tell you that it's the cause, because there's certain things that you can never ever study, and that's one of them.

But you do take the combination of that paper and the next paper and the following paper and the -- and the -- and the basic science research looking at the effects on these things, and you can -- you can say, You know what, this is all adding together. And you could do that study, but it would -- not in this country you couldn't.

MS. SCHMID: Move to strike as nonresponsive.

**Q (By Ms. Schmid) Dr. Vidal --**

A Yes.

**Q -- can you identify for me, of the 25 articles that you have listed as supporting your opinions in your expert report, any of them where**

MS. SCHMID: Move to strike as nonresponsive.

**Q (By Ms. Schmid) Earlier this afternoon, Dr. Vidal, you agreed with me that further research is, quote, certainly necessary, closed quote, to understand all the cause or causes that may be related to chondrolysis, correct?**

A Correct.

**Q One of the reasons -- or actually you gave me at least four reasons why this future research is necessary so that as the scientific community and medical community moves forward, that they can begin to understand all the potential causes is that you identified, such things as unique patient factors, genetic factors, biochemical factors, and exposure factors. Do you recall that list you gave me, sir?**

A Yes.

**Q And would you agree with me, sir, that those are still factors that are yet unknown, or we are not yet aware of what role they may play in causing chondrolysis, correct?**

A What role that those factors that I discussed have in causing chondrolysis, like

patient factors causing chondrolysis or genetic factors causing chondrolysis? Is that what you're asking? I think that -- I think that we don't have a firm understanding of how those factors play into the whole picture of chondrolysis, meaning do you have a susceptible patient population? Do you have a susceptible clinical scenario that can predispose somebody? That's what I -- that's what I mean by that.

**Q Do you -- let me ask you, then, Dr. Vidal, do you believe that there's a genetic predisposition in certain individuals?**

A I have no idea.

**Q That is not something that has not been sufficiently researched to say yes or no in terms of whether or not that's a potential cause of chondrolysis, correct?**

A The -- I'm going to answer that in two parts. The -- the short answer to your question is yes, that has not been studied, but that was not the implication of what I was saying, meaning that nobody's studied -- I wasn't implying the genetic factors as a cause for chondrolysis. I was implying the genetic factors as some sort of predisposing factor in an ideologic role in

And even human studies with human cells that are taken out of the organism like on a dish, like human chondrocytes, has that limitation. So taking -- I would say that in no in vitro study can you ever say definitively that you can extrapolate that to the clinical condition directly.

**Q Okay. So just so I understand, sir, it's your testimony that as a clinical scientist, you, Dr. Vidal --**

A Yes.

**Q -- would never take an in vitro study and the results from an in vitro study and extrapolate that to the human clinical setting; is that correct?**

A In isolation, no. I think a great example -- so just as an example of this is you're taking cells and you're taking osteochondral plugs, you're taking cells in the petri dish, and you're subjecting them to local anesthetic and seeing how many cartilage cells die. You can't create chondrolysis because you don't have a joint.

So chondrolysis is when the cartilage -- the cartilage cells die, the matrix dissolves, and then subsequently a mechanical phenomenon occurs, which is the joint degenerates.

How can you -- you can't create that in a petri dish. You could potentially create that in an animal model if you waited long enough, potentially, maybe.

MS. SCHMID: Move to strike as nonresponsive.

**Q (By Ms. Schmid) Dr. Vidal, is it your practice -- outside the arena of litigation, is it your practice as a medical professional, as an orthopedic surgeon, that you arrive at your medical opinions in your day-to-day practice by extrapolating from research that is conducted in vitro?**

A Do I use that for clinical decision making?

**Q Yes, sir.**

A Yes.

**Q Do you -- is it your opinion testimony, Dr. Vidal, that it is appropriate and reasonable and a method followed by other scientists in the medical and scientific community, to extrapolate from the in vitro tests that have been done on rabbits and other animals, to then say that the continuous flow of anesthetic into a human joint causes chondrolysis?**

is what you're specifically asking?

**Q Correct.**

A Okay. I just need one second, please.

**Q No problem. Take your time.**

A I would say in print that specifically says that it is a cause of chondrolysis, I'm not sure that I've seen that in print. I'm not saying it doesn't exist. But does that answer your question?

**Q As an expert, sir, in the area of general causation --**

A Uh-huh.

**Q -- in terms of shoulder chondrolysis, if such an article existed anywhere in the world literature in a peer reviewed journal, you would know about it, correct?**

A In a peer reviewed journal?

**Q Yes.**

A Yes.

**Q And as you sit here today, there is no such article that appears in a peer reviewed journal that agrees with your opinion as you've expressed on general causation, correct?**

A In general, peer reviewed articles and peer reviewed journals do not publish opinions.

**Q That's not my question to you --**

A Well, it doesn't exist.

**Q -- Dr. Vidal.**

A The question is does it exist in the peer reviewed literature? What I'm telling you is that doesn't -- opinions don't exist in the peer reviewed literature. So the -- the -- the -- the -- the opinion in the opposite direction doesn't exist either because people don't publish opinions in literature, not in the peer reviewed literature.

