# EXHIBIT 68

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

DANIKA GROSSNICKLE and TIMOTHY GROSSNICKLE, husband and wife; ROBIN LABAW; CHRISTINE O'RILEY and MICHAEL O'RILEY, husband and wife; CHARLES SHWALLON and TRISHA SHWALLON, husband and wife; TROY STANPHILL and MARGARET STANPHILL, husband and wife; JUANITA BERRY and JEFFREY BERRY, husband and wife; and SCOTT ROONEY and MISTI ROONEY, husband and wife,

Plaintiffs,

vs. NO. 0703-02834

(Caption continued on next page.)

TRANSCRIPT OF PROCEEDINGS

Volume 7-A

(Pages 1587 to 1709)

BEFORE THE HONORABLE MICHAEL H. MARCUS

Thursday, March 5, 2009

STRYKER CORPORATION, a Michigan corporation;
STRYKER SALES CORPORATION, a Michigan corporation;
I-FLOW CORPORATION, a Delaware corporation;
PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation; TUALITY HEALTHCARE, an Oregon nonprofit corporation, doing business as TUALITY COMMUNITY HOSPITAL; and A. BROOKE BENZ, M.D., individual and doing business as BENZ BONE & JOINT CLINIC,

Defendants.

BE IT REMEMBERED THAT, the transcript of proceedings appended hereto was taken before Charlotte A. Powers, Certified Shorthand Reporter and Registered Merit Reporter, on Tuesday, March 5, 2009, commencing at the hour of 9:17 a.m., the proceedings being reported in the MULTNOMAH COUNTY COURTHOUSE, 1021 SW 4th, Room 318, Portland, Oregon.

WITNESS INDEX

Page

FREDERICK MATSEN, M.D.

Direct Examination by Mr. Keating............1597

Cross-Examination by Mr. Campillo............1634

EXHIBIT LIST

Page

Exhibit 822....................................1708

Exhibit 823....................................1708

Exhibit 855....................................1622

Exhibit 856....................................1622

Exhibit 2378..................................1652

Exhibit 3207..................................1700

had every patient on there and all the factors that you might look at, like the patient's age and their gender and what their diagnosis was and what the nature of the treatment was and what the follow-up was. And so putting all that together takes a lot of -- a lot of effort. But again, the -- the purpose of the methodology was to make sure there was a lot of distance between me and any proceedings here, for example, and -- and their review of the -- of the records.

**Q Who funded the study?**

A I am fortunate in holding an endowed chair at the University of Washington that was donated by a company, as well as by a number of individuals to fund orthopedic research related to the shoulder. So I funded it out of that -- out of that found, out of that endowment.

**Q Wasn't funded by lawyers?**

A No.

**Q Now, can you tell the jury what the criteria were that you wanted this team of investigators to look at?**

A Right. So when you're looking for something, you have to define what that something is. And

**as of this point in time?**

A That is correct.

**Q Has -- has anyone -- has it been presented in any forum, other than possibly to the lawyers?**

A It has not.

**Q So this jury, this Court, and the people in this courtroom are the first ones to hear the outcome of this study?**

A Outside our own research group, that's correct.

**Q Who brought the idea of the study to you?**

A The -- the history is an interesting one because I saw a patient, as I often do, who had sustained chondrolysis after treatment by a different surgeon. And I saw that patient in consultation because my major line of work is doing shoulder replacements, so that patient had come to me to find out if a shoulder replacement would be helpful to that patient.

After having seen the patient, I visited with the patient's attorney. After we concluded the interview that he had with me, I -- the attorney indicated that he had access to a group of other patients that had sustained a similar problem, and asked if I would be interested in looking at those cases from a

scientific standpoint.

And I should say here, if you don't mind, that I'm not an arthroscopic surgeon. This type of surgery is not something I do. But because of what I mentioned before, I'm always interested in studying adverse outcomes of any kind of treatment.

So I said sure, I'd like to look at those cases. And that -- that led to a study that we actually presented just last week at the American Academy of Orthopedic Surgeons' meeting in Las Vegas, and it was well-received. And that was a study in which we were able to present 65 or 67 new cases that had been previously unreported, which more than doubled the number of cases of chondrolysis from any cause that had been previously reported in the literature. So that was peer-reviewed in that sense.

Then I had another discussion with the attorney. And I said, you know, the problem with that study, the one I just referred to, is we don't know what the denominator is. We know that these cases had chondrolysis, but we don't know anything about the population from which

those patients were drawn. So we can't comment about incidents, other factors that may have been present. And so on. And I said, what would be really wonderful is if we had an entire case series from an individual surgeon.

And a little bit later, I got a call saying that such data are available, would you like to look at it. And I said yes.

So that's -- so just to be clear, there were two -- two studies, one that was presented last week by another one of our residents, and then the study that we're discussing today.

