IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:08-cv-00365-MSK-CBS

STACEY ANN HANSEN,

Plaintiff,

v.

DJO, INCORPORATED, f/k/a DJ Orthopedics, Inc.;
REABLE THERAPEUTICS, LLC; and
I-FLOW CORPORATION;

Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT I-FLOW'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS RULE 702 MOTION TO EXCLUDE THE PROPOSED EXPERT OPINIONS OF SUZANNE PARISIAN AND CHARLES BECK**

---

Plaintiff submits this Opposition to the motion by defendant I-Flow, which defendant DJO joins, to exclude the proposed expert opinions of Dr. Suzanne Parisian, M.D. and Charles Beck, M.D.

## I INTRODUCTION

At the heart of defendants' liability is these companies' joint decision to market their pain pumps to orthopedic surgeons for use in the joint space, despite Food & Drug Administration's ("FDA's") repeated denials of clearance for these precise indications. I-Flow's and DJO's defense hinges on their creative interpretations of FDA regulations and terminology. Unquestionably, the FDA regulatory process, including the process for approval and clearance of medical devices, are technical matters beyond the understanding of jurors. To decide whether I-Flow and DJO breached their duties of care, the jury will need to hear from an expert to explain the FDA's role in regulating medical devices, and how those regulations apply to defendants.

Plaintiff has disclosed Dr. Suzanne Parisian, a former FDA official who worked in the division that oversees medical devices, as a regulatory and labeling expert. Dr. Parisian has been qualified to testify in this capacity by numerous courts, including in the pain pump litigation. She has testified at two pain pump trials to date. Nevertheless, defendants claim that Dr. Parisian is not qualified to testify and that her opinions are neither reliable nor relevant. But if defendants were correct, then no regulatory expert would ever be permitted to testify in a medical device case. Dr. Parisian is extraordinarily well qualified and knowledgeable about FDA regulations, particularly as they pertain to medical devices. For the reasons stated below, defendants' motion to exclude her should be denied.

Defendants have also moved to exclude Dr. Charles Beck from testifying on FDA regulations, adequacy of labels and the standard of care. However, plaintiff does not intend to offer Dr. Beck for those opinions. Dr. Beck's testimony will be limited to medical causation and the facts concerning his and Dr. Hansen's study of their 152 patients' shoulder surgeries. Therefore, defendant's motion as to Dr. Beck should be denied as moot.

## II FACTUAL BACKGROUND

Plaintiff presents Dr. Parisian as her regulatory expert to testify concerning the actions of I-Flow and DJO in the context of their regulatory responsibilities in testing and marketing their pain pumps. Specifically, Dr. Parisian will provide expert testimony regarding the following: (1) the role, procedure and function of the FDA and medical device manufacturers; (2) The duties and responsibilities of defendants to obtain FDA clearance for their pain pumps in the United States for post-operative pain management and to market safe and effective devices; and 3) the duties and responsibilities of defendants to protect the public by monitoring device performance (including proper studies and follow-up on side effects) and communication of the risks attendant to the use of their devices. *See* Ex. 01, Parisian report at p.9 (May 27, 2009).

Dr. Parisian is a physician who is board-certified in anatomic and clinical pathology. Dr. Parisian holds a Masters Degree in biology. Ex. 01, Parisian report at ¶ 1. From 1991 to 1995, Dr. Parisian was assigned to the FDA while serving as a commissioned officer in the United States Public Health Service. *Id.* at ¶ 2. She began her tenure with the FDA as a Medical Officer in the Office of Health Affairs, a staff office within the Center for Devices and Radiological Health. *Id.*at 3. Her responsibilities included health hazard and risk assessments for medical devices and drugs, review of medical literature and product labeling, review of promotions, advertising and corporate records for compliance with the Food, Drug and Cosmetic Act ("FDCA"). *Id.*

Dr. Parisian also trained medical officers and scientific reviewers at the FDA on the agency's application process, clinical trials, labeling evaluation, annual report requirements, adverse event reporting, and both methods and procedures for health risk assessments and health hazards evaluations pursuant to 21 CFR Part 7. *Id.* at ¶¶5-6. Dr. Parisian attended medical meetings in her official capacity at the FDA, presenting the FDA's interpretation of food and drug laws as they pertain to medical products, as well as the roles of the manufacturer and health care providers. *Id.* at ¶ 8.

