# EXHIBIT 1

# EXPERT REPORT

## SUZANNE PARISIAN, M.D.

## I. QUALIFICATIONS

1. Since August 1995, I have been President and founder of MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the United States Food and Drug Administration's regulation of products. I received my Medical Degree (M.D.) from the University of South Florida in 1978 and have been Board Certified in Anatomic and Clinical Pathology since 1989. I have been a general practitioner and President of Mountain Emergency Physicians. I received a Masters in Biology from the University of Central Florida. I am the author of FDA Inside and Out, a text about the FDA.

2. From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander. During that time period, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the Food and Drug Administration ("FDA"). Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology ("AFIP"), Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3. From 1991 to 1993, I was a FDA Medical Officer in the Office of Health Affairs (OHA), a staff office within the Center for Devices and Radiological Health (CDRH), FDA. In OHA, I provided regulatory support to both the FDA's Office of Compliance and Office of Device Evaluation. My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports and medical literature and review of product labeling, promotions, advertising, and

corporate records as to compliance with the Food, Drug and Cosmetic Act. I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of voluntary reports submitted by health care providers, patients and others. I presided over 162 health risk assessments convened to advise the FDA on overall health risk issues for the public and made recommendations to the FDA regarding the subsequent regulatory actions which should be undertaken by the FDA, health care providers, users groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and participated in an administrative hearing as the FDA's expert witness. While in OHA, I was assigned primary responsibility for both anesthesia and orthopedic product issues.

4. There are two examples of drug safety issue that I helped identify and manage for the FDA as its medical officer. The first was an anesthetic drug and device combination that resulted in FDA's issuance of a May 29, 1992 Safety Alert titled: *Cauda Equina Syndrome Associated with Use of Small-Bore Catheters in Continuous Spinal Anesthesia*. The Safety Alert was sent from FDA directly to Anesthesia Care Providers, Hospital Administrators, Hospital Pharmacists and Risk Managers:

> This is to alert you to serious hazard associated with continuous spinal anesthesia, Since December 1989, following initial marketing of small-bore catheter (27 gauge or smaller), FDA has received 11 reports of cauda equina syndrome in which small-bore catheters were used to deliver 5% lidocaine with 7.5% glucose to the intrathecal space. Recent cases have also been reported in the medical literature. This compares with one reported case of cauda equina syndrome associated with the use of larger-bore catheters since 1984...
>
> We are concerned that the use of small-bore catheters in continuous spinal anesthesia is increasing, and thus that the potential for new cases of cauda equine syndrome associated with technique may be increasing. **Because of these safety concerns, we are advising against the use of <u>any</u> small-bore catheter for**

> **continuous spinal administration of any local anesthetic agents**. Please note that this Safety Alert is not directed towards catheters used for other types of drug delivery such as epidural anesthesia, of the use of 5% lidocaine with 7.5% glucose as a single-dose spinal anesthetic injection.
>
> **We are also taking action to remove from the market all small –bore catheters distributed for continuous spinal anesthesia**…
>
> If drug or device manufacturers, medical facilities, or physician groups wish to conduct controlled clinical studies demonstrating the safety and efficacy of a specific local anesthetic for continuous spinal anesthesia using small-bore catheters, FDA will consider Investigational New Drug (IND) and Investigational Device Exemption (IDE) applications.
>
> **Please share this Safety Alert with colleagues who are involved in anesthesia delivery or follow-up care**. If you have medical questions pertaining to this subject please contact: Suzanne Parisian, M.D.….

5. The second drug safety issues involved reports in FDA's databases and the medical literature of serious adverse events and deaths occurring in patients taking daily ACE Inhibitor (ACEI) drugs for control of hypertension who had their blood exposed to certain types of device membrane surfaces. From reviewing the Adverse Event Reports ("AERs"), both CDER's and CDRH's, the patients shared common events: 1) extracorporeal circulation of blood; 2) ingestion of an ACEI drug; 3) followed by a life-threatening anaphylactoid reaction. ACEI had been a class of popular antihypertensive drugs first approved by the FDA in the 1980s. They were approved with relatively limited safety information.

6. When patients had taken an ACEI near the period of blood exposure to specific types of device membrane surfaces, for example hemodialysis or LDL apheresis, a sudden life-threatening anaphylactoid reaction could be triggered. The event was unique in that it was not a typical allergic reaction, it did not respond to antihistamines but required epinephrine. As the FDA's medical officer, I reviewed both drug and device adverse event reports, the medical literature and performed a health risk assessment (21 C.F.R. Part 7.4), and then made a clinical

recommendation to FDA as a reasonable degree of medical certainty. As a clinician I felt that health care providers needed to be quickly informed by FDA of the potential interaction between membranes and timing of ACE I ingestion as well as the way to treat a patient and prevent death. I also felt as a FDA medical officer that both the drug and medical device industry needed help to identify the etiology of the reaction and improve label warnings for health care providers. No other FDA medical officer was assigned or involved in the work-up or handling of this drug/device safety issue. Working with an FDA epidemiologist, I helped design and issue the Agency's epidemiologic study to quickly obtain additional safety data for FDA. The epidemiology study was obtained as a questionnaire contained in FDA's Safety Alert. It was designed to capture essential risk information and to inform health care providers, raise awareness and protect patients. As a result of the project in 1992, both the involved devices labels and the current ACEI class drug labels warn physicians about the combined risk of membrane surface exposure, timing of ACE I dosing and potential for anaphylactoid reaction.

7. From March 1993 to December 1993, I was a Medical Officer in the Office of Device Evaluation (ODE), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology (DRAERD), FDA; from January 1994 through June 1995, I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for pre-marketing evaluation of new product applications and clinical trials to support safety and effectiveness to begin legal marketing within the United States. In ODE, I participated in the review of proposed clinical trials, pre-marketing applications, including review of animal toxicology and biocompatibility data, in addition to the assigned responsibility of training new medical officers and scientific reviewers in application, clinical trial and labeling evaluation. I was the primary reviewing medical officer in charge of pre-marketing approval applications required for

adherence to CDER's Drug Guidances, and for presentation at the FDA Advisory Panel with members from CDRH and Center for Drug Evaluation and Research (CDER). I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling. I consulted as a medical officer on Investigational New Drug Applications ("INDs") for combination products including drugs and biologics. While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for heath risk assessments, health hazard evaluations, annual report, adverse event and labeling review.

8. I was an initial instructor in the FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and pre-marketing applications. I had primary responsibility for review of marketing applications, labeling and was required to teach medical officers the process for evaluation and review required by the Food, Drug and Cosmetic Act for support of product marketing. I was charged with training medical officers on the process for health risk assessment and health evaluation per 21 C.F.R. Part 7.

9. Regarding post-market surveillance of marketed products, I participated with the FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, labeling, product complaints and adverse event reports obtained by the FDA. I was the primary clinician involved in several of the FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services to the FDA. My awards have included Department of Health and Human Services and the Food and Drug Administration Employee of the Month.

10. I was sent by the FDA to serve as an official Agency representative to medical meetings and seminars to help identify and monitor conduct of manufacturers for potential

deviations from regulations governing promotional activities. At those interactions, I was required to provide official guidance as to the FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

11. While at the FDA, I helped draft agency documents, guidance documents regarding requirements for obtaining FDA's marketing approval, FDA Safety Alerts, provided the FDA comments for voluntary warnings and physician and user notifications, and agency comments on voluntary industry standards. I was a FDA liaison with the National Institutes of Health (NIH) for issues involving ENT, Renal, Respiratory, Women's Health, and Alternative Medicine. I was required to provide support to Health Care Financing Agency (HCFA now CMS) regarding the FDA's approval of product and issues involving hemodialysis. I was assigned responsibility for product adverse event reporting to the Department of Defense (DOD) and Veterans Administration.

12. One of my assigned responsibilities at the FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post-marketing experience, and available manufacturing documents gathered by the FDA or provided to the FDA by the manufacturer or other regulatory agencies, and then to use those facts to 1) make a clinical determination to a reasonable degree of medical certainty for FDA per the FDCA and; 2) recommend the next courses of action available to FDA to protect the public health. I was also required by the FDA to advise and train other FDA employees regarding the review of facts of a case or issue, the requirements of the Food, Drug and Cosmetic Act, and making a determination to a reasonable degree of medical certainty regarding the clinical impact of the agency's actions to the public. This was a process I was

trained in and required to perform for the FDA. The health risk assessment process is further described in 21 C.F.R. Part 7. During my tenure at the FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for evaluation, marketing and labeling review of new products. I organized national conferences with industry and physicians to discuss and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

13. At the Armed Forces Institute of Pathology (AFIP), Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and make a final determination: 1) to a reasonable degree of medical certainty, as to the cause of death, and 2) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as the FBI and CIA. While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths, occurring in military hospitals, to a reasonable degree of medical certainty, appeared to have been associated with unanticipated drug/device effects. I then reported my findings as a MedWatch report to the FDA. As an AFIP Medical Examiner, I was able to trigger the FDA to investigate a major drug regulatory safety action which resulted in the protection of public health.

14. After leaving the FDA, and founding MD Assist, Inc., I have continued to provide information to individuals, manufacturers, and organizations of the FDA's requirements, Adverse Event Reporting, and labeling of FDA-regulated products. Those products have

included INDs, NDAs, IDEs, PMAs, and 510(k) s for devices, biologics and drugs. I was requested by the FDA to participate in a 1997 panel of experts convened by the FDA to comment on changes proposed in the requirements for medical device labeling. I continue to consult for manufacturers, lecture at conferences and seminars regarding FDA, pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action (CAPA) and Quality Systems. I have been an online instructor for the Regulatory Affairs Professional Society (RAPS) course regarding FDA and Medical Devices.

15. Attached is a list of my last 5 years of deposition and court testimony APPENDIX 2 A copy of my most recent *Curriculum Vitae* is attached as APPENDIX 1. I receive $400/hr for study and $600/hr for deposition and trial testimony.

Attached are the following:

- APPENDIX 1: is a copy of my most recent C*urriculum Vitae;*
- APPENDIX 2: S. Parisian, M.D. Legal Court and Deposition Testimony Through 5 Years
- APPENDIX 3: Summary of Failure to Warn

## **<u>II. PURPOSE OF EXPERT REPORT</u>**

16. I hold the following opinions, based on my training, experience and education, to a reasonable degree of medical and professional certainty. I have used the same methodology I was first trained to use while as an FDA medical officer in terms of analysis of the pre-and postmarket documentation regarding intra-articular promotion of external infusion pain pump manufacturers and distributors: McKinley Inc ("McKinley"); 2) I-Flow Corporation ("I-Flow");

3) Stryker Instruments, Inc ("Stryker"); DJO, LLC ("DJO") and Pacific Medical ("Pac Med"). I have been asked to first provide a background about the role, procedures and function of the Food and Drug Administration ("FDA") and the role and obligations of manufacturers, relabelers and distributors for selling safe and effective products to healthcare providers for patients. The report has been divided into the following sections:

1. The role, procedures and function of the Food and Drug Administration (FDA) and medical device manufactures, relabelers and distributors.

2. The duties and responsibilities of external infusion manufacturers McKinley, I-Flow, Stryker, to obtain FDA clearance to infusion pumps in the United States for elective post operative pain management and to market safe and effective devices in the United States. (

3. The duties and responsibilities of companies selling pumps in the United States to protect the public by monitoring device performance and communication of risks.

## EXECUTIVE SUMMARY

17. My opinions are made to a reasonable degree of medical, scientific, and professional certainty. McKinley, I-Flow, Stryker, DJO and Pacific Medical each had an independent obligation and duty under the Federal Food Drug and Cosmetic Act("Act") and implementing regulations to ensure the safety of the public and compliance with the Act in promotion, sales and distribution of infusion pain pumps. Each of these firms has failed in differing ways to protect the public, to fulfill standards of conduct for the medical device industry and to comply with the Act (See APPENDIX 3). As a direct result of their combined actions, they have directly contributed to needless pain and suffering and permanent injuries to consumers exposed to their pain pumps.

18. The lack of appropriate research and development, testing and knowledge about the risks of intra-articular infusion resulted in the marketing of dangerous products to health care providers when provided for a new intended use and without adequate testing, warnings or instructions for use. McKinley, I-Flow, DJO and Stryker, all knew by 1999 that FDA had repeatedly denied clearance of a 510(k) to begin to market infusion pumps for intra-articular use. FDA's denial was based on a lack of support for safety and efficacy of a new intended use. This same lack of FDA clearance would have triggered a responsible manufacturer to attempt to acquire the skill and knowledge to perform testing necessary to obtain FDA's clearance before beginning promoting products in violation of the Act for a new and unapproved indication. The manufacturers, besides promoting a violative product, failed to warn physicians and their own sales forces about the lack of adequate and appropriate testing and failed to provide adequate safety information.

19. Health care providers and sales representatives were not advised there was no FDA approved local anesthetic safe for intra-articular infusion. Besides promoting their own pumps in violation of FDA regulations, they engaged in conduct intended to misbrand other manufacturers' products. Stryker and later I-Flow were both told by drug manufacturers that their local anesthetics were not approved for intra-articular use and to make such recommendations was a violation of the Act. Long before 1988, the scientific literature discussed the long-term risks of a local anesthetic instilled in a joint and suggested the potential for damage to cartilage.

20. Despite all these safety signals, these three external infusion pump manufacturers, and both distributors, persisted in promoting pumps for intra-articular use without adequate

testing, without an approved safe drug, and without adequate warnings or labeling. These firms each independently disregarded the law, and disregarded patient safety to profit from promoting general pain pumps for a new, untested and unapproved orthopedic use despite:

- lack of FDA premarket clearance for a new use;
- FDA's communications against intra-articular use based on a lack of supporting data on safety and efficacy;
- lack of an FDA approved local anesthetic for intra-articular infusion;
- the Food Drug & Cosmetic Act's prohibition against misbranding and providing misleading information;
- scientific literature, which described risks to articular cartilage from local anesthetics;
- a failure to adequately design, develop, and test its products for intra-articular placement;
- a failure to investigate adverse events;
- a failure to warn physicians, sales representatives, distributors;
- a failure to monitor the medical literature to identify long-term risks.

21. By 2002, each of these pump manufacturers and distributors had notice from signals in the medical literature about the risks of unapproved use described in the medical literature[1], yet failed to warn. By May 2004, each manufacturer again received a safety signal

[1] Liguori GA, et al. Possible Bupivacaine Toxicity After intraarticular Injection for Postarthroscopic Analgesia of the Knee: Implications of the Surgical Procedure. Anesthesia Analgesia 2002;94:1010-3.

about risks of indwelling pumps when Dr. Brown, FDA published findings about adverse events associated with pain pumps in *Anesthesia*[2]. In November 2005, FDA required a contraindication for intra-articular use in I-Flow's Silver Soaker Catheter, another signal. In February 2006, in another signal, FDA told I-Flow the only method to remove the intra-articular contraindication was by testing, clinical studies, and obtaining FDA's clearance of a new indication.

22. All of the three pump manufacturers, and both distributors, sold pumps for unapproved use, and each had an independent duty to protect the public by monitoring the medical literature, performing failure investigations, trending complaints, and warning about the risks. By December 2008, all pain pump manufacturers and distributors were given repeated and direct notice of a safety signal identified by FDA when both CDER plus CDRH described a combined FDA signal in "*Potential Signals of Serious Risks/New Safety Information Identified from the Adverse Event Reporting (AERS) between July-September 2008*". The FDA indicated from its own review of filed combination drug and device adverse events that "*Bupivacaine intra-articular injection given by infusion- Chondrolysis; FDA (CDER and CDRH) is evaluating this issue involving local infusion for post-operative pain, which is an unapproved use*."[3]

## **III. OPINIONS:**

### ISSUE #1

### ROLE OF THE FDA

---

[2] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

[3] (http://www.fda.gov/cder/aers/potential_signals/potential_signals2008Q3.htm).

**OPINION #1:** McKinley, I-Flow, DJO, and Stryker each disregarded their duties and obligations to protect public safety and ensure compliance with regulatory safeguards of the Food Drug and Cosmetic Act ("the Act"). Each failed to adequately design, test and obtain appropriate premarketing clearance from FDA to begin marketing its infusion pain pump legally for a new and unapproved indication. Such negligent actions directly contributed to the pain, suffering and permanent injuries of patients.

**OPINION #2:** Each of the actions of McKinley, I-Flow, DJO, and Stryker rendered other drug manufactures' FDA-approved products misbranded pursuant to 21 C.F.R. 801.6 (21 C.F.R. 201.6). Such conduct is prohibited by the Food, Drug and Cosmetic Act pursuant to 21 USC 331(a) & (b) and directly contributed to the pain, suffering, and permanent injuries of patients.

**ISSUE #2**

**FDA AND PREMARKET CLEARANCE**

**OPINION #4:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker promoted orthopedic surgical pumps to physicians for investigational use in patients without first obtaining an approved IDE (21 C.F.R. 812) or IND (21 C.F.R. 312). Such negligent action after notification that 510(k) clearance was necessary for intra-articular use ignored the safeguards developed by Congress. Each manufacturer's and distributor's actions directly contributed to needless pain, suffering, and serious injuries of orthopedic patients**.**

**OPINION #5:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker disregarded information in medical and scientific literature regarding negative effects of anesthetics on cartilage, and the negative effects of prolonged exposure of cartilage to foreign substances, when they promoted post operative continuous infusion of anesthetic into joints. Each firm also disregarded the medical and scientific literature for NDA approved local anesthetic drug products when they failed to warn physicians of the risks.

**OPINION #6:** McKinley, I-Flow, DJO, Pacific Medical,. and Stryker all engaged in practices designed to mislead the FDA, physicians, sales representatives in order to continue selling adulterated and misbranded pain pump sets when used for continuous infusion of local anesthetics into joints.

**ISSUE #3**

**COMMUNICATION OF RISK**

**OPINION #7:** McKinley, I-Flow, DJO, Pacific Medical, and Stryker failed to voluntarily and adequately warn health care providers, sales representatives, distributors and patients of the risks of continuous infusion of local anesthetics into joints for elective post operative pain management.

**OPINION #8:** McKinley, I-Flow, DJO, and Stryker failed as manufacturers and distributors to adequately monitor complaints, device performance and the medical literature to identify safety signals from intra-articular infusion of local anesthetic into joints, and thus failed to warn health care providers and sales representatives of these potential risks.

**OPINION #9:** McKinley, I-Flow, DJO, and Stryker all continue to minimize and downplay the risks of chondrolysis associated with continuous intra-articular infusion to health care providers, employees, distributors and sales representatives.

**OPINION #10:** Neither McKinley, I-Flow, DJO nor Stryker have performed epidemiological studies necessary to determine the incidence of chondrolysis associated with the unapproved use of their own pain pumps.

**OPINION #11:** Pacific Medical, relying on DJO, failed to monitor the medical literature and labeling of products it sells. As a result, it failed to communicate the risk of chondrolysis to health care providers and changes in the DonJoy PainPump labeling before April 2008.

## IV. BASES FOR OPINIONS #1 -#3

### A. FOOD & DRUG ADMINISTRATION (FDA) & OVERSIGHT OF MEDICAL DEVICES

23. After a public health outcry from women injured by the Dalkon Shield as a result of insufficient product development and testing, Congress took steps to ensure that FDA became involved with premarketing review and oversight of medical devices. The passage of the Medical Device Amendments (MDA) of 1976 to the Federal Food Drug and Cosmetic Act of 1938 (“Act”), gave FDA authority to institute regulations for premarket review similar to

regulations created for drugs. FDA was to perform a premarket review to ensure that all medical devices sold in the United States met a minimum standard of safety and effectiveness. FDA also would monitor medical device reports (MDRs), inspect manufacturing facilities, and continue to monitor device labeling, marketing and promotions.

24. Prior to MDA, manufacturers of medical devices were regulated only by postmarket oversight of commercial products by FDA much as cosmetics and foods. FDA would look for evidence of adulteration and misbranding. Certain medical devices, for example, suture and contact lenses, later called "transitional devices," based on potential risk to public health, were regulated by FDA before MDA with premarket review under authority of FDA's drug regulations.

25. Prior to MDA, manufacturers of medical devices were regulated by labeling misbranding. Certain medical device, for example, suture, later called transitional device, based on risk to the public, were regulated with premarket review under drug regulations.

26. It was initially assumed by Congress that FDA would issue performance standards for categories of devices to expedite support of safety and effectiveness by industry. However, FDA's issuance of performance standards did not occur. Instead, FDA elected to rely on a simple 510(k) notification process (21 C.F.R. part 807). The MDA had required FDA to issue Good Manufacturing Practices (21 C.F.R. part 820) for the medical device industry that would describe minimum GMP requirements, as well as later factory inspection to ensure adherence to GMP.

27. After MDA, FDA began premarket oversight of medical devices by establishing a risk-based classification scheme. FDA used public advisory panels of outside experts to

recommend types of manufacturing controls needed for categories of devices on the market prior to 1976 (pre-Amendments). Classification was based on potential known and unknown risks at the time of a classification panel to ensure that manufactured devices remained safe and effective. FDA classified devices into one of three classes.

- Class I- the lowest risk, were devices for which general manufacturing controls and device reporting alone appeared to be sufficient to help ensure performance of a device and safety of the public.

- Class II- devices of moderate risk, were devices for which general controls, reporting and special controls of GMP appeared sufficient. Finally,

- Class III- highest risk, included devices that were life-sustaining or failure could result in permanent injury or death, or there was insufficient information for classification of risk and manufacturing controls.

28. Class III devices include devices with insufficient scientific information available at time of FDA's initial classification to allow recommendations to be made by the Panel or FDA as to the manufacturing controls necessary to ensure safety and effectiveness for the public. Faced with the large task of all medical device classification, FDA was able to defer until a later date its request that a sponsor provide additional data as premarket approval applications (PMA) for these types of pre-amendment class III devices.

29. Class III devices also include the larger category of all new post-1976 devices or already marketed devices making new claims or marketed for new intended use not yet cleared

or approved by FDA. Class III devices are the most diverse group of devices and alternative methods have been provided by Congress to FDA to help deal with oversight.

30. Following a re-evaluation of FDA's classification strategy, Congress determined it would accept the Agency's classification and review approach using 510(k) based on substantial equivalence to pre-1976 devices and passed grandfathering provisions so that the majority of medical devices on the United States market prior to 1976 (pre-Amendments) were deemed safe and effective when sold for the same pre-1976 intended use. The emphasis was shifted in the 1990s by Congress away from primary reliance on FDA's premarket review to post market surveillance with passage of the Safe Medical Device Act of 1990.

31. FDA has not been given the mandate to perform its own development and research of medical devices; it does not test or physically examine medical devices; it is not responsible for designing or conducting clinical trials; it does not write product labeling. FDA's device branch reviewers interact with marketing applications submitted by competing manufacturers within the same industry, therefore, the agency must deal with each medical device and each manufacturer individually and with dispassion. It is prohibited under the Act (21 USC Sec. 301[331]) for a manufacturer to sell a medical device in the United States that is not safe, effective and adequately labeled.

32. FDA premarket reviewers in ODE examine a sponsor's premarketing application with proposed draft labeling to determine the intended use of the product. Devices are able to be cleared by 510(k) as substantially equivalent if they have the same intended use ( 21 C.F.R.§ part 807; 21 C.F.R. §860.7 ). Congress has made the FDA the public's gatekeeper for the flow of new medical devices and it provides a minimal standard. FDA examines premarketing

applications to determine if certain conditions are met that allow it to either approve or deny clearance. Once a product is cleared for marketing, it is the primary responsibility of the manufacturer, and not the FDA, to continue to monitor the safety and performance of its product throughout the product's life cycle. It is the sponsor that updates the product labeling to ensure safety of the public.

33. It is a violation of United States Code 18 USC Sec. 1001 for a company to falsify, conceal, cover-up by trick, scheme or device a material fact, or to make any materially false, fictitious, or fraudulent statements or representations to the FDA. Such a violation carries the possibility of fine as well as imprisonment. Therefore, it is assumed by FDA's reviewers that a product manufacturer understands the potential for legal action and fines, which will serve as a deterrent to falsification and serves to help promote truthful and accurate representations to FDA.

34. The FDA requires that a representative from a company actually sign, in a submitted marketing application, a "Truthful and Accuracy Statement" as required by 21 C.F.R.§ 807.87(k) prior to FDA's acceptance of the application for review. The premarket notification statement states: "*I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.*" In a 510(k), the truthful and accurate statement must be on a separate page, **must** be identified in the table of contents and **must** be signed by a responsible person on the company required to submit the premarket notification, **not** a consultant for a submitter.

35. The FDA's review process has not been designed to identify false and misleading statements and information. As industry is aware, FDA does not have a mechanism to independently determine what information is not being provided to it by a company in a premarketing submission.

36. During the 510(k) clearance process, the FDA does have some ability, within the requirements of the Least Burdensome Method, (Food Drug and Modernization Act of 1997), to request additional information from a sponsor based on information it receives in premarketing applications. After passage of the FDA Modernization Act ("FDAMA") of 1997, the ability for FDA's reviewers to request a firm conduct additional new testing for an application was limited to only the "least burdensome method" necessary to support substantial equivalence to a predicate device. Once products have been cleared or approved, FDA has not been given a method to compel sponsors to perform additional new safety testing without having sufficient scientific justification to support a public health necessity

37. There are two <u>common</u> premarketing submission procedures used at CDRH to bring a new medical device or a modified medical device onto the United States market:

1) **510(k) Premarket Notification Process (21 C.F.R. 807 Subpart E)** - A sponsor of a class III medical device submits in a premarketing notification application (21 C.F.R. §807.92) its own description of a device that it intends to market in the United States to FDA. Submission of a 510(k) application first requires the payment of a Medical Device User Fee by the sponsor, with authorization by Congress through 2012, which in 2009 was $3,693 standard fee and $1,847 small business fee. The fees are authorized to subsidize the agency's review cost following the October 26, 2002 Medical Device User Fee and Modernization Act of 2002. In exchange for industry's payments of medical device user fees, FDA is to seek to become more efficient and complete the review and bring to final closure the majority of 510(k)s within 90 days. The fees are adjusted annually based on the changes in the Agency's workloads and other factors.

A 510(k) marketing submission for a non-exempted device is to provide FDA with a supportive statement indicating the device is similar to and/or different from products of a comparable type in commercial distribution (predicate), accompanied by data to support the statement(21 C.F.R. 807.87(f). The evidence is required to provide support that the device is substantially equivalent( 21 USC 513[360c](i))[4] to a pre-Amendments (grandfathered) device or an already cleared device ("predicate") in terms of support for the "same intended use" pursuant to (21 C.F.R.§ 801.4). The 510(k) notification to FDA is to support that there are no unaddressed issues of safety and effectiveness. The device described in a 510(k) does not need to be currently manufactured by the sponsor to request clearance.

Based on the data provided by the sponsor in the 510(k) notification, FDA's reviewers determine if there is sufficient information to clear or not clear a product for marketing for an intended use. The draft labeling is submitted for review by FDA to support the same intended use. At the end of the review process, FDA issues either a 510(k) clearance substantially equivalent (SE) letter or a not substantially equivalent (NSE) (denial) letter. The FDA will publish on its website 510(k) clearances (not denials) and the cleared indications for use, a the sponsor's Summary of Safety and Effectiveness or Summary Statement Clearance of a 510(k) may require submission of additional clinical trial data obtained in the United States under an Investigational Device Exemption (IDE) (21 C.F.R. part 812) or further laboratory and/or bench testing to address new questions of safety and efficacy. There is no user fee for submission of an IDE application, and the Agency is to respond to the IDE request within 30 days.

[4] 21 USC 360c(i)(1)(A) For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent " or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that the Secretary by order has found that the device-(i) has the same technological characteristics as the predicate device, or (ii)(I) has different technological characteristics and the information submitted is substantially equivalent to the predicate device contains information, including clinical data if deemed necessary by the Secretary, that demonstrates the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and efficacy than the predicate device.

Commercial marketing of a cleared device can only begin in the United States after the sponsor has received the Agency's 510(k) clearance letter. A 510(k) clearance letter provides the sponsor with certain limitations or restrictions of 510(k) clearance in terms of legal marketing claims, intended use. All sponsors of cleared 510(k)s must adhere to requirements for Quality Systems including design controls, complaint file handling, failure investigation, corrective and preventive actions, statistical methods, post approval surveillance, medical device reporting, establishment registration and device listing, labeling; which will be verified at time of FDA inspection. The 510(k) cleared device is to be regulated with the same controls and requirements as its substantially equivalent predicate device.

Sponsors of cleared 510(k) devices are not permitted to represent that their product has been approved by FDA. The Agency considers such representations as misleading and can constitute misbranding (underlining added for emphasis):

> Submission of a premarket notification in accordance with this subpart, and a subsequent determination by the Commissioner that the device is intended for introduction into commercial distribution is substantially equivalent to a device in commercial distribution before May 28, 1976, or is substantially equivalent to a device introduced into commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or class II, does not in any away denote official approval of the device. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding.[21 C.F.R. 807.97]

38. It is a violation of United States Code 18 USC Sec. 1001 for a company to falsify, conceal, cover-up by trick, scheme or device a material fact, or to make any materially false, fictitious, or fraudulent statements or representations to the FDA. Such a violation carries the possibility of fine as well as imprisonment. Therefore, it is assumed by FDA's reviewers and compliance staff that a product manufacturer understands the potential for legal action and fines and will provide truthful and accurate reports (premarket and postmarket) to FDA.

39. The FDA requires that a representative from a company, not a consultant, actually sign, in a submitted premarketing application, a "Truthful and Accuracy Statement" as required by 21 C.F.R.§ 807.87(k) prior to FDA's acceptance of the application for review. The premarket notification statement states: "*I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.*" In a 510(k), the truthful and accurate statement must be on a separate page, must be identified in the table of contents and must be signed by a responsible person on the company required to submit the premarket notification.

2) **Premarket Approval Application ("PMA") (21 C.F.R. part 814) -** A sponsor submits a Premarket Approval Application (PMA) for a class III medical device to FDA, which is to summarize all available and relevant valid scientific evidence to allow FDA to make a determination of safety and efficacy (21 C.F.R.§ 860.7) as well as the controls the manufacturer ahs said are necessary for manufacturing. Information in an original PMA application will include human and preclinical performance data, medical literature, proposed manufacturing controls to support to FDA that the new proposed device or new intended use is reasonably safe and effective to begin marketing in the United States. Submission of an original PMA application requires, with authorization by Congress through 2012, the payment of a Medical Device User Fee by the sponsor, which in 2009 is $200,725 standard fee and $50,181 small business fee. The first premarket application from firms with gross receipts or sales ≤$30 million is waived.

   The PMA application will contain a summary of the clinical information obtained in the United States clinical trials through Investigational Device Exemption pursuant to 21 C.F.R. part 812. An original PMA will also require a review of the manufacturing establishment by the FDA to ensure that the

controls described in the PMA are actually in place as described. FDA reviews the sponsor's data provided in the PMA submission and based on the information and fulfillment of regulatory requirements can issue one of three letters: approval, approval with conditions or denial of approval. FDA will negotiate the final label with the PMA sponsor based on the information contained in the marketing submission. FDA is required to publish a Summary of Safety and Effectiveness of information it considered for a filed PMA giving the Agency's basis for its final decision.

FDA may elect to convene an external Advisory Panel of outside experts to provide it with nonbinding recommendations and/or comments as to FDA's future actions with a PMA application or similar PMA applications.

In a PMA approval letter, FDA provides a sponsor with conditions for approval (COA) describing conditions which must be complied with for a product to remain PMA- approved. The conditions include certain restrictions to ensure safety and effectiveness for the public, as well as general conditions applicable to all sponsors of a PMA-approved device including adherence to the requirements for Quality Systems including design controls, complaint file handling, failure investigation, corrective and preventive actions, statistical methods, post approval surveillance, medical device reporting, establishment registration and device listing, labeling. Failure to adhere to the conditions of PMA approval, will invalidate the PMA approval. In a PMA denial letter, FDA is required to provide a sponsor with information to help make a PMA approvable.

Changes to an approved PMA are made by a sponsor submitting a PMA Supplement (21 C.F.R.§ 814.39). Each PMA Supplement is to have sufficient information necessary to support FDA's approval of the requested change. A panel-track PMA supplement Medical Device User Fee is $150,544 standard and $37,636 small business; 180-day supplement $30,109 standard, $7,527

small business; real-time supplement $14,051 standard, $3,513 small business; 30-day notice $3,212 standard and $1,606 small business.

40. Manufacturers of pre-Amendments class III devices intended for human use, for which a PMA has not been officially requested by FDA, can continue to market a Class III 510(k) notification (21 C.F.R. 807). The annual fee for periodic reporting on a class III device is $7,025 standard and $1,756 small business fee. Class III device are required to file a premarket notification with class III certification and summary pursuant to 21 C.F.R. 807.94. FDA has the option to call for a PMA for a pre-amendment class III device or elect to reclassify the device with issuance of special controls to class I or class II (e.g., 21 C.F.R. 862.9, 21 C.F.R. 864.9) based on new information available about risk and manufacturing controls since the initial classification process. FDA also has the ability to exempt certain class I and II devices from a requirements for premarket notification. Most Class I devices and some class II devices with some exceptions reserved by the FDA have been exempted from a requirement to submit a 510(k).

41. In contrast to premarketing notification safety issues, postmarketing safety issues occurring with commercially marketed devices are primarily handled by FDA's District Office and CDRH's Office of Compliance ("OC"). Postmarketing issues shared by both 510(k) cleared and PMA approved devices can include adulteration and misbranding (21 USC 321 (n), 21 USC 352 (f) (1) and (2), 21 USC 351 (a)); Good Manufacturing Practices (GMP)/Quality Systems Regulations (QSR) (21 C.F.R. 820); Medical Device Reporting (21 C.F.R. 803); User Notifications; and Recalls.

**B. FDA-GENERATED PERFORMANCE STANDARDS**

42. Congress reportedly assumed that FDA would issue performance standards for categories of devices to help industry expedite support of safety and effectiveness through demonstration of adherence to FDA's performance standards (21 USC 360d). However, FDA has issued a limited number of device performance standards for industry. FDA's Radiological Devices division has issued mandatory performance standards for electronic radiation emitting products (21 C.F.R. 1010-1050), such as lasers, microwave ovens, television receivers, video displays, ultrasound devices, and apnea monitors. The FDA's mandated performance standard for apnea monitors was later withdrawn. The Office of In Vitro Devices created a performance standard for Antimicrobial Susceptibility minimum inhibitory concentration (MIC) and disk diffusion devices.

43. Instead of FDA's widespread issuance of performance standards, FDA chose an alternative route. FDA chose to rely on each sponsor providing a 510(k) premarket notification submission to FDA for clearance based on substantial equivalence to a predicate device [21 C.F.R. 807.92-100].

**C. CONFORMANCE OF INDUSTRY TO FDA RECOGNIZED STANDARDS**

44. In terms of a 510(k)s sponsor being able to reference voluntary industry standards, and FDA's "least burdensome" provisions of the Food Drug and Modernization Act (FDAMA) of 1997, 510(k) sponsors were allowed to reference compliance with certain FDA-recognized industry standards. Not all voluntary industry standards were deemed "recognized" by FDA and not all sections of even the recognized standards were considered acceptable to FDA. Use of industry recognized standards by a sponsor is optional and not mandatory, but was suggested by FDA to help industry reduce the burden in supporting substantial equivalence

in a premarketing submission. Each sponsor of a 510(k) has been allowed to use other alternative methods for attempting to support substantial equivalence to FDA.

45. To assist both industry and Agency reviewers with use of recognized standards, FDA issued Guidance for Industry and FDA Staff- Frequently Asked Questions on Recognition of Consensus Standards.[5] As the 2007 guidance indicated, it was issued to address FDA's implementation of section 514 [360c] (c) of the Act. The guidance did not establish legally enforceable responsibilities for industry and was part of the Agency's required Least Burdensome Approach for industry. The guidance reflected the Agency's continuing "review of the relevant scientific and legal requirements and provided the easiest way for industry to comply with those requirements". However FDA's guidance stated on page 1, "if you believe that an alternative approach would be less burdensome, please contact us so we can consider your point of view."

46. In a 510(k) submission, the sponsor was able to provide a "Declaration of Conformity" with applicable recognized consensus standards and even inapplicable requirements or deviations from a recognized standard. The sponsor was also able to specify any deviations from each applicable standard and specify what differences existed, if any, between the predicate device and the new device, with a justification for use of test results to address areas of difference. The declaration of conformance would be acceptable to FDA in lieu of any information and/or data addressed by the standard. FDA's reviewer should, however, expect to see the results of testing, when the standard merely specified a test method to be used without providing associated performance limits and/or acceptance criteria.

[5] FDA September 17, 2007 Guidance for Industry and FDA- Staff- Frequently Asked Questions on Recognition of Consensus Standards

47. The sponsor was to provide in its premarket notification the name and address of each laboratory or certifying body involved in determining conformance to applicable consensus standards and reference any accreditation for those organizations. The 510(k) could use a Standards Data Form for 510(k) s (FDA Form #3654).

48. When a 510(k) submission included a declaration of conformity to an FDA-recognized consensus standard, and the declaration of conformity appeared adequate, the FDA reviewer should consider the documentation for the aspects of the device being addressed by the standards to be acceptable. However, if the reviewer had remaining concerns about the adequacy of a recognized consensus standard for addressing particular aspects of device performance, after consultation with and concurrence by their immediate supervisor, then the reviewer should request the sponsor provide addition information for the premarket application.

49. FDA indicated in its consensus Q&A guidance (2007) that it placed all responsibility for supporting the accuracy and adequacy of the declaration of conformity on the person submitting the 510(k) application. The declaration of conformity could be based on data or information received from a component manufacturer(s), but responsibility for assuring accuracy of the information rested with the submitter of the information to FDA. The Quality Systems (QS) regulation (21 C.F.R. 820.80) further specified that there were certain management controls that need to be in place to oversee and test products provided as components.

50. Members of CDRH on the Standards Task Groups (STGs) actively assess the impact of new standards, revision of existing standards, withdrawal of standards or portions of recognized standards on the premarket review process and, as appropriate, make recommendations for or against recognition by FDA. As new or revised standards are

recognized, or old standards are withdrawn, the information is published in the Federal Register and listed on CDRH's website for industry.

51. FDA has published the document "CDRH Standard Operating Procedures for the Identification of Candidate Consensus Standards for Recognition" to explain to industry the internal procedures used by the Agency to identify standards for recognition.[6] In terms of international harmonization, the FDA's policies for use of recognized consensus standard is to be consistent with International Standards Organization (ISO)/International Electrotechnical Commission (IEC) Guide 22.

52. The FDA's Consensus Standards Guidance (2007) "Introduction" has (underlining for emphasis):

> A person required to submit a premarket notification…must provide information as required by the statute and regulations to allow CDRH to make an appropriate decision regarding the clearance or approval of the submission. This guidance describes how CDRH should use information on conformance with recognized standards to satisfy premarket review requirements. It does not affect CDRH's ability to obtain any information authorized by the statute or regulations (21 U.S.C. 360d).
>
> This guidance describes how CDRH should use information on conformance with recognized standards to satisfy premarket review requirements…
>
> CDRH believes that <u>conformance with recognized consensus standards can support reasonable assurance of safety and/or effectiveness for many applicable aspects of medical devices</u>….information on conformance with recognized consensus standards <u>may help establish the substantial equivalence</u> of a new device to a legally marketed device. This information may be used to show that the new device is as safe and effective as the predicate in the areas covered by the standards….
>
> Conformance with recognized standards <u>may not always be sufficient basis</u> for regulatory decisions. For example, <u>a specific device may raise a safety or effectiveness issue not addressed by any recognized consensus standard</u>, or a specific FDA regulation <u>may require additional information</u> beyond what

[6] September 17, 2007 Guidance for Industry and FDA Staff Recognition and Use of Consensus Standards

> conformity to the recognized consensus standards provide. Under such circumstances, conformity with recognized standards will not satisfy all requirements for marketing, or investigating the product in the United States…

53. Under "General use in the Premarket Applications Review Process", page 6, FDA wrote:

> To simplify and streamline the premarket review process, applicants may utilize FDA recognized standards in premarket submissions….Conformity to the recognized standard should, in these cases, minimize the amount of data and documentation needed in the 510(k) submission to demonstrate substantial equivalence. However, such comprehensive consensus standards are rare.
>
> **Voluntary Conformance**
> Conformance with recognized consensus standards is strictly voluntary for a medical device manufacturer…

## D. QUALITY SYSTEMS REGULATIONS (QSR) (21 C.F.R. PART 820)

54. On May 28, l976, the Medical Device Amendments amended the FDCA in terms of good manufacturing practices that were to be required of medical device manufacturers for the production of medical devices legally marketed in the U.S. Section 520(f) of the Act (or 21 U.S.C. 360j (f)) provided FDA with legal authority to prescribe a regulation requiring that the methods used in, and the facilities and controls used for, the manufacture, packing, storage, and installation of medical devices conform to current GMP (cGMP) requirements to assure that devices were safe and effective and otherwise in compliance with the Act. The proposed device or Aumbrella@ GMP regulation was published in the Federal Register of March 1, l977 (42 FR 11997). The FDA had begun work on the creation of a GMP draft for medical device manufacturers starting December 1973.

55. Federal Register, Vol. 43, No. 141- Friday, July 21, l978, **Final Rule for GMP** stated:

Consumers who use devices differ from other consumers in an important respect. They are usually injured or diseased, and thus are a population at risk. These patients, and the many health professionals who diagnose and treat their conditions, depend on and trust the medical device manufacturers to produce safe and effective devices of high quality.

Based on FDA's experience, the Commissioner believes that it is vitally important that devices be manufactured in accordance with quality assurance principles that help prevent the production of defective products that can endanger consumers. In monitoring device recalls, FDA has found that, too often, device manufacturers have fallen short in meeting the expectations of those who need and depend upon high quality medical products.

During the past several years, FDA monitored approximately 1,000 device recalls. Many of these resulted from manufacturers'= failure to follow good manufacturing practices. For example, of 232 device recalls monitored by the FDA from October 1976 through November 1977, FDA believes that 198 of them were attributable to poor manufacturing practices.

The quality assurance program mandated by this regulation is designed to be preventive. The device GMP regulation requires all device manufacturers to design, implement, and continually monitor a comprehensive quality assurance program......

The device GMP regulation has been developed in accordance with basic principles of quality assurance...

Effective date for the final GMP rule was December 18, l978.

56. The l978 GMP regulation required a manufacturer to document in the device master record (DMR) (21 C.F.R. 820.181) any changes to device design and any associated testing (21 C.F.R. 820.100). It also required process validation to assure that devices meeting the designed quality characteristics will consistently be produced (21 C.F.R. 820.5 and 820.100). Finally, manufacturers had to have in place a formal approval procedure for any change in manufacturing process of a device including those dictated by design changes (820.100(b)(3)).

57. The FDCA's 1978 Good Manufacturing Practices (GMP) regulation did not directly address the original design of a device. In fact, it was the recognition of a need for this type of control for many types of devices that led to the inclusion of pre-production validation design controls within the Safe Medical Device Act of l990. The new GMP with the requirement for design control regulation, FDA called the "Quality Systems Regulation" (QSR) and implemented a new authority for FDA through the Safe Medical Device Act. The Quality Systems Regulation for GMP, except for design controls, took effect June 1, l997. Design control provisions became effective June 1, l998.

**21 C.F.R. Sec. 820.3 Definitions (**underlining added for emphasis**)**

a) ***Act*** means the Federal Food, Drug, and Cosmetic Act, as amended (secs. 201-903, 52 Stat. 1040 *et seq.,* as amended (21 U.S.C. 321-394)). All definitions in section 201 of the act shall apply to the regulations in this part.

(b) ***Complaint*** means any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution.

(n) ***Management with executive responsibility*** means those senior employees of a manufacturer who have the authority to establish or make changes to the manufacturer's quality policy and quality system.

(o) ***Manufacturer*** means any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions.

(s) ***Quality*** means the totality of features and characteristics that bear on the ability of a device to satisfy fitness-for-use, including safety and performance.

(v) ***Quality system*** means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management.

(z) ***Validation*** means confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be consistently fulfilled.

(2) ***Design validation*** means establishing by objective evidence that device specifications conform with user needs and intended use(s).

(aa) ***Verification*** means confirmation by examination and provision of objective evidence that specified requirements have been fulfilled.

**Sec. 820.20 Management Responsibility**

a) ***Quality policy***. Management with executive responsibility shall establish its policy and objectives for, and commitment to, quality. Management with executive responsibility shall ensure that the quality policy is understood, implemented, and maintained at all levels of the organization.

(1) ***Responsibility and authority***. Each manufacturer shall establish the appropriate responsibility, authority, and interrelation of all personnel who manage, perform, and assess work affecting quality, and provide the independence and authority necessary to perform these tasks.

(3) ***Management representative***. Management with executive responsibility shall appoint, and document such appointment of, a member of management who, irrespective of other responsibilities, shall have established authority over and responsibility for:

> (i) Ensuring that quality system requirements are effectively established and effectively maintained in accordance with this part; and
>
> (ii) Reporting on the performance of the quality system to management with executive responsibility for review.

(c) ***Management review***. Management with executive responsibility shall review the suitability and effectiveness of the quality system at defined intervals and with sufficient frequency according to established procedures to ensure that the quality system satisfies the requirements of this part and the manufacturer's established quality policy and objectives. The dates and results of quality system reviews shall be documented.

(d) ***Quality planning***. Each manufacturer shall establish a quality plan which defines the quality practices, resources, and activities relevant to devices that are designed and manufactured. The manufacturer shall establish how the requirements for quality will be met.

(e) ***Quality system procedures***. Each manufacturer shall establish quality system procedures and instructions. An outline of the structure of the documentation used in the quality system shall be established where appropriate.

**Sec. 820.25 Personnel**.

a) ***General***. Each manufacturer shall have sufficient personnel with the necessary education, background, training, and experience to assure that all activities required by this part are correctly performed.

(b) ***Training***. Each manufacturer shall establish procedures for identifying training needs and ensure that all personnel are trained to adequately perform their assigned responsibilities. Training shall be documented.

> (1) As part of their training, personnel shall be made aware of device defects which may occur from the improper performance of their specific jobs.
>
> (2) Personnel who perform verification and validation activities shall be made aware of defects and errors that may be encountered as part of their job functions.

**Sec. 820.100 Corrective and Preventive Action (CAPA).**

a) Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

> (1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;
>
> (2) Investigating the cause of nonconformities relating to product, processes, and the quality system;

(3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review.

(b) All activities required under this section, and their results, shall be documented.

**Sec. 820.198 Complaint Files.**

a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that:

(1) All complaints are processed in a uniform and timely manner;

(2) Oral complaints are documented upon receipt; and

(3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

(b) Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary. When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate.

(c) Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary.

(d) Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by § 820.198(e), records of investigation under this paragraph shall include a determination of:

(1) Whether the device failed to meet specifications;

(2) Whether the device was being used for treatment or diagnosis;

(3) The relationship, if any, of the device to the reported incident or adverse event.

(e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The record of investigation shall include:

(1) The name of the device;

(2) The date the complaint was received;

(3) Any device identification(s) and control number(s) used;

(4) The name, address, and phone number of the complainant;

(5) The nature and details of the complaint;

(6) The dates and results of the investigation;

(7) Any corrective action taken; and

(8) Any reply to the complainant.

[61 FR 52654, Oct. 7, 1996, as amended at 69 FR 11313, Mar. 10, 2004]

**Sec. 820.250 Statistical Technique**

(a) Where appropriate, each manufacturer shall establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling, and verifying the acceptability of process capability and product characteristics.

## E. MANDATORY MEDICAL DEVICE REPORTING (21 C.F.R. PART 803)

58. **Sec. 519 [360i] Records and Reports on Devices:**

(a) General rule

Every person who is a manufacturer or importer of a device intended for human use shall establish and maintain such records, make such reports, and provide such information, as the Secretary may by regulation reasonably require to assure that such device is not adulterated or misbranded and to otherwise assure its safety and effectiveness. Regulations prescribed under the preceding sentence—

(1) shall require a device manufacturer or importer to report to the Secretary whenever the manufacturer or importer receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices--
  (A) may have caused or contributed to a death or serious injury, or
  (B) has malfunctioned and that such device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur;

(2) shall define the term ``serious injury" to mean an injury that--
  (A) is life threatening,
  (B) results in permanent impairment of a body function or permanent damage to a body structure, or
  (C) necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure;

(3) shall require reporting of other significant adverse device experiences as determined by the Secretary to be necessary to be reported;

59. Under 21 C.F.R. 803.1, first effective December 13, l984, FDA required a device manufacturer or importer to report to FDA whenever they became aware of information that reasonable suggested that one of their marketed (commercially distributed) devices:

1. May have caused or contributed to a death, or serious injury or

2. Has malfunctioned and that the device or any other device marketed by the firm would be likely to cause or contribute to a death, serious injury, or serious illness if the malfunction were to recur.

60. Under Section 519(a) and (b) of the Food Drug and Cosmetic Act (FDCA), (See above), manufacturers, initial distributors of medical devices (importers), distributors, and later user groups were required to comply with certain mandatory Medical Device Reporting (MDR) requirements. Manufacturers and importers of devices report MDRs directly to FDA. Whereas, user groups may report directly to manufacturers and distributors or to FDA. The MDR provisions supplemented, and did not supersede, provisions of the FDCA for regulation of medical device, particularly GMP provisions of 21 C.F.R. Part 820. Under GMP requirements, a manufacturer was required to investigate the reported failure of a device or any of its components to meet the performance specifications and to establish and maintain a written record of the investigation and follow up; establish and maintain a complaint file; allow access to, and copying of files by an authorized FDA representative.

61. A manufacturer or an importer must report to FDA each time it becomes aware of a reportable event (death, serious injury, or malfunction) which is likely to cause or contribute to a death or a serious injury if it recurs, even if an event of the same or similar nature has been reported previously or if it is believed to be the result of user error, faulty service or maintenance, etc. However, if there is more than one source of information concerning the same patient and event, only one report is required to be filed with FDA.

**21 C.F.R. 803.3 Definitions**

(c) ***Become aware*** means that an employee of the entity required to report has acquired information reasonably suggesting a reportable adverse event has occurred;

(1) Device user facilities are considered to have "***become aware***" when medical personnel, as defined in paragraph(s) of this section, which are employed by or otherwise formally affiliated with the facility, acquire such information about a reportable event.

(2) Manufacturers are considered to have ***become aware*** of an event when:

(i) Any employee becomes aware of a reportable event that is required to be reported within 30 days or that is required to be reported within 5 days under a written request from FDA under

. 803.53(b); and

(ii)Any employee, who is a person in management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or a person whose duties relate to collection and reporting of adverse events, becomes aware that a reportable MDR event or events, from any information, including trend analysis, necessitates remedial action to prevent an **unreasonable risk** of substantial harm to the public health.

(d) ***Caused or contributed*** means that a death or serious injury was or may have been attributed to a medical device, or that a medical device was or may have been a factor in a death or serious injury, including events occurring as a result of:

(1) Failure;

(2) Malfunction;

(3) Improper or inadequate design;

(4) Manufacture;

(5) Labeling; or

(6) User error.

62. In order to facilitate a continuous upgrading of device labeling, manufacturers **(* not FDA)** are expected to monitor device usage and promptly and voluntarily revise its product

label's warnings and precautions sections based on the device use experience to protect the public and remain in compliance with the Act. FDA performs a quick pre-market review of draft labeling with a 510(k) submission to support the intended use and claims of substantial equivalence. The manufacturer (*not FDA) is responsible for upgrading its own device label and labeling once the device is market. Events that precipitate changes of labeling are the types of events usually required to be reported to FDA under the Medical Device Reporting regulation (MDR) 21 C.F.R. Part 803.

## F. DEVICE LABELS AND LABELING

According to the Food Drug and Cosmetic Act (FDCA):

> **SEC. 502. [352]**
>
> A drug or device shall be deemed to be misbranded -
>
> (a) If its labeling is false or misleading in any particular
>
> (f) Unless its labeling bears:
>
> (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users….

63. When reviewing FDA's procedures, it is important to understand how the FDCA and as a result the industry defines the terms labels, labeling and misbranding of medical devices. The Federal Food Drug and Cosmetic Act (FDCA- 21 USC) defines label, labeling and misbranding as follows:

> **201 (k)** The term label means a display of written, printed, or graphic material upon the immediate container of any article.

> **201 (m)** The term labeling means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.
>
> **201(n)** If an article is alleged to be misbranded because of the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling of advertising thereof or under such conditions of use that is customary or usual.

64. The phrase "false and misleading" does not mean only that a statement is untrue, fraudulent or deceptive. Labeling can be deemed to be in violation of the Act by FDA if it proves deceptive or misleading for the intended reader. The word "misleading" means that the labeling is deceptive if it creates or leads to a false impression in the mind of the reader. A "false impression" may result not just result from a false statement, but also can be created in the mind of the reader through methods of ambiguity, misdirection or failure to reveal material facts relevant to statements being made. In other words a label that remains silent to certain consequences can be as deceptive. In terms of my experience with FDA's consideration of violations of the Act for misbranding (21 USC 321(n)) for both drugs and devices, the FDA takes into consideration representations being made or suggested about a product, including sales representatives, advertising and promotions. FDA considers for determination of misbranding, all information provided from a manufacturer, whether oral, word, design or any combination of all factors. FDA also considers the extent to which labeling, advertising or marketing fails to reveal material facts to the user in the light of representations or that it fails to provide the user with warnings about consequences which can occur.

65. In terms of FDA's consideration of 'intended use' for either a medical device (21 CFR 801.4) and/or a drug (21 CFR 201.128), and whether a product has a new intended use that has not been first appropriately accepted by FDA for start of marketing, FDA, for either a device a drug manufacturer, considers the objective intent of the persons legally responsible for the labeling of the product. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. The objective intent may, for example, according to FDA "be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. 801.4(device) and 21 C.F.R. 201.128(drug) further discuss the manufacturers' duties for oversight of intended use by:

> If a for example, a packer, distributor, or seller intends for an article for different uses than those intended by the person from whom he received the drug (devices), such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug (device) introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug (device) which accords with such other uses to which the article is to be put.

## G. PREMARKET PROCESS TO ADDRESS "OFF LABEL" OR UNAPPROVED USE

66. The terms 'Intended Use' refers to the "*objective intent*" of the persons legally responsible for the labeling of the device. The objective intent may, for example, be shown by labeling claims, advertising matter, or through oral and/or written statements made by sales representatives. It may be shown by the offering or the using of the device, with the knowledge of such persons or their representatives, for such purpose for which it may not have been labeled nor specifically advertised (21 C.F.R.§ 801.4; 21 C.F.R.§ 201.128).The intended use of a device

or a drug, whether prescription or nonprescription, is the key identification to be made by both the FDA and the sponsor and it is the foundation of all decisions for premarket regulations of products either through approval or clearance for marketing by FDA.

67. As stipulated in Section 513(i) of the Act, FDA may issue an order of substantial equivalence for a premarketing application only upon making the determination that the device to be introduced into commercial distribution has the same intended use as the predicate device and is as safe and effective as a legally marketed device. Section 513(i)(1)(E) of the Act generally limits the determination of the intended use of a device that is the subject of a premarket notification to the proposed labeling (Section 201(m)) contained in the submission. Proposed labels, labeling and advertisement sufficient to describe the device, its intended use, and the directions of use are required to be submitted in a 510(k) for review during the substantial equivalence determination (21 C.F.R. 807.87(e)).

68. According to ODE's Blue Book Memorandum #K 86-3[7], "[o]rdinarily, intended use is determined by reference to 'labeling' or 'promotional claims: only in rare cases might it be necessary to infer intended use from other types of information." The device reviewer would be also be trying to bring the 510(k) to closure within the mandatory Medical User Fee due date of 90 days. FDA' s December 3, 2002 guidance[8] which superseded FDA's January 30, 1998 guidance, discusses the regulatory process or hurdles that a CDRH reviewer would have to go through in order to persist to attempt to limit a device's proposed labeling if he/she is aware that

[7]#K86-3 entitled Guidance on the Center for Devices and Radiological Health's Premarket Notification Review Program (June 30, 1986) (http:..www.fda.gov/cdrh/k863.html)

[8] December 3, 2002 Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff (Update to K98-1) that supersedes the Guidance for Industry and CDRH Staff Issued January 30, 1998

there may be a potential for the sponsor to promote a product for off-label or unapproved use ( page 4):

> In addition to the restrictions regarding the determination of intended use, the law defined the procedures to be followed if the Office Director believes "that there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling for the device" that such use could cause harm." (See Section 513(i)(1)(E)(ii). These procedures are described below.
>
> **PROCEDURES**
>
> **A. Procedures for Division Staff**
>
> In determining the intended use of a device that is the subject of a 510(k), reviewers should continue to follow Blue Book #K86-3 guidance, which states that the intended use of the device should be determined by the proposed labeling for the product. As defined above, this includes the actual label for the device and any accompanying information such as direction for sue and promotional materials.
>
> In reviewing the premarket notification, there may be rare instances in which the design of the device or published literature referencing the subject device or a similar device, would lead one to believe that there may be an intended use different than that appearing in the labeling. If this situation occurs, the reviewer should bring the discrepancy to the attention of senior division management.
>
> The reviewer and division management should consider:
>
> - Whether there is a **reasonable likelihood** that the device will be used for an intended use not identified in the proposed labeling for the device, **and**
> - If such use **could cause harm** to the patient or the consumer.
>
> If, while reviewing the 510(k), the division makes the determination that there is a reasonable likelihood that the device will be used for an intended use other than that in the proposed labeling (hereinafter referred to as off-label use) that could cause harm, the review of the submission should proceed as follows. The reviewer should discuss all deficiencies with regard to the submission, except those regarding the off-label use, with the firm and resolve the deficiencies in accordance with established division procedures. Once all other outstanding issue have been resolved, the reviewer will promptly bring the concern about the off-label use to the attention of the Chief of Premarket Notification Section (Chief), Program Operations Staff (POS). The Chief will be responsible for coordinating the resolution of the off-label use issue with the appropriate Office Director. If, while reviewing the 510(k), the reviewer observes no deficiencies that prevent a substantial equivalence recommendation other than the concern regarding an off-

label use, the division should bring that concern to POS as soon as the review of the 510(k) is complete.

Devices that are substantially equivalent to legally marketed devices that have limitations regarding off-label use imposed by the Office Director under Section 513(i)(1)(E) should be subject to the same limitations. Review divisions should be vigilant in identifying devices that fall within this category. When a review division encounters a device that should be subject to the same limitations regarding off-label use as the predicate, the review division should retrieve a copy of the predicate device's "substantially equivalent (SE) with limitations" letter and forward it with the submission to POS as described above.[9]

**Procedures for the Office Director**

When the Office Director receives a referral for POS regarding off-label use, the Office Director will evaluate the information provided and determine if the two statutory criteria are met. That is, the Office Director must decide (1) if there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling and (2) if such use could cause harm to the user. If the Office Director determines that these criteria are not met, the Office Director should document the discussion and the Office should promptly issue a "substantially equivalent" (SE) letter. If, however, the Office Director believes that the two criteria are met, the 510(k) submitter will have an opportunity for consultation.

**Consultation**

Consultation between the Office Director and the 510(k) submitter may take the form of a telephone call or a meeting. The form of the consultation will depend on the needs of both parties and the most expedient path to resolution.

**Resolution**

Following consultation, one of three actions may ensue.

First after discussing the off-label use issue with the firm, the Office Director may decide that the two criteria regarding off-label use have not been met and direct the division to issue a substantial equivalence determination.

[9] When the station is encountered, CDRH has determined that the most expedient course of action is for POS to send a draft "SE with limitations" letter to the submitter of the pending 510(k). The letter will propose the identical limitations imposed by the Office Director on the predicate device. The submitter will have an opportunity to assent or to request a telephone call or meeting with the Office Director, in accordance with the procedures outlined in the "Consultation" section of this memorandum. In cases where the submitter assent to the proposed limitations, the Office Director will immediately issue a final order.

Alternatively, if the Office Director believes that there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling and that this use could cause harm, the firm will have the opportunity to:

- Modify the device design to address the off-label use; or
- Request a written determination for the Office Director.

If the modified design satisfies the Agency's concerns regarding off-label use, the division will issue a substantially equivalent determination.

Finally, if the firm either fails to modify the device or decides to request a written determination from the Office Director, the Office Director will issue an "SE with limitations" letter within 10 days of the consultation.

The "SE letter with limitations" letter (the letter) will advise the 510(k) submitter that the Office of Director has determined that :

- there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling for the device; and
- Such use could cause harm.

According to ODE Blue Book #K97-1 entitled, "Deciding When to Submit a 510(k) for a Change to and Existing Device" http://www.fda.gov/cdrh/ode/510kmod.html, manufacturers are permitted to make certain labeling changes without submission of a new 510(k). The labeling submission included in the "SE letter with Limitations," however, are required by Section 513(i)(1)(E) of the Act. Therefore, a manufacturer must submit a new 510(k) before these limitations are modified in any way or removed from the device's labeling.

69. **Directions for Use** provides directions under which the intended user, whether a practitioner (trained health care provider)(21 C.F.R.§ 801.109; 21 C.F.R. 201.57) or layman (e.g., patient or unlicensed health care provider)(21 C.F.R. §801.5; 21 C.F.R. 201.5), can use a device safely and for the purposes for which it is intended. Directions for use also include indications for use and appropriate contraindications, warnings, precautions and adverse reaction information. All manufacturers of medical devices as well as drugs are required to provide the intended user with adequate instructions for use and warnings to avoid misbranding (21 USC 502[352](f)(1) & (2). Manufacturers of both FDA-regulated drugs and devices are prohibited

from statements or labeling which render a device and/or drug misbranded by false and misleading representations with respect to another device, drug, food or cosmetic. (21 C.F.R. 801.6; 21 C.F.R.§ 201.6). A drug is misbranded if it is dangerous to health when used in the dosage or manner prescribed, recommended, suggested , or suggested in a label (21 USC 502[352](j)

70. **Safety and Effectiveness Considerations** (21 C.F.R. 860.7) in determining the safety and effectiveness of a device for its intended use, the following factors are to be considered and addressed in the device' s labeling by the inclusion of appropriate information:

a) the persons for whose use the device is represented or intended;

b) the conditions of use for the device, including conditions of use prescribed, recommended or suggested in the labeling or advertising of the device, and other intended conditions of use;

c) the probable benefit to health from the use of the device weighed against any probable injury of illness from such use;

d) the reliability of the device;

e) and other relevant factors.

71. **Indications for Use** identifies the target population in a significant portion of which sufficient valid scientific evidence has demonstrated that the device, as labeled, will provide a clinically significant result and at the same time not present an unreasonable risk of illness or injury associated with the use of the device.

72. In terms of a combination of products (drug/device):

**21 C.F.R. 801.6: Medical devices; misleading statements**

> Among representations in the labeling of a device which render such device misbranded is a false or misleading representation with respect to another device or a drug or food or cosmetic.

## H. FDA'S GOOD GUIDANCE PRACTICE (21 C.F.R.§ 10.115)

73. According to February 14, 2000 (Volume 65, N. 30 proposed rules Good Guidance Practices pages 7321-7330), the FDA's February 1997 Good Guidance Practice (GGP) document provided FDA's working definition of guidance; established a standard way of naming FDA guidance documents; described the legal effects of guidance documents; established practices for developing guidance documents and receiving public input; established ways for making guidance documents available to the public; and provided information concerning the agency's existing appeals produced for disputes regarding guidance documents.

74. On November 21, 1997, the President signed Food and Drug Modernization Act (FDAMA) into law (Public Law No. 105-115), Section 405 of FDAMA, which added section 701(h) to the Act (U.S.C. 371(h), established certain aspects of the 1997 Good Guidance Practice (GGP) document as law. It also directed the agency to evaluate the effectiveness of the 1997 GGP document and then develop and issue regulations specifying the FDA's policies and procedures for issuance of guidance documents. As a result, the FDA proposed changes to 21 C.F.R. part§ 10 to clarify procedures about guidances.

75. The Presidential Memorandum of Plain Language on June 1, 1998, directed FDA to ensure that all its guidance documents are clear and easy-to read. The 1997 GGP document explained its purpose was to ensure the agency guidance documents are developed with proper amount of participation to have users have easy access to guidance documents and that guidance

documents are not treated as binding requirements for industry or FDA. The agency also wanted to ensure that every part of the agency followed these same policies and procedures. The FR continued regarding the proposal for 21 C.F.R. 10.115 [Final Rule 65 FR 56477, September 19, 2000 see below] :

> The 1997 GGP document also clarified what does and does not constitute a guidance document, and it provided examples.
>
> The 1997 GGP documents stated that guidance documents themselves do not create rights or responsibilities under the law, and guidance documents are not legally binding on you or on the agency. Instead, guidance documents explain how the agency believes the law applies to certain regulated activities. The 1997 GGP document also noted, however, that guidance document represents the agency's current thinking on a subject addressed in the document, and it is intended to ensure consistency in the application of laws and regulations. Therefore FDA supervisors will take steps to ensure that their employees do not make determinations that are different from what is in a guidance document without appropriate justifications and supervisory concurrence….
>
> Under the 1997 GGP document, the agency adopted a two-level approach to the development of guidance documents. Level 1 guidance documents were defined as those documents directed primarily to applicants/sponsors or other members of the regulated industry that set forth first interpretations of statutory or regulatory requirements, changes in interpretation or policy that are of more than a minor nature, unusually complex scientific issues, or highly controversial issues. Level 2 guidance documents included all other documents.
>
> For a Level 1 guidance document, which the agency defined as generally more controversial or new, FDA calls for public input, in most cases, before the document goes into effect. For a level 2 document, which is generally less novel or controversial in nature, FDA calls for your comments when the document is issued.
>
> The 1997 GGP document established certain standard elements that are included in all guidance documents, including: A standard way of referring to guidance documents; a statement of nonbinding effect; the absence of any language implying that the documents is mandatory; and other standard information, such as date of issuance and whether a document is draft or final.

**Statutory Requirements Under FDAMA**

Section 701(h) of the act (21 U.S.C. 371(h)) codifies certain parts of the 1997 GGP document. Section 701(h)(1)(A) of the act requires the agency to develop guidance documents with public participation and to ensure that information identifying the existence of such documents and the documents themselves are made available to you both in written form and, as feasible, through electronic means.

Section 701(h) (1) (A) of the act further explains that guidance documents shall not create or confer any rights for or on any person, although they represent the views of the agency on matters within its jurisdiction.

*Definitions*

Proposed Sec. 10.115(a) explains that "Good Guidance Practices (GGP's) set forth FDA's policies and procedures for developing, issuing, and using guidance documents."

Proposed Sec 10.115(b) (1) defines the term "guidance document"… [t]he agency defines guidance documents as those prepared by FDA staff, applicants/sponsors, and the public that describe the agency's interpretation of or policy on a regulatory issue.

The proposed regulation states that guidance documents include, but are not limited to, documents that relate to: (1) The design, production, manufacturing, and testing of regulated products; (2) the processing, content, and evaluation/approval of submissions; and (3) inspection and enforcement policies.

In addition, the agency is clarifying what is not a guidance document. As discussed in the 1997 GGP document, documents that would fall into the nonguidance category include: (1) Those relating to internal FDA procedures; (2) agency reports, (3) general information documents provided to consumers and health professionals, (4) speeches, (5) journal articles and editorials, (6) media interviews, (7) press materials, (8) warning letters, or (9) other communications directed to individual persons or firms.

As discussed above, proposed Sec. 10.115(c_ (3) defines "you" as all affected parties outside of the agency.

**B. Legal Effect of Guidance Documents**

Consistent with section 701(h) (1) (A) and (h) (1) (B) of the act, proposed Sec 10.115(d) describes the nonbinding effect of guidance documents. Specifically, it provides that guidance documents do not establish legally enforceable rights or responsibilities. They do not legally bind you or the agency.

> Proposed Sec. 10.115(d) further provides that you may choose to use an approach other than the one set forth in a guidance document. However, the alternative approach must comply with the relevant statutes and regulations.
>
> The proposed regulation also clarifies that although guidance documents do not legally bind FDA, they represent the agency's current thinking. Therefore, FDA employees may depart from guidance documents only with appropriate justification and supervisory concurrence.
>
> Proposed Sec. 10.115(i)(2) also provides that, due to the nonbinding nature of guidance documents, certain mandatory language cannot be included in guidance documents, unless the agency' is using these words to describe a statutory or regulatory requirements. Examples of such language includes words like "shall", "must," "required," or "requirement".
>
> **H. Conforming Changes**
>
> The agency is also proposing conforming changes to its regulations at Sec. 10.90(b) that describe the agency's procedures for guidelines. For many years, the agency issued documents articulating regulatory guidance that were referred to as "guidelines." However, since the development of GGPS, the agency has moved to referring to all documents that provide you with guidance as "guidance documents." To make these regulations consistent, the agency is proposing to revise Sec 10.90(b) to eliminate reference to the term guideline, and instead cross-reference the procedures for development, issuance, and use of guidance documents at Sec. 10.115. In addition, the agency is proposing to make conforming changes throughout parts 10, 14, 19, and 25 (21 C.F.R. parts 14, 19, and 25) to ensure the term "guidance document" replaces the term "guideline," as appropriate.

76. On February 9, 2001 there was the issuance of "CDRH Manual for the Good Guidances Practices (GGP) Regulations; Final Guidance for FDA Staff". CDRH indicated that the GGP regulations (21 C.F.R.§ 10.115) went into effect on October 19, 2000 (published September 19, 2000 (65 FR 56468). In terms of the designation of draft and final guidance, use of the term "*draft*" means that the guidance document is not for implementation, it is being issued only for public comment. "*Final*" means that the FDA is implementing the guidance when it was issued. FDA continues accepting public comment on all final guidance documents. When public comment is not feasible or appropriate, FDA may issue a Level 1 guidance as an Immediately-in-Effect instead of draft. FDA implements this type of Level 1 guidance as soon

as it is available on the Internet and in hard copy. The Level 1 draft issued for public comment is marked "*Draft Not for Implementation*". All Level 1 guidances are published with a notice of availability (NOA) in the Federal Register. Generally a Level 1 guidance will have a 90 day comment period. The Level 1 final is released after completion of review of public comments for a Level 1 draft. A final guidance document can be revised by FDA at any time. When public comment is not feasible or appropriate, the level 1 is issued identified as Immediately-in-Effect and implemented immediately at time of publication. Immediately-In-Effect guidances are limited to exceptions to public participation which included: public health reasons; statutory requirements, executive order, or court order that requires immediate implementation; or the document provides a less burdensome policy consistent with public health.

77. FDA must provide for a public comment period for all drafts guidances, which are Level 1. Therefore Level 2 documents are released only in Final form without an opportunity for public comment period. Level 2 guidances can be withdrawn by FDA at any time if considered as too controversial.

78. There are three kinds of FDA guidances:1) draft; 2) Final; 3) Final, Immediately Effective. The non-binding effect statement and least burdensome statement <u>must</u> be placed be in all CDRH guidance documents. By regulation per 21 C.F.R. § 10.115(i)(1)(iv), the nonbinding effect statement reads:

> *This document is intended to provide guidance. It represents the Agency's current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind the Food and Drug Administration (FDA) of the public. An alternative approach may be used if such approach satisfies the requirements of the*

| |
|---|
| *applicable statute and regulations.* |

## V. BASES FOR OPINIONS #4-6

### A. SHARED CONSIDERATIONS FOR EXTERNAL INFUSION PAIN PUMP MANUFACTURES

#### 1. FDA PREMARKET REVIEW OF EXTERNAL INFUSION PUMPS

79. CDRH's device review branch that has cleared over five hundred 510(k)s submitted for general postoperative pain pumps is General Hospital Devices Branch, Division of Dental, Infection Control and General Hospital Devices, Office of Device Evaluation (ODE). An industry guidance applicable to the review activities of this branch and FDA-regulated external infusion pump manufacturers is FDA's March 1993 guidance titled "*Guidance on the Content of Premarket Notification [510(k)] Submission for External Infusion Pumps*",. The guidance was last updated in September 5, 1997. The Introduction to the guidance (page 4-5):

> This document establishes the 510(k) review requirements for external infusion pumps. The external infusion pump may be electrically powered, mechanically powered, or use an alternate energy source. Examples of devices within this generic type of include peristaltic, piston, spring-driven, syringe, and elastomeric types of pumps.
>
> EXCLUSIONS
>
> This document does not address submission for implantable infusion pumps or closed-loop devices, which require premarket approval. This document also does not cover pressure infusors for IV bags (as described in 21 C.F.R. 880.5420)
>
> Definitions:
>
> **Infusion Pump**: described in FDA regulation, 21 C.F.R. 880.5725, as "a device used in a health care facility to pump fluids into a patient in a controlled manner….The device may also operate using a constant force to propel fluid through a narrow tube which determines its flow rate…

> **Elastomeric Pump**: an infusion pump which utilizes the energy in an elastic membrane to provide the force for fluid delivery…
>
> **Syringe Pump**: an external infusion pump which utilizes a piston syringe as the fluid reservoir and to control fluid delivery…
>
> **Intended Use**: the objective intent of the persons legally responsible for the labeling of the device. The intent is determined by their expressions or may be shown by the circumstances surrounding the distribution of the device. The objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such representatives. It may be shown by the offering or the using of the device, with the knowledge of such persons or their representatives, for a purpose for which it is neither labeled nor advertised (801.4). Some use conditions for infusion pumps may be included single use only, home use, reusable, intravenous and intra-arterial delivery.

80. For a 510(k) submission for an external infusion pump, the sponsor is required to provide proposed labels, labeling and advertisements sufficient to describe the device, its intended use and the directions for use. For devices intended for laypersons, the labeling is to conform to 21 C.F.R.§ 801.4 and §801.5, related to intended uses and adequate directions for use. For prescription devices the labeling is to confirm to 21 C.F.R.§ 801.109 and 21 C.F.R. §801.116. Regarding the commercial labeling and marketing of the device, ODE's guidance stated "*Other provision of Part 801 are deferred for review to CDRH/OCS*[10] *Device Labeling Compliance Branch*." Under device description, the sponsor was to provide a "clear statement of the intended use(s) of the infusion pump", and the guidance continued:

> a. Specify the route(s) of administration**.**
>
> b. If the infusion pump is labeled for use with a specific drug/biologic, the applicant must supply information demonstrating that use of the drug/biologic with the device is consistent with the approved drug/biologic labeling.

[10] Office of Compliance and Surveillance, CDRH, at FDA. Unlike ODE which is involved with premarket review of medical devices and determination of SE; OCS is a postmarket review branch at CDRH involved with the monitoring and determination of adulteration and misbranding and violative conduct for medical devices sold in the United States

c. Identify any specific uses for the pump…

81. If there was to be a new claim for a 510(k) for an infusion pump, such as "intra-articular use" or "orthopedic surgery," at some time in the process the General Hospital Branch Chief or the Division Director over General Hospitals Devices Branch, upon becoming aware of the new intended use or claim for the application, the reviewer had an option, based on workloads of both divisions, to obtain a consultation from or have the application transferred to a reviewer in the involved device branch, for example, Orthopedic Devices Branch, Division of General, Restorative and Neurological Devices. The Agency would also have the option to obtain a consult from another FDA center, including reviewers in the Office of Drug Evaluation (ODE)Center for Drug Evaluation and Research (CDER) if a device sponsor were making a claim about a new use of an approved drug, for example intra-articular use of a local anesthetic such as bupivacaine.

82. FDA utilizes its Establishment Registration and Product Listing databases to quickly be able to identify Specification Developers, Contract Manufacturers, Manufacturers, Repackagers and Relabelers for products both for the United States and non-United States in terms of oversight of industry, facility inspection, and requesting additional information about products.

83. Pursuant to 21 C.F.R. 880.5725, FDA grouped several types of pumps by features or characteristics and assigned an internal three digit Product Code. FDA classified elastomeric pumps under its three letter Product Code "MEB". FDA has cleared 84 MEB 510(k)s for distribution in the United States as of 2009. The Product Code "FRN" is used to designate "pump, infusion." There are more than 500 510(k)s cleared as "pump, infusion." The other

product code “MEA” is identified as “PCA” (patient controlled analgesia) pumps, with 30 510(k)s cleared for that indication. The majority of these external infusion pumps have been cleared by FDA’s reviewers in the General Hospital Devices Branch.

84. The Product Listing database with the Product Codes will help FDA quickly locate members of a particular industry engaged with production and marketing of certain types of product in the United States. Under the FDA’s assigned product codes for industry engaged with infusion pumps, there are 21 Establishment Registrations under product code “MEA” for infusion pumps, patient controlled analgesia (PCA). In 2009, Stryker is listed as an FDA registered establishment with MEA infusion pumps sold in the United States. Firms that are not registered with FDA in 2009 as producing MEA infusion pumps include DJO, McKinley, I-Flow, Curlin (MOOG or WalkMed).

85. Under the product code “MEB” there are 27 establishments registered with FDA listing MEB, elastomeric infusion pumps. Another manufacturer, Breg Mexico, Breg, Inc. an Orthofix Company, I-Flow and Stryker are all listed as involved with “MEB” pumps. However, DJO, McKinley, and Curlin (MOOG or WalkMed) are not listed with FDA as involved with MEB infusion pumps in the United States.

86. The third Product Code assigned by FDA for identification of external infusion pumps is “FRN.” The FDA’s database system is capable of returning a maximum of 100 registered establishments for this product code ( names A-So). Of the first 100 returned, Breg Mexico, Breg Inc, an OrthoFix Company; and I-Flow Corporation are listed. There is still no listing of FRN pumps for DJO, McKinley, and Curlin (MOOG or WalkMed) in 2009.

87. DJO has multiple establishments registered with FDA ( DJ Orthopedics De Mexico, DJ Frameworks LTD, China; DJO France SAS; DJO, LLC CA/USA), as well as a wide variety of listed products. DJO is identified to FDA as a Manufacturer; Contract Manufacturer; Repackager; Relabeler; and Specification Developer, but just not listed for pumps. However DJO has no listing in 2009 with FDA for any involvement in any capacity with infusion pumps of any product code.

### 2. CHANGING FROM A GENERAL TO A SPECIFIC INTENDED USE

88. FDA issued "*Guidance for Industry: General/Specific Intended Use*" on November 4, 1998. The stated purpose of the document was to assist medical device manufacturers understand the principles being used by FDA to determine whether the addition of a specific indication for use to a medical device cleared for marketing with a general indication for use could trigger the need for a PMA. FDA defined a change from general to specific indication for use as:

> Any proposed increase in the level of specificity of the indication for use of medical device. A change in a device's indication for use from general to specific usually results in an indication for use that is narrower than the approved or cleared general use. Such a change or additional indication generally will narrow the indication for use with respect to function, target population, organ or organ system, tissue type, disease entity, or analyte.
>
> <u>Regulatory Background</u>
>
> …Blue Book memorandum #K86-3 further states that the Center assesses any differences in indications for use in terms of the safety and effectiveness questions those differences may raise. This guidance also indicates that some modifications in indications will be considered a new use, "even though the intended effect of the new device is very similar to that of the predicate device." The Blue Book memorandum notes that slight modifications in indications for use can significantly change the intended use of the predicate device.

It should also be noted that the agency has received previous Congressional guidance which bears directly on the issue of substantial equivalence in the Report of the Committee on Interstate and Foreign Commerce on the Medical Device Amendments on 1976 (Senate Report):

> *The committee believes that the term, substantial equivalence, should be construed narrowly where necessary to assure the safety and effectiveness of a device but not narrowly where differences between a new device and a marketed device do not relate to safety and effectiveness.*

**Decision-Making Criteria**

**3.** *Risk*- Does a specific use introduce new risks not normally associated with the general use of the device?

**4.** *Public Health Impact*- Does a specific use impact public health to a significantly greater degree than the general use of the device? Differences in public health impact can result from changes in target population. These changes may have quantitative dimensions, but routinely will also affect safety and effectiveness because of major qualitative differences in how the device is to be used…

**5.** *Knowledge base*- Is there a body of evidence available to the agency regarding the proposed specific use that reflects existing understanding by the medical community that the more specific use is a subset of the general use, rather than a new intended use? The evidence can be derived from such sources as the medical literature and practical guidelines…

*Specific indications for use that ordinarily fall outside a general use for the purpose of determining substantial equivalence include:*

- Those indications for use that involve the diagnosis, therapy, or prevention of a particular disease entity or entities, especially where such entity carries clinical implications not normally associated with other general uses of the device…

It should be noted that the vast majority of submission for 510(k)s for specific indications for use are cleared as substantially equivalent to a legally marketed predicate for the general use. Some of these submissions require clinical data for clearance.

**Conclusion**

Determinations of substantial equivalence related to specific versus general indications are often difficult and complex. There are multiple factors that influence those determinations…Manufacturers may obtain further guidance by

communicating directly with the relevant ODE division either through submission of a 510(k) or prior to making a submission.

89. The five external infusion pump manufacturers all have received specific written guidance from FDA regarding the change from general post operative pain control to intra-articular post operative pain control (a more narrow indication). FDA determined that there was no cleared predicate pump intended for intra-articular or synovial infusion and, despite a September 30, 1998 clearance in what appears to be error, required that indication be removed from McKinley's OutBound pain pump in a letter of March 3, 1999. All subsequent continuous infusion pain pumps have consistently not been cleared for that new indication since 1998. If a pump sponsor wanted to pursue that new indication, as FDA discussed with I-Flow during a February 2006 teleconference for removing a contraindication for intraarticular placement, it would first be required to provide FDA with additional scientific data, animal and human, to support safety and effectiveness of that new indication (IFLOW30515-6). FDA would also require in the clinical protocol information about the use of a drug that was approved for the new proposed intended use. It would remain in FDA's purview to determine whether the new class III indication for intra-articular infusion could be marketed by a sponsor through either a 510(k) (21 C.F.R. 807) or a Premarketing Application (PMA) (21 C.F.R. 814).

90. The responsibility for monitoring the safety and performance of all these 510(k) cleared pumps, including the promotion, medical literature and updating of labeling rests with each manufacturer and distributor. Once ODE's reviewers have cleared or approved a device's premarketing applications for marketing, the daunting task for FDA's oversight and monitoring activities of industry and public safety for all United States medical device firms, including

distributors, shifts to CDRH's Office of Compliance (OCS) and FDA's District Offices, the postmarketing arm of FDA.

### 3. VERBAL COMMUNICATIONS WITH FDA EMPLOYEES

91. If a manufacturer wanted to request to receive an official advisory opinion from FDA on a matter of general applicability, for example, the approval process necessary for marketing of intra-articular pain pumps, pursuant to 21 C.F.R.§ 10.85 Advisory opinion, the request for such an opinion could be denied by FDA if: the information provided to FDA to consider was incomplete on which to base an informed advisory opinion; the Commissioner concluded that an advisory opinion could not be reasonably given on the matter involved; or the matter had already been adequately covered by a prior FDA advisory opinion.(i.e., opinions of 1998-9). A request for an advisory opinion from FDA is to be submitted to FDA in accordance with 21 C.F.R.§ 10.20 in the form described in "Request for Advisory Opinion."

92. The Commissioner may respond to either an oral or written request to the agency as a request for an advisory opinion, in which case the request will be subsequently filed with the Division of Dockets Management. An advisory opinion represents the formal position of FDA on a matter and obligates the agency to follow it until amended or revoked. An advisory opinion may be used in administrative or court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement. Regarding opinions obtained from FDA employees, according to 21 C.F.R. §10.85(k):

> A statement made or advice provided by an FDA employee constitutes an advisory opinion only if it is issued in writing under this section. A statement or advice given by an FDA employee orally, or given in writing but not under this section or 10.90, is an informal communication that represents the best judgment of that employee at that time but does not constitute an advisory opinion, does not

necessarily represent the formal position of the FDA, and does not bind or otherwise obligate or commit the agency to the views expressed.

**4. METHODS FOR OBTAINING CLINICAL DATA FOR FDA APPROVAL IN THE UNITED STATES**

93. FDA views the manufacturers,, sponsors, and distributors, McKinley, I-Flow, Stryker, and DJO as legally responsible for ensuring the safety of patients enrolled in their clinical studies intended for future device marketing and claims. FDA requires all sponsors of human research to ensure the safety of the public with investigational devices. Intra-articular use of pain pumps as encouraged by these firms is investigational and an unapproved use of a combination of a drug and a device instilled in a joint space for post operative pain. Such research can only be legally and ethically performed in the United States with, at a minimum, oversight and monitoring of an Institutional Review Board (IRB). The study is a significant risk study and should also be performed under either an FDA approved IDE (device) or IND (drug).

94. FDA requires sponsors of clinical investigations to ensure that both the investigators (physicians) and patients are adequately informed about the potential risks of an investigation. Subjects must first sign an adequate informed consent before voluntarily being enrolled in a study. An investigator is required to sign an Investigators Agreement to abide by the protocol. The investigators are to receive Investigator Brochures providing information about the potential risks and benefits for subjects, the protocol, and how to complete the Case Report Forms for data collection. The investigation sponsor is required to maintain patient reports and records and to notify FDA of adverse events occurring in its studies.

95. McKinley, I-Flow, Stryker, and DJO have each been a **"sponsor"** of investigational intra-articular continuous infusion since 1999 using investigational local

anesthetics for post operative pain management following orthopedic procedures. Unfortunately, the studies have been performed without the knowledge and consent of the investigators or the patients and without informing the sales representatives, and without approval of the FDA. Some of the rare studies have had involvement of an IRB. According to FDA, the definition of a sponsor is one that:

> …..initiates but does not actually conduct the clinical investigation. An entity other than an individual (e.g. a corporation) which uses one or more of its own employees to conduct an investigation that is has initiated is considered to be a sponsor of the investigation and its employees are considered to be "**investigators**". Financial agreements, incentives, consulting agreements, contracts or other benefits can "initiate" or trigger research or procedures that change the standard accepted practice of medicine or treatment.

96. United States sponsors are legally responsible for the conduct of clinical investigators, assurance of safety of the subjects, accountability and control of its investigational products, documentation of valid informed consent, report and record keeping, ensuring IRB approval and reporting adverse events to investigators and FDA. Since no local anesthetics were currently approved for infusion into a joint, the use of any local anesthetic for the new indication or intra-articular infusion was investigational.

97. For the components of clinical investigations, FDA uses the following definitions:

> A "**subject**" is a human who voluntarily agrees to participate in a clinical investigation, either as an individual on whom or on whose specimen an investigational device is used. The subject may also serve as a control. A subject may be of normal health or may have a medical condition or disease. The subject has the moral, ethical and legal right in the United States to be adequately informed prior to enrollment in an investigation regarding the known and unknown risks and benefits and then to voluntarily elect to participate or not participate after the risks and benefits have been explained.

An "**unanticipated adverse device effect**" is considered to be any serious adverse effect on health or safety, any life threatening problem or death caused by, or potentially associated with a device, if that effect, problem, or death was not previously identified in nature, severity, or degree of incidence in the IDE application; or any other serious problem associated with a device that relates to the rights, safety, or welfare of subjects. 21 C.F.R. 860.7 lists the definition of a well-controlled clinical investigation.

An “**Institutional Review Board**” (IRB) is required to consist of a minimum of five members who posses varying backgrounds to promote a complete and adequate review of research activities conducted at the institution. The IRB members are to possess a professional competence necessary to review the specific research activities. IRB members are required to be knowledgeable about the issues involved in the proposed investigation. An IRB member is permitted to be involved in the research being reviewed by the IRB, but that member may not vote on approving or disapproving the proposed research nor may they be involved in the continuing review of the research (21 C.F.R. 56.107(e)).

98. Since 1971, FDA has required that all clinical studies involving investigational "FDA-regulated products" performed using human subjects within institutions in the United States have review, approval and monitoring by an IRB. In 1976, medical device clinical trials were specifically required to have IRB review, approval and monitoring as the result of passage of Medical Device Amendment (MDA).

**21 C.F.R. 50.20 General requirements for informed consent**

Except as provided in §50.23, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative. No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's rights, or releases or appears to release the investigator, the sponsor, the institution, or its agents from liability for negligence.

**21 C.F.R. 50.25 Elements of informed consent**

(a) Basic elements of informed consent. In seeking informed consent, the following information shall be provided to each subject:

(1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental.

(2) A description of any reasonably foreseeable risks or discomforts to the subject.

(3) A description of any benefits to the subject or to others which may reasonably be expected from the research.

(4) A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject

(6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained.

(8) A statement that participation is voluntary, that refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled.

99. It would have been a reasonable expectation of an orthopedic surgeon from 1998-2009, that responsible orthopedic manufacturers, distributors or sales representatives would share a similar concern about their patients' safety and would adequately warn about a lack of adequate testing and a lack of an approved local anesthetic for an intra-articular infusion. An orthopedic surgeon from 1998-2009 would also assume that a responsible firm would have informed physicians that its orthopedic pain pump devices for intra-articular use were considered investigational by FDA and that a manufacturer would inform them if it had failed to conduct adequate testing and review of the medical literature to determine the benefits for the physicians'

patients were not commensurate with the risk. At an absolute minimum, orthopedic surgeons would reasonably expect to be notified or warned by the manufacturer and distributors that the FDA had repeatedly rejected intra-articular use of pain pumps.

100. It is a Prohibited Act and violation of the FDCA pursuant to 21 USC 301[331] for anyone to introduce or deliver into interstate commerce any drug or device that is adulterated or misbranded. As a relabeler of pain pumps, DJO received in interstate commerce misbranded and adulterated devices for intra-articular use through 2003 from I-Flow and then from McKinley/Curlin. Receipt of adulterated (class III and investigational) or misbranded devices is prohibited. DJO was aware from 1998 through 2009 that the pain pumps it received and relabeled and sold were not approved by FDA for intra-articular indication yet failed to reveal that very material fact to either physicians, its own sales representatives or sales forces of its distributors including Pacific Medical, as required by 21 USC 321(n) and 21 C.F.R. 1.21.

### 5. MANUFACTURER'S OBLIGATION PURSUANT TO THE ACT TO CONTROL USE OF 510(k) CLEARED PRODUCT

101. The first example of a manufacturer's responsibilities for controlling the use of its devices, involves reuse of hemodialyzers, a component that goes inside the hemodialysis machine to filter (dialyze) the patient's blood. In the hemodialysis industry, physicians independently began to reuse of hemodialyzers for the same patient to reduce the loss of blood in priming the device at each dialysis session. As a result, the hemodialysis industry began to develop products specifically intended to help with reuse of hemodialyzers. FDA cleared these devices as accessories to hemodialysis machines to facilitate unapproved use of hemodialyzers by 510(k). Individual hemodialyzer manufacturers, aware of the new unapproved use of their devices by physicians, provided physicians with no reuse guidance, testing or label instructions

or warnings regarding the risks of "off-label" use to ensure safety of patients. Not all hemodialyzers, cleared for single use, were equally able to be safely reprocessed. The manufacturers remained silent about the risks for each of its products.

102. In 1995, based on FDA's concerns about public health and disease transmission, FDA issued its Hemodialyzer Reuse Labeling Guidance. Manufactures of hemodialyzers, not the physicians, were held by FDA as legally responsible under 21 C.F.R. 801.4 for providing adequate instructions for use and warnings based on the intended use for their hemodialyzers. All hemodialyzers were required to be adequately labeled by each manufacturer based on the intended use of the product. All promotion and representations made by manufacturers were to be consistent with its hemodialyzer's 510(k) cleared intended use and label. Manufacturers of hemodialyzers who continued to intend products for "single use" were legally required to ensure the use of the product by physicians was as "single use" or be held in violation of the Act by FDA. In other words, the FDA considered it the responsibility of the manufacturers, not the medical community, to be aware of this off-label use, and that the manufacturer had a duty to disclose to healthcare providers not to use the product in a manner inconsistent with the label.

103. Another example of an obligation of a manufacturer to ensure consistent use of its 510(k) cleared devices according to its cleared label occurred in 2004 and involved a biliary stent being used for a new and unapproved indication. Johnson & Johnson ("J&J") conducted a voluntary product recall to curb "off label" use by physicians with its biliary stent. The recall was based on public health safety and a manufacturer's legal requirement under the Act to provide health care providers with adequate instructions and warnings according to its intended use (21 C.F.R. 801.4). In April 2004, J&J was required to voluntarily conduct a Class I recall of

its Precise Rx Biliary Stents. The Precise Rx Biliary Stents are class II 510(k) cleared biliary stents considered a palliative device for patients with biliary obstruction from cancer. As palliative devices, these stents are cleared based only on mechanical testing, with no requirement for clinical trials and human data. The recall was conducted because J&J "became aware" of "off- label" ( unapproved use) by cardiologists of the biliary stent for a new and unapproved intended use, namely cardiac coronary artery stenting. The Precise biliary stents were being used by physicians, as a result of J&J representations, as coronary artery vascular stents. When intended as a vascular stent, the same stent design became a class III device now requiring clinical trials, and FDA's PMA approval of both the device and label. J&J's biliary stent was not approved as a vascular stent, and at that time was considered an investigational vascular stent available only at approved investigational sites for approved clinical investigators under an FDA approved IDE.

104. J&J was required to remove all violative Precise biliary stents from the United States market and submit a new 510(k) requesting to add a new contraindication to the stent's label contraindicating vascular use. J&J sent out a notification to healthcare providers warning that "off-label" use of its Precise biliary stent was contraindicated and investigational and not shown to be reasonably safe or effective. FDA also required that all J&J's promotions for the Precise Biliary Stent be consistent with the class II cleared intended use until time of PMA approval.

### 6. FAILURE TO REVEAL MATERIAL FACTS

105. Among the general provisions of the regulations implementing the Federal Food Drug and Cosmetic Act is 21 C.F.R.§ 1.21. The regulation is applicable to the conduct of all

firms involved with relabeling, distribution or sales of FDA- regulated products sold within the United States pursuant to 21 USC 321(n), 21 USC 325(a) and (f)(1)& (2). All manufacturers, relabelers, and distributors have a duty to adequately warn of risks and to protect the public. Pursuant to 21 C.F.R. 1.21:

> (a) Labeling of a food, drug, device, or cosmetic shall be deemed to be misleading if it fails to reveal facts that are:
>
> (1) material in light of other representations made or suggested by statement, word, design, device or any combination thereof; or
>
> (2) Material with respect to consequences which may result from use of the article under: (i) The conditions prescribed in such labeling or (ii) such conditions of use as are customary or usual.
>
> (b) Affirmative disclosure of material facts pursuant to paragraph (a) of the section may be required among other appropriate regulatory procedures, by (1) Regulations in this chapter, promulgated pursuant to section 701(a) of the act; or
>
> (2) Direct court enforcement action.

106. A label that indicates a infusion pump can be used in an “intraoperative site,” when being promoted by a sales representative to an orthopedic surgeon, misrepresents that the device can be used in an “orthopedic” intraoperative site and that there is a drug approved by FDA as safe and effective for that indication. This is especially true if the surgery was in a joint, an intra-articular operative site. Unless the surgeon is told otherwise by either product information, including warnings or by an adequately trained and knowledgeable sales representative, falsely implies ability to use the pump safely and effectively for post operative pain management following an arthroscopic and/or joint surgery. The failure of so many pump manufacturers to appropriately and adequately reveal the material facts about the limitations and

risks of continuous infusion pain pumps for orthopedic indications and intra-articular infusion directly contributed to patient injuries.

**B. FDA CLEARANCE OF MANUFACTURERS, RELABELERS AND DISTRIBUTORS EXTERNAL INFUSION PUMP 510(k)s:**

1) **MCKINLEY;**
2) **I-FLOW;**
3) **DJO;**
4) **STRYKER**

**1. MCKINLEY, INCORPORATED**

**a. K971844 OUTBOUND2**

107. McKinley Incorporated's, 510(k) K971844 Outbound-2 System was received by FDA on October 27, 1997 and cleared on January 23, 1998. The OutBound 2 was cleared with the following indications for use (IFU) as a prescription device:

> The McKinley OUTBOUND-2 is indicated for patients requiring intravenous, intra-arterial, subcutaneous, or enteral administration of medication. It is convenient for use by ambulatory patients.(PUB000001)-

108. The pump was assigned by FDA Product Code "FPA," intravascular administration set. Of a return of over 100 registered and listed firms on FDA's website making a product under FPA ( names from A-K), in 2009 DJO and Curlin products are not listed with FDA. The designation by FDA as FPA indicated that the FDA did clear the McKinley device not as a patient controlled analgesia(PCA) infusion pump but rather based on the syringe design. (See Hung Trinh memorandum July 21, 1998 below).

**b. K982256 OUTBOUND LABEL CHANGE**

109. On June 23, 1998 Suzanne Dennis, Director of Regulatory Affairs and Quality Assurance at McKinley sent a letter to FDA requesting to make a label change for its OutBound Family of disposable ambulatory infusion pumps. The request was assigned K982256 by FDA. The letter stated McKinley's new request:

> The intended use of the pumps-precisely-controlled infusion of medications of fluids- will not be affected by the proposed modification. The proposed modification is to add the term "synovial cavities" to the list of infusion sites. There have been no changes made to the device to accommodate the proposed labeling.
>
> The outbound family of ambulatory infusion pumps provide Continuous, Intermittent and Patient Controlled Analgesia (PCA) infusion. The pump is indicated for intravenous, subcutaneous, enteral, epidural and arterial infusion of antibiotics, analgesics, chemotherapeutic agents and other medications. Detailed product information can be found in previously submitted 510(k)s listed in Section A.
>
> The following information is being provided in compliance with C.F.R. 807.87 (FOIS-000051)
>
> APPENDIX 2-DESCRIPTIVE COMPARISON TO A LEGALLY MARKETED DEVICE
>
> McKinley Medical believes that there have been no significant changes to the device with the addition of an alternate infusion site. The intended use of the device- precisely controlled infusion of medications or fluids- has not changed. The proposed modification listed in Appendix 1 provides physicians with an additional infusion site for the infusion of medications
>
> The physician determines the parameters of the infusion: medication, duration, flow rate, including which location and mode of infusion best meets the needs of the patient.
>
> The addition of intrasynovial cavities (areas surrounding bone) as an infusion site does not introduce new risks not normally associated with the use of the device,
>
> Orthopedic surgeons are currently using a substantially equivalent pump (I-Flow Disposable 'PainBuster') for this indication (FOIS-000057).

110. McKinley assured the FDA that it had already determined that continuous infusion into the synovial cavity would raise no new risks. It was the responsibility of McKinley and not FDA to have first determined through its own testing or review of the medical literature if that was indeed a truthful statement. As a follow-up to its request, McKinley sent a July 7, 1998 letter referencing its phone call with FDA on July 7, 1998. To complete the more recent requirements to allow filing of a 510(k) application for review by FDA, McKinley sent FDA an Indications for Use (IFU) Form and a signed Truthful and Accurate Statement. The requested new McKinley IFU included "synovial cavity" in the singular and not plural:

> The Outbound infuser is indicated for intravenous, intra-arterial, subcutaneous, epidural, and synovial cavity infusion of medications or fluids requiring continuous delivery at controlled infusion rates (FOIS-000040).

111. The FDA's assigned reviewer for the McKinley K982256 510(k) was Hung Trinh, GHDB/DDIGD/ODE/CDRH. He made a July 21, 1998 memorandum to the official 510(k) record regarding a summary of a phone conversation held with Ms. Dennis, McKinley and his rationale for placing the 510(k) "on hold" to stop the FDA's review clock and provide McKinley with time to provide the additional information to complete the review of the 510(k). H. Trinh wrote (underlining added for emphasis):

> I contacted Ms. Dennis and told her that the predicate devices she cited do not have the same indication:"…for synovial cavity infusion of medications or fluids requiring continuous delivery at controlled infusion rate." I asked her to clarify the intended use statement. She indicated that she has seen other devices that are used for postoperative pain management, and would like to extend the device's indication to include postoperative pain management. I told her that she would need to specify a legally marketed device that has the same intended use. She may even want to consider modifying her intended use to be consistent with other legally marketed device. In addition she would also need to compare the characteristics of her device to those predicate devices. The comparative characteristics could include volume, flow rate, <u>pressure output</u>, and route of administration. Where there are differences, justification should be provided to

> show that no new safety or effectiveness issues are raised, Ms. Dennis understands that the submission will be placed on hold pending the receipt of additional information.(FOIS-000034)

112. There is a July 21, 1998 internal email from Ms. Dennis to Steve Bush and Randy Hoffman, McKinley, titled "synovial site-FDA contact:"

> Received a phone call a few minutes ago from FDA. Indicated they were having trouble finding a predicate device. I re-iterated IFlow approval. They asked me to fax the flyer which I did. I asked them to please help since I wasn't able to obtain labeling, but they obviously had recently approved it. And would they please help….
>
> He did state that during chats with orthopedics they mentioned that their current devices have some sort of pressure relief valve to assure that too much pressure doesn't build up (GR001558).

113. Ms. Dennis wrote back to FDA, "Per our telephone conversation of July 29, 1998, enclosed are the requested documents: Revised Indications for Use Form; Comparison of Predicate Devices"(FOIS-000012). For comparison of volume, flow rate, pressure and route of administration, Ms. Dennis sent a paper with a handwritten note with SE PCIP K898422 (there is no such pump in database) and K980558 I-Flow's PainBuster (see below). McKinley re-submitted its official response and amended 510(k) information and indications for use on August 14, 1998, thus restarting the Agency's review clock.

114. In a Memo to the Record 510(k) Review, dated September 29, 1998 by H. Trinh, the day prior to FDA's clearance of McKinley's OutBound 510(k), he wrote indicating there was no agency plan to clear the new indication of synovial cavity for the OutBound pump:

> SUMMARY DESCRIPTION OF THE SUBMISSION UNDER REVIEW:
>
> The firm intends to expand their indication to include"…continuous infusion of a local anesthetic directly into the operative site for postoperative pain

> management." The firm has removed the previous claims regarding the synovial cavity infusion of medication.
>
> INTENDED USE:
>
> The device is indicated for intravenous, intra-arterial, subcutaneous, and epidural infusion of medication or fluids requiring continuous delivery at controlled infusion rates.
>
> The device is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

115. In an unexpected twist, on September 30, 1998 FDA issued a 510(k) clearance letter for K982256 which included the new indication for synovial cavity, the McKinley pre-August 1998 proposed IFU. The 510(k) clearance letter began "[w]e have reviewed your Section 510(k) notification of intent to market…"(GR004486). FDA cleared the following IFU for the McKinley Outbound Disposable Infuser:

> Indications for Use
>
> The Outbound infuser is indicated for intravenous, intra-arterial, subcutaneous, epidural, and synovial cavity infusion of medications or fluids requiring continuous delivery of controlled rates. (GR004488).

116. As will be discussed further below, it was I-Flow's request for a 510(k) clearance of synovial clearance with McKinley as a cleared predicate, that appeared to notify FDA that McKinley's clearance had included an intended use for synovial cavity.

### i. FDA NOTIFIED MCKINLEY IN WRITING THAT IT REVOKED THE SYNOVIAL CAVITY INDICATION- MARCH 3, 1999

117. Despite the 510(k) clearance of September 30, 1998, on March 3, 1999 FDA, in an unusual move for FDA , it sent a revised 510(k) clearance letter to Ms. Dennis and McKinley regarding the agency's retraction of a synovial cavity indication from the OutBound 2 Disposable Infusion Pump. FDA provided no additional public explanation for its actions. The

510(k) clearance letter was signed by Timothy Ulatowski, Director, Division of Dental, Infection Control and General Hospital Devices. The agency's letter began:

> This letter corrects our substantially equivalent letter of August 14, 1998, regarding the Indications for Use (enclosed).
>
> We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent [(for the indications for use stated in the enclosure)] to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976…(FOIS-000071)
>
> **Indications for Use:**
>
> The OutBound DIP is indicated for intravenous, intra-arterial, subcutaneous, and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The OutBound pump is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.
>
> (FOIS-000014; FOIS-000073)

**c. K990461 MCKINLEY SP DISPOSABLE INFUSION PUMP (BEELINE SYSTEM)**

118. On May 13, 1999, McKinley submitted K990461 for a McKinley SP (Spring Pump) Disposable Infusion Pump obtaining 510(k) clearance on June 30, 1999. The device would be marketed by McKinley under the name "BeeLine System". The cleared IFU:

> The McKinley SP is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The McKinley SP is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

**d. K023098 ACCUFUSER/ACCUFUSER PLUS**

119. In September 2002, McKinley submitted K023098 for clearance of an Accufuser; Accufuser Plus; Standard Procedure Kit, an elastomeric infusion pump kit, product code MEB. The new 510(k) was for a modification to an existing device K003915 Accufuser and Accufuser

Plus. Predicates include K013928 Breg Corporation, PainCare 3000 and 32000, and Accessory kit; K014091 Stryker Pain Pump and Accessory Kit; K020862, I-Flow Infusion Pump and Administration Set. The modifications to the Accufuser included: two new proposed IFU; expansion of the bolus delivery range; addition of two bolus lockout times; addition of one reservoir volume size by combining two reservoirs; addition of flow rates for bolus devices; and addition of a standard procedure kit. FDA assigned the product a product code MEB. The cleared IFU for the Accufuser:

> The Accufuser and Accufuser Plus systems are intended for general infusion use. Routes of infusion include intravenous, percutaneous, intra-arterial and epidural, and into the intra-operative (soft tissue/body cavity) site. The Accufuser Plus is also intended for a patient-controlled infusion using the integrated bolus button. General infusion uses include pain management for preoperative, perioperative and postoperative surgery.
>
> The Accufuser and Accufuser Plus systems are also intended for continuous and/or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative , perioperative and postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural or percutaneous.
>
> The Accufuser/Accufuser Plus system is suitable for use in an ambulatory device and is intended for use in the hospital, home environment or alternative care sites.

**e. K032542 BEELINE MOTIV**

120. McKinley then submitted in August 27, 2003 a Special 510(k) K032542 to request clearance of a modification to its June 30, 1999 McKinley Sp (Beeline System) K990461. The modification was called Beeline Motiv. McKinley cited K990461 as well as K023098 Accufuser and Accufuser Plus as the predicates. FDA cleared the Special 510(k) on September 23, 2003. The Beeline Motiv was cleared with the same IFU as the McKinley SP (BeeLine System), with FDA assigned product code FRN:

> The Beeline system is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Beeline system is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

121. On the same day as clearance of K032542, September 23, 2003, FDA also cleared K032642 for the Beeline Motiv Spring Pump & Kit. The 510(k) was received on August 27, 2003. The application was for a modification of K023098 to include standard procedure kits with multiport catheters. It was cleared for the same IFU:

> The Beeline system is indicated for intravenous, intra-arterial, enteral, subcutaneous and epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Beeline system is also intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

**f. K042228 BEELINE MOTIV, PROPOLIS PCA**

122. On August 17, 2004, McKinley submitted K042228, Beeline Motiv, Propolis PCA System & Kit, which was cleared on November 8, 2004. The predicates were K990461 and K032642. The modification to the existing Beeline system consisted of an extension of the flow rate range; addition of new medication reservoir volumes; addition of an indication for use; addition of bolus capability; addition of intermittent flow capability. Supporting other predicate devices included McKinley's Accufuser (K033039), I-Flow's "Elastomeric Pump" (K040337)(see below), the Baxter Colleague Volumetric Pump (K010566), and the SIMS Deltec CADD-Prizm Model 6101 Ambulatory Infusion System (K000842). The product code assigned by FDA was FRN and it is a prescription device. The cleared Indications for Use:

> 1. The Beeline system is intended for continuous and/or intermittent infusion of medication for general infusion use, including antibiotic delivery, chemotherapy and pain management. The Beeline system is indicated for

intravenous, intra-arterial, enteral, subcutaneous, percutaneous and epidural infusion of medications or fluids requiring continuous and /or intermittent delivery at controlled infusion rates. The Beeline system is suitable for use as an ambulatory device and is intended for use in the hospital, home environment, and alternative care sites.

2. The Beeline system is intended to provide continuous and /or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative, perioperative and postoperative regional anesthesia and pain management. The Beeline system is also intended for patient-controlled infusion using the integrated bolus device.

3. The Beeline system is intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**g. K050770 ACCUFUSER/ACCUFUSER PLUS**

123. Following up on the trend to claim reduction of narcotic use as in I-Flow's K040337, cleared May 24, 2004, McKinley submitted K050770 on March 25, 2005 as modifications to the McKinley Accufuser, Accufuser Plus and Standard Procedure Kit which was cleared on April 14, 2005. Predicates cited by McKinley were: K003915 (Accufuser HELPTechnologies, cleared 2001 510(k) submitted by Robert Bard- (see I-Flow below)); K023098 (McKinley Infuser Accufuser, cleared 2002); and K033039 (McKinley Accufuser modification, cleared 2003). The 2005 request was to modify the IFU. McKinley requested to add to the already approved IFU for its Accufuser/Accufuser Plus:

> The Accufuser and Accufuser Plus systems are intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**h. K060119 SATURATION CATHETER**

124. McKinley obtained its final clearance on April 12, 2006 of K060119 of a McKinley Saturation Catheter classified as an anesthesia conduction catheter, product code BSO.

The device claimed substantially equivalence to Micor, Inc's Wundcath Conduction Catheter K031600 & K003966 and I-Flow's Soaker Catheter K994374. The catheter is a flexible tubular infusion catheter with multiple holes (fenestrations) along the distal end of the catheter producing an infusion segment. The catheter would be available in a number of sizes and diameters. The FDA cleared the device with the product code FRN as an accessory to an FRN infusion pump.

**i. K980791 CURLIN'S CUE AMBULATORY VOLUMETRIC INFUSION PUMP CAREMED5**

125. Curlin, at one time part of "Becton Dickinson Curlin, LLC," a firm based in Huntington Beach, CA, would later combine with McKinley in 2006. Curlin kept the brand names for the McKinley pumps, but has not used the name "McKinley." Curlin is now a wholly owned subsidiary of MOOG. Curlin submitted a 510(k) K980791 for clearance of its CUE Ambulatory Volumetric Infusion Pump (Care MED5)(Product Code FRN) on September 14, 1998. Becton Dickinson Curlin claimed substantial equivalence to the Sabratek 6060 HOMERUN Volumetric Infusion Pump K941984 and Abbott's Ambulatory Infusion Manager Plus (Abbott AIM Plus). The CareMED5 was called an electromechanical curvilinear (Peristaltic Action ) volumetric infusion pump. FDA cleared it as product code FRN on December 4, 1998 with the following Indications for Use:

> The CareMED5 infusion pump can be used for intravenous, intra-arterial, epidural, subcutaneous, or enteral infusions. Any therapy should be overseen by a physician or certified, licensed healthcare practitioner. The infusion pump can provide therapy to patients/users who are ambulatory and needed an alternative to receiving their medication in a restricted manner (hospital or clinic). Typically, these patients are capable of being given instruction for performing basic tasks by having a caregiver closely by, or living with them. All patients and caregivers must be instructed in the use of the CareMED5 by a qualified clinician and demonstrate an adequate level of proficiency in the use of the pump.

> The CareMED5 is small, lightweight and is designed to have exceptional ease so that after learning the pump features and basic programming, the pump can be operated and can be customized to the specific needs of each individual patients without the need to constantly refer to the User's Manual.(00009)

**2. I-FLOW CORPORATION**

126. I-Flow, Inc. was formed in 1985. In 1996, I-Flow Corporation acquired Block Medical, a company that manufactured and promoted general infusion pumps sold under the names Verifuse Ambulatory Pump (K902891; K934551) and HomePump (K896546;K944692) (R. Masengale 7/1/08; p16, L. 3-4; p26, L 20-24). I-Flow used the pump technology for its Vivus (K913907; K915646;K924527) and SideKick (K923875) and to develop two subsequent lines of infusion pumps called the ON-Q and PainBuster. Initially, I-Flow's plan was to have the PainBuster distributed through DJO for orthopedics (R. Masengale 7/1/08, p195-6, L.10-7). The I-Flow PainBuster Pump would be marketed by DJO with the private label name DonJoy for orthopedic indications. I-flow also had J&J's Ethicon Endo-Surgery distribute the other line of I-Flow pumps called ON-Q pump for general surgery. (R. Masengale 7/1/08 p 41-42, L. 24-2; 7/2/08. 227 L 20-23).

127. During the product development phase of the PainBuster, I-Flow's development team consisted of engineers, marketing and regulatory affairs personnel. The only employee assigned to the project with medical expertise was Kathy Thompson, a registered nurse. However, she worked on the project for marketing the PainBuster and not to address safety aspects of the pump development (Roger Massengale 7/1/08; p 31-33 L. 10-3). I-Flow's communications with its physician consultants was for product development and not to determine the safety of exposing cartilage to common local anesthetics or the effects of

increasing the amount of anesthetic delivered to joints. (Roger Massengale 7/1/08, p 70-75, L. 22-14).

128. I-Flow never did a clinical study designed by I-Flow for this purpose. This was confirmed by Alan Dine's testimony. (Alan Dine 12/16/08, p 34, L.2-6). I-Flow promoted intra-articular use while warning that "Medications must be administered per instructions provided by drug manufacturers." (IFLOW ESD 061236-7). However, I-Flow failed to warn physicians that there was no local anesthetic approved for prolonged infusion into the intra-articular space. Any physicians reviewing the labels for commonly used local anesthetics would find no mention or instructions about intra-articular use of the medications. Since not all commonly used local anesthetics still have labels published in the Physician's Desk Reference (PDR), it cannot be assumed that health care providers would always be able to locate an anesthetic's product information in the PDR to determine whether or not a drug had been approved by the FDA for use in joints.

129. I-Flow first intended to expand its PainBuster product line through obtaining FDA's clearance for "continuous infusion of a local anesthetic directly into the <u>intraoperative site</u> for postoperative pain management."(IFLOW0002682) I-Flow continued to produce the HomePump C- Series through at least 2004. The PainBuster differed from the HomePump C series in that it was designed to deliver drug via a catheter. The catheter was to be included as part of the I-Flow infusion pump kit (IFLO0002682-693).

130. The year 1998 was an active regulatory year for I-Flow. In 1998, I-Flow submitted at least four 510(k)s to FDA to obtain clearance of pain pumps: 1) K980558 PainBuster (submitted February 13, 1998, cleared May 28, 1998); 2) K 982946 PainBuster

(submitted August 21, 1998, cleared November 18, 1998); 3) K984146 Paragon (submitted November 19, 1998, cleared February 9, 1999); 4) K984502 Nerve Block(submitted December 18, 1998 , cleared March 4, 1999). Often times there would be multiple I-Flow 510(k) applications in the same review branch.

131. In I-Flow's 1997 10K Report (filed in March 1998), I-Flow told its shareholders about studies it had conducted with pain pumps for postoperative pain management, that it intended to market pumps to orthopedic surgeons and that it:

> …recently applied for FDA permission to market a new pain management kit for use by orthopedic surgeons. Preliminary results from more than 25 patients has shown a significant reduction in pain after surgery and a significant reduction in the time for rehabilitation of the repaired limb, all with a reduction in the use of oral pain medications and their unpleasant side effects. Once permission to market is received, we intend to begin selling this new pain kit to orthopedic surgeons through a yet unnamed distribution partner.

132. Yet only one month earlier, (as discussed below), it had filed a 510(k) (K980558, PainBuster) with FDA and failed to mention to FDA that it intended to pursue the use of the pump for a new "orthopedic indication."

**a. K980558 PAINBUSTER**

133. On February 11, 1998 Robert Bard, ESQ, RAC, I-Flow's VP Regulatory and Legal Affairs, submitted 510(k) K980558, PainBuster Infusion System, to FDA. The 510(k) was cleared on May 28, 1998(IFLOW0002682-686; DJO1128-139) as a general surgery elastomeric infusion set. The predicates cited by I-Flow included the Pain Control Infusion Pump (PCIP) (K896422) distributed by Sgarlato; the I-Flow HomePump C-Series (K944692); and HomePump Eclipse (K932740). The I-Flow HomePumps were elastomeric pumps intended for "general" infusion. The Sgarlato pump predicate, manufactured by Burron/B. Braun for Sgarlato, was used

as a predicate to help expand I-Flow's pump indication for use statement, allowing I-Flow to claim as an indications for use (IFU) statement: "[*t*]*he system is indicated for the relief of pain in patients following surgery, by the continuous administration of medication into the wound site.*" (IFLOW0002682-730).

134. I-Flow's initial PainBuster came in three sizes and flow rates from 0.5-2.0ml/hr: 65ml volume, 0.5ml/hr flow rate; 125 ml volume, 1.5ml/hr flow rate; and 125 volume, 2.0 ml/hr flow rate. The catheter used was a 20gauge, 11 to 40 in length, B. Braun K813186 (B. Braun Perifix Epidural Catheter Set, Product Code BSO, anesthetic conduction catheter). The test fluid used for product design was 0.9% saline with an operating pressure of 9 to 14 psi.

135. The I-Flow PainBuster Infusion System 510(k) was assigned product code MEB. It was cleared on May 28, 1998 by FDA as intended for intraoperative (soft tissue/body cavity) site for postoperative pain management, and not intended for epidural, subcutaneous or vascular drug delivery or chemotherapy (IFLOW0002678-81).

136. At this same time, I-Flow began negotiations with Smith & Nephew, Inc, Division DJO, Bracing and Support System, to purchase and distribute I-Flow's PainBuster for orthopedic indications. On August 31, 1998, I-Flow and Smith & Nephew entered into a Letter of Understanding to enter into a future Distribution Agreement that would give S&N the right to distribute the PainBuster Infusion Kits in the United States and Canada for areas of Sports Medicine, Trauma, Joint Repair and Replacement, Podiatry and Spine. The Product as defined by the Letter of Understanding was for PainBuster kits, which are used for continuous infusion of local anesthetics into intraoperative or intra-articular sites.

137. In I-Flow's Press Release announcing the Letter of Understanding, I-Flow falsely announced it had "received approval in June 1998 from the [FDA] to market PainBuster in the United States for orthopedic surgery applications." (IFLOW0020930). The Smith & Nephew Launch Manual dated September 8, 1998 for the Pain Buster Pain Management System also falsely announced that "[t]he Corporation on June 2, 1998,received approval from the US Food and Drug Administration to market its new disposable PainBuster infusion pain management kit for orthopedic surgery applications ." (DJO0747-9).

**b. K982946 PAINBUSTER-NO ORTHOPEDIC OR INTRA-ARTICULAR INDICATION**

138. To increase the reservoir and flow rates, I-Flow submitted K982946 on August 20, 1998. The new PainBuster would be available in a new reservoir size of 270 ml volume with increased flow rates of 5.0 and 10.0ml/hr. I-Flow also requested the new indications "to provide continuous infusion of a local anesthetic directly into the intraoperative or intra-articular site for postoperative pain management"(IFLOWP0002805).

139. There was an I-Flow fax from Robert Bard to FDA reviewer, Irene Naveau, dated September 16, 1998 for the new proposed IFU. Mr. Bard wrote:

> As requested, please find attached the revised copy of the Indications for Use page from I-Flow's Corporations' Premarket Notification K982946
>
> The PainBuster is intended to provide continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) or intra-articular (within a joint) site for postoperative pain management. Additional routes of administration include percutaneous and subcutaneous infusion (IFLOWP00030544-4)

140. To provide additional information to FDA to attempt to support the safety and efficacy of the new indication, Mr. Bard sent a fax to Ms. Naveau on October 29, 1998 with the

statement that *"[t]he changes specifically clarify intra-articular use of the device and specifics for use of the various flow rates.*" (IFLOWP00030457-62). FDA's reviewer was also told that the PainBuster was being used in a controlled research study for joint replacement surgery at Kettering Medical Center in Southern Ohio to determine the effectiveness of providing operative and post-operative pain relief and to determine the cost benefit to the institution.

141. The I-Flow information was not acceptable to the FDA reviewer. There are two November 4, 1998 fax messages from Mr. Bard to Ms. Naveau. The first fax:

> Please find attached the modification to the PainBuster Infusion Kit indications for use.
>
> I-Flow Corporation has agreed to delete infusion proximal to intra-articular site from the device's Indications for Use and will substitute with "…into the intra-operative site for general and orthopedic surgeries…"(IFLOWP00030539)

142. The second fax from I-Flow to FDA's Ms. Naveau:

> Please find attached Comprehensive Pain management in Outpatient Arthroscopic Knee Surgery from Sports, Medical and Arthroscopy Review 6:176-189; 1998
>
> This article gives an overview of pain management, including local anesthetic, into the intra-articular space.
>
> Once you have had a chance to review this article I would like to continue our discussion of the inclusion of delivery into the intra-articular space as part of the indication for use for the PainBuster Infusion Kit. (IFLOWP00030563).

143. Once again Mr. Bard faxed information to FDA's Ms. Naveau, now on November 9, 1998. He was now removing any reference to orthopedic surgery or intra-articular use from the indications for use:

> Please find attached the revision to the PainBuster notifications as we discussed on Monday morning.

> I-Flow Corporation has revised the submission with the deletion of the indication for use of orthopedic surgeries. We have now limited the indications to intraoperative site for general surgery (IFLOWP00030579).

144. Mr. Bard sent another fax, November 11, 1998 to Ms. Naveau regarding re-opening I-Flow's proposed IFU to allow an orthopedic surgery indication, not an intra-articular indication:

> I have sent revised pages for the PainBuster premarket notification (K982946). However, before you implement the changes provided, please review the attached articles,
>
> The articles report the use of slow continuous infusion of local anesthetics for post operative pain management specifically during orthopedic surgeries
>
> A short abstract of a 1994 study by Wilkes and Thomas reports the use of bupivacaine for post surgical bone grafts from the iliac crest. The Discussion finds continuous infusion more effective than single infiltration. In the 1998 article (Anesth Anal 1998;87:88-92) three methods of pain management are studies including continuous infusion , continuous epidural and PCA IV. This article was the subject of a follow on study of 540 subjects. The results are similar to the Wilkes abstract.
>
> Please review the attached articles and abstracts to determine whether there is sufficient clinical data to support an orthopedic claim. If you find the data supportive, disregard my earlier fax deleting orthopedic surgeries. If you are unable to find the data supportive, proceed with my latest revisions deleting orthopedic surgeries. (IFLOWP00030588).

### i. FDA DENIED I-FLOW's INTRA-ARTICULAR AND ORTHOPEDIC SURGERY CLAIM

145. Based on I-Flow's cleared indication for use for K982946 FDA's reviewers determined that I-Flow had failed to provide sufficient valid scientific evidence to support a new indication for orthopedic surgery and/or intra-articular use. (R. Bard 3/18/09. P 122-164, L5-22; IFLOWP00030544-5;IFLOWP00030547; IFLOWP00030563; IFLOWP00030565; IFLOWP00030539; IFLOWP00030541; IFLOWP00030579; IFLOWP00030581-2;

IFLOWP00030588). The final cleared IFU on FDA's 510(k) website Summary- "REVISED INDICATIONS FOR USE (NOVEMBER 9, 1998) (underlining added for emphasis):

> The Painbuster is intended to provide continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management. Additional routes of administration include percutaneous and subcutaneous infusion.

**c. K984146 PARAGON (INTRAVENOUS INFUSION SYSTEM)**

146. Only days after approval of the PainBuster on November 9, 1998 without orthopedic indications or intra-articular use, on November 19, 1998 I-Flow submitted K984146 requesting to extend the indications for its existing Paragon Infusion Kit (K923875). The 510(k) was for clearance of the Paragon Basal/Bolus Administration Sets without a modification of the Paragon pump (IFLOW0014123-4). The requested IFU included:

> 1) to provide a continuous basal level infusion of medication and to allow patient controlled bolus delivery
>
> 2) epidural, intramuscular, and subcutaneous routes of administration, in addition to intravenous administration (IFLOW0014123-41; IFLOW0014145)

147. According to Mr. Bard, Dan Miller of DJO had called him to inform him about the clearance of McKinley's OutBound 510(k) for placement of a catheter in the synovial cavity (Bard, 3/18/09, p.220-22; L3-8). Upon learning of McKinley's September 30, 1998 (K982256) clearance for a synovial cavity indication, I-Flow revised its own IFU for the Paragon to now include a "synovial cavity" indication on January 13, 1999 (IFLOW0014052-3; IFLOW0003107-9).

148. FDA, however, indicated to I-Flow on February 2, 1999 that the McKinley Outbound 2 pain pump would not be allowed to have a new indication of synovial cavity

infusion. I-Flow's Robert Bard sent a letter via fax to H. Trinh, FDA's reviewer for the McKinley Outbound Pump2 that revised I-Flow's proposed IFU for the still pending K984063, K984146, and K984638. Mr. Bard wrote:

> Pursuant to our conversation of February 2, 1999, I have made the following changes to the above referenced premarket notifications
>
> **K984063** The Indications for Use description has been change to a single statement….
>
> **K984146** A supplemental submission was made on January 13, 1999 to include synovial infusions as an additional indication for use. The basis of this supplemental submission was the finding of a predicate device (the McKinley Outbound K982256) that included synovial cavity infusion as an indication for use.
>
> I-Flow has agreed to remove the January 13 revision for our submission based on your statement that the McKinley will not be allowed to have an indication for use that includes synovial cavity infusions. Based on your statement, I-Flow believes the Office of Device Evaluation will require McKinley to modify their Indications for Use Statement and that the posting on the FDA 510(k) webpage will be changed….
>
> **K984638** The Indications for Use description has been changed….(IFLOW0013585-6).

149. On February 9, 1999, FDA cleared the I-Flow Paragon Infusion Kit 510(k) with the newly proposed IFU:

> (1)Continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management
>
> (2) percutaneous, subcutaneous, intramuscular and epidural infusion as additional routes of administration.(IFLOW0013240-2)

150. Unlike the post operative pain management infusion pumps, I-Flow did obtain clearance for a new IFU including "orthopedic surgery" but not the synovial cavity or intra-articular space. The FDA's March 4, 1999 cleared IFU:

> The Nerve Block Infusion Kit is intended to provide continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion include percutaneous, subcutaneous, epidural and into intraoperative sites.(IFLOW0004802-04)

151. I-Flow had voluntarily chosen to revise its indications on the assumption FDA would ask McKinley to withdraw the indication for synovial cavity infusion. On February 9, 1999, FDA cleared I-Flow's Paragon Infusion Kit for the following indications for use:

> Continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management.
>
> Percutaneous, subcutaneous, intramuscular and epidural infusion as additional routes of administration.

152. On March 3, 1999, FDA wrote to McKinley to officially correct the agency's prior 510(k) clearance for the Outbound 2 pump, removing clearance of a synovial cavity indication. The revised cleared intended use for McKinley's K982256 as of March 3, 1999 on FDA's website:

> The Outbound infuser is indicated for intravenous, intra—arterial, subcutaneous, epidural infusion of medications or fluids requiring continuous delivery at controlled infusion rates.
>
> The Outbound pump is also intended to provide continuous infusion of a local anaesthetic directly into the intraoperative site for postoperative pain management.

**d. K984502 NERVE BLOCK INFUSION KIT**

153. On December 17, 1998, I-Flow submitted a Nerve Block Infusion Kit, K984502 as a new product line. The I-Flow 510(k) was submitted before McKinley had to officially remove the September 30, 1998 synovial indication for its label (March 3, 1999) and prior to I-Flow revising its indications for the Paragon (February 2, 1999). The 510(k) was cleared on March 4, 1999, after the formal request for revision of the OutBound 510(k) removing synovial

cavity. The predicate devices cited by I-Flow for the Nerve Block Kit included its two PainBuster 510(k)s, K980558 and K982946; the Sgarlato Pain Control Infusion Pump (PCIP); I-Flow HomePump; McKinley Outbound pump and B. Braun's Continuous Nerve Block Set, an anesthesia conduction set, product code CAZ.

154. The Nerve Block pump design was similar to I-Flow's PainBuster but with a new IFU and multiple new configurations. The kit had three new pump models and three new kit components to facilitate placement of anesthetic conduction, regional and local anesthesia (IFLOW0002982-91). I-Flow sought the proposed new IFU for the new line of products:

> To provide continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion include percutaneous, subcutaneous, epidural and into the intraoperative (soft tissue/body cavity) site and synovial cavity (IFLOW0002982-012)

155. I-Flow sought with the Nerve Block Kit to obtain clearance of both a new orthopedic and a new synovial cavity indication. The product was to be indicated for continuous infusion of a local anesthetic near a nerve for regional anesthesia and pain management for pre-operative, perioperative and postoperative general and orthopedic surgery. Additional routes of infusion included percutaneous, subcutaneous, epidural and into intraoperative sites but not synovial cavity.

156. However, as FDA was apparently not adequately informed, I-Flow intended to use the "orthopedic surgery" indication gained from clearance of the Nerve Block Kit to expand indications to include the infusion pump PainBuster. The I-Flow plan misrepresented to FDA that it had an off-label intention, which included a plan to stretch FDA's latest clearance for the

Nerve Block kit, with its multiple pumps and accessories for anesthesia, when used as a single configuration of the PainBuster pump minus the anesthesia accessories as intended for orthopedic use.

157. Therefore, I-Flow, despite previous interactions with FDA, which included providing medical literature and the best information available to attempt to support a new indication, had failed to convince the FDA to clear the new indication for the PainBuster. Furthermore, the agency had taken steps to correct and error and ensure that there was no infusion pump cleared for intra-articular, synovial and orthopedic use.

158. I-Flow's creative but incorrect interpretation of FDA's clearance of the I-Flow Nerve Block kit was discussed in an October 29, 1999 letter from Howard Holstein, Hogan & Hartson, representing I-Flow, to S. Kurlander, Latham & Watkins, representing DJO. Mr. Holstein failed in his discussion to include all the many predicates cited by I-Flow to FDA as support for substantial equivalence for "continuous nerve block" including B. Braun's Continuous Nerve Block Set (not just the catheter). The reference to a continuous nerve block set to FDA implies planned marketing of infusion pumps as substantially equivalent to product code, CAZ, an anesthesiology device described under 21 C.F.R. 868.5140(Anesthesia Conduction Kit-. An anesthesia conduction kit is made of components necessary for delivery conduction, regional or local anesthesia. The device may contain syringes, needles, and drugs). Therefore, the 510(k) informed FDA that I-Flow intended to market its Nerve Block Kit consistent with its cleared intended use as a predicate anesthesia kit.

159. I-Flow did not appear to adequately inform FDA before clearance on May 4, 1999 that I-Flow intended to represent that one configuration of the Nerve Block Kit, without its

conduction components and accessories, was the PainBuster kit for orthopedic surgery. There is nothing in the Nerve Block clearance to have permitted promotion for "intra-articular" use. Mr. Holstein wrote:

> One of the Nerve Block infusion kit configurations is identical to the PainBuster device. The Nerve Block infusion kit also provides several configurations of the PainBuster using various pump models and components. Although the Nerve Block infusion kit includes three new pump models and three new kit components (insulated Touhy needle, hemostasis valve assembly, and hookup wire), the Nerve Block kit does not require, for example, that the device be configured with the Touhy needle or any of the alternative new kit components or pump models for pain management in orthopedic surgery.
>
> …As discussed above, I-Flow claimed in 510(k) number K984502 that the Nerve Block infusion kit is substantially equivalent to the PainBuster infusion kits which FDA cleared for marketing under 510(k) number K980558 and K982946 (IFLOW0022320)…

**e. K991543 INTRAOP CATHETER**

160. R. Bard submitted a 510(k) for I-Flow to market the IntraOp Catheter on September 7, 1999 cleared by FDA on October 25, 1999. The IntraOp Catheter was substantially equivalent to the Teleflex Medical Epidural Catheter (K840202) and B. Braun Perifix Set (K813186) and Epimed International FETH-R_KATH catheter. The IntraOp Catheter is identical to the Teleflex Medical epidural catheter with the exception of a hollow fiber in the inner diameter of the distal end of the catheter. The IntraOp Catheter is manufactured by TFX of the same plastics as the predicate. There are no specific drugs referenced in the labeling for the IntraOp Catheter, however, the IntraOp Catheter is intended for use with general anesthetics and narcotic medications. The FDA's cleared IFU:

> The **IntraOp Catheter** is intended to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and nerve trunks outside of the epidural space. Routes of administration may be either intraoperative, intramuscular, subcutaneous or percutaneous.

**f. K994374 I-FLOW SOAKER CATHETER**

161. Two months after FDA's clearance of the IntraOp catheter (K991543)**,** I-Flow's Stanley Fry submitted 510(k) K994374 for clearance of I-Flow's Soaker Catheter on December 27, 1999. The Soaker Catheter was claimed to be substantially equivalent to the predicate I-Flow IntraOp Catheter (K991543); Teleflex Medical (TFX) Epidural Catheter (K840202); B. Braun Perifix Set (K813186) and Epimed International FETH-R_KATH catheter. The 510(k) was to add an additional model to the Soaker Catheter family of products. The Soaker Catheter consisted of a Teleflex Medical (TFX) Epidural Catheter (K840202) with the insertion of a hollow fiber membrane in the inner diameter of the distal end of the catheter. The catheter had a closed end tip with multiple holes arranged radially along the lateral surface at the distal end of the device. The addition of the hollow fiber was to allow unimpeded flow of medication to the end of the infusion segment producing a more even distribution of medication along the catheter. However, as not discussed by I-Flow in the published summary of safety and efficacy, for an indwelling catheter that may remain in the body for several days, the inclusion of an additional hollow fiber chamber provides an additional area for growth of microorganisms and infection.

162. The device would come in 20 GA with a 6.5cm (2.5in) infusion segment (K991543). The device would also come in 20 GA with a 12.5cm (5.0 in) infusion segment. Each of the catheter sizes would be available as a separate catheter with a currently marketed catheter connector (a Touhy Borst type is an example) or an attached luer lock connector.

163. The Soaker Catheter may consist of a kit that includes components that are legally marketed and will be used in I-Flow's Pain Management Systems such as K982946 and K984502 including the On-Q, PainBuster and Nerve Block pain management kits. The catheter

is intended to deliver local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration cam be intraoperative or percutaneous.

164. THE FDA' cleared IFU:

The **Soaker Catheter** is intended to be used as follows:

1. With I-Flow Corporations' PainBuster, ON-Q and Nerve Block pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration may be intraoperative or percutaneous.

**g. K022869 SOAKER CATHETER**

165. Shane Noehre submitted a Special 510(k) on August 29, 2002, cleared September 20, 2002 requesting to make a minor modification to I-Flow's soaker catheter. The change proposed a "slight design that has the membrane along the outside diameter of the catheter" instead of inside diameter. I-Flow requested to be able to move the hollow fiber to the outside of the catheter instead of the inside. The predicates were I-Flow Soaker Catheter K991543 (I-Flow IntraOp) and K994374 (I-Flow Soaker Catheter).

1. With I-Flow Corporations' PainBuster, ON-Q and Nerve Block pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of local anesthetics or narcotics to surgical wound sites and/or close proximity to nerves outside of the epidural space. Routes of administration may be intraoperative, percutaneous or perineural.

**h. K043456 MODIFICATION TO SOAKER CATHETER**

166**.** Shane Noehre submitted K043456 on December 15, 2004 for a modification to the I-Flow Soaker Catheter K994374, which was cleared on January 11, 2005. I-Flow cited the

predicates as K991543, K994374 and K022869. The I-Flow Catheter now was to consist of three design options utilizing infusion segments ranging from epidural (0.5) to now include a new 10 inches. The standard epidural catheter had 3 radial holes at the distal tip with an approximate infusion segment length of 0.5 inch. The Fenestrated Catheter was a modified epidural catheter with multiple holes (fenestrations) at the distal end allowing up to a new 10 inch infusion segment. The Soaker Catheter is a modified epidural catheter with multiple holes at the distal end to a 10 inch infusion segment. The new version of the I-Flow Catheter contained a hollow fiber either along the inner lumen or along the outside diameter of the distal end of the catheter to provide even distribution of medication along the infusion segment. I-Flow claimed that there was no difference between the performance (safety and efficacy) of the predicates and the new catheters with addition of a longer 10 inch infusion segment.

167. FDA's cleared IFU:

1. With I-Flow Corporations ON-Q, PainBuster and C-bloc pain management kits; and
2. As a standalone device to provide continuous or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves, Routes of administration may be intraoperative, percutaneous, epidural or perineural. The Soaker version of the I-Flow Catheter is contraindicated for the epidural space.

**i. K040337 I-FLOW ELASTOMERIC PUMP**

168. On May 19, 2004, after I-Flow took over the distribution of its pain pumps from both DJO and J&J, with consolidation of its many pump lines into a single pump series. I-Flow submitted K040337 for a device which it generically called "I-Flow Elastomeric Pump." The 510(k) was cleared as product code MEB on May 24, 2004. The predicates cited by I-Flow

included its ON-Q, PainBuster, C-Bloc, Eclipse, C-Series, Easypump, and Homepump. For device description, I-Flow wrote in its published Summary of Safety and Effectiveness (a document that is not required to be reviewed by FDA for the 510(k)) that:

> The current package labeling of the I-Flow Elastomeric Pump does not reference specific types of surgeries or potential benefits. This 510(k) proposes a labeling change that would reference the specific type(s) of surgery and potential benefits that are supported by published clinical studies.
>
> The I-Flow Elastomeric Pump was used in the published clinical studies. The device was used according to FDA cleared indications for use (i.e. intraoperative or perineural anesthetic delivery to relieve pain at the surgical site). I-Flow believes this change would not impact safety or efficacy and is supported by published clinical studies in widely known and esteemed journals.

169. FDA's cleared IFU for the I-Flow Elastomeric Pump:

1. The I-Flow Elastomeric Pump is intended for continuous and/or intermittent infusion of medications for general use, including antibiotic delivery, chemotherapy and pain management. Routes of administration include the following: intravenous, intra-arterial, subcutaneous, intramuscular and epidural.

2. The I-Flow Elastomeric Pump is also intended for continuous and/or intermittent delivery of medication (such as local anesthetics or narcotics) to surgical wound sites and/or close proximity to nerves for preoperative, perioperative and postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural or percutaneous.

3. The I-Flow Elastomeric Pump is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

**i. I-FLOW WAS REQUIRED TO ADD A CONTRAINDICATION FOR INTRA-ARTICULAR USE**

170. As discussed, I-Flow took over complete distribution activities for its elastomeric pumps in 2004. I-Flow submitted a 510(k) K051401 on June 1, 2005 to FDA's Anesthesiology Devices Branch requesting to market an On-Q Catheter, an anesthetic conduction catheter, as either I-Flow's fenestrated or soaker catheter models, now coated with silver and called ON-

Antimicrobial Catheter, product code BSO (21 C.F.R. 868.5120). The predicate catheter was the ON-Q Catheter (K043456) formerly called the I-Flow Catheter.

171. The fenestrated catheter was a modified epidural catheter with multiple holes at the distal tip for a 10 inch infusion segment. The soaker catheter was also a modified epidural catheter with multiple holes at the distal end up to a 10 inch infusion segment, however, it had a hollow fiber along the inner lumen to provide even distribution of medication along the entire infusion segment.

172. The 510(k) was to request to add a silver coating to I-Flow's catheter as an antimicrobial agent to destroy or inhibit the growth of microorganisms on both the inner and outer surface of the catheter. The longer a catheter would stay in place in a patient, the greater the risk of infection. Postoperative infusion catheters could remain in the surgical site for greater than three days, increasing the risk for infection.

173. The silver coating was intended to help reduce the possibility that the catheter may become compromised with microorganisms and is not intended to treat existing infections. The silver is to reduce binding of organisms (biofilm) to the catheter. The use of silver as a antimicrobial agent dates back to prior to 1938 and the Federal Food, Drug and Cosmetic Act, so that silver is a pre-amendment drug.

174. On August 3, 2005, FDA wrote to I-Flow to request additional information, thus, placing the 510(k) review "on hold." FDA's letter stated that the use of silver in the epidural space was a "new and novel" approach, that the release of silver ions in the body might be a drug, and that some recent articles had questioned the prophylactic antibiotic use for continuous

epidural use. The safety of silver had not been established for use in the epidural space because of proximity to the central nervous system. Predicate devices such as urinary and central venous catheters with silver coatings were not indicated for use in the epidural space.

175. I-Flow subsequently indicated that the epidural space was only one of several areas in the body where the catheter may be indicated. I-Flow agreed to "contraindicate the use in the epidural space". As a result of the FDA's concerns, I-Flow also requested a meeting with members of FDA, which was held on August 24, 2005(IFLOW30640).

176. Prior to the meeting, on August 19, 2005, I-Flow hand delivered to FDA's catheter reviewer Michael Husband, Anesthesiology & Respiratory Devices Branch, a letter from James S. Black, Hogan & Hartson LLP. The letter was to represent I-Flow's position on the clearance of silver catheters (IFLOW30568). According to I-Flow's record of the FDA meeting titled "FDA Meeting Minutes," I-Flow in 2005 was willing to document that it had provided misleading information to FDA's reviewers regarding I-Flow's current status of placement of I-Flow catheters within the intra-articular space:

> The letter indicated, among other things, that I-Flow would contraindicate the catheter for the epidural space, that use in surgical wounds was the product's principal indication, that the company viewed central venous catheters, urinary catheters, mediastinal drainage catheters, and other catheters with silver coatings as good predicates because they contact similar tissues and have similar mechanisms for making available similar amounts of silver, that the silver coating was safe, that the silver was not intended to have a prophylactic sue in the body, but only a use for reducing the microbial load on the catheter , and that silver coatings on catheters had been traditionally viewed by FDA as device components and not as drug substances.
>
> The meeting resolved most of the issues raised in FDA's August 3, 2005 letter.(IFLOW30640-1)
>
> **Q3** FDA expressed concerns about the locations in which the catheter will be placed and whether those sites have had silver used in them before. Specific

concerns were raised with the following use locations: epidural, intra-articular, large neurovascular bundles, and neonates. FDA indicated that the instructions for use should contain appropriate cautions or warnings regarding placement of the catheter in those locations and in neonates.

**A3** I-Flow discussed where the catheter is used particularly, including intraoperative sites. The catheters are not typically placed in intra-articular sites, nor are they recommended for neonates. The epidural space will be contraindicated, I-Flow agreed to provide labeling containing cautions and warnings regarding the uses noted above. FDA indicated that current uses for silver included uses in subcutaneous, subfascial, and intramuscular areas, in abdominal wounds, and in the thoracic cavity, among others. I-Flow indicated that uses for the catheters near joints were subcutaneous and would not compromise the synovial membrane or synovial space.

In regard to administrative matters, FDA indicated that the file had been "on hold" since August 3, 2005, and that the review was 63 days into the cycle. Accordingly, 27 days remain. FDA indicated that a hold can be up to 180 days. I-Flow indicated it would apply for an extension of time to obtain the information needed to gain 510(k) clearance.(IFLOW30641-2).

177. Mr. Husband, FDA reviewer, sent an email to Shane Noehre, I-Flow on November 21, 2005 regarding the agency's completion of K051401/S001. The agency's review of the supplemental I-Flow material had been completed and the agency had additional questions/comments for I-Flow:

1. You have stated in the Directions for Use that the device is contraindicated for use in the epidural space and for neonates. Please provide separate statements for each of these contraindications. You have also provided a caution statement that "recommends" against intra-articular placement. Please revise this to be a contraindication stating that the device is not for use in the intra-articular space.(IFLOW30534).

178. I-Flow responded to FDA and Mr. Husband on November 21, 2005 for statement #1 (above), adding a contraindication to use of the I-Flow catheter in the intra-articular space.

**a.** The following statements (see below) have been added to the Contraindications section of the ON-Q Antimicrobial Catheter Directions (DFU):

- The ON-Q Antimicrobial Catheter is not intended for placement in the epidural space
- The On-Q Antimicrobial Catheter is not intended for use in neonates
- The On-Q Antimicrobial Catheter is not intended for placement in the intra-articular space.(IFLOW30527)

**ii FDA DESCRIBED THE PROCESS FOR I-FLOW TO REMOVE THE INTRA-ARTICULAR CONTRAINDICATION**

179. On February 21, 2006 I-Flow recorded “Meeting Minutes” of a conference call held with FDA to discuss how I-Flow could obtain specific indications for perineural and intra-articular placement of the SilverSoaker catheter (K051401) and remove the contraindication. The meeting was between I-Flow and FDA ‘s members of Anesthesiology & Respiratory Devices Branch (ARDB) and Infection Control Devices Branch (ICDB):

- FDA’s position is that the proposed indications would require human clinical trials. Removing either the Caution statement for large neurovascular bundles (LNB) or the Contraindication for intra-articular would require the same data. The agency is specifically concerned about signs and symptoms of neurotoxicity. We would have to demonstrate the absence of neurotoxicity. The typical regulatory path is as follows:

  animal study →pre-IDE→IDE→510(k)

- For intra-articular placement, the following specific issues would need to be addressed in the clinical data (animal then human):
  - Define the usual time-frame
  - Which joints would be used? Two or more joints should be evaluated
  - Histology in the joint
  - Synovial membrane
    - Synovial fluid over time
    - Protein over time
  - Inflammation over time(IFLOW30515-6)

### iii I-FLOW PROMOTED INTRAARTICULAR CATHETER PLACEMENT

180. In I-Flow's "One-One Marketing Tactics Memo", I-Flow did marketing that instructed physicians on catheter placement. The "Jan Fronek, MD" ON-Q Catheter Placement Technique was designed as if for educational purposes and represents the technique used by the above surgeon". However, the information, even through represented as information coming from a private physicians, is labeled was for I-Flow, for example ONQ PainBuster and constitutes misbranding (21 USC 201(m)) and promotion an unapproved indication, adulteration, to physicians when provided by I-Flow.(IFLOW ESD 00548-9;IFLOW ESD 006938-0; IFLOW ESD 015414-5) The Catheter Placement Technique states:

> Catheter Placement Catheter can be placed intra-articular… (IFLOW ESD 006866.

### iv. I-FLOW ENGAGED IN CLINICAL TRIALS FOR INTRA-ARTICULAR USE

181. There is an April 10, 2000 I-Flow slide presentation titled "PainBuster Pain Management Systems Product Update".

**Clinicals**

- Tuckahoe Orthopedic Association- subject enrollment is over 70%
- Scripps- Changes to protocol necessary due to intra-articular catheter placement; resubmission to IRB
- Dr. Nissan-33% enrollment, moving forward slowly
- Drs. Curry and Brown- just received IRB Approval, coordinating the start with the surgeons.(IFLOW0021031).

**Selling Issues Remain the Same**

- Ethicon selling Orthopedics

- 1999 Estimated yearly loss $750K
- 2000 Estimated Run Rate $1M, based on 1st Quarter Loss of $276,000((IFLOW0021036).

182. There is also an December 19, 2000 I-Flow slide presentation titled “PainBuster Pain Management Systems Product Update:

**2 ½” Soaker Catheter Trials**…

- **Types of Procedures**
- Shoulder
- ACL-BPB graft
- **Source of Pain**
- Intra-articular
    - Subacromial Space
- **Catheter Placement**
    - Graft Site/Joint
    - Subacromial Space(IFLOW0021039)

**2 ½” Soaker Catheter Trials (cont’d)**

- Pump Contents- 71% used 0.50% Marcaine((IFLOW0021040)

**Clinicals**

- Tuckahoe Orthopedic Association-study was on hold and has resumed
- Scripps-Statistical analysis has been completed to adjust protocol and resubmit to IRB
- Dr. Nissen- 40% enrollment
- Case Reports for Academy- Knee, Shoulder and Poster Presentation((IFLOW0021048)

183. An I-FLOW PowerPoint for physicians to use, begins with the introductory slide:

**I FLOW CORPORATION**

- Initially developed this device and marketed it for use in orthopedic patients
- Particularly useful in shoulder and other joint surgery with its constant analgesic infusion into a closed space (IFLOW ESD 284540-3).

184. A May 6, 2005 email from Tricia Engle to Barbara Saint John titled Pain management meeting next Tues (underlining added for emphasis):

> I spoke to Chris Roddighiero this morning regarding our presentation new Tuesday at 12:15 for Scripps La Jolla. This is exciting for use because they want to help us standardize the ONQ throughout Scripps La Jolla. Basically, they want us to inform them of which doctors and specialties the pain pump is being utilized in now, the efficacy of the pump, list of all of our studies so they can help push the pump where it is not being used, <u>specifically in joints</u>. <u>They want to understand why the orthopedic surgeons are afraid to put these in joints at La Jolla…</u>
>
> The response from Barbara Saint John to Tricia Engel:
>
> Thanks for all of this information Tricia. With the limitation of time we may not be able to get into too much details. My preliminary thoughts are (my part) to talk about I-Flow's commitment to advancing clinical practice of pain management through:
>
> Support of studies: <u>44 completed, 60+ in progress</u> or in consideration… (IFLOW ESD 064655)

**v. I-FLOW FILED FALSE AND MISLEADING INFORMATION WITH THE SEC**

185. On March 31, 1999, I-Flow filed another 10K with the SEC. The filing once again falsely reported that tot eh SEC and investors, in June 1998, I-Flow had received permission from the FDA to market the PainBuster kit for orthopedic surgery applications. Once again this was misleading and inaccurate information (R. Bard 3/18/09, p. 273-75,L 19-22) I-Flow was aware of FDA 's decision in November 1998 that it would not clear the PainBuster for an orthopedic indication. Shane Noehre, I-Flow, acknowledged that I-Flow

would have been required to first establish safety and efficacy of its device for an intra-articular use, in order to get a premarket approval from the FDA (Shane Noehre 7/8/08; p88-9, L. 23-9).

186. In summary, I-Flow submitted requests to FDA following McKinley's September 1998 clearance of the OutBound Pump for three pending 510(k)s, including both its PainBuster and the Nerve Block Kit, to include intra-articular/synovial cavity infusion. When I-Flow informed FDA that the McKinley pump had been cleared for synovial use, FDA had the option to do nothing and allow clearance of pumps for intra-articular use. However, FDA communicated to I-Flow in January 1999 that it intended to pursue a more difficult path, namely to revise McKinley's 510(k) clearance to remove a synovial cavity indication from the cleared indication for use.

187. Despite I-Flow's best attempts during October and November 1998 to convince FDA otherwise by providing support for safety and efficacy of a new synovial/intraarticular indication, providing FDA with reports from the medical literature, I-Flow failed to persuade the FDA. There was not sufficient scientific support for safety and efficacy for a new indication and FDA denied I-Flow's requests.

188. I-Flow's February 2, 1999 letter to Hung Trinh, FDA, documents that it revised the indications for use for its pending pump 510(k)s, namely K984063, K984146, and K984638, to remove a synovial cavity infusion indication. As I-Flow indicated in its letter:

> I-Flow has agreed to remove the January 13 revision from our submission based on your statement that the McKinley will not be allowed to have an indication for use that includes synovial cavity infusions. Based on your statement, I-Flow believes the Office of Device Evaluation will require McKinley to modify their Indications for Use Statement and that the posting on the FDA 510(k) webpage will be changed."(IFLOW0013585)

189. In an August 19, 2005 pre-marketing briefing package for I-Flow's silver coated ON-Q Catheter made to respond to FDA's concerns about the catheter including a potential for intra-articular use, I-Flow told FDA that catheters "are not typically placed in intraarticular sites". I-Flow continued that " uses for catheters near joints were subcutaneous and would not compromise the synovial membrane or synovial space."(IFLOW 30641-2). I-Flow further responded to FDA's concerns about intraarticular use on November 21, 2005, it voluntarily placed a contraindication in the catheter's draft label against intraarticular placement.

190. I-Flow and FDA held a follow-up teleconference on February 21, 2006 to specifically discuss the clinical and laboratory testing necessary for I-Flow to remove the contraindication and obtain FDA's clearance of a specific new indication for joint placement. Therefore, I-Flow's interactions with FDA from 1998 through 2006 consistently showed it was aware FDA considered clearance of a pain pump and catheter for infusion in a joint space a new intended use, which had not been covered by FDA's prior clearance of an intraoperative site (soft tissue/body cavity).

**3. DJO, LLC (DONJOY)**

191. DJO began as a Division of Smith & Nephew and then became independent of Smith & Nephew. During the 1998 initial negotiations with I-Flow, DJO was still associated with Smith & Nephew. The draft Letter of Intent was faxed to DJO from I-Flow on August 14, 1998(DJO1155-61). In terms of the current role of DJO with the intra-articular pain pumps, it is a "relabeler," distributing its own private brand "DonJoy" pain pumps which it purchases directly from I-Flow. DJO also has distributors, such as, Pacific Medical (Pac Med), that are sales representatives who work to promote and distribute DJO's products. Anyone buying a

DonJoy pain pump would view DJO (DonJoy) as responsible for having ensured safety, efficacy and adequacy of label and promotions. I-Flow from 1999 through December 2003 and then McKinley/Curlin beginning in 2004 supplied DJO with finished infusion pumps that were relabeled by DJO with the brand name "DonJoy". Therefore, DonJoy is viewed by FDA as a manufacturer responsible for ensuring adequacy of its label and warnings to health care providers and sales representatives. According to FDA, a manufacturer includes but is not limited to those who perform the functions of "relabeling."

192. DJO is registered with FDA as a United States Medical Device Establishment and it does have its own cleared 510(k)s. DJO in 2009 does not list itself on FDA's database as a relabeler or manufacturer of an infusion pump. Before involvement with pain infusion pumps, DJO was primarily engaged in the manufacture of class I orthopedic and sports bracing products, many exempted from requiring a 510(k) (Miller,3/25/09, p.17,l.6; p41, L. 20). DJO as a registered medical device establishment and holder of cleared 510(k)s is required to be knowledgeable about and have standard operating procedures (SOP) pertaining to 510(k)s, Quality Systems (21 C.F.R. 820), Medical Device Reporting (21 C.F.R. 803), post market surveillance, registration and listing, updating labeling (21 C.F.R. 801) and conducting recalls.

193. As part of DJO's Quality Systems, Mr. Miller testified that DJO in 1999 did have a SOP for complaint tracking (Miller, 3/25/09. P. 21, L. 21). DJO would receive complaints, record them and when appropriate forward them on to manufacturer of the device for investigation (Miller, 3/25/09, p. 22-3, L. 24-3). DJO did have internal procedures for monitoring statistical trends for its manufacturers. I-Flow pumps were assigned and tracked by both I-Flow and DJO numbers. (Miller, 3/25/09, p. 29 L. 13-14). As a manufacturer, DJO was

required to have procedures for training personnel, monitoring the medical literature, Corrective and Preventive Action (CAPA), component acceptance, complaint investigation and filing of mandatory Medical Device Reports (MDR) (21 C.F.R. 803), updating and review of labeling. DJO also had a duty under the act to be knowledgeable about the performance of the devices it markets and to adequately train its sales representatives and agents regarding the risks and benefits of its devices.

194. On August 31, 1998 Smith & Nephew and I-Flow entered into a Letter of Understanding for a Distribution Agreement that would give Smith & Nephew the right to distribute I-Flow's PainBuster Infusion Kits in the United States and Canada in areas of Sports Medicine, Trauma, Joint Repair, and Replacement, Podiatry and Spine and under the private brand name DonJoy. The product to be distributed was the PainBuster Kits "which are used for continuous infusion of local anesthetics into intra-operative or intra-articular sites."

195. On November 2, 1998, Mr. Bard, I-Flow wrote a letter he faxed to Dan Miller, Director of Regulatory Affairs & Quality Assurance at S&N/DJO regarding PainBuster Press Releases that Mr. Miller had forwarded on to Mr. Bard for review (IFLOW0022298). Mr. Bard had reviewed a document that contained the following sentence: "PainBuster is the first product of its kind to be cleared by the FDA for orthopedic application." As a result, Mr. Bard wrote back to Mr. Miller to clarify I-Flow's lack of an orthopedic clearance for the PainBuster:

> …does not have any indication specific to orthopedic use. The submission currently under review includes the specifically identified "intra-articular" space/site. Clearly, intra-articular is included to allow a claim for orthopedic use however, at this time, there is no release specific to orthopedics." (IFLOW0022298)

**a. DJO's MANAGEMENT WAS AWARE THAT FDA HAD NOT CLEARED ITS PAIN PUMPS FOR INTRA-ARTCULAR USE**

196. Therefore, I-Flow did inform DJO in 1998 that the PainBuster was not FDA cleared for orthopedic or intra-articular indications. Mr. Bard's response reportedly had come as a surprise to members of DJO. As a result, there is a January 12, 1999 email from Margaret Sheehan, DJO Director of Marketing to James Dal Porto, Executive Vice-President and Chief Operating Officer I-Flow and copy to Dan Miller:

> Regulatory is requesting information on the Paragon such as the 510(k) and any changes to the product since the 510(k). Could you please have Bob Bard call Dan Miller regarding the information.
>
> In our meeting we indicated we would use the pilot study to better understand how to position the product and validate it's performance in the clinical setting.
>
> A new issue arose yesterday regarding the claims we can make with the Pain Buster. Bob Bard is indicating that we cannot use Orthopedic Surgery in our promotional materials. I'm struggling with this as it has been in all materials and is the letter of understanding. I would request that you send us all communication with the FDA on this particular issue so we can make an informed decision on the risk of the claim. Bob Bard also indicated we should use general surgery instead of orthopedic surgery, which I think we need to discuss further as this will be confusing to our customers. (Miller Exhibit 4 DJO1085-DJO1086):

197. In response to Ms. Sheehan's letter, there was a phone conference held during the second week of January 1999 between I-Flow and Smith & Nephew. In response to the phone conversation, Smith & Nephew requested "All correspondence with the FDA pertaining to the PainBuster."(IFLOWP00030480-1) Mr. Bard then advised Mr. Miller that "all discussions with the FDA concerning the PainBuster were verbal." Mr. Bard continued:

> The discussions centered around specific intended use(s) and the availability of a predicate device or supporting literature. Various pieces of literature were sent to ODE in support of intra-articular and orthopedic indications in the absence of a predicate device. The reviewer did not accept the literature as sufficient to allow a specific intended use statement for orthopedic surgery. The reviewer did

acknowledge that orthopedic and intra-articular surgery are included specific intended uses within the general use statement.(IFLOW0022299)

The 510(k) limits the product to general intraoperative use and as such, the labeling and marketing position should take both into consideration. Direct statements of "approval" by the FDA or release to market by the FDA for orthopedic use is outside of the limited permission to market granted by the Agency. Talking about the types of uses that have been made to date is a much safer road to run. (IFLOW0022299).

**b. DJO ENTERED INTO A DISTRIBUTOR AGREEMENT WITH I-FLOW AWARE THE PAINBUSTER WAS NOT CLEARED FOR ORTHOPEDIC OR INTA-ARTICULAR INFUSION**

198. On May 12, 1999 I-Flow and DonJoy, LLC, a Delaware Liability company, entered into a Distribution Agreement. I-Flow was to manufacturer PainBuster infusion kits. DonJoy was to purchase the PainBuster infusion kits for resale in the market to market then for amelioration of pain by orthopedic surgeons performing procedures in the areas of Sports Medicine, Trauma, Joint Repair and Replacement and Podiatry. The products distributed were to include infusion pumps containing disposable elastomeric pumps proprietary to I-Flow. Pumps using gravity, springs (e.g. the Paragon and SideKick), electronics, or other non-elastomeric balloon mechanisms as a means to deliver medicines were not included in the Agreement (IFLOW0016190; IFLOW0022306; IFLOW0022309; IFLOW0022302; IFLOW0022315).

199. The Distribution Agreement of May 12, 1999 between I-Flow Corporation and DonJoy, LLC on page 1 specifically indicated that "Products" means "PainBuster infusion kits (or equivalent private labeled product) which are used for the continuous infusion of local anesthesia into intra-operative or intra-articular sites"(IFLOW0016190). The signed agreement clearly differentiated between the difference in use of the PainBuster in the intra-operative site and an intra-articular site. The "Market" was defined and limited in the Agreement to

"orthopedic procedures where the Products are used for the amelioration of pain by orthopedic surgeons performing procedures in the areas of Sports Medicine, Trauma, Joint Repair and Replacement and Podiatry" (IFLOW0016190) . Both companies signed a mutual Agreement to violate the law by agreeing to promote the PainBuster for an unapproved indication not cleared by FDA.

200. On September 24, 1999, Les Cross, President & CEO, DJ Orthopedics, LLC wrote to Mr. Donald Earhart, President of I-Flow Corporation about his serious concerns over the Distribution Agreement. DJO's President in 1999 did not express concern about patient safety and that he was aware he is marketing a PainBuster for an unapproved orthopedic use in violation of the Act. What concerned the DJO President in 1999 were the financial terms of the Minimum Purchase Agreement with I-Flow and loss of profits by competition from J&J. He began:

> The first of these pertains to the claim that the PainBuster infusion systems can be used for orthopedic applications. It was clearly our understanding, based on I-Flow's representations, that the PainBuster infusion system can be marketed for orthopedic applications. This understanding is also documented in Section 1 of the Agreement and in your press release about the Agreement. However, after conducting our own investigation, we recently learned that the PainBuster infusion system is not approved for such applications, due to the fact that I-Flow has not obtained necessary 510(k) registration. Our assent to the terms of the Agreement, including the Minimum Purchase Requirements and license royalty fee, was predicated directly on your representations regarding the acceptability of the Pain Buster infusion system for the aforementioned applications.
>
> The second issue of concern regards the material adverse effect I-Flow's distribution agreement with Johnson & Johnson (J&J) has had on our ability to market the PainBuster infusion system. While you have assured us that the J&J Agreement is limited to non-orthopedic surgical applications, certain of our hospital clients, who have elected to sue the PainBuster infusion system for both surgical and orthopedic applications, are obtaining their product requirements for both applications solely from J&J Whether intentional or not, such actions seriously encroach on our exclusive rights under the Agreement and triggers the

> obligation of I-Flow and dj Orthopedics, under Section 4 of the Agreement, to renegotiate the Minimum Purchase Requirement. (IFLOW0022306-7)

201. Mr. Earhart, President & CEO, I-Flow replied to Mr. Cross, DJO with a misleading letter dated September 29, 1999. The focus of the controversy was not patient safety and compliance with the Act but rather profits:

> First, please let me assure you that—at all times after the date of the Agreement—the PainBuster infusion system has been fully approved by the FDA for use in orthopaedic applications. We simply would not, either as a matter of business ethics or social responsibility, market our products without this governmental approval in place. Enclosed is a copy of the relevant 510(k), #K982946, dated November 19, 1998, which should address any concerns you may have.
>
> On your secondary issue of concern, please be assured that I also want to address this as a high priority matter. Once again, I want to confirm that no third party has rights to market the PainBuster product for orthopaedic surgical applications…
>
> Finally, we should be very clear that the $2 million guaranteed license royalty fee is non-refundable and has nothing to do with the Minimum Purchase Requirements. As you can see, I want to immediately address any concerns you may have, but we expect timely payment of the two remaining installments of the license fee.(IFLOW0022309).

202. On October 22, 1999, Stuart Kurlander, Latham & Watkins, Attorneys at Law, on behalf of DJ O wrote to Mr. Earhart, President, I-Flow Corporation about DJO's concerns about the lack of FDA clearance for marketing of the PainBuster for orthopedic indications and the Distribution Agreement:

> We are writing on behalf of dj Orthopedics, LLC regarding serious concerns pertaining to I-Flow Corporation's performance of its obligations under and representations made in the Distribution Agreement…
>
> While we believe there are a number of issues, the focus of this letter is whether the PainBuster Infusion System can be marketed for orthopedic indications. Mr. Cross raised this in his September 24 letter and subsequent telephone conversations, and has provided us with your letter of September 29, 1999, in which you enclose a copy of a "510(k)" letter and continue to assure him that the

PainBuster Infusion System has been fully approved by the FDA for orthopedic applications.

Based on the information you have provided and on our independent investigation, contrary to your repeated representations, we do not believe that the PainBuster Infusion System is FDA approved for orthopedic application. The reasons for this conclusion are:

- The 510(k) letter you provided (Re: number K982946), dated November 18, 1998, notes the following indications for use:

  There is no express mention of approval for orthopedic surgical applications…

- We have retained a prominent consultant experienced in FDA matters, to advise us with respect to whether the aforementioned 510(k) letter constitutes FDA approval of the PainBuster Infusion System for orthopedic applications. The consultant has advised us that it is not so approved…

For the foregoing reasons, we believe that the PainBuster Infusion System does not have FDA approval for orthopedic surgical applications…To date, the only assurance for orthopedic applications are your representations—no other source supports that view

Absent reliable proof that I-Flow has obtained FDA approval for orthopedic applications for the PainBuster Infusion System, we believe that I-Flow's failure to obtain such approval constitutes a material breach of the Agreement, which would trigger dj Orthopedics' termination rights under Section 15 of the Agreement. Moreover, in the event I-Flow has not obtained FDA approval for orthopedic applications, dj Orthopedics may no longer be able to market such products for orthopedic applications, as contemplated under the Agreement. This will deprive dj Orthopedics of the benefits it contemplated under the Agreement and may have significant adverse monetary consequences.

Accordingly, we request that you immediately provide all information you have in your possession or under your control which provides adequate assurances that the PainBuster Infusion System can be legally marketed for orthopedic applications.(IFLOW0022302-5).

203. There was a seven page October 29, 1999 response letter from Howard Holstein, Hogan & Hartson, attorneys for I-Flow, hand delivered, to S. Kurlander, Esq at Latham & Watkins regarding the Distribution Agreement between DJO and I-Flow. Mr. Holstein begins by reference to an October 25, 1999 letter where he advised Mr. Kurlander that his firm had been

retained to represent I-Flow in the matter. Mr. Holstein wrote regarding the marketing status of the PainBuster pump, that DJO had been fully aware of FDA's clearance limitations and inability to promote the PainBuster for orthopedic indications before they entered into the Distribution Agreement (May 1999) with I-Flow; that FDA had not contraindicated the PainBuster for orthopedic use; that FDA's clearance of a Nerve Block Infusion kit, with three new components and pumps, has also clearance of a PainBuster configuration for orthopedic use:

> In your letter, you stated your view that approval of the PainBuster Infusion System for general surgical application does not include approval for orthopedic surgical application. This simply is not the case. As discussed in more detail below, in May 1998, I-Flow first obtained FDA clearance under the premarket notification provisions of Section 505(k) of the Federal Food, Drug and Cosmetic Act ("FDC ACT"), 21 U.S.C.§ 360(k), to commercially distribute (i.e. "to sell") the PainBuster for use in postoperative pain management, Therefore, I-Flow and, under the terms of the Agreement, DonJoy are lawfully authorized to sell the PainBuster to orthopedic surgeons performing procedures in sports medicine, trauma, joint repair and replacement, and podiatry.
>
> 1. On May 28, 1998, FDA cleared I-Flow's first in a series of premarket notification ("510(k)") submission (K980588) for an infusion kit containing an elastomeric pump. …
>
> When FDA cleared 510(k) number K980558, such clearance permitted the Company to sell the PainBuster for use in postoperative pain management in all types of surgery, including orthopedic surgery. I-Flow also understood, however, that the Company could not actively promote the PainBuster explicitly for sue in orthopedic surgery.
>
> The difference between FDA's authorization to sell the PainBuster for use for postoperative pain management, on the one hand, and promotion of the device for a specific type of surgery, including orthopedic surgery, on the other hand, was made clear during discussions with DonJoy following FDA's clearance of 510(k) number K980558. Thus DonJoy fully understood that it could lawfully sell the PainBuster to orthopedic surgeons performing procedures in the areas of sports medicine, trauma, joint repair and replacement, and podiatry, but that it could not lawfully promote the PainBuster specifically for use in pain management following orthopedic surgery. Although FDA contraindicated a number of specific uses, it did not contraindicate orthopedic use, which the agency could have done were it concerned about the use.

DonJoy obviously was well aware of the promotional limitations because it was aware that I-Flow submitted a second 510(k) (K982946) to FDA to seek, among other things, clearance to promote the PainBuster specifically for use in orthopedic pain management.

2. I-Flow, with DonJoy's knowledge submitted a second 510(k) (K982946) for the PainBuster to FDA on August 1998. FDA cleared that 510(k) submission on November 28, 1998. Such clearance allowed the PainBuster to be sold "to provide continuous infusion of a local anesthetic directly into the intraoperative (soft tissue/body cavity) site for general surgery for postoperative pain management." Additional routes of administration of the device cleared by FDA included percutaneous and subcutaneous infusion. As with the first 510(k) (K980558), the FDA-cleared labeling included several contraindications…Again, despite extensive discussions between Company and FDA, no contraindications for orthopedic use was required.

   In response to a request by FDA during its review of the second 510(k) submission, I-Flow deleted references in the submission to specific use of the PainBuster in orthopedic surgery.

   Following the deletion, FDA cleared the 510(k) and allowed the PainBuster to be sold and promoted with the more general claim for use in "general surgery". As noted, orthopedic use was not prohibited.

   All of the discussion between I-Flow and FDA focused on specific intended use(s) and the availability of a predicate device or literature to support the ability to promote the specific orthopedic surgery indication for the PainBuster. In the absence of a specific predicate device, the FDA reviewer did not accept literature as sufficient to allow a specific intended use statement for orthopedic surgery in the product labeling. The reviewer acknowledged, however, that orthopedic and intra-articular surgeries are included intended sues within the "general surgery" indication for use.

   …I-Flow again understood, however, that FDA's clearance of 510(k) number K982946 did not permit the Company to actively promote the device for such specific use.

   All of this information was communicated to DonJoy in a facsimile dated January 25, 1998, from Bob Bart of I-Flow to Dan Miller of DonJoy. Therefore, DonJoy was well aware of this information before it entered into the Agreement….

3. At no time during I-Flow's discussions with FDA regarding the specific indications for use of the PainBuster during the agency's review of 510(k) number K980558 and K982946 did the agency ever suggest that the labeling of the device should state that it is contraindicated for use in orthopedic surgery…Had FDA intended to contraindicate use in orthopedic surgery, it certainly knew how to do it.

4. On March 4, 1998, FDA cleared I-Flow's third in a serious of 510(k) submissions for an infusion kit containing an elastomeric pump (K984502). I-Flow changed the trade name of the device from PainBuster to "Nerve Block". FDA cleared the device "to provide continuous infusion of local anesthetic near a nerve for regional anesthesia and pain management of pre-operative, perioperative and postoperative general and orthopedic surgery."…The clearance was granted prior to the date of the agreement (May 121, 1999)

   While this third 510(k) did not change the ability to sell the PainBuster for orthopedic use, FDA's clearance of 510(k) number K984502 now permits I-Flow and DonJoy to promote the PainBuster specifically for use in pain management…including orthopedic surgery.

5. One of the Nerve Block infusion kit configurations is identical to the PainBuster device. The Nerve Block infusion kit also provides several configurations of the PainBuster using various pump models and components. Although the Nerve Block infusion kit includes three new pump models and three new kit components (insulated Touhy needle, hemostasis valve assembly, and hookup wire), the Nerve Block kit does not require, for example, that the device be configured with the Touhy needle or any of the alternative new kit components or pump models for pain management in orthopedic surgery.

   …As discussed above, I-Flow claimed in 510(k) number K984502 that the Nerve Block infusion kit is substantially equivalent to the PainBuster infusion kits which FDA cleared for marketing under 510(k) number K980558 and K982946 (IFLOW0022320)…

   In addition, I-Flow and, by extension, DonJoy are lawfully permitted to promote the infusion kits to which the Company previously assigned the PainBuster trade name for general surgery, including orthopedic surgery, as long as those devices are substantially the same as the Nerve Block device, which they are. Therefore, all of the I-Flow infusion kits containing an elastomeric pump that FDA has cleared to market under 510(k) numbers K980558, K982946, and K984502 can be lawfully sold and promoted for sue in pain management in general surgery, including orthopedic surgery, regardless of the trade names under which they are distributed.

   Under Section 12 of the Agreement, DonJoy acknowledges that the infusion kits containing an elastomeric pump it purchases from I-Flow shall be sold to DonJoy on a private label basis and shall be resold by DonJoy under a trade mark or trade name of DonJoy. As also stated in Section 21, DonJoy acknowledges that except by agreement in writing, no product purchased by DonJoy under the Agreement shall be marketed or sold by DonJoy under any I-Flow trademark, trade name or logo. Thus, except with I-Flow's express written permission, DonJoy cannot market the elastomeric infusion pumps it purchases from I-Flow under the PainBuster or Nerve Block trade names. It can sell those devices, however, under any other lawful trade name even though I-Flow initially assigned the PainBuster

or Nerve Block trade name to the infusion kits cleared by FDA under 510(k0 numbers K980558, K982946, and K984502.

Under the terms of the Agreement, I-Flow is obligated to provide DonJoy with infusion kits containing a disposable elastomeric infusion pump. Those devices can be provided to DonJoy under the PainBuster or equivalent private trade name as long as the devices can be lawfully sold for use in the management of orthopedic pain. All of the infusion kits that I-Flow has provided, is providing, and will provide to DonJoy under the terms of the Agreement can be lawfully sold by DonJoy to orthopedic surgeons performing procedures in the areas of sports medicine, trauma, joint repair and replacement, and podiatry.

I-Flow has met and is continuing to meet all of its commitments to DonJoy under the terms of the Agreement. In taking this effort to detail fully the relevant history and legal issues, I-Flow trusts this matter has been resolved and that there are no further misunderstandings with regard to the terms of the Agreement (IFLOW0022315-21).

**c. DJO PURCHASED AND SOLD I-FLOW PAINBUSTER INFUSION PUMPS FOR UNAPPROVED ORTHOPEDIC INDICATIONS THROUGH DECEMBER 2003**

204. As indicated in Mr. Holsteins' October, 1999 letter, DJO purchased finished pumps directly from I-Flow and relabeled them as DonJoy Pain Pumps for promotion. According to Mr. Miller, who left DJO in 1999, DJO routinely did review the indications for use to see that the devices' information provided to them was consistent with the FDA cleared indications for use (Miller, 3/25/09, p. 61, L. 12). Mr. Miller did not recall ever having reviewed any I-Flow drug information for DJO at time of product launch. (Miller, 3/25/09, p. 62, L. 6) However, when asked about catheter placement in the shoulder, he stated "I just don't know if catheter placement would be covered in the Indications for Use."(Miller, 3/25/09, p. 62-3, L.25-2). I-Flow provided the marketing materials for its pumps including its Catheter Placement Technique Guide.

205. According to the 1999 Distribution Agreement, all customer complaints were to be forwarded by DJO to I-Flow Customer Service. I-Flow was then to report back to DJO the analysis of the complaint. DJO was to handle all interactions with customers. I-Flow was to

provide technical support to DJO on the operation and use of the products.(IFLOW ESD 121971)

206. The distribution arrangement between DJO and I-Flow would last until December 2003. At that time, I-Flow took over its own pump distribution, merging its two pump lines into a single pump line it called On-Q PainBuster.

207. When DJO's contract ended with I-Flow, DJO in 2004 entered into another distribution agreement with McKinley and in 2007 McKinley/Curlin. DJO continued to distribute and promote DonJoy elastomeric pumps, after January 2004, McKinley's BeeLine was relabeled as a DonJoy Pump and still promoted for unapproved orthopedic indications(S. Rogow, 3/27/09 p.19, L. 6-11).

208. An email was sent January 10, 2002 from Patti Gerke, Sales Marketing Manager, DJO, to Distributors, Sales Representatives, Sales & Marketing titled "PainBuster and Columbia Contract", related to changes in J&J's contract with I-Flow.

> HUGE OPPORTUNITY!!
>
> J&J ON-Q pump WAS on the Columbia Contract. When J&J stopped distributing the ON-Q December 31st, the ON-Q came off the contract! Now the Columbia customers are looking to PainBuster as a replacement!(PACMED02355)

209. On April 24, 2002 there was another email from Patti Gerke again with wide release to General Manager, Distributor Partners and Sales marketing titled VERY IMPORTANT PainBuster INFORMATION. The announcement had:

> On April 23, 2002, I-Flow Corporation filed a complaint, in the Superior Court of the State of California for the County of Orange, claiming that dj Orthopedics, LLC and DonJoy, LLC breached the Distribution Agreement for the sale of

> PainBuster products in the orthopedic market in the United States and Canada. The complaint seeks unspecified money damages and an injunction to enjoin sales outside of the orthopedic market and to prevent combinations of products within a single package.
>
> While the complaint contains various legal theories, the thrust of the allegations is that dj Orthopedics, LLC and its sales representatives have been selling the PainBuster products outside the orthopedic market, for general surgical applications, and have sold "kit" that include Soaker catheters. We urge you to continue in your efforts to sell Painbuster products. Nothing in the lawsuit will stop our ability to act as distributor at this time. We also wish to remind you, as we have in the past, that our market is for orthopedic applications. Continue to confine your sales to that market only.
>
> In that we do not and have never made a "kit" that includes a Soaker catheter, we do not expect that it will add to your burden to avoid I-Flow's allegations.
>
> We have reviewed the allegations of the complaint and conducted our own internal investigation and believe strongly that the complaint is without merit. We intend to vigorously defend the claims and believe that we have a counter-claim against I-Flow upon its own breaches of the Distribution Agreement.

210. Patti Gerke wrote to Donald Earhart, President & CEO, I-Flow Corporation on August 4, 2002 regarding the Distribution Agreement and proposing a few potential modifications to Amendment #2. Under labeling, DJO forwarded its own attachment with slight modifications to the label. DJO wanted to keep the name "PainBuster Management System" and did not want to change the name to "Relief System" as proposed by I-Flow. Second, Ms. Gerke maintained that DJO customers (including the HPG) have always purchased "PainBuster Soaker Catheters.. To be consistent, DJO proposed to continue to call the catheters "PainBuster Soaker Catheters" so as not to confuse customers. However, I-Flow responded that the labeling "ON-Q with it unique package would be reserved for distribution to HPG accounts only."

211. Ms. Gerke maintained that DJO had found that they sold by fill volume and flow rate. Therefore they wanted to keep that information as more prominent than the "2 Day"

portion. I-Flow's response however was that they were " finding it less confusing to surgeons if we label for days of pain relief available instead of the pump's volume and flow rate."

212. Ms. Gerke wrote that they still had substantial existing inventory, so it was difficult for DJO to purchase 3000 additional kits. DJO wanted to discuss the possibility further with I-Flow about consigning the inventory. I-Flow's response was that:

> If you do not believe DJ O can sell at least 3000 of the new kits to HPG over the remaining 17 months on our Contract, it does not make sense for either of use to pursue this change to our existing business relationship. I will be investing sales time, nursing in-service time and marketing materials to help dj O increase revenues and profits. I need something in return to cover these costs. However, if djO is willing to share these costs, I will be willing to accept a Purchase Order for less than 3000 units.
>
> If djO places an order for 3000 units to be shipped before September 27, 2002, I will rebate $35 instead of the proposed $30 on the 3000 catheters purchased in June. After that, the rebate will be $30. All other aspects of our relationship, including the right to return excess inventory, will continue as defined in the original Contract.
>
> We would consider reworking inventory for a reasonable charge, Better yet, after the initial 3000 new kits purchased, we could consider a trade-in value for the old kits if used to purchase additional new HPG kits.(IFLOW ESD 040082-3; IFLOW ESD 040093-4).

213. Mr. Rogow, when asked what led to DJO's discontinuing the I-Flow pump, answered that "[i]t turned into a partnership that wasn't beneficial for us to stay in due to distribution conflicts." He continued that I-Flow decided to employ "I believe a direct sales force, so we were competing with a very similar product to the company that was manufacturing the product, and for us as salespeople or an organization, exclusivity is always a better option."(S. Rogow, 3/ 27 /09, p. 57, L. 1-9).

**d. DJ O HAS BEEN A FINANCIAL SPONSOR OF INTRA-ARTICULAR STUDIES**

214. Roger Massengale of I-Flow had in his a file an article by Dr. Hoenecke, an orthopedic surgeon, Division of Orthopedic Surgery, Scripps Clinic, La Jolla, California, titled a "Case Report Continuous Local Anesthetic Infiltration" published in *Orthopedic Technology Review*, Vol. 3 No.2 March/April 2002. The case report involved the use of a disposable infusion pump (dip) with a 20 gauge catheter for pain management following a knee anterior cruciate ligament (ACL) surgery conducted at Scripps Clinic, La Jolla, California. The study was performed to evaluate the use of these devices following knee procedures. The discussion included the use of bupivacaine, but failed to indicate that there was no local anesthetic approved for continuous intra-articular infusion. Regarding the procedures which failed to describe the effects on cartilage, the author wrote:

> Most of the failures of the technique involve incorrect placement or dislodgement of the catheter from the wound site. It is important to place the catheter under direct or arthroscopic visualization. The catheter needs to be immediately taped in place and flushed with saline or bupivacaine to keep it from clotting off.
>
> No toxic effects of bupivacaine on articular cartilage have been reported. One study of bolus injection of bupivacaine and saline injection demonstrated a transient inhibition of sulfate uptake by chondrocytes. This temporary effect appeared to be primarily related to the saline effect on articular cartilage[11].
>
> The placement site for shoulder rotator cuff repair is usually in the subacromial space through the anterior deltoid…For intra-articular labral or capsular repairs, the catheter may be placed in the glenohumoral joint through the rotator interval….

215. Dr. Hoenecke was a clinical investigator for DJO. He received financial support from DJO for his investigations with continuous infusion pain pumps and local anesthetics for orthopedic surgery. The funding for Dr. Hoenecke continued from DJO even after the

[11] Nole R, Munson NM, Fulkerson JP. Bupivacaine and saline effects on articular cartilage. Arthroscopy. 1985:1(2):123-127.

distribution agreement with I-Flow ended in 2003. In a letter of December 12, 2001 to DJ Orthopedics and Patti Gerke from Cathi Rabago, Scripps Clinic, Ms. Rabago wrote:

> Enclosed you will find an invoice and full copy of the signed agreement for "A Double-Blind, Prospective Randomized Study of Continuous Infiltration of Bupivacaine and Placebo to Evaluate the Efficacy of Local Anesthetic for the Management of Pain Following Elective Arthroscopic Repair of the Rotator Cuff"(DJO9526).

216. According to the "Form of Clinical Research Agreement", an agreement was entered into on November 9, 2001, between Dr. Hoenecke, Scripps and DJO. The proposed study was to be completed by June 6, 2003. The "Engagement of Researcher" was by DJO (DJO9528). The final report was to be provided to DJO (DJO9529). In terms of ownership of the data:

> The Researcher hereby grants to DJO, and DJO hereby accepts, a worldwide, perpetual, non-exclusive, royalty- free license (with the right to sublicense) in and to any and all Research Data to use for any purpose whatsoever during and after the term of this Agreement; including without limitation, the right to copy, reproduce, transmit, publish, distribute, modify, adapt, translate or prepare derivative works from the Research Data for any purpose during the term of the Agreement and subsequent to any termination of this Agreement.
>
> The Researcher shall submit any intended publication or oral presentation to DJO, thirty (30 ) days prior to public presentation or submission to a publisher. DJO shall review such intended publication or presentation within (14) days of receipt thereof. DJO shall provide comments to the Researcher, which the Researcher will consider in good faith. (DJO9530).

217. DJO had recently been supplying infusion pumps for a pediatric study being conducted in Philadelphia, PA. Ms. Coulter received an email from Jonathan Beus dated June 13, 2007, subject Continuous Intraarticular Infusion Study at the Children's Hospital in Philadelphia" which had:

> Just wanted to send you an update concerning the study at our institution that DJO Orthopedics is supplying pain control device for. Our investigators recently became aware of some in vitro studies suggesting that intraarticular bupivacaine may cause chondrolysis. Until more research is done on the possible clinical implications of these findings, we have decided to temporarily place the study on hold. I have attached the letter that we sent to our Institutional Review Board explaining our actions as well as some corresponding literature. Please let me know if you have any questions or need any additional information.(Coulter, 3/24/09, p.183, L. 7-18)

218. Ms. Coulter of DJO had been providing the investigators with DJO infusion pumps for the study. However, she stated she was not familiar with the parameters of the study and was not positive as to who started or maintained the study. (K Coulter 3/24/09, p. 183-4, L. 7-3).

**e. DJO STUDIES OF INTRAARTICULAR USE ARE NOT SUPPORTIVE OF BENEFIT**

219. On January 13, 2005, Heinz Hoenecke, Scripps Clinic wrote to Colin Gregersen, Manager, Applied Research, DJ Orthopedics a letter titled RE: Pain pumps study. He began "[w]e have completed the 60 patients in the rotator cuff repair study". He goes on:

> We noticed quite a variation in pain reports even in the placebo group making it difficult to reach statistical significance with 60 patients….
>
> The study neither supports nor defeats the use of pain pumps although we had expected a more dramatic result with the pump, especially the 5 ml one. With the <u>5ml pump, we observed an interesting trend towards</u> <u>more pain than with the placebo although not significan</u>t. The 2 ml pump trended toward less pain than the pump with placebo but again not significantly different from the other groups.
>
> <u>I don't know about the future use of pain pumps</u>. We have continued to use them. It could be the rotator cuff repair is not a good pain model for any studies even if it is arthroscopic. Previous studies with subacromial decompression (Savoie) showed a significant decrease in pain and narcotic use.
>
> Our ACL study showed a decrease in pain by about one third also. This is similar to several other pain pump studies that were no controlled as well. Most other pain pump studies were not double blind placebo controlled as ours have been

This does not answer the question whether a basal flow or patient controlled bolus would work better. We only looked at Marcaine (Bupivacaine) as an anesthetic but there may be better options…

Enclosure: Invoice inclosed(sic) for $3,500.(DJO9558-9)

220. In a September 26, 2002 email from Colin Gregersen to Michael McBrayer et al

Subject OrthoIndy PainBuster review, he wrote:

My two cents:

1) Agreeing to this study would be purely a business decision. We currently have two PB studies for rotator cuff repair underway and a knee arthroscopy PB study about to begin.

2) Savoie's study has demonstrated the efficacy of pain management for arthroscopic repair.

3) If we chose to move forward, then I would like to ask then to revise their protocol based on my comments. This includes hypothesis development, a sample size justification, and a literature review by the authors. I fear that they do not have a good grasp on the pain management literature….These are important as I would hate for use to fund a study that was either 'inconclusive' or reflected negatively on our product (due to poor methods, not actual ineffectiveness of the device)(ENJ)-00093304-5)

A follow-up email from Glade Pauley to Colin Gregersen, titled OrthoIndy PainBuster Review

Sorry, Colin- I do not like your premise. WE want THEM to do business with US rather than the competition. Unlike Black and Lynch (a couple of sticks in the mud who I know from their days as Cleveland Clinic Fellows and both non-bracers for the most part) this group has unbelievable market share, capital resources, and influence over an entire state. They use the most products from other people!...

You may not want to hear it, but WE are the ones who have to make the investment up front, because they have the business spread around elsewhere. We are compelled to front end load. Lynch and Black are two members of a group at an academic institution where we already have some good quality relationships and history of physician support. They can and should do their own research (EDJO-00093303).

**4. STRYKER CORPORATION**

221. Stryker is a major world-wide orthopedic firm. It was formed in Kalamazoo, Michigan in 1941 by Dr. Homer Stryker, an orthopedic surgeon. Stryker Endoscopy has obtained clearance of arthroscopic infusion pumps (K910858;K963304). Stryker entered into the external infusion pumps for post operative pain management through its acquisition of rights to McKinley's OutBound Pump. The focus of Stryker's marketing activities in the United States has been primarily orthopedics products.

**a. K003543 STRYKER PAINPUMP II**

222. Ms. Nicole Petty, Stryker submitted K003543 on November 17, 2000 for a 510(k) for its PainPump 2 that would be cleared by FDA on June 5, 2001. According to Ms. Petty, the Pain Pump 2 had a new increased reservoir size of 250cc when compared to the prior designs (Petty, 2/20/08, p175, l.15-17).

223. In January 2001 Stryker made a change to its Pain Pump 1 to 1.5, revision G to increase the size of the reservoir to 270cc (FET0159). During the 510(k) review of the PainPump 2, according to Ms. Perry, FDA did not request additional information about Stryker's rationale for changing the reservoir size or testing of the new reservoir. Instead, for the PainPump 2, a software controlled device, FDA requested additional information about the device's software and biocompatibility testing. Based on Ms. Petty's testimony the reservoir was increased by Stryker based on the market's asking for it. "Our customers wanted to be able to infuse more medication when using the Pain Pump". In terms of the PainPump 2, she continued that at the same time, competitor I-Flow did provide a similar large reservoir (Petty,

7/20/08 p.180, L.9-17). ( I-Flow already had a 270cc pump at that time, so the modification of the PainPump 1 to the PainPump 1.5 reservoir had been made to match the I-Flow 270 cc reservoir size.) Ms. Petty did not recall seeing any Stryker assessment of the safety of increasing the pump volume from 100 cc's to 270 cc's (N. Petty 7/20/08 p. 172, L. 4-24). If there had been discussion taking place about the reservoir size, she would have been involved in those discussions if a risk analysis took place. (N. Petty 7/20/08, p 173, L. 2). The Stryker plan in 2000 for its PainPumps was to increase the reservoir size up to 400ccs. Stryker in 2009 sells pain pumps with 400 cc reservoirs.

224. On March 28, 2001 Ms. Petty, Stryker wrote to FDA to amend its PainPump 2 IFU to include a new indication for infusion into the synovial cavity. The letter was the result of a phone conversation she had with FDA on March 15, 2001. The letter included that the McKinley's Outbound Infusion Pump, which was cited as one of Stryker's predicates devices, was initially "cleared for that use". Ms. Petty continued (underlining added for emphasis) "[a]ccording to McKinley Medical LLP, the synovial cavity was later removed to avoid confusion." (GR004493). Ms. Petty later testified that Stryker did not understand what the confusion had been at the time it sent the letter to FDA as to why the indication was removed (N. Petty, 7/24/08, p.16:9; NPET-000105). According to Ms. Petty, Stryker had requested that McKinley provide it with all the regulatory records before Stryker acquired the rights to the pump technology from McKinley, but it did not receive all the records until after the acquisition. Stryker had obtained the rights to sell the Outbound pump, later renaming it the Stryker PainPump 1.0, in 1999 (N. Petty 7/20/08 p. 155 L. 18).

225. Ms. Petty indicated that a risk assessment is part of Stryker's usual due diligence process before purchasing technology but she did not recall any risk assessment being done that dealt with intra-articular use. (N. Petty 7/20/08, p/148, L 19). Stryker had closed the deal with McKinley and then found out after the deal was completed that the synovial space indication had been revoked by FDA. Stryker had been lead to believe by Ms. Dennis, McKinley, that it had been cleared (N. Petty 7/20/08 p.151, L12-24). Stryker's understanding had been that the FDA had approved use in the synovial space for the Outbound until it later found out from FDA sometime after 1999 that it was not cleared. When Stryker approached FDA seeking clearance, Stryker believed there was a McKinley predicate. (N. Petty 7/20/08 p, 155-6, L. 18-12). Ms. Petty testified that Stryker had a discussion internally that it wanted to add the synovial use. When Stryker requested to add it, the FDA then told Stryker to redact it because there was not a predicate device with that indication. She did not recall who had the discussion within Stryker trying to add the indication (Petty, 7/20/08, p. 152, L. 17-24). The Stryker marketing department was in favor of adding an indication for use in the synovial space. (N. Petty 7/20/08 p/ 154, L. 14).

226. On June 5, 2001 FDA cleared the 510(k) but without Stryker's requested synovial cavity indication. FDA assigned product code FRN. The FDA's cleared IFU:

> Pain Pump II is an electromechanical pump which delivers a controlled amount of medication to the patient for the purpose of managing pain. The pump delivers medication using one or both of the following drug delivery profiles: an hourly flow rate and a bolus PCA (patient controlled anesthetic) dosing option. Routes of administration may be intraoperative, subcutaneous or percutaneous. Dosage rates and patient lock out times are programmed into the PainPump II unit by the physician.
>
> The PainPump II is contraindicated for infusion of blood and blood products, insulin, of life-supporting medication.

227. The following documents come from the period of development of the PainPumpII project at Stryker (underlining for emphasis):

> PainPump II Functional Specifications
>
> Draft #1
>
> Project #1614
>
> Project Definition
>
> 00-March-21
>
> Luis A Diaz
>
> 1.2 INDICATIONS FOR USE(5.2.3)
>
> Orthopedics- Continuous flow (.5cc/hr up to 8cc/hr) Options- Two site catheter insertions, modular quantity up to 400cc, maximum use 1 to 5 days (Exhibit 791).
>
> ***Project Requirements (5.4)***
>
> ***Project Driver***
>
> This product will be driven primary (sic) by product performance and cost. Time to market in the next six month could be potential to be the driver of the project.
>
> Performance and Claims as marketing strategy …
>
> Flow capacity: Up to 400 cc
>
> Infusion time: 1 to 5 days
>
> Versatility: Potential to be used in Orthopedics, General, Obgyn, Thoracic and CV sites or any surgery procedure.
>
> More infusion Coverage: Cover area from epidural up to 5 inches with capabilities for two catheters
>
> ***Product Success Measurement***:
>
> The success of the product will be measured during CPT(*Note: Consumer Preference Trials) trials. A user satisfaction % of each of their needs will be evaluated between the Engineer Team, Marketing and Upper management to assure all needs are in the levels of expectations required to launch a Best in Class Product.
>
> ***Design Challenges***:

> The following are the most basic design challenges that the new design will confront:
>
> a) Ergonomics and functionality
>
> b) Flow distribution…
>
> c) Understand toxicity Levels, Biocompatibility Materials, Drug suppliers and distribution methods, most common anesthetic used…
>
> ***Potential Company Risks***:
>
> b) Medication Toxicity: More investigation in terms of all possible drugs intended to use and their indication for use..(Exhibit 791)

228. There is a memo titled "PainPump II Brainstorming" of May 10, 2000 signed by Luis Diaz and Jason Allen. Two areas were discussed, the first titled, "**Y-connector for treating subcutaneous and joint pain simultaneously**"( underlining for emphasis):

> Treat two sites for joint procedures: one catheter to fill joint space, the other catheter to treat subcutaneous tissue affected by the incision. The joint catheter could have the same configuration as the currently offered product (one-three fenestrations), while the subcut. Catheter could have a soaker configuration. The y-connector could divide the flow unevenly-possibly splitting the flow 70 subcut./30 joint. The majority of the post operative pain is coming from the soft tissue damage- let's design our product to primarily treat the tissue damage and secondarily treat the joint and bone damage.
>
> **Pressurize the soaker hose from both ends**.
>
> The majority of the problems seen with the current version of the soaker houses (*sic) on the market are caused from the lack of pressure provided to this hose. This pressure problem could be overcome by looping the catheter to provide pressure at both ends. The current product has a pressure source at one end, and the opposite end is clamped shut. The proposed idea would provide pressure at both ends of the catheter, either utilizing two pumps or one pump with two pressure ports.(Exhibit 792)

229. Two physician forms from Stryker's SIMULATION TRIAL FEEDBACK FORM/PAINPUMP II INFUSION SYSTEM included the following comments (underlining for emphasis):

Dr. Collins- general procedure- hernia gave the following feedback October 5, 2000:

> Have a warning go off if someone sets it for too high of a toxicity level!
>
> What if the reading is wrong? The present pain pump is great because there is a visual reading.
>
> Worried about puncture of bag. PUT IN A CARRY CASE! A little bulky. Can we make it smaller? Toxicity is a big problem=a law suit waiting to happen. (GR018712-3)(Plaintiffs Exhibit 783).

Dr. Mark Holder- orthopedic procedure shoulder, allograft, total knee, pump used 2 to 3 days:

> 4cc/hr should be the maximum, excellent results with 2cc/hr (due to toxicity)
>
> Reduce size by 1/3, easier for patient to wear. 370cc version "extremely heavy"
>
> Dosage: Totally disagree with anything above 4cc, unsafe (GR018707-9)(Exhibit 782).

230. There was a Stryker Instruments "Technical Report" Company Confidential dated November 28, 2001 written by Omar Velez for PainPump2 Flow Rate Testing. It appears to be a Design Document for the PainPum2. In Section 11 under CLINICAL DATA is only the following statement:

> PainPump2 does not warrant a clinical trial to demonstrate safety. A customer preference Trail (CPT) was conducted to verify that the user needs were met. The customer validation summary of those CPTs are included in this file.(GR009035).

**b. K014091 PAINPUMP**

231. On December 11, 2001, Ms. Petty, Stryker submitted K014091as a modification to is PainPump. FDA cleared the submission on December 31, 2001, product code FRN. The cleared IFU:

> Intended to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.

### i. STRYKER HAD KNOWLEDGE OF LACK OF APPROVED LOCAL ANESTHETIC FOR CONTINUOUS INFUSION INTO A JOINT

232. Stryker design engineers did obtain local anesthetic package inserts**.** There is an April 10, 2000 letter from Paul D. Rosen, Medical Departments Abbott Hospital Products Division to Mr. Jason Allen, Design Engineer, Stryker Instruments. Mr. Allen was sent the package inserts for Lidocaine and Marcaine (Bupivacaine Hydrochloride Injection, USP). The package inserts did not identify either Lidocaine or Marcaine as approved as safe by FDA for continuous intra-articular infusion (STR5855).

233. Stryker failed to identify a single local anesthetic manufacturer to partner in production of PainPump 2 kits**.** There is a signed July 6, 2000 Stryker/Purdue record of a business meeting held between Stryker and Purdue Pharma LP to discuss the PainPumpII Project. Attendees included Jason Allen, Nicole Petty, Luis Diaz, Steve Schewe from Stryker and James Dolan, VP of Licensing and Business Development, representing Purdue Pharma. The meeting notes had the following:

> The meeting began with Jim Dolan sharing some background information on Purdue Pharma…
>
> Next Jason and Steve shared the background of the current PainPump device, its market, and a background on Stryker Instruments and Stryker Corporation. The Purdue representatives had many questions related to the device flow rates, capacity, indications for use, catheter placement, and reimbursement structure. Mike and Brianne shared with the Stryker team that currently their local anesthetic, Chirocaine, is indicated for continuous epidural infusion but not for interarticular injection. The drug is indicated for local infiltration in surgical anesthesia and pain management. IT may be necessary that Purdue would need to submit an IND to the FDA to indicate for interarticular and local infiltration applications. This would be a considerable effort.
>
> After the current device and market were fully explained, the Stryker team shared briefly the functional specifications for the new device. Specifically, the device will hold 400cc compared to the current 120cc, allow the surgeon to program the

desired flow rate, and offer a PCA of rescue dose option. The circular fluid reservoir concept was also shared by drawing a simple schematic on the dry-erase board. Three general concepts were discussed:

1) Purdue currently offers Chirocaine in 30cc vials. With the current device, this requires the surgical staff to open 4 vials to fill it to full capacity. The new device would require 14 vials. The surgical staff typically sees opening these vials as a great nuisance, which could be avoided if Purdue offered Chirocaine in larger containers (100cc or greater)…

2) Purdue could partner with Stryker to allow Stryker to package Chirocaine with the PainPump or PainPumpII devices. This would benefit Stryker by offering its customers an added convenience while benefitting Purdue by increasing sales of their local anesthetic. Possible obstacles that need to be overcome for this to be a reality include: receiving FDA approval for Chirocaine to be used in this indication…This process could take anywhere from 3 to 12 months, and is dependent on many factors.

3) Purdue could partner with Stryker, allowing the device to be filled with the local anesthetic during the manufacturing process. This is by far the most time and resource intensive proposal…(STR4668-9)

## c. K030885 MODIFICATION TO PAINPUMP2

234. Ms. Nicole Petty submitted K030885 on March 21, 2003 to modify the Stryker PainPump2 that was cleared on April 18, 2003, as product code FRN, BSO. The Stryker Pain Pump 2 had a capabilities as a 2-Site infusion set. The kit had introducer needles, syringe, dressings and catheters. The predicate was the infusion pump systems was marketed by I-Flow. The submission signed by Ms. Petty, as all the Stryker pain pump 510(k)s, "The Stryker PainPump2 does not raise any new safety and efficacy concerns when compared to similar devices already legally marketed." The PainPump 2, unlike the elastomeric infusion pump of the PainPump1, was an electromechanical pump. It could be set to provide either an hourly flow rate and/or a bolus PCA dosing option. The dosage rates and patient lock out times were programmed into the PainPump2 unit by the physician. The PainPump2 was to be contraindicated for infusion of blood, blood products, insulin or life-supporting medication.

235. The FDA's cleared IFU:

> PainPump2 is an electromechanical pump which delivers a controlled amount of medication t the patient for the purpose of managing pain. The pump delivers medication using one or both of the following drug delivery profiles: an hourly flow rate and a bolus PCA (patient controlled anesthetic) dosing option. Route so administration may be intraoperative, subcutaneous, or percutaneous. Dosage rates and patient lock out times are programmed into the PainPump II unit by the physician.
>
> The PainPump II is contraindicated for infusion of blood and blood products, insulin, or life-supporting medication.

**d. K030661 STRYKER PAINPUMP2**

236. Ms. Petty submitted K030661 on March 3, 2003 for a pain pump assigned product code MEA that was cleared May 30, 2003. The Stryker PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. The PainPump 2 is substantially equivalent to infusion pumps marketed by I-Flow. The Stryker PainPump2 catheter is equivalent in intended use to catheters marketed by I-Flow and Sims Portex. FDA's cleared IFU:

> PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rte and provides an option for patient controlled bolus doses. Medications are infused through intramuscular or subcutaneous routes.
>
> PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management, Routes of administration may be intraoperative, perineural, or percutaneous.

**e. K031249 MODIFICATION TO STRYKER PAINPUMP1**

237. Ms. Petty submitted a modification to the Stryker PainPump to FDA, K031249, on April 18, 2003, which was cleared on July 21, 2003, assigned product code FRN. The Stryker PainPump1 is a disposable syringe infuser pump that comes in kit models now available in fill

volumes of 120 to 270cc and flow rates from 0.60 up to 8.32 cc/hr. Technically, there is no Stryker PainPump cleared by FDA by a 510(k) with the trade name "PainPump 1.5", however K031249 included clearance of a Stryker PainPump 1 series to include a 270cc reservoir, which appears to be the origin of Stryker's PainPump 1.5. The predicates included pumps marketed by Stryker, I-Flow and Sgarlato. The FDA's cleared IFU:

> The Stryker PainPump delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provides an option for patient controlled bolus doses. Medications are infused through intramuscular or subcutaneous routes.
>
> The Stryker PainPump is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.

**f. K042405 PAINPUMP1; PAINPUMP2**

238. Stryker bundled its two 510(k) cleared PainPumps, 1.0 ( which would include the PainPump 1.5) and 2.0 into a single 510(k),submitted September 7, 2004 and cleared October 14, 2004. The 510(k) was submitted by Ms. Jennifer Mars for Stryker to obtain FDA's clearance to add a new efficacy claim to marketing and its label like I-Flow's K040337 (cleared in February 2001). The new claim was reduction of narcotic use for a patient when using a Stryker infusion pain pump for postoperative pain management.

239. Stryker's PainPump 1 was its disposable syringe infuser intended to deliver continuous infusion to a patient for pain management. The predicate was Stryker's PainPump 1(and PainPump 1.5) (K031249).

240. Stryker's PainPump2 was its electromechanical pump designed to deliver medication for pain management and/or antibiotic delivery. The predicate for the PainPump2 was Stryker's K030661 PainPump2 and K040337 I-Flow Elastomeric Pump w/bolus (ON-Q, PAINBUSTER, C-Bloc, HomePump cleared 2/13/2004).

241. The FDA's cleared IFU:

> PainPump1 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate. Medications are infused intraoperatively and postoperatively through intramuscular or subcutaneous routes.
>
> PainPump1 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> **PainPump1 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.**
>
> PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provides the option for patient controlled bolus doses. Medications are infused intraoperatively and postoperatively through intramuscular or subcutaneous routes.
>
> PainPump2 is also intended for controlled delivery of local anesthetics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> **PainPump2 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.**

**g. K043466 STRYKER PAINPUMP2 AND STRYKER PAINPUMP2 BLOCKAID**

242. On April 19, 2005 FDA received a resubmission of a 510(k) which was originally submitted in 2004, based on the assigned 510(k) identifier, for the Stryker PainPump2. The application was cleared on May 10, 2005. The application was signed off on by Ms. Jennifer

Mars for Stryker. Stryker requested to label its Stryker PainPump2 to included delivery of narcotics and as an epidural.

243. The PainPump2 Blockaid is electromechanical and to be used for continuous peripheral nerve block. The Blockaid has a 300mL capacity, but is able to be refilled filled up to 1000mL. The predicates listed were K042405 Stryker PainPump1 and Stryker PainPump2 (cleared October 14, 2004) and K040337 I-Flow Elastomeric Pump w/bolus (ON-Q, PAINBUSTER, C-Bloc, HomePump cleared 2/13/2004)(I-Flow's new consolidated post DJO pump series).

244. The FDA's cleared IFU:

> The Stryker PainPump2 delivers controlled amounts of medication and narcotics directly to the intraoperative site for pain management. The pump infuses the medication at an hourly flow rate and provided the option for patient controlled bolus doses. Medications and narcotics are infused intramuscular, subcutaneous, and epidural routes.
>
> The Stryker PainPump2 delivers controlled amounts of medication directly to the intraoperative site for pain management and/or antibiotic administration. The pump infuses the medication at an hourly flow rate and provided the option for patient controlled bolus doses. Medications are infused through intramuscular and subcutaneous routes.
>
> The Stryker PainPump2 is intended for controlled delivery of local anesthetics and narcotics in close proximity to nerves for postoperative regional anesthesia and pain management. Routes of administration may be intraoperative, perineural, or percutaneous.
>
> The Stryker PainPump2 is also intended to significantly decrease narcotic use and pain when used to deliver local anesthetics to surgical wound sites or close proximity to nerves when compared with narcotic only pain management.

245. Dr. S. Brown and A. Morrison (2004)[12] of FDA's CDRH, published the FDA's findings from review of its Medical Device Report database increased risk of infection with continuous infusion pump, a safety signal about product design for the pump manufacturers. Ms. N. Perry testified that Stryker first got wind of the Pain Pump injuring cartilage in 2005 (N. Petty, 2/20/08 p. 181, L.11). In 2004, Lori Brown, FDA

**h. K072702 STRYKER 'ANTIMIC' CATHETER (SILVER EXFEN CATHETER®)**

246. Julie Pryor submitted additional information for Stryker on February 19, 2008 for a 2007 510(k) requesting marketing clearance of a Stryker AntiMic Catheter. The 510(k), K072702 was cleared on March 19, 2008, product code BSO. The predicates with K051401 I-Flow ON-Q SilverSoaker Catheter (see above); K061250 Vygon: MultiCath Expert cleared 9/29/2006); and K043466 Stryker PainPump2.

247. The predicate Vygon MultiCath Expert is a line of multi-lumen intravascular catheters. They are composed of polyurethane impregnated with silver ion-based antimicrobial agent AgION and were available as 2-,3-,4-, and 5- lumen catheters. Expert catheters releases silver ions from a surface mineral coating applied to both the internal and external surfaces gradually.

248. The Stryker AntiMic catheter was intended to be used along with the Stryker PainPump Systems. It was to be available in the following sizes: Standard; and 2/5", 5/0" and 10" Extended Fenestration ("ExFen"). The Standard catheter had a closed tip with three holes

[12] Brown SL Morrison A E Local Anesthetic Infusion Pump Systems Adverse Events Reported to the Food and Drug Administration. Anesthesiology May 2004; Vol 100(5):1305-1306.

arranged radially along the lateral surface at the distal end of the device. The Extended Fenestration catheters had a closed tip with multiple holes arranged radially along the lateral surface at the distal end of the device.

249. The Stryker administration catheter contained an antimicrobial agent intended to inhibit the growth of microorganisms and reduce the possibility of the catheter becoming microbially compromised. It has the same technology as the I-Flow ON-Q Silver Soaker Catheter and Vygon MultiCath Expert Catheter predicates. However, unlike the I-Flow soaker catheter technology, the Stryker ExFen catheter did not utilize a <u>hollow tube</u> on <u>either the inside or outside</u> of the catheter as described in a variation of the I-Flow Soaker Catheter (K051401). The antimicrobial surface consisted of zeolite crystals containing silver ions applied as AgION that are randomly oriented on the catheter and distributed throughout the surface of the catheter

250. The Stryker AntiMic Catheter was intended to provide continuous or intermittent delivery of medication to or around surgical wound sites for preoperative, perioperative and postoperative pain management. The Stryker AntiMic Catheter was contraindicated for the epidural space and in neonatal populations. The FDA's cleared IFU:

> The Stryker AntiMic Catheter Kit is intended to provide continuous or intermittent delivery of medication (such as local anesthetics or narcotics) to or around surgical wound sites for preoperative, perioperative, and postoperative pain management. The Stryker AntiMic Catheter Kist is contraindicated for the epidural space and in neonatal populations,
>
> The Stryker AntiMic Catheter Kit contains an anti-microbial agent which may destroy or inhibit the growth of microorganisms on both the inner and outer surfaces of the catheter. The antimicrobial agent is intended to reduce the possibility that the catheter may become microbially compromised. The antimicrobial agent is not intended to be sued as a treatment for existing infections.,

251. On Stryker's website (http://www.stryker.com) May 2009, the Stryker AntiMic Catheter is marketed with the trade name "Silver ExFen Antimicrobial Cather". It is intended to reduce microbial colonization. The infusion segment listed in the 2009 PainPump2 Brochure is 2.5" or 5.0," not the 10" infusion segment of the I-Flow and Stryker 510(k)s. The Stryker Silver ExFen Brochure downloaded May 11, 2009 contains 'no contraindication or warning information about intra-articular use.. Stryker markets two silver catheter, the Standard ExFen catheters and 2-Site ExFen Catheters.

## VI. BASES OF OPINIONS #7-11

### A. SHARED ISSUES FOR EXTERNAL PUMP MANUFACTURES AN DISTRIBUTORS

#### 1. PRACTICE OF MEDICINE VERSUS A FAILURE TO WARN

252. The Food and Drug Administration was not given authority or a mandate by Congress to provide regulatory oversight over the "practice" of medicine by health care providers in the United States as it pertains to the individual care and treatment of patients. The FDA since 1976 was given new authority over industry to ensure it provides health care professionals with devices with truthful and accurate labeling, adequate instructions for use and warnings. Health care providers have come to assume that products promoted to them in the United States by industry have been found by FDA to be safe and effective for the indication for which they are being promoted by a manufacturer, and that the manufacturer would warn of risks. It is not the role of each health care provider engaged in the practice of medicine caring

for patients to independently review each new medical device and ensure that it is safe and effective and appropriately labeled. That is the role of the FDA and manufacturer.

253. As a response to the atrocities of World War II, the Belmont Report (21 C.F.R. Part 50, Appendix F) produced by the National Commission for Protection of Human Subjects of Biomedical and Behavior Research issued its conclusions in April 18, 1979 of basic guidelines for conducting ethical biomedical research. It is one of the documents relied upon by the FDA, other government agencies, and the medical device industry as a guidance to help define the difference between “research” and “practice of medicine.”

> For the most part, the term "**practice**" refers to interventions that are designed solely to enhance the well being of an individual patient or client and that have a reasonable expectation of success. The purpose of medical or behavioral practice is to provide diagnosis, preventive treatment or therapy to particular individuals. By contrast, the term "**research**" designates an activity designed to test a hypothesis, permit conclusions to be drawn, and thereby to develop or contribute to generalizable knowledge (expressed, for example, in theories, principles, and statements of relationships). Research is usually described in a formal protocol that sets forth an objective and a set of procedures designed to reach that objective.

254. The oversight of the “practice of medicine” and the “physician and patient relationship” has traditionally been left to other regulatory agencies outside the FDA such as State Licensing and Medical Boards and Hospital-based peer review and credentialing bodies. For oversight of medical device manufacturers, in 1976 FDA was given Congressional authority for premarketing review, oversight of conduct of product sponsors, manufacturers, distributors, to ensure truthful and adequate labeling and promotions with a universal mandate to protect public health. Prior to the passage of the Medical Device Amendments in 1976, FDA’s oversight of medical devices was primarily through oversight of product postmarketing

including labeling, misbranding and adulteration provisions of the Food Drug and Cosmetic Act.

255. In 1976, FDA's role for regulation and oversight of medical devices was dramatically changed to a system like FDA's regulation of drugs. The process included a pre- and post market phase for FDA oversight and interaction. Health care providers have come to rely in their daily practice of medicine that the ability of a manufacture to openly promote and distribute a medical device in the United States as equivalent with that manufacturer having obtained some form of minimal premarketing clearance and/or approval from the FDA.

256. However, health care providers and subsequent conduct as it relates to medical devices and patient safety have not been "exempted" by Congress from certain applicable sections of the Act. A health care provider can be viewed as device manufacturers or an agent of a device manufacturer. FDA used the FDCA to legally address physician and health care provider conduct engaged in the roles of sponsor, manufacturer, distributor that can impact public health. As example, the Act is applicable to physicians engaged in clinical investigation activities for sponsors for support of marketing applications, whether with or without an IDE. The physician is seen as a clinical investigator using patients as subjects when obtaining clinical data for sponsors to support product development, new claims or new indications. FDA can become involved with physicians when their actions enter them into marketing and promotion agreements with industry. There are situations where the Act can become applicable when a health provider's conduct falls outside the true day to day "practice" of medicine and accepted methods of peers.

257. However, it is the manufacturer that is held responsible by the Act to provide adequate instructions for use and adequate warnings to all health care providers engaged in their investigations in terms of clinical protocols, investigator brochures, informed consents and labeling and using its products. Manufacturers are also required by the Act to not misbrand or adulterate products sold in the United States. Labeling changes and updates can be made voluntarily by manufacturers to quickly ensure safety and efficacy of products, to address user errors, whether the product is still premarket or postmarket. Holders of cleared 510(k)s, with a few exceptions, such as a contraindication, can immediately make changes to labels improve the safety of labeling without first having to obtain approval from the FDA. Manufacturers of 510(k) products can immediately and voluntarily send out notifications, such as Dear healthcare Provider letters, to health care providers, hospitals, pharmacists, risk management, its customers, sales force, distributors without first obtaining FDA's approval.

## 2. DISCUSSION OF RISK FACTORS FOR CARTILAGE IN SCIENTIFIC LITERATURE

258. J. A. Key (1933)[13] wrote that by 1933 he was aware that there was literature that showed arthritic-like changes could be produced in joints by injecting a small amount of a strong chemical irritant into the joint. In his paper, he described being able to produce chronic progressive arthritis from repeated injection of weak acids, weak alkalies, distilled water, or salt solution into joints of animals. In terms of injury being produced in articular cartilage, he found that there were only certain areas of cells that would be immediately killed by the injections. The small superficial cells of cartilage tended to be able to survive the insult while the deeper cells in the deeper zones were killed. Necrosis and erosion of the cartilage over a joint's bearing

[13] Key JA, The Production of Chronic Arthritis by the Injection of Weak Acids, Alkalies, Distilled Water, and Salt Solution into Joints. J Bone & Joint Surg. 1933; 15:67-84

surface were usually accompanied by a proliferation of cartilage and bone around the margins of the cartilage and beneath the adjacent periosteum. The combination of central necrosis with marginal proliferation of the cartilage resulted in deformities of the joint's bearing surface. His observations supported that cartilage grows from beneath up rather than on the surface and that deeper cells are younger cells than those nearer the surface. Repeated injections caused inflammation of the synovial tissues and deformation and death of the articular cartilage. When the source of irritation was removed, the synovial tissues tended to return to normal, but the damage to the cartilage was more or less permanent. When articular cartilage was killed, it was difficult for the body to repair it because replacement cells could not freely migrate through the dense matrix to the site of injury. As a result, the dead cartilage remained in situ, preventing any further repair or replacement from adjacent living tissue. Furthermore, when cells of cartilage were killed, the surrounding matrix begin to disintegrate. Consequently, the effect of repeated minor injuries to cartilage was cumulative with time.

### 3. ARTHROSCOPIC SURGICAL PROCEDURES AND RISK FOR INJURY TO CARTILAGE

259. The use of arthroscopic procedures in orthopedics began to rapidly expand with the availability of new flexible endoscopic imaging technology in the late 1970s early 1980s. Regarding the new risk of bathing joints with solutions during arthroscopy, B. Regan et al[14], (1983) described that a standard time for arthroscopy knee procedures at their facility was fifteen to forty-five minutes, with the amount of irrigation solution being infused into a knee joint less than 500 ml. From their own observation, the authors concluded that the apparent ability of the knee to withstand the length of time and the amount of solution infused provided further that

[14] Regan, B et al Irrigating Solutions for Arthroscopy A Metabolic Study Journal of Bone & Joint Surg. June 1983. 65-A(5):629-631

"chondrocyte metabolism during such a short exposure to a limited amount of even an unphysiological solution at a pH of 5.3 is probably not a crucial issue." The authors continued:

> For operative procedures, however, the duration if the procedure is longer, and as much as 3000 ml of the solution is infused into the joint. Based on the data presented in this study, this would seem to pose a significant hazard to chondrocytes and it is likely that metabolism is severely impaired, at least for a period of time during and following the procedures. Normal cartilage my recover rapidly from such an insult, but it is possible that arthritic tissues (which generally maintain a *higher* rate of synthesis of matrix components than normal) could be severely damaged.

260. J. Fulkerson and T. Winters, Jr.[15] (1986) later began to review the long-term effects of arthroscopic procedures in terms of the selection of intra-articular irrigant solutions. The authors stated there was knowledge developing about the short-term alterations of articular cartilage environment being produced by these agents and the conditions introduced in the perioperative period. Regarding the perioperative use of local anesthetics during arthroscopy, the authors wrote (underlining added for emphasis):

> Injection of these agents can lessen pain in the postoperative period. Of immediate concern, however, is whether one is exposing the joint to unnecessary risks by limiting the protective pain response. An impactive insult, as might occur in an asensate joint, may progress to permanent cartilage degeneration.
>
> …Loss of feedback has been demonstrated in anesthetized joints. One must be concerned about inhibition of proprioceptive response in an already injured and surgical traumatized joint.
>
> The biochemical effects of anesthetic agents are complicated. <u>Bupivacaine</u> (Marcaine) and <u>lidocaine</u> are produced in an isotonic saline solution, sometimes with a preservative methyl paraben. Nole et al. have shown that <u>bupivacaine</u> and saline independently <u>cause inhibition of proteoglycan synthesis, and that the two have an additive effect.</u> It appears the effect on cartilage is transient, as the recent electron micrographs from our lab show no evidence of ultrastructural damage to chondrocytes six days following bupivacaine/isotonic saline injection. <u>Toxic effects of bupivacaine on other tissues, however, have been well documented.</u>

[15] Fulkerson J P & Winters T.F Articular Cartilage Response to Arthroscopic Surgery: A Review of Current Knowledge Arthrosc: Journal of Arth and Related Surg. 1986. 2(3):184-189

261. J. Neidel et al[16] (1992) studied the effects of repeated intra-articular injection of a sterile saline solution on articular cartilage. After 20 injections into the knee joints of rabbits over a period of 4 weeks, chondrocyte glucosaminoglycan synthesis was evenly reduced in all cartilage layers and being accompanied by a depletion of the matrix. These changes were only partly reversed during a 4-week period when injections were stopped. The authors concluded that the microtrauma being produced by repeated injection into the joint and introduction of a saline solution over a short interval could produce damage to the articular cartilage.

262. S. Bulstra et al (1994)[17]discussed that synovial fluid normally maintains the physiological environment within a joint and that it supplies nutrition to the chondrocytes. During arthroscopy, the synovial fluid is replaced by irrigating solution; this may impair cartilage metabolism and especially proteoglycan synthesis. Regarding the authors' Discussion:

> The ideal irrigating solution should have compatible osmotic, pH, ion and conduction properties. Water is known to have a negative effect on cartilage metabolism. The ionic concentration of normal saline resembles that of serum and other body fluids, but it is considerably more acid (pH 5.3) than most body fluids, and it also disturbs the ionic equilibrium of the cells…
>
> Some authors have shown that even short-term exposure to irrigating fluids induced metabolic inhibition of chondrocytes. It has been considered that articular chondrocytes make a quick recovery, but we showed definite inhibition of recovery time of 16 hours with a prolonged exposure to the radiolabel. In vivo, recovery may well be even more inhibited by the inflammatory reaction of the synovium to the irrigating fluid and the arthroscopic procedure.

[16] Neidel, et al. Intra-articular injections and articular cartilage metabolism. An experimental study in rabbits. Arch Orthop Trauma Surg(1992) 111:237-242

[17] Bulstra SK, Kuuer R, et al. The Effect in Vitro of Irrigating Solutions on Intact Rat Articular Cartilage. J Bone Joint Surg (Br) 1994; 76-B:468-70

263. J.S. Jurvelin, et al (1994)[18] found that the physiochemical characteristics of an immersion solution for cartilage can produce significant effects on its mechanical behavior. Using bovine cartilage, the authors identified that nonionic solutions retained functional characteristics of bovine cartilage better than did traditional Ringer's solution.

264. Y. Nakagawa et al. (1998)[19]reported a case of glenohumeral osteoarthritis following a color test used during a rotator cuff repair. The pathology was associated with the injection of an intraoperative color test aqueous gentian violet solution into the joint. At follow up 25-months after surgery, the patient noticed that she still had a dullness in her right shoulder when she tried to work. The case was thought to show that use of gentian violate solution in the joint might be harmful to chondrocytes.

265. G. Liguori et al. (2002)[20] provided a case report of a 44-yr-old male undergoing knee arthroscopy with a local anesthetic that showed systemic toxicity following a postoperative injection of 0.25% bupivacaine with subsequent intravascular uptake of the local anesthetic.

266. N. Dogan et al. (2004)[21] investigated the effects of intra-articular injections of bupivacaine and neostigmine on articular cartilage and the changes in the synovial membrane of rabbit knee joints. Joints treated with bupivacaine and neostigmine showed significantly more histopathological changes than control joints. The joints injected with neostigmine showed

[18] Jurvelin J.S., et al. Effects of Different Irrigation Liquids and Times on Articular Cartilage: An Experimental, Biomechanical Study. Arthroc: J Arthro and Relat Surg(1994) Vol. 10 No. 6:667-672

[19] Y. Nakagawa et al. Glenohumeral Osteoarthritis Following a "Color Test" during Rotator Cuff Repair A Case Report and a Review of the Literature. Bulletin Hospital for Joint Disease 1998 Vol 57(4) 216-218

[20] Ligouri G et al Possible Bupivacaine Toxicity After Intra-articular Injection for Postarthroscopic Analgesia of the Knee: Implications of the Surgical Procedure. Anesth Analg 2002;94:1010-3

[21] Dogan N, et al. The Effects of Bupivacaine and Neostigmine on Articular Cartilage and Synovium in the Rabbit Knee Joint. J Internat Research 2004:32:513-519

significantly more cartilage changes than bupivacaine. However, bupivacaine had more articular cartilage inflammation on day 10. The authors discussed that many studies had supported the safety of intra-articular injections of bupivacaine. But, from their study, they saw there is a potential for bupivacaine to cause latent inflammation in articular cartilage and synovial membranes. When compared to injection of saline, bupivacaine produced more structural changes in chondrocytes. In the study, intra-articular bupivacaine treatment caused more inflammation than saline, but less inflammation cell infiltration, hyperplasia and hypertrophy in the synovial membrane when compared with intra-articular neostigmine. Therefore, different solutions used in joints whether as a single injection or as multiple injections could all produce different findings. The authors continued:

> Our results show that bupivacaine is an agent that can be used safely as in intra-articular injection. There have been a few case reports, however, indicating that bupivacaine can lead to a delayed hypersensitivity reaction and toxicity after intra-articular use. In this case, the histopathological changes in the joint brought about by bupivacaine might be important.

### 4. ORTHOPEDIC SURGEONS BEGAN TO EXAMINE THE RISKS AND BENEFITS OF POST OPERATIVE CONTINUOUS INFUSION WITH LOCAL ANESTHETICS

267. Articles began to be published which debated the use of local anesthetics like bupivacaine for continuous infusion by intra-articular pain pumps as elective post-operative pain management following orthopedic and arthroscopic procedures. F. A. Barber et al[22] (2002) evaluated the effectiveness of a local anesthetic continuous-infusion pain pump on postoperative pain after outpatient shoulder surgery using bupivacaine. B. Ilfeld et al (2002)[23] expressed

[22] Barber FA Morley AH The Effectiveness of an Anesthetic Continuous-Infusion Device on Postoperative Pain Control Journal of Arthro & relate Surg January 2002 Vol 18(1):76-81

[23] Ilfeld BM Morey T, et al. The Delivery Rate Accuracy of Portable Infusion Pumps Used for Continuous Regional

concerns that the performance of the post-operative pain pumps, which could infuse potentially toxic medications, had not been independently investigated. The authors felt that the pain pump power source and the ambient temperature would also impact the pump's infusion rate, with differences in pump flow rates having a potential impact on patient safety and outcome.

268. In an article for *Orthopedics Today* by P. McGee (2004)[24], the usefulness of the post operative pain pumps for pain management came into question. "We lost some of our enthusiasm for the pumps when the techniques evolved into more arthroscopic approaches", the article continued"[w]e also found that we could get good analgesia with an interscalene block. The article had that "[i]n 1994, Mallon published the first study on the use of pain pumps." Regarding the lack of adequate clinical studies from a healthcare providers perspective, McGee wrote about a need for more research about pain pumps:

> Ticker and other agree that more data might help persuade surgeons to use these tools. There are now, at most, 15 published studies on pain pumps, and most of those focus on their use in the shoulder. Many surgeons who have used the pumps believe that more randomized, blinded trials could clarify whether lidocaine, marcaine or some other drug is best to sue, and what rate of drug infusion is optimal. Duralde said studies could also be done to examine the possible placebo effect of patient-controlled analgesia.

269. AP Boss, et al (2004)[25], wrote that the "continuous subacromial infiltration of 0.25% bupivacaine at a rate of 6 mL/h is concluded to be <u>ineffective</u> in providing pain relief supplementary to patient-controlled analgesia after open rotator cuff repair and acromioplasty."

---

Anesthesia. Anesth Anal 2002; 95:1331-6.

[24] McGee P. Pain Pumps: Efficacy and usefulness debated for shoulder repair. Orthopedics Today May 2004; 24:1(http://www.orthosupersite.com/print.asp?rID=1794

[25] Boss AP et al Continuous subacromial bupivacaine infusion for postoperative analgesia after open acromioplasty and rotator cuff repair: Preliminary results

D C Quick et al (2003)[26] concluded that use of the" device presented some inconveniences to the surgical staff and the patient. It was concluded that use of this particular device in these particular applications is not justified." S. Klein et al (2003)[27] performed a comparator study at Duke University Medical Center between post operative pain relief from interscalene blocks versus intra-articular infusion for post-operative pain management for rotator cuff surgery. The primary measurement used did not support there was adequate pain relief provided by the intra-articular pain pump infusions when compared to interscalene blocks.

270. W.M. Ciccone et al (2008)[28] concluded that the interscalene regional block provided more pain relief than infusion pumps immediately after arthroscopic shoulder surgery. Also, the infusion pumps did not significantly reduce pain levels after the block wore off.

## 5. REPORTS OF CHONDROLYSIS IN THE MEDICAL LITERATURE ASSOCIATED WITH ARTHROSCOPIC PROCEDURES

271. The medical literature began to report physicians describing clustering of patient case reports all with chondrolysis associated with arthroscopic procedures. D. Petty (2004)[29] and colleagues began their article by noting, "glenohumeral chondrolysis is a rare and devastating complication of shoulder arthroscopy." The authors continued, "[t]here had been no cases of glenohumeral chondrolysis reported after routine shoulder arthroscopy in the medical literature and now his group had three". These authors now reported rapid glenohumeral joint

---

[26] Quick DC Guanche CA Evaluation of an anesthetic pump for postoperative care after shoulder surgery. J Shoulder Elbow Sur 2003; 12:618-21.

[27] Klein S M et al The difficulties of ambulatory interscalene and intra-articular infusions for rotator cuff surgery: a preliminary report Can J Anesth 2003 Vol 50(3): 265-269

[28] Ciccone WJ et al. Assessment of Pain Relief Provided by Interscalene Regional Block and Infusion Pump After Arthroscopic Shoulder Surgery Journ of Arthrosco & Related Surg, January 2008; Vol 24(1):14-19.

[29] Petty DH et al Glenohumeral Chondrolysis After Shoulder Arthroscopy. Case Reports and Review of the Literature. Amer J of Sports Med 2004 Vol 32 (2): 509-515

destruction in three young patients following elective shoulder arthroscopy. The authors did not know the cause of the chondrolysis but the speculated that in the cases heat produced in the joint from new use of a thermal ablator for the procedures may have been a possible cause of a once formerly rare event.

272. AH Gomoll, et al. (2006)[30] concluded from his animal research of chondrotoxicity that continuous intra-articular infusion of bupivacaine, both with and without the use of epinephrine, was able to produce significant histopathologic and metabolic changes in articular cartilage. The findings of Gomoll (2006) paralleled the prior scientific literature and findings about cartilage toxicity described by Key (1933). For Gomoll, et al., from his studies bupivacaine demonstrated it was capable of producing profound chondrotoxic effects in an experimental model simulating the clinical use of postoperative pain pumps for orthopedic surgery. The authors cautioned against the future use of such pain pumps in smaller joints with minimal clearance or dilution of local anesthetic such as occurs with residual hematoma and where continuous exposure of cartilage to bupivacaine would be expected. The same animal chondrotoxicity data and conclusions were published again in Europe by RW Kang[31]. At the American Academy of Orthopedic Surgeons in 2006, there was a Podium Presentation by B. Hansen, C. Beck and R. Townsley (2006)[32]. The presentation included their review of 152 patient charts for 177 shoulder arthroscopies performed from January 1, 2003 to December 31, 2005. The charts were examined for evidence of post-operative chondrolysis. The authors found

[30] Gomoll AH, et al. Chondrolysis After Continuous Intra-Articular Bupivacaine Infusion: An Experimental Model Investigating Chondrotoxicity in the Rabbit Shoulder J. Arthos & Relat Surg. August 2006; Vol 22(8):813-819

[31] Kang RW Gomoll AH, et al Chondrolysis after Continuous Intra-Articular Bupivacaine Infusion An experimental model investigating chondrotoxicity in the rabbit shoulder. European Cells and Materials Suppl 1, 2006; Vol 12: 61.

[32] Hansen B Beck C Townsley Post-arthroscopic shoulder chrondrolysis with associated intra-articular Pain Pump Catheter use. March 23, 2006 (http://www3.aaos/anmeet2006/podium/podium.cfm?Pevent=360)

twelve shoulders for ten patients that had gone on to develop chondrolysis. 83% of those patients required to have a subsequent surgical procedure.

273. Dr. C. Chu, et al (2006)[33] conducted a study using bovine cartilage which showed 0.5% bupivacaine solution was cytotoxic to articular chondrocytes and articular cartilage *in vitro* after only 15 to 30 minutes exposure. The areas of intact bovine articular surface had shown some chondroprotective effects. The authors continued:

> Because healthy chondrocytes are important for maintenance of the cartilage matrix, chondrocyte loss may contribute to cartilage degeneration. This study shows a cytotoxic effect of 0.5% bupivacaine solution on bovine articular chondrocytes in vitro. Although these results cannot be directly extrapolated to the clinical setting, the data suggest that caution should be exercised in the intra-articular use of 0.5% bupivacaine.

274. The same authors followed up with a 2008 study, C. Chu (2008)[34]. Using an *in vitro* human chondrocyte model, the authors used time-lapse confocal microscopy of the articular chondrocytes to show >95% cellular death after exposure to 0.5% bupivacaine for 30 minutes. Both human and bovine chondrocytes, when exposed to 0.25% bupivacaine, had a time-dependent reduction in viability. The longer the exposure times of cartilage to bupivacaine, the higher the chondrotoxicity. Cellular death of cartilage persisted even after the 0.25% bupivacaine solution was removed. The authors continued:

> After exposure to 0.25% bupivacaine for 15 minutes, flow cytometry showed bovine chondrocyte viability to be 41% of saline control after seven days. After exposure to 0.125% bupivacaine for up to 60 minutes, the viability of both bovine and human chondrocytes was similar to that of the control group. These data

---

[33] Chu C R, Izzo, NJ et al. In Vitro Exposure to 0.5% Bupivacaine is Cytotoxic to Bovine Articuarl Cartilage. Jounr Artho & related Surg July 2006; Vol 22(7):693-699.

[34] Chu CR, et al The in vitro effects of bupivacaine articular chondrocytes Joun of Bone & Joint Surg. June 2008; Vol 90-B(6):814-815.

> show that prolonged exposure to 0.5% and 0.25% bupivacaine solutions are potentially chondrotoxic.

275. Dr. Chu (2009) was one of several authors in a later study also looking at the effects of injection of local anesthetic lidocaine (Xylocaine) and the corticosteroid methylprednisolone.[35] The injection of lidocaine as an intraarticular nerve block for arthroscopic procedures is in the product insert for that anesthetic. The results showed a dose and time-dependent decrease in chondrocyte viability after exposure to clinically relevant doses of methylprednisolone. Lidocaine and Methylprednisolone are commonly used together as an injection for a treatment of a painful and acutely or chronically inflammed knee. The methylprednisolone is added to lidocaine to help reduce the amount of inflammation in the knee. The authors found that the combination of methylprednisolone and lidocaine together, despite the long-term empirical use together, was actually chondrotoxic. Virtually no cells survived after treatment. In addition, the methylprednisolone had failed to reduce the inflammatory effect as anticipated, but rather appeared to potentiate the chondrotoxicity. This *in vitro* study however, provided important new information on the potential negative effects of two common drugs on articular cartilage following a single intraarticular injection.

276. G. Poehling[36](2009), wrote in his editorial that :

> In addition, for those who missed (the rather tart) dessert the first, second, and third times around, high levels of bupivacaine are cytotoxic to chondrocytes, and continuous intra-articular infusion of bupivacaine cannot be recommended pending research to the contrary.

---

[35] Seshadri V, Coyle C, Chu C Lidocaine Potentiates the chondrotoxicity of Methylprednisolone. Joun Arth & Related Surg April 2009 Vol 25(4);337-347.

[36] Poehling GG, Editorials Editor-in-Chief Keeping it Short: Evidence-Based International Systematic Reviews, Rotator Cuff, Knee Posterolateral Corner, and Bupivacaine Chondrotoxicity. Journ of Arthroscop & Related Surg March 2009 Vol 25(3):223

277. Alan Anz, et al (2009)[37], reflecting the result that a lack of appropriate premarketing research by manufacturers as to the types of drug that might be best suited for combination with its infusion intraarticularly for postoperative pain produced, wrote:

> Intra-articular bupivacaine infusion is an effective analgesic strategy and is frequently used in both office and outpatient surgical settings. This study provides evidence that the continued usage of postoperative bupivacaine continuous infusion pumps may have a detrimental effect on chondrocytes, Morphine has been shown to be an effective intra-articular analgesic, and its anti-inflammatory role seen in this study makes it a potential alternative to bupivacaine.

278. A responsible pump manufacturer would have first conducted an adequate search of animal cartilage studies, first obtained knowledge about the properties of cartilage, first become aware of 1990s arthroscopic medical literature and risks of irrigants in a joint. A responsible pump manufacturer would also have considered FDA's 1998 safety concerns about clearing continuous infusion of a joint space. Then, if still convinced an intraarticular pain pumps was still a feasible product, a responsible pump manufacturer's next step would have been to take all available information to design and test pain pump systems and medications for creation of reliable pump systems with adequate instructions for use to safely infuse a patient's joints post operatively for elective pain control. However, the three manufacturers, McKinley, I-Flow and Stryker, all failed to take the appropriate steps of research and development, all failed to adequately design and test and all failed to create reliable and safe systems for intraarticular use. The three manufacturers went able to prematurely get through the 510(k) process to market poorly developed products. The lack of adequate premarket research and development however did eventually get uncovered in 2006 by physicians reporting of chondrolysis.

---

[37] Anz A, Smith M, et al The Effect of Bupivacaine and Morphine in a Coculture Model of Diarthroidal joints, Journ Arthosc & Related Surgery Article in Press, 2009 (Vol xx(X):xxx (M00020)

.

### 6. DESPITE THE RISKS AND SAFETY SIGNALS, MANUFACTURERS AND DISTRIBUTORS CONTINUE TO PROMOTE INTRAARTCULAR INFUSION WITH LOCAL ANESTHETICS TO PHYSICIANS

279. Despite the scientific literature that discussed chondrotoxicity and delicacy of synovial membranes, chondrocytes and the cartilaginous joint environment, pump manufacturers and distributors like McKinley, I-Flow, DJO and Stryker continued to promote unapproved use of bupivacaine with its pain pumps for continuous intra-articular infusion. All of these firms failed to inform or train its sales representatives and employees about the risk of intra-articular injection, that such use was investigational since it had not been cleared by FDA.

## B. PUMP MANUFATURER POST MARKETING CONDUCT

280 As has already been discussed above, it is the pain pump manufacturers and distributors that have the primary continuing duties and obligations for monitoring and ensuring the safety and performance of its products, not the FDA. It is a Prohibited Act (21 USC 331) to sell either a drug or device in the United States that is not safe and effective and adequately and truthfully labeled. Manufacturers also have a duty to update labeling, marketing, communications to provide adequate instructions for use and warnings. All the pain pump manufacturers and distributors discussed have failed to adequately monitor and warn.

### 1. MCKINLEY/CURLIN/MOOG

281. After January 2004, DJO participated in the distribution of the McKinley pain pumps (Beeline Systems and Accufuser/Accufuser Plus)(See discussion of DJO below). According to testimony by Ms. Coulter at DJO as well as testimony from Pacific Medical, Curlin/MOOG made modifications to its pain pump label regarding the risk of intra-articular use

and failed to tell anyone. Curlin/MOOG did not send out a Dear Healthcare Provider Letter or even a letter for its distributors, sub-distributor, sales force. DJO received no letter from Curlin/MOOG about label changes. As a result of Curlin's failure to update DJO, DJO sent out its own letter to customers informing them that there had been changes made to the pump's labels.

282. At the end of 2005, McKinley first reported to FDA that "Surgeons have reported a 'higher than normal incidence of chondrolysis' in shoulder-surgery patients when using local anesthesia kits."

283. In October 2007, Ms. Coulter first DJO heard from Mr. Buck, there was discussion within McKinley/Curlin/Moog, was considering a disclaimer for the kit telling healthcare providers not to infuse an epinephrine containing product.

284. DJO's first and only action to independently notify its current customers purchasing pumps about the risk of chondrolysis was August 11, 2008. (K Coulter 3/24/09, p. 135, L. 15-17, Coulter Exhibit 35). Curlin/MOOG had no input into the DJO letter. DJO's letter was sent out only to purchasing customers, not physicians or health care providers, when it realized that it had not been informed by Curlin/MOOG that it had updated its own pump product labeling warnings regarding intra-articular use (K Coulter 3/24/09p. 139, L. 23-25).

**2. I-FLOW CORPORATION**

285. I-Flow utilized multiple marketing tools and methods to promote off-label intra-articular use, including training its sales staff specifically to promote intra-articular use (C.

Pritchard 2/20/09 p 58-60, L. 16-17; p 174-5, L. 7-24; p 176 L 4-9). I-Flow gave its sales staff direction sheets titled Catheter Placement Techniques.

286. In May 2004, each manufacturer, including I-Flow had a safety signal about risks of indwelling pain pumps when Dr. Brown, FDA published the agency's findings about adverse events associated with pain pumps in *Anesthesia*[38]. The FDA discussed adverse events associated with use of indwelling pain pump systems for 40 patients. The authors wrote, "[t]he consequences of these adverse events were typically severe and required intervention and additional medical and surgical treatment." The authors also concluded:

> …the reports provide a potentially important signal, suggesting a need for further investigation of the relation between use of pumps for direct continuous infusion of anesthetics and other drugs into surgical wounds and tissue necrosis, serious infection, or cellulitis
>
> ..These reports may represent sentinel evens, i.e. an early warning that is representative of a problem that is widespread, or alternatively, these may be isolated events.(IFLOW ESD 001372-373).

287. Alan Dine, Director of Clinical Research, I-Flow wrote about the Brown (2004) article: "…the purpose of this article remains unclear, however it seems to be aimed at increasing awareness about the use of local anesthetic infusion pumps and the need for institutions and practicing physicians to populate the MDR database." He continued (underlining added for emphasis) "[a]s this is a case report and lacking scientific depth in any area, the true purpose of the paper is to raise awareness to the <u>need for further surveillance of this technique and others</u>." He concluded that I-Flow "will continue to aggressively investigate

[38] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

complications like these and make changes to our labeling and training when we have scientific evidence of cause and effect."(IFLOW ESD 001568-0)

### i. I-FLOW FAILED TO ADEQUATELY INVESTIGATE COMPLAINTS OF CHONDROLYSIS

288. On July 27, 2004, I-Flow Territory Manager Cheryle Pritchard emailed a report back to I-Flow that she had learned of eight college age patients with "instability repairs who receive pain pumps and developed a virus that caused chondrolysis." (IFLOW ESD 001153). The information was reported to Alan Dine, and despite his conclusions about surveillance and aggressive investigation of complaints for the FDA's Brown (2004)[39] article, he let the I-Flow investigation essentially stop with him (A. Dine 12/6/08, p. 57, L. 14-24; p 66, L 22-25; p. 67 L. 1-15). Mr. Dine stated he never told anyone at I-Flow about the e-mail. (A. Dine 12/16/08, p73, l. 6-13). I-Flow's executive management is held directly responsible by FDA under the Quality System Regulations and pursuant to 21 CFR§ 820.20 for establishing policies and procedures, selection of personnel and adequacy of training that ensures quality procedures are understood and implemented at all levels. Quality Systems includes the handling of complaints like received from Ms. Pritchard, conduction of further investigation by I-Flow, quality control corrective and preventive action (CAPA) and timely adverse event reporting to FDA(21 CFR§ 803). Mr.Dine had received a very serious complaint from the field, Yet as a direct result of his lack of actions, the complaint failed to be entered into I-Flow's complaint database. Because the event was not entered into the database, no investigation was conducted and no one considered whether the

[39] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

filing of a timely MDR pursuant to 21 CFR 803 was required. The information from the field literally hit a wall with Mr. Dine and was lost.

289. Available to I-Flow in 2004, if a search had been conducted of the literature or I-Flow had monitored the medical literature for reports of chondrolysis was Petty (2004)[40]. The article reported three cases of glenohumeral chondrolysis following arthroscopic shoulder surgery, one patient had a pain pump. The patients, as in the Pritchard email were young, a16-year old male and two 18-year old female athletes. The authors noted that no other case of glenohumeral chondrolysis secondary to shoulder surgery had been previously reported and they found only two other case reports on chondrolysis secondary to shoulder surgery in the world literature. Yet, I-Flow through Ms. Pritchard had received a report of eight college age patients, and Petty (2004) had reported on an additional one patient in the year 2004 all with chondrolysis and pain pumps. The reporting of a previously rare condition occurring in an unusual population, young patients, associated with an unapproved combination of products following the same procedure, arthroscopic shoulder surgery, should have raised a big red flag for a responsible manufacturer with a robust surveillance system.

290. In January 2006, an orthopedic surgeon in Montana, a "big user of pain pumps"(IFLOW0001041) notified I-Flow of three patients, female athletes with no prior history of health problems, who developed chondrolysis following the use of an ON-Q pump (IFLOW ESD 10065)(2006-00013;206-00015; 2006-00016)(IFLOW000968). Complaint 2006-00013, female had a shoulder procedure(arthroscopic Bankhart Repair) September 23, 2004, and

---

[40] Petty DH et al Glenohumeral Chondrolysis After Shoulder Arthroscopy. Case Reports and Review of the Literature. Amer J of Sports Med 2004 Vol 32 (2): 509-515

developed symptoms of grinding by seven months (IFLOW0001024). Complaint 2006-00015 is a 13 year old female, had her procedure in August 2005 and began having grinding symptoms at 3 months(IFLOW0000988). Complaint 2006-00016 is a 19 year old female, had a shoulder procedure in June 2005, and grinding symptoms at 3 months,)(IFLOW0001006). All patients had the ON-Q PainBuster (100ml x 2ml/hr) for 48 hours and good results with pain pump (IFLOW0001038). Patients would require an arthroplasty in the future. The Evaluation Summary for the FDA used for the three MDRs:

> The device involved in this incident is not available for evaluation; therefore, our results and conclusion are based on the information that was given to I-Flow by the initial reporter.
>
> Based on the information provided, we are unable to determine whether our device caused or contributed to the reported incident.
>
> We have reviewed our complaint data base dating back to 2002, and no other incidents were found. This incident is one of three for "chondrolysis" involving the same surgeon and reported at the same time
>
> This is a very rare incident. In addition, the attached study shows that the disease pathophysiology is currently not understood. (IFLOW0000972)

291. Risk information not provided to FDA, but the Montana physician also reported to I-Flow that one of his colleagues had 15 of chondrolysis he attributed the cause to the "pain pump"(IFLOW0001041)- not I-Flow pumps. Other physicians began to openly express concerns about the pain pumps. Again, additional signals for a responsible company that was intent on monitoring product performance and safety. The Montana "big user of pumps" asked if I-Flow had received other reports. (IFLOW0001041)

292. I-Flow did submit the three Montana reports to FDA as MDRs in February 2006 as chondrolysis post shoulder surgery. The Manufacturer's narrative on the MDR has:

> "Co has reviewed co's complaint database dating back to 2002, and no other incidents were found…This is a very rare incident. In addition, the attached study shows that the disease pathophysiology is currently not understood."

293. Kathy Thompson, who circulated the complaint from the Montana surgeon within I-Flow stated, "[t]his is one of those complaints that will take some investigation to try to determine whether the use of ON-Q contributed in any way." There is no information about the aggressiveness of the investigation that was actually conducted by I-Flow in 2006.

294. On March 23, 2006, orthopedic surgeons Brett Hansen and Charles Beck made a presentation at an orthopedic medical conference reporting that 12 shoulders of 10 patients exposed to a pain pump and Marcaine developed shoulder chondrolysis. None of the patients that did not receive a PainPump developed chondrolysis. The authors concluded that:

> Although the exact etiology and mechanism of chondrolysis is still unknown, we believe there is a significant and previously unrecognized risk associated with the use of IAPPC's [intra-articular pain pump catheters] and bupivacaine with epinephrine. IAPPC's should be used with caution until the safety of constantly infusing local anesthetics intraarticularly is better defined (IFLOW ESD 067213; IFLOW ESD 096167).

295. Despite the mounting safety signals for unapproved product in the medical literature, adverse event reports and conferences, I-Flow continued not to test its pain pump and bupivacaine in terms of potential risk to cartilage and cause of chondrolysis. I-Flow also did not attempt to get feedback from its sales representatives directly from the field as to physician reports of patient outcomes. Dr. Dragoo, Stanford, though Barbara St John in late 2006 contacted Mr. R Massengale, I-Flow to request support from I-Flow to conduct animal studies. Mr. Massengale testified that I-Flow's response was that "they were not interested in pursuing a study". (R. Massengale 12/9/08. P 48-9, L. 22-20; 50 l 5-13).

296. Barbara St. John, in an email entitled "Chondrolysis" on March 7, 2006 to Kathy Thompson, Alan Dine, and Roger Massengale, wrote:

> Apparently the question about chondrolysis is coming up again. This time in San Fran….Chris O'Neill asked if I could come up with an explanation for his region to arm them with responses to objections. Maybe we can talk about this tomorrow so we can come up with a standardized response (IFLOW ESD 079634).

297. Alan Dine in a March 31, 2006 email entitled "Chondrolysis" sent to I-Flow's Clinical, Sales and Inside Sales reported:

> I have had a few inquiries into the relationship of infusion pumps to reports of chondrolysis…It appears from the data we currently have that the cause of chondrolysis in these patients may be related to the use of epinephrine in the pump. We continue to review the data on these events and report any new findings to you. (IFLOW ESD 067186)

298. In response to Alan Dine's email, Barbara St. John referred to the Hansen and Beck presentation that prompted inquiries about chondrolysis writing "Hopefully we can throw some water on the fire and put it out before it does much damage." (IFLOW ESD 079092).

299. Cheryle Pritchard, Arizona Territory Management for I-Flow, reported a cluster of patients' cases with chondrolysis on June 27, 2006. This time, Ms. Pritchard reported that multiple surgeons noted an increase in patients developing chondrolysis. Ms. Pritchard was told by one surgeon that "although your company would be angry, you should discourage surgeons from using the pump in joints." Ms. Pritchard continued in her email: "[m]any many surgeons bring this topic up to me every day- ortho and non-ortho." (IFLOW ESD 080457-458; IFLOW ESD 067210).

300. A financial analyst for I-Flow discussed another case of chondrolysis. In September 2006 the analyst described a surgeon who, when after his patient used a PainBuster,

upon re-opening the area found that at the surgical site "all the articular cartilage was gone." The surgeon had come to the conclusion that" the constant infusion of the joint with the local anesthetic was responsible for the damage." (IFLOW ESD 059323-4).

301. I-Flow's response to the reports was that the same problem had not been seen in their clinical trials. Orlando Rodrigues, Vice President of Marketing, who had received the September 2006 report, testified that of the 30 or 40 clinical studies that had been done with the pumps in various surgical specialties, none of the clinical studies that he was aware of had examined the issue of intra-articular placement of a catheter infusing general anesthetic at a flow volume of greater than 100cc unto a joint space (O. Rodrigues 12/11/08 p. 129-130, L. 23-16).

302. Internally, the concern about chondrolysis was increasing as in the medical community, but I-Flow did not take active and effective steps to address the safety issue. Territory Manager, Amy Harper, wrote to Barbara St. John asking for a copy of the articles discussed "a few weeks ago concerning the use of marcaine and potential cartilage damage." She asked, "Do we have a response yet?" Ms. St. John replied:

> Our response is still pending. I will attach the two articles, but I would be pretty careful about how you use them because those orthopods could make trouble for you elsewhere if they spread the word to their friends. Our official reply to this at this point is "We're looking at the data."(IFLOW ESD 082733).

303. Despite all of this discussion about risk of chondrolysis, I-Flow continued to provide physicians with information about the glenohumeral joint placement of a catheter. On October 16, 2006, Group Marketing Director Julie Schneider provided a Territory manager with a PowerPoint presentation to show to an orthopedic surgeon that might serve as one of I-Flow's speakers. Two of the slides reference glenohumeral placement as a use for surgeons (IFLOW

ESD 096941; IFLOW ESD 096943-63, 965). Ironically, at the same I-Flow was providing the October 2006 about use in joints, I-Flow silently revised its DFU to warn against catheter placement in a joint space (IFLOW ESD 31243).

304. I-Flow September 24, 2008 letter to FDA:

> Enclosed herewith are twenty (20) MDRs reflecting lawsuits that have been served on I-Flow. These lawsuits and MDRs were previously referenced in the letter sent to FDA on August 19, 2008. We have not previously filed MDRs in relation to these lawsuits because product identification has not yet been confirmed in all the lawsuits that I-Flow has received. However, taking the conservative approach, we are filing the enclosed MDRs for those lawsuits.(IFLOWP00030501)
>
> I-Flow report # 2026095-2008-00144, patient identifier 080754, chondrolysis event date event date "February <u>2006</u>". Report filed with FDA 2008IFLOWP00030504)

305. An example of one of the I-Flow MDRs from a lawsuit filed with FDA in 2008:

> ADDITIONAL MANUFACTURER NARRATIVE (H10))
>
> The ON-Q Pump Direction For Use (DFU) contain a warning that states: "Avoid placing the catheter in joint spaces." Although there is no definitive established causal relationship, some literature has shown a possible association between continuous intra-articular infusions (particularly with bupivacaine) and the subsequent development of chondrolysis (DFU 1034265, Rev. G)
>
> I-Flow has also prepared a technical bulletin entitled "What We Know About Chondrolysis Today" (1303722, Rev. E)
>
> If additional information that is pertinent to this event becomes available, I-Flow will submit a follow-up report. (IFLOWP00030506)

306. FDA was not told that the label was changed after the woman's surgery, October 2006, and physicians were not notified. Also the technical bulletin was released in August 2007. None of the statements are applicable to this patient. Since the report is from a litigation, no further investigation will be conducted by I-Flow. (IFLOWP00030510) Under Corrective

Action: QA-1099: A warning is in the DFU and a Technical Bulletin is available to address Chondrolysis (IFLOWP00030510)

307. I-Flow has still not sent out a notification to physicians not to use the Pain Pump for intra-articular infusion based on the unacceptable risk of chondrolysis (permanent disability) from an elective post operative pain management.

**ii. I-FLOW FAILED TO WARN PHYSICIANS OF THE RISK OF CHONDROLYSIS**

308. Dr. Brian Badman, who had used the catheter through 2007 for joint placement in his patients, in his "complaint with how things were handled" to I-Flow, noted that the label warning was changed in late 2006 to recommend to avoid intra-articular use, yet he complained, "at no time was I notified by either your company or your rep of this change." He continued, "if a notification had been made, at least three cases would have been prevented in my opinion." Dr. Badman reported to I-Flow that he had a 100% rate of chondrolysis when he used the high flow pump. With respect to the three patients that would not have had pumps and been spared chondrolysis, he wrote: "[t]his has devastated my patients' lives permanently resulting in a catastrophic outcome." (IFLOW ESD 078437-8; IFLOW ESD 077512-3)

309. I-Flow did file an MDR for Dr. Badman's 2006 events late for his three patients who developed chondrolysis after the switch to the high flow pump in October 2007. The Manufacturer's narrative submitted to FDA stated:

> In late 2006, in light of the possible connection between the use of bupivacaine in the intra-articular space and the onset of chondrolysis as suggested in the literature, and in an abundance of caution, I-Flow modified the ON-Q directions for use (DFU) by adding a warning to avoid placing the catheter intraarticularly.

310. FDA was not told that I-Flow did not notify physicians of the change to its labeling through a Dear Doctor letter or through training of its sales representatives (IFlow ESD 031243; B. St. John 12/15/08 p52, L. 9-14). I-Flow did not conduct a recall of inventory to update the labels and it did not add new warning stickers to its remaining product. Therefore, the label change may have occurred in October 2006, but with I-Flow's lack of efforts to notify physicians it could take months to years for the new label to be in the field and months to years for the physicians to learn about the change. I-Flow did not conduct a formal voluntary recall to remove violative product with inadequate warnings (Roger Massengale 12/10/08, p. 144, L.5-19) I-Flow did not monitor its sales force to ensure the adequacy of its actions and that sales representatives and health care providers were aware of the new DFU (B. St. John 12./15/08, p. 63, L. 5-9).

311. I-Flow's new 2006 Warning:

> Avoid placing the catheter in joint spaces. Although there is no definitive established causal relationship, some literature has shown a possible association between continuous intra-articular infusions (particularly with bupivacaine) and the subsequent development of chondrolysis (IFLOW ESD 031243-4).

312. I-Flow prepared a Technical Bulletin entitled "*Continuous Infusion in Restrictive Spaces: Volume and Flow Rate Selection*" to include the same DFU Warning (IFLOW ESD 067865). Don Earhart, President I-Flow, however, halted the release of the Bulletin (IFLOW ESD 095744). An alternative I-Flow Technical Bulletin concerning chondrolysis was later released in August 2007 titled "*What We Know About Chondrolysis Today*".(IFLOW ESD 105895). I-Flow's President, Don Earhart, directly disregarded patient safety when he prevented the release of any formal notification, such as a Dear Health Care Provider Letter to health care providers, operating room managers, clinical and hospital risk managers that would reasonably

have been expected to be read warning about the risks of chondrolysis which had been causally associated with intra-articular infusion. His actions failed to inform users about I-Flow's voluntary October 2006 changes to the product's label.

313. Instead I-Flow delayed and released a Technical Bulletin in August 2007. Without a formal communication that could effectively alert about risks, namely the risk of intraarticular use and chondrolysis and lack of an approved local anesthetic for infusion into a joint, a health care provider in an operating room who had already implanted pain pumps or who had interacted with sales representatives that downplayed the risks would have been unlikely to review the Pain Pump's new warning when it finally did appear with the product.

314. Furthermore, I-Flow failed to voluntarily conduct a recall of product remaining in the field with pre-October 2006 product labeling to update the label to include a warning about chondrolysisi. By I-Flow's not conducting an official product recall as required pursuant to 21 CFR 806.10 with notification of FDA in 10-working days, the agency was not alerted by I-Flow to the safety issue of chondrolysis which had been associated with unapproved intraarticular infusion with local anesthetics. FDA was not given an opportunity to classify the health risk for the public in 2006 pursuant to 21 CFR §7.41. FDA was not permitted to comment on I-Flow's label change and proposed communications to health care providers. FDA was not alerted to monitor the adequacy of I-Flow's voluntary recall plans and warning. According to 21 CFR§ 806.10:

> (a) Each device manufacturer or importer shall submit a written report to FDA of any correction or removal of a device initiated by such manufacturer if the correction or removal was initated :
>
> (1) To reduce a risk of health posed by the device; or

(2) To remedy a violation of the act caused by the device which may present a risk to health unless the information has already been provided…

(b) The manufacturer or importer shall submit any report requird by paragraph 9a) of this section within 10-working days of initiating such correction or removal.

**iii. I-FLOW CAUSED LOCAL ANESTHETIC MANUFACTURERS' DRUGS TO BE MISBRANDED DRUGS**

315. On June 26, 2008, the Richard Maround, General Counsel, APP Pharmaceuticals, LLC ("APP") wrote to I-Flow regarding the violative nature of its conduct:

I am writing now to explain our position further and to ask once again that I-Flow Corporation ("I-Flow") immediately cease and desist from referencing any product of APP Pharmaceuticals…in its promotional materials and activities for the ON-Q Pain Relief System. It is our position that your promotional materials and activities mislead the public and violate FDA regulations, federal trademark laws, and numerous state statutes barring unfair business practices.

You insist that your promotional materials and activities are "purely educational, not promotional." We strongly disagree. I refer you to the FDA's November 1997 Guidance for Industry-still current and in effect- titled ,*Industry-Supported Scientific and Educational Activities.* That guidance distinguishes between unregulated educational materials and programs that are "truly independent from substantive influence by the marketers of regulated products." From FDA-regulated promotional materials and programs that are "not functionally independent [from and are] subject to influence by such marketers. Certainly I-Flow's materials-including, as just one example, I-Flow's "Technical Bulletin"-cannot be deemed "truly independent from substantive influence" by I-Flow. We note that your Technical Bulletins typically include your company's logo, your website address, a corporate telephone number, and I-Flow's registered trademark for the ON-Q Pain Relief System. Such materials and activities are regulated by the FDA under the Food, Drug and Cosmetic Act. Far more troubling, your promotional materials and activities appear to promote the use of APP products for unapproved uses, a clear violation of the FDA regulations (see, e.g., 22 C.F.R.§202.1(e)(6)(i)). It must be emphasized that I-Flow's promotion of unapproved uses for APP products with the ON-Q Pain Relief System constitutes a violation of FDA regulations whether or not I-Flow uses APP trademarks or simply generic names. We cannot stand by while I-Flow violates FDA regulations. Unless I-Flow immediately ceases and desists from such activities, APP will have no other choice but to report your unlawful promotional activities to the FDA.

> We further note that I-Flow's unauthorized use of APP's registered trademarks such as Naropin® (USPTO registration number 2130448) and Sensorcaine® (USPTO registration number 1313013) constitutes an act of trademark infringement (15 U.S.C. §§1114,1125)…
>
> Most troubling for APP is the potential for I-Flow's unlawful promotional materials and activities to mislead the public. We believe there is a substantial probability that the public, including medical and health professionals, may be mislead into believing that APP endorses the use of its product in conjunction with I-Flow's ON-Q Pain Relief System-a use that has never been approved by the FDA or thoroughly tested for safety and efficacy…We consider I-Flow's promotion of APP's products for uses that are unapproved by the FDA to be irresponsible, unethical , and unlawful (APP0335609-10)

**3. DJO**

**i. DJO FAILED TO TRAIN ITS OWN EMPLOYEES AND SALES REPRESENTATIVES ABOUT LACK OF FDA CLEARANCE OF INTRA-ARTICULAR USE**

316. On August 2000, DJO sent a SELLING BULLETIN to Distributor Partners and Sales Consultants, the subject was PainBuster and Controlling Pain Column in NURSING, July 2000. The title of the presentation was CONTROLLING PAIN: SOOTHING THE ACHE OF JOINT SURGERY. Sales was provided a copy of a recent question/answer column published in NURSING regarding the PainBuster Pain Management System for postoperative pain management following total joint surgery. The column was written by Karen Kettelman, RN, CAN, BA, Pain Management Coordinator Pain Service, Doctors Medical Center, Modesto, CA. It was suggested by DJO management that the reference could be used to share in–servicing the nursing staff on the PainBuster System. The Seller Bulletin failed to provided information to the sales representative or the nursing staff that the PainBuster was not cleared for an orthopedic surgery indication or for placement of a catheter in the intraarticular space. The Seller Bulletin also did not inform that bupivacaine was not approved by FDA for continuous infusion into a joint. The Bulletin, going to be handed out by DJO sales force failed to warn that there was no

information about long-term effects of infusion of bupivacaine into a joint. The reprint is not fair and balanced and constitutes providing false and misleading promotional materials for the pump sets. The reprint also misbrands bupivacaine, when provided by a pump manufacturer or agent, failing identify to the health care provider that the article is discussing investigational use of both a drug and a device. The reprint has the following question and answer:

> **QUESTION**: In my surgical unit, we have a new device for pain control after total joint surgery: a small pump that continuously infuses local anesthetic into the surgical site. Can you tell me more about it?
>
> **ANSWER:** The PainBuster, introduced by I-Flow Corporation and distributed by DJ Orthopedics, is the first infusion pump approved by the Food and Drug Administration for orthopedic applications….
>
> **Starting the infusion**
>
> At the end of the surgical procedure, the surgeon places microbore tubing attached to the pump in the joint or other surgical site….
>
> **Minimal adverse reactions**
>
> The risk of adverse reactions from this treatment is low. Although cardiotoxicity is a risk associated with L.V. Bupivacaine, it's not as much of a concern when the drug is infused locally into the surgical site.(DJO853-5)

317. Patti Gerke's document files contain one example of violative slide presentation training given to DonJoy sales force and distributors and is titled "PainBuster"(Exhibit 48). The second page has "*Objectives of the PainBuster Training*". It is followed by "*Important Clinical Information*" which included "*What do you known about Bupivacaine, Lidocaine and Ropivacaine?*"(DJO0716) In terms of the comparison between the use of narcotics versus local anesthetics, the benefits for use of local anesthetics are said to be " *minimal side effects, direct to the site, Bupivacaine (Marcaine), Lidocaine (Xylocaine) Ropivacaine (Naropin)*" and "*accepted treatment pre-op and post-op as a bolus*"(DJO0718). The presentation does state "*not to go to the cost*" since the PainBuster is an increase in cost versus the cost of using pain medications

(DJO0719). The next slide is titled " *What do we know about Bupivacaine (Marcaine)?"* and provides that there are 10cc, 30cc and 50cc vials, the daily dosage limit – 400mg…(DJO0720). "*What do we know about Lidocaine (Xylocaine)*?", provides there are 2cc-50cc vials, .5%, 1% concentrations (1.5% and 2% also) and the daily dosage limit- 300mg without epinephrine, 500 mg with epinephrine(DJO0721). "*What do we know about Ropivacaine (Naropin*)?", the slide provides it is available in 10, 20, 30, 100 and 200 cc vials, 0.2%, 0.5%, 0.75% and 1% concentrations, daily dosage limit-770mg(DJO0722) The types of surgeries for the pump are listed to include: Knee, Shoulder, Elbow, Foot & Ankle, Hand & Wrist (DJO0725).

318. The training presentation continued: "*When you get "Toxicity questions,*" the recommendation was to follow drug manufacturer's recommendations for proper dosing; the sales person was told that "*the manufacturer of Marcaine (Abbott Labs) does not recommend exceeding 400mg/day."* The training indicates to the sales force that they will "*Need to be able to calculate the 24 hour dose including the bolus.*".(DJO0727).

319. Ms. Gerke testified that in the training sides, when she reached "*Catheter Placement –Case Reports,*" that slide information was normally presented by a physician (P. Gerke,3/26/09,p.102-3, L. 9-3). The slide indicated that for knee surgeries, the catheter goes in the joint or graft site…, for shoulder surgeries it is placed in the subacromial space or the joint (DJO0730). Therefore, it is clear from the presentation and testimony of Ms. Gerke, as well as other at DJO, that DonJoy, in cooperation of I-Flow before 2004, was teaching the DonJoy PainBuster distributors and sales force about intra-articular catheter placement and warning them that they will need to be facile with calculation of dosing of common local anesthetics. There is no mention for sales representatives that any of this is considered as investigational.

320. The DJO training included a discussion of current pump competition. There was discussion of the strengths and weaknesses of Sgarlato, Stryker PainPump-McKinley OutBound; Stryker Pain Pump ², Zimmer Palm Pump; Breg PainCare 2000, 2000L, 3000; and Alpha 200 (DJO00732-8).

321. According to Scott Rogow, a former DJO Manager of Education and Training, the primary method for training DonJoy new sales force was at the DJ University, using a PowerPoint presentation. During the time he was DJO's Manager of Education and Training, he had been unaware of DJO having its own Catheter Placement Guide (s. Rogow, 3/27/09 p. 54, L. 23)(DJO05399). He indicated that he did review the local anesthetics was part of the sales representative training (S. Rogow, 3/27 /09, p. 55, L. 15). When he was DJO's marketing manager for the pain pump line, he testified that <u>no one ever informed him</u> that orthopedic surgery or intra-articular use was unapproved or considered as off-label. (S. Rogow, 3/27 /09, p. 57, L. 6-20). Therefore, it is highly unlikely he would have conveyed that information to the new sales force at any time in any training.

322. Kyle Coulter became responsible for managing and in-servicing for DonJoy pumps in 2006, when DJO was selling McKinley/Curlin pumps. The DonJoy pumps beginning in 2004 were relabeled McKinley BeeLine pumps with a later change to the Accufuser and involvement of Curlin in 2007 (K. Coulter, 3/24/09, p. 57, L. 4-14). Her job at DJO meant "basically being responsible for education, answering questions and basically providing sales support to the field and support to customers." (K. Coulter, 3/24/09, p. 20, L. 8-11). Her contact at McKinley/Curlin was Jim Buck.

323. Ms. Coulter began that DJO would never send out its own warnings without first consulting with the manufacturer. (K Coulter 3/24/09, p91, L.21). It was her policy that she wouldn't discuss physician complaints with sales representatives unless specifically instructed she was able to do so from regulatory or legal (K. Coulter 3/24/09, p. 92-3 L. 23-1) In terms of her Pain Control Device In-Service Presentations (EDJ-5578-5591), she told health care professionals that it was up to them where they placed a catheter. (K. Coulter, 3/24 /09, p. 59, L. 16-18). At the training, she would show how to put the pumps together (K Coulter, 3/24/09 p. 59, L.21-22).

324. Ms. Coulter indicated that she would not recommend the use of any medication to be put in the pump, and in relation to toxicity, she referred people to the PDR (K.Coulter, 3/24 /09, p. 60, L. 6-11). She was unsure who was responsible for recommendations of drugs such none are recommended by DJO. (Coulter 3/24/09, p. 204 L. 2-3). She did not discuss warnings about use of local anesthetics with the sales representatives in her training session. (K. Coulter, 3/24 /09 p, 67, L. 21). However, she was unaware of physicians filling the pumps with anything other than local anesthetics (K. Coulter 3/24/09, p. 76, L. 15). When shown the January 30, 2009 FDA announcement of the safety signal seen with unapproved use of the infusion pump combined with bupivacaine and chondrolysis, she answered that "[i]t doesn't mention, though, which or where." (KCoulter 3/24 /09, p.77, L. 12). DJO is a distributor, so if a manufacture deemed a product safe, then per the manufacturer's recommendations, DJO assumes the device is safe.(K. Coulter 3/24/09, p. 204, L. 15-18)

325. Just as testified by Mr. Rogow, Ms. Coulter answered that she had never been told or made aware that intra-articular infusion of bupivacaine was an unapproved use (KCoulter,

3/24 /09 p. 78, L. 3-11). In all her interactions with personnel from McKinley or Curlin, no one had ever discussed with her that intra-articular injection of a local anesthetic by an infusion pump was not approved by FDA (KCoulter, 3/24 /09, p. 77, L. 21).Therefore, since she has never told, she had not trained sales representatives that intra-articular infusion of a local anesthetic was unapproved (KCoulter, 3/24/09 p. 78, L. 7)

326. Ms. Coulter first became aware of the issue of reports of chondrolysis in August 2006. (K Coulter 3/24/09, p. 81, L. 12). However, she didn't discuss the studies of chondrolysis at training session, nor did she discuss chondrolysis and toxicity of the shoulder at her in-service training session since the presentation was not intended just for orthopedic use. (K Coulter 3/24 /09, p.60, L. 20). She only answered questions about chondrolysis when specifically asked for information. She stated that in terms of her training work, "she pretty much shows up, does her part and then goes back to work"(K. Coulter, 3/24/09, p. 68, L. 20).

327. She has received no guidance from McKinley or Curlin to add any specific warnings to her presentation with respect to the pain pump and shoulder surgery (K. Coulter, 3/ 24 /09, p. 61-16, L. 24-4). Her last training session was November 2008, and she had obtained no feedback about reports of chondrolysis. It was up to Marketing if they wanted her to obtain feedback from sub-distributors. The Catheter Line Placement Guide used by DJO was created by Curlin/McKinley. It is used by DJO per McKinley/Curlin's recommendation as a hand out and it is used by sales representatives (K. Coulter 3/24/09, p.108-9, l. 9-18).

328. When she was asked if it was her opinion whether physicians independently perform their own research as to the safety of medical devices they buy from DJO. Her answer was that "they can and they should" (K Coulter, 3/24/09, p. 111, L. 22-23).

329. In terms of sale's training about off-label use, the only discussion she was aware of regarding off-label uses by DJO at its training session was for DonJoy's Regeneration section. That discussion was done by Shannon Small for DonJoy Bone Stimulators. The off-label use of these devices is a topic connected to the current use of bone stimulators and which sales representatives need to be informed (Coulter, 3/24 /09 p. 70-71, L.10-5).

330. DJO's first and only action to independently notify its current customers purchasing pumps about the risk of chondrolysis was August 11, 2008. (K Coulter 3/24/09, p. 135, L. 15-17, Coulter Exhibit 35). Curlin had no input into the writing of DJO's letter. DJO sent out a letter to its purchasing customers, not physicians or health care providers, when it realized that it had not been informed by Curlin that it had updated its own pump product labeling warnings regarding intra-articular use. (K Coulter 3/24/09p. 139, L. 23-25).

331. As a result of DJO coming across the changes in the Curlin labels, DJO sent out a letter. Ms. Coulter said a letter was sent from DJO to distributor Pacific Medical as a courtesy. There were no further recommendations from DJO provided to sales and distributors like Pacific Medical as to what should be done with the new risk information. Ms. Coulter had met with Don Roberts, DJO Legal, before sending out the letter. There was no plan for DJO to notify physicians of the changes in the Curlin label. DJO did not post the letter on its website, but the letter is used as DJO's statement that there have been changes to the instructions.(K Coulter, 3/24/09, p. 190-1, L. 5-13; Exhibit 35; 192, L. 23-25).

332. When DJO is asked about chondrolysis as a result of injecting local anesthetic into the shoulder joint, Ms. Coulter indicates that DJO refers everybody to its current updated patient instructions given to DJO by the manufacture (K. Coulter, 3/24/09, p. 192, L. 8-10). She

would now refer a sales representative to the current instructions, the updated warnings, and say per the manufacturer's recommendations "refer to the new warnings." (K Coulter 3/24/09, p. 193 L.4-7)

333. As a distributor of purchased and relabeled finished goods, DJO looks to its device manufacturer (supplier) to provide it with adequate and accurate information that would indicate whether its product was safe or unsafe. (K Coulter3/24/09 181, L. 20-23). If Curlin made a recommendation that one of its products was unsafe, DJO would go by whatever the manufacturer recommended to address the problem. (K. Coulter 3/24/09, p. 182, L. 11-13).

334. In October 2, 2007, Ms. Coulter had sent an email to Tom Armbrust and asked him "*Ok, can you say, exit strategy*?" She indicated at her deposition that what she had meant was that "it might be a time to stop selling the pain pumps." (Coulter 3/24/09, p. 144, L. 16-17). However, she acknowledged that was a decision of upper management whether or not DJO would continue to sell pain pumps (K. Coulter 3/24/09, p. 144, L. 21-22).

335. Ms. Coulter was asked whether Curlin stopped selling pain pumps and did a recall, would DJO also stop selling pain pumps. She answered that it would not be her call (Coulter 3/24/09, p. 200, L. 17). Ms. Coulter was never told about complaints of chondrolysis and had never seen any prior to her deposition (Coulter 3/24/09, p. 84, L. 12). Ms. Coulter had tried to look into the issue of chondrolysis for the sub-distributor, Brian Balliant, who had a surgeon with few cases, she forwarded the information on to legal and regulatory and also asked the manufacturer for guidance as to what the Curlin position statement would be.(Coulter, 3/24/09, p. 87-88, L. 10-23). Her assumption was that the issue had just been brought to the attention of Moog when she was informed by Jim Buck about Curlin/Moog discussions of

putting a disclaimer in the pump kits not to infuse or include epinephrine in October 8, 2007 (Coulter 3/24/09, p. 89-90, L. 17-4). She looked to Curlin for guidance or any direction or if there was anything to say or anything to add(Coulter, 3/24/09, p.89 l.20-23)

### ii. DJO AND MCKINLEY LAUNCHED ACCUFUSER AND USED BREG'S WHITE PAPER DOWNPLAYING RISK OF CHONDROLYSIS

336. Ms. Coulter had received a Breg White Paper about the controversy of chondrolysis from Jim Buck McKinley/Curlin for inclusion in the DJO's Curlin Accufuser launch materials in approximately April 2004 (Coulter 3/24/09 p. 178, L. 21). She sent it out to DJO's entire sales force and distributor partners. (Coulter 3/24/09, p. 175-6, L. 25-22). On page 28 she wrote:

> Many of you are facing the objection of Chondrolysis. Many physicians are misinformed about this topic. As of today, the research on this topic is sparse and inconclusive. This should not stop you from selling pain pumps. Here is the rebuttal from the competition to combat the objection of pain pumps causing chondrolysis.(Coulter 3/24/09, p. 178,L. 4-10)

337. P. Cawley, Vice President Research, BREG, Inc., an Orthofix Company, another pain pump manufacturer, which promoted intra-articular use, wrote a white paper titled "*The Controversy Regarding Chondrolysis Following Arthroscopic Shoulder Surgery: A Review of the Literature and Discussion of Potential Etiologies*." The paper focused on the other causes of chondrolysis, including surgery, trauma, congenital, thermal/laser, bioabsorbable implants, and irrigating solutions. It also indicated that local anesthetics have been successfully used as a single bolus injection with arthroscopy without any reports of obvious or immediate side effects. Breg found support in that on that over the last decade, the FDA had received only 34 adverse events associated with these device applications. Breg should have been aware that the number

of reports received by the FDA in its MDR database is not a valid measure of true risk or incidence of chondrolysis associated with intra-articular continuous infusion by pumps.

338. Mr. Cawley continued "[o]f over 80 published studies on effects of pain pumps on the efficacy of pain pumps for postoperative pain control, seven have addressed the efficacy for postoperative pain control following arthroscopic shoulder surgery. The only complication reported involved difficulty removing catheters placed intra-articularly. There is a discussion of NSAIDS and genetic predisposition. The author wrote:

> For these reasons, intra-articular placement of these catheters in the shoulder is probably not warranted. Subacromial and extracapsular placement of these catheters may decrease concerns that may exist related to the continuous infusion of the local anesthetic agent directly onto the articular cartilage for an extended period.

3339. Under the discussion:

> The apparent rarity of chondrolysis following arthroscopic surgical procedures of the shoulder is unfortunate because of the devastating nature of the disease, particularly in young athletes. The one potential factor that has stimulated the most discussion recently is the use of pain pumps to control postoperative pain. The paper presented by Hansen et al at the most recent meeting of the American Academy of Orthopedic Surgeons is persuasive in its implication of pain pumps. However, the paper presented by Larsen et al at the same meeting implicates the use of thermal devices. In their excellent case reports and review of the literature, Petty et al note that the pathophysiology and natural history of this condition are unknown and further note a number of factors that might contribute to the development and progression of this disease. None of the publications regarding the efficacy of pain pumps for postoperative pain control reported chondrolysis as a complications. Gobezie et al reported on a series of 687 patients over a five year period in whom chondrolysis was not reported as a complication. Based on the limited data available, it would appear that avoiding the intra-articular placement of the pain pump catheter in the shoulder may help to decrease concerns related to continuous infusion of the local anesthetic agent directly onto the articular cartilage for an extended periods.sho
>
> Of note is that there have been no published reports of chondrolysis associated with the use of intra-articular pain pumps in the knee. Because of the larger volume and the ability to place the catheter without concern for the impingement

> of the catheter on articular cartilage, intra-articular placement of pain pump catheters in the knee appears to be both efficacious and safe….
>
> Clearly more investigation is indicated to elucidate the etiology and scope of the problem.

340. The Breg white paper fails to indicate that it was manufacturers like Breg, promoting unapproved use continuous infusion into the joint with a local anesthetic to physicians, that had failed to conduct the research necessary to ensure safety and efficacy of the technique. The responsibility to "elucidate the etiology and scope of the problem" rests with Breg and industry, not physicians of FDA.

**4. STRYKER CORPORATION**

**i. PHYSICIANS INFORM STRYKER OF CHONDROLYSIS IN 2005**

341. Dr. Paulos testified that he brought the pain pump issue to Stryker Endoscopy V.P. Brady Shirley's attention because there was cartilage damage related to the use of pain pumps that was becoming apparent. As a Stryker paid consultant for several years before and after his warnings to Stryker, he felt it was his obligation to provide them with his best expertise and knowledge about the issue. The incident of cartilage injury he had seen occurred after the catheter was placed in the glenohumeral space. (L. Paulos, 8/15/08, p. 22-23, L.7-24). On February 11, 2005, Dr. Paulos wrote to Brady Shirley, Stryker Endoscopy, Vista Ridge regarding his concerns about "Anesthetic –pain pump"(underlining added for emphasis).

> I want to let you know what I am hearing about complications with drip pain pumps. Over the past 2 years there have been a number of incidences of chondrolysis in younger patients. We have been perplexed and thought it could be the heat wand used.

> It now appears that the only common thread through all the cases is the Marcain and /or Lidocain with the Epinephrine solution which tends to be very acidic and is probably the cause.
>
> You might want to look into this development and advise Stryker to change labeling…(Exh 254).

342. Dr. Lonnie Paulos followed up his message about chondrolysis with a February 15, 2005 email to Shirley Brady (Vice President of Sales, Stryker Endoscopy, with a copy to Stryker Sales, Don Kelly, subject re: "problems with Marcaine pumps" which triggered a series of emails among Stryker managers and officers about chondrolysis within Stryker. In terms of Dr. Paulos next email, it was not the responsibility of physicians using Stryker PainPump to identify the root cause of a problem like chondrolysis. That responsibility for a Corrective and Preventive Action (CAPA)(21 C.F.R. 820.100) rests with a manufacturer, in this case Stryker. A manufacturer with a robust surveillance system (21 C.F.R. part 820) receiving Dr. Paulos reports should have raised a significant big red flag. In this case, Stryker personnel would eventually place the blame for reports of chondrolysis on the physicians.

343. Yet, unlike Dr. Paulos, Stryker management was aware it had not tested its pain pumps clinically for intra-articular use and that it had not been cleared by FDA for that new intended use. By 2005, Stryker should have been aware that chondrolysis had been reported in the medical literature, there was animal data to support a mechanism for continuous infusion of a local anesthetic from the pain pump to injure cartilage, other manufacturers' pain pumps also used off-label had reports of chondrolysis, and the chondrolysis was a formerly rarely reported condition before intra-articular pain pumps. Dr. Paulos was reporting physician awareness of a major life- destroying safety issue for young people to Stryker in the shoulder joint which

Stryker should already have been aware was occurring with pain pumps before receiving his report.

344. The Dr. Paulos reports should have quickly triggered an immediate thorough and scientific investigation to determine a potential cause of chondrolysis associated with shoulder surgery. The Stryker investigation could have included animal testing, obtaining outside scientific expertise from individuals knowledgeable about cartilage; a review of the scientific and medical literature; involvement of Stryker's own sales force to get additional information from the field as to reports of chondrolysis; instructions to sales representatives about the issue to be able to warn physicians about the reports of increased risk. The most immediate and cost-effective action by Stryker could have been to just stop promoting unapproved intra-articular use. Such significant and alarming reports should have at least triggered internally a discussion of sending out a Dear HealthCare Professional Letter warning about the increased reporting of chondrolysis with intra-articular use of pain pumps including Stryker pain pumps, and as said by Dr. Paulos, updating of the label warnings. The appropriate course of conduct for Stryker as late as 2005, which they did not appear to pursue, would have been actions to protect the public. Dr. Paulos email of February 15, 2005 warned (underlining for emphasis):

> I know I sent a fax to you the other day but wanted to send this email to reinforce the importance of this issue.
>
> Guaranteed! This summer when Charlie Beck presents his paper at the Heodicus Society there will be a huge out pouring of other cases that have been smoldering for several years. Buddy Savoie has at least a dozen, Jim Andrews has an equal number and Charlie and I have about 6-8 cases. These are cases I know of personally, the only common link is the pain dripping devices with Marcain or Lidocain and Epinephrine. It is extremely acidic solution when Epinephrine is included. Without Epinephrine it becomes less acidic and probably not an issues.

> I strongly recommend that Stryker change its labeling as soon as possible. They should recommend against using Marcain or Lidocain with Epinephrine because of the acidic nature of the fluid, Stryker should change the label for now until we can do an animal study.
>
> I propose and animal study that we can start, complete and have information in 30 days. We can do this study at Medicine Lodge with rabbits, dogs or sheep. 10 animals per group, 3 groups….Costs of this will probably be well below $25,000 and you could have meaningful information back within 60 days.
>
> I believe that Stryker should "cover it's butt" through label changes now and immediatly study knowing that by this summer there will be a great deal of controversy created.(STR 2242-3)

345. There is a follow-up email from D. Kelly to Dylan Crotty FW: "problems with Marcain pumps":

> Dr. Lonnie Paulos and Dr. Charles Beck feel that Marcain w/epi is acidic and is rotting the cartilage in shoulders. Dr. Beck is adamant about it, as is Dr. Paulos who I spoke to yesterday. Dr. Beck plans to present a paper at an orthopedic meeting in Colorado this summer indicating this. I have previously exchanged voice mails with Jay Arnold regarding this when Dr. Beck brought it to my attention. Jay spoke with someone at Stryker about this and indicated that this has not been a previously reported problem elsewhere. We need to research this and get back with these doctors as if impacts patient care and our business (Whether it be real or perceived)(STR 2241-2).

346. The chain of Stryker internal emails are now raised to "Importance: High." On March 1, 2005 Steve Docsa, Clinical Monitor, wrote back to D. Kelly Subject: Answer to your Question-"problems with Marcaine pumps."Without a shred of valid scientific evidence or testing to determine that local anesthetic with epinephrine was actually a contributing factor to chondrolysis, and based on an anesthesiologist's personal off the cuff opinion, Stryker dismissed the entire issue of chondrolysis as not caused by its pump but rather as user error, the physician's use of epinephrine in the joint. Dr. Paulos testified that no one from Stryker asked him for the contact information for Dr. Beck, Andrews or Savoie or asked if the cases he was reporting

involved Stryker PainPumps or some other manufacturer's pumps. (L.Paulos, 8/15/08 p. 32 L.8)

Steve Docsa's email:

> I spoke with one of the anesthesiologists we work with regarding the statement made (below) by Dr.(s) Paulos and Beck that Marcaine with Epinephrine is acidic and is rotting the cartilage in their patient's shoulders.
>
> Dr. Ilfeld feels the epinephrine which is causing the problem they are experiencing. I have attached an article which appeared in the May 2004 Journal issue of *Anesthesiology*. The authors report a possible reason for wound ischemia and necrosis to be the infusion of Marcaine in combination with epinephrine…(STR2240)

347. John Saunders, Vice President of Regulatory Affairs, Quality Systems, and Information Systems, wrote an email to Steve Docsa dated March 3, 2005 RE: Answer to your question-"problems with Marcaine pumps:"

> …it looks like their concerns have some validity (STR 2240).

348. Steve Docsa responded to John Saunders on March 3, 2005, the importance was no longer identified as High (underlining added for emphasis):

> I believe the two surgeons are experiencing something real and have encountered an <u>event which is documented in the literature or at least there is anecdotal information to support it</u>. I spoke to Don and he was appreciative of the articles and he said he would cover this information with them. Hopefully after reading the articles <u>they understand it is not the pump</u> which is causing this event and it is <u>probably the epinephrine</u> which is the culprit.
>
> <u>I don't believe we need to do anything else</u> unless someone expresses interest or is in need of further information (STR 2239)

349. The final email in the series is from Nicole Petty, Regulatory Affairs, and is dated March 4, 2005 and sent to John Saunders, Steve Docsa, and Jennifer Mars:

> We should document these as complaints if these doctors were using our pumps. In regards to the epi concern, <u>we warn against the use of epi in our IFU</u>

> Jen- can you please follow up with Steve and Don Kelly to get the info and enter into SUPER?(STR 2239)

350. Ms. Petty was later asked at her deposition if the emails from February and early March from Dr. Paulos and statements when he told Stryker about Dr. Andrews patients with chondrolysis, if those patients were entered into Stryker's complaint database. Ms. Petty indicated that the Dr. Andrews patients were not entered into the Stryker's complaint database (SUPER)(N. Petty 2/20/08, p. 212 L. 1-2) When asked if the patients mentioned by Dr. Paulos for Dr. Savoie's with chondrolysis were entered into the SUPER database, again the answer was no. When Dr. Paulos told Stryker about his own patients with chondrolysis, she indicated that those reports also were not entered into the SUPER database. (N.Petty 2/20/08, p. 212, L. 14-22) Her rationale was that since Dr. Paulos did not specifically allege that Stryker pumps were involved in the adverse events, none of his reports were entered into the database. However, according to Ms. Petty no further investigation was done with Dr. Andrew, Dr. Savoie, or Dr. Paulos to determine the types of pumps involved with the patient injuries (N. Petty 2/20/08 p. 213, L. 1-13). Moreover, Stryker never submitted the Dr. Paulos reports of chondrolysis as MDRs to FDA as required by 21 CFR 803.22 (b)(2).

351. Ms. Petty said Stryker asked Dr. Crothers, an orthopedic surgeon, and Dr. Ilfeld, an anesthesiologist, both Stryker consultants, for their opinions about epinephrine and risk of chondrolysis. According to Dr. Paulos, it had been known for decades that epinephrine could cause some toxicity to tissues (L. Paulos, 8/15/08, p. 50, L. 14). Ms. Hoffman emailed Dr. Crothers on November 1, 2005 with a request for a Medical Opinion. She attached the seven chondrolysis MDRs and asked him to comment on the precautions section's discussion of

epinephrine. Dr. Crothers emailed back that he did not see a reason to change the current label for epinephrine (STR 2284; Zufall Exhibit 10)

352. On November 4, 2005, Dr. Crothers sent in his written responses to Stryker's three questions in a document titled "Re: Questions about Pain Pump and Epinephrine:"

> *What is your professional opinion on the use of epinephrine mixed with Marcaine in an infusion pump following shoulder surgery*?
>
> Many shoulder surgeons use this combination at the time of arthroscopy, probably more common as a single intra or extra-articular injection
>
> *Based on the information, can you surmise that the use of epinephrine mixed with Marcaine caused or contributed to chondrolysis in these patients?*
>
> Certainly one could envision potential limitation of blood supply to the deeper layer of cartilage with prolonged excessive intra-articular concentration of epinephrine. However, I am unaware of any such report. Superficial articular cartilage does not have a blood supply and I know nothing of potential cartilage toxicity secondary to epinephrine
>
> *In regards to catheter placement are you aware of any correlation between intra-articular placement and an incident of chondrolysis?*
>
> I am unaware of any correlation between intra-articular catheter placement and chondrolysis. However one of the patients in the recent report by Petty in the American Journal of Sports medicine was said to have had a pain pump with the use of epinephrine.
>
> Comment:
>
> Chondrolysis is clearly an uncommon complication of shoulder arthroscopy which has been the subject of two recent reports (AJSM, March 2004 and JBJS, March 2005) with the only common thread between the 5 reported cases is the use of Thermal Radiofrequency at surgery in 4 of the cases. I am however aware of one of your competitors who recommends against the use of epinephrine (reason being risk to skin, not to cartilage). In speaking with 3 different shoulder surgeons about the issue (Stryker unnamed), none use a pump with arthroscopy (preference as they feel with soft tissue surgery it is unnecessary) but all inject with Marcaine and Epinephrine at the time of surgery. They all felt that chondrolysis is likely multi-factorial and all were amazed at the incidence in one institution. (STR 2285)

353. Ms. Petty did not recall anyone at Stryker ever discussing having the sales force go out to surgeons and ask them about their experiences with its PainPump and cartilage (Petty 2/20/08, p. 182, L. 1-4). She also indicated that Stryker was aware of cartilage being injured by the PainPump in 2005 (Petty 2/20/08 p. 181, L 11).

354. Dr. Paulos testified that no one from Stryker had informed him that the safety of use of the PainPumps in a joint space was unknown, had not been studied and had not been tested by Stryker. No one from Stryker had made him aware that FDA had repeatedly rejected requests by manufacturers to allow use of their pain pumps in a joint space. Furthermore, he stated that the PainPumps were promoted by Stryker and its sales representatives for use in the joint space (L.Paulos, 8/15/08, p.32-33, L. 17-15). He stated that when the PainPump first came out the Stryker sales reps would approach doctors in the operating rooms and encourage them to use the devices intraarticularly in the knee and shoulder. The implication was that the device could be used inside the joint and outside the joint both in knee and shoulder locations. (L. Paulos, 8/15/08, p. 69 L. 2-18

355. Dr. Paulos indicated that at the time he sent the February 2005 email he had read package inserts for the PainPump, DonJoy, DJ Orthopedics. The inserts specifically stated that the devices could be inserted in the area of surgery. Dr. Paulos continued:

> …if you are were doing intra-articular surgery, then you would assume that it was-based on the literature okay to put it in the-place it in intra-articular surgery.(L.Paulos, 8/15/08 p. 48 L. 18-24).

356. Not having received any responses from Stryker to his fax or his email, Dr. Paulos spoke personally with V.P. Brady Shirley at an orthopedic convention in about March 2005 about his concerns. But again, he received no response from Stryker. Dr. Paulos wasn't really

satisfied that people at Stryker were looking into the issue he reported. Therefore, he did not contact Stryker again about it to follow up. (L. Paulos, 8/15/08, p. 67, L. 17)

### ii. STRYKER AND PRODUCT SURVEILLANCE

357. There is an April 19, 2005 Jennifer Mars email to Dylan Crotty et al. subject "I-Flow MDRs.xls." Stryker was tracking the number of MDRs filed for I-Flow, so Stryker was monitoring the adverse events being reported to FDA for competitor I-Flow. According to the testimony of Jason Allen, Stryker was looking at I-Flow MDRs because I-Flow was selling significantly more devices than Stryker. Stryker was looking in the MDRs in attempt to find problems reported for I-Flow's devices. (J.Allen, 7/24/08 p. 58, L. 16)

358. A product report, even if from the medical literature, or a patient report to a sales representative, cannot result in a complaint in a company's surveillance database unless it is recognized by someone at the company as a potential complaint. Complaints require the creation of a permanent record (file) and documentation of the investigation that was done by the company and a final signature as to a rationale for filing or not filing a MDR. Company complaint files and MDRs can be examined by FDA during a facility inspection to look for deviations from the Act in a firm's Quality Systems.

359. A complaint cannot result in a filed MDR unless it fits an internal SOP for MDR reportability at the company. The backbone of a robust surveillance system begins with proactive identification of safety trends by personnel at the complaint handling and signal identification level. The personnel handling the complaint must have sufficient training or motivation to identify a potential health risk for a patient as early as possible. As occurred with Stryker as late as 2005, patient reports with chondrolysis associated with a pain pump from intra-

articular use should have been filed as complaints in the SUPER database, as stated by N. Petty in March. From the testimony of Don Kelly, Sales, Dr. Paulos' complaints of chondrolysis with the pain pump had actually begun in 2003(see below). However, none of the Dr. Paulos complaints as of February 2005 got entered into SUPER and none get adequately investigated as to whether or not an MDR was required to be filed with FDA. Without the initial entry into the SUPER database, patient reports of chondrolysis are lost and not filed as MDRs. Without complaint files for reports of chondrolysis for an unapproved use, the information will not be available in the Stryker database if the facility were to be inspected by FDA.

360. When Dr. Charles Beck notified Stryker directly on August 11, 2005 of 13 patients with post shoulder surgery chondrolysis with Stryker pain pumps. Unlike Dr. Paulos', Dr. Andrew's and Dr. Savoie's patients with chondrolysis, at least some of Dr. Beck's patients (7) were entered into the Stryker's SUPER complaint database. Stryker's rationale for the difference in handling patient reports from Dr. Beck was that he "alleged" that Stryker Pain Pumps were involved with the adverse events of chondrolysis (N.Petty 2/20/08 p. 213, L. 1-6). However, as noted below, not even all of Dr. Beck's patient case reports were reported by Stryker to the FDA as MDRs.

361. At the time Dr. Beck's complaints should have been logged into the complaint database and investigated by Stryker, on August 30 through September 1, 2005, Stryker's Kalamazoo, MI offices were also inspected by FDA. The reason for the inspection was as a follow-up inspection of a Quality Systems Regulation inspection of August 2004 of the PainPump 2 had found violation of equipment calibration. The 2005 inspection was to examine that changes were made to correct the 2004 inspection item and to focus on the corrective and

preventive actions (CAPA), design control, human factors, software validation, complaints and MDRs. FDA, without a warrant, during an inspection receives access only to the files and facility areas that are acceptable to Stryker. Regarding the FDA's inspection of Stryker's complaints and MDRs the inspector wrote:

> Complaint trending for the past 12 months is shown in Exh 22. Examples of CAPA from complaint trending, were also discussed…In addition to complaint rending and internal review, the Regulatory Affairs Dept. generates a weekly report of MDRs and potential MDRs, for distribution to Mr. Hartman, those senor managers reporting to him, department managers, and QA Engineers. These are discussed in weekly management staff meeting.
>
> The firm uses an electronic complaint system called SUPER (Stryker Unified Product Experience Reporting)…A designated Regulatory Affairs person assigns an initial high, normal or low risk. Ms. Petty notes this is checked weekly in the system by herself or another designated RA person, to assure the appropriate classification. She said normal or low risk complaints are also checked by QA Engineer receiving the investigation assignment. Incoming complaints are screened for MDR or other vigilance reporting. Key words for Pain Pumps, that are supposed to be flagged as a potential MDR (pMDR) include: over-infused, exploded, popped, adverse patient reaction, tissue damage, cellulites, necrosis, infection, and catheter broke.
>
> The top 4 complaints reasons and cause codes for the Pain Pump 2 in 2006, and associated CAPA are as follows:
>
> - Inserting catheter backwards or luer lock tube set reversed (OT1)- 33 complaints
> - Warning sign or frozen screen (SF1)- 25 complaints…
> - Dimmed or low battery (SF2)-10 complaints…
> - Leaking or limited failure mode information (LK1)- 9 complaints
>
> The firm provided a summary of PainPump complaints from the past 12 months, shown in Exh 33. Exh 34 is a list of complaints submitted as MDRs submitted during the same period. Currently I reviewed the following 11 complaints files. Investigations appeared to be adequate, and no other complaint appeared to meet MDR criteria.

362. There is nothing in the FDA' Establishment Inspection Report (EIR) that indicated the FDA inspector was aware of the reports of chondrolysis by Dr. Beck. There is not a mention

of a complaint of condrolysis discussed in his review of 11 complaints or the 12 month summary provided by Stryker. By August 30, 2005, for a company in compliance with 21 CDR 820. 198, Dr. Beck's patient complaints for chondrolysis should have been logged into Stryker's complaint system as open complaint files being investigated as to reportability for filing of MDRs. Complaints of reports of chondrolysis with intraarticulur use following shoulder surgery in August 2005 could have provided the FDA's investigator with an opportunity to ask to obtain additional safety information about Stryker's pain pumps and its quality systems.

363. The MDRs filed by a firm are greatly influenced by a firm's internal standard operating procedures (SOP) for both complaint handling (21 C.F.R. 821.198) and then MDRs (21 C.F.R. 803), the level of training and understanding the individuals tasked with analyzing product reports (21 C.F.R. 820.25), and management's attitude about the role of Quality Systems. MDRs are also examined in terms of the company's market share when compared to competitor products and the likelihood that the company will receive reports of adverse events.

364. MDRs are entered into FDA's database from any source, both as voluntary and mandatory reports. Therefore, not all MDRs in FDA's database come from a company source. The FDA's database is a passive surveillance system, it cannot be used to determine the risk or incidence rate of a safety issue, but is used by FDA to look for trends and signals. The accuracy of the information in the MDR database is not verified by FDA, but as a required report from industry to a federal government agency, the report submitted is required to be accurate and not misleading.

365. The Brown (2004)[41] article was an example of information that can be derived from FDA's analysis of its MDR database. FDA periodically examines certain products in its database to look for safety trends to help protect the public.

366. The April 19, 2005 Jennifer Mars April 19, 2005 email to Dylan Crotty et al. subject "I-Flow MDRs.xls.", was sent after the Dr. Paulos February 2005 email (above) (underlining for emphasis):

> I have updated the MDR spreadsheet for I-Flow through Q1 of 2005. It is worthy to note that they filed 19 MDRs in three months. That is quite a bit, especially considering that we have only filed 2 MDRs for PainPump so far this year.
>
> They filed 49 MDRs in 2004 (STR 3588).

**ii. STRYKER DID NOT SEND OUT A DEAR DOCTOR LETTER WARNING ABOUT CHONDROLYSIS AND UNAPPROVED INTRA-ARTICULAR USE**

367. A Dear Doctor Letter was not sent out by Stryker as a result of the Dr. Paulos information about reports of chondrolysis or reports by other physicians. However, there had been internal discussions, according to Ms. Petty, to create a letter intended to send to customers who inquired about chondrolysis. The reason no Dear Doctor Letter was sent, according to Ms. Petty, was because:

> We didn't feel we had a strong enough scientific basis to be able to make an overall conclusion or correlation, but we did want to be able to respond when customers did inquire about it. (N. Petty 2/20/08 p. 182, L. 21-15)

[41] Brown S.L., Morrison AE *Local Anesthetic Infusion Pump Systems Adverse events Reported tit e Food and Drug Administration* Anesthesiology May 2004; Vol. 100(5): 1305-6

368. Ms. Petty also testified that in terms of changes to the label and discussion with individuals in regulatory, legal, quality and marketing:

> There had been discussions at Stryker about adding a caution statement in our instructions for use to reference the fact that there have been published animal invitro studies that suggested there may be a relationship between local anesthetics and chondrocyte toxicity (N. Petty, 2/20/08, p. 183, L. 1-12).

369. Ms. Petty, as a member of Stryker's Regulatory Affairs, had been involved in the initial PainPump Stryker 510(k)s. She was asked during her deposition if when the FDA told Stryker that they would not clear a synovial cavity indication, if she had wondered if that meant it might not be safe for that indication. She responded inaccurately:

> You know, we probably wondered about it, but honestly if the FDA felt very strongly that it was unsafe, they would have asked us to add a contraindication in our instructions for use, so it wouldn't be sued for that. (N.Petty, 2/20/08, p. 200 L. 10-15)

**STRYKER MAY COULD HAVE BEEN INFORMED ABOUT RISK OF CARTILAGE DAMAGE IN 2003**

370. Mr. Don Kelly was involved as first a sales representative and then later Sales Manager at Stryker for its PainPumps. He testified that he doesn't recall Stryker's sales force <u>ever</u> being informed that infusion directly into a joint had been refused by FDA (D. Kelly, 6/18/08 p. 18, l15-16).

371. Mr. Kelly did recall being informed that a customer had <u>cartilage injury</u> from a Pain Pump and that customer was Dr. Paulos, a Stryker consultant. He thought Dr. Paulos had first questioned him in 2003 and later 2005(above) about the potential impact of the PainPump on cartilage. According to what Mr. Kelly recalls, Dr. Paulos may have thought there was a possibility in 2003 for epinephrine to destroy cartilage in joints. (D.Kelly 6/18/08, p. 23-243-5).

Somehow Mr. Kelly recalls having become aware in 2003 of concerns about destruction of cartilage with the PainPump and already had an injury to a patient's joint. Yet, Mr. Kelly did not discuss his following up on any adverse event report from the field he may have received from a physicians about cartilage and filing of a complaint with Stryker. There was no additional follow-up on a report in 2003 by Stryker as required per 21 C.F.R. 820.198. Stryker management is responsible for the adequacy of the training of its personnel to be able recognize and follow-up on a complaint, including its sales representatives (21 C.F.R. 820.20) Mr. Kelly gave Dr. Paulos as a physician asking about a serious question about the performance of Stryker's product in a joint:

> You know, I shared with him my knowledge, which was, frankly, that I don't have an intimate knowledge or understanding of how medications impacts patients and, in this case, how epinephrine impacts cartilage. I do remember having that discussion. And I don't remember all the details and how it connects, but there was some dialogue that I had then ultimately with Dylan Crotty and/or Mike McGarity to see if they had any knowledge of where medication plays in the potential deterioration of cartilage.- in that 2003 to 2005 time frame.(D. Kelly 6/18/08 p. 24, L21-15).

372. In terms of the role of a Stryker sales representative, Mr. Kelly felt he needed to do further research to answer Dr. Paulos' question according to his February 16, 2005 email to Ronda Jones, Dr. Paulos' office manager or nurse. Mr. Kelly defined his research and the role of the sales representative at his deposition:

> We need to research this and get back with these doctors as it impacts patient care and our business. (D.Kelly, 6/18/08, p. 35, L6-8)

> You know, "research" is kind of a general term. My role as –as a sales rep really is to provide information to the surgeon where I can, and if there is any information that we could provide to the surgeon that would be insightful or helpful for them in making their decisions for patient care then that's kind of how I saw my role as a sales rep (D.Kelly, 6/18/08, p.35, L. 13-19)

373. Mr. Kelly testified that he was unaware of any research that had been done with the Stryker PainPump to ensure pump safety (D. Kelly 6/18/08, p. 36, L. 19). When he wrote that February 16, 2005 email (above) he was aware that the surgeons had concern, but he thought the concern was about the medication, the use of Marcaine with epinephrine. (D. Kelly 6/18/08 p. 37, L. 14-17).

374. In terms of pain pumps used by Dr. Charles Beck and Dr. Paulos, he was aware there was pain pump usage there and he was aware some of the pumps were Stryker's pain pumps (D.Kelly 6/18/08 p. 38, L. 22-24). N. Petty had asked in her email to Don Kelly and Jennifer Mars to obtain follow-up from Don Kelly to get information for the SUPER database regarding Dr. Paulos' and Dr. Beck's patients and if they were using Stryker pain pumps. He didn't recall anyone following up with him for him to go get additional information about whether Dr. Paulos and Dr. Beck were using Stryker pain pumps for the patients with cartilage injuries. (D. Kelly 6/18/08, p. 51-2, L. 21-3). Additionally, Vice President. Brady Shirley, Stryker Endoscopy had been warned by Dr. Paulos on three separate occasions about the risks of chondrolysis with PainPumps, knew Dr. Paulos he had a consulting agreement with Stryker Endoscopy since 1999 (B.Shirley 7/22/08 p. 27, L. 23). When he received the email, he felt that Dr. Paulos was warning because he wanted to do a study about drug impact on cartilage. (B.Shirley 7/22/08 p48 L. 7) Brady did not follow up on the email since he thought it was Stryker Instruments' responsibility (B.Shirley 7/22/08 p49 L. 3). He did relay the information on to Stryker Instruments. (B.Shirley 7/22/08 p56, L. 2) After the email, he later had a discussion with Dr. Paulos regarding his concerns about cartilage injuries and pain pumps. (B Shirley 7/22/08 p 50, L 20). He never had any reason to question the accuracy of the information Dr. Paulos was giving to him in the email (BShirley 7/22/08 p72, L. 15). Mr. Shirley testified that he

understood that Dr. Paulos was concerned about Stryker PainPumps since he would not have reached out to him about an issue unless it involved Stryker's products.(BShirley 7/22/08 p87, L. 9)

### iv. PUBLICATION OF DR. CHARLES BECK'S CHONDROLYSIS PAPER

375. On January 12, 2006 Jennifer Hoffman sent information by email to other members of Stryker about a possible publication by Dr. Beck about his patients with chondrolysis.

> I thought you probably thought you heard the end of this but I recently received a draft of Dr. Beck's paper he wrote on Post Arthroscopic Glenohumeral Chondrolysis. He requested I keep it confidential since it has not been published. He has, however submitted it to AAOS.
>
> He did mention that the pain pump catheters he used were from Stryker…
>
> Attached is a summary of his paper.
>
> I will be doing some further research on intra-articular catheter placement for a few different reasons. This is pointed out in his paper as a factor and also because of the many catheter breakages I have investigated recently. I am hearing more and more that the catheters are being placed this way. This type of placement is not listed in our indications for use and seems to be the placement of choice with shoulder surgeries(GR003581)

376. Ms. Hoffman testified that she had been unaware of Dr. Paulos' February 2005 email to Stryker until she became involved with litigation for the PainPump. She had not spoken with Jennifer Mars to see if she had contacted Dr. Paulos, Dr. Beck, Dr. Andrews or Dr. Savoie. She also understood that the cartilage injuries mentioned in the emails were not entered into Stryker's complaint systems and she has never tried to determine why they were not entered.(J. Hoffman, 6/27/08, p. 36-39 L 23-13) Ms. Hoffman, had worked up Dr. Beck's patient

complaints for filing with FDA in August 2005. She filed seven MDRs for Dr. Beck's 13 patients.(J.Hoffman 6/27/08 p.70, l. 10. However, she had not been told of the February letter with the Dr. Beck patient information (J Hoffman 6/27/08 p. 67 ,l. 7). Dr. Beck had initially told her he was upset that the Stryker sales representative had not told him what type of drug to use in the pump (J Hoffman 6/27/08 p. 63, l.7).

377. Ms. Hoffman, whose role at Stryker was to be involved with the drafting of labeling and modification of IFUs, upon reading the PainPump IFU, became aware that intra-articular placement was not described in the IFU. She was also aware that Dr. Beck in his paper had pointed to intra-articular placement as a risk factor for chondrolysis.

378. Ms. Hoffman, who is responsible for writing Stryker's IFUs and working up physician orthopedic complaints, testified that she did not know the difference between a synovial space and a joint but she knew they were different spaces because they are labeled in documents as different spaces and from her looking at human anatomy. This was also based on her own experience having heard surgeons say they are placing a catheter in a joint, an intra-articular joint, and also from hearing other complaint investigations and what surgeons have said. Discussions with regulatory science department have also come up, and the way it was explained to her is that they were different. (J. Hoffman, 6/27/08, p. 75-6 l. 20-24).

379. Kevin Thornal responded to Jennifer Hoffman's email on January 12, 2006 subject "Re: Chondrolysis-Dr. Beck from Utah:"

> …he is basically saying that it is the placement that is the issue not the pump. Is there any way we can influence him to add some comments to his abstract? For example, I would like to include that Stryker recommends that you limit or do not include eppy etc.(GR003579-0)

380. Scott Zufall responded back to Ms. Hoffman et al on January 17, 2006, failing to address that it is not Dr. Beck's responsibility, but Stryker's responsibility, to identify the root cause of chondrolysis with Stryker's PainPump (underlining for emphasis):

> I bet he won't do it. He'd indict himself for using epi with his patients against our recommendation.
>
> The best we could hope for is that it will fail peer review. It is a crappy article, so it might. Then again, I've seen worse go through (especially clinical articles)
>
> Alternatively, we might be able to ask him (as Kevin indicates below) to emphasize placement as a likely cause. I'm still guessing he'll say no.
>
> The problem is that he is implying the use of the pain pump caused the chondrolysis by not having determined root cause before attempting to publish. One of the hazards of living in an academic environment. (GR003578-9).

381. Ms Hoffman sent an email on January 19, 2006 to Dr. Beck regarding Stryker's thoughts about his draft paper. The comments sent back to Dr. Beck by Stryker:

> Thank you Dr. Beck for sharing this draft of your paper. I would like to make a few additional comments after reading through it. First, your paper basically suggests that possibly the placement of the catheter and/or the use of epinephrine and the anesthetic is the reason behind the chondrolysis, not necessarily the use of our pump. Is there any way to further state that? Also is there any way to add that the Stryker IFU recommends that you limit the amount of epi used?
>
> I just hope that people read this paper and take it as informative and educational about placement of catheters, medication infused, and all of the other factors that could contribute to chondrolysis, not the use of the Stryker PainPump.

382. Dr. Beck responded back to Ms Hoffman and Stryker on January 19, 2006 (underlining for emphasis):

> What Stryker document recommends epi limits and what are the limits? Why was a limit suggested: for cardiac reasons or because of local effects? When was it put in the insert? I was never aware of this while using the pumps. I did ask that the info about epi be put in your inserts a year ago when I realized the apparent danger.

> I tried to be very very clear that the combination of volume, pressure, and medication were implicated, not a specific pump or manufacturer. However, I only used the Stryker pump (GR003582).

383. Regarding Dr. Beck's questions of Ms. Hoffman about the changes to the Stryker label regarding systemic effects of epinephrine and not intra-articular use and chondrolysis, Ms. Hoffman wrote to Dr. Beck on January 20, 2006:

> Our IFU had a warning added in August 2002 to limit the amount of epinephrine used. We do not suggest what the limit is because we don't typically make recommendations on the medications used in our pumps. The warning was added because of both local effects (especially areas of limited blood supply) and also for patients with hypertensive vascular disease. (GR003582).

384. On May 23, 2006 Ms. Hoffman sent out an email to Kevin Thornal, et al:

> I just found this on the internet regarding Dr. Charles Beck and his presentation on chondrolysis. This is why we are hearing about this again….(STR 2364; Zufall Ex 153)

385. Scott Zufall sent a follow up email to Nicole Petty on May 23, 2006:

> Should we expect some FDA reaction to this type of thing (however poorly documented) hitting the peer review literature? (STR 2364; Zufall Ex 153)

386. Ms. Petty responded to Scott Zufall still on May 23, 2006:

> I doubt they would come back to use. I believe they have already asked for information on the MDRs filed. I honestly don't know how closely they monitor journal articles. STR 1825; Zufall Ex 152)

387. Kevin Thornal responded to Ms. Hoffman's original email on May 23, 2006:

> We need to see if the epi could be the culprit here. All along we have stated not to use epi. We need to come up with a response here, or should we have the producers of Marcaine send us a response? We are simply providing a device that sends any liquid from point A to point B. I would think the drug manufacturers would be best suited to help us answer these concerns? I am going to set up a meeting so we can all discuss how we should respond to these inquiries.(STR 1825; Zufall Ex 152)

388. Tom Keiper email of October 5, 2006 to Kevin Thornal titled "Marcaine Study"

> Have you come across a study showing that marcaine has a negative effect on cartilage? One of my orthopods is holding off on site specific pp until he finds out more info.

389. Kevin Thornal forwarded the request on to Ms. Hoffman with the statement: More of these comig(sic) in each day!(STR 2140 Zufall Exhibit 154).

390. On October 8, 2006, John Saunders, VP QA, RA and IS, email "Marcaine study" asked Rod and Steve "What are your thoughts?"

391. Steve Docsa replied back to John Saunders on October 9, 2006 RE "Marcaine Study":

> This is complicated because it is difficult to say if it's really bupivacaine causing the chondrolysis or it's some other factor(s). I spoke to Jim Curtis, PharmD, and Debbie Lloyd, MD, this past Friday, regarding this. With the available literature they don't believe it's the bupivacaine but they are not the audience to convince. I believe Rod has developed a response if any physicians would like to discuss their concerns.(STR 1859; Zufall Ex 155)

**v. STRYKER FILES ONLY SEVEN MDRS FOR CHONDROLYSIS**

392. In August 2005**,** Dr. Beck told Ms. Hoffman that he knew of 13 patients that had all received Marcaine .25% and epinephrine 1:200,000 in their pain pumps following either a Bankhart repair or a capsular shift surgery. All received a high flow pump set at 4.16 cc/hr. He stated that four of the patient had no further symptoms postoperatively, but 9 came in approximately 6 months postop with increased pain, loss of motion and weakness. He stated all were diagnosed with chondrolysis. Six of these patients had already received shoulder replacements, 2 had symptoms but have not had additional procedures and the other is recovering from a micro fracture procedure. (GR006586; Hoffman Ex 162)

393. Stryker filed 7 MDRs, the two patients with chondrolysis that did not have surgery were not filed by Stryker as MDRs despite reporting of serious injuries and requirements of 21 C.F.R. 803. Ms. Hoffman verified that the warning about epinephrine was added to the IFU August 1, 2002.

394. Stryker on October 19, 2005 responded to FDA's first request for additional information dated September 20, 2005. FDA's letter was in reference to MDR # 1811755-2005-00027. FDA had requested information about the frequency of this type of complaint. Stryker responded on October 19, 2005 by providing FDA with the following chart to show that chondrolysis was occurring at an acceptable rate.

> The following information details the frequency of this incident occurring in PainPump:

| **Year** | **# of PainPumps sold** | **# of Chondrolysis MDRs** | **Complaints per Million** |
|---|---|---|---|
| 2003 | 102,245 | 0 | 0 |
| 2004 | 117,290 | 0 | 0 |
| 2005 | 89,525 (Q1-Q3) | 7 | 78.19 |

> From the statistical data referenced above, we consider the CPM to be at an acceptable level.(GR001592-3; Hoffman Exhibit 163)

395. Stryker received a second request from FDA for additional information on September 22, 2005 now for MDRs, # 1811755-2005-00024. FDA had requested that Stryker provide:

> Any evaluation or information used by your firm to determine whether the event described in the medical device report is attributable to the device.
>
> All information, including any evaluation or analysis, from which your firm determined that the reported event has occurred, or is occurring with lesser or greater frequency or severity than is stated in the labeling for the device or; if there is not any pertinent statement in the labeling, than is usual for the device. State the expected and observed frequency and severity of the occurrence for this reported incidence with this device.

396. Stryker responded, but it did so once again without differentiating for Melissa Eakle, MDR, CDRH how many of Stryker's PainPumps were actually used for "unapproved"

intra-articular infusion versus how many total device were sold and used for a cleared indication. Ms. Eakle is involved in FDA postmarketing and not in pre-marketing. She typically would not have been engaged with premarket review of external infusion pumps, therefore, she would have relied on the truthfulness, accuracy and knowledge of Stryker about the reporting of chondrolysis.

397. Stryker did not inform Ms. Eakle and CDRH FDA there was no FDA approved local anesthetic, including Marcaine, intended for local infusion in a joint. Ms. Eakle and FDA were not told by Ms. Hoffman that she personally was aware of two other patients with chondrolysis from Dr. Beck that she had not filed as MDRs. Ms. Eakle and FDA were not told that others within Stryker were aware of reports of patients with chondrolysis for Dr. Andrew, Dr. Paulos and Dr. Savoie since February 2005 which were not been investigated by Stryker and were not entered into Stryker's complaint files or filed as MDRs. Stryker in November 2005 provided false and misleading information to FDA's MDR reviewer's request for additional information about chondrolysis:

> This request requires a response in three parts. The first being the information that we use in order to determine whether the events described in the medical report are or are not attributable to the device. Secondly, the information of this event compared with what is usual for this device, and thirdly, the expected and observed frequency and severity of this type of incident.
>
> The device was not returned for evaluation, therefore we could not determine whether chondrolysis is or is not attributable to the device. However, upon researching the etiology of chondrolysis, it was found that chondrolysis is more likely to be caused by one or more of the following[42]:
>
> - Mechanical injury of the joint surface by arthroscopic instruments
> - Nutritional abnormalities

[42] Perry MD, Damon H, et al. Glenohumeral Chondrolysis After Shoulder Surgery The American Journal of Sports Medicine, 2004: Vol.32, No. 2.

- Ablative thermal energy
- Patient age
- Patient pre-existing conditions
- Abnormal intrascapular pressure
- Use of bioabsorbable material

It was alleged by the physician that the combination of using epinephrine mixed with an anesthetic in the PainPump causes chondrolysis. This alleged condition led to shoulder replacement surgery or micro fracture surgery in 7 patients. The PainPump Instructions for Use includes a warning about the use of epinephrine in the anesthetic solution. In addition, the medication insert for Marcaine 0.5% with epinephrine 1:200,000 also lists a precaution: *The lowest dosage that gives effective anesthesia should be sued in order to avoid high plasma levels and serious systemic side effects. Injection of repeated doses of Marcaine may cause significant increase in blood levels with each additional dose, due t accumulation of the drug or its metabolites or due to slow metabolic degradation. Tolerance varies with the status of the patient.* Based on results of our literature search, there is no scientific research linking the use of epinephrine mixed with an anesthesia in an infusion pump to cause chondrolysis.

The following information details the frequency of this incident occurring in PainPump:

| **Year** | **# of PainPumps sold** | **# of Chondrolysis MDRs** | **Complaints per Million** |
|---|---|---|---|
| 2003 | 102,245 | 0 | 0 |
| 2004 | 117,290 | 0 | 0 |
| 2005 | 89,525 (Q1-Q3) | 7 | 78.19 |

From the statistical data referenced above, we consider the CPM to be at an acceptable level.

The severity of chondrolysis is that the patient may undergo another procedure (i.e. should replacement surgery or micro fracture surgery). If chondrolysis is left untreated, the patient may experience pain, loss or range of motion, weakness and also arthritis. There have been no other reported events of chondrolysis other than these 7 patients. In addition, there have been no

other reported adverse events from patients who have undergone an additional procedure.

A medical opinion was obtained from an orthopedic surgeon regarding this event. He concluded as well that it is not likely that our infusion pump caused or contributed to these patients developing chondrolysis. In addition, he stated that the use of epinephrine with an anesthetic is a widely used practice and this alone would not have caused chondrolysis.(GR001590-1; Hoffman Ex. 166)

### vi. STRYKER SAW CHONDROLYSIS AS A SALES ISSUE, NOT A SAFETY ISSUE

398. Curt Hartman wrote an email to Dylan Crotty and Kevin Thornal October 25, 2006:

> It looks like as fast as we pick up anesthesia/CPNB business we are losing site specific from PainPump1. Anything we should consider to regain traction in that market (STR 2302)

399. Kevin Thornal, Product Manager-Pain Management, responded to Curt Hartman and Dylan Crotty on October 25, 2006(underlining for emphasis):

> Thanks for noticing and asking what we should consider to turn the ship around. Below are a few factors, and what we are moving towards to make it better:
>
> 1) Factors
>
> a.Approx 85% of our site specific business comes/came from Ortho. As facilities and physicians search for better results, they are transitioning to CPNB, thus, there is a bit of cannibalization in these numbers. Pain relief is night and day with CPNB vs. site specific and will be standard of care in 2-4 years.
>
> b. <u>In ortho, there are a few fears that bathing the join itself with local anesthetics MAY cause something called Chondrolysis (disappearance of articular cartilage). There have been 2 clinical studies and 1 presenter on the subject this year that we know of. We have lost a number of our top users as they are awaiting the outcome of further research.</u> Our response to this? We have assembled a team of Rod Parker, Zufall, Pomper, Docsa, Nicole Petty, John Saunders, and Jennifer Hoffman to discuss our options for research. In addition, CPNB is a great alternative here, but it takes time to train anesthesiologists/facilities.

c. It continues to be a challenge for our reps to spend larger portions of their time out of ortho procedures. I take responsibility by not driving focus here from marketing and we are working on ways to improve this. I Flow has purposely taken their 275 reps and attacked our weakness outside of ortho.

d. Product line- In competitive situations, our current product line with pp 1.5 does not line up well against I-Flow, which makes conversion difficult at times. Our volume limits in pp 1/1.5 is 275ml. I Flow has pumps up to 550ml for larger incisions for plastics, general, barratries, and some cardio. Our only option is PP2 in these situations (400ml: which is many times at a different price point than I-Flow, and is not a perfect fit for all facilities).

2) Solutions

a.[BLANK-REDACTED????]

b.Education-I need to do a better job educating our reps on procedures outside of orthopedics. We have tried this in the past with little follow through in the field. But we must continue to push this opportunity

c.[ Redacted????]

400. Kevin Thornal sent an October 10, 2006 email to Dylan Crotty subject Chondrolysis, Importance : High.

This is going to hurt our pp numbers badly since a large number comes from shoulders, 2 studies and a bunch of presentations as large meeting are speaking badly on the subject. I am driving rod, zufall etc to help but we don't know the answers so until we do, some dr's are choosing not to use them…

401. The reply from Dylan Crotty to K. Thornal:

Hmmm. Are most Docs buying into it?(STR 2261).

### vii. STRYKER'S TIMELINE OF CHONDROLYSIS AND ANIMAL STUDY PROPOSAL

402. Dr. Zufall emailed a timeline of chondrolysis and rationale for conducting an animal study to John Saunders on November 28, 2006:

**First Awareness:**

Complaint by Dr. Charles Beck on 8/9/05. 9 of 13 shoulder patients with post-surgical complications. 2 or 9 responded to conservative therapy, 1 of 9 required micro-fracture surgery and 6 of 9 required shoulder replacement. 7 MRDs were filed.

**Recent Literature**

Implicating the intra-articular use of bupivacaine and bupivacaine with epinephrine

1. 2 Peer-reviewed articles in Arthroscopy: The Journal of Arthroscopic and Related Surgery (July and August 2006)

   *In-vitro* study using bovine chondrocytes

   *In-vitro* study using a rabbit shoulder model

2. Abridged version of the rabbit study in *European Cells and Materials*

3. Beck Presentation of retrospective clinical data at the AAOS 2006 Annual meeting

4. Medscape Article

**Business Impact**

1. Earnings

   Three lawsuits are currently pending: potential impact on future cases based on perceived failure to warn

   Questions from accounts regarding the potential for chondrolysis as a consequence of intra-articular PainPump use. Despite lack of direct evidence, several customers have stopped using Pain Pump for site-specific applications.

2. Regulatory Risk

   FDA requested additional information on the 7 MDRs filed. 9/20/05 (asked for CPM) and 9/22/05 (asked for investigation information used to determine if our product was at fault)

   4 MDRs filed by competitors (3 from I-Flow. 1 from McKinley filed for DonJoy kit that cited several incidents.)

**Recommended Study**

*In-vivo* rabbit shoulder model. Similar to Gomoll study, but designed using more clinically relevant experimental parameters.

Estimated Cost:~ $400,000 ~($120,000 up front)

Potential outcomes:

1. No correlation between infusion of bupivacaine and chondrolysis

   Continue to market PainPump for site specific applications

   Provide sales reps with article to address physician concerns as encountered

2. Correlation between intra-articular infusion of bupivacaine and chondrolysis but no correlation between extra-articular infusion of bupivacaine and chondrolysis.

   Continue to market Pain Pump for site specific applications

   Add warning to literature to discourage intra-articular use of Pain Pump with bupivacaine (or derivatives)

   Train sales force

   Provide sales reps with article to address physician concerns as encountered

   Correlation between intra-articular and extra-articular infusion of bupivacaine and chondrolysis (**We believe this outcome is highly unlikely**)

3. Continue to market PainPump for site specific applications

   Add warning to literature to discourage intra-articular use of Pain Pump with bupivacaine (or derivatives)

   Train sales force

   Determine follow-up study to evaluate contrast between this result and positive clinical data from other studies.(STR 2116-8; Zufall Exhibit 156).

403. On November 30, 2006 the DaVINCI proposal was sent around Stryker. The title of the proposed study by DaVINCI Biomedical Research Products was Intra-Articular Bupivacaine Infusion Study In Rabbits NON-GLP N=108(STR 1906-1913; Zufall Exhibit158).

404. On December 1, 2006 John Saunders emailed Scott Zufall regarding the DaVinci proposal for Stryker:

> …Here is my concern. Based upon what I have heard from Rod in our meeting with Curt it sounds like the experiment was designed to disprove Dr. Beck's study. As Curt pointed out this will only get us in to an argument with Dr. Beck supporters about whose study is right.

> What should be the real hypothesis that we are trying to prove or disprove? Is it to determine if intra-articular placement is safe or has any potential harm? Is it to determine if there are certain conditions when a catheter is placed intraarticularly that it may result in a potentially harmful condition? Is it something else?(STR 2112; Zufall Exhibit159)

### viii. STRYKER MODIFIED ITS PUMP LABEL IN MAY 2008

405. According to Ms. Hoffman, Stryker modified its PainPump labels, for models 1.0, 1.5, and 2, in March through May of 2008. The goal was to make the labels clearer (J Hoffman, 6/27/08, p. 41 L. 11). Stryker determined that it did not need FDA approval to make changes to its labels (J. Hoffman 6/27/08 p. 45, L1-20) Revision T for the Stryker PainPump2 Infusion Pump is dated May 2008 (GRO249640Stryker Exhibit 264). The revised labeling appears written for attorneys more than for health care providers. Stryker still has not added a Contraindication against intra-articular use and no Warning that no local anesthetic has been approved for continuous infusion in a joint. The sixth point of six points is the only mention of chondrolysis and it is discussed in a noncommittal way as to whether the use of the pump for intra-articular infusion is associated with chondrolysis. Furthermore, Stryker admits that it has done "no independent assessment" to determine if its pain pumps are associated with chondrolysis when used for intra-articular use.

406. Stryker added the new section in 2008 placing it next to the contraindication section under the heading "Special Reminder to Users" is a new section of information about a product:

> The product has been carefully designed and manufacturer to ensure its safe and effective use when used as indicated and when the instructions and cautions provided herewith are thoroughly followed. However, it should be noted that:

1. Stryker has not tested any particular medications (s)/solutions(s) in animals nor in humans and has not made any determination about the propriety or safety of any particular medication(s)/solution(s) which may be infused via the system. Accordingly, Stryker makes no recommendations or representation regarding the propriety or safety of any medication(s)/solution(s) which may be infused via the system.
2. The selection of the particular medication(s)/solution(s) to be used with any patient and the determination that such medication(s)/solution(s) is appropriate and safe for any patient are medical decision to be made solely by the physician.
3. In selecting the medication(s)/solution(s) to be used with the patient, the physician should be familiar with the potential risks and effect of each medication/solution to be used and/or combined in general and, in particular, when infused continuously via the system.
4. The selection and determination of the particular dose, flow-rate, concentration or duration of infusion for any medication(s)/solution(s) to be used via the system are medical decisions to be made solely by the physician.
5. The determination for catheter placement and other such critical decision for a given patient are to be made solely by the physician.
6. Certain clinical reports in the medical literature suggest a potential association between intra-articular continuous infusion of local anesthetic (with and without epinephrine) and the subsequent development of chondrolysis in shoulder joints. Stryker has made no independent assessment as to the validity thereof and is neither adopting nor disputing the accuracy and validity of these reports which are referenced here fin for consideration by the physician(GRO24967).

Within the Section USER/PATIENT SAFETY on in the second page of Warnings appears

DO NOT place the catheter in the synovial cavity or intra-articular space. Failure to comply may result in patient injury.

407. The PainPump2 brochure downloaded on May 11, 2009 from www.stryker.com contains no warnings or contraindication regarding intra-articular use. The brochure has photos of types of surgeries appropriate for the Pain Pump 2 and the pictures include: rotator cuff repair, ACL repair, and total knee replacement. There is no mention of risk of chondrolysis with intra-articular use or that local anesthetics are not approved for intra-articular infusion. The website

also has no Stryker Dear Health Care Professional Letter regarding the reporting of Chondrolysis and the changes in Stryker's labeling. A search of the website with the search word chondrolysis brings up no information.

**5. PACIFIC MEDICAL**

408. Pacific Medical (Pac Med) is a distributor of DonJoy Orthopedic products. It was founded by John Petlansky, who has no medical training, but has a degree in economics. He first learned about the pain pumps from DonJoy in 1999 with the launch of DonJoy's PainBuster from I-Flow.

409. Prior to his deposition had never heard that FDA had rejected clearing the pain pumps for use in the joint space (J. Petlansky,1/7/09 p 21, L.12) He also stated that since 1999, he had always understood the pain pumps were intended for intra-articular use (J. Petlansky 1/7/09 p. 21 l. 2-8). Pacific Medical ("Pac Med") had learned it was okay to use the pain pump in the joint from many avenues including the manufacturer, training, DFU, product managers, I-Flow and DJO.(J. Petlansky 1/7/09, p. 23 l. 16-20). At no time did Pac Med attempt to inform customers that intra-articular use may not be safe (J. Petlansky 1/7/09 p. 25 L. 7)

410. Pac Med looked to DonJoy to provide all training materials, launch packets and sales materials for the use of the Pac Med sales force.

411. Somewhere in March 2008, Pac Med received a phone call or letter about a lawsuit for a pain pump. He was not sure the source but it was the first time Pac Med was aware of any issue with pain pumps. Pac Med became concerned since it had been in business for 20 years and would not want anyone to receive a product from Pac Med that would hurt them. As a

result, Pac med's General Counsel, Matt Werner contacted DJO about the lawsuit. Shortly after Pac Med received notification of another lawsuit.

412. Pac Med had sold a few thousand pain pumps and had never had a complaint. They saw in the legal papers that the cases involved the shoulder.( (J Petlansky 1/7/09 p. 25 l. 18-21).

413. Pac Med looked at the DonJoy pain pump's label. They found a sticker with new warnings on some of the current inventory shortly after the middle of March. As a result, Pac Med had a conference call with its sales force on April 6 to share the changes in the directions and to inform surgeons of the changes in the directions. (J Petlansky 1/7/09 p.26, l. 5-19).

414. Pac Med never received written communications about the label changes for the McKinley pain pumps. (Petlansky 1/7/09 p. 27 L. 16)

415. Pac Med's sales manager did not learn that the FDA had rejected the intra-articular indication for pain pumps until the day before his deposition (D. Gamroth 2/27/09 p. 40, L. 4-24).

416. Pac Med understood that it would be inappropriate to promote products for unapproved uses (D. Gamroth 2/27/09 p. 40, L. 12-21)). Nevertheless, Pac Med sales force was trained on the use of pain pumps in the joint space and informed doctors about the ability to use the pain pumps in joints. (Gamroth 2/27/09 p 50-1, L 20-17 ).

## VII. BREECH OF STANDARD OF CARE FOR THE MEDICAL DEVICE INDUSTRY

417. The medical device industry and distributors have standards of conduct for selling safe and effective products in the United States. The FDA, at the mandate of Congress, is to provide oversight of a minimal standard of conduct by industry to help ensure that new medical devices introduced in the United States fulfill certain requirements for safety and effectiveness. The FDA is to also be involved in postmarketing actions to help ensure the safety of the public from FDA-regulated products and labeling. All manufacturers are able to exceed the FDA's requirements.

418. Many manufactures are now international, selling products outside the United States. For these, there are different government and regulatory requirements for medical devices. In the United States, regulatory requirements are the FDA's Food Drug and Cosmetic Act and implementing regulations. Internationally there is the ICH with global harmonization task force including the requirements of the European Commission, the Therapeutic Goods Association (TGA) of Australia, the Medicines and Healthcare Products Regulatory Agency (MHRA) of the United Kingdom (MHRA), Health Canada, Ministry of Health, Labor and Welfare (MHW) of Japan, etc. All these organizations have standards and requirements for marketing of medical devices and protection of the public

418. Beyond government standard and requirements of conduct for the medical device industry, there are the policies and procedures and codes of their own professional trade organizations. In the United States the professional trade association for medical device industry is called AdvaMed, (previously HIMA). In Europe it is Eucomed. For electrical devices in the United States, the United Sates professional trade organization is National Electrical

Manufacturers Association (NEMA). These trade organizations provide the industry and their members with standards of conduct in terms of testing, designing, manufacturing and marketing medical devices to health care professionals.

420. There are voluntary industry standards organization such a International Organization for Standardization (ISO), American National Standards Institute (ANSI) , Association for the Advancement of Medical Instrumentation (AAMI), and American Society for Testing and Materials (ASTM) to name a few. These organizations are both international and American. They develop industry standards to address adequacy of design, testing, monitoring, materials and labeling of medical devices.

421. Each United States medical device manufacturer/ distributor with product sold in the United States is required to register and list its establishment and products. Each firm is required as good manufacturing practices and pursuant to 21 CFR 820 to establish and implement its own internal written standard operating procedures, policies and guidelines. The purpose for all the standards, requirements and procedures is to ensure that the products sold to the public or to health care providers for use with patients are safe and effective and adequately labeled. Written standards and policies are meaningless if a company fails to adhere to the required standards and procedures and standards of conduct to ensure the safety and effectiveness of the product it sells.

422. All companies involved with external infusion pumps used for intraarticular infusion of local anesthetics, had deviated from the standard of care. Each has been involved in the introducing, distribution or sale of adulterated ( 21 USC 351) and/or misbranded (21 USC

352) medical device in the United States which is prohibited by the Act pursuant to 21 USC 331.

423. APPENDIX 3, titled " Summary of Failure to Warn" provides examples of when these firms have deviated from the standard of care of responsible United States medical device manufacturers.

424. I reserve the right to amend my opinions pending further discovery.

Suzanne Parisian, MD

May 27, 2009

**APPENDIX 1**

# SUZANNE PARISIAN, M.D.

## ***CURRICULUM VITAE***

## EMPLOYMENT HISTORY:

**8/95- PRESIDENT**
**MD ASSIST, Inc.**
7117 N. 3rd Street
Phoenix, Arizona 85020

**12/1993-7/95 CHIEF MEDICAL OFFICER**
Division of Reproductive, Abdominal, Ear, Nose and
Throat, and Radiology (DRAERD)
OFFICE OF DEVICE EVALUATION (ODE)
CENTER FOR DEVICES AND RADIOLOGICAL HEALTH (CDRH)
FOOD AND DRUG ADMINISTRATION (FDA)

**8/1991-7/95 Lt. Commander**
United States Public Health Service

**8/1991-3/1993 Medical Officer**
Office of Health Affairs (OHA)
Center for Devices and Radiological Health (CDRH)
FOOD AND DRUG ADMINISTRATION (FDA)

**4/1993-11/93 Medical Officer**
Division of Reproductive, Abdominal, Ear, Nose &
Throat, and Radiology (DRAERD)
Office of Device Evaluation (ODE)
Center for Devices and Radiological Health (CDRH)
Food and Drug Administration (FDA)

**8/1991-7/95 Clinical Staff Appointment**
Office of the Medical Examiners for Armed Forces
Armed Forces Institute of Pathology (AFIP)
Washington, D.C.

**4/1985-6/1987 General Practice**
AVTEX Fibers, INC
Front Royal, Virginia

**4/1980-7/1981 Emergency Medicine**
President
Mountain Emergency Medical
Caldwell Memorial Hospital
Lenoir, North Carolina

**10/1979-3/1980 General Practice**
Caldwell County Health Department
Lenoir, North Carolina

## CDRH / FDA /HHS & USPHS HONORS:

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Employee of the Month** August l993

**FOOD AND DRUG ADMINISTRATION**
**Employee of the Month** August 1993

**CENTER FOR DEVICES AND RADIOLOGICAL HEALTH**
**Employee of the Month** August 1993

**Public Health Service's Achievement Medal- 1992**

**Public Health Service's Unit Commendation Medals**
Acupuncture Workshop- 1995
Total Parenteral Nutrition Complications Group- 1995
Night Vision Equipment Radiation Leak Group- 1995
Anesthesia Heated Wire Circuit-1994
Small-Bore Anesthesia Group-1992
Corporate-Wide Injunctions Groups-1993, 1994, 1995

**Public Health Service's Commendation Medal**
Neonatal Ventilators-1992
Hemodialyzer Reuse Labeling-1995

**Public Health Service's Unit Citations- 1992, l992**
Latex Allergy-1993

**Nominee for FDA Honor Award**
FDA's Policy for Hyperthermia Clinical Trials-1995

**Certificate of Appreciation CDRH's Staff College**
Clinical Trials Course, Spring, 1995

**Other Honors**

University of Central Florida, *Cum Laude*, l974

University of Central Florida, *Summa Cum Laude*, l975

## REGULATORY ACTIVITIES:

**OFFICE OF DEVICE EVALUATION (ODE) PRIMARY RESPONSIBILITY:**
**Primary responsibilities included:**

1) **Review of FDA Premarket applications-** 510Ks,Investigational Device Exemption(IDEs), Premarket Approval Applications (PMAs)) including design, labeling, health issues and quality systems requirements for manufacturing issues; INDs.
2) **Review and evaluation of clinical trials, etc;**
3) **Design of Post Marketing Clinical Studies;**
4) **Health Risk Assessments and management for Office of Compliance and the FDA District Field Offices;**
5) **Liaison for manufacturers, clinical investigators, government agencies, medical community, press, Congress, patient advocate groups, public, and manufacturers organizations;**
6) **Training of ODE clinical reviewers;**
7) **Quality Assurance design;**
8) **Identification and resolution of safety and efficacy issues;**
9) **Presentation of clinical device issues to FDA Advisory Panels;**
10) **Presentation of Device-related issues to Health Care Financing Administration's Technology Assessment Committee (HCFA, TAC);**
11) **Investigator and Manufacturer Guidances from CDRH for Clinical Protocols;**
12) **Clinical support for FDA regulatory actions and hearings.**

**CLINICAL DEVICE RESPONSIBILITY AREAS in ODE:**

**ENT -** Cochlear implants, brainstem implants;
**Radiology -** Magnetic Resonance Imaging, Ultrasonography, Mammography, Radiation Hyperthermia Therapy, Neurosurgical Imaging Systems, Interventional Radiology, Thermography, Radiotherapy;
**Urology-** cryosurgery, lasers, stents, penile prostheses, urethral implants, lithotripsy**;**
**Extracorporeal circulation -** Hemodialysis, LDL-Apheresis, Plasmapheresis**,** Immunadsorption, Cell Harvest; Organ Preservation;
**Pulmonary-** bronchoscopy, stents;
**Gynecology-** infertility, PAP smear technology;
**Obstetrics-** chorionic villus sampling, amniocentesis, fetal monitoring;
**Gastroenterology-** biliary stents, neuromuscular stimulators**;**
**Endoscopy & Laparoscopy; Lasers;**
**Alternative Medicine for FDA;**
**Immunology;**
**In vitro diagnostics; Toxicology; Cytology;**
**Biological Artificial Organ Assist Devices (Center for Biologics Evaluation and Review (CBER);**
**Implanted Neuroelectrical Stimulators;**
**Genetics; Perinatology;**
**Transfusion Medicine; Electromagnetic Fields and Interference;**
**Tissue and Organ Transplantation (CBER);**
**Forensics**
**Combination Products-Drug/Device, Biologics/Device**
**Contrast Agents**

***100 Health Risk Assessments while in ODE***

**OFFICE OF HEALTH AFFAIRS PRIMARY RESPONSIBILITY :**

**1) Primary support for Office of Compliance-**
Health Risk Assessments & Health Hazard Evaluations; review of Labeling, Mandatory Device Reports (MDRs), Adverse Experience Reports (AERs)
2) Interaction with manufacturers, investigators, health care providers, professional organizations;
3) Interaction with FDA District Offices, other government agencies, the Office of Device Evaluation;
4) Identification of public health and safety issues**.**

**Primary Clinical Responsibility Areas for OHA:**
Cardiovascular; Anesthesia; Pulmonary;

Orthopedics; Unconventional Therapies;
Rehabilitative Medicine; Pathology; Home Health;
Emergency Medicine; Hemodialysis; Toxicology; Radiology

***162 Health Risk Assessments while in OHA***

## FORENSIC MEDICINE CLINICAL ACTIVITIES:

Evaluation of Patient Cause of Death & Injury with FDA regulated products

Review and Final Sign-Out Cause of Death Military, Dependent,
FBI and CIA
Armed Forces Institute of Pathology
Office of Medical Examiner
Washington, D.C.

**Center for Devices and Radiological Health (CDRH) Assigned Support:**

Anesthesia Post Market Surveillance Chairman (l992- May, l993)
FDA and CDRH's Liaison for Alternative Medicine
CDRH Staff College Instructor, Clinical Trials
Temple Tier II Report-ODE's Internal Quality Assurance (QA) Review

**CDRH's Representative**
National Kidney and Urological Diseases Advisory Board
National Institutes of Health
Health Care Financing Administration's Technology Assessment Committee
Ad Hoc Working Group CDRH Transfusion Medicine

**CDRH's Support for FDA's Office of Legislative Affairs (OLA) and Press Office for:**
Extracorporeal Hyperthermia and treatment of patients with AIDS;
Alternative Medicine;
Hemodialysis

**LECTURES While at FDA:**

Armed Forces Institute of Pathology
Essentials of Medical Devices and Death Investigations
Washington, D.C.
**October, 1993**

Third World Conference of Acupuncture

FDA's Viewpoint of Acupuncture
Kyoto, Japan
**November, l993**

Alternative Medicine Conference
FDA's Viewpoint of Acupuncture
Smithsonian Museum of Medicine
National Museum of Medicine
Washington, D.C.
**December, 1993**

Reuse of Hemodialyzers
Office of Device Evaluation
Presentation and Review of CDRH's Draft Guidance Document
Rockville, Maryland
**December, 1993**

Panel Chairman
Office of Alternative Medicine/National Institutes of Health (OAM/NIH)
Workshop for Acupuncture Needle Reclassification
Provided FDA's Viewpoint
Rockville, Maryland
**April, 1994**

National Acupuncture and Oriental Medicine Alliance
Annual Conference
FDA's Viewpoint - Acupuncture
Crystal City, Virginia
**May, 1994**

OAM/NIH and FDA's Workshop Planning Group
for Herbs Conference,
FDA's and CDRH's policy
For Alternative Medicine Providers
Rockville, Maryland
**May, 1994**

American Association for Medical Instrumentation (AAMI)
FDA's perspective Hemodialysis Reuse Labeling Guidance
Washington, D.C.
**June, 1994**

AAMI Conference
FDA's Recommendation for Hemodialyzer Reprocessing Labeling
Hemodialysis Reuse Section
Washington, D.C.
**June, 1994, November 15, 1994**
**& May 9, 1995** (Joint AAMI/HIMA Workshop)

FDA's Genitourinary Advisory Panel
Presentation Hemodialysis Reuse Labeling Guidance
Rockville, Maryland
**July, 1994 &**
**January 1995**

FDA Urology Devices Advisory Panel Meeting
Presentation of LDL-Apheresis Premarket Applications
Kaneka's Liposorber LA-15 System
B. Braun of America's H.E.L.P. System
Rockville, Maryland
**April, 1995**

FDA's ENT Advisory Panel Meeting
Presentation of Cochlear's Nucleus 22 Cochlear Implant
PMA application- expansion of patient population
Rockville, Maryland
**April, 1995**

Second Symposium of Society for Acupuncture Research (SAR)
Georgetown University Conference Center
Government's perspectives on clinical trials for acupuncture
Washington, D.C.
**September 17, 1994**

## FDA's CHAIRMAN

Reuse of Hemodialyzer,
Rockville, Maryland
**December 10, 1993**
**May 1995**

**LECTURES, INTERVIEWS & ACTIVITIES After FDA:**

**FDA and Acupuncture**
ABC News Interview
Los Angeles, CA

**Summer 1995**

**Dealing with Adverse Events**
1996 National Sales Meeting
Johnson & Johnson Medical Inc.
Dallas, Texas
**April 1, l996**

**Dialyzers Labeled for Reuse**
The Manufacturer's Responsibilities
Fifth Annual Spring Clinical Nephrology Meeting
National Kidney Foundation
Anaheim, CA
**April 27, l996**

**Challenges with Infusion Therapy Complications**
Intravenous Nursing Society
Charlotte, North Carolina
**May 7, l996**

**510(k) Tutorial**
Food Drug and Law Institute
40th Annual Educational Conference
Washington, D.C.
**December 9, l996**

**FDA Expert Panel Member**
Medical Devices: Device Labeling Requirements
Center for Devices and Radiological Health
Food and Drug Administration
Rockville, MD
**September 5, l997**

**Science and Art of Designing Successful Medical Device Clinical Trials for the FDA**- A Workshop
Institute for International Research, Pharmaceutical Division
Santa Monica, CA
**September 22-24, l997**

**What You May Need to Know about Medical Devices And FDA But Never Would Have Thought to Ask.**
22nd Annual Great Lakes Biomedical Conference
Engineering in Medicine and Biology Society
Milwaukee School of Engineering

Milwaukee, Wisconsin
**April 3, l998**

**ABC News Interview with Ron Regan**
Medical Device Reporting for Surgical Trocar Injuries
WEWS ABC - Channel 5 News
Cleveland, Ohio
**May 17, 2001**

Interview in**: The *Trouble with Trocars***
By Linda Carroll & Alfred Lubrano
Smart Money
**The Wall Street Journal Magazine of Personal Business,** Hearst Communications
New York, NY
**November 2001**

**FDA Inside and Out- Public Health Issues in Cervical Cancer Screening**
Global Vista Medical Foundation
Sponsored by President Medical technologies Co., LTD
Taipei, Taiwan, R.O.C.
**March 3, 2002**

**Inside the FDA**
Presentation to Kent County Medical Society
Grand Rapids, MI
**May 14, 2002**

**Clinical Trials**
**What physicians need to know about FDA.**
Medical Grand Rounds
St. Mary's Hospital
Grand Rapids, MI
**May 15, 2002**

Interview in ***The Risky World of Medical Implants***
A Three Part Series
Robert Cohen and J. Scott Orr
Star Ledger
Morris Edition, New Jersey
**August 11-13, 2002**

NBC's **Dateline** Interview with Lea Thompson
Special Investigations- **Do No Harm-Sulzer's Hip Recall**
NBC News Washington
Washington, D.C.
*2004 Emmy Outstanding Investigative Reporting Business News Story
*2004 Edward R. Morrow Television Investigative Reporting
**July 25, 2003**

Interview with Author Barbara Seaman
**History of FDA's Clearance of Bone Densitometers**, page 78
The Greatest Experiment Ever Performed on Women
Published by Hyperion, New York, New York
**Fall 2003**

Interview **Is This Any Way to Have a Baby? The Terrifying Truth About Fertility Drugs.**
Barbara Seaman and Joanna Perlman
OPRAH Magazine, beginning page 188
Published by Hearst Communications Inc., New York, New York
**February 2004**

Interview **Warning! The Medical "Miracles" That May Be Hazardous to Your Health.**
Alexis Jetter
Good Housekeeping Magazine, beginning page 138
Published by Hearst Communications Inc., New York, New York
**March 2004**

Interview **Investigation of FDA's Oversight of Mammography Facilities**
Producer Mary Schwager
Investigative News
WHDHTV-NBC
Boston, MA
**October 19, 2004**

**Bayer Stroke Trial Continues**
Tim Gurrister
Top of Utah
Salt Lake City, UT
**January 22, 2005**

**Drugs, Informed Consent and Monitoring to Ensure Safety of Women for Stem Cell Donation**
Open Letter of Suzanne Parisian, MD
Presented to California Legislature and Massachusetts Legislature
Released **February 2005**

**Open Letter Suzanne Parisian, MD**
Chapter 25- **Infertility and Assisted Reproduction**
Emerging Biotechnologies: Cloning
**<u>Our Bodies Ourselves</u>**
Boston Women's Health Book Collective, Inc.
Boston, MA
**March 2005**

Interview **Stem Cell Research & Egg Donation**
Martha Bebinger
WBUR NPR Radio
Boston, MA
**April 2, 2005**

Interview in **Exposed Nerve**
Craig Malisow
<u>Houston Press</u>
Houston, TX
**April 7, 2005**

**Public Statement-Regarding Two Pending PMAs**
On Behalf of ProChoice Alliance for Responsible Research (PROCARR)
General & Plastic Surgery Devices Panel
Center for Devices and Radiological Health
Food and Drug Administration
Gaithersburg, MD
**April 11, 2005**

**FDA's History of Silicone-Gel Filled Breast Implants**
Briefing of US House of Representatives and US Senate Staff
Washington, DC
**April 25, 2005**

**Conference - Two Pending PMAs**
Presentation to FDA Commissioner Dr. L. Crawford
Food and Drug Administration
Washington, DC
**April 26, 2005**

**Public Statement – Two Pending License Applications**
Health Canada Therapeutic Products Expert Review Panel
Ottawa, Canada
**September 29, 2005**

**FDA & CLIA**
**Trends in Medical Diagnostic Commercialization**
Arizona Biotechnology Association
Phoenix, AZ
**February 7, 2006**

ABC Interview **Nightline**
**Fertility Myth**
Producer Mary C. Foster
**May 30, 2006**

Interview **FDA and IVF Donor Safety**
Penumbra Films
Documentary Name TBD
**March 17, 2007**

**Regulatory Affairs Professional Society (RAPS)**
Web-Based Class
Faculty
Medical Devices: Definition and Lifecycle
**January 2008**

**The Pathologist's Role in Preserving Implanted Cardiac Pacemakers And Defibrillators or "How Not to get Shocked!"**
American Academy of Forensic Sciences Annual Meeting
Washington DC
**February 22, 2008**

Interview **IVF**
Producer Jack Hafer
Boulevard Pictures

Documentary for PBS, Name TBD
**May 21, 2008**

KHPO NEWS FOX Network
Interview Kara Liu
FDA: Beware Tainted Weight Loss Drugs
**March 23, 2009**

A New Washington- The Impact on the Bioscience Industry
Trends at the FDA
BIOZONA 2009
Arizona's Annual Bioscience Industry Conference
**April 7, 2009**

**VOLUNTARY STANDARDS COMMITTEE INVOLVEMENT**

Has been an active member of the following committees for
**AMERICAN SOCIETY for TESTING MATERIALS (ASTM)**
Medical and Surgical Material and Devices
Occupational Health and Safety
Search and Rescue
Anesthetic and Respiratory Equipment
Forensics
Biotechnology

**AMERICAN ASSOCIATION FOR THE ADVANCEMENT OF MEDICAL INSTRUMENTATION (AAMI)**
Renal Disease and Detoxification Committee

## PUBLICATIONS:

***Homoeotic Effect of the Tumorous-Head Mutant and Differential Effect of an Enhancer Gene in the Tumorous-Head Strain of Drosophila Melanogaster***, *Canadian J Genet. and Cytology*, 1975; 17:423-432.

***Latex Allergy and Anesthesiology.***
*Anesthesia Patient Safety Foundation Newsletter*
Spring, l992.

***The Potential for Adverse Reactions Due to the Presence of Additives and Preservatives in Intravenous Solutions and Medications***; *Journal Vascular Access Devices*, Winter 1996, Vol 1 (1): 5-14.
*Sponsored by Johnson & Johnson Medical, Inc.

***Letter to the Editor, Midline Catherization in Hospitalized Patients*****.**
*Annals of Internal Medicine***,** October 15, l996; Vol 125, No 8: p 697.
*Sponsored by Johnson & Johnson Medical, Inc.

**FDA INSIDE and OUT,**
S. Parisian, M.D.
Publication May, 2001
***Fast Horse Press, Inc*****.**

## DATE AND PLACE OF BIRTH:
September 20,1952,
Rapid City, Pennington County, South Dakota

## MARITAL STATUS:
Married- August 26, 1977

## FAMILY:
Son 02/09/1985
Daughter 09/12/1986

## MEDICAL LICENSURE:
State of Virginia
State of Arizona

## EDUCATION:
**6/1970-6/1974** Bachelors of Science
University of Central Florida
Orlando, Florida

**7/1994-6/1975** Masters of Science
University of Central Florida
Orlando, Florida

**7/1975-6/17/1978** Medical Doctorate
University of South Florida
Tampa, Florida

## TRAINING:

**7/1/1978-6/30/1979** Flexible Internship
Greenville Hospital System
Greenville, South Carolina

**9/14/1981-6/30/1982** Pathology Resident
University of California, San Diego
San Diego, California

**7/1/1982-2/29/1984** Pathology Resident
University of Southern California
Los Angeles County Medical Center
Los Angeles, California

**1/4/1988-1/30/1990** Pathology Resident
Grand Rapids Area Medical Education Center
Grand Rapids, Michigan

## BOARD CERTIFICATION:

Board Certified in Anatomic and Clinical Pathology, 1989, American Board of Pathology
College of American Pathologists, Fellow (FCAP)
American Society of Clinical Pathologists, Fellow (FASCP)

## SOCIETIES:

American Medical Association
Arizona Medical Association
Arizona BioIndustry Association
Maricopa County Medical Society
American Advancement for Medical Instrumentation
American Society for Testing Materials
Regulatory Professionals Society
Food and Drug Law Institute
College of American Pathologists
Food and Drug Alumni Association

## OFFICE ADDRESS:

**MD ASSIST, Inc.**
7117 N. 3rd Street
Phoenix, Arizona 85020
Phone: (602) 354-8491
FAX: (602) 354-8696
E-Mail: info@mdassist.com

**WEBSITE:**
http://www.mdassist.com

5/27/09

# APPENDIX 2
# LEGAL TESTIMONY HISTORY

## Suzanne Parisian, M.D.

## COURT TESTIMONY
## 2004- May 22, 2009

**2/26, 23/09** Law Offices of Jeffrey B. Wihtol
D. Grossnickel, et al. vs. Stryker Corporation, et al.
Multnomah County Circuit
Court Case No. 0703-0284
Portland, OR

**1/29-30/09** Wilentz, Goldman & Spitzer
Kimberly Zundel & Charles Zundel, Stephanie Zundel vs. Johnson & Johnson; McNeil Consumer Healthcare
Middlesex County Docket No. MID-L-6854-05
Superior Court of New Jersey, NJ

**12/01/08** Walkup, Melodia, Kelly, Wecht & Schonenberger
Lisa Ann Seeno vs. Mentor Corporation and Does One through 100, inclusive
Case No.: RG06264787
County of Alameda
Superior Court of California, CA

**08/19-20/08** Mayfield & Ogle, P.A.
Wesley Webster vs. Body Dynamics, Inc., The Pantry Inc., Nittany Pharmaceuticals, Inc.
Circuit Court of the Eight Judicial Circuit, Case No: 01-01-CA-137, Division J
Alachua County, FL

**07/21-24/08** Littlepage & Booth
A. Woods vs. Pfizer, Upjohn, Pharmacia
Clark County District Court of Nevada
Eight Judicial District
Las Vegas, NV

**2/15/2008** Luvera Law Firm
P. Singh & H. Kaur vs. Edwards Lifesciences Corporation, et.al.
No: 05-2-12213-5
County of Snohomish
Superior Court State of Washington, WA

**2/12-13/08** Brent Coon & Associates
Donna Scoggins vs. Wyeth, Pfizer
United States District Court Eastern District of Arkansas
Western Division, Little Rock, AR

**4/26/07** Beasley Allen, Crow, Methvin, Portis & Miles, P.C.
Carolyn Reece vs. AstraZeneca Pharmaceuticals, LP; AstraZeneca LP
Case No. C-1-05-322
U S District Court Southern District of Ohio
Western Division, OH

**4/18-19/07** Brent Coon & Associates
Merle Simon vs. Wyeth, Pfizer
Case No: 040604229
Court of Common Pleas
Philadelphia, PA

**2/28/07** Goldenberg & Johnson, PLLC
Becky Masters vs. Eniva Corporation
Fourth Judicial District Personal Injury
District Court, Court No. 27-CV-06-6071
County of Hennepin, State of Minnesota
Minneapolis, MN

**6/7-9/06** Locks Law Firm, LLC
E. Doherty and D. Doherty vs. Merck & Co, Inc
Docket No.: ATL-L-0638-05-MT
VIOXX Litigation
Case Code No. 619
Superior Court of New Jersey Law Division: Atlantic, City
Atlantic City, NJ

**3/20/06** Walkup, Melodia, Kelly, Wecht & Schoenberger
V. Buonocore, Estate of C. Buonocore vs. Cardeon Corporation, et al.
CIV 438695
Superior Court of State of California
County of San Mateo, CA

**03/16/06** Phillip K Fife Law Office
Martha Stewart vs. Sulzer, LTD
No. BC 262780
Superior Court State of California For the County of Los Angeles
Los Angeles, CA

**01/20-24/05** Rheingold, Valet, Rheingold, Shkolnik
Marlus Hardy vs. Bayer Corporation
Second Judicial District Court
Civil No. 010902836 PL
Weber County, State of UT

## DEPOSITION TESTIMONY
## 2004- May 22, 2009

**5/21/09** Motley Rice, LLC
Denise Poole v. Matrixx Initiatives, Inc.
Case No. CV 2006-016722
Superior Court of the State of Arizona
County of Maricopa
Phoenix, AZ

**5/15/09** Searcy, Denney, Scarola, Barnhart & Shipley
D. Kilpatrick v. Breg, Inc.
Case No. 08-10052-CIV-Moore/Simonton
United States District Court
Southern District FL

**4/16-17/09** Aredia & Zometa Products Liability Litigation MDL No. 1760
No. 3:06-MD-1760
United States District Court for
The Middle District of Tennessee
Nashville, TN

**03/26/09** Bubalo, Hiestand & Rotman
C. Vance v. Rite Aid of West Virginia, et al.
Civil Action No. 06-C-351-P
Circuit Court of Logan County, WV

**03/12/09** Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor, P.A.
United States District Court Southern District of New York
In RE: FOSAMAX Products Liability Litigation
No. 1:06-md-01789-JFK-JCF

**2/19/09** Harrell & Nowak, L.L.C.
Betty Mason Slicho, et al vs. Boston Scientific Corporation
24th Judicial District Court
No. 607-594, Division "C"
Parish of Jefferson, State of LA

**5/04/09**
**2/16/09** Childers & Schlueter, LLP
Patricia Ingram, parent of deceased minor Rakesh Dorsey vs. Mylan Pharmaceuticals, Inc, et al
Civil Action No. 1:08-CV-0574
In the United States District Court
Northern District of Georgia, Atlanta Division, GA

**2/5-5/09** Curry & Tolliver
J. Higginbotham et. al. vs. J. King, DO, et. al.
Civil Action No. 04-C-470
Circuit Court of Putnam County, WV

**1/10/09** Kershaw, Cutter & Ratinoff, LLP
Panacryl Sutures Products Liability Litigation
Civil Action N. 5:08-MD-01959
United States District Court
Western Division
Eastern District of North Carolina, NC

| | |
|---|---|
| **02/09/09** | |
| **12/18/08** | May Oberfell Lorber; O'Koon & Hintermeister PLLC<br>Jodi McGookin, As Mother of the deceased Samantha McGookin, et al. vs. Guidant Corporation, et al.<br>No. 71D07-0608-CT-00192<br>State of Indiana, County of St. Joseph<br>St. Joseph Superior Court, IN |
| **10/16/08** | Walkup, Melodia, Kelly, Wecht & Schonenberger<br>Lisa Ann Seeno vs. Mentor Corporation and Does One through 100, inclusive<br>Case No.: RG06264787<br>County of Alameda<br>Superior Court of California, CA |
| **10/10/08** | Wilentz, Goldman & Spitzer<br>Kimberly Zundel & Charles Zundel, Stephanie Zundel vs. Johnson & Johnson; McNeil Consumer Healthcare<br>Middlesex County Docket No. MID-L-6854-05<br>Superior Court of New Jersey, NJ |
| **09/16/08** | Laszlo & Associates, LLC<br>Jack Kelley, et al. vs. Unico Holdings Company, Inc.<br>Case No. C:1-07-8<br>Western Division in the United States District Court<br>Southern District of Ohio, OH |
| **09/09/08** | Tracey Law Firm<br>Radford Steele & Lisa Collins, and as Next Friend of Chase Steel, a Minor Child vs. GlaxoSmithKline, PLC et al.<br>Cause No. 37373<br>23rd Judicial District<br>District Court of Brazoria County, TX |
| **07/31/08** | Mayfield & Ogle, P.A.<br>Wesley Webster vs. Body Dynamics, Inc., The Pantry Inc., Nittany Pharmaceuticals, Inc.<br>Circuit Court of the Eight Judicial Circuit, Case No: 01-01-CA-137, Division J<br>Alachua County, FL |

**09/22/08**
**06/30/08** Filan & Associates, LLC
Dan Oliva vs. Bristol-Myers Squibb and Company
UWY CV 05 4009606
Superior Court
Judicial District of Waterbury
Waterbury, CT

**06/03/08** Williams, Kastner & Gibbs, PLLC
William Dussault as Guardian Ad Litem for S.P, a minor, Eugene and Clarissa Patnode vs. Children's Hospital& Regional Medical Center, Shelhigh,Inc.
No. 05-2-36911-6 SEA
King County
Superior Court of the State of Washington
Seattle, WA

**04/21/08** Feldman, Shepherd, Wohlgelernter, Tanner & Weinstock
Lorraine Dubzak and Gerald Dubzak vs. Boston Scientific Corporation
No: 04- CV-6083
United States District Court
Eastern District of Pennsylvania, PA

**03/17/08** Bextra Marketing Sales Practices and Product Liability Litigation
Beverly Haslam vs. Pfizer, Inc.
MDL M:05-cv-01699
United States District Court
Northern District of California, CA

**03/04/08** Ortho Evra Products Liability Litigation
N.D. Ohio Case No. 1:06cv-4000
MDL Docket No. 1742
US District Court
Western Division
For the Northern District of Ohio, OH

**02/28/08** Searcy, Denney, Scarola, Barnhardt & Shipley,PA
Carolyn Runner-Bradden vs. Bausch & Lomb, Inc.
Case No. 50 2007 CA6046XXXXMB AG
Circuit Court 15th Judicial Circuit
Palm Beach County, FL

**02/01/08** Hollis, Wright & Harrington, PC
Mellisa Rix vs. Gilberto Sanchez, M.D., Abbott Laboratories, Inc.
Case No: CV 05-1219
Circuit Court
Montgomery, AL

**11/8/2007** Luvera Law Firm
P. Singh & H. Kaur vs. Edwards Lifesciences Corporation, et.al.
No: 05-2-12213-5
County of Snohomish
Superior Court State of Washington, WA

**10/15/07** Schlichter, Bogard & Denton
Binth Lewis, Guardian of Ashley Lewis, and Binth T.Lewis, representative of the estate of Ashley Lewis vs. Ortho-McNeil Pharmaceutical, et al.
Case No. 052-11741
Circuit Court of the City of St. Louis
St. Louis, MO

**10/02/07** Foley & Mansfield PLLP
Eva Hays & Ram Hays vs. C.B. Fleet Holding Company, Inc., etc.
Case No. 1-05-CV-048258
Superior Court of the State of California
County of Santa Clara, CA

**8/20/07** Human Tissue Products Liability Litigation
Civil Action No. 2:06-135 (WJM); MDL No.1763
United States District Court
District of New Jersey, NJ

**12/20/07**
**11/14/07**
**07/20/07** Prempro Products Liability Litigation
MDL. Docket No. 4:03CV1507 WRW
Pending in Eastern District of Arkansas
Western Division, Little Rock, AR

**07/10/07** The Mack Law Firm
Dawn Pryor vs. Bon-Secours-St. Joseph Health Resources, Tyco International, United States Surgical, Surgical Dynamics, Inc. et al.
Case No.: 02-2229-CA
Circuit Court of the Twentieth Judicial Circuit
Charlotte County, FL

**06/14/2007** Lynch Daskal Emery, LLP
Fleet® Phospho-soda® Litigation
New York Consolidated Cases
New York, NY

**02/20/07** Motley Rice, LLC
Mayda Nix surviving mother of Christopher Nix v GlaxoSmithKline PLC
No. CV 06-0043-PHX-EHC
United States District Court District of Arizona
Phoenix, AZ

**02/09/07** Becnel Law Firm, LLC
Sandra Jacob, Kirt Jacob, Sr. vs. Caesars Entertainment, Inc.
Civil Action No. 05-0805 Section "L"
United States District Court
Eastern District of Louisiana, LA

**12/18/06** The Stone Law Firm, PLC
Nancy Matareese vs. Tom Reese and Ruth Reese
Case No. CV 2002-003954
Superior Court State of Arizona
County of Maricopa
Phoenix, AZ

**10/11/06** Guidant Corp Implantable Defibrillators
Products Liability Litigation MDL N. 05-1708
U.S. District Court
Third Division, MN

**9/21/06** Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Carolyn Reece vs. AstraZeneca Pharmaceuticals, L.P.
Case Number 1:05-CV-00322
U.S. District Court Southern District of Ohio
Western Division, OH

**8/18/06** The McNair Law Firm
Monica Weston vs. Kim’s Dollar Store and CIBA Vision, a Division of Novartis Company
Civil Action No. 05-CP-40-0655
In the Common Court State of South Carolina
Pleas County of Richland
Columbia, SC

**7/28/06** The Kim Law Firm
Charles McCullough vs. Aventis Pasteur Inc.
C.A. No. A-04-CV-525-LY
United States District Court
Western District of Texas
Austin Division, TX

**7/21/06** Kershaw, Cutter, Ratinoff & York
Barbara Black vs. Ethicon, Inc (dba Gynecare Worldwide), Johnson & Johnson, Lifecore Biomedical Inc., Vital Pharma, Inc.
Civil Division
Circuit Court of the 15th Judicial Circuit in and for
Palm Beach County, FL

**5/8-9/06** Locks Law Firm
E and D. Doherty vs. Merck & Co, Inc.
Vioxx Litigation
Superior Court of New Jersey Law
Division- Atlantic County
Docket No. ATL-L-0638-05-MT, Case No. 619
Atlantic City, NJ

**12/20/07**
**11/14/07**
**07/19/07**
**04/19/06** Janet, Jenner & Suggs, LLC
Prempro Products Litigation
In the Court of Common Pleas Philadelphia County
In Re: Hormone Therapy Case MDL Docket No. 4:03CV1507 WRW
In the United States District Court for Eastern District of Arkansas
Western District, Little Rock, AR

**3/27/06** Carter Morey, Esq
Edna R. Judd vs. TMC Healthcare dba Tucson Medical Center
No. C20043079
In and For the County of Pima
Superior Court of the State of Arizona
Tucson, AZ

**01/16/06** Wallace & Graham, P.A.
John and Jane Doe2, Individually and as Guardians ad litem of Minor Child Doe 2
vs. Ortho-Clinical Diagnostics, Inc.
United States District Court, Middle District of North Carolina
Case No. 1:03CV00669
Charlotte, NC

**1/04/06** Philip K Fife Law Office
Martha Stewart vs. Sulzer, LTD
No. BC 262780
Superior Court State of California For the County of Los Angeles
Los Angeles, CA

**12/16/05**
**11/10/05** Kershaw, Cutter, Ratinoff & York
Renee Contratto vs. Ethicon, Inc(dba Gynecare Worldwide), Johnson & Johnson, Lifecore Biomedical Inc., Vital Pharma, Inc.
Case No. C-03-3804 ARB
United States District Court
Northern District of California
Sacramento, CA

**11/09/05** Walkup, Melodia, Kelly, Wecht & Schoenberger
V. Buonocore, Estate of C. Buonocore vs. Catholic Healthcare West, Sequoia Hospital, Cardeon Corporation, et al.
CIV 438695
Superior Court of State of California
County of San Mateo, CA

**9/08/05** Motley Rice, LLC
Estate of Estle Dutschke vs. Hoveround Corporation
Case No. 3:03-CV-00704-MO
US District Court Western District of Kentucky
Louisville, KY

**7/15/05** Law Office of R. Michael Shickich
Brian Renovitch vs. Teton County Hospital District, Synthes, Inc.
Civil No. 04-CV-188-J
For the District of Wyoming
Jackson, WY

**4/4/06**
**7/11/05** Fowler, White, Boggs, & Banker, P.A.
Grother, Bender , Williams vs. M. Meriwether; Doctor's Hospital of Sarasota; Clarus Medical Systems, Inc. and Surgical Innovations and Service Company
Case No. 98-6451-CA-01
Circuit Court of the Twelfth Judicial Circuit in and For Sarasota County, FL
Sarasota, FL

**12/01/05**
**06/10/05** Meyer & Williams, LPC
Brenda & Paul Saban vs. Idaho Urgent Care, Lumenis Inc., Coherent Inc.
District Court of the Seventh Judicial District State of Idaho
Case No. CV-03-1340
County of Bonneville, ID

**05/13/05** John S. Simmons, L.L.C.
Moses Ashford, Sr. for Mary Bell Ashford (deceased) vs. Brian Center of Central Columbia, Inc. and Mariner Post-Acute Network
Civil Action No. 00-CP-40-4682
County of Richland, SC

**05/24/05**
**05/03/05** Edwards. Frickle, Anner-Hughes & Cook
P. Vinion and C. Riddle vs. Amgen Inc. and Immunex Inc.
United States District Court for District of Montana
C V 03-202-M-DWM
Missoula Division, MT

**02/02/05** Robins, Kaplan, Miller & Ciresi LLP
John Doschadis vs. Zimmer, Inc.
United States District Court for the District of Minnesota
Case No. 03-CV-6439
Minneapolis, MN

**03/15/05**
**03/14/05**
**12/06/04**
**12/07/04** Sutter Law Firm
Carlos Johnson, et al. vs. Ethicon, Inc., Johnson & Johnson Health Care Systems
Consumer Litigation
Charlestown, WV

**11/11/04** Tobin Koster Oleckna Reitman Greenstein Konray, PC
Roger Allan vs. Terens, et al.
Docket No. M 10-L-3030-01
Middlesex County, NJ

**10/27/04** Rheingold, Valet, Rheingold, Shkolnik
Marlus Hardy vs. Bayer Corporation
Second Judicial District Court Civil No. 010902836
Weber County, UT

**9/21/04** Phillip K. Fife Law Office
Juliet Cueva vs. FKA Sulzer Orthopedics, Ltd., et al.
Superior Court of the State of California Case No: 01CC07945
County of Orange, CA

**9/10/04** Edmond Vines Gorham Waldrep PC
Mary K Paulin vs. Aventis Pasteur Inc., et al.
Bibb County Circuit Court Case N. CV-2002-190
Birmingham, AL

**8/24/04** The Velez Law Firm
Kirsten Ross vs. Cyberonics, Inc.
Case No. SCV 14716
Superior Court of State of California
In and For the County of Placer
Sacramento, CA

**5/26/04** Robins, Kaplan, Miller & Ciresi LLP
Robert G. Oakberg, Ph.D. vs. Zimmer, Inc.
United States District Court for District Court of Montana
Cause No. CV-03-47-BU-SHE
Butte Division, MT

**5/26/04** Robins, Kaplan, Miller & Ciresi LLP
Allen Lillebo, Evelyn Reiling, vs. Zimmer, Inc.
United States District Court for District Court of Minnesota
Case No. 03-2919, Case No. 03-2920.
Minneapolis, MN

**2/25/04** William C. Greene, Attorney at Law
F. George vs. Aultman Hospital, Cardiovascular Consultants, Inc., et al.
New Philadelphia, OH

**APPENDIX 3**

Summary of Failure to Warn

- In failing to instruct or warn the U.S. medical community that the safety of the device had not been established for use in the shoulder joint space;
- In failing to disclose to the U.S. medical community that continuous injection of commonly used anesthetics, such as lidocaine or marcaine with or without epinephrine, in volumes of 250 cc's or more, over two days or more, into the shoulder joint space, may cause serious and permanent injury to the joint cartilage;
- In failing to include a precaution against placing the catheter of the pain pump directly in the shoulder joint space;
- In failing to provide to the U.S. medical community adequate instructions for the safe use of the device, specifically failing to identify quantities, flow rates, and types of anesthetic medications that could be safely and effectively used in the shoulder joint space;
- In failing to disclose to the U.S. medical community that the effectiveness of the device was uncertain for use directly in the shoulder joint space;
- In failing to disclose to the U.S. medical community that the FDA had considered requests to add use of the pain pump in a joint space as an indication for use in pain pump labels, but would not clear the addition of this use of pain pumps;
- Promoting and marketing the pain pump for use in the joint space after the FDA had considered and rejected such an indication for use;
- In failing to test the pain pumps to establish that they could safely be used within the shoulder joint space; and
- In failing to disclose to the U.S. medical community that testing to establish safety of using the pumps in a joint space had not been done.