**Q Are you finished?**

A Yes.

**Q Can you point me to any literature anywhere in the world where it arrives at the same opinion that you've just enunciated, which is, prolonged exposure to Marcaine is a more likely than not causative factor in the development of chondrolysis?**

A I would say no.

**Q None, correct?**

A Correct.

**Q You've never seen such an opinion in print anywhere in the world literature, correct?**

ships crossing in the night.
**Q Could be. We'll let the jury decide.**
A Sure.
**Q The Gomoll article, is it your testimony to the ladies and gentlemen of the jury, that it agrees with the opinion, as you have stated it, regarding the use of Marcaine and general causation in a human shoulder?**
A Yes, it agrees with my opinion. It does not disagree with my opinion.
**Q I don't know what that means.**
A And even I --
**Q And I'm guessing the ladies and gentlemen of the jury don't understand that either.**
A Okay. I guess that it's also their determination to make. I think it is in agreement with my opinion.
**Q His rabbit study, in which he said this is not a predictor of what's going to happen in a live human shoulder --**
A His findings are consistent and aligned with my opinion, and they do not -- his findings do not disagree with my opinion.
**Q How is it that you, Dr. Vidal, as a**

**litigation expert, can extrapolate from Dr. Gomoll's own clinical study and reach a conclusion which Dr. Gomoll won't reach in a scientific setting?**

A Because the onus on him on this paper was not to make that determination. The onus on him was to -- the onus on this paper is different than what I do on a clinical basis every day.

When he did this paper, he was looking at the injury to articular cartilage from bupivacaine and the response of those chondrocytes to bupivacaine. He was not -- he was taking it from Point A to Point B. He wasn't trying to get to Point Z. My job when I evaluate patients, when I treat patients, is to take that Point A to Point B and that Point D to Point F and that Point H to J, and there are a bunch of gaps in between, and to make an educated assessment. And we do that every day on a clinical basis. And there are a lot of things that go into that recipe.

So just like if you're doing a criminal case, and you've got a lot of circumstantial evidence, you've got a gun, you've got fingerprints, you've got all these things, but you

didn't see somebody pull the trigger, you don't have that Level 1 data, but you've got a lot of circumstantial evidence that points in that direction.

MS. SCHMID: Move to strike as nonresponsive and incomprehensible, frankly.

MS. KALUR: Move to object to the commentary on his testimony.

MR. JONES: Working away the afternoon.

MS. SCHMID: We'll be here.

MR. JONES: Then we'll be coming a bit casual this morning.

MS. SCHMID: Pardon me?

MR. JONES: A bit casual. I'm sorry, I don't want to interject. This isn't my deponent.

**Q (By Ms. Schmid) Other than Chu and Gomoll's literature from 2006, what other literature do you believe supports your opinion regarding causation?**

A I think we've been down this road before, but certainly I'm willing to revisit it, but I've given you the bibliography that we used to prepare -- that I used to prepare the causation

MR. KIRPALANI: Objection.
MS. SCHMID: Objection.
**Q (By Ms. Kalur) You were asked a lot of questions about can you point to one specific article that says causation.**
A Uh-huh.
**Q Can you explain why it would be faulty -- why that questioning alone and in isolation would be faulty for you to be able to make a statement as to causation?**
A Sure. The --
MS. SCHMID: Objection.
MR. KIRPALANI: Objection.
A -- the articles that we have available to us right now and the articles that we've discussed today essentially weren't designed to answer the question of causation specifically of chondrolysis. They're each individual pieces of a puzzle. And just like a puzzle, each individual piece doesn't necessarily tell you what the puzzle overall -- what the pictures is, but when you piece those pieces together, you -- you get a broader understanding of -- of the whole picture.
So each of those individual puzzle pieces isn't representative or isn't a small

microcosm of the overall picture. So I guess to be more clear, the -- those papers, the basic science papers, weren't designed to say this causes chondrolysis. They were designed to say what is the biologic effect of local anesthetic exposure to chondrocytes. And they showed pretty conclusively that the cells die and that they're insulted by this process.

The clinical papers also aren't designed to say this caused it. The clinical papers are, we've observed this complication, and these are the factors, this -- these are descriptive terms or -- or variables that these patients had so that ultimately we can understand it better as well.

You start taking those pieces together, and -- and that's how you come to the conclusion. I think I explained it probably better earlier to be honest, right.

**Q Well, if I'm -- and correct me if I'm not summarizing this correctly. So the clinical data and the case reviews are a piece of the puzzle that taken as a whole with your education, your training, your experience, animal studies, that all culminates together to form your**

STATE OF COLORADO)
) ss. REPORTER'S CERTIFICATE
COUNTY OF DENVER )

I, Alan E. Bjork, do hereby certify that I am a Certified Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature and seal this 14th day of July, 2009.

My commission expires July 8, 2011.

______________________________

Alan E. Bjork, CSR
216 - 16th Street, Suite 1280
Denver, Colorado 80202