**Q Just so that the record is clear, you're referring to the study that was presented at the AOS. And the speaker, I think, was Dr. Scheffel?**

A That's exactly right.

**Q That's a different population of patients. It was a report on a number of different physicians; in other words, it was not a report on the experience by one single doctor?**

A You are correct.

**Q Right. So I want to keep my questions -- at least for now -- focused on the study of the 300 and -- whatever the number is, 396 cases**

**that the jurors and us heard for the first time today.**
A Right.
**Q And so the idea germinated from a discussion you had with a lawyer.**
A That -- well, the -- the idea for the first study came from the discussion I had with a lawyer. The idea for the second study came from my complaint that we didn't have the denominator. The lawyer said, what if I can get you such a study. So it was actually -- not to do too much credit here -- but it was my idea that, boy, it would be wonderful if we had a case series from an individual surgeon. And then I got the callback from the lawyer saying that such data were available.
**Q Was that a lawyer from Portland?**
A Yes.
**Q And did the materials that were submitted to you and to your colleagues at the University of Washington to study -- to make -- to conduct the study, did they come from lawyers?**
A They did.
**Q Did you personally or anyone in your group go to the doctor's office, to the hospitals where**

**the patients were treated, in other words, do anything on your own to obtain records, apart from whatever the lawyers sent you?**

A No.

**Q And when did you receive the last bit of information that was included in the analysis and the ultimate information that you've presented here this morning?**

A I don't think I can be sure of the exact date. But let me say within the last two months.

**Q So you -- and when did the data start arriving, or the materials that the lawyers sent to you start coming to you?**

A I'm going to have to say approximately four months ago, maybe. I'm not exactly sure. I don't have an independent recollection of when it came.

**Q Okay. You mentioned you'd just gotten a bill recently from one of the people involved in the study. Was that for work done very recently?**

A That was for work done from the time we got -- for the entire span of the study.

**Q Okay. Did the group -- how many people were involved in this analysis at your end?**

A There was a research nurse, there was a

resident. You mentioned Dr. Scheffel, who was the resident on the first paper. There was a resident, then, on the second case. And then we have a statistician.

**Q So three people, plus yourself?**

A Right.

**Q And the --**

A Again --

**Q I'm sorry.**

A I'm sorry. I was not directly involved in the -- the analysis. I -- the only part of the work that I've done so far was putting together the sort of summary slides that we showed you today. But I didn't look at the individual records and didn't come to -- I wasn't the one that came to conclusions about the different individuals in the study.

**Q So you, in a sense, are presenting the data, but the analysis, the reviewing of the records, the looking at the x-rays, that work was done by the resident, the nurse and the statistician in some combination?**

A That's correct.

**Q So who -- who was the resident that did the work?**

A His name is Brett Wiater.

**Q Can you spell that for us, please?**

A W-I-A-T-E-R.

**Q And is he a resident currently at the University of Washington?**

A He is.

**Q Do you -- I think you said earlier that you do not personally do arthroscopic shoulder repairs, that you do total shoulders, I believe.**

A I do not do -- I do a lot of things, but I don't do arthroscopic surgery.

**Q Have you ever done arthroscopic shoulder surgery?**

A No.

**Q Okay. So for the benefit of the jury, what you do is, in part, what's called total shoulder replacements?**

A Right. Again, the reason that I get involved in cases like this is I'm often consulted in situations such as the one that were shown on the screen where there's loss of cartilage from whatever cause, whether it's from chondrolysis or arthritis or injury, and that's how I come to see these patients.

STATE OF OREGON

ss.

County of Multnomah

I, Charlotte A. Powers, Official Court Reporter Pro Tempore of the Circuit Court of the State of Oregon, Fourth Judicial District, certify that I reported in stenotype the foregoing proceedings in the above-entitled case.

I further certify that my stenotype notes were reduced to transcript form by Computer-Aided Transcription under my direction.

And I further certify that pages 1587 through 1708, Volumes 7-A, contain a full, true, and accurate record of my stenotype notes.

Dated this 5th day of March, 2009, at Portland, Oregon.

-----------------------------------

Charlotte A. Powers, RMR, CSR, CRR, FCRR

Official Court Reporter

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

DANIKA GROSSNICKLE and TIMOTHY GROSSNICKLE, husband and wife; ROBIN LABAW; CHRISTINE O'RILEY and MICHAEL O'RILEY, husband and wife; CHARLES SHWALLON and TRISHA SHWALLON, husband and wife; TROY STANPHILL and MARGARET STANPHILL, husband and wife; JUANITA BERRY and JEFFREY BERRY, husband and wife; and SCOTT ROONEY and MISTI ROONEY, husband and wife,

Plaintiffs,

v. No. 0703-02834

(CAPTION CONTINUED ON NEXT PAGE)

TRANSCRIPT OF PROCEEDINGS

VOLUME 7-B

(Pages 1710 to 1834)

BEFORE THE HONORABLE MICHAEL H. MARCUS

Thursday, March 5, 2009

STRYKER CORPORATION, a Michigan corporation; STRYKER SALES CORPORATION, a Michigan corporation; I-FLOW CORPORATION, a Delaware corporation; PROVIDENCE HEALTH SYSTEM-OREGON, an Oregon nonprofit corporation; TUALITY HEALTHCARE, an Oregon nonprofit corporation, doing business as TUALITY COMMUNITY HOSPITAL; and A. BROOKE BENZ, M.D., individually and doing business as BENZ BONE & JOINT CLINIC,

Defendants.