Dr. Parisian later became a Medical Officer, and then Chief Medical Officer, in the FDA's Office of Device Evaluation. *Id.* at ¶ 7. As a Medical Officer, she participated in the review of proposed clinical trials and pre-marketing applications for medical devices, including the review of animal toxicology and biocompatibility data. *Id.* Dr. Parisian was also an instructor at the agency's staff college, where FDA reviewers were trained in the design and evaluation of clinical data in investigational and premarketing applications. *Id.* at ¶ 8. In addition, Dr. Parisian presided over 162 health risk assessments, was responsible for reviewing adverse event reports, participated in mandatory recalls and served as the FDA's expert witness

in Congressional hearings. She has received numerous citations and honors for her service. *Id.* at ¶ 9-11.

While at the FDA, Dr. Parisian advised and trained other FDA employees on reviewing the facts of a case or issue, the requirements of the FDCA and how to make a determination to a reasonable degree of medical certainty regarding the clinical impact of the agency's actions on the public. She also assisted in drafting FDA guidance documents for the industry, which explain the requirements and best practices for obtaining marketing approval from the FDA. She also drafted FDA Safety Alerts directed to healthcare providers and their patients. In addition, Dr. Parisian was responsible for reviewing product marketing applications, clinical trials, medical literature, reports of post-marketing experience, as well as reviewing available manufacturing documents gathered or provided to the FDA by manufacturers or other regulatory agencies. After conducting these reviews, Dr. Parisian made a clinical determination and recommended the courses of action available to the FDA to protect the public health. *Id.* at ¶¶ 8-13.

Since leaving the FDA in 1995, Dr. Parisian continues to consult with individuals, pharmaceutical manufacturers and organizations and law firms regarding FDA regulations. Topics of consultation include adverse event reports, labeling, and both pre-market and post-market applications for devices, biologics and drugs. She is also an invited lecturer and consultant to pharmaceutical companies regarding FDA regulations addressing pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action ("CAPA") and Good Manufacturing Practices ("GMP"). *Id.* at 14.

Dr. Parisian has published a textbook on the FDA and how it functions. *Id.* at ¶ 1. Her book, FDA INSIDE AND OUT (Fast Horse Press 2001) is now the graduate student textbook in the Biomedical Ph.D. program at Wayne State University and Colorado State University. Dr. Parisian's textbook has not only been recognized by academics, but also praised by reviewers

in the medical community. In the August 28, 2002 issue of the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION ("JAMA"), Dr. James P. Morgan of Beth Israel Deaconess Medical Center praised Dr. Parisian's book stating, "The reader who spends any significant amount of time perusing this book will learn something new about the FDA or some new approach to this complex organization that is so critical to safeguarding the foods and drugs we use daily."

For the past 18 years, Dr. Parisian has provided forensic litigation support for both plaintiffs and defendants. As described below, her methodology has routinely survived scrutiny under Rule 702 in matters involving both medical devices and pharmaceutical drugs.

## III ARGUMENT

Despite Dr. Parisian's unique and impressive credentials, defendants attack her qualifications and opinions. None of these attacks have merit.

### A. <u>As a Physician, Dr. Parisian Is Qualified to Explain the Medical Implications of Medical Device 510(k) Applications for New Uses, the Studies Needed for Approval and the Impact of Adequate Warnings.</u>

Defendants contend that Dr. Parisian's credentials as a physician do not qualify her to testify on medical issues. On the contrary, Dr. Parisian's medical degree, and her work as a Medical Officer at the FDA, permit her to explain to the jury both the regulatory and medical significance of exposing a medical device to a part of the anatomy without testing it for safety. Defendants forget that Dr. Parisian is board certified in anatomic and clinical pathology. She has expertise in advising medical device companies on the types of studies needed to obtain approval, either as a new device (premarketing approval or "PMA") or as a device that is substantially equivalent to one that has previously been approved ("510(k)").

To be clear, plaintiffs do not proffer Dr. Parisian to testify about causation. However, she should be allowed to educate the jury about the types of studies the FDA requires to demonstrate the safety of medical devices for new uses in specific parts of the body in order to obtain approval or "clearance." As a medical doctor, Dr. Parisian can describe why infusions from a

pain pump are potentially toxic to the shoulder joint as opposed to other anatomical systems. Accordingly, she can explain to the jury why 510(k) approval of pain pumps for use in the joint space requires a separate medical review by the scientists in the FDA's Orthopedic Devices Branch or the Office of Drug Evaluation. Dr. Parisian is also qualified to explain how part of this process involves reviewing the relevant published medical literature for any safety signals that might affect the performance of the medical device in the human body.