BE IT REMEMBERED THAT, the transcript of proceedings appended hereto were taken before Marilynn T. Hoover, Certified Shorthand Reporter and Registered Professional Reporter, on Thursday, March 5, 2009, commencing at the hour of 2:12 P.M., the proceedings being reported in the MULTNOMAH COUNTY COURTHOUSE, 1021 S.W. Fourth Avenue, Room 318, Portland, Oregon.

APPEARANCES

KEATING JONES HUGHES, P.C.
By Mr. Robert Keating
One S.W. Columbia, Suite 800
Portland, Oregon 97258
On behalf of Defendant Benz

BARTON & STREVER, P.C.
By Mr. William A. Barton
214 S.W. Coast Highway
P.O. Box 870
Newport, Oregon 97365
On behalf of Cross Complainant Benz

LANE POWELL, P.C.
By Mr. Robert Maloney
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
On behalf of Defendants Stryker

SEDGWICK DETERT MORAN & ARNOLD, LLP
By Mr. Ralph Campillo
801 S. Figueroa Street, 19th Floor
Los Angeles, California 90017
On behalf of Defendants Stryker

AFTERNOON SESSION
THURSDAY, MARCH 5, 2009
2:12 P.M.

THE CLERK: Okay. Folks, we're back on the record now.
THE COURT: So without further ado, we'll get the jurors and get back to cross examination, which I understand will be skillfully sculpted to be short and effective.
MR. CAMPILLO: Short, perhaps; effective, I can't promise.
THE COURT: Okay.
MR. BARTON: I'm going to step out and call the office and tell Lindsey that I'll be over about 3:30 to proof her stuff, because I don't do law stuff but I want to at least read it before you read it.
THE COURT: That's fine.
MR. BARTON: Carry on.
THE COURT: It's the "aw shucks" school of advocacy.
MR. CAMPILLO: Kind of like Columbo, you know.
THE COURT: No, it's like Chuck Paulos.

**Q. And this was a patient, in fact, in which Dr. Benz had in fact done an arthroscopic intra-articular procedure himself?**
A. That's correct.
**Q. Okay. Before the end of 2008?**
A. That's correct.
**Q. Okay. Doctor, you were asked some questions about these 396 shoulder arthroscopies. Do you know if each patient -- each patient in the study had an arthroscopic intra-articular procedure done?**
A. It's my -- Because that is one of our screening criteria, was to include patients that met that criteria.
**Q. And, in fact, a patient might have more than one procedure?**
A. Right.
**Q. Okay. Whereas only one of them might be an intra-articular arthroscopy --**
A. That's true.
**Q. -- which was the focus of this study?**
A. That's true.
Q. Okay. Some questions were asked to you about, "You didn't do this, other people did." Was it -- I'll ask you this question first: Was all

the study done under your direction?
A. It was.
**Q. Who designed the study?**
A. I did.
**Q. Who told the people what to do?**
A. I did.
**Q. Are you familiar with the skills and talents of the people that you asked to do it?**
A. I did.
**Q. Were they competent to do it?**
A. They were.
**Q. And do they -- Is this a standard way for this kind of a study to be done?**
A. Yes, sir. It's the way the previous study that was presented at the academy was done, and the way many of our studies are done.
**Q. We have heard reference to the senior author on a whole lot of articles that have come into evidence. Who would be considered the senior author of this study?**
A. I would be.
**Q. And is it true that the senior author normally appears toward the end of the list?**
A. Usually at the end.
**Q. Okay. Do you intend to submit this study for**

STATE OF OREGON
ss.
COUNTY OF MULTNOMAH

I, MARILYNN T. HOOVER, Official Court Reporter Pro Tempore of the Circuit Court of the State of Oregon, Fourth Judicial District, certify that I reported in stenotype the foregoing proceedings in the above-entitled case.

I further certify that my stenotype notes were reduced to transcript form by computer aided transcription under my direction.

And I further certify that pages 1710 through 1834, Volume 7-B, contain a full, true, and accurate record of my stenotype notes.

Dated this 6th day of March 2009, at Portland, Oregon.

____________________________

MARILYNN T. HOOVER, RPR
OR CSR NO. 04-0837