In addition, Dr. Parisian is qualified to express her opinions on the language of medical device labels and their effect on prescribing doctors. Not only does Dr. Parisian have experience drafting and approving medical device labels, but as a medical doctor, she also is familiar with physicians' expectations that device manufacturers will provide complete and accurate information about their products' safety and regulatory status.

**B. <u>Defendants' Claim of "Litigation Bias" is Unfounded.</u>**

Disingenuously, defendants argue that Dr. Parisian's opinions are unqualified and unreliable because even a current FDA employee is not necessarily knowledgeable about the agency's complex regulatory scheme. Further, defendants charge, because Dr. Parisian has not worked at the FDA for several years, she is even less qualified. Defendants overlook the fact that the FDA prohibits current employees from testifying in litigation, particularly if it pertains to drugs or medical devices for which they have had direct oversight. Former FDA employees may, and often do, consult as litigation experts – primarily for the pharmaceutical and medical device industry. Defendants' regulatory expert, Bill Damaska, is one example. Like Dr. Parisian, Mr. Damaska used to work at the FDA. Like Dr. Parisian, he has his own consulting business. Mr. Damaska, though, works almost exclusively for medical device manufacturers. In the narrow field of FDA regulatory expertise, practically every expert is considered a "litigation expert." Defendants make no apologies for hiring FDA experts who work exclusively for their industry clients. Plaintiff's experts should not be held to a different

standard. If Dr. Parisian lacks the qualifications and expertise to testify, so does defendants' expert.

### C. Numerous Courts Have Approved Dr. Parisian's Qualifications and Testimony on Similar Subject Matter.

Courts throughout the country have denied similar *Daubert* motions by device and drug company defendants to exclude Dr. Parisian's testimony, including in the pain pump litigation. Significantly, defendants failed to alert the Court to a recent decision in *Paugh et al. v. I-Flow*, No. 32D02-0802-CT-9 (Hendricks Cnty. Super. Ct. No. 2, Ind. Apr. 19, 2010) (attached as Ex. 02). In *Paugh,* defendant I-Flow moved to exclude the regulatory opinion testimony of Dr. Parisian and Dr. Pence. The court rejected the identical arguments I-Flow makes here, holding:

> The Court finds the testimony of Peggy Pence and Suzanne Parisian could assist the jury in understanding the complex regulatory scheme applicable to medical devices. Their testimony relies upon the relevant literature, internal I-Flow documents, government documents and deposition testimony. Their testimony demonstrated numerous opportunities I-Flow had to advise surgeons about the risks of chondrolysis, but that they failed to do so.

*Id.* at 6.

In *Schott v. I-Flow,* No. 1:08-CV-00323, 2010 WL 1008478 (S.D. Ohio Mar. 16, 2010), the court denied I-Flow's motion to exclude the testimony of Dr. Pence, a similarly credentialed and qualified regulatory expert whose opinions and factual foundation are essentially the same as those of Dr. Parisian. *Id.* at *6. Over defendant I-Flow's objection, Dr. Parisian was deemed qualified to testify at trial in Portland, Oregon last January, in *Beale v. I-Flow Corp.*, No. 0801-01554 (Multnomah Cnty. Cir. Ct., Or).

Defendants misrepresent various court decisions to suggest that Dr. Parisian has been regularly excluded from testifying as an FDA expert. In fact, the opposite is true. In fact, Dr. Parisian's regulatory opinions have been routinely admitted. In fact, Dr. Parisian has been admitted to testify in court on 23 different occasions in the past four years. Recently, for

example, the MDL court for the Fosamax litigation held that Dr. Parisian's testimony was both reliable and helpful to the jury:

> The Court further finds that Dr. Parisian has followed an appropriate methodology. An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience. Here, Dr. Parisian has drawn conclusions about Merck's conduct based on her review of pertinent portions of the regulatory findings for Fosamax and Merck's internal company documents. This is the methodology she applied as a Medical Officer, and Merck's regulatory experts have followed the same methodology to prepare their reports.

*In re: Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190-91 (S.D.N.Y. 2009).

Similarly, the court in *In re: Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2007 WL 1964337 (D. Minn. Jun. 29, 2007) held that Dr. Parisian was allowed to testify "as to the general nature of the approval and regulatory process including compliance with FDA regulations and guidelines, the FDA's general expectations with respect to testing and marketing of new products, Guidant's actions in that respect, and her opinion as to whether Guidant's actions were reasonable and appropriate." *Id. See also In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, MDL No. 1909, 2010 WL 1796334, at *13 (N.D. Ohio May 4, 2010) (holding Dr. Parisian may offer testimony regarding development, testing and post-marketing surveillance of prescription drugs, as well as an opinion as to defendant's compliance with FDA regulations); *Lillebo v. Zimmer, Inc.*, No. 03-2919-JRT/FLN, 2005 WL 388598, at *6 (D. Minn. Feb. 16, 2005) (holding that Dr. Parisian's opinions as to whether medical device manufacturer complied with FDA labeling regulations were based on reliable methodology).

Defendants misleadingly cite *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644 (D.N.J. 2008), suggesting that Dr. Parisian's opinions on FDA compliance were excluded. However, in that case, Dr. Parisian was testifying as a general causation expert, not a regulatory expert. The court held she lacked sufficient expertise on transmission of cancer through bone tissue. Defendants also cite *In re Prempro*, 554 F. Supp. 2d 871, 878 (E.D. Ark. 2008) to argue

that Dr. Parisian's regulatory opinions were excluded. That was not the case. The basis for exclusion was plaintiff's use of Dr. Parisian's testimony to establish culpability of defendant Wyeth in the punitive damages phase. The court simply held that the plaintiffs improperly used a non-employee expert witness to lay foundation for evidence of wanton conduct of the defendant. The court did, however, permit her to testify along the same lines as the above cited cases regarding applicability of FDA regulations and whether the defendant complied with them. The court in *Trasylol*, 2010 WL 1737107 (S.D. Fla. Apr. 27, 2010) cited to the *Prempro* court's ruling on the punitive damages phase. It is important to note that Dr. Parisian's regulatory testimony has been admitted in several subsequent Prempro trials.[1]

Defendants also mention *Oakberg v. Zimmer*, 2004 WL 5503779 (D. Mont. Nov. 23, 2004), *aff'd*, 2006 WL 3478318 (9th Cir. Dec. 1, 2006). However, in that unpublished opinion, the court's order contained no analysis or reasoning to explain why it precluded Dr. Parisian from testifying. Based on the court's refusal to admit evidence that the defendant violated FDA regulations, it is plausible that her testimony was excluded on federal preemption grounds – which, as explained below, do not apply to this case.

In sum, the vast majority of courts that have heard similar *Daubert* challenges by defendants to the FDA regulatory opinions offered by Dr. Parisian have consistently ruled that she is qualified to testify to the following issues: (1) the complex regulatory framework governing the approval, labeling, advertising and marketing of pharmaceutical and medical products; (2) the FDA's process for determining safety and efficacy of medical devices, including safety testing, monitoring and reporting; (3) FDA requirements for the development of

[1] Dr. Parisian has recently testified in four Prempro trials consolidated before Judge Sandra Moss in the Court of Common Pleas in Philadelphia County: *Simon v. Wyeth*, No. 040604229 (April 2007); *Kendall v. Wyeth*, No. 04-0965 (October 2009); *Singleton v. Wyeth*, No. 05-02885 (Jan. 2010); *Foust v. Wyeth* (Feb. 2010).

product labeling and marketing; and (4) the manufacturer's responsibility to comply with FDA regulations and guidelines. *Schott*, 2010 WL 1008478, at *5; *Paugh*, Ex. 02, at 6.

**D. <u>Dr. Parisian Is Qualified to Testify Concerning the Adequacy of the Pain Pump Label.</u>**

Defendants contend that Dr. Parisian's medical degree does not qualify her as an expert on the adequacy of warnings on device labels. But defendants ignore the obvious fact that while she was at the FDA, Dr. Parisian was involved in drafting and reviewing product labeling, and she trained FDA employees how to do so. Ex. 01, Parisian Report at ¶¶ 8-12. Dr. Parisian's textbook devotes considerable attention to FDA labeling requirements. As both a physician and an expert on FDA labeling compliance, Dr. Parisian is well qualified to render a technically reliable opinion on the quality and adequacy of defendants' pain pump label and the warnings (and the lack thereof) within them.

The cases defendants rely on are easily distinguished. In *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 (10th Cir. 2001), the court found that an orthopedic surgeon was not qualified to testify on the adequacy of the defendant's medical device (a bone nail) because she had no experience drafting a warning label for a product of any type. *Id.* Similarly, in *Lemmermann v. Blue Cross Blue Shield of Wis.*, No. 08-CV-0779, 2010 WL 2016848 (E.D. Wis. May 18, 2010), the court held that the plaintiff's causation witness could not opine on the defendant chemical company's negligence for failure to warn because he had no expertise in the field of warnings. In contrast, Dr. Parisian's testimony does not suffer from these deficiencies because she has direct and relevant experience with medical labels and reviewing their contents for compliance with FDA regulations.

Defendants also misrepresent to the Court the holding in *Reece v. AstraZeneca Pharms., LP*, 500 F. Supp. 2d 736 (S.D. Ohio 2007). Defendants cite only to the passage finding that Dr. Parisian was not qualified to testify as a causation expert witness on chronic pain or renal



129562_1.DOC

failure. *Id.*at 745. Misleadingly, defendants omit the district court's holding that Dr. Parisian's testimony on regulatory issues, including the adequacy of labeling:

> The court finds that Dr. Parisian's testimony is admissible insofar as she seeks to testify concerning the matters which plaintiff has identified as the subject of her testimony, i.e., regulations governing the approval, labeling, advertising and marketing of pharmaceutical and medical products; the processes by which the FDA determines the efficacy and safety of new products and new drug applications; the issues the FDA considers in the development of product labeling and marketing information; and a manufacturer's responsibility within this system.

*Id.* at 744.

Given Dr. Parisian's impressive background and experience with medical device labels and the widespread approval of her testimony on the matter by numerous courts, Defendants cannot credibly argue that Dr. Parisian lacks the qualifications to testify on the adequacy of the pain pump label.

### E. <u>Dr. Parisian's Opinions Are Reliable and Helpful, and Her Testimony Is Based on a Thorough and Accurate Factual Foundation.</u>

Defendants next accuse Dr. Parisian of employing "no methodology" in forming her opinions. I-Flow Br. at 9. Most puzzling, defendants claim that Dr. Parisian did not implicate I-Flow "*a single time*" for disregarding its duties of care. *Id.* It is evident that defendants did not actually read Dr. Parisian's report. Her opinions could not be more complete.

After describing her qualifications, Dr. Parisian began her report by explaining the purpose of her report and how it was organized. Ex. 01, Parisian Report at ¶¶ 16. She then provided an executive summary of her opinions, *id.* at ¶¶ 17-22, followed by a statement of her opinions, organized by issues, at pages 12-14. Dr. Parisian next provided a detailed overview of the FDA's function and oversight of medical devices, which included a thorough explanation of the applicable regulations and guidances. *Id.* at ¶¶ 23-78.

Dr. Parisian's report devoted roughly 36 pages to I-Flow's deviations from its duties of care as set forth in the FDA regulations. In each instance, she explained how I-Flow violated

these regulations and identified the specific documents she relied on to support her opinions. The first 25 of those pages describe I-Flow's multiple attempts to secure 510(k) clearance for use of the pain pumps in the intra-articular (joint) space, how the FDA repeatedly denied clearance for that use, and I-Flow's efforts to promote its pain pumps for use in the joints space. In addition, I-Flow engaged in clinical studies of its pumps in the joint space without obtaining approval by the FDA. *Id.* at ¶¶ 126-190. The report also documents other deviations from the regulations: I-Flow's failure to adequately investigate complaints of chondrolysis, *id.* at ¶¶ 288-307; its failure to warn physicians of the risk of chondrolysis, *id.* at ¶¶ 308-314; and that it caused local anesthetic manufacturers' drugs to be mislabeled. *Id.* at ¶ 315.

Beyond preparing an exquisitely detailed report, Dr. Parisian also sat for multiple depositions spanning five full days. Various defendants, including I-Flow and DJO, quizzed her at length about the particulars of her report, leaving no stone unturned. Defendants have no basis to claim that Dr. Parisian's methodology or the facts supporting her opinion are incomplete or otherwise unsound.

To muddy the waters, defendants argue that Dr. Parisian is unqualified to testify on subjects for which plaintiff is <u>not</u> offering her. For one thing, Dr. Parisian does not intend to testify as an expert on causation. As a medical doctor, however, Dr. Parisian is entitled to – indeed obligated – to read and understand the relevant medical literature so that she can identify whether unexpected adverse events reported in the field, known as "signals," require further investigation by the manufacturer and distributor. Mindful of the limitations Rule 702 place on her opinions, plaintiff will confine Dr. Parisian's testimony to her area of expertise, which is FDA regulatory and labeling compliance. Furthermore, Dr. Parisian will not express opinions as to I-Flow's or DJO's state of mind or intent based on a reading of documents and corporate witness testimony. She will not testify in a "narrative" form. Nor will she offer any testimony or opinions at trial that the defendants deliberately engaged in wrongful conduct, or words to that

effect. She may, however, refer to such evidence in expressing her opinions as to whether I-Flow and DJO met or departed from their duties of care under applicable FDA regulations and industry standards. Dr. Parisian may also refer to documents and testimony by explaining the regulatory context of the subject matter. Contrary to defendants' assertions, the same contours of Dr. Parisian's testimony have been deemed admissible by numerous courts,[2] including in the pain pump litigation.

**F. <u>Defendant's "Fraud on the FDA" Defense Does Not Apply to this Case.</u>**

Defendants contend that evidence that defendants made misrepresentations to the FDA is barred under the federal preemption doctrine pursuant to *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). I-Flow Br. at 11. To be clear, Dr. Parisian will not testify that defendants intended to lie to the FDA. However, she should be permitted to point to evidence that I-Flow and DJO violated FDA regulations by assuring the FDA that pain pumps were not being used or promoted for use in the joint space, as well as actively marketing their pain pumps for that very use, even though it was prohibited.

The *Buckman* case provides no umbrage for defendants. In *Buckman,* plaintiffs alleged a stand-alone claim of "fraud-on-the-FDA." They claimed that, but for the defendant's fraudulent concealment of safety data, the FDA would never have approved the defendant's pedical screw medical device. Ultimately, the Supreme Court held that plaintiff's fraud-on-the-FDA claim was preempted because such claims "conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Buckman,* 531 U.S. at 350. The Court, however, distinguished *Buckman* from straightforward negligence actions arising

---

[2] Defendants cite the decisions in *In re Guidant* and *In re Fosamax* for the misleading proposition that those courts excluded Dr. Parisian's testimony. To the contrary, the courts in both cases permitted Dr. Parisian to testify, but limited the scope of her opinions to the same issues for which she is offered in this case: the regulatory process, guidelines and compliance, and the defendant's actions in that respect, as well as whether the defendant's actions were reasonable and appropriate. *In re Guidant,* 2007 WL 1964337, at *7-8; *In re Fosamax,* 645 F. Supp. 2d 164, 190-91.

from the manufacturer's alleged failure to use reasonable care. In such cases, the defendants' liability does not arise solely from an FDA violation. *Id.* at 352-53. Nor would plaintiff's proof depend on speculation as to what the FDA would have done had it been aware of the alleged fraud. *Id.* at 354.

Here, plaintiff does not allege a "fraud-on-the-FDA" claim. She is merely presenting proof of defendants' negligence with evidence that they failed to meet even minimum duties of care as imposed by parallel state and federal requirements. More recently, the Supreme Court clarified that the existence of a regulatory scheme governing the approval of medical devices "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008).[3]

**G. <u>Dr. Parisian Does Not Offer Legal Conclusions.</u>**

Quoting from a decision from the District of Colorado, *Myers v. Mid-West Natl. Life Ins. Co.*, No. 04-cv-00396-LTB-KLM, 2008 WL 4002429, at *2 (D. Colo. Aug. 25, 2008), I-Flow argues that Dr. Parisian's testimony should be excluded because it offers little more than a legal conclusion on the ultimate issue will usurp the function of the jury and the judge. I-Flow Br. at 13-14. I-Flow's argument is misplaced.

It is well settled that "[a]n expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience." *In re Fosamax*, 645 F. Supp. 2d at 190. The bar to exclude expert testimony "is invoked to exclude expert testimony <u>about the applicable law that governs the case</u>." 645 F. Supp. 2d at 191, fn. 16 (emphasis added). Because

[3] Moreover, as the Supreme Court made clear in *Riegel*, medical device claims are not necessarily barred by preemption to the extent they involve devices that were marketed pursuant to a 510(k) approval. The Court found that the focus on 510(k) approval is on "substantial equivalence," not safety and efficacy. *Riegel*, 522 U.S. at 322-23. Here, the facts militate further against preemption, because when the FDA approved defendants' 510(k) application for pain pumps, on three separate occasions, it explicitly denied clearance for indications for use in the synovial cavity (joint space).

the claims in *In re Fosamax* were "not governed by federal regulations but by state law theories of negligence and strict liability," the court permitted the expert's testimony on the defendant's compliance (or lack thereof) with the federal regulation by finding that such evidence would be helpful to the jury in determining whether the defendant's actions were "reasonably prudent" within these regulations. *Id*.

Similarly, in this case, plaintiffs do not allege claims governed by any federal regulations. Rather, they arise from state tort law, as did the plaintiff's claims in *In re Fosamax.* Dr. Parisian's report and opinions identify the safety signals that defendants knew or should have known regarding the potential of pain pumps to destroy shoulder joint cartilage. Dr. Parisian also identifies defendants' failure to warn the medical community that pain pumps were not approved for intra-articular use, were untested for that purpose, and could potentially harm patients. To express her opinion, it is important that Dr. Parisian set forth the precise duties and obligations that a drug manufacturer bears so that a jury may understand precisely how the FDA oversees device manufacturers and what responsibilities the agency imposes on them to ensure that their devices are safe and effective. As her report demonstrates, Dr. Parisian is describing an industry standard, not a legal one. Indeed, as the Supreme Court stated in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009), FDA regulations impose minimum standards as a "floor" upon which state tort law can build to protect the safety of its citizens. *Id.* at 1202.

Indeed, a "witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms. *Peckham v. Cont'l Cas. Co.*, 895 F.2d 830, 837 (1st Cir. 1990); *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*,668 F.2d 725, 731 (3d. Cir. 1981). Moreover, as the MDL court held in the *Fosamax* litigation, the ultimate legal outcome is not governed by the law contained in the Code of Federal Regulations:

> **The Court disagrees with Merck that expert testimony about FDA regulations and procedures would "usurp either the role**

> **of the trial judge** in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Unites States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). **This principle is invoked to exclude expert testimony about the applicable law that governs the case.** *See, e.g., United States v. Scop*, 846 F.2d 135, 139-40, *modified*, 856 F.2d 5 (2d Cir. 1988) (in criminal prosecution for violation of securities laws, overruling admission of expert's testimony that defendants' conduct amounted to a manipulative fraudulent scheme within the meaning of the securities laws); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510-11 (2d Cir. 1977) (in dispute over whether defendant breached its contractual obligation to use best efforts, overruling admission of expert's interpretation of the meaning of best efforts within the contract); *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (in action seeking penalties for violation of airline regulations, affirming exclusion of expert's testimony about the meaning and applicability of airline regulations). **The cases in this MDL are not governed by federal regulations but by state law theories of negligence and strict liability.** Expert testimony on regulatory compliance will assist the jury in determining whether Merck acted as a reasonably prudent pharmaceutical manufacturer. The Court will instruct the jury that it must take the law from the Court and not from any witnesses.

*In re Fosamax*, 645 F. Supp. 2d at 191 n. 16 (emphasis added).

Here, Dr. Parisian will not express opinions that defendants were "negligent" or "broke the law," or words to that effect. Rather, she will testify as to whether defendants' actions complied with, or deviated from, pertinent regulatory requirements. Again, before the jury, Dr. Parisian will not present a "narrative" as the way her report reads. As the *Fosamax* court directed, "Dr. Parisian's commentary on any documents and exhibits in evidence will be limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Id.* at 192.

### H. Dr. Parisian's Opinions Concerning DJO Are Reliable and Relevant Because FDA Regulations Apply with Equal Force to Companies that Repackage and Relabel Medical Devices.

In its Joinder to I-Flow's motion to exclude Dr. Parisian, defendant DJO claims that because it is a "distributor," not a "manufacturer," Dr. Parisian wrongly opines that DJO is subject to liability under FDA regulations. DJO Br. (Doc. No. 247). DJO is not only mistaken

about its regulatory duties; its selective parsing of FDA terminology demonstrates the need for a qualified expert such as Dr. Parisian to assist the jury in understanding how the regulations apply to DJO.

Although DJO denies any responsibility to the FDA, the company has registered several of its entities with the FDA. In fact, counter to DJO's assertions, DJO is identified to the FDA as a "Manufacturer," "Contract Manufacturer," "Repackager," "Relabeler" and "Specification Developer" for products other than pain pumps, even though DJO placed its "DonJoy" label on pain pumps manufactured by I-Flow. *See* Ex. 01, Parisian at ¶¶ 87, 126.

21 C.F.R. § 8210.3 defines a "manufacturer" as "any person who designs, manufactures, fabricates, assembles, or processes a finished device. *Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions*." *Id.* at ¶ 57. Because DJO relabeled, repacked and sold I-Flow's pain pumps under its own name "DonJoy," DJO fell under the rubric of "manufacturer" and was obligated to comply with FDA safety regulations, which governed medical device reporting, labeling, promotions and other activities.

As Dr. Parisian explains, it is a Prohibited Act and a violation of Section 21 U.S.C. 301 of the FDCA for anyone "to introduce or deliver into interstate commerce any drug or device that is adulterated or misbranded. As a relabeler of pain pumps, DJO received from I-Flow, in interstate commerce pain pumps that were misbranded and adulterated for intra-articular use. During that time, DJO was aware that the pain pumps it received and relabeled with the "DonJoy" sticker were not approved by FDA for intra-articular use, yet it failed to reveal this information, either to physicians to its own sales representatives, or to its distributors, as required by Section 21 U.S.C. 321(n) and 21 C.F.R. 1.21. Ex. 01, Parisian Report at ¶ 100.

It strikes plaintiff as disingenuous that DJO would pretend that it was an innocent seller when, in fact, DJO's supply agreement with I-Flow as exclusive distributor was premised on I-Flow's obtaining FDA clearance of the pain pumps for placement of the catheter in the synovial cavity. *Id.* at ¶ 194, 199-200. DJO knew that the pain pumps had not obtained this clearance; nevertheless, it represented to the public that the device had been approved for orthopedic surgery applications. *Id.* at ¶ 136, 137, 195, 196, 197, 203, 204. DJO even funded a clinical trial to support its claims that pain pumps were safe and effective for intra-articular use. *Id.* at ¶¶ 214-220. DJO was also required by law to have procedures for training personnel, monitoring the medical literature, take "Corrective and Preventive Action (CAPA), component acceptance, complaint investigation and filing of mandatory Medical Device Reports, and update and review the labeling. *Id.* at ¶ 193.

## IV CONCLUSION

I-Flow is transparent in its acrimonious dislike for Dr. Parisian's opinions and the voluminous evidence she cites of I-Flow's noncompliance with FDA regulations. Likewise, DJO vigorously disputes Dr. Parisian's conclusion that it was subject to FDA oversight and compliance. But disagreements with the expert's conclusions are not a valid basis for exclusion of expert testimony under Rule 702, as long as the expert's methodology was reliable. Dozens of courts have approved of the methodology employed by Dr. Parisian and the factual foundation for her opinions. Accordingly, plaintiff asks the Court to deny defendants' motion to exclude Dr. Parisian's regulatory opinion testimony, and to deny as moot their motion to exclude Dr. Beck's testimony.

Dated: July 28,2010.

Respectfully submitted,

By:/s/ Leslie W. O'Leary
Leslie W. O'Leary, OSB No. 99090
loleary@wdolaw.com
Michael L. Williams, OSB No. 78426

mwilliams@wdolaw.com
Thomas B. Powers, OSB # 98393
tpowers@wdolaw.com
Heather A. Brann, OSB #040495
hbrann@wdolaw.com
WILLIAMS LOVE O'LEARY & POWERS, P.C.
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 295-2924
Facsimile: (503) 295-3720

Laura B. Kalur, OSB No. 023424
lbkalur@kalurlaw.com
Kalur Law Office
9755 SW Barnes Road, Suite 450
Portland, OR 97225-6681
Telephone: (503) 595-4145
Facsimile: (503) 295-3720

D. Robert Jones, CSB No. 25393
Jones@drjpc.com
D. Robert Jones, PC
219 West Colorado Ave Suite 210
Colorado Springs, CO 80903
Telephone: (719) 630-1556
Facsimile: (719) 630-7004

Ernest Franklin Woodson, ASB No. 0479-W66E
frank.woodson@beasleyallen.com
Beasley Allen Crow Methvin Portis & Miles, P.C.
234 Commerce St.
Montgomery, AL 36104-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was served electronically via the Court's electronic filing system on the 28th day of July, 2010, according to this Court's provision for service on the following:

Jeffrey R. Pilkington, Esq.
jeff.Pilkington@dgslaw.com
Jordan Lipp, Esq.
Jordan.lipp@dgslaw.com
Davis Graham & Stubbs LLP
1550 – 17th Street, Suite 500
Denver, CO 80202

Chad J. Layton, Esq.
clayton@smsm.com
Erin N. Graham, Esq.
egraham@smsm.com
Segal McCambridge Singer & Mahoney, Ltd.
233 South Wacker Drive
Sears Tower, #5500
Chicago, IL 60606-6306

*Attorneys for I-Flow Corporation*

Brett Marshall Godfrey, Esq.
godfrey@godlap.com
James A. Johnson
johnson@godlap.com
Godfrey & Lapuyade, PC
9557 S. Kingston Court
Englewood, CO 80112

Marilyn Nuir Jager, Esq.
mjager@mpplaw.com
Morris Polich & Purdy LLP
1055 West Seventh Street, 24th Floor
Los Angeles, CA 90017

*Attorneys for DJO, Incorporated f/k/a DJ Orthopedics, Inc.*

WILLIAMS LOVE O'LEARY & POWERS, P.C.

/s/ Leslie W. O'Leary
Leslie W. O'Leary, OSB No. 99090
loleary@wdolaw.com

cc: Co-counsel